Daniel M. Petrocelli
Brett J. Williamson
Jeffrey A. Barker
David S. Almeling
(*pro hac vice* applications forthcoming)
**O'MELVENY & MYERS LLP**
Times Square Tower
7 Times Square
New York, New York 10036
Tel: (212) 326-2000
FAX: (212) 326-2061

Lawrence S. Lustberg
Daniel J. McGrady
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
Tel: (973) 596-4500
Fax: (973) 596-0545

*Attorneys for Plaintiffs*
*Par Pharmaceutical, Inc.*
*and Par Sterile Products, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., and PAR STERILE PRODUCTS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> QUVA PHARMA, INC., STUART HINCHEN, PETER JENKINS, and MIKE RUTKOWSKI, <br><br> Defendants. | Civil Action No. _____ <br><br> *Document Electronically Filed* |

## <u>COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF</u>

Plaintiffs Par Pharmaceutical, Inc. ("Par Pharmaceutical") and Par Sterile Products, LLC ("Par Sterile") (collectively, "Par"), by and through their counsel, allege for their Complaint against Defendants QuVa Pharma, Inc. ("QuVa"), Stuart Hinchen, Peter Jenkins, and Mike Rutkowski (collectively, "Defendants"), as

follows:

## NATURE OF THE CASE

1.  This is a blatant case of trade secrets theft.  Defendant QuVa and its principals, Defendants Stuart Hinchen and Peter Jenkins, were desperate to begin competing with Par's life-saving, FDA-approved, vasopressin-based cardiopulmonary drug Vasostrict®, but were unwilling to spend the time and money to do the research and development work necessary to launch their own alternative product.  So they took a short cut.  Just weeks after founding QuVa, Hinchen and Jenkins (themselves former Par Sterile executives) began a poaching campaign to hire away key employees with intimate knowledge of Par's trade secrets regarding the development, validation, regulatory approval, and market introduction of Vasostrict® and other vasopressin products.  To date, QuVa has hired at least nine former Par Sterile executives, managers, and consultants, highlighted by the recent addition of former Par Sterile Senior Vice President and General Manager, Defendant Mike Rutkowski.

2.  Internal Par email records show that in the weeks and months leading up to his April 14, 2017 departure from Par Sterile, Rutkowski was communicating with QuVa personnel and, in violation of Par's rights, disclosing highly confidential and proprietary information relating to manufacturing and storage methods, operating details and results, business strategies for Vasostrict®, and

other confidential Par information. Rutkowski hid these communications from Par, which has only recently discovered them after conducting an investigation. This investigation has also uncovered that Rutkowski additionally violated Par company policy by, on information and belief, improperly downloading numerous Par documents to a personal hard drive within days of giving notice that he was leaving the company. These documents include, on information and belief, confidential Par documents regarding personnel, finances, corporate strategy, and many other topics.

3.  Additionally, on April 19, 2017—just five days after Rutkowski's departure from Par Sterile—QuVa submitted a letter to the U.S. Food and Drug Administration ("FDA") seeking to add vasopressin to a list of active ingredients for drug compounding in an effort to avoid the formal FDA approval process, which effort, if successful, would allow QuVa to directly compete with Par Sterile's formally FDA approved Vasostrict®. Although the letter was rife with factual misrepresentations, the FDA nevertheless relied on it in deciding to add vasopressin to its Bulk Drug Substances List dated as of July 1, 2017, indicating that it is now under "Category 1" of bulk drug substances under evaluation pursuant to Section 503B of the Food, Drug and Cosmetic Act of 1938 ("FDCA"). Inclusion in Category 1 means that "the FDA does not intend to take action against an outsourcing facility" that compounds the drug substance at issue while it is

under evaluation, effectively giving a green light to an outsourcing facility such as QuVa to begin compounding.

4.     As a result of the FDA's action and Par's investigation and forensic analysis, Par is informed and believes that QuVa either has begun or imminently will begin manufacturing and selling its competing drug compound using Par's confidential and proprietary trade secrets, actions that will irreparably harm Par if not enjoined.

5.     In light of these actions, Par has no choice but to bring this action to prevent QuVa from unfairly competing and improperly usurping Par's significant investment in Vasostrict® and other vasopressin products.

## THE PARTIES

6.     Plaintiff Par Sterile is a Delaware limited liability company with its headquarters in Chestnut Ridge, New York.  Par Sterile is a wholly-owned, indirect subsidiary of Par Pharmaceutical.  In 2014, Par Pharmaceutical acquired JHP Group Holdings, Inc., which was the ultimate parent company of JHP Pharmaceuticals, LLC ("JHP"), a Delaware limited liability company that was headquartered in Parsippany, New Jersey, and changed JHP's name to Par Sterile.

7.     Plaintiff Par Pharmaceutical is a New York corporation with its headquarters in Chestnut Ridge, New York.  Par Pharmaceutical is a wholly-owned, indirect subsidiary of Endo International plc.

8.     Par is informed and believes that defendant QuVa is a Delaware corporation with a regular and established place of business in Bloomsbury, New Jersey.

9.     Par is informed and believes that defendant Stuart Hinchen is a resident of Saddle River, New Jersey.  Hinchen served as President and Chief Executive Officer of JHP in Parsippany, New Jersey from its founding in 2007 until the acquisition of JHP Group Holdings, Inc., which was the ultimate parent company of JHP, by Par Pharmaceutical in February 2014 through a reverse subsidiary merger, and as President of Par Sterile in Woodcliff Lake, New Jersey from February 2014 to June 11, 2014, and by doing so availed himself of the privileges of New Jersey law.

10.     Par is informed and believes that defendant Peter Jenkins is a resident of New York City, New York.  Jenkins served as Chief Development Officer of JHP in Parsippany, New Jersey from its founding in 2007 until the acquisition of JHP Group Holdings, Inc., which was the ultimate parent company of JHP, by Par Pharmaceutical in February 2014 through a reverse subsidiary merger, and as Chief Development Officer of Par Sterile in Woodcliff Lake, New Jersey from February 2014 to June 6, 2014, and by doing so availed himself of the privileges of New Jersey law.

11.     Par is informed and believes that defendant Mike Rutkowski is a

resident of the State of New Jersey and is an employee of QuVa in Bloomsbury, New Jersey.  Rutkowski served as Vice President and General Manager of JHP from May 2013 until the acquisition of JHP Group Holdings, Inc., which was the ultimate parent company of JHP, by Par Pharmaceutical in February 2014 through a reverse subsidiary merger.  As Senior Vice President and General Manager of Par Sterile from February 2014 to April 14, 2017, Rutkowski regularly traveled to and communicated with other executives at JHP's headquarters at Parsippany, New Jersey, and subsequently at Par Sterile's headquarters in Woodcliff Lake, New Jersey, and by doing so availed himself of the privileges of New Jersey law.

12.     Par is informed and believes that the Defendants, and each of them, were the agents, servants, and employees of each of their co-defendants, and in doing the things alleged herein were acting within the course and scope of their authority as such agents, servants, and employees and with the permission and consent of their co-defendants, and each of them.  In particular, Par is informed and believes that Defendants Hinchen, Jenkins, and Rutkowski have acted and are presently acting as the agents and/or employees of QuVa and working on its behalf.

## JURISDICTION AND VENUE

13.     This action arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, *et seq.*, as amended, and New Jersey law.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over Defendants.  Along with each of the Defendants' substantial and continuing contacts with New Jersey as alleged herein, Par is informed and believes that Defendants' actions causing Par's injury, even if initiated at times outside of New Jersey, were expressly aimed at New Jersey, with knowledge that they would cause harm in New Jersey.  These purposeful actions constitute at least minimum contact with New Jersey such that the maintenance of this suit in this Court does not offend traditional notions of fair play and substantial justice.  This Court's personal jurisdiction over Hinchen and Jenkins is further established by virtue of their express consent to personal jurisdiction in the federal courts of New Jersey as set forth in their respective written agreements, described *infra*.

15.     As is further set forth herein, a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred and have a direct effect in this District.  Venue therefore lies in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2).

# GENERAL ALLEGATIONS

## A.    Par Sterile Obtains The First And Only FDA-Approved Intravenous Vasopressin Injection.

16.    Par Sterile is a specialty pharmaceutical company that develops, manufactures, and sells sterile drug products, including Vasostrict®, the first (and so far only) intravenous vasopressin injection, United States Pharmacopeia ("USP"), product with a New Drug Application ("NDA") approved by the FDA. Developed using proprietary technologies and advanced medical methods, Vasostrict® increases blood pressure in adults with vasodilatory shock (*e.g.*, postcardiotomy or sepsis) who remain hypotensive despite the administration of fluids and catecholamines (such as norepinephrine), restoring blood pressure to safe levels through the narrowing of blood vessels and the increase in blood volume due to water retention in the body.

17.    Vasopressin is the synthetic form of a polypeptide hormone secreted by the posterior pituitary gland.  For many decades prior to 2014, vasopressin was allowed to be sold as an unapproved drug in the United States, due to its having been marketed as a therapeutic agent prior to the 1938 enactment of the FDCA. Among the companies manufacturing and selling unapproved vasopressin injection was JHP, a privately-held company founded in 2007 and led by Defendants Jenkins and Hinchen (the "JH" in "JHP").  JHP's name was changed to Par Sterile when JHP Group Holdings, Inc., which was the ultimate parent company of JHP,

was acquired by Par Pharmaceutical in 2014.

18.    In recent years, the FDA has sought to have manufacturers of marketed unapproved drugs seek FDA approval for such products.  Specifically, in September 2011, the FDA issued guidance to drug manufacturers stating that it would begin taking steps to "encourage the manufacturers of these products to obtain the required evidence and comply with the approval provisions of the Federal Food, Drug, and Cosmetic Act [] or remove the products from the market."

19.    In response to the FDA's guidance, JHP, then under the control of Defendants Hinchen and Jenkins, pursued the FDA's extensive NDA process to seek approval from the FDA to manufacture and sell a vasopressin injection, USP, product pursuant to Section 505(b)(2) of the FDCA, 21 U.S.C. § 355(b)(2).  On September 26, 2012, JHP submitted to the FDA NDA No. 204485 for its intravenous vasopressin injection under the name Vasostrict®.

20.    On February 25, 2014, Par Pharmaceutical acquired JHP Group Holdings, Inc., which was the ultimate parent company of JHP, through a reverse subsidiary merger for total consideration approximating $490 million, and JHP's name was changed to Par Sterile.

21.    Both before and after the acquisition, Par invested substantial amounts of time and money in its development program for Vasostrict® to satisfy the FDA's requirements for an NDA.  Those requirements, which are detailed in 21

C.F.R. § 314, *et seq.*, include demonstrating:  (a) the safety and efficacy of the drug; (b) the ways in which the benefits of the drug outweigh any risks associated with its use; and (c) that the methods used in manufacturing the drug, and the controls used to maintain the drug's quality, are adequate to preserve the drug's identity, strength, quality, and purity.  Par Sterile also was required to demonstrate and document the results of clinical tests, how the drug behaves in the human body, and how it is manufactured, processed and packaged.

22.    Par's substantial investment in the development program for Vasostrict® and in the NDA process was rewarded on April 17, 2014, when Par Sterile received FDA approval to sell Vasostrict®, the first (and so far only) FDA-approved intravenous vasopressin injection, USP.  Par Sterile thereafter applied for and received numerous supplemental FDA approvals regarding the product's shelf life, storage, formulation and dosage, and began commercial sales of Vasostrict® in November 2014.

23.    Par has devoted significant time and resources researching, developing, and validating different formulations of Vasostrict® and other vasopressin products.  This process involved years of effort and collaboration across different departments, including laboratory research, formulation development, analytical chemistry, quality control and assurance, validation, process development, and manufacturing.  Through largely time-consuming trial-

and-error experimentation with different pH adjustments, buffers, excipients, temperatures and other experimental conditions, Par achieved important and commercially valuable increased efficiencies in manufacturing and improved products.

**B.    Par's Trade Secrets And Its Extensive Measures To Protect Them.**

24.    Par's development of Vasostrict® and other vasopressin products, including the work performed as part of NDA No. 204485 and the supplements thereto, as well as Par Sterile's ongoing efforts to manufacture and sell an increasing variety of formulations of Vasostrict®, has produced a substantial amount of highly sensitive and proprietary trade secret information, the confidentiality of which is critical to the significant value that these products represent to Par.  Included among these trade secrets is technical know-how relating to chemical compositions and properties, batch quantities, assays, test methods and specifications, stability protocols, validation methods, quality control, and research & development efforts to obtain increased shelf life under both refrigeration and room temperature storage conditions, as well as confidential information relating to the manufacture, packaging, distribution, marketing, and sale of Vasostrict® and other vasopressin products, including customer identities, industry competitive intelligence, strategic plans, results of operations, and short- and long-term business strategies and initiatives (collectively, the "Trade Secrets").

25.     To protect the confidentiality of the Trade Secrets, Par has implemented numerous security measures.  For example, Par's physical facilities (including, in particular, Par's laboratory and manufacturing facilities located in Rochester, Michigan, where Vasostrict® is presently manufactured and packaged for distribution and sale, and where research and development work on new vasopressin products is conducted) are enclosed by secure fencing (including barbed wire) and monitored 24 hours a day by surveillance cameras and manned patrols.  Entry to and exit from Par facilities is controlled, and access is allowed only to authorized individuals.  Within Par's facilities, tangible copies of Trade Secret information, including but not limited to lab notebooks, batch records, and quality control procedures and protocols, are maintained in secured and locked locations, access to which is limited to those with a need to know and who use the Trade Secrets in the development and manufacturing process.

26.     Par maintains certain Trade Secrets in the form of electronic records that are accessible via the Par secure computer network.  Access to that network is limited to Par employees, and access to electronically stored Trade Secret information on that network is password protected and monitored by Par security personnel.  All relevant Par employees are required to read, acknowledge, and execute a confidentiality agreement as a condition of, and in consideration for, their employment, by which they agree not to disclose any confidential or

proprietary information to anyone outside of the company, and not to use any of that information in connection with work performed for any future employer.

27. Par has also implemented corporate policies and trainings to protect its Trade Secrets and other confidential information, including information technology security guidelines that, *inter alia*, strictly limit the downloading, copying, or distribution of the company's confidential information by its employees, except as specifically authorized and required for the performance of the employee's duties.

28. Par also requires third parties, such as partners and vendors, to sign non-disclosure agreements. And Par limits access to confidential information to such third parties on an as-needed basis.

## C. Defendants Hinchen And Jenkins Form QuVa And Solicit Par Sterile's Employees To Unfairly Compete With Par.

29. As the founders of JHP, and subsequently as executives with Par Sterile, Defendants Hinchen and Jenkins had detailed knowledge of and access to certain Trade Secrets and other Par confidential information, and both were parties to employment agreements under which they promised not to "directly or indirectly, disclose, reveal, divulge, publish or otherwise make known to any Person or use any Confidential Information for any reason or purpose whatsoever, except for the proper discharge of the Employee's duties to the Company under this Agreement." "Confidential Information" is broadly defined in the

employment agreements to include "all information, data, agreements, documents, reports, 'know-how', interpretations, plans, studies, forecasts, projections and records (whether in written form, electronically stored or otherwise) containing or otherwise reflecting information [including] . . . operating procedures, techniques, systems, processes and methods, all intellectual property, product and service information, including research and development and proposed products and services . . . and . . . other commercial 'knowhow', trade secrets and information not available to the public generally."

30.    On June 6, 2014, shortly after Par Sterile received FDA approval for Vasostrict®, Jenkins resigned his employment with Par Sterile.  As part of his resignation, Jenkins received a substantial severance payment.  He also executed a "Separation Agreement and Release" in which he acknowledged having access to Par Confidential Information, as defined in the employment agreement described above, and agreed that he "shall not at any time, other than as may be required in connection with the performance by him of any remaining duties or obligations under the Employment Agreement, directly or indirectly, use, communicate, disclose or disseminate any Confidential Information in any manner whatsoever (except as may be required under legal process by subpoena or other court order)."

31.    A few days later, on June 11, 2014, Hinchen likewise resigned his employment with Par Sterile.  As part of his resignation, Hinchen received a

substantial severance payment.  He also executed a "Separation Agreement and Release" in which he acknowledged having access to Par Confidential Information as defined in the employment agreement described above, and agreed that he "shall not at any time, other than as may be required in connection with the performance by him of any remaining duties or obligations under the Employment Agreement, directly or indirectly, use, communicate, disclose or disseminate any Confidential Information in any manner whatsoever (except as may be required under legal process by subpoena or other court order)."

32.    Par is informed and believes that at, about, or before the time of their resignations, Hinchen and Jenkins began secretly planning and preparing to launch a new pharmaceutical company that would compete with Par for business from hospitals and other healthcare providers using a hybrid "compound manufacturing" model to avoid the time and expense of going through the rigorous FDA new drug approval that applies to drug manufacturers such as Par Sterile.  Compounding by an outsourcing facility is a practice in which a person combines, mixes, or alters ingredients of a drug to create a medication under the supervision of a licensed pharmacist.  Compounded drugs are not required to be FDA-approved and may lack an FDA finding of manufacturing quality before being marketed, though they are required to comply with Current Good Manufacturing Practices ("CGMP") guidelines and inspections by the FDA.

33.     On July 29, 2015, Hinchen and Jenkins formally incorporated QuVa in Delaware, and shortly thereafter simultaneously announced the acquisition of a sterile drug compounding facility in Sugar Land, Texas, and a majority equity investment from Bain Capital Private Equity, a global investment firm.   QuVa subsequently announced the acquisition of a manufacturing facility in Bloomsbury, New Jersey.

34.     On or about December 15, 2015, less than six months after QuVa's formation, QuVa announced a six-person executive leadership team, four members of which were former Par Sterile employees or consultants.

35.     Par is informed and believes that QuVa is pursuing a strategy of rapid growth to become a major competitor in the sterile drug manufacturing market by, in part, poaching experienced employees of Par Sterile, including executives and managers with valuable expertise in research and development, quality control, testing and validation, process development, and manufacturing methods.   In particular, Par is informed and believes that QuVa has targeted Par Sterile employees with intimate knowledge of the Trade Secrets and other confidential information regarding sterile manufacturing, Vasostrict®, and Par's other vasopressin products.

36.     Consistent with this strategy, Par is informed and believes that QuVa solicited, induced, and ultimately hired the following employees, on or about the

16

dates indicated:

(a)     David Short, Par Sterile's Senior Director of Quality Control, on or about October 26, 2015;

(b)     Stephen Rhoades, Par Sterile's Manager of Sterility Assurance, on or about October 26, 2015;

(c)     Travis McGrady, Par Sterile's Manager of Deviations and Lot Disposition, on or about February 15, 2016;

(d)     David "Mike" Hartley, Par Sterile's Director of Technical Services, on or about March 14, 2016;

(e)     Guy Thompson, Par Sterile's Supervisor of the Microbiology Lab, on or about November 14, 2016;

(f)     Mike Rutkowski, Par Sterile's Senior Vice President and General Manager of the Rochester, Michigan facility, on or about April 17, 2017;

(g)     Ashley Short, Par Sterile's Quality Control Chemist II, on or about May 8, 2017; and

(h)     Chinnasamy Subramaniam, Par Sterile's Manager of Analytical Research & Development, on or about June 28, 2017.

37.     Par is further informed and believes that, in or before January 2016, QuVa also solicited, induced, and ultimately hired Donna Kohut, a former Par

Sterile consultant who had accesses to certain of Par's Trade Secrets and other confidential information through her responsibility for certain operations at the Rochester, Michigan facility, and who also read, acknowledged, and executed a confidentiality agreement identical in all material respects to the confidentiality agreements described above as a condition of, and in consideration for, her engagement.

**D.  Par's Discovery Of QuVa's Actual And Threatened Misappropriation Of The Trade Secrets.**

38.    In June 2017, Par learned for the first time that, on or about April 19, 2017, QuVa had submitted a letter to the FDA requesting that vasopressin be added to the list of bulk drug substances under "Category 1" pursuant to the FDA's "Interim Policy on Compounding Using Bulk Drug Substances Under Section 503B of the Federal Food, Drug, and Cosmetic Act" (the "Interim Policy").  The Interim Policy is intended to provide guidance to the pharmaceutical industry regarding the submission and review of nominations of substances to be included on the FDA's list of bulk drug substances that may be used in compounding conducted by outsourcing facilities under section 503B of the FDCA.

39.    In July 2017, Par learned that, notwithstanding numerous material factual misrepresentations in QuVa's April 19 letter, the FDA had responded to QuVa's request by adding vasopressin to its Bulk Drug Substances List dated as of July 1, 2017, indicating that vasopressin is now under "Category 1" of bulk drug

substances under evaluation pursuant to Section 503B of the FDCA.  Inclusion in Category 1 means that "the FDA does not intend to take action against an outsourcing facility" that compounds the substance at issue while it is under evaluation.

40.    This information, coupled with QuVa's solicitation and hiring of multiple Par employees involved in the development, testing and manufacture of Par Sterile's Vasostrict® and other vasopressin products, caused Par to launch an investigation into whether QuVa and/or any of its agents or employees had improperly disclosed or used Par's Trade Secrets and other confidential information.  While that investigation is ongoing and has necessarily been limited to information within Par's ability to access, the results to date have been shocking and have led Par to conclude that Defendants are engaged in actual and threatened misappropriation of the Trade Secrets and other confidential information.

41.    A review of certain internal Par emails shows that defendant Rutkowski, Par Sterile's former Senior Vice President and General Manager of its Rochester, Michigan facility (and QuVa's most senior hire from Par) began disclosing Par's Trade Secrets and other confidential information to QuVa by email at least as early as June 2016 (ten months *before* he resigned from Par Sterile).  Those improper email communications continued until just prior to Rutkowski's departure from Par Sterile.

42.    For example, in a June 28, 2016 email, Rutkowski delivered to Donna Kohut (the former Par Sterile consultant who by that date had joined QuVa) a Par "backorder report," disclosing in detail (including average days aging and total backorder amount, broken down by facility location) certain Trade Secrets in the form of confidential Par business information.

43.    In an October 25, 2016 email exchange, Rutkowski informed Kohut that he was willing to provide "any slides" that she would need for an upcoming QuVa employee meeting, and further improperly disclosed confidential Par business information regarding "unit counts" at the Rochester, Michigan facility, and the fact that Par was performing product testing using certain metrics that he believed have an effect on absorption rates.

44.    In a March 9, 2017 email exchange, Rutkowski provided Kohut with Par Trade Secrets and other confidential information relating to how to pass an FDA facility inspection, to which Kohut responded, "[a]ppreciate the tip."  This information was particularly important to QuVa, as the FDA had previously determined that the QuVa facility in question failed to meet certain quality control standards related to maintaining sterility and avoiding contamination.  Notably, Rutkowski's email was in response to an earlier email from Kohut, forwarding an internal QuVa announcement (distributed to former Par Sterile employees Rhoades and Hartley, who were by that time QuVa employees) that a QuVa facility was "in

20

operation," to which Rutkowski responded "Way to go team!!!!!!!!!!!!!!!!!,"
evidencing that by at least March 2017 Rutkowski considered his "team" to be
QuVa, not his employer Par Sterile.

45.     In a March 13, 2017 email, Rutkowski and Kohut discussed some of
their joint efforts to recruit Par Sterile employees from QuVa while Rutkowski was
still employed by Par Sterile.  After informing Kohut that a Par Sterile employee
had announced he was departing for another company, Kohut lamented that she
was "sorry to have missed out on him joining QuVa, yet he is closer in distance *so
that would actually facilitate hire without any of the politics between the
organizations*."   (emphasis added).   Rutkowski responded with a damning
admission of his own efforts to solicit Par Sterile employees for QuVa: "*I spoke to
him but he elected to go elsewhere*.  Not much else I can do." (emphasis added).

46.     In a second March 13, 2017 email, Rutkowski sent Kohut an internal
Par PowerPoint presentation containing Trade Secrets and other confidential
information regarding Par's historical operations and sales.

47.     And on March 15, 2017—just prior to giving notice to Par Sterile that
he was leaving the company—Rutkowski forwarded to Kohut at QuVa three
detailed, internal Par PowerPoint presentations containing many of Par's sensitive,
highly confidential and proprietary Trade Secrets, including supply chain metrics
(such as batching performance, yields, deviation rates, complaints, recalls, perfect

batches, and values of backorders), monthly finances and budgets, training and personnel developments, and future business plans relating to planned new product launches, including vasopressin products.   In reply, QuVa's Kohut candidly announced, *"I'll steal with pride just like you taught me."* (emphasis added). Rutkowski responded favorably:  "LOL Love it!!!!!"

48.    On information and belief, Rutkowski's misconduct did not end with his emails to QuVa but, instead, extended to improperly downloading numerous Par documents to a personal hard drive within days of giving notice that he was leaving Par Sterile.  For example, on April 3, 2017, Rutkowski, in violation of Par's computer-usage policies, connected to his Par computer his personal Western Digital My Passport Portable External Hard Drive, a large hard drive with the storage capacity for an entire terabyte of data.  For several hours on that same day, Rutkowski accessed a large number of documents in short succession and, on information and belief, downloaded to his personal hard drive, among other things, confidential Par documents regarding FDA regulations and inspections, product tables, accounting documents, personnel documents, historical presentations about Par's Rochester facility, and a presentation to the Board of Directors.

49.    Upon   information   and   belief,   these   emails   and   forensics demonstrating Defendants' misconduct are only the tip of the iceberg, and expedited discovery of QuVa's, the individual Defendants' and their financial

backers' internal emails, documents, electronic records, and testimony under oath of QuVa principals, along with various other forms of discovery, will uncover much more, similar evidence.

50.    Additionally, Hinchen, Jenkins, and Rutkowski, through their respective roles at Par Sterile, had daily access to, and even assisted in creating, certain of Par's Trade Secrets and other confidential information.  They were involved in and exposed to, for example, technical know-how relating to chemical compositions, batch quantities, assays, test methods and specifications, stability protocols, validation methods, quality control, and other research and development efforts, as well as confidential information relating to the manufacture, packaging, distribution, marketing, and sale of Vasostrict® and other vasopressin products.

51.    Par is informed and believes that Hinchen, Jenkins, and Rutkowski have assumed roles at QuVa similar to their prior roles at Par Sterile.  Par is informed and believes that given these roles at QuVa, as well as the voluminous confidential and proprietary information they were exposed to, it would be impossible for Hinchen, Jenkins, and Rutkowski to have performed or to continue to perform any work for QuVa regarding a vasopressin drug product that would directly compete with Par Sterile's Vasostrict®—as QuVa recently described in its letter to the FDA nominating vasopressin for inclusion on the Bulk Drug Substances List—without using Par's Trade Secrets.

52.     Similarly, and on information and belief, the other former Par Sterile employees with extensive knowledge of the Trade Secrets that QuVa recently poached—David Short, Stephen Rhoades, Travis McGrady, David "Mike" Hartley, Guy Thompson, Ashley Short, and Chinnasamy Subramaniam—have all assumed roles at QuVa similar to those that they performed at Par, and in these new roles, they too will inevitably use and disclose Par's Trade Secrets for their own benefit and for the benefit of QuVa.  Par is informed and believes that QuVa has not taken the steps necessary to prevent these former Par Sterile employees from disclosing or using Par's Trade Secrets, such as assigning the employees to positions that have no relationship with sterile manufacturing.  On the contrary, QuVa is having them work directly with sterile manufacturing.

53.     In particular, and based on information and belief, all former Par Sterile employees who now work at QuVa are doing so in similar roles:

a.     Hinchen, co-founder of JHP and former President of Par Sterile, is now co-founder and Chief Executive Officer of QuVa.

b.     Jenkins, co-founder of JHP and Chief Development Officer at Par Sterile, is now co-founder and Chief Development Officer at QuVa.

c.     Hartley, former Director of Technical Services at Par Sterile, is now the Director of Facilities and Engineering at QuVa.

24

d.      David Short, former Senior Director of Quality Systems at Par Sterile, is now Vice President of Quality at QuVa.

e.      Kohut, former consultant to Par Sterile, is now Vice President of Operations & Logistics at QuVa.

f.      McGrady, former Manager of Deviations & Lot Disposition at Par Sterile, is now Director of Corporate Quality Systems at QuVa.

g.      Rhoades, former Manager of Sterility Assurance at Par Sterile, is now Director of Quality at QuVa.

h.      Thompson, former Supervisor of the Microbiology Lab at Par Sterile, is now Manager of Manufacturing Quality Assurance at QuVa.

i.      Subramaniam, former Manager of Analytical R&D at Par Sterile, is now in a similar role at QuVa.

j.      Ashley Short, former Quality Control Chemist II at Par Sterile, is now in a senior chemist role at QuVa.

k.      Rutkowski, former Senior Vice President and General Manager of the Rochester facility at Par Sterile, is now in a similar role in the New Jersey facility at QuVa.

54.     Based on the information provided above, Par is informed and believes that QuVa has used or will use Par's Trade Secrets and other confidential information to compound vasopressin products with the properties described in the

nomination submitted by QuVa to the FDA on April 19, 2017, and pursuant to the FDA's July 1, 2017 addition of vasopressin to the Bulk Drug Substance List.

55.     Par is informed and believes that it is impossible for Hinchen, Jenkins, and Rutkowski—and the former Par Sterile employees they hired—to have performed or continue to perform their respective duties at QuVa in compounding a vasopressin product without using or relying on Par's Trade Secrets.  For example, there are several challenges involved in making pre-mixed formulations of vasopressin.  To overcome these challenges and create the pre-mixed products with the characteristics that QuVa is claiming (*e.g.*, potency, sterility, and shelf life) within the time period in which QuVa made its representations, Par is informed and believes that QuVa necessarily has to rely on or use the information QuVa has misappropriated (as described above) and QuVa's employees' knowledge gained from Par's years of work on Vasostrict®, including confidential work regarding ways to stabilize vasopressin and increase its shelf-life in undiluted and diluted formulations.

## COUNT I
## Violation Of Federal Defend Trade Secrets Act, 18 U.S.C. § 1836
## (*Against All Defendants*)

56.     Par re-alleges each and every allegation set forth in Paragraphs 1 through 55, inclusive, and incorporates them herein by reference.

57.     Par is the owner of Trade Secrets and other proprietary or confidential

information relating to Vasostrict® and other vasopressin products.  These Trade

Secrets are described generally above and comprise financial, business, scientific,

technical, economic, and/or engineering information that are used in or intended

for use in interstate commerce and that accordingly constitute "trade secrets" under

18 U.S.C. § 1839(3).

58.    Par has taken reasonable steps to maintain the secrecy of its Trade

Secrets, including by, among other things, requiring confidentiality and/or

nondisclosure agreements to be signed by any party granted access to Par's Trade

Secrets and by taking the other reasonable measures described above.

59.    These confidential and proprietary Trade Secrets derive independent

economic value from not being generally known to or readily ascertainable through

proper means by another person who can obtain economic value from the

disclosure and use of such information, and have conferred a competitive

advantage on Par over others in the relevant market.

60.    Other than through Defendants' improper disclosure, the Trade

Secrets are not known to others and are not readily ascertainable by proper means

to persons who could derive value from their disclosure or use.

61.    Defendants misappropriated Par's Trade Secrets by improper means

and without authorization, including by disclosing and using and/or threatening to

disclose and use the Trade Secrets without Par's express or implied consent in the

preparation for production of a competing vasopressin drug product and in the other ways described above. Par's investigation of this conduct, which is ongoing, has identified several instances of this misappropriation by Defendants, including some described above.

62.    The Defendants' actual and threatened use and disclosure of the Trade Secrets constitutes misappropriation because, among other reasons, at the time of such use and disclosure, the Defendants knew or had reason to know that their knowledge of the Trade Secrets was derived through persons who owed a duty to Par to maintain the secrecy of the Trade Secrets.

63.    Defendants' misappropriation comprises acts, including without limitation use of Par's Trade Secrets, on or after the date of the enactment of the Defend Trade Secrets Act, May 11, 2016.

64.    Defendants' current and continued misappropriation of Par's Trade Secrets is reckless and malicious. Defendants know of the confidentiality, ownership, and use restrictions on the Trade Secrets.

65.    By reason of the above-alleged acts and conduct of Defendants, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

66.    Par is also entitled to recover compensatory and exemplary damages

from Defendants, including but not limited to the losses resulting from their wrongful conduct and any unjust enrichment caused by their misappropriation. The amount of such relief cannot be determined precisely at this time.

## COUNT II
### Violation Of The New Jersey Trade Secrets Act, N.J.S.A. 56:15-2
### (*Against All Defendants*)

67.    Par re-alleges each and every allegation set forth in Paragraphs 1 through 66, inclusive, and incorporates them herein by reference.

68.    Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products.  These Trade Secrets are described generally above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process that constitute "trade secrets" under N.J.S.A. 56:15-2.

69.    Par has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Par's Trade Secrets and by taking the other reasonable measures described above.

70.    These confidential and proprietary Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, others who can obtain

29

economic value from its disclosure or use, and have conferred a competitive advantage on Par in the relevant market.

71.     Other than through Defendants' improper disclosure, the Trade Secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

72.     Defendants misappropriated Par's Trade Secrets by improper means and without authorization, including by disclosing and using and/or threatening to disclose and use the Trade Secrets without Par's express or implied consent in the preparation for production of a competing vasopressin compound and in the other ways described above, including in the inevitable disclosure or use of the Trade Secrets in their work for QuVa.   Par's investigation, which is ongoing, has identified several instances of this misappropriation by Defendants, including some described above.

73.     The Defendants' actual and threatened use and disclosure of the Trade Secrets constitutes misappropriation because at the time of such use and disclosure, the Defendants knew or had reason to know that their knowledge of the Trade Secrets was derived through persons who owed a duty to Par to maintain the secrecy of the Trade Secrets.

74.     Defendants' current and continued misappropriation of Par's Trade Secrets is willful and malicious.   Defendants know of the confidentiality,

ownership, and use restrictions on the Trade Secrets.

75.     By reason of the above-alleged acts and conduct of Defendants, Par has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

76.     Par is also entitled to recover compensatory and punitive damages from Defendants, including but not limited to the losses resulting from their wrongful conduct and any unjust enrichment caused by their misappropriation. The amount of such relief cannot be determined precisely at this time.

## COUNT III
### Misappropriation Of Trade Secret, New Jersey Common Law
### (*Against All Defendants*)

77.     Par re-alleges each and every allegation set forth in paragraphs 1 through 76, inclusive, and incorporates them herein by reference.

78.     Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products.  These Trade Secrets are described above and comprise a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process that constitute "confidential information" under New Jersey Common Law.

79.     Defendants had regular access to the Trade Secrets throughout the

31

course of their employment with Par Sterile.   Defendants know of the confidentiality, ownership, and use restrictions on the Trade Secrets.

80.    Par has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Par's Trade Secrets and by taking the other reasonable measures described above.

81.    These confidential and proprietary Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use, and have conferred a competitive advantage on Par.

82.    Other than through Defendants' improper disclosure, the Trade Secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

83.    Defendants misappropriated Par's Trade Secrets by improper means and without authorization, including by disclosing and using and/or threatening to disclose and use the Trade Secrets without Par's express or implied consent in the preparation for production of a competing vasopressin compound and in the other ways described above.   Par's forensic investigation, which is ongoing, has identified several instances of this misappropriation by Defendants, including some

32

described above.

84.     Defendants have and will continue to misappropriate Par's Trade Secrets by using these Trade Secrets without authority, including in their preparation for the production of a competing vasopressin compound.

85.     The Defendants' actual and threatened use and disclosure of the Trade Secrets constitutes misappropriation because at the time of such use and disclosure, the Defendants knew or had reason to know that their knowledge of the Trade Secrets was derived through persons who owed a duty to Par to maintain the secrecy of the Trade Secrets.

86.     Defendants' current and continued misappropriation of Par's Trade Secrets is willful and malicious.

87.     By reason of the above-alleged acts and conduct of Defendants, Par has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

88.     Par is also entitled to recover compensatory and punitive damages from Defendants.  The amount of such relief cannot be determined precisely at this time.

## COUNT IV
## Unfair Competition, New Jersey Common Law
### (*Against Defendant QuVa*)

89.    Par re-alleges each and every allegation set forth in  Paragraphs 1 through 88, inclusive, and incorporates them herein by reference.

90.    Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products.  These Trade Secrets and other confidential information are described above and constitute "confidential information" under New Jersey Common Law.

91.    Par has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Par's Trade Secrets.

92.    These confidential and proprietary Trade Secrets derive independent economic and commercial value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use, and have conferred a competitive advantage on Par.

93.    QuVa misappropriated Par's Trade Secrets by knowingly acquiring the Trade Secrets through improper means, namely by knowingly inducing former employees to breach their duty to maintain the secrecy of the Trade Secrets.  QuVa

also misappropriated the Trade Secrets by disclosing and using the Trade Secrets without Par's express or implied consent after knowingly using improper means to acquire knowledge of the Trade Secrets.

94.     QuVa has and will continue to misappropriate Par's Trade Secrets by using these Trade Secrets without authority, including in the production of a competing vasopressin compound.

95.     QuVa's current and continued misappropriation of Par's Trade Secrets is willful, in bad faith, and malicious.   QuVa knows of the confidentiality, ownership, and use restrictions on the Trade Secrets.

96.     By reason of the above-alleged acts and conduct of QuVa, Par has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

97.     Par is also entitled to recover compensatory and punitive damages from QuVa.  The amount of such relief cannot be determined precisely at this time.

## COUNT V
### Breach Of Contract, New Jersey Common Law
### (*Against Defendant Hinchen*)

98.     Par re-alleges each and every allegation set forth in  Paragraphs 1 through 97, inclusive, and incorporates them herein by reference.

99.     During his course of employment with JHP and Par Sterile, Hinchen

signed at least three separate agreements with clauses relating to the Trade Secrets, confidential information, and non-solicitation.  The relevant provisions of these agreements remain in full force and, for good consideration, Hinchen remains obligated to comply with these provisions.  Par has satisfied all of its obligations under these valid and enforceable agreements.

100.  *First*, in December 2012, Hinchen signed an "Employee Agreement" with JHP.  This agreement defined "Confidential Information" as

> all information, data, agreements, documents, reports, 'know-how', interpretations, plans, studies, forecasts, projections and records (whether in written form, electronically stored or otherwise) containing or otherwise reflecting information [including] . . . operating procedures, techniques, systems, processes and methods, all intellectual property, product and service information, including research and development and proposed products and services . . . and . . . other commercial 'knowhow', trade secrets and information not available to the public generally . . . .

By signing the Employee Agreement, Hinchen agreed to a non-disclosure clause, which provided that Hinchen "will not, directly or indirectly, disclose, reveal, divulge, publish or otherwise make known to any Person or use any Confidential Information for any reason or purpose whatsoever, except for the proper discharge of the Employee's duties to the Company under this Agreement."

101.  Hinchen also agreed to a one-year non-solicitation clause, which provided that Hinchen

> will not in any manner, directly or indirectly . . . solicit, hire, induce or attempt to induce, or assist others to solicit, hire, induce or attempt to

induce, any director, officer, employee, contractor, consultant or agent of any member of [JHP] to either (I) leave or terminate his or her employment, consulting or other position or business relationship with any member of the Company Group, or (II) breach his or her employment, consulting or other agreement with any member of the Company Group . . . .

102.   Hinchen further agreed that JHP "will be entitled to seek equitable relief, including, without limitation, an injunction or injunctions (without the requirement of posting a bond, other security or any similar requirement or proving any actual damages), to prevent breaches or threatened breaches of this Agreement."

103.   *Second*, in December 2012, Hinchen signed a "Restrictive Covenant Agreement" with JHP.  This agreement defined "Confidential Information" as

all information of or regarding [JHP], including, without limitation . . . information regarding . . . all source code, object code, modules, algorithms, software programs, system architectures, research, inventions, processes, techniques, costs, prices, customer contracts, requirements, systems, specific needs, customer lists or any other information related to customers or prospective customers that could create a competitive advantage, plans, budgets, forecasts, financial results, operations and personnel information, all information relating to the development, formulation, production, marketing or sale of existing or contemplated products, services, systems or processes; . . . know-how, trade secrets and proprietary information . . . .

By signing the Restrictive Covenant Agreement, Hinchen agreed to a non-disclosure clause, which provided that Hinchen will not "disclose or furnish to any Person . . . any Confirmation Information."

104.   Hinchen also agreed to a three-year non-solicitation clause, which

37

provided that Hinchen will not "directly or indirectly employ, Solicit, or attempt to employ, or Solicit . . . any director, officer, consultant or employee" of JHP.

105.   *Third*, in June 2014, Hinchen signed a "Separation and Release" with Par Sterile.   This agreement provided that the parties "reiterate certain terms contained in [Hinchen]'s Employment Agreement."

106.   By signing the Separation and Release, Hinchen agreed to a non-disclosure clause, which provided that Hinchen will "not at any time, other than as may be required in connection with the performance by him of any remaining duties or obligations under the Employment Agreement, directly or indirectly, use, communicate, disclose or disseminate any Confidential Information in any manner whatsoever . . . ."

107.   Hinchen also agreed to a one-year non-solicitation clause, which provided that Hinchen will

> not in any manner, directly or indirectly . . . . solicit, hire, induce or attempt to induce . . . any director, officer, employee, contractor, consultant or agent of [Par Sterile] existing on or prior to the date of this Release to either (i) leave or terminate his or her employment, consulting or other position or business relationship with [Par Sterile] or (ii) breach his or her employment, consulting or other agreement with [Par] . . . .

108.   Hinchen further agreed that a breach of the Separation and Release "will result in immediate and irreparable damage to [Par Sterile] and will entitle [Par Sterile] to injunctive relief from a court having appropriate jurisdiction."

109.   Hinchen consented to the jurisdiction of New Jersey state and federal courts.  Hinchen's consent to jurisdiction in New Jersey supersedes any previous consent to jurisdiction in other forums.

110.   The relevant provisions of all three agreements—the Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement and Release—are still in effect.   Neither Hinchen nor Par has terminated the agreements.  To the extent the non-disclosure and non-solicitation clauses in the agreements address the same subject matters, the clauses are consistent and without contradiction among the three agreements.  To the extent that other clauses within the agreements contradict these clauses, those contradictions do not affect the enforceability of the non-disclosure and non-solicitation clauses.  As a result, all three agreements are valid contracts and independently enforceable.

111.   Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products.  These Trade Secrets are described above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process.  Some or all of the documents and information comprising Par's Trade Secrets constitute "Confidential Information" as defined in the Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement and Release.

112.   Hinchen was in possession of Par's Trade Secrets while subject to three agreements.   In those agreements, he:   (1) expressly acknowledged and confirmed the confidential nature of Par's Trade Secrets; (2) agreed to maintain the confidentiality of Par's Trade Secrets; (3) agreed not to use Par's Trade Secrets for their own purposes or the purposes of a third party; and (4) agreed not to solicit Par's employees.

113.   Hinchen knowingly and improperly disclosed Par's Trade Secrets to QuVa and used the Trade Secrets outside the scope of his employment with Par Sterile.   Hinchen's knowing and improper disclosure and use of Par's Trade Secrets constitutes a breach of the non-disclosure clauses in his Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement.

114.   Hinchen knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile.   Hinchen's knowing and improper solicitation constitutes a breach of the non-solicitation clauses in his Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement.

115.   By reason of Hinchen's breach of contracts alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage.   The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

116.   Par is also entitled to recover compensatory damages, general damages, and special damages from Hinchen.  The amount of such relief cannot be determined precisely at this time.

## COUNT VI
## Breach Of Contract, New Jersey Common Law
### (*Against Defendant Jenkins*)

117.   Par re-alleges each and every allegation set forth in  Paragraphs 1 through 116, inclusive, and incorporates them herein by reference.

118.   During his course of employment with JHP and Par Sterile, Jenkins signed at least three separate agreements with clauses relating to the Trade Secrets, confidential information, and non-solicitation.   The relevant provisions of these agreements remain in full force and, for good consideration, Jenkins remains obligated to comply with these provisions. Par has satisfied all of its obligations under these valid and enforceable agreements.

119.   *First*, in December 2012, Jenkins signed an "Employee Agreement " with JHP.  This agreement defined "Confidential Information" as

> all information, data, agreements, documents, reports, 'know-how', interpretations, plans, studies, forecasts, projections and records (whether in written form, electronically stored or otherwise) containing or otherwise reflecting information [including] . . . operating procedures, techniques, systems, processes and methods, all intellectual property, product and service information, including research and development and proposed products and services . . . and . . . other commercial 'knowhow', trade secrets and information not available to the public generally . . . .

41

By signing the Employee Agreement, Jenkins agreed to a non-disclosure clause, which provided that Jenkins "will not, directly or indirectly, disclose, reveal, divulge, publish or otherwise make known to any Person or use any Confidential Information for any reason or purpose whatsoever, except for the proper discharge of the Employee's duties to the Company under this Agreement."

120.   Jenkins also agreed to a one-year non-solicitation clause, which provided that Jenkins

> will not in any manner, directly or indirectly . . . solicit, hire, induce or attempt to induce, or assist others to solicit, hire, induce or attempt to induce, any director, officer, employee, contractor, consultant or agent of any member of [JHP] to either (I) leave or terminate his or her employment, consulting or other position or business relationship with any member of the Company Group, or (II) breach his or her employment, consulting or other agreement with any member of the Company Group . . . .

121.   Jenkins further agreed that JHP "will be entitled to seek equitable relief, including, without limitation, an injunction or injunctions (without the requirement of posting a bond, other security or any similar requirement or proving any actual damages), to prevent breaches or threatened breaches of this Agreement."

122.   *Second*, in December 2012, Jenkins signed a "Restrictive Covenant Agreement" with JHP.  This agreement defined "Confidential Information" as

> all information of or regarding [JHP], including, without limitation . . . information regarding . . . all source code, object code, modules, algorithms, software programs, system architectures, research,

> inventions, processes, techniques, costs, prices, customer contracts, requirements, systems, specific needs, customer lists or any other information related to customers or prospective customers that could create a competitive advantage, plans, budgets, forecasts, financial results, operations and personnel information, all information relating to the development, formulation, production, marketing or sale of existing or contemplated products, services, systems or processes; . . . know-how, trade secrets and proprietary information . . . .

By signing the Restrictive Covenant Agreement, Jenkins agreed to a non-disclosure clause, which provided that Jenkins will not "disclose or furnish to any Person . . . any Confirmation Information."

123.   Jenkins also agreed to a three-year non-solicitation clause, which provided that Jenkins will not "directly or indirectly employ, Solicit, or attempt to employ, or Solicit . . . any director, officer, consultant or employee" of JHP.

124.   *Third*, in June 2014, Jenkins signed a "Separation and Release" with Par Sterile.   This agreement provided that the parties "reiterate certain terms contained in [Jenkins]'s Employment Agreement."   By signing the Separation and Release, Jenkins agreed to a non-disclosure clause, which provided that Jenkins will "not at any time, other than as may be required in connection with the performance by him of any remaining duties or obligations under the Employment Agreement, directly or indirectly, use, communicate, disclose or disseminate any Confidential Information in any manner whatsoever . . . ."

125.   Jenkins also agreed to a one-year non-solicitation clause, which provided that Jenkins will

not in any manner, directly or indirectly . . . . solicit, hire, induce or attempt to induce . . . any director, officer, employee, contractor, consultant or agent of [Par Sterile] existing on or prior to the date of this Release to either (i) leave or terminate his or her employment, consulting or other position or business relationship with [Par Sterile] or (ii) breach his or her employment, consulting or other agreement with [Par Sterile] . . . .

126.   Jenkins further agreed that a breach of the Separation and Release "will result in immediate and irreparable damage to [Par Sterile] and will entitle [Par Sterile] to injunctive relief from a court having appropriate jurisdiction."

127.   Jenkins consented to the jurisdiction of New Jersey state and federal courts.   Jenkins's consent to jurisdiction in New Jersey supersedes any previous consent to jurisdiction in other forums.

128.   The relevant provisions of all three agreements—the Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement and Release—are still in effect.   Neither Jenkins nor Par has terminated the agreements.   To the extent the non-disclosure and non-solicitation clauses in the agreements address the same subject matters, the clauses are consistent and without contradiction among the three agreements.   To the extent that other clauses within the agreements contradict these clauses, those contradictions do not affect the enforceability of the non-disclosure and non-solicitation clauses.   As a result, all three agreements are valid contracts and independently enforceable.

129.   Par is the owner of Trade Secrets and other proprietary or confidential

information relating to Vasostrict® and other vasopressin products.  These Trade Secrets are described above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process.  Some or all of the documents and information comprising Par's Trade Secrets constitute "Confidential Information" as defined in the Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement and Release.

130.   Jenkins was in possession of Par's Trade Secrets while subject to the three agreements.   In those agreements, he:   (1) expressly acknowledged and confirmed the confidential nature of Par's Trade Secrets; (2) agreed to maintain the confidentiality of Par's Trade Secrets; (3) agreed not to use Par's Trade Secrets for their own purposes or the purposes of a third party; and (4) agreed not to solicit Par's employees.

131.   Jenkins knowingly and improperly disclosed Par's Trade Secrets to QuVa and used the Trade Secrets outside the scope of his employment with Par Sterile.  Jenkins's knowing and improper disclosure and use of Par's Trade Secrets constitutes a breach of the non-disclosure clauses in his Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement.

132.   Jenkins knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par

Sterile.   Jenkins's knowing and improper solicitation constitutes a breach of the non-solicitation clauses in his Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement.

133.   By reason of Jenkins's breach of contracts alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

134.   Par is also entitled to recover compensatory damages, general damages, and special damages from Jenkins.   The amount of such relief cannot be determined precisely at this time.

**COUNT VII**
**Breach Of Contract, New Jersey Common Law**
(***Against Defendant Rutkowski***)

135.   Par re-alleges each and every allegation set forth in   Paragraphs 1 through 134, inclusive, and incorporates them herein by reference.

136.   During his course of employment with JHP and Par Sterile, Rutkowski at least signed three separate agreements with clauses relating to the Trade Secrets, confidential information, and non-solicitation.   The relevant provisions of these agreements remain in full force and, for good consideration, Rutkowski remains obligated to comply with these provisions.   Par has satisfied all of its obligations under these valid and enforceable agreements.

46

137.  *First*, in March 2015, Rutkowski signed a "Trade Secret, Non-Disclosure and Restrictive Covenant Agreement."   This agreement defined "Proprietary Information" as "confidential and trade secret information, including formulas, formulations, processes, methods of manufacture, research and development including protocols and/or records, results, data, product pricing information, financial information, product pricing, marketing information, and the identify of customers including customer lists . . . ."  By signing the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement, Rutkowski agreed to a non-disclosure clause, which provided that Rutkowski will not "divulge, disclose, or communicate to anyone or any entity, directly or indirectly either during or after the termination of your employment with Par, any of Par's Proprietary Information, and agree not to use Par's Proprietary Information in your required duties for any subsequent employer."

138.  Rutkowski also agreed to a non-solicitation clause, which provided that Rutkowski will not "solicit, induce, encourage or attempt to solicit, induce or encourage any employee of Par to leave his/her employment with Par . . . or . . . hire, attempt to hire, assist in the hire or, or attempt to assist in the hire of an employee of Par."

139.  Rutkowski further agreed that Par Sterile is "entitle[d] . . . to injunctive relief from a court having appropriate jurisdiction" as a result of his

"failure to abide by this Agreement."

140.  *Second*, in September 2015, Rutkowski signed a "Proprietary Information and Nondisclosure Agreement."  Par was the intended beneficiary of this agreement between Rutkowski and Endo International plc.  This agreement defined "Confidential Information" as "trade secret and . . . information . . . disclosed to or known by me as a consequence of my employment and . . . not generally known outside of Employer."  By signing the Proprietary Information and Nondisclosure Agreement, Rutkowski agreed to a non-disclosure clause, which provided that Rutkowski will not "disclose or use at any time, either during or subsequent to my employment, any Confidential Information of employer which I develop or otherwise become informed of during my employment, except as required in my duties to Employer."

141.  Rutkowski also agreed to a non-solicitation clause, which provided that Rutkowski will "not directly or indirectly, either for myself or through an agent, consultant, firm or corporation, solicit or cause loss of . . . employees from Endo."

142.  *Third*, in April 2017, Rutkowski signed an "Employee Certificate of Compliance."   Par was the intended beneficiary of this agreement between Rutkowski and Endo International plc.  By signing the Employee Certificate of Compliance, Rutkowski agreed to a non-disclosure clause, which provided that

Rutkowski was:

> obligated to preserve in confidence and not use for my own benefit or the benefit of any third party of any of the following: confidential and proprietary information, knowledge, data, documents or other information relating to the Company's products, systems, databases, research programs, know-how, designs, data, customer lists or any other proprietary and/or confidential information pertaining to any business of the Company or any of its subsidiaries, parents or affiliated companies, or information pertaining to any of the Company's suppliers, clients, customers, employees, consultants, or independent contractors that I had in my possession or had access to during my time of employment with the Company.

143. The relevant provisions of all three agreements—the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement, the Proprietary Information and Nondisclosure Agreement, and the Employee Certification of Compliance—are still in effect.  Neither Rutkowski nor Par has terminated the agreements.  To the extent the non-disclosure and non-solicitation clauses in the agreements address the same subject matters, the clauses are consistent and without contradiction among the three agreements.  To the extent that other clauses within the agreements contradict these clauses, those contradictions do not affect the enforceability of the non-disclosure and non-solicitation clauses.   All three agreements are valid contracts and independently enforceable.

144. Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products.  These Trade Secrets are described above and are comprised of a formula, business data

compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process.  Some or all of the documents and information comprising Par's Trade Secrets constitute "Proprietary Information" or "Confidential Information" as defined in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement, the Proprietary Information and Nondisclosure Agreement, and the Employee Certification of Compliance.

145.   Rutkowski was in possession of Par's Trade Secrets while subject to the three agreements.  In those agreements, he:  (1) expressly acknowledged and confirmed the confidential nature of Par's Trade Secrets; (2) agreed to maintain the confidentiality of Par's Trade Secrets; (3) agreed not to use Par's Trade Secrets for their own purposes or the purposes of a third party; and (4) agreed not to solicit Par's employees.

146.   Rutkowski knowingly and improperly disclosed Par's Trade Secrets to QuVa and used the Trade Secrets outside the scope of his employment with Par Sterile.  Rutkowski's knowing and improper disclosure and use of Par's Trade Secrets constitutes a breach of the non-disclosure clauses in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement, the Proprietary Information and Nondisclosure Agreement, and the Employee Certification of Compliance.

147. Rutkowski knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment

agreements with Par Sterile.  Rutkowski's knowing and improper solicitation constitutes a breach of the non-solicitation clauses in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement and the Proprietary Information and Nondisclosure Agreement.

148.   By reason of Rutkowski's breach of contracts alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

149.   Par is also entitled to recover compensatory damages, general damages, and special damages from Rutkowski.  The amount of such relief cannot be determined precisely at this time.

## COUNT VIII
### Breach Of Fiduciary Duty, New Jersey Common Law
### (*Against Defendants Hinchen, Jenkins, And Rutkowski*)

150.   Par  re-alleges each and every allegation set forth in  Paragraphs 1 through 149, inclusive, and incorporates them herein by reference.

151.   Hinchen, Jenkins, and Rutkowski each owed, and continue to owe, a fiduciary duty to Par because, among other reasons, Par entrusted each of them with access to the Trade Secrets and other confidential corporate information and because each was a corporate officer of Par Sterile.  Hinchen was President of Par Sterile, Jenkins was Chief Development Officer of Par Sterile, and Rutkowski was

a Senior Vice President and General Manager at Par Sterile.

152.   Hinchen's, Jenkins's, and Rutkowski's fiduciary duties included, among others, the duty to protect the confidentiality of Par's Trade Secrets and other confidential information and to refrain from unfairly competing with Par by using Par's Trade Secrets and other confidential information

153.   Hinchen, Jenkins, and Rutkowski have knowingly breached their fiduciary obligation to Par by disclosing and/or using Par's Trade Secrets and other confidential information for the benefit of QuVa in the preparation for the production of a competing vasopressin compound and the other acts described above.

154.   By reason of the above-alleged acts and conduct of Hinchen, Jenkins, and Rutkowski, Par has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

155.   Par  is also entitled to recover compensatory damages and punitive damages from Hinchen, Jenkins, and Rutkowski.  The amount of such relief cannot be determined precisely at this time.

## COUNT IX
### Breach Of Duty Of Loyalty, New Jersey Common Law
### (*Against Defendants Hinchen, Jenkins, And Rutkowski*)

156.   Par  re-alleges each and every allegation set forth in Paragraphs 1

through 155, inclusive, and incorporates them herein by reference.

157.   Hinchen, Jenkins, and Rutkowski owed, and continue to owe, a duty of loyalty to Par because, under New Jersey law, every employee owes a duty of loyalty to his or her employee to not act contrary to the employer's interests while employed.  This duty prohibits the disclosure of trade secrets or other confidential information of the employer, and it extends past an employee's termination. Hinchen, as President of Par Sterile, Jenkins, as Chief Development Officer of Par Sterile, and Rutkowski, as a Senior Vice President and General Manager at Par Sterile, were all employees of Par Sterile and therefore owed Par a duty of loyalty that extends past their employment with Par Sterile.

158.   Hinchen, Jenkins, and Rutkowski knowingly breached their duty of loyalty by disclosing and/or using Par's Trade Secrets and other confidential information for the benefit of QuVa in the preparation for the production of a competing vasopressin compound and the other acts described above.  At the time of such disclosure and use, Hinchen, Jenkins, and Rutkowski knew or had reason to know that their knowledge of the Trade Secrets was acquired under circumstances giving rise to a duty to maintain the secrecy, and limit the use, of the Trade Secrets and other confidential information.

159.   By reason of the above-alleged acts and conduct of Hinchen, Jenkins, and Rutkowski, Par has been damaged, and it will continue to suffer great and

irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

160.   Par is also entitled to recover compensatory damages and punitive damages from Hinchen, Jenkins, and Rutkowski.  The amount of such relief cannot be determined precisely at this time.

## COUNT X
### Breach Of Duty Of Confidence, New Jersey Common Law
### (*Against Defendants Hinchen, Jenkins, And Rutkowski*)

161.   Par re-alleges each and every allegation set forth in  Paragraphs 1 through 160, inclusive, and incorporates them herein by reference

162.   Hinchen, Jenkins, and Rutkowski owed, and continue to owe, a duty of confidence to Par because, among other reasons, Par disclosed to them Trade Secrets and other confidential information based on their express and implied promise of confidentiality.

163.   Hinchen, Jenkins, and Rutkowski breached their duty of confidence by misappropriating Par's Trade Secrets, including by disclosing and using the Trade Secrets without Par's express or implied consent.   At the time of such disclosure and use, Hinchen, Jenkins, and Rutkowski knew or had reason to know that their knowledge of the Trade Secrets of other confidential information was acquired under circumstances giving rise to a duty to maintain the secrecy, and limit the use, of the Trade Secrets and other confidential information.

164.   By reason of the acts and conduct of Hinchen, Jenkins, and Rutkowski alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

165.   Par  is also entitled to recover compensatory damages and punitive damages from Hinchen, Jenkins, and Rutkowski.  The amount of such relief cannot be determined precisely at this time.

## COUNT XI
### Tortious Interference With Contractual Relations, New Jersey Common Law
### (*Against Defendant QuVa*)

166.   Par  re-alleges each and every allegation set forth in  Paragraphs 1 through 165, inclusive, and incorporates them herein by reference.

167.   Par Sterile has contractual relationships with employees that have confidential knowledge of the Trade Secrets and other confidential described above, including such key employees as David Short, Stephen Rhoades, Travis McGrady, David "Mike" Hartley, Guy Thompson, Mike Rutkowski, Ashley Short, Chinnasamy Subramaniam, and Donna Kohut.   These contractual relationships include a non-disclosure clause.   Par has fulfilled its obligation under those agreements.

168.   As described above, QuVa engaged in an aggressive poaching campaign of Par Sterile's key employees with actual knowledge of Par Sterile's

contractual relationships with those employees and the contractual relationships' protection of Par Sterile's Trade Secrets. Legitimate hiring on the open market, without using confidential information as to which Par Sterile employees had knowledge of the Trade Secrets and other confidential information, would not have resulted in such targeting of the above-named individuals.

169.   QuVa intended to use improper means in interfering with Par Sterile's contractual relationships with the former key employees listed above without lawful justification or legitimate reason for this interference. As a result, QuVa's tortious interference was intentional and with malice.

170.   As a direct and proximate result of QuVa's actions, the former key employees listed above were induced to breach the non-disclosure clauses in their various employment agreements.

171.   As a result of QuVa's wrongdoing, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

172.   Par is also entitled to recover compensatory damages and punitive damages from QuVa. The amount of such relief cannot be determined precisely at this time.

## RELIEF SOUGHT

WHEREFORE, Par prays for judgment against Defendants, and each of them, as follows:

1.      An injunction restraining the Defendants, as well as their employers, agents, employees, and all persons acting in concert with them, from using, copying, publishing, disclosing, transferring, or selling Par's Trade Secrets or other confidential proprietary information that may be determined not to be Trade Secret information, or any product that is based on or incorporates part or all of Par's Trade Secrets or other confidential proprietary information, and from obtaining any commercial advantage or unjust enrichment from their misappropriation of Par's Trade Secrets or other confidential and proprietary information;

2.      An order enjoining Hinchen, Jenkins, and Rutkowski from engaging in or participating in any employment involving activity regarding a vasopressin drug product;

3.      An order requiring Defendants, their employers, agents, employees, and all persons acting in concert with them, to return to Par any and all of its Trade Secrets and other confidential, proprietary materials that may be determined not to be Trade Secret information, including but not limited to any and all materials created incorporating or referencing Par's Trade Secrets and other confidential information;

4.      During the pendency of this action, an injunction enjoining and restraining Defendants from destroying, manipulating, or otherwise altering any evidence, including evidence that may reside on (or be embodied by changes to) any computer system, network, or other electronic means of data storage or transfer, relating in any way to the matters alleged in this Complaint;

5.      Par be awarded damages caused by Defendants' conduct, including punitive and exemplary damages as applicable and interest;

6.      Reasonable attorneys' fees;

7.      All costs of suit herein incurred; and

8.      Such other and further relief as the Court may deem proper.

DATED:  August 14, 2017          Respectfully Submitted,
        Newark, New Jersey

                                 Daniel M. Petrocelli
                                 Brett J. Williamson
                                 Jeffrey A. Barker
                                 David S. Almeling
                                 (*pro hac vice* applications forthcoming)
                                 **O'MELVENY & MYERS LLP**
                                 Times Square Tower
                                 7 Times Square
                                 New York, New York 10036
                                 Telephone:  (212) 326-2000
                                 Facsimile:    (212) 326-2061

                                 Lawrence S. Lustberg
                                 Daniel J. McGrady
                                 **GIBBONS P.C.**
                                 One Gateway Center
                                 Newark, New Jersey 07102-5310
                                 Telephone:  (973) 596-4500
                                 Facsimile:    (973) 596-0545

                                 By:  s/ Lawrence S. Lustberg
                                      Lawrence S. Lustberg

                                 *Attorneys for Plaintiffs*
                                 *Par Pharmaceutical, Inc.*
                                 *and Par Sterile Products, LLC*