**BLANK ROME LLP**
*A Pennsylvania LLP*
Stephen M. Orlofsky, Esquire
David C. Kistler, Esquire
Leigh Ann Buziak, Esquire
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
Telephone: (609) 750-7700
Facsimile: (609) 750-7701
Orlofsky@blankrome.com
Kistler@blankrome.com
LBuziak@blankrome.com

**MERCHANT & GOULD, P.C.**
Jeffrey S. Ward, Esquire (*Pro Hac Vice*)
Wendy M. Ward, Esquire (*Pro Hac Vice*)
Stephen R. Howe, Esquire (*Pro Hac Vice*)
10 East Doty Street, Suite 600
Madison, WI 53703
Telephone: (608) 280-6750
jward@merchantgould.com
wward@merchantgould.com
showe@merchantgould.com

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., and PAR STERILE PRODUCTS, LLC, <br><br>                               Plaintiffs, <br>    v. <br><br> QUVA PHARMA, INC., STUART HINCHEN, PETER JENKINS, and MIKE RUTKOWKSI, <br><br>                              Defendants. | Civil Action No. 17-6115 (MAS)(DEA) <br><br> *Filed Electronically* |

**ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS OF DEFENDANTS QUVA, JENKINS, HINCHEN AND RUTKOWSKI**

       Defendants QuVa Pharma, Inc. ("QuVa"), Stuart Hinchen, Peter Jenkins, and Mike Rutkowski

(collectively, and together with QuVa, "Defendants"), by and through their counsel, hereby respond to

the enumerated paragraphs of Plaintiffs' Complaint for Damages, Injunctive, and Other Relief as follows. For purposes of this Answer, Defendants assume that the headings used in the Complaint are for organizational purposes and do not require a response. To the extent a response is required, the allegations of the headings are denied.

## NATURE OF THE CASE

1.      This is a blatant case of trade secrets theft.  Defendant QuVa and its principals, Defendants Stuart Hinchen and Peter Jenkins, were desperate to begin competing with Par's life-saving, FDA-approved, vasopressin-based cardiopulmonary drug Vasostrict®, but were unwilling to spend the time and money to do the research and development work necessary to launch their own alternative product.  So they took a short cut. Just weeks after founding QuVa, Hinchen and Jenkins (themselves former Par Sterile executives) began a poaching campaign to hire away key employees with intimate knowledge of Par's trade secrets regarding the development, validation, regulatory approval, and market introduction of Vasostrict® and other vasopressin products. To date, QuVa has hired at least nine former Par Sterile executives, managers, and consultants, highlighted by the recent addition of former Par Sterile Senior Vice President and General Manager, Defendant Mike Rutkowski.

**RESPONSE:** *Defendants admit that Hinchen and Jenkins were formerly executives employed by Par Sterile and that former Par Sterile employees, many of whom worked with Hinchen and Jenkins prior to their employment by Par Sterile, including Mike Rutkowski, are now employed by QuVa. The remaining allegations in Paragraph 1 are denied.*

2.      Internal Par email records show that in the weeks and months leading up to his April 14, 2017 departure from Par Sterile, Rutkowski was communicating with QuVa personnel and, in violation of Par's rights, disclosing highly confidential and proprietary information relating to manufacturing and storage methods, operating details and results, business strategies for Vasostrict®, and other confidential Par information. Rutkowski hid these communications from Par, which has only recently discovered them after conducting an investigation. This investigation has also uncovered that Rutkowski additionally violated Par company policy by, on information and belief, improperly downloading numerous Par documents to a personal hard drive within days of giving notice that he was leaving the company. These documents include, on information and belief, confidential Par documents regarding personnel, finances, corporate strategy, and many other topics.

**RESPONSE:** *The allegations in Paragraph 2 are denied.*

3.      Additionally, on April 19, 2017—just five days after Rutkowski's departure from Par Sterile—QuVa submitted a letter to the U.S. Food and Drug Administration ("FDA") seeking

to add vasopressin to a list of active ingredients for drug compounding in an effort to avoid the formal FDA approval process, which effort, if successful, would allow QuVa to directly compete with Par Sterile's formally FDA approved Vasostrict®. Although the letter was rife with factual misrepresentations, the FDA nevertheless relied on it in deciding to add vasopressin to its Bulk Drug Substances List dated as of July 1, 2017, indicating that it is now under "Category 1" of bulk drug substances under evaluation pursuant to Section 503B of the Food, Drug and Cosmetic Act of 1938 ("FDCA"). Inclusion in Category 1 means that "the FDA does not intend to take action against an outsourcing facility" that compounds the drug substance at issue while it is under evaluation, effectively giving a green light to an outsourcing facility such as QuVa to begin compounding.

**RESPONSE:** *Defendants QuVa, Hinchen and Jenkins admit that QuVa submitted a letter to the FDA on April 19, 2017 nominating vasopressin as a Bulk Drug Substance that can be used to compound drug products in accordance with section 503B of the Federal Food, Drug and Cosmetic Act. Defendants QuVa, Hinchen and Jenkins further admit that the FDA added vasopressin to its "Category 1- Bulk Substances Under Evaluation" List as of the July 1, 2017 update. Defendants admit that QuVa is a registered 503B outsourcing facility that may compound vasopressin due to its inclusion on this list. Defendants QuVa, Hinchen and Jenkins deny the remaining allegations in Paragraph 3. Defendant Rutkowski lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 3, and therefore denies the same.*

4.     As a result of the FDA's action and Par's investigation and forensic analysis, Par is informed and believes that QuVa either has begun or imminently will begin manufacturing and selling its competing drug compound using Par's confidential and proprietary trade secrets, actions that will irreparably harm Par if not enjoined.

**RESPONSE:** *The allegations in Paragraph 4 are denied.*

5.     In light of these actions, Par has no choice but to bring this action to prevent QuVa from unfairly competing and improperly usurping Par's significant investment in Vasostrict® and other vasopressin products.

**RESPONSE:** *The allegations in Paragraph 5 are denied.*

**THE PARTIES**

6.     Plaintiff Par Sterile is a Delaware limited liability company with its headquarters in Chestnut Ridge, New York.  Par Sterile is a wholly-owned, indirect subsidiary of Par Pharmaceutical. In 2014, Par Pharmaceutical acquired JHP Group Holdings, Inc., which was the ultimate parent company of JHP Pharmaceuticals, LLC ("JHP"), a Delaware limited liability company that was headquartered in Parsippany, New Jersey, and changed JHP's name to Par Sterile.

**RESPONSE:** *Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6, and therefore deny the same.*

7.     Plaintiff Par Pharmaceutical is a New York corporation with its headquarters in Chestnut Ridge, New York. Par Pharmaceutical is a wholly-owned, indirect subsidiary of Endo International plc.

**RESPONSE:** *Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7, and therefore deny the same.*

8.     Par is informed and believes that defendant QuVa is a Delaware corporation with a regular and established place of business in Bloomsbury, New Jersey.

**RESPONSE:** *Defendants admit that QuVa is a Delaware corporation and that it has a facility in Bloomsbury, New Jersey.  The remaining allegations in Paragraph 8 are denied.*

9.     Par is informed and believes that defendant Stuart Hinchen is a resident of Saddle River, New Jersey. Hinchen served as President and Chief Executive Officer of JHP in Parsippany, New Jersey from its founding in 2007 until the acquisition of JHP Group Holdings, Inc., which was the ultimate parent company of JHP, by Par Pharmaceutical in February 2014 through a reverse subsidiary merger, and as President of Par Sterile in Woodcliff Lake, New Jersey from February 2014 to June 11, 2014, and by doing so availed himself of the privileges of New Jersey law.

**RESPONSE:** *Defendants QuVa, Hinchen and Jenkins admit that Stuart Hinchen is a resident of Saddle River, New Jersey and that Hinchen served as President and Chief Executive Officer of JHP in Parsippany, New Jersey from its founding in 2007 until the acquisition of JHP Group Holdings, Inc., which was the ultimate parent company of JHP, by Par Pharmaceutical in February 2014 through a reverse subsidiary merger. Defendants QuVa, Hinchen and Jenkins deny the remaining*

4

allegations in Paragraph 9. Defendant Rutkowski lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9, and therefore denies the same.

10.    Par is informed and believes that defendant Peter Jenkins is a resident of New York City, New York. Jenkins served as Chief Development Officer of JHP in Parsippany, New Jersey from its founding in 2007 until the acquisition of JHP Group Holdings, Inc., which was the ultimate parent company of JHP, by Par Pharmaceutical in February 2014 through a reverse subsidiary merger, and as Chief Development Officer of Par Sterile in Woodcliff Lake, New Jersey from February 2014 to June 6, 2014, and by doing so availed himself of the privileges of New Jersey law.

RESPONSE: *Defendants QuVa, Hinchen and Jenkins admit that defendant Peter Jenkins served as Chief Executive Officer of JHP in Parsippany, New Jersey from its founding in 2007 until the acquisition of JHP Group Holdings, Inc., which was the ultimate parent company of JHP, by Par Pharmaceutical in February 2014 through a reverse subsidiary merger. Defendants QuVa, Hinchen and Jenkins deny the remaining allegations in Paragraph 10. Defendant Rutkowski lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10, and therefore denies the same.*

11.    Par is informed and believes that defendant Mike Rutkowski is a resident of the State of New Jersey and is an employee of QuVa in Bloomsbury, New Jersey. Rutkowski served as Vice President and General Manager of JHP from May 2013 until the acquisition of JHP Group Holdings, Inc., which was the ultimate parent company of JHP, by Par Pharmaceutical in February 2014 through a reverse subsidiary merger. As Senior Vice President and General Manager of Par Sterile from February 2014 to April 14, 2017, Rutkowski regularly traveled to and communicated with other executives at JHP's headquarters at Parsippany, New Jersey, and subsequently at Par Sterile's headquarters in Woodcliff Lake, New Jersey, and by doing so availed himself of the privileges of New Jersey law.

RESPONSE: *Defendants admit that Mike Rutkowski is a resident of the State of New Jersey and is an employee of QuVa in Bloomsbury, New Jersey. Defendants QuVa, Hinchen and Jenkins admit that Rutkowski served as Vice President and General Manager of JHP from May 2013 until the acquisition of JHP Group Holdings, Inc., which was the ultimate parent company of JHP, by Par Pharmaceutical in February 2014 through a reverse subsidiary merger. Defendant Rutkowski admits that he served as Vice President and General Manager of JHP from May 2013 until its acquisition*

by Par in February 2014. Defendant Rutkowski admits that as Senior Vice President and General Manager of Par Sterile from February 2014 to April 14, 2017, Rutkowski regularly traveled to and communicated with other executives at JHP's headquarters at Parsippany, New Jersey. Defendants QuVa, Hinchen and Jenkins lack knowledge or information sufficient to form a belief as to the truth of whether Rutkowski regularly traveled to and communicated with other executives at JHP's headquarters at Parsippany, New Jersey, and subsequently at Par Sterile's headquarters in Woodcliff Lake, New Jersey, and therefore denies the same. Defendants deny the remaining allegations in Paragraph 11.

12.     Par is informed and believes that the Defendants, and each of them, were the agents, servants, and employees of each of their co-defendants, and in doing the things alleged herein were acting within the course and scope of their authority as such agents, servants, and employees and with the permission and consent of their co-defendants, and each of them. In particular, Par is informed and believes that Defendants Hinchen, Jenkins, and Rutkowski have acted and are presently acting as the agents and/or employees of QuVa and working on its behalf.

**RESPONSE:** *Defendants admit that Hinchen, Jenkins and Rutkowski are employees of QuVa. The remaining allegations in Paragraph 12 are denied.*

### JURISDICTION AND VENUE

13.     This action arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, *et seq.*, as amended, and New Jersey law. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

**RESPONSE:** *Defendants admit the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction pursuant to 28 U.S.C. § 1367. The remaining allegations in Paragraph 13 are denied.*

14.     This Court has personal jurisdiction over Defendants. Along with each of the Defendants' substantial and continuing contacts with New Jersey as alleged herein, Par is informed and believes that Defendants' actions causing Par's injury, even if initiated at times outside of New Jersey, were expressly aimed at New Jersey, with knowledge that they would cause harm in New Jersey. These purposeful actions constitute at least minimum contact with New

Jersey such that the maintenance of this suit in this Court does not offend traditional notions of fair play and substantial justice. This Court's personal jurisdiction over Hinchen and Jenkins is further established by virtue of their express consent to personal jurisdiction in the federal courts of New Jersey as set forth in their respective written agreements, described *infra*.

**RESPONSE:** *Defendants do not contest this Court has personal jurisdiction over them solely for the purposes of this action but deny that they have committed acts causing injury to Par. The remaining allegations in Paragraph 14 are denied.*

15.     As is further set forth herein, a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred and have a direct effect in this District. Venue therefore lies in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2).

**RESPONSE:** *Defendants do not contest that Venue lies in this District solely for the purposes of this action, but deny that they have committed any acts giving rise to the claims alleged in this Complaint. The remaining allegations in Paragraph 15 are denied.*

## GENERAL ALLEGATIONS

**A.    Par Sterile Obtains The First And Only FDA-Approved Intravenous Vasopressin Injection.**

16.     Par Sterile is a specialty pharmaceutical company that develops, manufactures, and sells sterile drug products, including Vasostrict®, the first (and so far only) intravenous vasopressin injection, United States Pharmacopeia ("USP"), product with a New Drug Application ("NDA") approved by the FDA. Developed using proprietary technologies and advanced medical methods, Vasostrict® increases blood pressure in adults with vasodilatory shock (*e.g.*, postcardiotomy or sepsis) who remain hypotensive despite the administration of fluids and catecholamines (such as norepinephrine), restoring blood pressure to safe levels through the narrowing of blood vessels and the increase in blood volume due to water retention in the body.

**RESPONSE:** *Defendants admit Par Sterile is a specialty pharmaceutical company that develops, manufactures, and sells sterile drug products, including Vasostrict®, the first (and so far only) intravenous vasopressin injection, United States Pharmacopeia ("USP"), product with a New Drug Application ("NDA") approved by the FDA. Defendants admit that Vasostrict® increases blood*

*pressure in adults with vasodilatory shock (e.g., postcardiotomy or sepsis) who remain hypotensive*

*despite the administration of fluids and catecholamines (such as norepinephrine), restoring blood*

*pressure to safe levels through the narrowing of blood vessels and the increase in blood volume due to*

*water retention in the body. Defendants deny the remaining allegations in Paragraph 16.*

17.     Vasopressin is the synthetic form of a polypeptide hormone secreted by the posterior pituitary gland. For many decades prior to 2014, vasopressin was allowed to be sold as an unapproved drug in the United States, due to its having been marketed as a therapeutic agent prior to the 1938 enactment of the FDCA. Among the companies manufacturing and selling unapproved vasopressin injection was JHP, a privately-held company founded in 2007 and led by Defendants Jenkins and Hinchen (the "JH" in "JHP"). JHP's name was changed to Par Sterile when JHP Group Holdings, Inc., which was the ultimate parent company of JHP, was acquired by Par Pharmaceutical in 2014.

**RESPONSE:** *Defendants QuVa, Hinchen and Jenkins admit the allegations in Paragraph 17.*

*Defendant Rutkowski lacks knowledge or information sufficient to form a belief as to the truth of the*

*allegations in Paragraph 17, and therefore denies the same.*

18.     In recent years, the FDA has sought to have manufacturers of marketed unapproved drugs seek FDA approval for such products. Specifically, in September 2011, the FDA issued guidance to drug manufacturers stating that it would begin taking steps to "encourage the manufacturers of these products to obtain the required evidence and comply with the approval provisions of the Federal Food, Drug, and Cosmetic Act [] or remove the products from the market."

**RESPONSE:** *Defendants QuVa, Hinchen and Jenkins admit the allegations of Paragraph 18.*

*Defendant Rutkowski lacks knowledge or information sufficient to form a belief as to the truth of the*

*allegations in Paragraph 18, and therefore denies the same.*

19.     In response to the FDA's guidance, JHP, then under the control of Defendants Hinchen and Jenkins, pursued the FDA's extensive NDA process to seek approval from the FDA to manufacture and sell a vasopressin injection, USP, product pursuant to Section 505(b)(2) of the FDCA, 21 U.S.C. § 355(b)(2). On September 26, 2012, JHP submitted to the FDA NDA No. 204485 for its intravenous vasopressin injection under the name Vasostrict®.

**RESPONSE:** *Defendants QuVa, Hinchen and Jenkins admit that JHP, then under their control, on*

*September 26, 2012 submitted NDA No. 204485 pursuant to Section 505(b)(2) of the FDCA, 21 U.S.C. §*

*355(b)(2) seeking approval to manufacture and sell a vasopressin injection, USP, product. Defendants*

*QuVa, Hinchen and Jenkins deny the remaining allegations of Paragraph 19. Defendant Rutkowski*

*lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph*

*19, and therefore denies the same.*

20.     On February 25, 2014, Par Pharmaceutical acquired JHP Group Holdings, Inc., which was the ultimate parent company of JHP, through a reverse subsidiary merger for total consideration approximating $490 million, and JHP's name was changed to Par Sterile.

**RESPONSE:** *Defendants QuVa, Hinchen and Jenkins admit the allegations of Paragraph 20.*

*Defendant Rutkowski lacks knowledge or information sufficient to form a belief as to the truth of the*

*allegations in Paragraph 20, and therefore denies the same.*

21.     Both before and after the acquisition, Par invested substantial amounts of time and money in its development program for Vasostrict® to satisfy the FDA's requirements for an NDA.  Those requirements, which are detailed in 21 C.F.R. § 314, *et seq.*, include demonstrating: (a) the safety and efficacy of the drug; (b) the ways in which the benefits of the drug outweigh any risks associated with its use; and (c) that the methods used in manufacturing the drug, and the controls used to maintain the drug's quality, are adequate to preserve the drug's identity, strength, quality, and purity. Par Sterile also was required to demonstrate and document the results of clinical tests, how the drug behaves in the human body, and how it is manufactured, processed and packaged.

**RESPONSE:**  *Defendants lack knowledge or information sufficient to form a belief as to the truth of the*

*allegations in Paragraph 21, and therefore deny the same.*

22.      Par's substantial investment in the development program for Vasostrict® and in the NDA process was rewarded on April 17, 2014, when Par Sterile received FDA approval to sell Vasostrict®, the first (and so far only) FDA-approved intravenous vasopressin injection, USP. Par Sterile thereafter applied for and received numerous supplemental FDA approvals regarding the product's shelf life, storage, formulation and dosage, and began commercial sales of Vasostrict® in November 2014.

**RESPONSE:** *Defendants admit that Par Sterile received FDA approval to sell Vasostrict® on April 17,*

*2014 and that Vasostrict® is the first (and so far only) FDA-approved intravenous vasopressin*

*injection, USP. Defendants lack knowledge or information sufficient to form a belief as to the truth of*

*the remaining allegations in Paragraph 22, and therefore deny the same.*

23.     Par has devoted significant time and resources researching, developing, and validating different formulations of Vasostrict® and other vasopressin products. This process involved years of effort and collaboration across different departments, including laboratory research, formulation development, analytical chemistry, quality control and assurance, validation, process development, and manufacturing. Through largely time-consuming trial- and-error experimentation with different pH adjustments, buffers, excipients, temperatures and other experimental conditions, Par achieved important and commercially valuable increased efficiencies in manufacturing and improved products.

**RESPONSE:** *Defendants lack knowledge or information sufficient to form a belief as to the truth of the*

*allegations in Paragraph 23, and therefore deny the same.*

**B.     Par's Trade Secrets And Its Extensive Measures To Protect Them.**

24.     Par's development of Vasostrict® and other vasopressin products, including the work performed as part of NDA No. 204485 and the supplements thereto, as well as Par Sterile's ongoing efforts to manufacture and sell an increasing variety of formulations of Vasostrict®, has produced a substantial amount of highly sensitive and proprietary trade secret information, the confidentiality of which is critical to the significant value that these products represent to Par. Included among these trade secrets is technical know-how relating to chemical compositions and properties, batch quantities, assays, test methods and specifications, stability protocols, validation methods, quality control, and research & development efforts to obtain increased shelf life under both refrigeration and room temperature storage conditions, as well as confidential information relating to the manufacture, packaging, distribution, marketing, and sale of Vasostrict® and other vasopressin products, including customer identities, industry competitive intelligence, strategic plans, results of operations, and short- and long-term business strategies and initiatives (collectively, the "Trade Secrets").

**RESPONSE:** *Defendants deny the allegations of Paragraph 24.*

25.     To protect the confidentiality of the Trade Secrets, Par has implemented numerous security measures. For example, Par's physical facilities (including, in particular, Par's laboratory and manufacturing facilities located in Rochester, Michigan, where Vasostrict® is presently manufactured and packaged for distribution and sale, and where research and development work on new vasopressin products is conducted) are enclosed by secure fencing (including barbed wire) and monitored 24 hours a day by surveillance cameras and manned patrols. Entry to and exit from Par facilities is controlled, and access is allowed only to authorized individuals. Within Par's facilities, tangible copies of Trade Secret information, including but not limited to lab notebooks, batch records, and quality control procedures and protocols, are maintained in secured and locked locations, access to which is limited to those with a need to know and who use the Trade Secrets in

the development and manufacturing process.

**RESPONSE:** *Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25, and therefore deny the same.*

26.    Par maintains certain Trade Secrets in the form of electronic records that are accessible via the Par secure computer network. Access to that network is limited to Par employees, and access to electronically stored Trade Secret information on that network is password protected and monitored by Par security personnel. All relevant Par employees are required to read, acknowledge, and execute a confidentiality agreement as a condition of, and in consideration for, their employment, by which they agree not to disclose any confidential or proprietary information to anyone outside of the company, and not to use any of that information in connection with work performed for any future employer.

**RESPONSE:** *Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26, and therefore deny the same.*

27.    Par has also implemented corporate policies and trainings to protect its Trade Secrets and other confidential information, including information technology security guidelines that, *inter alia*, strictly limit the downloading, copying, or distribution of the company's confidential information by its employees, except as specifically authorized and required for the performance of the employee's duties.

**RESPONSE:** *Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27, and therefore deny the same.*

28.    Par also requires third parties, such as partners and vendors, to sign non-disclosure agreements. And Par limits access to confidential information to such third parties on an as-needed basis.

**RESPONSE:** *Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28, and therefore deny the same.*

**C.    Defendants Hinchen And Jenkins Form QuVa And Solicit Par Sterile's Employees To Unfairly Compete With Par.**

29.    As the founders of JHP, and subsequently as executives with Par Sterile, Defendants Hinchen and Jenkins had detailed knowledge of and access to certain Trade Secrets and other Par confidential information, and both were parties to employment agreements under which they promised not to "directly or indirectly, disclose, reveal, divulge, publish or otherwise make

11

known to any Person or use any Confidential Information for any reason or purpose whatsoever, except for the proper discharge of the Employee's duties to the Company under this Agreement." "Confidential Information" is broadly defined in the employment agreements to include "all information, data, agreements, documents, reports, 'know-how', interpretations, plans, studies, forecasts, projections and records (whether in written form, electronically stored or otherwise) containing or otherwise reflecting information [including] . . . operating procedures, techniques, systems, processes and methods, all intellectual property, product and service information, including research and development and proposed products and services . . . and . . . other commercial 'knowhow', trade secrets and information not available to the public generally."

**RESPONSE:** *Defendants QuVa, Hinchen and Jenkins admit that Hinchen and Jenkins were the founders of JHP. Defendants QuVa, Hinchen and Jenkins admit that Hinchen and Jenkins were subsequently executives with Par Sterile and that they were parties to certain agreements with Par. Defendants QuVa, Hinchen and Jenkins admit that the quoted language appears in one or more of their agreements, except to the extent those quotes are incomplete. Defendants QuVa, Hinchen and Jenkins deny the remaining allegations of Paragraph 29, including but not limited to any characterizations of the quoted language. Defendant Rutkowski lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29, and therefore denies the same.*

30.    On June 6, 2014, shortly after Par Sterile received FDA approval for Vasostrict®, Jenkins resigned his employment with Par Sterile. As part of his resignation, Jenkins received a substantial severance payment. He also executed a "Separation Agreement and Release" in which he acknowledged having access to Par Confidential Information, as defined in the employment agreement described above, and agreed that he "shall not at any time, other than as may be required in connection with the performance by him of any remaining duties or obligations under the Employment Agreement, directly or indirectly, use, communicate, disclose or disseminate any Confidential Information in any manner whatsoever (except as may be required under legal process by subpoena or other court order)."

**RESPONSE:** *Defendants QuVa, Hinchen and Jenkins admit that Jenkins executed a "Separation Agreement and Release" on June 6, 2014, and that the quoted language appears in that agreement, except to the extent those quotes are incomplete. Defendants QuVa, Hinchen and Jenkins deny the remaining allegations in Paragraph 30, including but not limited to any characterizations of the quoted*

*language. Defendant Rutkowski lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30, and therefore denies the same.*

31.     A few days later, on June 11, 2014, Hinchen likewise resigned his employment with Par Sterile.   As part of his resignation, Hinchen received a substantial severance payment. He also executed a "Separation Agreement and Release" in which he acknowledged having access to Par Confidential Information  as defined in the employment agreement described above, and agreed that he "shall  not at any time, other than as may be required in connection with the performance by him of any remaining duties or obligations under the Employment Agreement, directly or indirectly, use, communicate, disclose or disseminate any Confidential Information in any manner whatsoever (except as may be required under legal process by subpoena or other court order)."

**RESPONSE:** *Defendants QuVa, Hinchen and Jenkins admit that Hinchen executed a "Separation Agreement and Release" on June 11, 2014, and that the quoted language appears in that agreement, except to the extent those quotes are incomplete.  Defendants QuVa, Hinchen and Jenkins deny the remaining allegations in Paragraph 31, including but not limited to any characterizations of the quoted language. Defendant Rutkowski lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31, and therefore denies the same.*

32.     Par is informed and believes that at, about, or before the time of their resignations, Hinchen and Jenkins began secretly planning and preparing to launch  a new pharmaceutical company that would compete with Par for business from  hospitals and other healthcare providers using a hybrid "compound manufacturing"  model to avoid the time and expense of going through the rigorous FDA new drug  approval that applies to drug manufacturers such as Par Sterile. Compounding by an outsourcing facility is a practice in which a person combines, mixes, or alters ingredients of a drug to create a medication under the supervision of a licensed pharmacist. Compounded drugs are not required to be FDA-approved and may lack an FDA finding of manufacturing quality before being marketed, though they  are required to comply with Current Good Manufacturing Practices ("CGMP") guidelines and inspections by the FDA.

**RESPONSE:** *Defendants admit that compounding by an outsourcing facility is a practice in which a person combines, mixes, or alters  ingredients of a drug to create a medication under the supervision of a licensed pharmacist. Defendants also admit that compounded drugs are not required to be FDA-approved and may lack an FDA finding of manufacturing quality before being marketed, though compounded drugs made by registered 503B outsourcing facilities  are required to*

*comply with Current Good Manufacturing Practices ("CGMP") guidelines and inspections by the*

*FDA. Defendants QuVa, Hinchen and Jenkins deny the remaining allegations in Paragraph 32.*

*Defendant Rutkowski lacks knowledge or information sufficient to form a belief as to the truth of the*

*remaining allegations in Paragraph 32, and therefore denies the same.*

33.    On July 29, 2015, Hinchen and Jenkins formally incorporated QuVa in Delaware, and shortly thereafter simultaneously announced the acquisition of a sterile drug compounding facility in Sugar Land, Texas, and a majority equity investment from Bain Capital Private Equity, a global investment firm. QuVa subsequently announced the acquisition of a manufacturing facility in Bloomsbury, New Jersey.

**RESPONSE:** *Defendants QuVa, Hinchen and Jenkins admit the allegations in Paragraph 33.*

*Defendant Rutkowski lacks knowledge or information sufficient to form a belief as to the truth of the*

*allegations in Paragraph 33, and therefore denies the same.*

34.    On or about December 15, 2015, less than six months after QuVa's formation, QuVa announced a six-person executive leadership team, four members of which were former Par Sterile employees or consultants.

**RESPONSE:** *Defendants QuVa, Hinchen and Jenkins admit that QuVa announced its six-person*

*leadership team on December 15, 2015, which included Hinchen and Jenkins and four other individuals,*

*two of whom were former Par employees or consultants. Defendants QuVa, Hinchen and Jenkins deny*

*the remaining allegations of paragraph 34. Defendant Rutkowski lacks knowledge or information*

*sufficient to form a belief as to the truth of the allegations in Paragraph 34, and therefore denies the*

*same.*

35.    Par is informed and believes that QuVa is pursuing a strategy of rapid growth to become a major competitor in the sterile drug manufacturing market by, in part, poaching experienced employees of Par Sterile, including executives and managers with valuable expertise in research and development, quality control, testing and validation, process development, and manufacturing methods. In particular, Par is informed and believes that QuVa has targeted Par Sterile employees with intimate knowledge of the Trade Secrets and other confidential information regarding sterile manufacturing, Vasostrict®, and Par's other vasopressin products.

**RESPONSE:** *Defendants deny the allegations in Paragraph 35.*

36.     Consistent with this strategy, Par is informed and believes that QuVa solicited, induced, and ultimately hired the following employees, on or about the dates indicated:

(a)     David Short, Par Sterile's Senior Director of Quality Control, on or about October 26, 2015;

(b)     Stephen Rhoades, Par Sterile's Manager of Sterility Assurance, on or about October 26, 2015;

(c)     Travis McGrady, Par Sterile's Manager of Deviations and Lot Disposition, on or about February 15, 2016;

(d)     David "Mike" Hartley, Par Sterile's Director of Technical Services, on or about March 14, 2016;

(e)     Guy Thompson, Par Sterile's Supervisor of the Microbiology Lab, on or about November 14, 2016;

(f)     Mike Rutkowski, Par Sterile's Senior Vice President and General Manager of the Rochester, Michigan facility, on or about April 17, 2017;

(g)     Ashley Short, Par Sterile's Quality Control Chemist II, on or about May 8, 2017; and

(h)     Chinnasamy Subramaniam, Par Sterile's Manager of Analytical Research & Development, on or about June 28, 2017.

**RESPONSE:** *Defendants QuVa, Hinchen and Jenkins admit that QuVa hired the employees mentioned in Paragraph 36 (a)-(h) on or about the dates indicated. The remaining allegations of Paragraph 36 are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed.*

37.     Par is further informed and believes that, in or before January 2016, QuVa also solicited, induced, and ultimately hired Donna Kohut, a former Par Sterile consultant who had accesses to certain of Par's Trade Secrets and other confidential information through her responsibility for certain operations at the Rochester, Michigan facility, and who also read, acknowledged, and executed a confidentiality agreement identical in all material respects to the confidentiality agreements described above as a condition of, and in consideration for, her engagement.

**RESPONSE:** *Defendants QuVa, Hinchen and Jenkins admit that QuVa hired Donna Kohut. The remaining allegations of Paragraph 6 are subject to a concurrently filed Motion to Dismiss, and are*

*therefore not addressed.*

**D.**     **Par's Discovery Of QuVa's Actual And Threatened Misappropriation Of The Trade Secrets.**

38.     In June 2017, Par learned for the first time that, on or about April 19, 2017, QuVa had submitted a letter to the FDA requesting that vasopressin be added to the list of bulk drug substances under "Category 1" pursuant to the FDA's "Interim Policy on Compounding Using Bulk Drug Substances Under Section 503B of the Federal Food, Drug, and Cosmetic Act" (the "Interim Policy"). The Interim Policy is intended to provide guidance to the pharmaceutical industry regarding the submission and review of nominations of substances to be included on the FDA's list of bulk drug substances that may be used in compounding conducted by outsourcing facilities under section 503B of the FDCA.

**RESPONSE:** *Defendants admit that the Interim Policy is intended to provide guidance to the*

*pharmaceutical industry regarding the submission and review of nominations of substances to be*

*included on the FDA's list of bulk drug substances that may be used in compounding conducted by*

*outsourcing facilities under section 503B of the FDCA. Defendants lack knowledge or information*

*sufficient to form a belief as to the truth of the remaining allegations in Paragraph 38, and therefore*

*deny the same.*

39.     In July 2017, Par learned that, notwithstanding numerous material factual misrepresentations in QuVa's April 19 letter, the FDA had responded to QuVa's request by adding vasopressin to its Bulk Drug Substances List dated as of July 1, 2017, indicating that vasopressin is now under "Category 1" of bulk drug substances under evaluation pursuant to Section 503B of the FDCA. Inclusion in Category 1 means that "the FDA does not intend to take action against an outsourcing facility" that compounds the substance at issue while it is under evaluation.

**RESPONSE:** *Defendants QuVa, Hinchen and Jenkins admit that QuVa submitted a letter to the FDA on*

*April 19, 2017 nominating vasopressin as a Bulk Drug Substance that can be used to compound drug*

*products in accordance with section 503B of the Federal Food, Drug and Cosmetic Act. Defendants*

*QuVa, Hinchen and Jenkins further admit that FDA added vasopressin to its "Category 1- Bulk*

*Substances Under Evaluation" List as of the July 1, 2017 update. Defendants QuVa, Hinchen and*

*Jenkins deny the remaining allegations in Paragraph 39. Defendant Rutkowski lacks knowledge or*

16

*information sufficient to form a belief as to the truth of the allegations in Paragraph 39, and therefore*

*denies the same.*

40.     This information, coupled with QuVa's solicitation and hiring of multiple Par employees involved in the development, testing and manufacture of Par Sterile's Vasostrict® and other vasopressin products, caused Par to launch an investigation into whether QuVa and/or any of its agents or employees had improperly disclosed or used Par's Trade Secrets and other confidential information. While that investigation is ongoing and has necessarily been limited to information within Par's ability to access, the results to date have been shocking and have led Par to conclude that Defendants are engaged in actual and threatened misappropriation of the Trade Secrets and other confidential information.

**RESPONSE:** *Defendants lack knowledge or information sufficient to form a belief as to the truth of the*

*allegations in Paragraph 40, and therefore deny the same.*

41.     A review of certain internal Par emails shows that defendant Rutkowski, Par Sterile's former Senior Vice President and General Manager of its Rochester, Michigan facility (and QuVa's most senior hire from Par) began disclosing Par's Trade Secrets and other confidential information to QuVa by email at least as early as June 2016 (ten months *before* he resigned from Par Sterile). Those improper email communications continued until just prior to Rutkowski's departure from Par Sterile.

**RESPONSE:** *Defendants deny the allegations in Paragraph 41.*

42.     For example, in a June 28, 2016 email, Rutkowski delivered to Donna Kohut (the former Par Sterile consultant who by that date had joined QuVa) a Par "backorder report," disclosing in detail (including average days aging and total backorder amount, broken down by facility location) certain Trade Secrets in the form of confidential Par business information.

**RESPONSE:** *Defendants admit that Rutkowski sent an email to Donna Kohut on June 28, 2016.*

*Defendants deny the remaining allegations in Paragraph 42.*

43.     In an October 25, 2016 email exchange, Rutkowski informed Kohut that he was willing to provide "any slides" that she would need for an upcoming QuVa employee meeting, and further improperly disclosed confidential Par business information regarding "unit counts" at the Rochester, Michigan facility, and the fact that Par was performing product testing using certain metrics that he believed have an effect on absorption rates.

17

**RESPONSE:** *Defendants admit that Rutkowski and Donna Kohut exchanged emails on October 25,*

*2016. Defendants deny the remaining allegations of Paragraph 43.*

      44.     In a March 9, 2017 email exchange, Rutkowski provided Kohut with Par Trade Secrets and other confidential information relating to how to pass an FDA facility inspection, to which Kohut responded, "[a]ppreciate the tip." This information was particularly important to QuVa, as the FDA had previously  determined that the QuVa facility in question failed to meet certain quality control  standards related to maintaining sterility and avoiding contamination. Notably, Rutkowski's email was in response to an earlier email from Kohut, forwarding an internal QuVa announcement (distributed to former Par Sterile employees Rhoades  and Hartley, who were by that time QuVa employees) that a QuVa facility was "in operation," to which Rutkowski  responded "Way to go team!!!!!!!!!!!!!!!!," evidencing that by at least March 2017 Rutkowski considered his  "team"  to  be  QuVa, not his employer Par Sterile.

**RESPONSE:** *Defendants admit that Rutkowski and Donna Kohut exchanged emails on March 9, 2017.*

*Defendants deny the remaining allegations of Paragraph 44.*

      45.     In a March 13, 2017 email, Rutkowski and Kohut discussed some of  their joint efforts to recruit Par Sterile employees from QuVa while Rutkowski was  still employed by Par Sterile. After informing Kohut that a Par Sterile employee had announced he was departing for another company, Kohut lamented that she  was "sorry to have missed out on him joining QuVa, yet he is closer in distance ***so  that would actually facilitate hire without any of the politics between the  organizations***." (emphasis added). Rutkowski responded with a damning  admission of his own efforts to solicit Par Sterile employees for QuVa: "***I spoke to  him but he elected to go elsewhere***.  Not much else I can do."  (emphasis added).

**RESPONSE:** *Defendants admit that Rutkowski and Donna Kohut exchanged emails on March 13,*

*2017. Defendants deny the remaining allegations of Paragraph 45.*

      46.     In a second March 13, 2017 email, Rutkowski sent Kohut an internal Par PowerPoint presentation containing Trade Secrets and other confidential information regarding Par's historical operations and sales.

**RESPONSE:** *Defendants admit that Rutkowski and Donna Kohut exchanged emails on March 13,*

*2017. Defendants deny the remaining allegations of Paragraph 46.*

      47.     And on March 15, 2017—just prior to giving notice to Par Sterile that  he was leaving the company—Rutkowski forwarded to Kohut at QuVa three detailed, internal Par PowerPoint presentations containing many of Par's sensitive, highly confidential and proprietary Trade Secrets, including supply chain metrics  (such as batching performance, yields, deviation rates, complaints, recalls, perfect batches, and values of backorders), monthly finances and budgets, training and

personnel developments, and future business plans relating to planned new product launches, including vasopressin products. In reply, QuVa's Kohut candidly announced, *"I'll steal with pride just like you taught me."* (emphasis added). Rutkowski responded favorably: "LOL Love it!!!!!"

**RESPONSE:** *Defendants admit that Rutkowski and Donna Kohut exchanged emails on March 15,*

*2017. Defendants deny the remaining allegations of Paragraph 47.*

48.     On information and belief, Rutkowski's misconduct did not end with his emails to QuVa but, instead, extended to improperly downloading numerous Par documents to a personal hard drive within days of giving notice that he was leaving Par Sterile. For example, on April 3, 2017, Rutkowski, in violation of Par's computer-usage policies, connected to his Par computer his personal Western Digital My Passport Portable External Hard Drive, a large hard drive with the storage capacity for an entire terabyte of data. For several hours on that same day, Rutkowski accessed a large number of documents in short succession and, on information and belief, downloaded to his personal hard drive, among other things, confidential Par documents regarding FDA regulations and inspections, product tables, accounting documents, personnel documents, historical presentations about Par's Rochester facility, and a presentation to the Board of Directors.

**RESPONSE:** *Defendants deny the allegations in Paragraph 48.*

49.     Upon information and belief, these emails and forensics demonstrating Defendants' misconduct are only the tip of the iceberg, and expedited discovery of QuVa's, the individual Defendants' and their financial backers' internal emails, documents, electronic records, and testimony under oath of QuVa principals, along with various other forms of discovery, will uncover much more, similar evidence.

**RESPONSE:** *Defendants deny the allegations in Paragraph 49.*

50.     Additionally, Hinchen, Jenkins, and Rutkowski, through their respective roles at Par Sterile, had daily access to, and even assisted in creating, certain of Par's Trade Secrets and other confidential information. They were involved in and exposed to, for example, technical know-how relating to chemical compositions, batch quantities, assays, test methods and specifications, stability protocols, validation methods, quality control, and other research and development efforts, as well as confidential information relating to the manufacture, packaging, distribution, marketing, and sale of Vasostrict® and other vasopressin products.

**RESPONSE:** *Defendants deny the allegations in Paragraph 50.*

51.     Par is informed and believes that Hinchen, Jenkins, and Rutkowski have assumed roles at QuVa similar to their prior roles at Par Sterile. Par is informed and believes that given these roles at QuVa, as well as the voluminous confidential and proprietary information they were exposed to, it would be impossible for Hinchen, Jenkins, and Rutkowski to have performed or to continue to perform any work for QuVa regarding a vasopressin drug product that would directly compete with Par Sterile's Vasostrict®—as QuVa recently described in its letter to the FDA

19

nominating vasopressin for inclusion on the Bulk Drug Substances List—without using Par's Trade Secrets.

**RESPONSE:** *Defendants deny the allegations in Paragraph 51.*

52.     Similarly, and on information and belief, the other former Par Sterile employees with extensive knowledge of the Trade Secrets that QuVa recently poached—David Short, Stephen Rhoades, Travis McGrady, David "Mike" Hartley, Guy Thompson, Ashley Short, and Chinnasamy Subramaniam—have all assumed roles at QuVa similar to those that they performed at Par, and in these new roles, they too will inevitably use and disclose Par's Trade Secrets for their own benefit and for the benefit of QuVa. Par is informed and believes that QuVa has not taken the steps necessary to prevent these former Par Sterile employees from disclosing or using Par's Trade Secrets, such as assigning the employees to positions that have no relationship with sterile manufacturing. On the contrary, QuVa is having them work directly with sterile manufacturing.

**RESPONSE:** *Defendants deny the allegations in Paragraph 52.*

53.     In particular, and based on information and belief, all former Par Sterile employees who now work at QuVa are doing so in similar roles:

    a.     Hinchen, co-founder of JHP and former President of Par Sterile, is now co-founder and Chief Executive Officer of QuVa.

    b.     Jenkins, co-founder of JHP and Chief Development Officer at Par Sterile, is now co-founder and Chief Development Officer at QuVa.

    c.     Hartley, former Director of Technical Services at Par Sterile, is now the Director of Facilities and Engineering at QuVa.

    d.     David Short, former Senior Director of Quality Systems at Par Sterile, is now Vice President of Quality at QuVa.

    e.     Kohut, former consultant to Par Sterile, is now Vice President of Operations & Logistics at QuVa.

    f.     McGrady, former Manager of Deviations & Lot Disposition at Par Sterile, is now Director of Corporate Quality Systems at QuVa.

    g.     Rhoades, former Manager of Sterility Assurance at Par Sterile, is now Director of Quality at QuVa.

    h.     Thompson, former Supervisor of the Microbiology Lab at Par Sterile, is

now Manager of Manufacturing Quality Assurance at QuVa.

      i.      Subramaniam, former Manager of Analytical R&D at Par Sterile, is now in a similar role at QuVa.

      j.      Ashley Short, former Quality Control Chemist II at Par Sterile, is now in a senior chemist role at QuVa.

      k.      Rutkowski, former Senior Vice President and General Manager of the Rochester facility at Par Sterile, is now in a similar role in the New Jersey facility at QuVa.

**RESPONSE:** *Defendants deny the allegations in Paragraph 53.*

54.      Based on the information provided above, Par is informed and believes that QuVa has used or will use Par's Trade Secrets and other confidential information to compound vasopressin products with the properties described in the nomination submitted by QuVa to the FDA on April 19, 2017, and pursuant to the FDA's July 1, 2017 addition of vasopressin to the Bulk Drug Substance List.

**RESPONSE:**  *Defendants deny the allegations in Paragraph 54.*

55.      Par is informed and believes that it is impossible for Hinchen, Jenkins, and Rutkowski—and the former Par Sterile employees they hired—to have performed or continue to perform their respective duties at QuVa in compounding a vasopressin product without using or relying on Par's Trade Secrets. For example, there are several challenges involved in making pre-mixed formulations of vasopressin. To overcome these challenges and create the pre-mixed products with the characteristics that QuVa is claiming (*e.g.*, potency, sterility, and shelf life) within the time period in which QuVa made its representations, Par is informed and believes that QuVa necessarily has to rely on or use the information QuVa has misappropriated (as described above) and QuVa's employees' knowledge gained from Par's years of work on Vasostrict®, including confidential work regarding ways to stabilize vasopressin and increase its shelf-life in undiluted and diluted formulations.

**RESPONSE:** *Defendants deny the allegations in Paragraph 55.*

## COUNT I
### Violation Of Federal Defend Trade Secrets Act, 18 U.S.C. § 1836
### (*Against All Defendants*)

56.      Par re-alleges each and every allegation set forth in Paragraphs 1 through 55, inclusive, and incorporates them herein by reference.

**RESPONSE:** *Defendants incorporate their responses to Paragraphs 1-55 as if fully set forth herein.*

57.     Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products. These Trade Secrets are described generally above and comprise financial, business, scientific, technical, economic, and/or engineering information that are used in or intended for use in interstate commerce and that accordingly constitute "trade secrets" under 18 U.S.C. § 1839(3).

**RESPONSE:** *Defendants deny the allegations in Paragraph 57.*

58.     Par has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Par's Trade Secrets and by taking the other reasonable measures described above.

**RESPONSE:** *Defendants deny the allegations in Paragraph 58.*

59.     These confidential and proprietary Trade Secrets derive independent economic value from not being generally known to or readily ascertainable through proper means by another person who can obtain economic value from the disclosure and use of such information, and have conferred a competitive advantage on Par over others in the relevant market.

**RESPONSE:** *Defendants deny the allegations in Paragraph 59.*

60.     Other than through Defendants' improper disclosure, the Trade Secrets are not known to others and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

**RESPONSE:** *Defendants deny the allegations in Paragraph 60.*

61.     Defendants misappropriated Par's Trade Secrets by improper means and without authorization, including by disclosing and using and/or threatening to disclose and use the Trade Secrets without Par's express or implied consent in the preparation for production of a competing vasopressin drug product and in the other ways described above. Par's investigation of this conduct, which is ongoing, has identified several instances of this misappropriation by Defendants, including some described above.

**RESPONSE:** *Defendants deny the allegations in Paragraph 61.*

62.     The Defendants' actual and threatened use and disclosure of the Trade Secrets constitutes misappropriation because, among other reasons, at the time of such use and disclosure, the Defendants knew or had reason to know that their knowledge of the Trade Secrets was derived through persons who owed a duty to Par to maintain the secrecy of the Trade Secrets.

**RESPONSE:** *Defendants deny the allegations in Paragraph 62.*

63.     Defendants' misappropriation comprises acts, including without limitation use of Par's Trade Secrets, on or after the date of the enactment of the Defend Trade Secrets Act, May 11, 2016.

**RESPONSE:** *Defendants deny the allegations in Paragraph 63.*

64.     Defendants' current and continued misappropriation of Par's Trade Secrets is reckless and malicious. Defendants know of the confidentiality, ownership, and use restrictions on the Trade Secrets.

**RESPONSE:** *Defendants deny the allegations in Paragraph 64.*

65.     By reason of the above-alleged acts and conduct of Defendants, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *Defendants deny the allegations in Paragraph 65.*

66.     Par is also entitled to recover compensatory and exemplary damages from Defendants, including but not limited to the losses resulting from their wrongful conduct and any unjust enrichment caused by their misappropriation. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:**  *Defendants deny the allegations in Paragraph 66.*

**COUNT II**
**Violation Of The New Jersey Trade Secrets Act, N.J.S.A. 56:15-2**
***(Against All Defendants)***

67.     Par re-alleges each and every allegation set forth in Paragraphs 1 through 66, inclusive, and incorporates them herein by reference.

**RESPONSE:** *QuVa incorporates its responses to Paragraphs 1-66 as if fully set forth herein.*

68.     Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products. These Trade Secrets are described generally above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process

that constitute "trade secrets" under N.J.S.A. 56:15-2.

**RESPONSE:** *QuVa denies the allegations in Paragraph 68.*

69.    Par has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Par's Trade Secrets and by taking the other reasonable measures described above.

**RESPONSE:** *QuVa denies the allegations in Paragraph 69.*

70.    These confidential and proprietary Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, others who can obtain economic value from its disclosure or use, and have conferred a competitive advantage on Par in the relevant market.

**RESPONSE:** *QuVa denies the allegations in Paragraph 70.*

71.    Other than through Defendants' improper disclosure, the Trade Secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

**RESPONSE:** *QuVa denies the allegations in Paragraph 71.*

72.    Defendants misappropriated Par's Trade Secrets by improper means and without authorization, including by disclosing and using and/or threatening to disclose and use the Trade Secrets without Par's express or implied consent in the preparation for production of a competing vasopressin compound and in the other ways described above, including in the inevitable disclosure or use of the Trade Secrets in their work for QuVa. Par's investigation, which is ongoing, has identified several instances of this misappropriation by Defendants, including some described above.

**RESPONSE:** *QuVa denies the allegations in Paragraph 72.*

73.    The Defendants' actual and threatened use and disclosure of the Trade Secrets constitutes misappropriation because at the time of such use and disclosure, the Defendants knew or had reason to know that their knowledge of the Trade Secrets was derived through persons who owed a duty to Par to maintain the secrecy of the Trade Secrets.

**RESPONSE:** *QuVa denies the allegations in Paragraph 73.*

74.    Defendants' current and continued misappropriation of Par's Trade Secrets is willful and malicious. Defendants know of the confidentiality, ownership, and use restrictions on the Trade Secrets.

**RESPONSE:** *QuVa denies the allegations in Paragraph 74.*

75.     By reason of the above-alleged acts and conduct of Defendants, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *QuVa denies the allegations in Paragraph 75.*

76.     Par is also entitled to recover compensatory and punitive damages from Defendants, including but not limited to the losses resulting from their wrongful conduct and any unjust enrichment caused by their misappropriation. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *QuVa denies the allegations in Paragraph 76.*

## COUNT III
### Misappropriation Of Trade Secret, New Jersey Common Law
### (*Against All Defendants*)

77.     Par re-alleges each and every allegation set forth in paragraphs 1 through 76, inclusive, and incorporates them herein by reference.

**RESPONSE:** *QuVa incorporates its responses to Paragraphs 1-76 as if fully set forth herein.*

78.     Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products. These Trade Secrets are described above and comprise a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process that constitute "confidential information" under New Jersey Common Law.

**RESPONSE:** *QuVa denies the allegations in Paragraph 78.*

79.     Defendants had regular access to the Trade Secrets throughout the course of their employment with Par Sterile. Defendants know of the confidentiality, ownership, and use restrictions on the Trade Secrets.

**RESPONSE:** *QuVa denies the allegations in Paragraph 79.*

25

80.     Par has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Par's Trade Secrets and by taking the other reasonable measures described above.

**RESPONSE:** *QuVa denies the allegations in Paragraph 80.*

81.     These confidential and proprietary Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use, and have conferred a competitive advantage on Par.

**RESPONSE:** *QuVa denies the allegations in Paragraph 81.*

82.     Other than through Defendants' improper disclosure, the Trade Secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

**RESPONSE:** *QuVa denies the allegations in Paragraph 82.*

83.     Defendants misappropriated Par's Trade Secrets by improper means and without authorization, including by disclosing and using and/or threatening to disclose and use the Trade Secrets without Par's express or implied consent in the preparation for production of a competing vasopressin compound and in the other ways described above. Par's forensic investigation, which is ongoing, has identified several instances of this misappropriation by Defendants, including some described above.

**RESPONSE:** *QuVa denies the allegations in Paragraph 83.*

84.     Defendants have and will continue to misappropriate Par's Trade Secrets by using these Trade Secrets without authority, including in their preparation for the production of a competing vasopressin compound.

**RESPONSE:** *QuVa denies the allegations in Paragraph 84.*

85.     The Defendants' actual and threatened use and disclosure of the Trade Secrets constitutes misappropriation because at the time of such use and disclosure, the Defendants knew or had reason to know that their knowledge of the Trade Secrets was derived through persons who owed a duty to Par to maintain the secrecy of the Trade Secrets.

**RESPONSE:** *QuVa denies the allegations in Paragraph 85.*

86.     Defendants' current and continued misappropriation of Par's Trade Secrets is willful and malicious.

**RESPONSE:** *QuVa denies the allegations in Paragraph 86.*

87.     By reason of the above-alleged acts and conduct of Defendants, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *QuVa denies the allegations in Paragraph 87.*

88.     Par is also entitled to recover compensatory and punitive damages from Defendants. The amount of such relief cannot be determined precisely at this time.

**RESPONSE: QuVa denies the allegations in Paragraph 88.**

**COUNT IV**
**Unfair Competition, New Jersey Common Law**
***(Against Defendant QuVa)***

89.     Par re-alleges each and every allegation set forth in Paragraphs 1 through 88, inclusive, and incorporates them herein by reference.

**RESPONSE:** *QuVa incorporates its responses to Paragraphs 1-88 as if fully set forth herein.*

90.     Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products. These Trade Secrets and other confidential information are described above and constitute "confidential information" under New Jersey Common Law.

**RESPONSE:** *QuVa denies the allegations in Paragraph 90.*

91.     Par has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Par's Trade Secrets.

**RESPONSE:** *QuVa denies the allegations in Paragraph 91.*

92.     These confidential and proprietary Trade Secrets derive independent economic and commercial value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use, and have conferred a competitive advantage on Par.

**RESPONSE:** *QuVa denies the allegations in Paragraph 92.*

93.     QuVa misappropriated Par's Trade Secrets by knowingly acquiring the Trade Secrets through improper means, namely by knowingly inducing former employees to breach their duty to maintain the secrecy of the Trade Secrets. QuVa also misappropriated the Trade Secrets by

27

disclosing and using the Trade Secrets without Par's express or implied consent after knowingly using improper means to acquire knowledge of the Trade Secrets.

**RESPONSE:** *QuVa denies the allegations in Paragraph 93.*

94.     QuVa has and will continue to misappropriate Par's Trade Secrets by using these Trade Secrets without authority, including in the production of a competing vasopressin compound.

**RESPONSE:** *QuVa denies the allegations in Paragraph 94.*

95.     QuVa's current and continued misappropriation of Par's Trade Secrets is willful, in bad faith, and malicious. QuVa knows of the confidentiality, ownership, and use restrictions on the Trade Secrets.

**RESPONSE:** *QuVa denies the allegations in Paragraph 95.*

96.     By reason of the above-alleged acts and conduct of QuVa, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *QuVa denies the allegations in Paragraph 96.*

97.     Par is also entitled to recover compensatory and punitive damages from QuVa. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *QuVa denies the allegations in Paragraph 97.*

## COUNT V
## Breach Of Contract, New Jersey Common Law
### (*Against Defendant Hinchen*)

98.     Par re-alleges each and every allegation set forth in Paragraphs 1 through 97, inclusive, and incorporates them herein by reference.

**RESPONSE:** *Hinchen incorporates his responses to Paragraphs 1-76, as if fully set forth herein.*

99.     During his course of employment with JHP and Par Sterile, Hinchen signed at least three separate agreements with clauses relating to the Trade Secrets, confidential information, and non-solicitation. The relevant provisions of these agreements remain in full force and, for good consideration, Hinchen remains obligated to comply with these provisions. Par has satisfied all of its obligations under these valid and enforceable agreements.

**RESPONSE:** *Hinchen admits that he signed certain agreements with Par, but denies that all obligations contained in these agreements continue in full force and effect.  To the extent Paragraph 99 pertains to the non-solicitation provisions of certain agreements, those provisions are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed. Hinchen denies the remaining allegations of Paragraph 99.*

100.     *First*, in December 2012, Hinchen signed an "Employee Agreement" with JHP. This agreement defined "Confidential Information" as

> all information, data, agreements, documents, reports, 'know-how', interpretations, plans, studies, forecasts, projections and records (whether  in written  form,  electronically  stored  or otherwise) containing or otherwise reflecting information [including]
> . . . operating procedures, techniques, systems, processes and methods,  all  intellectual property, product  and service information, including research and development and proposed products and services . . . and
> . . . other commercial 'knowhow', trade secrets and information not available to the public generally . . . .

By signing the Employee Agreement, Hinchen agreed to a non-disclosure clause, which  provided that Hinchen "will not, directly or indirectly, disclose, reveal, divulge, publish or otherwise make known to any Person or use any Confidential  Information for any reason or purpose whatsoever, except for the proper discharge  of the Employee's duties to the Company under this Agreement."

**RESPONSE:** *Hinchen admits that he entered into an Employee Agreement with JHP, and that the quoted language appears in the agreement, except to the extent it is incomplete. Hinchen denies the remaining allegations of Paragraph 100, including but not limited to any characterizations of the quoted language.*

101.     Hinchen also agreed to a one-year non-solicitation clause, which  provided that Hinchen

> will not in any manner, directly or indirectly . . . solicit, hire, induce or  attempt to induce, or assist others to solicit, hire, induce or attempt to induce, any director, officer, employee, contractor, consultant or agent  of any member of [JHP] to either (I) leave  or terminate  his or her  employment, consulting or other position or business relationship with any member of the Company Group, or (II) breach his or her  employment, consulting or other agreement with any member of the Company Group . . . .

**RESPONSE:** *The allegations of Paragraph 101 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

     102.   Hinchen further agreed that JHP "will be entitled to seek equitable relief, including, without limitation, an injunction or injunctions (without the requirement of posting a bond, other security or any similar requirement or proving any actual damages), to prevent breaches or threatened breaches of this Agreement."

**RESPONSE:** *To the extent Paragraph 102 pertains to the non-solicitation provisions of the*

*agreements, those provisions are subject to a concurrently filed Motion to Dismiss, and are therefore*

*not addressed. Hinchen admits the agreement contains the quoted language, except to the extent it is*

*incomplete. Hinchen denies the remaining allegations of Paragraph 102, included but not limited to any*

*characterizations of the quoted language.*

     103.   *Second*, in December 2012, Hinchen signed a "Restrictive Covenant Agreement" with JHP. This agreement defined "Confidential Information" as

> all information of or regarding [JHP], including, without limitation . . . information regarding . . . all source code, object code, modules, algorithms, software programs, system architectures, research, inventions, processes, techniques, costs, prices, customer contracts, requirements, systems, specific needs, customer lists or any other information related to customers or prospective customers that could create a competitive advantage, plans, budgets, forecasts, financial results, operations and personnel information, all information relating to the development, formulation, production, marketing or sale of existing or contemplated products, services, systems or processes; . . . know-how, trade secrets and proprietary information . . . .

By signing the Restrictive Covenant Agreement, Hinchen agreed to a non-disclosure clause, which provided that Hinchen will not "disclose or furnish to any Person . . . any Confirmation Information."

**RESPONSE:** *Hinchen admits he signed an agreement entitled "Restrictive Covenant Agreement," and*

*that the quoted language appears in that agreement, except to the extent it is incomplete. Hinchen*

*denies the remaining allegations of Paragraph 103, including but not limited to any characterizations of*

*the quoted language.*

104.    Hinchen also agreed to a three-year non-solicitation clause, which provided that Hinchen will not "directly or indirectly employ, Solicit, or attempt to  employ, or Solicit . . . any director, officer, consultant or employee" of JHP.

**RESPONSE:** *The allegations of Paragraph 104 are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed.*

105.    *Third*, in June 2014, Hinchen signed a "Separation and Release" with Par Sterile. This agreement provided that the parties "reiterate certain terms  contained in [Hinchen]'s Employment Agreement."

**RESPONSE:** *Hinchen admits that he entered into a Separation and Release Agreement with Par, and that the quoted language appears in that agreement, except to the extent it is incomplete. Hinchen denies the remaining allegations of Paragraph 105, including but not limited to any characterizations of the quoted language.*

106.    By signing the Separation and Release, Hinchen agreed to a non-disclosure clause, which provided that Hinchen will "not at any time, other than as may be  required  in connection with the performance by him of any remaining  duties or obligations under the Employment Agreement, directly or indirectly, use,  communicate, disclose or disseminate any Confidential Information in any manner  whatsoever . . . ."

**RESPONSE:** *Hinchen admits that he entered into a Separation and Release Agreement with Par, and that the quoted language appears in that agreement, except to the extent it is incomplete. Hinchen denies the remaining allegations of Paragraph 106, including but not limited to any characterizations of the quoted language.*

107.    Hinchen also agreed to a one-year non-solicitation clause, which  provided that Hinchen will

not in any manner, directly or indirectly . . . . solicit, hire, induce or  attempt  to induce . . .  any director, officer, employee, contractor, consultant or agent of [Par Sterile] existing on or prior to the date of this Release to either (i) leave or terminate his or her employment,  consulting or other position or business relationship with [Par Sterile]  or (ii) breach his or her employment, consulting or other agreement with [Par] . . . .

**RESPONSE:** *The allegations of Paragraph 107 are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed.*

108.    Hinchen further agreed that a breach of the Separation and Release "will result in immediate and irreparable damage to [Par Sterile] and will entitle  [Par Sterile] to injunctive relief from a court having appropriate jurisdiction."

**RESPONSE:** *Hinchen admits the quoted language appears in the Separation and Release Agreement, except to the extent it is incomplete. Hinchen denies the remaining allegations of Paragraph 108, including but not limited to any characterization of the quoted language.*

109.    Hinchen consented to the jurisdiction of New Jersey state and federal courts.  Hinchen's consent to jurisdiction in New Jersey supersedes any previous  consent to jurisdiction in other forums.

**RESPONSE:** *Hinchen denies the allegations of Paragraph 109.*

110.    The relevant provisions of all three agreements—the Employment  Agreement, Restrictive Covenant Agreement, and Separation Agreement and Release—are still in effect. Neither Hinchen nor Par has terminated the agreements.  To the extent the non-disclosure and non-solicitation clauses in the  agreements address the same subject matters, the clauses are consistent and without contradiction among the three agreements. To the extent that other clauses  within the agreements contradict these clauses, those contradictions do not affect the enforceability of the non-disclosure and non-solicitation clauses.  As a result,  all three agreements are valid contracts and independently enforceable.

**RESPONSE:** *To the extent Paragraph 110 pertains to the non-solicitation provisions of the agreements, those provisions are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed. Hinchen denies the remaining allegations of Paragraph 110.*

111.    Par is the owner of Trade Secrets and other proprietary or confidential  information relating to Vasostrict® and other vasopressin products. These Trade  Secrets are described above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram,  drawing,  invention, plan, procedure, prototype or process. Some or all of the documents and information comprising Par's Trade Secrets constitute "Confidential Information" as defined in the Employment Agreement, Restrictive Covenant Agreement,  and  Separation Agreement and Release.

**RESPONSE:** *Hinchen denies the allegations of Paragraph 111.*

112.    Hinchen was in possession of Par's Trade Secrets while subject to three agreements. In those agreements, he: (1) expressly acknowledged and  confirmed the confidential nature of Par's

Trade Secrets; (2) agreed to maintain the confidentiality of Par's Trade Secrets; (3) agreed not to use Par's Trade Secrets for their own purposes or the purposes of a third party; and (4) agreed not to solicit Par's employees.

**RESPONSE:** *To the extent Paragraph 112 pertains to the non-solicitation provisions of the*

*agreements, those provisions are subject to a concurrently filed Motion to Dismiss, and are therefore*

*not addressed. Hinchen denies the remaining allegations of Paragraph 112.*

113.    Hinchen knowingly and improperly disclosed Par's Trade Secrets to QuVa and used the Trade Secrets outside the scope of his employment with Par Sterile. Hinchen's knowing and improper disclosure and use of Par's Trade Secrets constitutes a breach of the non-disclosure clauses in his Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement.

**RESPONSE:** *Hinchen denies the allegations of Paragraph 113.*

114.    Hinchen knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile. Hinchen's knowing and improper solicitation constitutes a breach of the non-solicitation clauses in his Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement.

**RESPONSE:** *The allegations of Paragraph 114 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

115.    By reason of Hinchen's breach of contracts alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *To the extent Paragraph 115 pertains to the non-solicitation provisions of the contracts,*

*those provisions are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed.*

*Hinchen denies the remaining allegations of Paragraph 115.*

116.    Par is also entitled to recover compensatory damages, general damages, and special damages from Hinchen. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *Hinchen denies the allegations of Paragraph 116.*

**COUNT VI**
**Breach Of Contract, New Jersey Common Law**
(***Against Defendant Jenkins***)

117.    Par re-alleges each and every allegation set forth in Paragraphs 1 through 116,

33

inclusive, and incorporates them herein by reference.

**RESPONSE:** *Jenkins incorporates his responses to Paragraphs 1-76, as if fully set forth herein.*

118.     During his course of employment with JHP and Par Sterile, Jenkins signed at least three separate agreements with clauses relating to the Trade Secrets, confidential information, and non-solicitation. The relevant provisions of these agreements remain in full force and, for good consideration, Jenkins remains obligated to comply with these provisions. Par has satisfied all of its obligations under these valid and enforceable agreements.

**RESPONSE:** *Jenkins admits that he signed certain agreements with Par, but denies that all obligations contained in these agreements continue in full force and effect. To the extent Paragraph 118 pertains to the non-solicitation provisions of certain agreements, those provisions are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed. Jenkins denies the remaining allegations of Paragraph 118.*

119.     *First*, in December 2012, Jenkins signed an "Employee Agreement" with JHP. This agreement defined "Confidential Information" as

> all information, data, agreements, documents, reports, 'know-how', interpretations, plans, studies, forecasts, projections and records (whether in written form, electronically stored or otherwise) containing or otherwise reflecting information [including]
> . . . operating procedures, techniques, systems, processes and methods, all intellectual property, product and service information, including research and development and proposed products and services . . . and
> . . . other commercial 'knowhow', trade secrets and information not available to the public generally . . . .

By signing the Employee Agreement, Jenkins agreed to a non-disclosure clause, which provided that Jenkins "will not, directly or indirectly, disclose, reveal, divulge, publish or otherwise make known to any Person or use any Confidential Information for any reason or purpose whatsoever, except for the proper discharge of the Employee's duties to the Company under this Agreement."

**RESPONSE:** *Jenkins admits that he entered into an Employee Agreement with JHP, and that the quoted language appears in the agreement, except to the extent it is incomplete. Jenkins denies the remaining allegations of Paragraph 119, including but not limited to any characterizations of the quoted language.*

120.    Jenkins also agreed to a one-year non-solicitation clause, which provided that Jenkins

> will not in any manner, directly or indirectly . . . solicit, hire, induce or attempt to induce, or assist others to solicit, hire, induce or attempt to induce, any director, officer, employee, contractor, consultant or agent of any member of [JHP] to either (I) leave or terminate his or her employment, consulting or other position or business relationship with any member of the Company Group, or (II) breach his or her employment, consulting or other agreement with any member of the Company Group . . . .

**RESPONSE:** *The allegations of Paragraph 120 are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed.*

121.    Jenkins further agreed that JHP "will be entitled to seek equitable relief, including, without limitation, an injunction or injunctions (without the requirement of posting a bond, other security or any similar requirement or proving any actual damages), to prevent breaches or threatened breaches of this Agreement."

**RESPONSE:** *To the extent Paragraph 121 pertains to the non-solicitation provisions of the agreements, those provisions are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed. Jenkins admits the agreement contains the quoted language, except to the extent it is incomplete. Jenkins denies the remaining allegations of Paragraph 121, included but not limited to any characterizations of the quoted language.*

122.    *Second*, in December 2012, Jenkins signed a "Restrictive Covenant Agreement" with JHP. This agreement defined "Confidential Information" as

> all information of or regarding [JHP], including, without limitation . . . information regarding . . . all source code, object code, modules, algorithms, software programs, system architectures, research, inventions, processes, techniques, costs, prices, customer contracts, requirements, systems, specific needs, customer lists or any other information related to customers or prospective customers that could create a competitive advantage, plans, budgets, forecasts, financial results, operations and personnel information, all information relating to the development, formulation, production, marketing or sale of existing or contemplated products, services, systems or processes; . . . know-how, trade secrets and proprietary information . . . .

By signing the Restrictive Covenant Agreement, Jenkins agreed to a non-disclosure clause, which provided that Jenkins will not "disclose or furnish to any Person . . . any Confirmation Information."

**RESPONSE:** *Jenkins admits he signed an agreement entitled "Restrictive Covenant Agreement," and that the quoted language appears in that agreement, except to the extent it is incomplete. Jenkins denies the remaining allegations of Paragraph 122, including but not limited to any characterizations of the quoted language.*

123.    Jenkins also agreed to a three-year non-solicitation clause, which provided that Jenkins will not "directly or indirectly employ, Solicit, or attempt to employ, or Solicit . . . any director, officer, consultant or employee" of JHP.

**RESPONSE:** *The allegations of Paragraph 123 are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed.*

124.    *Third*, in June 2014, Jenkins signed a "Separation and Release" with Par Sterile. This agreement provided that the parties "reiterate certain terms contained in [Jenkins]'s Employment Agreement." By signing the Separation and Release, Jenkins agreed to a non-disclosure clause, which provided that Jenkins will "not at any time, other than as may be required in connection with the performance by him of any remaining duties or obligations under the Employment Agreement, directly or indirectly, use, communicate, disclose or disseminate any Confidential Information in any manner whatsoever . . . ."

**RESPONSE:** *Jenkins admits that he entered into a Separation and Release Agreement with Par, and that the quoted language appears in that agreement, except to the extent it is incomplete. Jenkins denies the remaining allegations of Paragraph 124, including but not limited to any characterizations of the quoted language.*

125.    Jenkins also agreed to a one-year non-solicitation clause, which provided that Jenkins will

> not in any manner, directly or indirectly . . . . solicit, hire, induce or attempt to induce . . . any director, officer, employee, contractor, consultant or agent of [Par Sterile] existing on or prior to the date of this Release to either (i) leave or terminate his or her employment, consulting or other position or business relationship with [Par Sterile] or (ii) breach his or her employment, consulting or other agreement with [Par Sterile] . . . .

**RESPONSE:** *The allegations of Paragraph 125 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*


126.    Jenkins further agreed that a breach of the Separation and Release "will result in immediate and irreparable damage to [Par Sterile] and will entitle [Par Sterile] to injunctive relief from a court having appropriate jurisdiction."

**RESPONSE:** *Jenkins admits the quoted language appears in the Separation and Release Agreement,*

*except to the extent it is incomplete. Jenkins denies the remaining allegations of Paragraph 126,*

*including but not limited to any characterization of the quoted language.*


127.    Jenkins consented to the jurisdiction of New Jersey state and federal courts. Jenkins's consent to jurisdiction in New Jersey supersedes any previous consent to jurisdiction in other forums.

**RESPONSE:** *Jenkins denies the allegations of Paragraph 127.*


128.    The relevant provisions of all three agreements—the Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement and Release—are still in effect. Neither Jenkins nor Par has terminated the agreements. To the extent the non-disclosure and non-solicitation clauses in the agreements address the same subject matters, the clauses are consistent and without contradiction among the three agreements. To the extent that other clauses within the agreements contradict these clauses, those contradictions do not affect the enforceability of the non-disclosure and non-solicitation clauses. As a result, all three agreements are valid contracts and independently enforceable.


**RESPONSE:** *To the extent Paragraph 128 pertains to the non-solicitation provisions of the*

*agreements, those provisions are subject to a concurrently filed Motion to Dismiss, and are therefore*

*not addressed. Jenkins denies the remaining allegations of Paragraph 128.*


129.    Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products. These Trade Secrets are described above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process. Some or all of the documents and information comprising Par's Trade Secrets constitute "Confidential Information" as defined in the Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement and Release.

**RESPONSE:** *Jenkins denies the allegations of Paragraph 129.*

130.     Jenkins was in possession of Par's Trade Secrets while subject to the three agreements. In those agreements, he: (1) expressly acknowledged and confirmed the confidential nature of Par's Trade Secrets; (2) agreed to maintain the confidentiality of Par's Trade Secrets; (3) agreed not to use Par's Trade Secrets for their own purposes or the purposes of a third party; and (4) agreed not to solicit Par's employees.

**RESPONSE:** *To the extent Paragraph 130 pertains to the non-solicitation provisions of the*

*agreements, those provisions are subject to a concurrently filed Motion to Dismiss, and are therefore*

*not addressed. Jenkins denies the remaining allegations of Paragraph 130.*

131.     Jenkins knowingly and improperly disclosed Par's Trade Secrets to QuVa and used the Trade Secrets outside the scope of his employment with Par Sterile. Jenkins's knowing and improper disclosure and use of Par's Trade Secrets constitutes a breach of the non-disclosure clauses in his Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement.

**RESPONSE:** *Jenkins denies the allegations of Paragraph 131.*

132.     Jenkins knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile. Jenkins's knowing and improper solicitation constitutes a breach of the non-solicitation clauses in his Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement.

**RESPONSE:** *The allegations of Paragraph 132 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

133.     By reason of Jenkins's breach of contracts alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *To the extent Paragraph 133 pertains to the non-solicitation provisions of the contracts,*

*those provisions are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed.*

*Jenkins denies the remaining allegations of Paragraph 133.*

134.     Par is also entitled to recover compensatory damages, general damages, and special damages from Jenkins. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *Jenkins denies the allegations of Paragraph 134.*

## COUNT VII
## Breach Of Contract, New Jersey Common Law
### (*Against Defendant Rutkowski*)

135.     Par re-alleges each and every allegation set forth in Paragraphs 1 through 134, inclusive, and incorporates them herein by reference.

**RESPONSE:** *Rutkowski incorporates his responses to Paragraphs 1-76, as if fully set forth herein.*

136.     During his course of employment with JHP and Par Sterile, Rutkowski at least signed three separate agreements with clauses relating to the Trade Secrets, confidential information, and non-solicitation. The relevant provisions of these agreements remain in full force and, for good consideration, Rutkowski remains obligated to comply with these provisions. Par has satisfied all of its obligations under these valid and enforceable agreements.

**RESPONSE:** *Rutkowski admits that he signed certain agreements, but denies that all provisions of these agreements remain in full force and effect. To the extent that Paragraph 136 pertains to non-solicitation provisions of certain agreements, those provisions are subject to a concurrently filed Motion to Dismiss and are therefore not addressed. Rutkowski denies the remaining allegations of Paragraph 136.*

137.     *First*, in March 2015, Rutkowski signed a "Trade Secret, Non-Disclosure and Restrictive Covenant Agreement." This agreement defined "Proprietary Information" as "confidential and trade secret information, including formulas, formulations, processes, methods of manufacture, research and development including protocols and/or records, results, data, product pricing information, financial information, product pricing, marketing information, and the identify of customers including customer lists . . . ." By signing the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement, Rutkowski agreed to a non- disclosure clause, which provided that Rutkowski will not "divulge, disclose, or communicate to anyone or any entity, directly or indirectly either during or after the termination of your employment with Par, any of Par's Proprietary Information, and agree not to use Par's Proprietary Information in your required duties for any subsequent employer."

**RESPONSE:** *Rutkowski admits that he signed a Trade Secret, Non-Disclosure and Restrictive Covenant Agreement with Par, and that the agreement contains the quoted language, except to the extent it is incomplete. Rutkowski denies the remaining allegations in Paragraph 137, including but not limited to any characterization of the quoted language.*

138.     Rutkowski also agreed to a non-solicitation clause, which provided that Rutkowski will not "solicit, induce, encourage or attempt to solicit, induce or encourage any employee of Par to

leave his/her employment with Par . . . or . . . hire, attempt to hire, assist in the hire or, or attempt to assist in the hire of an employee of Par."

**RESPONSE:** *The allegations of Paragraph 138 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

139.    Rutkowski further agreed that Par Sterile is "entitle[d] . . . to injunctive relief from a court having appropriate jurisdiction" as a result of his "failure to abide by this Agreement."

**RESPONSE:** *Rutkowski admits that the agreement contains the quoted language, except to the extent it*

*is incomplete.  Rutkowski denies the remaining allegations in Paragraph 139, including but not limited*

*to any characterization of the quoted language.*

140.    *Second*, in September 2015, Rutkowski signed a "Proprietary Information and Nondisclosure Agreement." Par was the intended beneficiary of this agreement between Rutkowski and Endo International plc. This agreement defined "Confidential Information" as "trade secret and . . . information . . . disclosed to or known by me as a consequence of my employment and . . . not generally known outside of Employer." By signing the Proprietary Information and Nondisclosure Agreement, Rutkowski agreed to a non-disclosure clause, which provided that Rutkowski will not "disclose or use at any time, either during or subsequent to my employment, any Confidential Information of employer which I develop or otherwise become informed of during my employment, except as required in my duties to Employer."

**RESPONSE:** *Rutkowski admits he signed a "Proprietary Information and Non-Disclosure Agreement"*

*in September 2015, and that the agreement contains the quoted language, except to the extent it is*

*incomplete. Rutkowski denies the remaining allegations in Paragraph 140, including but not limited to*

*any characterization of the quoted language.*

141.    Rutkowski also agreed to a non-solicitation clause, which provided that Rutkowski will "not directly or indirectly, either for myself or through an agent, consultant, firm or corporation, solicit or cause loss of . . . employees from Endo."

**RESPONSE:**  *The allegations of Paragraph 141 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

142.    *Third*, in April 2017, Rutkowski signed an "Employee Certificate of Compliance." Par was the intended beneficiary of this agreement between Rutkowski and Endo International plc. By signing the Employee Certificate of Compliance, Rutkowski agreed to a non-disclosure clause, which provided that Rutkowski was:

obligated to preserve in confidence and not use for my own benefit or the benefit of any third party of any of the following: confidential and proprietary information, knowledge, data, documents or other information relating to the Company's products, systems, databases, research programs, know-how, designs, data, customer lists or any other proprietary and/or confidential information pertaining to any business of the Company or any of its subsidiaries, parents or affiliated companies, or information pertaining to any of the Company's suppliers, clients, customers, employees, consultants, or independent contractors that I had in my possession or had access to during my time of employment with the Company.

**RESPONSE:** *Rutkowski admits he signed an "Employee Certificate of Compliance With Proprietary Information and Nondisclosure Agreement and Termination Information Acknowledgement" in April 2017, and that the agreement contains the quoted language, except to the extent it is incomplete. Rutkowski denies the remaining allegations in Paragraph 142, including but not limited to any characterization of the quoted language.*

143.   The relevant provisions of all three agreements—the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement, the Proprietary Information and Nondisclosure Agreement, and the Employee Certification of Compliance— are still in effect. Neither Rutkowski nor Par has terminated the agreements. To the extent the non-disclosure and non-solicitation clauses in the agreements address the same subject matters, the clauses are consistent and without contradiction among the three agreements. To the extent that other clauses within the agreements contradict these clauses, those contradictions do not affect the enforceability of the non-disclosure and non-solicitation clauses. All three agreements are valid contracts and independently enforceable.

**RESPONSE:** *To the extent Paragraph 143 pertains to the non-solicitation provisions of the agreements, those provisions are subject to a concurrently filed Motion to Dismiss and are therefore not addressed. Rutkowski denies the remaining allegations in Paragraph 143.*

144.   Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products. These Trade Secrets are described above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process. Some or all of the documents and information comprising Par's Trade Secrets constitute "Proprietary Information" or "Confidential Information" as defined in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement, the Proprietary Information and Nondisclosure Agreement, and the Employee Certification of Compliance.

**RESPONSE:** *Rutkowski denies the allegations in Paragraph 144.*

145.    Rutkowski was in possession of Par's Trade Secrets while subject to the three agreements. In those agreements, he: (1) expressly acknowledged and confirmed the confidential nature of Par's Trade Secrets; (2) agreed to maintain the confidentiality of Par's Trade Secrets; (3) agreed not to use Par's Trade Secrets for their own purposes or the purposes of a third party; and (4) agreed not to solicit Par's employees.

**RESPONSE:** *To the extent Paragraph 145 pertains to the non-solicitation provisions of the*

*agreements, those provisions are subject to a concurrently filed Motion to Dismiss, and are therefore*

*not addressed. Rutkowski denies the remaining allegations in Paragraph 145.*

146.    Rutkowski knowingly and improperly disclosed Par's Trade Secrets to QuVa and used the Trade Secrets outside the scope of his employment with Par Sterile. Rutkowski's knowing and improper disclosure and use of Par's Trade Secrets constitutes a breach of the non-disclosure clauses in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement, the Proprietary Information and Nondisclosure Agreement, and the Employee Certification of Compliance.

**RESPONSE:** *Rutkowski denies the allegations in Paragraph 146.*

147.    Rutkowski knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile. Rutkowski's knowing and improper solicitation constitutes a breach of the non-solicitation clauses in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement and the Proprietary Information and Nondisclosure Agreement.

**RESPONSE:** *The allegations of Paragraph 147 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

148.    By reason of Rutkowski's breach of contracts alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *To the extent Paragraph 148 pertains to the non-solicitation provisions of the contracts,*

*those provisions are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed.*

*Rutkowski denies the remaining allegations in Paragraph 148.*

149.    Par is also entitled to recover compensatory damages, general damages, and special damages from Rutkowski. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *Rutkowski denies the allegations in Paragraph 149.*

**COUNT VIII**
**Breach Of Fiduciary Duty, New Jersey Common Law**
(***Against Defendants Hinchen, Jenkins, And Rutkowski***)

150.     Par re-alleges each and every allegation set forth in Paragraphs 1 through 149, inclusive, and incorporates them herein by reference.

**RESPONSE:** *The allegations of Paragraph 150 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

151.     Hinchen, Jenkins, and Rutkowski each owed, and continue to owe, a fiduciary duty to Par because, among other reasons, Par entrusted each of them with access to the Trade Secrets and other confidential corporate information and because each was a corporate officer of Par Sterile. Hinchen was President of Par Sterile, Jenkins was Chief Development Officer of Par Sterile, and Rutkowski was a Senior Vice President and General Manager at Par Sterile.

**RESPONSE:** *The allegations of Paragraph 151 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

152.     Hinchen's, Jenkins's, and Rutkowski's fiduciary duties included, among others, the duty to protect the confidentiality of Par's Trade Secrets and other confidential information and to refrain from unfairly competing with Par by using Par's Trade Secrets and other confidential information.

**RESPONSE:** *The allegations of Paragraph 152 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

153.     Hinchen, Jenkins, and Rutkowski have knowingly breached their fiduciary obligation to Par by disclosing and/or using Par's Trade Secrets and other confidential information for the benefit of QuVa in the preparation for the production of a competing vasopressin compound and the other acts described above.

**RESPONSE:** *The allegations of Paragraph 153 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

154.     By reason of the above-alleged acts and conduct of Hinchen, Jenkins, and Rutkowski, Par has been damaged, and it will continue to suffer great and irreparable harm and

damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *The allegations of Paragraph 154 are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed.*

155.    Par is also entitled to recover compensatory damages and punitive damages from Hinchen, Jenkins, and Rutkowski. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *The allegations of Paragraph 155 are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed.*

## COUNT IX
## Breach Of Duty Of Loyalty, New Jersey Common Law
### (*Against Defendants Hinchen, Jenkins, And Rutkowski*)

156.    Par re-alleges each and every allegation set forth in Paragraphs 1 through 155, inclusive, and incorporates them herein by reference.

**RESPONSE:** *The allegations of Paragraph 156 are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed.*

157.    Hinchen, Jenkins, and Rutkowski owed, and continue to owe, a duty of loyalty to Par because, under New Jersey law, every employee owes a duty of loyalty to his or her employee to not act contrary to the employer's interests while employed. This duty prohibits the disclosure of trade secrets or other confidential information of the employer, and it extends past an employee's termination. Hinchen, as President of Par Sterile, Jenkins, as Chief Development Officer of Par Sterile, and Rutkowski, as a Senior Vice President and General Manager at Par Sterile, were all employees of Par Sterile and therefore owed Par a duty of loyalty that extends past their employment with Par Sterile.

**RESPONSE:** *The allegations of Paragraph 157 are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed.*

158.    Hinchen, Jenkins, and Rutkowski knowingly breached their duty of loyalty by disclosing and/or using Par's Trade Secrets and other confidential information for the benefit of QuVa in the preparation for the production of a competing vasopressin compound and the other acts described above. At the time of such disclosure and use, Hinchen, Jenkins, and Rutkowski knew or had reason to know that their knowledge of the Trade Secrets was acquired under circumstances giving rise to a duty to maintain the secrecy, and limit the use, of the Trade Secrets and

other confidential information.

**RESPONSE:**   *The allegations of Paragraph 158 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

159.    By reason of the above-alleged acts and conduct of Hinchen, Jenkins,  and Rutkowski, Par has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult  if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:**   *The allegations of Paragraph 159 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

160.    Par is also entitled to recover compensatory damages and punitive damages from Hinchen, Jenkins, and Rutkowski. The amount of such relief cannot  be determined precisely at this time.

**RESPONSE:**   *The allegations of Paragraph 160 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

**COUNT X**
**Breach Of Duty Of Confidence, New Jersey Common Law**
**(*Against Defendants Hinchen, Jenkins, And Rutkowski*)**

161.    Par re-alleges each and every allegation set forth in Paragraphs 1 through 160, inclusive, and incorporates them herein by reference

**RESPONSE:** *The allegations of Paragraph 161 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

162.    Hinchen, Jenkins, and Rutkowski owed, and continue to owe, a duty of confidence to Par because, among other reasons, Par disclosed to them Trade Secrets and other  confidential information  based  on  their  express  and  implied  promise of confidentiality.

**RESPONSE:** *The allegations of Paragraph 162 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

163.    Hinchen, Jenkins, and Rutkowski breached their duty of confidence by misappropriating Par's Trade Secrets, including by disclosing and using the Trade Secrets without Par's  express  or  implied  consent. At  the  time  of  such  disclosure and use, Hinchen,

45

Jenkins, and Rutkowski knew or had reason to know that their knowledge of the Trade Secrets of other confidential information was acquired under circumstances giving rise to a duty to maintain the secrecy, and limit the use, of the Trade Secrets and other confidential information.

**RESPONSE:** *The allegations of Paragraph 163 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

164.    By reason of the acts and conduct of Hinchen, Jenkins, and Rutkowski alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *The allegations of Paragraph 164 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

165.    Par is also entitled to recover compensatory damages and punitive damages from Hinchen, Jenkins, and Rutkowski. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *The allegations of Paragraph 165 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

## COUNT XI
### Tortious Interference With Contractual Relations, New Jersey Common Law
### (*Against Defendant QuVa*)

166.    Par re-alleges each and every allegation set forth in Paragraphs 1 through 165, inclusive, and incorporates them herein by reference.

**RESPONSE:** *The allegations of Paragraph 166 are subject to a concurrently filed Motion to Dismiss,*

*and are therefore not addressed.*

167.    Par Sterile has contractual relationships with employees that have confidential knowledge of the Trade Secrets and other confidential described above, including such key employees as David Short, Stephen Rhoades, Travis McGrady, David "Mike" Hartley, Guy Thompson, Mike Rutkowski, Ashley Short, Chinnasamy Subramaniam, and Donna Kohut. These contractual relationships include a non-disclosure clause. Par has fulfilled its obligation under those agreements.

**RESPONSE:** *The allegations of Paragraph 167 are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed.*

168.     As described above, QuVa engaged in an aggressive poaching campaign of Par Sterile's key employees with actual knowledge of Par Sterile's contractual relationships with those employees and the contractual relationships' protection of Par Sterile's Trade Secrets. Legitimate hiring on the open market, without using confidential information as to which Par Sterile employees had knowledge of the Trade Secrets and other confidential information, would not have resulted in such targeting of the above-named individuals.

**RESPONSE:** *The allegations of Paragraph 168 are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed.*

169.     QuVa intended to use improper means in interfering with Par Sterile's contractual relationships with the former key employees listed above without lawful justification or legitimate reason for this interference. As a result, QuVa's tortious interference was intentional and with malice.

**RESPONSE:** *The allegations of Paragraph 169 are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed.*

170.     As a direct and proximate result of QuVa's actions, the former key employees listed above were induced to breach the non-disclosure clauses in their various employment agreements.

**RESPONSE:** *The allegations of Paragraph 170 are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed.*

171.     As a result of QuVa's wrongdoing, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *The allegations of Paragraph 171 are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed.*

172.     Par is also entitled to recover compensatory damages and punitive damages from QuVa. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *The allegations of Paragraph 172 are subject to a concurrently filed Motion to Dismiss, and are therefore not addressed.*

47

## RELIEF SOUGHT

**RESPONSE:**  *Defendants deny that Plaintiffs are entitled to any of the relief identified in Paragraphs 1-8 in the Relief Sought Section.*

## <u>DEFENDANTS' AFFIRMATIVE  DEFENSES</u>

Based on the factual allegations contained in the Complaint, without admitting any wrongful conduct on the part of Defendants, without admitting that Par suffered any loss, damage, or injury, and without assuming any burden of proof that it would not otherwise bear under applicable law, Defendants asserts the following affirmative defenses. These defenses are pleaded in the alternative and without prejudice to the denials and other statements made in Defendants' Answer and/or Counterclaims to the Complaint.

Defendants reserve the right to amend this Answer and to add additional Affirmative Defenses.

### FIRST DEFENSE

Par's claims are barred, in whole or in part, because the Complaint fails to state a claim for damages or for injunctive relief upon which such relief may be granted.

### SECOND DEFENSE

Plaintiffs are not entitled to the relief requested as a matter of law on any of their claims against Defendants.

### THIRD DEFENSE

Plaintiff's claims are or may be barred, or the relief it seeks limited, because the information asserted by Plaintiff to be confidential or trade secrets does not constitute protectable trade secrets or confidential information. They are and have been generally known to the public (at least by way of Plaintiffs' patents and published patent applications, as well as other acts of Plaintiffs), are and have been readily ascertainable by proper means, are and have been independently developed by others,

48

and/or are not subject to reasonable efforts by Plaintiffs to maintain secrecy. Plaintiffs' claims fail to establish any purported trade secrets have economic value derived from not being generally known. Plaintiffs' claims fail to establish any purported trade secrets have economic value to Defendants.

## FOURTH DEFENSE

Plaintiffs' claims are or may be barred, or the relief it seeks limited, due to Plaintiffs' failure to describe its alleged confidential information and trade secrets with reasonable particularity or with sufficient detail to distinguish them from unprotected information and to inform Defendants whether or to what extent Plaintiff possesses trade secrets or that such trade secrets have been misappropriated. Virtually every pharmaceutical business includes "technical  know-how relating to chemical compositions and properties, batch quantities, assays, test methods and specifications, stability protocols, validation methods, quality control, and research & development efforts to obtain increased shelf life under both refrigeration and room temperature storage conditions," as well as "confidential information relating to the manufacture, packaging, distribution, marketing, and sale" of pharmaceutical products. Additionally such businesses may include "customer identities, industry competitive intelligence, strategic plans, results of operations, and short- and long-term business strategies and initiatives," making Plaintiffs' vague allegations insufficient to inform Defendants of what alleged trade secrets have purportedly been misappropriated.

## FIFTH DEFENSE

Plaintiffs have not suffered any monetary damages or other injury as a result of any acts or omissions of Defendants regarding any alleged trade secrets or confidential information, or any alleged misappropriation or misuse thereof.

## SIXTH DEFENSE

Plaintiffs' claims are brought in bad faith without substantial justification and for an improper

49

purpose.

### SEVENTH DEFENSE

At all times relevant to the Complaint, Defendants acted in good faith. Defendants have not misappropriated trade secrets or other proprietary or confidential information in violation of any New Jersey or Federal Statute or common law.

### EIGHTH DEFENSE

Par's claims fail because Defendants have, at all material times, engaged in lawful dealings with Par in the marketplace and without any intent to harm Par.

### NINTH DEFENSE

Par's claims against Defendants are barred in whole or in part by the equitable doctrines of unclean hands, waiver, release, laches, estoppel, and/or res judicata.

### TENTH DEFENSE

Par's claims for breach of fiduciary duty, breach of the duty of loyalty, and breach of the duty of confidence are barred by the economic loss doctrine.

### ELEVENTH DEFENSE

Par's claims and damages, if any, are barred because Defendants' conduct was not the factual or proximate cause of any injury or loss that Par allegedly sustained and any such injury or loss was caused by Par and/or another third party for which Defendants are not responsible.

### TWELFTH DEFENSE

Par's claims against Defendants are barred in whole or in part by its failure to mitigate its damages, if it has suffered any such damages.

### THIRTEENTH DEFENSE

Par is not entitled to recover actual or compensatory damages because it cannot demonstrate any actual injury or special damages arising from the alleged acts of Defendants and/or its other former

employees.

## FOURTEENTH DEFENSE

Par's claims for equitable relief against Defendants are barred, in whole or in part, because Par has not alleged any conduct that may cause irreparable harm and/or Par has an adequate remedy at law and because the relief requested is overly broad, unreasonable, and based on an incorrect interpretation of Hinchen's, Jenkins's, and Rutkowski's obligations to Par.

## FIFTEENTH DEFENSE

Par's request for exemplary or punitive damages is barred by the applicable facts and laws, including applicable provisions of state law as well as the United States Constitution.

## SIXTEENTH DEFENSE

Par's request for attorneys' fees is barred because there is no legal basis for attorneys' fees for Par's claims.

## SEVENTEENTH DEFENSE

Par's claims fail because Par's former employees have not breached their respective agreements with Par and because QuVa did not have any knowledge of any alleged breach that may have occurred.

## EIGHTEENTH DEFENSE

QuVa never rendered substantial assistance or encouragement of any kind to any former Par employee to breach his or her contractual agreements with Par.

## NINETEENTH DEFENSE

QuVa has not tortiously interfered with Par's contracts or business relationships therefore, any such alleged actions are privileged and justified.

## TWENTIETH DEFENSE

QuVa has not tortiously interfered with Par's contracts or business relationships because at all times relevant to the Complaint, Defendants engaged in proper and acceptable conduct that comported

with, and was sanctioned by, the "rules of the game" which society and the relevant industry have adopted, and which Par has adopted and used.  As a result, any alleged interference by Defendants with Par's alleged contracts or business relationships was proper and privileged under the circumstances.

### TWENTY-FIRST DEFENSE

Par's claim for tortious interference with contractual relationships fails because Par cannot identify contract or prospective gain that was lost from QuVa's intentional interference.

### TWENTY-SECOND DEFENSE

Par's claims against Defendants are barred in whole or in part because the manner in which Par is attempting to enforce its agreements renders the agreements invalid and unenforceable under the applicable state law.

### TWENTY-THIRD DEFENSE

Certain categories of information Par may claim as confidential or proprietary is a matter of public or general knowledge in the industry and was otherwise widely known outside of Par.

### TWENTY-FOURTH DEFENSE

Par's former employees each had their own independent reasons for leaving Par and joining Defendants and were not induced to leave Par by Defendants.

### TWENTY-FIFTH DEFENSE

Par has selectively enforced its restrictive covenants with former employees.

### TWENTY-SIXTH DEFENSE

Par filed this lawsuit without having conducted a proper investigation, and without a sufficient factual basis to make the allegations contained therein.

### TWENTY-SEVENTH DEFENSE

Par's business and management policies, procedures, and practices caused many employees,

including some of the employees who joined QuVa, to seek employment elsewhere.

## DEFENDANTS' COUNTERCLAIMS

Defendant/Counter-Plaintiff QuVa Pharma, Inc. ("QuVa") for its Counterclaims against

Plaintiffs/Counter-Defendants Par Pharmaceutical Inc. and Par Sterile Products LLC (collectively,

"Par"), hereby alleges as follows:

## THE PARTIES

1.      Defendant/Counter-Plaintiff QuVa is a Delaware corporation with its headquarters in

Sugarland, Texas.

2.      On information and belief, Plaintiff/Counter-Defendant Par Sterile Products LLC ("Par

Sterile") is a Delaware limited liability company with its headquarters in Chestnut Ridge, New York.

Par Sterile is a wholly-owned, indirect subsidiary of Par Pharmaceutical Inc. In 2014, Par

Pharmaceutical Inc. acquired JHP Group Holdings, Inc., which was the ultimate parent company of JHP

Pharmaceuticals, LLC ("JHP"), a Delaware limited liability company that was headquartered in

Parsippany, New Jersey, and changed JHP's name to Par Sterile Products LLC.

3.      On information and belief, Plaintiff/Counter-Defendant Par Pharmaceutical Inc. ("Par

Pharmaceutical,") is a New York corporation with its headquarters in Chestnut Ridge, New York. Par

Pharmaceutical is a wholly-owned, indirect subsidiary of Endo International plc.

## JURISDICTION AND VENUE

4.      This is a declaratory judgment action arising under 28 U.S.C. § 2201 and the patent laws

of the United States, 35 U.S.C. § 1, et seq.

5.      QuVa and Par have adverse legal interests presenting a concrete, real and substantial,

justiciable controversy between them. QuVa seeks judicial declarations that the Asserted Patents are not

infringed by it.

6.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.      This Court has personal jurisdiction over Counter-Defendants. On information and belief, Counter-Defendants regularly conduct business throughout the United States including within the State of New Jersey, and derive substantial revenue from its activities within the State of New Jersey. Counter-Defendants have also specifically directed activities to the state of New Jersey by filing the current action.

8.      Venue is proper pursuant to 28 U.S.C. § 1391(b).

## BACKGROUND

9.      In 2001, Stuart Hinchen and Peter Jenkins, as employees of Mayne Group Limited, purchased Faulding Pharmaceuticals, a pharmaceutical company specializing in sterile pharmaceutical products, and renamed the company Mayne Pharmaceuticals ("Mayne"). Mayne had two sterile manufacturing facilities, one in Australia, which provided oncology drugs globally, and one in Puerto Rico, which provided non-oncology drugs for the U.S. market. Mayne's products were made using aseptic processing techniques. Both of Mayne's plants had to comply with FDA regulations regarding current Good Manufacturing Procedures ("cGMP") and were subject to FDA inspection. Mayne also had a cGMP-compliant manufacturing facility in Boulder, Colorado that made active pharmaceutical ingredients ("API") for use in these sterile formulations. In 2006, Mayne was sold to Hospira.

10.      In 2007, Mr. Hinchen and Mr. Jenkins founded JHP Pharmaceuticals ("JHP") and purchased a sterile solution manufacturing facility in Rochester, Michigan from King Pharmaceuticals ("King"), as well as the rights to make certain products previously made by King, including a vasopressin product called Pitressin®.  At the time JHP purchased the Rochester facility, King had been

making Pitressin® for many years. JHP continued to make Pitressin® at the Rochester facility in the same way it had been previously made by King and earlier owners of the facility.

11.      Pitressin® was an unapproved product that was nevertheless lawfully sold because it was first marketed long before FDA first implemented specific safety and efficacy guidelines for the approval of drug products in 1938 (i.e., it was a "grandfathered" product). In late 2012, pursuant to an FDA initiative to remove unapproved drugs from the market, JHP filed a New Drug Application ("NDA") pursuant to 21 U.S.C. § 355(b)(2) (also known as a "505(b)(2) application") to manufacture and market an FDA-approved version of Pitressin®. In doing so, JHP relied on the substantial published literature relating to vasopressin to show the safety and efficacy of Pitressin®.  JHP also developed an analytical method to measure the potency of Pitressin®, which was included in a publicly-available monograph prepared by the United States Pharmacopeia ("USP").

12.      Par Pharmaceutical acquired JHP on February 25, 2014, and renamed it Par Sterile. Approximately two months later, on April 17, 2014, the FDA approved the Pitressin® application originally filed by JHP. Par renamed the product Vasostrict®. At or about the same time, the FDA made portions of JHP's NDA application available to the public. This information, set forth among other things, the Vasostrict® formulation, the most effective solution pH for stability, and the vial and closure information. It also indicated that the potency specifications for the product matched those in the USP monograph for vasopressin injection.

13.      After JHP was sold to Par, Par told Mr. Hinchen and Mr. Jenkins not to come to work any longer, but to be available as necessary should questions arise.  When no such questions arose, on June 6, 2014, Par terminated Mr. Jenkins without cause pursuant to section 4(c) of Mr. Jenkins' JHP Employment Agreement. That same day, Mr. Jenkins signed a Separation Agreement and Release

("Separation Agreement") that contained one-year Covenants Not to Solicit and Covenants Not to Compete. The same scenario was repeated with Mr. Hinchen on June 11, 2014.

14.   After receiving approval for Vasostrict®--during the time Mr. Hinchen and Jenkins were sidelined by Par--and knowing the FDA had removed all other unapproved vasopressin products from the market, Par began raising the price per vial of Vasostrict®. Publicly-available industry data indicates that as of May 2017, Par has raised the price of Vasostrict to about $125 per vial. This is a 2500% increase from the $5 per vial price sought by APP Pharmaceuticals in 2013-14 and a 6250% increase from JHP's price per vial.

15.   Meanwhile, on or about July 29, 2015, Mr. Hinchen and Mr. Jenkins incorporated QuVa in Delaware for the purpose of manufacturing compounded drug products that are then sold directly to healthcare providers and not wholesalers.  QuVa's market is different from that for approved drug products and its products differ from approved drug products manufactured pursuant to an NDA or ANDA in many ways, including composition, stability, shelf-life, and methods of manufacture.

16.   QuVa has two manufacturing facilities in Texas, both of which are registered with the FDA as outsourcing facilities pursuant to Section 503B.  QuVa purchased these facilities from other compounding companies.  QuVa also has a third outsourcing facility in New Jersey.

17.   As QuVa's business has grown it has developed significant confidential business information related to its business, including its distribution, marketing, customer identities, supplier identities, pricing, forecasts, and strategic business plans.  These strategic business plans include the time-lines for commercialization, development, and launch of QuVa's products.

18.     As evidenced by its unconscionable pricing practices, Par currently has a monopoly with respect to vasopressin products, even though those products are over 100 years old. In view of this monopoly, Par is desperate to prevent others from competing with it, and has attempted to unlawfully thwart competition in a number of ways, including bringing the present action against QuVa.

19.     Par's Action is motivated by bad faith. Specifically, on information and belief, Par seeks competitive business information from QuVa and seeks to delay a competing QuVa product from entering the market in order to preserve its monopoly-enabled inflating prices for Vasostrict products. On information and belief, Par also seeks information regarding QuVa's product so that it may bring a patent infringement action against QuVa.

### QUVA'S COMPOUNDED VASOPRESSIN PRODUCTS ARE DIFFERENT FROM VASOSTRICT® AND DO NOT INFRINGE PAR'S PATENTS

20.     Par purports to own five patents that are currently listed in the FDA's "Approved Drug Products with Therapeutic Equivalence Evaluations" (the "Orange Book") in connection with Par's Vasostrict® product. Those five patents are:

U.S. Patent No. 9,375,478 ("the '478 patent");
U.S. Patent No. 9,687,526 ("the '526 patent");
U.S. Patent No. 9,744,239 ("the '239 patent");
U.S. Patent No. 9,744,209 ("the '209 patent");
U.S. Patent No. 9,750,785 ("the '785 patent");

(collectively, the "Asserted Patents"). The Asserted Patents are attached hereto as Exhibits A-E.

21.     The Asserted Patents are entitled "Vasopressin Formulations for use in Treatment of Hypotension." All of the Asserted Patents claim ultimate priority to abandoned U.S. Patent Application Ser. No. 14/610,499, filed on January 30, 2015. The inventors listed on the '478, '526, '785 and '209 patents are Matthew Kenney, Vinayagam Kannan, Sunil Vandse and Suketu Sanghvi. The '239 patent

57

lists only two of these inventors: Kenney and Kannan. The Asserted Patents are assigned to Par Pharmaceutical according to the face sheets of the patents.

22.    The asserted patents relate to compositions and methods of increasing blood pressure. The claimed compositions include from about 0.01 mg/mL to about 0.07 mg/mL vasopressin (or a pharmaceutically acceptable salt thereof). The methods of increasing blood pressure comprise administering those compositions to "a human in need thereof."

23.    For example, claim 1 of the '478 patent recites:

> A method of increasing blood pressure in a human in need thereof, the method comprising administering to the human a unit dosage form, wherein the unit dosage form consists essentially of:
> a) from about 0.01 mg/mL to about 0.07 mg/mL of vasopressin or a pharmaceutically-acceptable salt thereof;
> b) 10 mM acetate buffer; and
> c) water,
>
> wherein:
> the unit dosage form has a pH of 3.8; the administration provides to the human from about 0.01 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute to about 0.1 units of vasopressin or the pharmaceutically-acceptable salt thereof per minute; and the human is hypotensive.

24.    Upon information and belief, Plaintiffs contend that their Vasostrict® products and/or their use are commercial embodiments of at least one claim of each of the Asserted Patents. Vasostrict®, like Pitressin® before it, is manufactured and sold as a concentrate. The label for Vasostrict® states that it contains 20 units of vasopressin per one milliliter (ml) of solution, and is packaged as one milliliter of solution per vial. For use, it must be diluted using either saline or a 5% dextrose solution in water called D5W so that the dilute solution contains either 0.1 units/ml or 1 unit/ml. These dilute solutions are directly administered to patients and are 200 and 20 times more dilute, respectively, than the Vasostrict® concentrate sold by Par.

58

25.     In contrast, QuVa's products are not concentrates like Vasostrict®; they are already-diluted solutions. On April 19, 2017, QuVa requested that the FDA add vasopressin to the list of drug substances that can be compounded by registered outsourcing facilities. In this publicly-available request, QuVa described its proposed products as vasopressin solutions for direct use in patients without any further dilution. Specifically, QuVa proposed to make products having volumes from 50 ml to 250 ml, with vasopressin concentrations ranging from 0.1 unit/ml to 1 unit/ml ("QuVa's proposed compounded vasopressin products"). QuVa's proposed compounded vasopressin products are different from Vasostrict® in at least the respects shown in the table below:

|  | Concentration | Total Volume | Shelf Life |
|---|---|---|---|
| **Vasostrict®** | 20 units/ml | 1 ml | Stored at 2-8°C.; 12 months after being placed at room temperature |
| **QuVa's Proposed Compounded Products** | 0.1-1.0 units/ml | 50-250 ml | 75 days at room temperature |

These products, by definition, are not essentially copies of Vasostrict®. If they were, the FDA would not allow them to be sold.

26.     Upon information and belief, Par knows and understands this distinction and realizes that QuVa's vasopressin products cannot be copies of Vasostrict®.  Thus, out of fear of losing its monopoly profits through lawful competition, Par filed a Complaint against QuVa not for a lawful purpose, but in an attempt to prevent or delay QuVa from marketing its compounded vasopressin product and to improperly use the discovery process to obtain information about QuVa's business strategy.

27.     Par's Complaint against QuVa, coupled with Par's current monopoly, establish that the parties have adverse interests in relation to the Asserted Patents, and a substantial controversy exists between the parties.

28.     Further, on information and belief, Par will claim that QuVa's marketing of its proposed compounded vasopressin products infringes the Asserted Patents, and such claim is imminent.

## PAR IMPROPERLY ATTEMPTS TO PREVENT OR DELAY QUVA'S LAWFUL MARKETING OF ITS COMPOUNDED VASOPRESSIN PRODUCTS AND IMPROPERLY SEEKS QUVA'S BUSINESS STRATEGY

29.     As early as February 2016, Par had knowledge that Mr. Hinchen and Mr. Jenkins had started QuVa and that QuVa was a compounding company.

30.     In or around February 2016, Par sent a letter to QuVa regarding QuVa's hiring of former Par employees David Short, Travis McGrady, and Stephen Rhoades.

31.     Par expressed its concerns regarding Short's employee non-solicitation obligations, and alleged that Short had been involved in hiring McGrady and Rhoades, who had also worked for Par.

32.     QuVa responded to Par's letter with assurances that it has instructed all former Par employees to comply with their contractual and common law obligations.  QuVa further explained that Short did not solicit McGrady and Rhoades: McGrady had approached Hinchen directly about possible employment and Rhoades approached QuVa directly.  In short, Short did not direct or assist QuVa in hiring McGrady or Rhoades.

33.     QuVa further reiterated that Hinchen and Jenkins faithfully had honored the contractual restrictions they had with Par and indicated QuVa was willing to discuss any further concerns Par had about QuVa's actions with it.

34.     In response to these assurances, Par thanked QuVa for providing such assurances and QuVa considered any dispute to be resolved.

35.     Par never raised further concerns with QuVa regarding the obligations of Mr. Hinchen or Mr. Jenkins or the hiring of any other Par employee until the filing of this lawsuit nearly a year and a half later.

36.     Upon information and belief, it was not until after April 19, 2017, when QuVa requested that the FDA add vasopressin to the list of bulk drug substances that can be compounded by registered outsourcing facilities that Par again became concerned with QuVa.  At this time, Par realized that although QuVa's compounded product would differ from Vasostrict® in many ways, the existence of such a product had the potential to create lawful competition in the market for vasopressin and thus erode their monopoly prices.

37.     In an attempt to protect its monopoly, Par instigated this litigation to obtain confidential information concerning QuVa's business strategy and launch plans, and to ultimately stop or delay QuVa's marketing of its compounded product.

38.     By instituting this litigation, Par is also attempting to gain access to QuVa's business strategy for any vasopressin compounded product, including seeking the name of its API supplier and repeatedly requesting the date that QuVa would launch its vasopressin products.  This information is QuVa's confidential information that Par would not otherwise be able to access, but which has value to Par.

39.     Indeed, on August 14, 2017, the same day that Par filed suit against Defendants, it also sent a letter to Defendants that revealed Par's true motives in pursing this case. In that letter, Par explicitly sought information about whether Defendants "had begun in the promotion, marketing, or sale of any vasopressin product" and demanded that QuVa agree that "no such activity will commence while this lawsuit remains pending."

40.     On August 22, 2017, after Par had not received a response from QuVa about whether it had begun the promotion, marketing, or sale of any vasopressin product, Par sent another letter demanding a response and threatening to seek interim relief from the Court.

41.     Par has continued to be transparent about its motive to gain QuVa's confidential information about its business strategy regarding vasopressin.  Par's original discovery requests focused almost exclusively on obtaining information about Defendants' competitive plans related to vasopressin.

42.     Plaintiffs' Interrogatories clearly sought to obtain every detail of Defendants' dealing with vasopressin. For example, Interrogatory No. 1 asks to "[d]escribe all facts regarding any plans You have to manufacture, market, promote and/or sell any Vasopressin Product."  Interrogatory No. 2 seeks information including "the date you started any work relating to any Vasopressin Product, and the work You have performed so far."  Interrogatory No. 4 requires identification of "all products and processes on which You have worked while at QuVa that relate to vasopressin and describe what work you performed."

43.     Par's Requests for Production also sought information about QuVa's business plans regarding QuVa's compounded vasopressin product, including:  All internal and external communications regarding vasopressin and the FDA (QuVa RFP 1); All documents related to the distribution of vasopressin (QuVa RFP 6); and All documents relating to QuVa's business strategy regarding any vasopressin product (QuVa RFP 7; Hinchen RFP 6; Jenkins RFP 5; Rutkowski RFP 4).

44.     Plaintiffs' Notice of Deposition to QuVa also primarily identified topics about Defendants' plans regarding vasopressin.  For example, it noticed the following topics: QuVa's filings with the FDA related to vasopressin (Topic 1); and QuVa's API suppliers of vasopressin, the dates the supplier relationship began, and the amount of vasopressin provided by the supplier (Topic 10).

45.     Even after Par narrowed its discovery requests at the urging of the Court, it has continued its transparent attempt to learn QuVa's business plan for vasopressin. QuVa's representations that it plans to launch a vasopressin product as soon as possible has chagrined Par, and Par continues to press for information about QuVa's launch plans. . By instituting this suit, Par seeks to delay or prevent QuVa's launch of its compounded vasopressin product.

## COUNT 1

### DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '478 PATENT

46.     QuVa incorporates all previous allegations by reference.

47.     QuVa's compounded vasopressin products and their use do not and will not infringe the claims of the '478 patent.

48.     Accordingly, QuVa is entitled to a judicial declaration that it does not infringe, literally or under the doctrine of equivalents, directly or indirectly, any claim of the '478 patent.

## COUNT 2

### DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '526 PATENT

49.     QuVa incorporates all previous allegations by reference.

50.     QuVa's compounded vasopressin products and their use does not and will not infringe the claims of the '526 patent.

51.     Accordingly, QuVa is entitled to a judicial declaration that it does not infringe, literally or under the doctrine of equivalents, directly or indirectly, any claim of the '526 patent.

## COUNT 3

### DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '785 PATENT

52.     QuVa incorporates all previous allegations by reference.

53.     QuVa's compounded vasopressin products and their use does not and will not infringe the claims of the '785 patent.

54.     Accordingly, QuVa is entitled to a judicial declaration that it does not infringe, literally or under the doctrine of equivalents, directly or indirectly, any claim of the '785 patent.

## COUNT 4

### DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '209 PATENT

55.     QuVa incorporates all previous allegations by reference.

56.     QuVa's compounded vasopressin products and their use does not and will not infringe the claims of the '209 patent.

57.     Accordingly, QuVa is entitled to a judicial declaration it does not infringe, literally or under the doctrine of equivalents, directly or indirectly, any claim of the '209 patent.

## COUNT 5

### DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '239 PATENT

58.     QuVa incorporates all previous allegations by reference.

59.     QuVa's compounded vasopressin products and their use does not and will not infringe the claims of the '239 patent.

60.     Accordingly, QuVa is entitled to a judicial declaration that it does not infringe, literally or under the doctrine of equivalents, directly or indirectly, any claim of the '239 patent.

## COUNT 6

### UNFAIR COMPETITION (New Jersey Common Law)

61.     QuVa incorporates all previous allegations by reference.

62.     QuVa is the owner of confidential information regarding its compounded vasopressin product, including, but not limited to, its supplier information, its development strategy, and its commercial plans, including launch and marketing plans.  This information constitutes "confidential information" under New Jersey Common Law, as its value to QuVa lies in it being not generally known to QuVa's competitors.

63.     QuVa maintains the secrecy of its confidential information by, among other things, limiting the number of employees that have access to certain aspects of its confidential information, and by implementing physical and electronic controls to prevent access by others.

64.     QuVa's confidential information has independent economic and commercial value from not being generally known to, and not being readily ascertainable through proper means by, other persons, such as QuVa's competitors. QuVa's competitors would obtain economic value from disclosure or use of QuVa's confidential information.

65.     Par has attempted to obtain QuVa's confidential information through improper means-- by employing oppressive litigation tactics in connection with an objectively baseless lawsuit to attempt to prevent or delay QuVa from lawfully marketing its compounded vasopressin products.

66.     Par seeks QuVa's confidential information through this litigation so that it can maintain monopoly profits in the vasopressin market, including by preventing or delaying QuVa's launch of its compounded vasopressin products.

67.     Par undertook the above detailed acts to gain an unfair competitive advantage over QuVa with knowledge of and disregard for QuVa's rights and with the intention of causing harm to QuVa and for the benefit of Par.

68.     Par's unfair competition has caused, and unless enjoined, will continue to cause, substantial harm and irreparable injury for which QuVa has no adequate remedy at law.

69.     Par's conduct is without privilege or justification and is undertaken in bad faith in that, through its actions, Par intended, among other things, to create or continue an illegal restraint of competition.

70.     Par's unlawful conduct has harmed QuVa by stifling competition and interfering with QuVa's business relationships.

71.     Par's conduct, as alleged herein, constitutes malicious, oppressive, willful, and wanton tortious behavior in blatant and reckless disregard of QuVa's rights, for which QuVa should recover punitive damages in an amount sufficient to deter Par and others similarly situated from engaging in future similar conduct.

## **PRAYER FOR RELIEF**

Wherefore, QuVa requests that judgment be entered in its favor and against Par as follows:

A.     A declaration that QuVa does not infringe the Asserted Patents;

B.     Judgment that Par has unfairly competed by asserting baseless claims against QuVa to gain QuVa's confidential information and to prevent or delay market entry of QuVa's vasopressin product;

C.     A declaration that this is an exceptional case;

D.     A declaration that QuVa is entitled to their fees, costs, and expenses in this action pursuant to 35 U.S.C. § 285 and any other applicable statute, and awarding such fees, costs, and expenses;

E.    An award of preliminary and permanent injunctive relief against Par for the acts complained of herein;

F.    An award of damages, including, without limitation, exemplary and punitive damages for Par's malicious, wanton, and oppressive misconduct;

G.    Attorneys' fees and costs; and

H.    An award of such other relief as deemed appropriate.


Dated: October 13, 2017                    Respectfully submitted,


                                           **BLANK ROME LLP**

                                           *s/Stephen M. Orlofsky*
                                           Stephen M. Orlofsky
                                           David C. Kistler
                                           Leigh Ann Buziak
                                           301 Carnegie Center, 3rd Floor
                                           Princeton, NJ 08540
                                           Tel: (609) 750-7700
                                           Fax: (609) 750-7701
                                           Orlofsky@BlankRome.com
                                           Kistler@BlankRome.com
                                           LBuziak@BlankRome.com

                                           Jeffrey S. Ward *(Pro Hac Vice)*
                                           Wendy M. Ward *(Pro Hac Vice)*
                                           Stephen R. Howe (Pro Hac Vice)
                                           **MERCHANT & GOULD P.C.**
                                           10 E. Doty Street, Suite 600
                                           Madison, WI  53703
                                           Tel: (608) 280-6750
                                           Fax: (612) 332-9081
                                           jward@merchantgould.com
                                           wward@merchantgould.com
                                           showe@merchantgould.com

                                           *Attorneys for Defendants*

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Defendants QuVa Pharma, Inc., Stuart Hinchen, Peter Jenkins, and Mike Rutkowski hereby certify that, to their knowledge, the matter in controversy in this action is not the subject of any other pending lawsuit, arbitration, or administrative proceeding.

Dated: October 13, 2017                    Respectfully submitted,

**BLANK ROME LLP**

*s/Stephen M. Orlofsky*
Stephen M. Orlofsky
David C. Kistler
Leigh Ann Buziak
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
Tel: (609) 750-7700
Fax: (609) 750-7701
Orlofsky@BlankRome.com
Kistler@BlankRome.com
LBuziak@BlankRome.com

Jeffrey S. Ward *(Pro Hac Vice)*
Wendy M. Ward *(Pro Hac Vice)*
Stephen R. Howe (Pro Hac Vice)
**MERCHANT & GOULD P.C.**
10 E. Doty Street, Suite 600
Madison, WI  53703
Tel: (608) 280-6750
Fax: (612) 332-9081
jward@merchantgould.com
wward@merchantgould.com
showe@merchantgould.com

*Attorneys for Defendants*

68