Lawrence S. Lustberg
Daniel J. McGrady
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
Telephone:  (973) 596-4500
Facsimile:    (973) 596-0545

Daniel M. Petrocelli (admitted *pro hac vice*)
Brett J. Williamson (admitted *pro hac vice*)
Jeffrey A. Barker (admitted *pro hac vice*)
David S. Almeling (admitted *pro hac vice*)
**O'MELVENY & MYERS LLP**
Times Square Tower
7 Times Square
New York, New York 10036
Telephone:  (212) 326-2000
Facsimile:    (212) 326-2061

*Attorneys for Plaintiffs Par Pharmaceutical,*
*Inc. and Par Sterile Products, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| PAR PHARMACEUTICAL, INC. and PAR STERILE PRODUCTS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> QUVA PHARMA, INC., STUART HINCHEN, PETER JENKINS, and MIKE RUTKOWSKI, <br><br> Defendants. | Civil Action No. 3:17-cv-06115-MAS-DEA <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> **EVIDENTIARY HEARING REQUESTED** |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................1

II.    STATEMENT OF FACTS .........................................................2

    A.    Defendants Hinchen and Jenkins' Found and Sell JHP
    Pharmaceuticals to Par ....................................................2

    B.    Defendants Hinchen and Jenkins Depart From Par and Begin
    Soliciting Par Employees to Unfairly Compete ...................................4

        1.    Hinchen and Jenkins Recruit David Short, Donna Kohut,
        and Mike Rutkowski From Par, and Form QuVa.....................5

        2.    Defendants Solicit Additional Par Employees to Steal
        Par's Confidential Processes.......................................8

    C.    The Former Par Employees Engage in a Massive Campaign of
    Trade Secrets Misappropriation .........................................11

        1.    Rhoades and Defendants Steal Par's Aseptic
        Manufacturing Trade Secrets....................................11

        2.    Rutkowski and Defendants Steal Par's Operational Trade
        Secrets ......................................................14

    D.    Defendants Attempt to Conceal Their Wrongdoing .........................16

III.   LEGAL STANDARD ...............................................................21

IV.    PAR HAS SHOWN A LIKELIHOOD OF SUCCESS ON THE
    MERITS.........................................................................21

    A.    Par Has Shown It Will Likely Succeed on the Merits as to Its
    Breach of Contract Claims ...............................................22

    B.    Par Has Shown It Will Likely Succeed on the Merits as to Its
    Trade Secret Misappropriation Claims .................................25

V.     PAR WILL SUFFER IRREPARABLE HARM ABSENT AN
    INJUNCTION AGAINST DEFENDANTS....................................30

    A.    Par Will Be Irreparably Harmed Unless the Court Enjoins
    Further Development and Sale of QuVa's Competing Sterile
    Products ..................................................................30

**TABLE OF CONTENTS**
(continued)

**Page**

B.   Par Will Be Irreparably Harmed Unless the Court Enjoins Defendants' Solicitation of Par Employees and Disclosure of Trade Secrets ................................................................................ 33

C.   Par Will Be Irreparably Harmed Unless the Court Enjoins Defendants and Former Par Employees from Working on QuVa's Competing Sterile Products .................................... 35

VI.   THE BALANCE OF EQUITIES TIPS STRONGLY IN PAR'S FAVOR ........................................................................................ 37

VII.   THE PUBLIC INTEREST FAVORS AN INJUNCTION ........................ 38

VIII.   CONCLUSION ............................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bimbo Bakeries USA Inc. v. Botticella*,
  613 F.3d 102 (3d Cir. 2010) ...............................................................................35

*Campbell Soup Co. v. ConAgra, Inc.*,
  977 F.2d 86 (3d Cir. 1992) ..................................................................................21

*Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*,
  420 F. Supp. 2d. 866 (N.D. Ill. 2006)..................................................................34

*Frederico v. Home Depot*,
  507 F.3d 188 (3d Cir. 2007) ................................................................................22

*Fresenius Kabi USA, LLC v. Fera Pharm., LLC*,
  No. 15-cv-3654, 2016 WL 5348866 (D.N.J. Sept. 23, 2016) .............................39

*Jackson Hewitt Inc. v. Cline*,
  No. 14-cv-6931, 2015 WL 6687545 (D.N.J. Oct. 29, 2015)........................33, 34

*Marsh USA Inc. v. Karasaki*,
  No. 08-cv-4195, 2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008) ..........................33

*Nat'l Reprographics, Inc. v. Strom*,
  621 F. Supp. 2d 204 (D.N.J. 2009)......................................................................39

*Nat'l Starch & Chem. Corp. v. Parker Chem. Corp.*,
  219 N.J. Super. 158 (N.J. Super. Ct. App. Div. 1987) ..................................34, 35

*Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co.*,
  297 F. Supp. 2d. 463 (N.D.N.Y. 2003)...........................................................31, 32

*NVR, Inc. v. Davern*,
  No. 15-cv-5059, 2015 WL 9450831 (D.N.J. Dec. 23 2015) ........................31, 37

*Oburn v. Shapp*,
  521 F.2d 142 (3d Cir. 1975) ................................................................................22

*Osteotech, Inc. v. Biologic, LLC*,
  No. 07-cv-1296, 2008 WL 686318 (D.N.J. Mar. 7, 2008)..................................35

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017) ...............................................................21

*Rohm and Haas Co. v. Adco Chem. Co.*,
    689 F.2d 424 (3d Cir. 1982) ..............................................................26

*Scholastic Funding Grp. LLC v. Kimble*,
    No. 07-557, 2007 WL 1231795 (D.N.J. Apr. 24, 2007) ....................34

*Trico Equip., Inc. v. Manor*,
    No. 08-cv-5561, 2009 WL 1687391 (D.N.J. June 15, 2009) ......................25, 34

*Williams v. Curtiss-Wright Corp.*,
    681 F.2d 161 (3d Cir. 1982) ...............................................................31

*Winter v. Nat. Resources Def. Council, Inc.*,
    555 U.S. 7 (2008)................................................................................21

**Statutes**

18 U.S.C. § 1836(b)(3)...........................................................................31

18 U.S.C. § 1839(3) ................................................................................25

18 U.S.C. § 1839(5) ................................................................................26

N.J.S.A. 56:15-3......................................................................................31

N.J.S.A. 56:15-2...............................................................................25, 26

**Other Authorities**

"Compounding: Inspections, Recalls, and other Actions," *available at*
    https://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInfor
    mation/PharmacyCompounding/ucm339771.htm#R. ........................38

"Owner of New England Compounding Center Sentenced for
    Racketeering Leading to Nationwide Fungal Meningitis Outbreak,"
    *available at*
    https://www.fda.gov/ICECI/CriminalInvestigations/ucm564768.htm..............38

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

503B Ooutsourcing Services, QuVa Pharma, Inc., *available at*
    http://www.quvapharma.com/503b-outsourcing-services/.................................37

## I.    INTRODUCTION

Plaintiffs Par Sterile, LLC and Par Pharmaceutical, Inc. (together, "Par") seek a preliminary injunction to put a stop to Defendants' extensive, premeditated campaign to steal Par's trade secrets and unlawfully hire away key Par employees. The initial evidence of Defendants' misdeeds, which were detailed in the Complaint, was disturbing, but expedited discovery has now uncovered conclusive proof that Defendants and their employees breached their contractual obligations to Par, and committed numerous thefts of Par's confidential and proprietary methods, plans and designs for the development and manufacture of its valuable sterile pharmaceutical products.  Furthermore, Defendants have sought to conceal their wrongdoing by altering electronic records, instructing their agents and employees to lie to Par, and improperly redacting discovery documents to prevent Par and the Court from learning the full extent of Defendants' activities. ███████████████

████████████████████████████████████████████████████

███████████████    Because Par is likely to succeed on the merits of its claims and will be irreparably harmed if Defendants are allowed to unfairly compete with Par by using Par's trade secrets and the know-how of unlawfully solicited former Par employees, and because enjoining Defendants from making or selling competing sterile products using Par's trade secrets is in the public interest, a preliminary injunction is warranted.

-1-

The record overwhelmingly supports a Court order (1) enjoining Defendants from selling or offering for sale any product that competes with a Par product[1] and was developed and/or is manufactured using Par's trade secrets, including Par's sterility assurance methodologies; (2) enjoining all Defendants and all improperly solicited employees from further work on any products that would compete against Par (including vasopressin-based products); (3) enjoining Defendants from further soliciting Par's employees; and (4) enjoining any further use of Par's confidential and trade secret documents and information.

## II.   STATEMENT OF FACTS[2]

### A.   Defendants Hinchen and Jenkins' Found and Sell JHP Pharmaceuticals to Par

Defendants Stuart Hinchen and Peter Jenkins founded a company called JHP Pharmaceuticals, LLC ("JHP") in 2007 by purchasing an existing sterile pharmaceutical manufacturing facility in Rochester, Michigan.  Dkt. No. 48 at 54,

---

[1] Current QuVa products that compete with Par products include Ephedrine, Epinephrine HCl, Ketamine, Methohexital, Neostigmine, and Oxytocin.  QuVa's planned vasopressin product would also compete with Par's Vasostrict®. Declaration of Antonio Pera, ¶¶ 3-4.

[2] The facts recounted in this motion are based on evidence thus far developed by Par through the limited amount of expedited discovery permitted under the Court's Order.  *See* Dkt. No. 43.  In addition, and as detailed later in this brief, Defendants have withheld and redacted a substantial amount of evidence based on improper objections.  Par has applied to the Court for an order compelling Defendants to comply with their discovery obligations, *see* Dkt. No. 64, which application is still pending.

¶ 10.[3]   Although both Hinchen and Jenkins had worked in the pharmaceutical industry prior to founding JHP, neither had any experience with vasopressin, *see id.* at 54, ¶ 9, a lifesaving drug that immediately increases blood pressure in adults experiencing cardiopulmonary stress.  *See* Declaration of Michael J. Miller, Ph.D. ("Miller Decl.") ¶ 37.  For decades, the U.S. Food and Drug Administration ("FDA") allowed vasopressin to be sold as an unapproved drug in the U.S., due to its having been marketed as a therapeutic agent prior to the enactment of the Food, Drug and Cosmetic Act of 1938.  Dkt. No. 48 at 8, ¶ 17.  But after the FDA issued guidance that makers of unapproved drugs should do the research and clinical work necessary to pursue a New Drug Application ("NDA"), JHP undertook such an effort for its existing vasopressin-based product called Pitressin.  *Id.* at 8, ¶¶ 18–19.   On September 26, 2012, JHP submitting NDA No. 204485 for Pitressin.  *Id.* at 8, ¶ 19.

While the NDA for Pitressin was still pending, on February 25, 2014, Par acquired JHP from its then-owners, which included Hinchen, Jenkins, and private equity investors, for approximately $490 million, and JHP's name was changed to Par Sterile.  *Id.* at 9, ¶ 20.  ███████████████████████

██████████████████████████████████████   Ex. 2[4]

---

[3] Allegations in the Complaint not denied in the Answer are deemed admitted.  *See U.S. for Use of Automatic Sprinkler Corp. of Am. v. Merritt-Chapman & Scott Corp.*, 305 F.2d 121, 123 (3d Cir. 1962).

[4] All references to "Ex. __" are to exhibits to the Declaration of David S. Almeling filed concurrently herewith.

at 79:14-81:6; Ex. 3 at 49:13-50:5.  Shortly thereafter, on April 17, 2014, Par

received FDA approval for its vasopressin injection product and changed the name

from Pitressin to Vasostrict®.  Ex. 4.

### B.   Defendants Hinchen and Jenkins Depart From Par and Begin Soliciting Par Employees to Unfairly Compete

In early June 2014, Hinchen and Jenkins left Par.  Exs. 5–6.  ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████  Ex. 5 ¶ 2; Ex. 6 ¶ 2.  They also agreed not to

"directly or indirectly use, communicate, disclose, or disseminate any Confidential

Information" of Par, and further agreed, for a period of twelve months, not to "in

any manner, directly or indirectly . . . solicit, hire, induce or attempt to induce, any

director, officer, employee, contractor, consultant or agent" of Par to leave their

employment with Par.  Ex. 5 ¶¶ 7–8; Ex. 6 ¶¶ 7–8; Exs. 47–48.  Within months of

leaving Par, in blatant violation of their promises, Hinchen and Jenkins began laying

the groundwork to usurp Par's business, planning to both poach Par's key employees

and take Par's trade secret and confidential information regarding the development,

validation, and regulatory approval of sterile manufacturing products.  Using the

advantage gained from Par's development work, Hinchen and Jenkins would create

a competing company, Defendant QuVa Pharma, Inc. ("QuVa").

1. **Hinchen and Jenkins Recruit David Short, Donna Kohut, and Mike Rutkowski From Par, and Form QuVa**

Hinchen and Jenkins began with a plan to secure the services of three key Par employees and consultants: David Short, Donna Kohut, and Mike Rutkowski. ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

a. <u>David Short</u>

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



b.   <u>Donna Kohut</u>

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

      c.    <u>Mike Rutkowski</u>

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

-7-

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

2.   **Defendants Solicit Additional Par Employees to Steal Par's Confidential Processes**

On July 29, 2015, Hinchen and Jenkins formally incorporated QuVa in Delaware. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

---

[5] Par is currently preparing and intends to file an Amended Complaint asserting additional claims against Kohut, Short, Rhoades, and others based on their misappropriation of Par confidential information and improper solicitation of Par Sterile employees.





**C.   The Former Par Employees Engage in a Massive Campaign of Trade Secrets Misappropriation**

Defendants poached Par's employees as part of a deliberate effort to obtain Par's trade secret and confidential processes. ███████████████████████

███████████████████████████████████████

████████████████ other QuVa employees led by Rhoades and Rutkowski shamelessly stole Par's trade secret information for QuVa's benefit.

**1.   Rhoades and Defendants Steal Par's Aseptic Manufacturing Trade Secrets**

A facility seeking to be an FDA-approved drug compounder must demonstrate compliance with current Good Manufacturing Processes ("cGMP") to perform aseptic manufacturing; otherwise, the FDA may take action to prevent the facility from continuing operations. *See* Miller Decl. ¶¶ 38–39. ████████

███████████████████████████████████████

███████████████████████   ███████████

███████████████████████████████████████

███████████████████████████████████████

████████████████ Ex. 51 at 96:14–98:7. It is now clear that QuVa's APS steals heavily from Par's own highly confidential and proprietary ███████ and related trade secret processes. ███████████████████



Ex. 52.

. *Id.*

Rhoades' use of Par's confidential document was not an isolated incident.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████ And

Rutkowski's unauthorized consulting for QuVA did not end in January 2016. ██████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ *See* Ex. 79; Miller

Decl. ¶ 150.  As detailed below, Rutkowski soon began a regular practice of sending

Par's confidential information to Kohut by email.

Defendants also targeted other Par employees familiar with Par's aseptic

manufacturing trade secrets.  In January 2016, after hiring Rhoades, Defendants

solicited McGrady, who was knowledgeable regarding confidential aspects of ████

████████████████████████████████████████████

████████████████████████ *See* Miller Decl. ¶¶ 109–12.  Also in

January 2016, Defendants solicited Hartley, ██████████████ ████████

████████████████████████, a document marked Confidential &

Proprietary.  Ex. 55.  Even Hinchen himself took non-public Par information ████

██████████████████████████, including an internal ██████████

█████████████████████ marked "For internal use only, not for distribution."

Ex. 3 at 162:2–25; Ex. 56.

### 2. Rutkowski and Defendants Steal Par's Operational Trade Secrets

At the same time QuVa was soliciting Par employees for their confidential and trade secret information, QuVa continued to receive inside information from Defendant Rutkowski.  As Senior Vice President and General Manager of Par's Rochester, Michigan facility, Rutkowski had wide-ranging knowledge of Par's internal operations.  But, in violation of his contractual and fiduciary duties, Rutkowski was simultaneously serving QuVa.  In addition to revising QuVa's APS in January 2016, he passed on other important Par confidential and trade secret information to Kohut, who then shared that information with QuVa:

- On June 28, 2016, Rutkowski sent Kohut an email including Par Sterile's confidential backorder report.  Ex. 57.

- On October 25, 2016, Rutkowski emailed Kohut and disclosed Par confidential information regarding unit counts at Par's Rochester facility and the fact that Par was performing product testing using certain metrics that he believed have an effect on absorption rates.  Ex. 58.

- On March 9, 2017, Rutkowski passed on Par confidential information regarding how to pass an FDA facility inspection, which was particularly important to QuVa, as the FDA had previously determined that a QuVa facility failed to meet certain quality control standards related to maintaining sterility and avoiding contamination.  Ex. 59.

- On March 13, 2017, Rutkowski sent to Kohut a document entitled COO Meeting Presentation, with information regarding Par's metrics of derivations per batch, complaints per unit sold, batch projections, batch

rejection, and sales revenue for productions.  Ex. 60.

Rutkowski also attempted to solicit Par employees to join QuVa while he was still at Par.  In a March 13, 2017 email, for example, Rutkowski and Kohut discussed some of their joint efforts to recruit Par employees.  Ex. 61.

As QuVa began preparing to manufacture vasopressin, it moved to "formally" hire Rutkowski.  On March 15, 2017—just two weeks before he resigned from his position at Par to assume a role at QuVa—Rutkowski forwarded to Kohut three detailed, internal Par PowerPoint presentations containing numerous Par confidential and proprietary trade secrets, including Par's metrics regarding its quality measures, operations, and human resources, including batching performance, yields, deviation rates, complaints, recalls, perfect batches, values of backorders, monthly finances and budgets, training and personnel developments, and future business plans relating to planned new product launches, including vasopressin products.  *See* Ex. 62.  Imbedded in the PowerPoint presentations were over 500 pages of confidential Par spreadsheets.  *Id.*  In reply to this delivery, Kohut candidly announced, "I'll steal with pride just like you taught me."  Ex. 63.  Rutkowski responded favorably, "LOL Love it!!!!!"  *Id.*

As he prepared to resign from Par, Rutkowski connected a pair of USB drives and two large hard drives—a 1 TB Western Digital hard drive and a 500 GB Lenovo hard drive—to his computer at Par.  *See* Declaration of Scott Cooper ("Cooper

Decl.") ¶¶ 14–22.  Par's forensic investigation uncovered at least ▮ Par confidential documents taken by Rutkowski, including operating metrics, information for new hires, FDA inspection responses, and Par product information.  *Id.* ¶¶ 60–61.  These ▮ documents are likely only a fraction of what Rutkowski downloaded onto his hard drives, as explained below.

### D.      Defendants Attempt to Conceal Their Wrongdoing

As disturbing as these brazen acts of solicitation and misappropriation are, Par believes it has uncovered only a fraction of Defendants' unlawful actions.  This is because Defendants have gone to substantial lengths to conceal their wrongdoing from Par and the Court.

From its very beginnings, QuVa, though Hinchen, strategized with its recruits on how to conceal QuVa's solicitation and the recruits' double-dealing. ▮

███████████████████████████████████████

███████████████████████████████████ █

███████████████████████████████

By February 2016, Par began suspecting that Defendants and their agents were soliciting Par employees in violation of their agreements. Par's outside counsel sent a letter to QuVa's Hinchen, demanding that QuVa and Short cease their improper solicitation. *See* Ex. 66. In response, counsel for QuVa characterized Par's beliefs as "unfounded," and assured Par that QuVa had hired McGrady and Rhoades "***not*** based on any information or assistance from Mr. Short." Ex. 67 (emphasis added). ███████████████████████████████

███████████████████████████████████████

███████████████   *See* Ex. 22.

The evidence also demonstrates that Defendants have altered electronically stored information and attempted to deceive Par in an effort to cover up their pervasive theft of Par confidential materials. As detailed in the Cooper Declaration, a forensic examination has uncovered that, just prior to Rutkowski leaving Par to join QuVa, he attached multiple external hard drives and other storage devices to his Par computer and transferred numerous confidential Par documents and files onto those personal devices. Although Rutkowski devised a cover story for his actions, the forensics prove the unauthorized transfers. Cooper Decl. ¶¶ 15, 18, 49, 50, 57–

-17-

62.

The forensic investigation also shows that one of the devices Rutkowski used (but denied using) to take Par confidential information with him to QuVa—a Lenovo hard drive—has since been intentionally damaged so that no data can be recovered from it.  The facts surrounding this Lenovo hard drive are particularly troubling. At the outset of the expedited discovery phase, Defendants would not give Par direct access to the original Lenovo hard drive, but they did make it available to DriveSavers, a third party, in a physically damaged state.  Cooper Decl. ¶¶ 21–34.

███████████████████████████████████████████████████

███████████████████████, Ex. 49 at142:2-144:8, is refuted by the forensic evidence, which shows that the Lenovo hard drive was functional when Rutkowski connected it to his Par computer in 2017.  Cooper Decl. ¶¶ 35–40.   Given the nature and extent of the damage, it is certain that the damage to the hard drive occurred after March 23, 2017, the last recorded activity on the drive, and it is impossible that the damage occurred inadvertently.  *Id.* ¶¶ 39–40; *see also* Declaration of John Lee ¶¶ 11, 17–19.

From all indications, the Lenovo device was damaged in an effort to conceal other confidential documents Rutkowski took from Par.  In discovery, Defendants produced at least one Par confidential document with no apparent source—█

███████████████████████████████████████████████████

████████   Ex. 68.   ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████   *Id.*  Rutkowski began working for QuVa on

April 17, 2017, ██████████████████████████████████

███████████████.   The timing suggests that Rutkowski brought this Par's

document to QuVa, but raises more questions—is this document from one of

Rutkowski's hard drives, and what else was taken?

There is also direct evidence of other affirmative misrepresentations by

Defendants that demonstrate their intention to conceal their true intentions to

unfairly compete with Par by using Par's trade secrets.  ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

    Finally, Defendants have made ongoing efforts to limit or avoid expedited

discovery and to conceal clearly relevant evidence.  In addition to refusing to provide

the Lenovo hard drive for a physical inspection, *see* Ex. 77, Defendants made

massive redactions to over 250 documents produced in response to Par's requests,

not based on any assertion of attorney-client privilege or the work product doctrine.

These redactions and the various examples are detailed in the parties' joint letter to

the Court on this issue.  *See* Dkt. No. 64.  █████████████████████████

████████████████████████████████████████████████████

██████████████████████████████  *See* Ex. 51 at 55:15–57:12; Ex. 3 at 156:5–157:11.

The evidence of Defendants' attempt to conceal the truth is manifest.   In combination with Defendants' improper recruiting and stealing of Par's confidential information, Defendants' actions are directed toward one clear purpose—to obtain an unfair head start against Par and its sterile pharmaceutical products, including most prominently Vasostrict®.

## III.  LEGAL STANDARD

In determining whether to grant a preliminary injunction, courts look to four factors: (1) a likelihood of success on the merits, (2) irreparable harm in the absence of relief, (3) that the balance of equities tips in the moving party's favor, and (4) that an injunction is in the public interest.  *See Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  To support a preliminary injunction, a plaintiff first must show both a likelihood of success on the merits and a probability of irreparable harm.  *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992).  Upon a threshold showing of a likelihood of success and irreparable harm, the Court balances all four factors to determine whether to issue an injunction.  *Reilly v. City of Harrisburg*, 858 F.3d 173, 176–77 (3d Cir. 2017).

## IV.  PAR HAS SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS

A likelihood of success on the merits does not require that success be wholly without doubt; rather, the burden is on the party seeking relief to make a *prima facie*

case showing a reasonable probability that it will prevail on the merits.  *Oburn v. Shapp*, 521 F.2d 142, 148 (3d Cir. 1975).  Par meets and exceeds that burden.

### A.  Par Has Shown It Will Likely Succeed on the Merits of Its Breach of Contract Claims

Par alleges that Defendants breached their contracts prohibiting them from soliciting Par employees and disclosing Par confidential information.  To state a claim for breach of contract under New Jersey law, a plaintiff must show: (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) performance of plaintiff's own contractual obligations.  *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d. Cir. 2007).  Par is likely to succeed on proving these claims.

Valid contracts exist between Par and Defendants.  First, the individual Defendants each agreed not to solicit Par's employees for a year after they left their positions at Par Sterile.  Hinchen and Jenkins expressly agreed not to "solicit, hire, induce or attempt to induce" a Par employee for a twelve-month period.  Exs. 5–6.  Each of Rutkowski, Kohut, Short, Rhoades, and McGrady were also subject to similar twelve-month non-solicitation provisions.  Exs. 14–15, 19–20, 78.  Second, Defendants in this action agreed not to disclose Par's confidential or trade secret information.  Hinchen and Jenkins expressly agreed not to "directly or indirectly, use, communicate, disclose or disseminate any Confidential Information in any manner whatsoever."  Exs. 5–6, 47–48.  Rutkowski, Kohut, Short, Rhoades, and

McGrady similarly agreed not to use Par's confidential information.  Exs. 14–15, 19–20, 78.

Par performed with respect to its employment contracts.  Par employed each of the Defendants up through their date of resignation and paid them wages accordingly.

Defendants, however, each breached their respective employment agreements.  In breach of their Employment and Separation Agreements, Hinchen and Jenkins solicited Kohut, Short, and Rutkowski to join QuVa well before their one-year solicitation agreements expired, as described above.  *See supra* Part II.B.1; Exs. 7–13.

In breach of their Trade Secret, Non-Disclosure And Restrictive Covenant Agreements, Kohut, Short, and Rhoades solicited McGrady and Thompson, to join QuVa well-before their one-year solicitation agreements expired, as described above.  Also in breach of their agreement, Kohut and Short together solicited Subramaniam, Short solicited Soliman, and Soliman solicited Ashley Short, as described in detail above.  *See supra* Part II.B.2; Exs. 22, 24, 25, 27–29, 31–32, 34–35, 132.

In breach of his Trade Secret, Non-Disclosure And Restrictive Covenant Agreement, Rhoades disclosed Par's trade secret and confidential information to QuVa, as described above.  *See supra* Part II.C.1; Exs. 53–54.  In addition, in breach

of their Trade Secret, Non-Disclosure and Restrictive Covenant agreement, Kohut and Short continued to disclose such Par confidential information knowing that ████████████████████████████████, as detailed above.  *See supra* Part II.C.1; Ex. 51 at 98:8–99:10.

In breach of his Trade Secret, Non-Disclosure And Restrictive Covenant Agreement, Rutkowski disclosed and used Par's trade secret and confidential information to and for QuVa, as described above.  *See supra* Parts II.C.1 and C.2, and D; Exs. 52, 57–60, 62, 68, 79 , 92–97.  In breach of their Trade Secret, Non-Disclosure and Restrictive Covenant agreement, Kohut and Rhoades used and disclosed Par's trade secret and confidential information to QuVa and Defendants, as detailed above.  *See supra* Part II.C.1; Exs. 52–53, 62–63.

Par is likely to uncover even more information supporting its claim that Defendants breached the terms of their non-confidentiality provisions, including evidence that is currently concealed from Par.  *See supra* Part II.D; Cooper Decl. ¶¶ 63–68; Ex. 77; Dkt. No. 64.

Each of these breaches has caused and continues to cause harm to Par.  Par has lost key employees as a result of Defendants' improper solicitation, undermining Par's operations.  And Defendants have stolen Par's technology to erode Par's business built on years of investment and innovation.  The harm to Par is

-24-

far-reaching, and in large part irreparable. *See infra*, Part V; Declaration of Dr. Christine S. Meyer ("Meyer Decl.").

The non-solicitation and non-disclosure provisions of the contracts between Par and each of the Defendants are enforceable. Under New Jersey law, "[A]n employee's covenant will be given effect if it is reasonable under all the circumstances of his particular case; it will generally be found to be reasonable if it 'simply protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public." *Trico Equip., Inc. v. Manor*, No. 08-cv-5561, 2009 WL 1687391, at *6 (D.N.J. June 15, 2009) (enforcing two-year non-solicitation provision). Here, the non-disclosure provision and one-year non-solicitation provision are more than reasonable to protect against the type of misappropriation demonstrated by Defendants' misconduct.

### B. Par Has Shown It Will Likely Succeed on the Merits as to Its Trade Secret Misappropriation Claims

Par further alleges that Defendants misappropriated trade secrets in violation of the Federal Defend Trade Secrets Act ("DTSA") (18 U.S.C. § 1839, *et seq.*), the New Jersey Trade Secrets Act ("NJTSA") (N.J.S.A. 56:15-1, *et seq.*), and New Jersey common law proscribing the misappropriation of trade secrets. The elements for trade secret misappropriation under the DTSA and NJTSA are similar. First, a plaintiff must show the existence of a trade secret. N.J.S.A. 56:15-2 ("trade secret"); 18 U.S.C. § 1839(3). Second, the plaintiff must show misappropriation of that trade

secret.  N.J.S.A. 56:15-2 ("misappropriation"); 18 U.S.C. § 1839(5).  The elements of trade secret misappropriation under New Jersey common law more specifically require: (1) the existence of a trade secret, (2) communicated in confidence by the plaintiff to the employee, (3) disclosed by the employee in breach of that confidence, (4) acquired by the competitor with knowledge of the breach of confidence, and (5) used by the competitor to the detriment of the plaintiff.  *Rohm & Haas Co. v. Adco Chem. Co.*, 689 F.2d 424, 429-30 (3d Cir. 1982).

Par possesses numerous trade secrets with respect to its vasopressin business and aseptic drug manufacturing generally.  Miller Decl. ¶¶ 58-117.  Each of these trade secrets is not publicly known and derive substantial value from that fact.  *Id.* Through years of research, development, and investment, Par Sterile was able to develop the first and only intravenous vasopressin injection, United States Pharmacopeia ("USP") product with a New Drug Application ("NDA") approved by the FDA.  Dkt. No. 48 at 7, ¶ 16.  Par Sterile continues to devote significant time and resources researching, developing, and validating different formulations of Vasostrict® and other vasopressin products.  As explained by Dr. Michael Miller, Par has developed trade secrets that provide Par significant advantages in the vasopressin market.  *See, e.g.*, Miller Decl. ¶¶ 79–82

Par also takes reasonable measures to protect its trade secrets, as described in detail by Dr. Miller.  Miller Decl. ¶¶ 59–63; *see also* Ex. 113, Par's Response to

Rog. No. 3.  For example, Par ensures the security of its information by binding its employees and other third parties to non-disclosure agreements, and Par regularly provides training on information security and confidential training.  *Id.*  Par further retains a third party contractor to provide physical security twenty-four hours a day, seven days a week.  *Id.*  Par also employs numerous information-security measures to protect its trade secrets and confidential information, including access restrictions that block access from external networks.  *Id.*

As discussed previously with respect to the breach of contract claims, Rhoades and Rutkowski misappropriated Par's trade secret information by disclosing such information to QuVa in breach of the express duties as stated in their employment agreements, as well as their duty of loyalty as current and former Par Sterile employees entrusted with Par trade secret information.  Rutkowski also breached his fiduciary duties as Senior Vice President and General Manager at Par.  And each of the Defendants misappropriated Par's trade secret information by using Par's confidential information on behalf of QuVa, knowing full well that the information was obtained through improper means.

To summarize, Par will likely succeed on the merits of its trade secret claims because Trade Secret Nos. 1, 3, 5, 8, 11, 27, 33-36, 43, 45, 47 49, and 51 constitute trade secrets and Defendants misappropriated those trade secrets.  The full scope of

Defendants' misappropriation is detailed in the Statement of Facts above and in the expert declaration of Dr. Miller, incorporated here.

Rutkowski and QuVa misappropriated Trade Secret No. 5[6] when Rutkowski forwarded to Kohut two Par PowerPoint presentations containing this information. Ex. 62. Each of the Defendants misappropriated this trade secret by acquiring, using, and disclosing this information within QuVa. ██████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████████ QuVa could similarly benefit from other operational information and metrics taken and disclosed by Rutkowski. *See* Trade Secret Nos. 1, 3, 5, and 8; Miller Decl. ¶¶ 64–65, 69, 72, 75.

████████████████████████████████████ ██████ █████████████████████████████████████████████ █████████████████████████████████████████████ ██████ Ex. 51 at 96:14-98:7. ██████████████████████ ████████████████████ ████████████████████████ █████████████████████████████████████████████ ████████████████ ████████████████████████████

---

[6] The substance of each of the enumerated trade secrets is set forth in the Miller Declaration.

*See* Miller Decl. ¶¶ 77–87.

Defendants also misappropriated Par's trade secrets in developing their own

vasopressin products.

*See* Exs. 161-162.

Thus, Defendants likely have misappropriated Trade

Secret Nos. 33.

███████████████████████████████  *See* Trade Secret Nos. 27, 33-36;

Miller Decl. ¶¶ 92–108.

Finally, and as detailed in Trade Secret Nos. 43, 45, 47, and 49, Hinchen and Jenkins took advantage of their knowledge of the Par confidential information each solicited employee could offer, using that knowledge to solicit Par's most sensitive employees.  For example, Hinchen and Jenkins knew to immediately solicit Short to join their venture, ████████████████████████████████████████████ ████████████████████  Hinchen and Jenkins used that information to build QuVa's own quality department that would replicate Par's.  Miller Decl. ¶¶ 109–12.

## V.  PAR WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION AGAINST DEFENDANTS

### A.  Par Will Be Irreparably Harmed Unless the Court Enjoins Further Development and Sale of QuVa's Competing Sterile Products

QuVa must be enjoined from releasing or selling any product that competes with a Par product and was developed or is manufactured using Par's trade secrets, including vasopressin.[7]  Each of QuVa's aseptic preparations are derived from QuVa's orchestrated plot to solicit Par's employees and steal Par's trade secrets.  Applicable law recognizes that an injunction is generally an appropriate remedy to

---

[7] Par's entitlement to relief, including monetary damages and a permanent injunction, extends to all of QuVa's aseptic preparations that use Par's trade secret aseptic manufacturing processes.  For purposes of this motion, Par limits its analysis to competing products.  *See* Declaration of Antonio Pera ¶¶ 2–4.

misappropriation of trade secret. *See, e.g.*, 18 U.S.C. § 1836(b)(3) (remedies include an injunction, except "in exceptional circumstances that render an injunction inequitable"); N.J.S.A. 56:15-3 (same); *see also NVR Inc. v. Davern*, No. 15-5059, 2015 WL 9450831, at *3 (D.N.J. Dec. 23, 2015) (improper disclosure and use of trade secrets constitute irreparable harm under NJTSA). Where a competitor develops a competing product based on misappropriation of a party's trade secrets, courts regularly find irreparable harm as a matter of law and enjoin sales of that product. For example, the Third Circuit affirmed a New Jersey District Court decision enjoining the manufacture of J-65 jet engine parts derived from drawings and specifications of those parts. *Williams v. Curtiss-Wright Corp.*, 681 F.2d 161, 163 (3d Cir. 1982) (affirming injunction "permitting [defendant] to manufacture for sale only those parts that could be produced without resort to the trade secret data and could clearly be identified as [defendant's] product"). And in a case closely analogous to this one, a plaintiff sued a competitor in the market for injectable veterinary penicillin products, alleging misappropriation of a trade secret method for creating veterinary penicillin. *Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co.*, 297 F. Supp. 2d 463, 492 (N.D.N.Y. 2003). Prior to the misappropriation, the plaintiff was the sole manufacturer of the veterinary penicillin using the *in situ* method. *Id.* at 470. The *Norbrook* court determined that "the potential loss of an industry

leader's present market and the loss of the advantage of being the pioneer in the field and the market leader may constitute irreparable harm." *Id.* at 493.

These legal presumptions of irreparable harm and the appropriate scope of an injunction are augmented by the specific facts in this case. As explained in the Declaration of Dr. Christine S. Meyer ("Meyer Decl."), Par will suffer irreparable harm if QuVa is not enjoined from releasing a vasopressin product.

██████████████████████████████████████████████

████████   An injunction is appropriate given the near certainty of irreparable harm.

**B.    Par Will Be Irreparably Harmed Unless the Court Enjoins Defendants' Solicitation of Par Employees and Disclosure of Trade Secrets**

Defendants must also be enjoined from further soliciting Par's employees in breach of their non-solicitation agreements and further misappropriating Par's trade secrets to prevent irreparable harm.  As part of obtaining employment at Par, each of Par's employees agreed that "failure to abide by this Agreement will result in immediate and irreparable damage to Par [and] will entitle Par to injunctive relief from a court having appropriate jurisdiction." *See, e.g.*, Ex. 15.  Where, as here, the irreparable harm flows from a Defendants possession and ability to use and disclose trade secrets, courts will enforce such agreements. *Jackson Hewitt Inc. v. Cline*, No. 14-cv-6931, 2015 WL 6687545, at *4 (D.N.J. Oct. 29, 2015).

Here, the irreparable harm is well-supported in fact.  Each Par employee lost to QuVa's poaching represents the loss of that employee's unique knowledge, skills, and experience, developed over the span of years at Par.  Such loss is not adequately remedied by the recruitment and training of new employees.  Meyer Decl. ¶ 31; *see, e.g.*, *Marsh USA Inc. v. Karasaki*, No. 08-cv-4195, 2008 WL 4778239, at *14 (S.D.N.Y. Oct. 31, 2008) (finding irreparable harm where unlawful solicitation deprives the employer "of its investment in training and developing those

employees"). ████████████████████████████████████████

████████████████████████████████████████████████

████████████████     The continued solicitation of Par's employees by QuVa damages

Par's goodwill and reputation as a trusted manufacturer of vasopressin, as QuVa

drains Par's workforce of experienced personnel to work on behalf of a direct

competitor. *Scholastic Funding Grp. LLC v. Kimble*, No. 07-557, 2007 WL

1231795, at *9 (D.N.J. Apr. 24, 2007); *see Diamond Blade Warehouse, Inc. v.

Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d. 866, 872 (N.D. Ill. 2006) (absent

injunction against further solicitation, plaintiff "will lose goodwill, competitive

position, and continuity of business relationships with its customers and

employees"); *see also* Meyer Decl. ¶ 32.  Each of these harms cannot be fully

redressed by monetary damages alone.

Defendants must further be enjoined from further acquiring, using, or

disclosing Par's trade secret and confidential information.  Disclosure of trade

secrets causes irreparable harm, as a matter of law. *Trico Equip.*, 2009 WL 1687391,

at *8 (citing *Nat'l Starch & Chem. Corp. v. Parker Chem. Corp.*, 219 N.J. Super.

158, 162 (App. Div. 1987).  "Where a party is in possession of another party's

confidential information and is poised to use or disclose such information, there is a

likelihood of irreparable harm." *Jackson Hewitt*, 2015 WL 6687545, at *4 (citing

*Nat'l Starch*, 219 N.J. Super. at 162).  "[D]amages will not be an adequate remedy

when the competitor has obtained the secrets.  The cat is out of the bag and there is no way of knowing to what extent their use has caused damage or loss." *Nat'l Starch*, 219 N.J. Super. at 163.  Moreover, an injunction against solicitation is an appropriate remedy to prevent the irreparable harm from disclosure of trade secrets. *See Bimbo Bakeries USA Inc. v. Botticella*, 613 F.3d 102, 107–08 (3d Cir. 2010) (holding that "an injunction against employment" is "one weapon in an equity court's arsenal to prevent the threatened misappropriation of trade secrets").

### C.   Par Will Be Irreparably Harmed Unless the Court Enjoins Defendants and Former Par Employees from Working on QuVa's Competing Sterile Products

*National Starch* establishes that injunctive relief is necessary where misappropriation is inevitable.  219 N.J. Super. at 162–64.  Under the inevitable disclosure doctrine, "an employer need not establish that its former employee has used or disclosed trade secrets," but rather "may demonstrate that there is a sufficient likelihood of inevitable disclosure of its trade secrets to a competitor to show irreparable harm not adequately remedied by money damages." *Osteotech, Inc. v. Biologic, LLC*, No. 07-cv-1296, 2008 WL 686318, at *3 (D.N.J. Mar. 7, 2008) (citations omitted).  QuVa's actions suggest misappropriation of numerous additional Par methods, formulations, and processes that have yet to be revealed. *See supra* Part II.D.  The Court should enter an injunction based on this credible threat of further misappropriation. *See Nat'l Starch*, 219 N.J. Super. at 162 (despite

difficulty in establishing "the particular formulas, formulations, or application techniques" misappropriated in a case "where multiple complex compounds are involved," enjoining defendants from related employment responsibilities based on strong circumstantial facts).

Here, given QuVa's hiring practices, the disclosure of Par's trade secrets is inevitable absent an injunction. QuVa purposefully hired Par employees that were intimately associated with Par's trade secrets and employed those individuals in similar positions to those they held at Par. QuVa hired precisely the people needed to misappropriate Par's aseptic manufacturing trade secrets and co-opt Par's investment in vasopressin development and testing. ████████████████

████████████████████████████████████

████████████████████ *See supra* Part II.C. ████████████████

████████████████████████████████████

████  *See supra* Part II.B.2. Under these facts, there is a sufficient likelihood that Par's former employees will inevitably disclose Par's trade secrets in their equivalent roles at QuVa to warrant an injunction. *See id.*

Because each of the former Par employees will inevitably disclose Par's trade secrets, they must be enjoined from further work on QuVa's competing aseptic manufacturing products.

-36-

## VI.  THE BALANCE OF EQUITIES TIPS STRONGLY IN PAR'S FAVOR

While Par will suffer irreparable harm absent an injunction, QuVa has no countervailing equitable interest in continuing to sell aseptic products that are derived from its campaign of solicitation and trade secret misappropriation.  *See NVR,* 2015 WL 9450831, at *3 (D.N.J. Dec. 23 2015) (finding the balance of hardships "[c]learly . . . favors the [p]laintiff" where the plaintiff demonstrated that defendant "will not be harmed by being forbidden to use information he has no right to use or disclose" and "being obligated to compete only by lawful means").

To the extent that QuVa asserts other harms, these assertions are without merit.  First, an injunction against QuVa's sale of aseptic products that directly compete with Par will not endanger QuVa as a going concern.  QuVa's website identifies several non-sterile preparations as well as a multitude of non-competing sterile compounded medications that are sold by QuVa. [8]  Under the limited injunction proposed by Par, QuVa would not be enjoined against the manufacture and sale of such compounds, and Defendants would not be enjoined from working on such compounds. [9]  QuVa will also not be harmed by being enjoined from soliciting Par's employees.  QuVa still has access to the far larger market of non-Par

---

[8] 503B Ooutsourcing Services, QuVa Pharma, Inc., *available at* http://www.quvapharma.com/503b-outsourcing-services/.

[9] Par reserves its right to all other remedies for Par's continued misappropriation of Par's trade secrets, including monetary damages and a permanent injunction.

employees with experience in drug compounding, from which QuVa can lawfully hire without misappropriating Par's trade secrets.

## VII. THE PUBLIC INTEREST FAVORS AN INJUNCTION

The public interest clearly favors an injunction here.  At every turn, QuVa has cut corners and sought short-cuts in order to get to market—and that could have drastic public health consequences.   In 2012, the sale of unsafe injections manufactured at a 503(b) compounding facility resulted in 753 cases of fungal meningitis leading to 64 deaths. *See* "Owner of New England Compounding Center Sentenced for Racketeering Leading to Nationwide Fungal Meningitis Outbreak," *available at* https://www.fda.gov/ICECI/CriminalInvestigations/ucm564768.htm. Because of the danger, the FDA has not hesitated in recalling compounds and enjoining companies that fail to meet FDA standards.  *See* "Compounding: Inspections, Recalls, and other Actions," *available at* https://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Pharmacy Compounding/ucm339771.htm#R.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

The public interest also favors enjoining QuVa from poaching Par's employees and stealing Par's trade secrets. The "public has a clear interest in safeguarding fair commercial practices and in protecting employers from theft or piracy of trade secrets, confidential information, or, more generally, knowledge and technique in which employer may be said to have a proprietary interest." *Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 230 (D.N.J. 2009). While the entry of QuVa's competing products will likely depress prices in the public market, the law must balance the competing interest of encouraging investment and innovation. *See Fresenius Kabi USA, LLC v. Fera Pharm., LLC*, No. 15-cv-3654, 2016 WL 5348866 at *14 (D.N.J. Sept. 23, 2016). Allowing Defendants' deliberate acts of poaching and trade secret misappropriation to continue unabated fosters a business environment that ultimately discourages innovation, undermining the public interest.

## VIII.  CONCLUSION

For the foregoing reasons, the Court should grant Par's Motion and enter a preliminary injunction against Defendants.


DATED:      November 17, 2017     Respectfully submitted,


By:  s/ Lawrence S. Lustberg
                    Lawrence S. Lustberg

Lawrence S. Lustberg
Daniel J. McGrady
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
Telephone:  (973) 596-4500
Facsimile:   (973) 596-0545

Daniel M. Petrocelli (admitted *pro hac vice*)
Brett J. Williamson (admitted *pro hac vice*)
Jeffrey A. Barker (admitted *pro hac vice*)
David S. Almeling (admitted *pro hac vice*)
**O'MELVENY & MYERS LLP**
Times Square Tower
7 Times Square
New York, New York 10036
Telephone:  (212) 326-2000
Facsimile:   (212) 326-2061

*Attorneys for Plaintiffs Par Pharmaceutical,
Inc. and Par Sterile Products, LLC*