Daniel M. Petrocelli (admitted *pro hac vice*)
Brett J. Williamson (admitted *pro hac vice*)
Jeffrey A. Barker (admitted *pro hac vice*)
David S. Almeling (admitted *pro hac vice*)
**O'MELVENY & MYERS LLP**
Times Square Tower
7 Times Square
New York, New York 10036
Telephone:  (212) 326-2000
Facsimile:   (212) 326-2061

Lawrence S. Lustberg
Daniel J. McGrady
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
Telephone:  (973) 596-4500
Facsimile:   (973) 596-0545

*Attorneys for Plaintiffs Par*
*Pharmaceutical, Inc. and*
*Par Sterile Products, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAR PHARMACEUTICAL, INC. and PAR STERILE PRODUCTS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>QUVA PHARMA, INC., STUART HINCHEN, PETER JENKINS, MIKE RUTKOWSKI, DONNA KOHUT, DAVID SHORT, STEPHEN RHOADES, TRAVIS MCGRADY, and DAVID HARTLEY,<br><br>Defendants. | Civil Action No. 3:17-cv-06115-BRM-DEA<br><br>*Document Electronically Filed*<br><br>**FIRST AMENDED COMPLAINT** |

## FIRST AMENDED COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF

Plaintiffs Par Pharmaceutical, Inc. ("Par Pharmaceutical") and Par Sterile Products, LLC ("Par Sterile") (collectively, "Par"), by and through their counsel, allege for their First Amended Complaint against Defendants QuVa Pharma, Inc. ("QuVa"), Stuart Hinchen, Peter Jenkins, Mike Rutkowski, Donna Kohut, David Short, Stephen Rhoades, Travis McGrady, and David Hartley (collectively, "Defendants"), as follows:

### NATURE OF THE CASE

1.      This is a blatant case of trade secrets theft.  Defendant QuVa and its principals, Defendants Stuart Hinchen and Peter Jenkins, were desperate to begin competing with Par's life-saving, FDA-approved, vasopressin-based cardiopulmonary drug Vasostrict®, but were unwilling to spend the time and money to do the research and development work necessary to launch their own alternative product.  So they took a short cut.  Just four months after leaving their positions as Par Sterile executives, Hinchen and Jenkins began a poaching campaign to hire away key employees with intimate knowledge of Par's trade secrets regarding the development, validation, regulatory approval, and market introduction of sterile pharmaceutical products, including Vasostrict®.  Par's former employees then assisted in the disclosure and use of Par's trade secrets, as well as the unlawful

solicitation of additional Par employees, to establish QuVa as a competitor to Par. Defendants Donna Kohut, David Short, and Stephen Rhoades disclosed Par's trade secrets in an effort to assist QuVa in creating its competing sterile products. Defendants Kohut, Short, Rhoades, Travis McGrady, and David Hartley solicited additional Par Sterile employees in violation of their non-solicitation agreements with Par. To date, QuVa has hired at least twelve former Par Sterile executives, managers, and consultants, almost all of whom were solicited in violation of contractual promises to Par. QuVa's hiring practices are highlighted by the recent addition of former Par Sterile Senior Vice President and General Manager, Defendant Mike Rutkowski.

2.      Internal Par email records show that in the weeks and months leading up to his April 14, 2017 departure from Par Sterile, Rutkowski was communicating with QuVa personnel and, in violation of Par's rights, disclosing highly confidential and proprietary information relating to manufacturing and storage methods, operating details and results, business strategies for Vasostrict®, and other confidential Par information. Rutkowski hid these communications from Par, which has only recently discovered them after conducting an investigation. This investigation has also uncovered that Rutkowski additionally violated Par company policy by, on information and belief, improperly downloading numerous Par documents to a personal hard drive within days of giving notice that he was leaving

the company.  These documents include, on information and belief, confidential Par documents regarding personnel, finances, corporate strategy, and many other topics.

3.     Additionally, on April 19, 2017—just five days after Rutkowski's departure from Par Sterile—QuVa submitted a letter to the U.S. Food and Drug Administration ("FDA") seeking to add vasopressin to a list of active ingredients for drug compounding in an effort to avoid the formal FDA approval process, which effort, if successful, would allow QuVa to directly compete with Par Sterile's formally FDA approved Vasostrict®.  Although the letter was rife with factual misrepresentations, the FDA nevertheless relied on it in deciding to add vasopressin to its Bulk Drug Substances List dated as of July 1, 2017, indicating that it is now under "Category 1" of bulk drug substances under evaluation pursuant to Section 503B of the Food, Drug and Cosmetic Act of 1938 ("FDCA").  Inclusion in Category 1 means that "the FDA does not intend to take action against an outsourcing facility" that compounds the drug substance at issue while it is under evaluation, effectively giving a green light to an outsourcing facility such as QuVa to begin compounding.

4.     QuVa has already begun manufacturing and selling competing sterile pharmaceutical products, including Ephedrine, Epinephrine HCl, Ketamine, Methohexital, Neostigmine, and Oxytocin, using Par's confidential and proprietary trade secrets, and QuVa has admitted that it intends to begin manufacturing and selling a vasopressin product that will compete with Par's Vasostrict® "as soon as

possible," which will also be done using Par's confidential and proprietary trade secrets, actions that will irreparably harm Par if not enjoined.

5.      In light of these actions, Par has no choice but to bring this action to prevent QuVa from unfairly competing and improperly usurping Par's significant investment in Vasostrict® and other sterile pharmaceutical products.

## THE PARTIES

6.      Plaintiff Par Sterile is a Delaware limited liability company with its headquarters in Chestnut Ridge, New York.  Par Sterile is a wholly-owned, indirect subsidiary of Par Pharmaceutical.  In 2014, Par Pharmaceutical acquired JHP Group Holdings, Inc., which was the ultimate parent company of JHP Pharmaceuticals, LLC ("JHP"), a Delaware limited liability company that was headquartered in Parsippany, New Jersey, and changed JHP's name to Par Sterile.

7.      Plaintiff Par Pharmaceutical is a New York corporation with its headquarters in Chestnut Ridge, New York.  Par Pharmaceutical is a wholly-owned, indirect subsidiary of Endo International plc.

8.      Par is informed and believes that Defendant QuVa is a Delaware corporation with a regular and established place of business in Bloomsbury, New Jersey.

9.      Par is informed and believes that Defendant Stuart Hinchen is a resident of Saddle River, New Jersey.  Hinchen served as President and Chief Executive

Officer of JHP in Parsippany, New Jersey from its founding in 2007 until the acquisition of JHP Group Holdings, Inc., which was the ultimate parent company of JHP, by Par Pharmaceutical in February 2014 through a reverse subsidiary merger, and as President of Par Sterile in Woodcliff Lake, New Jersey from February 2014 to June 11, 2014, and by doing so availed himself of the privileges of New Jersey law.

10.     Par is informed and believes that Defendant Peter Jenkins is a resident of New York City, New York. Jenkins served as Chief Development Officer of JHP in Parsippany, New Jersey from its founding in 2007 until the acquisition of JHP Group Holdings, Inc. (as described above), and as Chief Development Officer of Par Sterile in Woodcliff Lake, New Jersey from February 2014 to June 6, 2014, and by doing so availed himself of the privileges of New Jersey law.

11.     Par is informed and believes that Defendant Mike Rutkowski is a resident of the State of New Jersey and is an employee of QuVa in Bloomsbury, New Jersey. Rutkowski served as Vice President and General Manager of JHP from May 2013 until the acquisition of JHP Group Holdings, Inc. (as described above). As Senior Vice President and General Manager of Par Sterile from February 2014 to April 14, 2017, Rutkowski regularly traveled to and communicated with other executives at JHP's headquarters at Parsippany, New Jersey, and subsequently at Par Sterile's headquarters in Woodcliff Lake, New Jersey, and by doing so availed

himself of the privileges of New Jersey law.

12.     Par is informed and believes that Defendant Donna Kohut is a resident of the State of Texas and is an employee of QuVa in Sugar Land, Texas.  Kohut, as an employee of LexaMed Ltd., served as a consultant for JHP from 2007 until the acquisition of JHP Group Holdings, Inc. (as described above).  Kohut continued as a consultant for Par Sterile at the Rochester, Michigan facility from February 2014 to August 2015.  Kohut also served as a consultant for QuVa from November 2014 until her eventual hiring as QuVa's Vice President of Operations on or about August 2015.   Kohut, as Vice President of Operations, regularly travels to and communicates with QuVa employees at QuVa's Bloomsbury, New Jersey facility, and by doing so availed herself of the privileges of New Jersey law.

13.     Par is informed and believes that Defendant David Short is a resident of the State of Texas and is an employee of QuVa in Sugar Land, Texas.  Short served as Senior Director of Quality Control at JHP from May 2011 until the acquisition of JHP Group Holdings, Inc. (as described above).  Short continued to serve as Senior Director of Quality Control at Par Sterile from February 2014 until October 2015.  Short also provided consulting services to QuVa during this time, until he was hired as QuVa's Vice President of Quality on or about October 2015.  Short, as QuVa's Vice President of Quality, regularly travels to and communicates with QuVa employees at QuVa's Bloomsbury, New Jersey facility, and by doing so

availed himself of the privileges of New Jersey law.

14.     Par is informed and believes that Defendant Stephen Rhoades is a resident of the State of Texas and is an employee of QuVa in Sugar Land, Texas. Rhoades served as Manager, Sterility Assurance at JHP from August 2013 until the acquisition of JHP Group Holdings, Inc. (as described above).  Rhoades continued to serve as Manager, Sterility Assurance at Par Sterile from February 2014 until October 2015.  QuVa hired Rhoades as its Director of Sterility Assurance on or about October 26, 2015.  Rhoades, as QuVa's Director of Sterility Assurance, regularly travels to and communicates with QuVa employees at QuVa's Bloomsbury, New Jersey facility, and by doing so availed himself of the privileges of New Jersey law.

15.     Par is informed and believes that Defendant Travis McGrady is a resident of the State of Texas and is an employee of QuVa in Temple, Texas. McGrady served as Manager, Deviations & Lot Disposition at JHP from October 2007 until the acquisition of JHP Group Holdings, Inc. (as described above). McGrady continued to serve as Manager, Deviations & Lot Distribution at Par Sterile from February 2014 until February 2016.  QuVa hired McGrady as its Director of Quality Systems on or about February 15, 2016.  McGrady, as QuVa's Director of Quality Systems, regularly travels to and communicates with QuVa employees at QuVa's Bloomsbury, New Jersey facility, and by doing so availed himself of the privileges of New Jersey law.

16.     Par is informed and believes that Defendant David Hartley is a resident of the State of Texas and is an employee of QuVa in Sugar Land, Texas.  Hartley served as Director, Technical Services at JHP from September 2013 until the acquisition of JHP Group Holdings, Inc. (as described above).  Hartley continued to serve as Director, Technical Services at Par Sterile from February 2014 until March 2016.  QuVa hired Hartley as its Director of Facility Engineering on or about March 14, 2016.  Hartley, as QuVa's Director of Facility Engineering, regularly travels to and communicates with QuVa employees at QuVa's Bloomsbury, New Jersey facility, and by doing so availed himself of the privileges of New Jersey law.

17.     Par is informed and believes that the Defendants, and each of them, were the agents, servants, and employees of each of their co-defendants, and in doing the things alleged herein were acting within the course and scope of their authority as such agents, servants, and employees and with the permission and consent of their co-defendants, and each of them.  In particular, Par is informed and believes that Defendants Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, and Hartley, have acted and are presently acting as the agents and/or employees of QuVa and working on its behalf.

## JURISDICTION AND VENUE

18.     This action arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, *et seq.*, as amended, and New Jersey law.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

19.     This Court has personal jurisdiction over Defendants.  Along with each of the Defendants' substantial and continuing contacts with New Jersey as alleged above and herein, Par is informed and believes that Defendants' actions causing Par's injury, even if initiated at times outside of New Jersey, were expressly aimed at New Jersey, with knowledge that they would cause harm in New Jersey.  These purposeful actions constitute at least minimum contact with New Jersey such that the maintenance of this suit in this Court does not offend traditional notions of fair play and substantial justice.  This Court's personal jurisdiction over Hinchen and Jenkins is further established by virtue of their express consent to personal jurisdiction in the federal courts of New Jersey as set forth in their respective written agreements, described *infra*.

20.     As is further set forth herein, a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred and have a direct effect in this District.  Venue therefore lies in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2).

## GENERAL ALLEGATIONS

**A.  Par Sterile Obtains The First And Only FDA-Approved Intravenous Vasopressin Injection.**

21.   Par Sterile is a specialty pharmaceutical company that develops, manufactures, and sells sterile drug products, including Vasostrict®, the first (and so far only) intravenous vasopressin injection, United States Pharmacopeia ("USP"), product with a New Drug Application ("NDA") approved by the FDA.  Developed using proprietary technologies and advanced medical methods, Vasostrict® increases blood pressure in adults with vasodilatory shock (*e.g.*, postcardiotomy or sepsis) who remain hypotensive despite the administration of fluids and catecholamines (such as norepinephrine), restoring blood pressure to safe levels through the narrowing of blood vessels and the increase in blood volume due to water retention in the body.

22.   Vasopressin is the synthetic form of a polypeptide hormone secreted by the posterior pituitary gland.  For many decades prior to 2014, vasopressin was allowed to be sold as an unapproved drug in the United States, due to its having been marketed as a therapeutic agent prior to the 1938 enactment of the FDCA.  Among the companies manufacturing and selling unapproved vasopressin injection was JHP, a privately-held company founded in 2007 and led by Defendants Jenkins and Hinchen (the "JH" in "JHP").  JHP's name was changed to Par Sterile when JHP Group Holdings, Inc., which was the ultimate parent company of JHP,  was acquired

by Par Pharmaceutical in 2014.

23.     In recent years, the FDA has sought to have manufacturers of marketed unapproved drugs seek FDA approval for such products.  Specifically, in September 2011, the FDA issued guidance to drug manufacturers stating that it would begin taking steps to "encourage the manufacturers of these products to obtain the required evidence and comply with the approval provisions of the Federal Food, Drug, and Cosmetic Act [] or remove the products from the market."

24.     In response to the FDA's guidance, JHP, then under the control of Defendants Hinchen and Jenkins, pursued the FDA's extensive NDA process to seek approval from the FDA to manufacture and sell a vasopressin injection, USP, product pursuant to Section 505(b)(2) of the FDCA, 21 U.S.C. § 355(b)(2).  On September 26, 2012, JHP submitted to the FDA NDA No. 204485 for its intravenous vasopressin injection under the name Vasostrict®.

25.     On February 25, 2014, Par Pharmaceutical acquired JHP Group Holdings, Inc., which was the ultimate parent company of JHP, through a reverse subsidiary merger for total consideration approximating $490 million, and JHP's name was changed to Par Sterile.

26.     Both before and after the acquisition, Par invested substantial amounts of time and money in its development program for Vasostrict® to satisfy the FDA's requirements for an NDA.  Those requirements, which are detailed in 21 C.F.R.

§ 314, *et seq.*, include demonstrating:  (a) the safety and efficacy of the drug; (b) the ways in which the benefits of the drug outweigh any risks associated with its use; and (c) that the methods used in manufacturing the drug, and the controls used to maintain the drug's quality, are adequate to preserve the drug's identity, strength, quality, and purity.  Par Sterile also was required to demonstrate and document the results of clinical tests, how the drug behaves in the human body, and how it is manufactured, processed and packaged.

27.     Par's substantial investment in the development program for Vasostrict® and in the NDA process was rewarded on April 17, 2014, when Par Sterile received FDA approval to sell Vasostrict®, the first (and so far only) FDA-approved intravenous vasopressin injection, USP.  Par Sterile thereafter applied for and received numerous supplemental FDA approvals regarding the product's shelf life, storage, formulation and dosage, and began commercial sales of Vasostrict® in November 2014.

28.     Par has devoted significant time and resources researching, developing, and validating different formulations of Vasostrict® and other sterile pharmaceutical products.  This process involved years of effort and collaboration across different departments, including laboratory research, formulation development, analytical chemistry, quality control and assurance, validation, process development, and manufacturing.  Through largely time-consuming trial-and-error experimentation

-13-

with different pH adjustments, buffers, excipients, temperatures and other experimental conditions, Par achieved important and commercially valuable increased efficiencies in manufacturing and improved products.

**B.     Par's Trade Secrets And Its Extensive Measures To Protect Them.**

29.     Par's development of Vasostrict® and other sterile pharmaceutical products, including the work performed as part of NDA No. 204485 and the supplements thereto, as well as Par Sterile's ongoing efforts to manufacture and sell an increasing variety of formulations of Vasostrict® and other sterile pharmaceutical products, has produced a substantial amount of highly sensitive and proprietary trade secret information, the confidentiality of which is critical to the significant value that these products represent to Par.  Included among these trade secrets is technical know-how relating to chemical compositions and properties, batch quantities, assays, test methods and specifications, stability protocols, validation methods, quality control, research & development efforts to obtain increased shelf life under both refrigeration and room temperature storage conditions, as well as confidential information relating to the manufacture, packaging, distribution, marketing, and sale of Vasostrict® and other sterile pharmaceutical products, including customer identities, industry competitive intelligence, strategic plans, results of operations, and short- and long-term business strategies and initiatives (collectively, the "Trade Secrets").

30.     To protect the confidentiality of the Trade Secrets, Par has implemented numerous security measures.  For example, Par's physical facilities (including, in particular, Par's laboratory and manufacturing facilities located in Rochester, Michigan, where Vasostrict® is presently manufactured and packaged for distribution and sale, and where research and development work on new vasopressin products is conducted) are enclosed by secure fencing (including barbed wire) and monitored 24 hours a day by surveillance cameras and manned patrols.  Entry to and exit from Par facilities is controlled, and access is allowed only to authorized individuals.  Within Par's facilities, tangible copies of Trade Secret information, including but not limited to lab notebooks, batch records, and quality control procedures and protocols, are maintained in secured and locked locations, access to which is limited to those with a need to know and who use the Trade Secrets in the development and manufacturing process.

31.     Par maintains certain Trade Secrets in the form of electronic records that are accessible via the Par secure computer network.  Access to that network is limited to Par employees, and access to electronically stored Trade Secret information on that network is password protected and monitored by Par security personnel.  All relevant Par employees are required to read, acknowledge, and execute a confidentiality agreement as a condition of, and in consideration for, their employment, by which they agree not to disclose any confidential or proprietary

information to anyone outside of the company, and not to use any of that information in connection with work performed for any future employer.

32.     Par has also implemented corporate policies and trainings to protect its Trade Secrets and other confidential information, including information technology security guidelines that, *inter alia*, strictly limit the downloading, copying, or distribution of the company's confidential information by its employees, except as specifically authorized and required for the performance of the employee's duties.

33.     Par also requires third parties, such as partners and vendors, to sign non-disclosure agreements.  And Par limits access to confidential information to such third parties on an as-needed basis.

## C.     Defendants Hinchen And Jenkins Solicit Kohut And Short To Form QuVa And Unfairly Compete With Par.

34.     As the founders of JHP, and subsequently as executives with Par Sterile, Defendants Hinchen and Jenkins had detailed knowledge of and access to certain Trade Secrets and other Par confidential information, and both were parties to employment agreements under which they promised not to "directly or indirectly, disclose, reveal, divulge, publish or otherwise make known to any Person or use any Confidential Information for any reason or purpose whatsoever, except for the proper discharge of the Employee's duties to the Company under this Agreement." "Confidential Information" is broadly defined in the employment agreements to include "all information, data, agreements, documents, reports, 'know-how',

interpretations, plans, studies, forecasts, projections and records (whether in written form, electronically stored or otherwise) containing or otherwise reflecting information [including] . . . operating procedures, techniques, systems, processes and methods, all intellectual property, product and service information, including research and development and proposed products and services . . . and . . . other commercial 'knowhow', trade secrets and information not available to the public generally."

35.   On June 6, 2014, shortly after Par Sterile received FDA approval for Vasostrict®, Jenkins resigned his employment with Par Sterile.  As part of his resignation, Jenkins received a substantial severance payment.  He also executed a "Separation Agreement and Release" in which he acknowledged having access to Par Confidential Information, as defined in the employment agreement described above, and agreed that he "shall not . . . directly or indirectly, use, communicate, disclose or disseminate any Confidential Information in any manner whatsoever," and that he "shall not . . . solicit, hire, induce or attempt to induce . . . any director, officer, employee, contractor, consultant or agent" of Par for one year.

36.   A few days later, on June 11, 2014, Hinchen likewise resigned his employment with Par Sterile.  As part of his resignation, Hinchen received a substantial severance payment.  He also executed a "Separation Agreement and Release" in which he acknowledged having access to Par Confidential Information

as defined in the employment agreement described above, and agreed that he "shall not . . . directly or indirectly, use, communicate, disclose or disseminate any Confidential Information in any manner whatsoever," and that he "shall not . . . solicit, hire, induce or attempt to induce . . . any director, officer, employee, contractor, consultant or agent" of Par for one year.

37.     Par is informed and believes that at, about, or before the time of their resignations, Hinchen and Jenkins began secretly planning and preparing, with the aid of Par confidential information, to launch a new pharmaceutical company that would compete with Par for business from hospitals and other healthcare providers using a hybrid "compound manufacturing" model to avoid the time and expense of going through the rigorous FDA new drug approval that applies to drug manufacturers such as Par Sterile.  Compounding by an outsourcing facility is a practice in which a person combines, mixes, or alters ingredients of a drug to create a medication under the supervision of a licensed pharmacist.  Compounded drugs are not required to be FDA-approved and may lack an FDA finding of manufacturing quality before being marketed, though they are required to comply with Current Good Manufacturing Practices ("CGMP") guidelines and inspections by the FDA.

38.     Hinchen and Jenkins laid the foundation for their competing business between October 2014 and February 2015.  Relying on Par's confidential information regarding the specific roles and duties of Par's employees, in October

2014 Hinchen and Jenkins began soliciting Short, who was still Par Sterile's Senior Director of Quality.  Using that same confidential information, in November 2014 Hinchen and Jenkins began soliciting Kohut, who was still a consultant for Par Sterile.  Short and Kohut also assisted Hinchen and Jenkins in creating numerous aspects of their competing business with the aid of Par confidential information (including various work regarding vasopressin and other sterile pharmaceutical products).

39.     On July 29, 2015, Hinchen and Jenkins formally incorporated QuVa in Delaware, and shortly thereafter simultaneously announced the acquisition of a sterile drug compounding facility in Sugar Land, Texas, and a majority equity investment from Bain Capital Private Equity, a global investment firm.  QuVa subsequently announced the acquisition of a manufacturing facility in Bloomsbury, New Jersey.

40.     QuVa officially hired Kohut as its Vice President of Operations on or about August 31, 2015, and Short as its Vice President of Quality on or about October 8, 2015.  On or about December 15, 2015, less than six months after QuVa's formation, QuVa announced a six-person executive leadership team, four members of which were former Par Sterile employees or consultants—Hinchen, Jenkins, Kohut, and Short.

**D.    QuVa Solicits Additional Par Sterile Employees To Unfairly Compete With Par.**

41.    Par is informed and believes that QuVa is pursuing a strategy of rapid growth to become a major competitor in the sterile drug manufacturing market by, in part, poaching experienced employees of Par Sterile, including executives and managers with valuable expertise in research and development, quality control, testing and validation, process development, and manufacturing methods, including sterile manufacturing.  In particular, Par is informed and believes that QuVa has targeted Par Sterile employees with intimate knowledge of the Trade Secrets and other confidential information regarding sterile manufacturing, Vasostrict®, and Par's other sterile products.

42.    Consistent with this strategy, Par is informed and believes that QuVa solicited, induced, and ultimately hired the following additional Par employees, on or about the dates indicated:

(a)    Stephen Rhoades, Par Sterile's Manager of Sterility Assurance, on or about October 26, 2015;

(b)    Travis McGrady, Par Sterile's Manager of Deviations and Lot Disposition, on or about February 15, 2016;

(c)    David "Mike" Hartley, Par Sterile's Director of Technical Services, on or about March 14, 2016;

(d)    Ahmed    Soliman,    Qualitest    Pharmaceutical's    Manager,

Analytical Research & Development, on or about April 1, 2016;

(e)     Guy Thompson, Par Sterile's Supervisor of the Microbiology Lab, on or about November 14, 2016;

(f)     Mike Rutkowski, Par Sterile's Senior Vice President and General Manager of the Rochester, Michigan facility, on or about April 17, 2017;

(g)     Ashley Short, Par Sterile's Quality Control Chemist II, on or about May 8, 2017; and

(h)     Chinnasamy Subramaniam, Par Sterile's Manager of Analytical Research & Development, on or about June 28, 2017.

43.     Par is informed and believes that after joining QuVa, most of these former Par Sterile employees aided and abetted QuVa's strategy by breaching their own employment agreements with Par.

44.     As employees or consultants of Par Sterile, Kohut, Short, and Rhoades had detailed knowledge of and access to certain Trade Secrets and other Par confidential information.  Kohut, Short, and Rhoades were parties to employment agreements under which they promised not to "divulge, disclose, or communicate to anyone or any entity, directly or indirectly, either during or after the termination of your employment with Par, any of Par's Proprietary Information, and agree not to use Par's Proprietary Information in your required duties for a subsequent employer."  They also promised to not "directly or indirectly (1) interfere with Par's

employees; (2) solicit, induce, encourage or attempt to solicit, induce or encourage any employee or Par to leave his/her employment with Par; or (3) hire, attempt to hire, attempt to hire or attempt to assist in the hire of any employee of Par" for one year after termination from Par Sterile.

45.     Beginning no later than early 2016, Kohut, Short, and Rhoades each breached their non-disclosure agreements by disclosing and utilizing Par's Trade Secrets to benefit QuVa.  This misappropriation was aided by Rutkowski who sent QuVa's employees additional Par Trade Secrets while he was still employed by Par. The misappropriation included the unauthorized disclosure, distribution, and use of confidential Par technical documents that were taken from Par without Par's permission.  These documents, prominently branded with the Par name, logo, and other clear identifying information, contained numerous, detailed Par Trade Secrets. While Par has still not determined how or when these confidential documents were taken, it has determined that QuVa incorporated the Trade Secrets from those confidential documents into its own business and operations.

46.     Kohut, Short, Rhoades, McGrady, Hartley, and Soliman each also breached the non-solicitation provisions in their respective employee agreements with Par.  The solicitations consisted of phone calls, emails, in-person conversations, and/or interviews with Par employees.  In particular:

(a)   Kohut, whose non-solicitation period expired on or about August 24,

2016, improperly solicited employees in breach of that agreement, including McGrady on or about January 21, 2016, Subramaniam on January 25, 2016, Hartley on or about February 1, 2016, Soliman on or about April 7, 2016, and Thompson on or about February 8, 2016;

(b)   Short, whose non-solicitation period expired on or about October 23, 2016, improperly solicited employees in breach of that agreement, including McGrady on or about January 21, 2016, Subramaniam on January 25, 2016, Hartley on or about February 1, 2016, Soliman on or about April 7, 2016, and Thompson on or about February 8, 2016;

(c)   Rhoades, whose non-solicitation period expired on or about October 17, 2017, improperly solicited employees in breach of that agreement, including McGrady on or about January 21, 2016, Hartley on or about February 1, 2016, and Thompson on or about February 8, 2016;

(d)   McGrady, whose non-solicitation period expired on or about February 13, 2017, improperly solicited Soliman on or about April 1, 2016 in breach of that agreement;

(e)   Hartley, whose non-solicitation period expired on or about March 12, 2017, improperly solicited Rutkowski on or about September 17, 2016 in breach of that agreement; and

(f)   Soliman, whose non-solicitation period expired on or about June 28,

2018, improperly solicited Ashely Short on or about April 17, 2017 in breach of that agreement.

**E.      Par's Discovery Of QuVa's Actual And Threatened Misappropriation Of The Trade Secrets.**

47.      In June 2017, Par learned for the first time that, on or about April 19, 2017, QuVa had submitted a letter to the FDA requesting that vasopressin be added to the list of bulk drug substances under "Category 1" pursuant to the FDA's "Interim Policy on Compounding Using Bulk Drug Substances Under Section 503B of the Federal Food, Drug, and Cosmetic Act" (the "Interim Policy").  The Interim Policy is intended to provide guidance to the pharmaceutical industry regarding the submission and review of nominations of substances to be included on the FDA's list of bulk drug substances that may be used in compounding conducted by outsourcing facilities under section 503B of the FDCA.

48.      In July 2017, Par learned that, notwithstanding numerous material factual misrepresentations in QuVa's April 19 letter, the FDA had responded to QuVa's request by adding vasopressin to its Bulk Drug Substances List dated as of July 1, 2017, indicating that vasopressin is now under "Category 1" of bulk drug substances under evaluation pursuant to Section 503B of the FDCA.  Inclusion in Category 1 means that "the FDA does not intend to take action against an outsourcing facility" that compounds the substance at issue while it is under evaluation.

-24-

49.     This information, coupled with QuVa's solicitation and hiring of multiple Par employees involved in the development, testing and manufacture of Par Sterile's Vasostrict® and other vasopressin products, caused Par to launch an investigation into whether QuVa and/or any of its agents or employees had improperly disclosed or used Par's Trade Secrets and other confidential information. While that investigation is ongoing and has necessarily been limited to information within Par's ability to access, the results to date have been shocking and have led Par to conclude that Defendants are engaged in actual and threatened misappropriation of the Trade Secrets and other confidential information.

50.     A review of certain internal Par emails shows that defendant Rutkowski, Par Sterile's former Senior Vice President and General Manager of its Rochester, Michigan facility (and QuVa's most senior hire from Par) began disclosing Par's Trade Secrets and other confidential information to QuVa by email at least as early as June 2016 (ten months *before* he resigned from Par Sterile).  Those improper email communications continued until just prior to Rutkowski's departure from Par Sterile.

51.     For example, in a June 28, 2016 email, Rutkowski delivered to Donna Kohut (the former Par Sterile consultant who by that date had joined QuVa) a Par "backorder report," disclosing in detail (including average days aging and total backorder amount, broken down by facility location) certain Trade Secrets in the

form of confidential Par business information.

52.     In an October 25, 2016 email exchange, Rutkowski informed Kohut that he was willing to provide "any slides" that she would need for an upcoming QuVa employee meeting, and further improperly disclosed confidential Par business information regarding "unit counts" at the Rochester, Michigan facility, and the fact that Par was performing product testing using certain metrics that he believed have an effect on absorption rates.

53.     In a March 9, 2017 email exchange, Rutkowski provided Kohut with Par Trade Secrets and other confidential information relating to how to pass an FDA facility inspection, to which Kohut responded, "[a]ppreciate the tip."   This information was particularly important to QuVa, as the FDA had previously determined that the QuVa facility in question failed to meet certain quality control standards related to maintaining sterility and avoiding contamination.   Notably, Rutkowski's email was in response to an earlier email from Kohut, forwarding an internal QuVa announcement (distributed to former Par Sterile employees Rhoades and Hartley, who were by that time QuVa employees) that a QuVa facility was "in operation," to which Rutkowski responded "Way to go team!!!!!!!!!!!!!!!!!," evidencing that by at least March 2017 Rutkowski considered his "team" to be QuVa, not his employer Par Sterile.

54.     In a March 13, 2017 email, Rutkowski and Kohut discussed some of

their joint efforts to recruit Par Sterile employees from QuVa while Rutkowski was still employed by Par Sterile.  After informing Kohut that a Par Sterile employee had announced he was departing for another company, Kohut lamented that she was "sorry to have missed out on him joining QuVa, yet he is closer in distance *so that would actually facilitate hire without any of the politics between the organizations*."  (emphasis added).  Rutkowski responded with a damning admission of his own efforts to solicit Par Sterile employees for QuVa: "*I spoke to him but he elected to go elsewhere*.  Not much else I can do."  (emphasis added).

55.     In a second March 13, 2017 email, Rutkowski sent Kohut an internal Par PowerPoint presentation containing Trade Secrets and other confidential information regarding Par's historical operations and sales.

56.     And on March 15, 2017—just prior to giving notice to Par Sterile that he was leaving the company—Rutkowski forwarded to Kohut at QuVa three detailed, internal Par PowerPoint presentations containing many of Par's sensitive, highly confidential and proprietary Trade Secrets, including supply chain metrics (such as batching performance, yields, deviation rates, complaints, recalls, perfect batches, and values of backorders), monthly finances and budgets, training and personnel developments, and future business plans relating to planned new product launches, including vasopressin products.   In reply, QuVa's Kohut candidly announced, "*I'll steal with pride just like you taught me*."  (emphasis added).

Rutkowski responded favorably:  "LOL Love it!!!!!"

57.    On information and belief, Rutkowski's misconduct did not end with his emails to QuVa but, instead, extended to improperly downloading numerous Par documents to a personal hard drive within days of giving notice that he was leaving Par Sterile.  For example, on April 3, 2017, Rutkowski, in violation of Par's computer-usage policies, connected to his Par computer his personal Western Digital My Passport Portable External Hard Drive, a large hard drive with the storage capacity for an entire terabyte of data.  For several hours on that same day, Rutkowski accessed a large number of documents in short succession and, on information and belief, downloaded to his personal hard drive, among other things, confidential Par documents regarding FDA regulations and inspections, product tables, accounting documents, personnel documents, historical presentations about Par's Rochester facility, and a presentation to the Board of Directors.

58.    Upon information and belief, these emails and forensics demonstrating Defendants' misconduct are only the tip of the iceberg, and full discovery of QuVa's, the individual Defendants' and their financial backers' internal emails, documents, electronic records, and testimony under oath of QuVa principals, along with various other forms of discovery, will uncover much more, similar evidence.  Par's limited expedited discovery has already uncovered extensive evidence that demonstrates Defendants improper and unlawful conduct.

59.     Additionally, Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades, through their respective roles at Par Sterile, had daily access to, and even assisted in creating, certain of Par's Trade Secrets and other confidential information.  They were involved in and exposed to, for example, technical know-how relating to sterile manufacturing, chemical compositions, batch quantities, assays, test methods and specifications, stability protocols, validation methods, quality control, and/or other research and development efforts, as well as confidential information relating to the manufacture, packaging, distribution, marketing, and sale of Vasostrict® and/or other sterile products.

60.     Par is informed and believes that Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, Hartley, and Soliman have assumed roles at QuVa similar to their prior roles at Par Sterile.  Par is informed and believes that given these roles at QuVa, as well as the voluminous confidential and proprietary information they were exposed to, it would be impossible for Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, Hartley, and Soliman to have performed or to continue to perform any work for QuVa regarding a vasopressin or other sterile drug product that would directly compete with Par Sterile's Vasostrict®—as QuVa recently described in its letter to the FDA nominating vasopressin for inclusion on the Bulk Drug Substances List—or other sterile products without using Par's Trade Secrets.

61.     Similarly, and on information and belief, the other former Par Sterile employees with extensive knowledge of the Trade Secrets that QuVa recently poached—Ahmed Soliman, Guy Thompson, Ashley Short, and Chinnasamy Subramaniam—have also assumed roles at QuVa similar to those that they performed at Par, and in these new roles, they too will inevitably use and disclose Par's Trade Secrets for their own benefit and for the benefit of QuVa.  Par is informed and believes that QuVa has not taken the steps necessary to prevent these former Par Sterile employees from disclosing or using Par's Trade Secrets, such as assigning the employees to positions that have no relationship with sterile manufacturing.  On the contrary, QuVa is having them work directly with sterile manufacturing.

62.     In particular, and based on information and belief, all former Par Sterile employees who now work at QuVa are doing so in similar roles:

        a.     Hinchen, co-founder of JHP and former President of Par Sterile, is now co-founder and Chief Executive Officer of QuVa.

        b.     Jenkins, co-founder of JHP and Chief Development Officer at Par Sterile, is now co-founder and Chief Development Officer at QuVa.

        c.     Hartley, former Director of Technical Services at Par Sterile, is now the Director of Facilities Engineering at QuVa.

d.      David Short, former Senior Director of Quality Systems at Par Sterile, is now Vice President of Quality at QuVa.

e.      Kohut, former consultant to Par Sterile, is now Vice President of Operations at QuVa.

f.      McGrady, former Manager of Deviations & Lot Disposition at Par Sterile, is now Director of Quality Systems at QuVa.

g.      Rhoades, former Manager of Sterility Assurance at Par Sterile, is now Director of Sterility Assurance at QuVa.

h.      Thompson, former Supervisor of the Microbiology Lab at Par Sterile, is now Quality Assurance Manufacturing Manager at QuVa.

i.      Soliman, former Manager, Analytical Research & Development at Qualitest Pharmaceuticals, is now Director of Analytical Lab Research & Development at QuVa.

j.      Subramaniam, former Manager of Analytical R&D at Par Sterile, is now Director of Quality Control Lab at QuVa.

k.      Ashley Short, former Quality Control Chemist II at Par Sterile, is now Senior Analytical Chemist at QuVa.

l.      Rutkowski, former Senior Vice President and General Manager of the Rochester facility at Par Sterile, is now Vice President and General Manager of Bloomsbury, New Jersey facility at QuVa.

63.     Based on the information provided above, Par is informed and believes that QuVa has used or will use Par's Trade Secrets and other confidential information to compound vasopressin products with the properties described in the nomination submitted by QuVa to the FDA on April 19, 2017, and pursuant to the FDA's July 1, 2017 addition of vasopressin to the Bulk Drug Substance List.

64.     Par is informed and believes that Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades—and the former Par Sterile employees they hired—performed or continue to perform their respective duties at QuVa in compounding a vasopressin and other sterile products by using or relying on Par's Trade Secrets.  For example, there are several challenges involved in making pre-mixed formulations of vasopressin.  To overcome these challenges and create the pre-mixed products with the characteristics that QuVa is claiming (*e.g.*, potency, sterility, and shelf life) within the time period in which QuVa made its representations, Par is informed and believes that QuVa necessarily has to rely on or use the information QuVa has misappropriated (as described above) and QuVa's employees' knowledge gained from Par's years of work on Vasostrict®, including confidential work regarding ways to stabilize vasopressin and increase its shelf-life in undiluted and diluted formulations.

## COUNT I
## Violation Of Federal Defend Trade Secrets Act, 18 U.S.C. § 1836
### (*Against QuVa, Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades*)

65.    Par re-alleges each and every allegation set forth in Paragraphs 1 through 64, inclusive, and incorporates them herein by reference.

66.    Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products.  These Trade Secrets are described generally above and comprise financial, business, scientific, technical, economic, and/or engineering information that are used in or intended for use in interstate commerce and that accordingly constitute "trade secrets" under 18 U.S.C. § 1839(3).

67.    Par has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Par's Trade Secrets and by taking the other reasonable measures described above.

68.    These confidential and proprietary Trade Secrets derive independent economic value from not being generally known to or readily ascertainable through proper means by another person who can obtain economic value from the disclosure and use of such information, and have conferred a competitive advantage on Par over others in the relevant market.

69.    Other than through Defendants' improper disclosure, the Trade Secrets

are not known to others and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

70.     Defendants misappropriated Par's Trade Secrets by improper means and without authorization, including by disclosing and using and/or threatening to disclose and use the Trade Secrets without Par's express or implied consent in the preparation for production of a competing vasopressin drug product and in the other ways described above.  Par's investigation of this conduct, which is ongoing, has identified several instances of this misappropriation by Defendants, including some described above.

71.     The Defendants' actual and threatened use and disclosure of the Trade Secrets constitutes misappropriation because, among other reasons, at the time of such use and disclosure, the Defendants knew or had reason to know that their knowledge of the Trade Secrets was derived through persons who owed a duty to Par to maintain the secrecy of the Trade Secrets.

72.     Defendants' misappropriation comprises acts, including without limitation use of Par's Trade Secrets, on or after the date of the enactment of the Defend Trade Secrets Act, May 11, 2016.

73.     Defendants' current and continued misappropriation of Par's Trade Secrets is reckless and malicious.  Defendants know of the confidentiality, ownership, and use restrictions on the Trade Secrets.

74.     By reason of the above-alleged acts and conduct of Defendants, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

75.     Par is also entitled to recover compensatory and exemplary damages from Defendants, including but not limited to the losses resulting from their wrongful conduct and any unjust enrichment caused by their misappropriation. The amount of such relief cannot be determined precisely at this time.

## COUNT II
### Violation Of The New Jersey Trade Secrets Act, N.J.S.A. 56:15-2
### (*Against QuVa, Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades*)[1]

76.     Par re-alleges each and every allegation set forth in Paragraphs 1 through 75, inclusive, and incorporates them herein by reference.

77.     Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products. These Trade Secrets are described generally above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process that constitute "trade secrets" under

---

[1] To the extent that economic loss doctrine applies to these claims, which Par contends it does not, Count II is alleged as an alternative to the contract claims pled herein. *See IDT Corp. v. Unlimited Recharge, Inc.*, No. 11-cv-4992, 2012 WL 4050298, at *6 (D.N.J. Sept. 13, 2012).

N.J.S.A. 56:15-2.

78.     Par has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Par's Trade Secrets and by taking the other reasonable measures described above.

79.     These confidential and proprietary Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, others who can obtain economic value from its disclosure or use, and have conferred a competitive advantage on Par in the relevant market.

80.     Other than through Defendants' improper disclosure, the Trade Secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

81.     Defendants misappropriated Par's Trade Secrets by improper means and without authorization, including by disclosing and using and/or threatening to disclose and use the Trade Secrets without Par's express or implied consent in the preparation for production of a competing vasopressin compound and in the other ways described above, including in the inevitable disclosure or use of the Trade Secrets in their work for QuVa.  Par's investigation, which is ongoing, has identified several instances of this misappropriation by Defendants, including some described

above.

82.     The Defendants' actual and threatened use and disclosure of the Trade Secrets constitutes misappropriation because at the time of such use and disclosure, the Defendants knew or had reason to know that their knowledge of the Trade Secrets was derived through persons who owed a duty to Par to maintain the secrecy of the Trade Secrets.

83.     Defendants' current and continued misappropriation of Par's Trade Secrets is willful and malicious.  Defendants know of the confidentiality, ownership, and use restrictions on the Trade Secrets.

84.     By reason of the above-alleged acts and conduct of Defendants, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

85.     Par is also entitled to recover compensatory and punitive damages from Defendants, including but not limited to the losses resulting from their wrongful conduct and any unjust enrichment caused by their misappropriation.  The amount of such relief cannot be determined precisely at this time.

## COUNT III
## Misappropriation Of Trade Secret, New Jersey Common Law
### (*Against QuVa, Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades*)[2]

86.     Par re-alleges each and every allegation set forth in Paragraphs 1 through 85, inclusive, and incorporates them herein by reference.

87.     Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products.  These Trade Secrets are described above and comprise a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process that constitute "confidential information" under New Jersey Common Law.

88.     Defendants had regular access to the Trade Secrets throughout the course of their employment with Par Sterile.  Defendants know of the confidentiality, ownership, and use restrictions on the Trade Secrets.

89.     Par has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Par's Trade Secrets and by taking the other reasonable measures described above.

90.     These confidential and proprietary Trade Secrets derive independent

---

[2] To the extent that economic loss doctrine applies to these claims, which Par contends it does not, Count III is alleged as an alternative to the contract claims pled herein.  *See IDT Corp.*, 2012 WL 4050298, at *6.

economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use, and have conferred a competitive advantage on Par.

91.    Other than through Defendants' improper disclosure, the Trade Secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

92.    Defendants misappropriated Par's Trade Secrets by improper means and without authorization, including by disclosing and using and/or threatening to disclose and use the Trade Secrets without Par's express or implied consent in the preparation for production of a competing vasopressin compound and in the other ways described above.  Par's forensic investigation, which is ongoing, has identified several instances of this misappropriation by Defendants, including some described above.

93.    Defendants have and will continue to misappropriate Par's Trade Secrets by using these Trade Secrets without authority, including in their preparation for the production of a competing vasopressin compound.

94.    The Defendants' actual and threatened use and disclosure of the Trade Secrets constitutes misappropriation because at the time of such use and disclosure, the Defendants knew or had reason to know that their knowledge of the Trade

Secrets was derived through persons who owed a duty to Par to maintain the secrecy of the Trade Secrets.

95.    Defendants' current and continued misappropriation of Par's Trade Secrets is willful and malicious.

96.    By reason of the above-alleged acts and conduct of Defendants, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

97.    Par is also entitled to recover compensatory and punitive damages from Defendants.  The amount of such relief cannot be determined precisely at this time.

**COUNT IV**
**Unfair Competition, New Jersey Common Law**
(***Against Defendant QuVa***)

98.    Par re-alleges each and every allegation set forth in Paragraphs 1 through 97, inclusive, and incorporates them herein by reference.

99.    Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products.  These Trade Secrets and other confidential information are described above and constitute "confidential information" under New Jersey Common Law.

100.   Par has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by, among other things, requiring confidentiality and/or

nondisclosure agreements to be signed by any party granted access to Par's Trade Secrets.

101.   These confidential and proprietary Trade Secrets derive independent economic and commercial value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use, and have conferred a competitive advantage on Par.

102.   QuVa misappropriated Par's Trade Secrets by knowingly acquiring the Trade Secrets through improper means, namely by knowingly inducing former employees to breach their duty to maintain the secrecy of the Trade Secrets.  QuVa also misappropriated the Trade Secrets by disclosing and using the Trade Secrets without Par's express or implied consent after knowingly using improper means to acquire knowledge of the Trade Secrets.

103.   QuVa has and will continue to misappropriate Par's Trade Secrets by using these Trade Secrets without authority, including in the production of a competing vasopressin compound.

104.   QuVa's current and continued misappropriation of Par's Trade Secrets is willful, in bad faith, and malicious.   QuVa knows of the confidentiality, ownership, and use restrictions on the Trade Secrets.

105.   By reason of the above-alleged acts and conduct of QuVa, Par has been

damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

106.   Par is also entitled to recover compensatory and punitive damages from QuVa.  The amount of such relief cannot be determined precisely at this time.

**COUNT V**
**Breach Of Contract, New Jersey Common Law**
(*Against Defendant Hinchen*)

107.   Par re-alleges each and every allegation set forth in Paragraphs 1 through 106, inclusive, and incorporates them herein by reference.

108.   During his course of employment with JHP and Par Sterile, Hinchen signed at least three separate agreements with clauses relating to the Trade Secrets, confidential information, and non-solicitation.   The relevant provisions of these agreements remain in full force and, for good consideration, Hinchen remains obligated to comply with these provisions.  Par has satisfied all of its obligations under these valid and enforceable agreements.

109.   *First*, in December 2012, Hinchen signed an "Employee Agreement" with JHP.  This agreement defined "Confidential Information" as

> all information, data, agreements, documents, reports, 'know-how',
> interpretations, plans, studies, forecasts, projections and records
> (whether in written form, electronically stored or otherwise) containing
> or otherwise reflecting information [including] . . . operating
> procedures, techniques, systems, processes and methods, all intellectual
> property, product and service information, including research and

> development and proposed products and services . . . and . . . other
> commercial 'knowhow', trade secrets and information not available to
> the public generally . . . .

By signing the Employee Agreement, Hinchen agreed to a non-disclosure clause,

which provided that Hinchen "will not, directly or indirectly, disclose, reveal,

divulge, publish or otherwise make known to any Person or use any Confidential

Information for any reason or purpose whatsoever, except for the proper discharge

of the Employee's duties to the Company under this Agreement."

110.   Hinchen also agreed to a one-year non-solicitation clause, which

provided that Hinchen

> will not in any manner, directly or indirectly . . . solicit, hire, induce or
> attempt to induce, or assist others to solicit, hire, induce or attempt to
> induce, any director, officer, employee, contractor, consultant or agent
> of any member of [JHP] to either (I) leave or terminate his or her
> employment, consulting or other position or business relationship with
> any member of the Company Group, or (II) breach his or her
> employment, consulting or other agreement with any member of the
> Company Group . . . .

111.   Hinchen further agreed that JHP "will be entitled to seek equitable

relief, including, without limitation, an injunction or injunctions (without the

requirement of posting a bond, other security or any similar requirement or proving

any actual damages), to prevent breaches or threatened breaches of this Agreement."

112.   *Second*, in December 2012, Hinchen signed a "Restrictive Covenant

Agreement" with JHP.  This agreement defined "Confidential Information" as

> all information of or regarding [JHP], including, without limitation . . .

> information regarding . . . all source code, object code, modules, algorithms, software programs, system architectures, research, inventions, processes, techniques, costs, prices, customer contracts, requirements, systems, specific needs, customer lists or any other information related to customers or prospective customers that could create a competitive advantage, plans, budgets, forecasts, financial results, operations and personnel information, all information relating to the development, formulation, production, marketing or sale of existing or contemplated products, services, systems or processes; . . . know-how, trade secrets and proprietary information . . . .

By signing the Restrictive Covenant Agreement, Hinchen agreed to a non-disclosure clause, which provided that Hinchen will not "disclose or furnish to any Person . . . any Confirmation Information."

113.    Hinchen also agreed to a three-year non-solicitation clause, which provided that Hinchen will not "directly or indirectly employ, Solicit, or attempt to employ, or Solicit . . . any director, officer, consultant or employee" of JHP.

114.    *Third*, in June 2014, Hinchen signed a "Separation and Release" with Par Sterile.  This agreement provided that the parties "reiterate certain terms contained in [Hinchen]'s Employment Agreement."

115.    By signing the Separation and Release, Hinchen agreed to a non-disclosure clause, which provided that Hinchen will "not at any time, other than as may be required in connection with the performance by him of any remaining duties or obligations under the Employment Agreement, directly or indirectly, use, communicate, disclose or disseminate any Confidential Information in any manner whatsoever . . . ."

116.   Hinchen also agreed to a one-year non-solicitation clause, which provided that Hinchen will

> not in any manner, directly or indirectly . . . . solicit, hire, induce or attempt to induce . . . any director, officer, employee, contractor, consultant or agent of [Par Sterile] existing on or prior to the date of this Release to either (i) leave or terminate his or her employment, consulting or other position or business relationship with [Par Sterile] or (ii) breach his or her employment, consulting or other agreement with [Par] . . . .

117.   Hinchen further agreed that a breach of the Separation and Release "will result in immediate and irreparable damage to [Par Sterile] and will entitle [Par Sterile] to injunctive relief from a court having appropriate jurisdiction."

118.   Hinchen consented to the jurisdiction of New Jersey state and federal courts.  Hinchen's consent to jurisdiction in New Jersey supersedes any previous consent to jurisdiction in other forums.

119.   The relevant provisions of all three agreements—the Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement and Release—are still in effect.  Neither Hinchen nor Par has terminated the agreements. To the extent the non-disclosure and non-solicitation clauses in the agreements address the same subject matters, the clauses are consistent and without contradiction among the three agreements.  To the extent that other clauses within the agreements contradict these clauses, those contradictions do not affect the enforceability of the non-disclosure and non-solicitation clauses.  As a result, all

three agreements are valid contracts and independently enforceable.

120.   Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products.  These Trade Secrets are described above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process.  Some or all of the documents and information comprising Par's Trade Secrets constitute "Confidential Information" as defined in the Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement and Release.

121.   Hinchen was in possession of Par's Trade Secrets while subject to three agreements.  In those agreements, he:  (1) expressly acknowledged and confirmed the confidential nature of Par's Trade Secrets; (2) agreed to maintain the confidentiality of Par's Trade Secrets; (3) agreed not to use Par's Trade Secrets for their own purposes or the purposes of a third party; and (4) agreed not to solicit Par's employees.

122.   Hinchen knowingly and improperly disclosed Par's Trade Secrets to QuVa and used the Trade Secrets outside the scope of his employment with Par Sterile.  Hinchen's knowing and improper disclosure and use of Par's Trade Secrets constitutes a breach of the non-disclosure clauses in his Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement.

123.    Hinchen knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile.  Hinchen's knowing and improper solicitation constitutes a breach of the non-solicitation clauses in his Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement.

124.    By reason of Hinchen's breach of contracts alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

125.    Par is also entitled to recover compensatory damages, general damages, and special damages from Hinchen.  The amount of such relief cannot be determined precisely at this time.

## COUNT VI
## Breach Of Contract, New Jersey Common Law
### (*Against Defendant Jenkins*)

126.    Par re-alleges each and every allegation set forth in Paragraphs 1 through 125, inclusive, and incorporates them herein by reference.

127.    During his course of employment with JHP and Par Sterile, Jenkins signed at least three separate agreements with clauses relating to the Trade Secrets, confidential information, and non-solicitation.  The relevant provisions of these agreements remain in full force and, for good consideration, Jenkins remains

obligated to comply with these provisions. Par has satisfied all of its obligations under these valid and enforceable agreements.

128. *First*, in December 2012, Jenkins signed an "Employee Agreement " with JHP. This agreement defined "Confidential Information" as

> all information, data, agreements, documents, reports, 'know-how', interpretations, plans, studies, forecasts, projections and records (whether in written form, electronically stored or otherwise) containing or otherwise reflecting information [including] . . . operating procedures, techniques, systems, processes and methods, all intellectual property, product and service information, including research and development and proposed products and services . . . and . . . other commercial 'knowhow', trade secrets and information not available to the public generally . . . .

By signing the Employee Agreement, Jenkins agreed to a non-disclosure clause, which provided that Jenkins "will not, directly or indirectly, disclose, reveal, divulge, publish or otherwise make known to any Person or use any Confidential Information for any reason or purpose whatsoever, except for the proper discharge of the Employee's duties to the Company under this Agreement."

129. Jenkins also agreed to a one-year non-solicitation clause, which provided that Jenkins

> will not in any manner, directly or indirectly . . . solicit, hire, induce or attempt to induce, or assist others to solicit, hire, induce or attempt to induce, any director, officer, employee, contractor, consultant or agent of any member of [JHP] to either (I) leave or terminate his or her employment, consulting or other position or business relationship with any member of the Company Group, or (II) breach his or her employment, consulting or other agreement with any member of the Company Group . . . .

130.   Jenkins further agreed that JHP "will be entitled to seek equitable relief, including, without limitation, an injunction or injunctions (without the requirement of posting a bond, other security or any similar requirement or proving any actual damages), to prevent breaches or threatened breaches of this Agreement."

131.   *Second*, in December 2012, Jenkins signed a "Restrictive Covenant Agreement" with JHP.  This agreement defined "Confidential Information" as

> all information of or regarding [JHP], including, without limitation . . . information regarding . . . all source code, object code, modules, algorithms, software programs, system architectures, research, inventions, processes, techniques, costs, prices, customer contracts, requirements, systems, specific needs, customer lists or any other information related to customers or prospective customers that could create a competitive advantage, plans, budgets, forecasts, financial results, operations and personnel information, all information relating to the development, formulation, production, marketing or sale of existing or contemplated products, services, systems or processes; . . . know-how, trade secrets and proprietary information . . . .

By signing the Restrictive Covenant Agreement, Jenkins agreed to a non-disclosure clause, which provided that Jenkins will not "disclose or furnish to any Person . . . any Confirmation Information."

132.   Jenkins also agreed to a three-year non-solicitation clause, which provided that Jenkins will not "directly or indirectly employ, Solicit, or attempt to employ, or Solicit . . . any director, officer, consultant or employee" of JHP.

133.   *Third*, in June 2014, Jenkins signed a "Separation and Release" with Par Sterile.  This agreement provided that the parties "reiterate certain terms

contained in [Jenkins]'s Employment Agreement."  By signing the Separation and Release, Jenkins agreed to a non-disclosure clause, which provided that Jenkins will "not at any time, other than as may be required in connection with the performance by him of any remaining duties or obligations under the Employment Agreement, directly or indirectly, use, communicate, disclose or disseminate any Confidential Information in any manner whatsoever . . . ."

134.   Jenkins also agreed to a one-year non-solicitation clause, which provided that Jenkins will

> not in any manner, directly or indirectly . . . . solicit, hire, induce or attempt to induce . . . any director, officer, employee, contractor, consultant or agent of [Par Sterile] existing on or prior to the date of this Release to either (i) leave or terminate his or her employment, consulting or other position or business relationship with [Par Sterile] or (ii) breach his or her employment, consulting or other agreement with [Par Sterile] . . . .

135.   Jenkins further agreed that a breach of the Separation and Release "will result in immediate and irreparable damage to [Par Sterile] and will entitle [Par Sterile] to injunctive relief from a court having appropriate jurisdiction."

136.   Jenkins consented to the jurisdiction of New Jersey state and federal courts.  Jenkins's consent to jurisdiction in New Jersey supersedes any previous consent to jurisdiction in other forums.

137.   The relevant provisions of all three agreements—the Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement and

Release—are still in effect.  Neither Jenkins nor Par has terminated the agreements. To the extent the non-disclosure and non-solicitation clauses in the agreements address the same subject matters, the clauses are consistent and without contradiction among the three agreements.  To the extent that other clauses within the agreements contradict these clauses, those contradictions do not affect the enforceability of the non-disclosure and non-solicitation clauses.  As a result, all three agreements are valid contracts and independently enforceable.

138.   Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products.  These Trade Secrets are described above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process.  Some or all of the documents and information comprising Par's Trade Secrets constitute "Confidential Information" as defined in the Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement and Release.

139.   Jenkins was in possession of Par's Trade Secrets while subject to the three agreements.   In those agreements, he:   (1) expressly acknowledged and confirmed the confidential nature of Par's Trade Secrets; (2) agreed to maintain the confidentiality of Par's Trade Secrets; (3) agreed not to use Par's Trade Secrets for their own purposes or the purposes of a third party; and (4) agreed not to solicit Par's

employees.

140.   Jenkins knowingly and improperly disclosed Par's Trade Secrets to QuVa and used the Trade Secrets outside the scope of his employment with Par Sterile.  Jenkins's knowing and improper disclosure and use of Par's Trade Secrets constitutes a breach of the non-disclosure clauses in his Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement.

141.   Jenkins knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile.  Jenkins's knowing and improper solicitation constitutes a breach of the non-solicitation clauses in his Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement.

142.   By reason of Jenkins's breach of contracts alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

143.   Par is also entitled to recover compensatory damages, general damages, and special damages from Jenkins.  The amount of such relief cannot be determined precisely at this time.

## COUNT VII
## Breach Of Contract, New Jersey Common Law
### (*Against Defendant Rutkowski*)

144.   Par re-alleges each and every allegation set forth in Paragraphs 1 through 143, inclusive, and incorporates them herein by reference.

145.   During his course of employment with JHP and Par Sterile, Rutkowski at least signed three separate agreements with clauses relating to the Trade Secrets, confidential information, and non-solicitation.   The relevant provisions of these agreements remain in full force and, for good consideration, Rutkowski remains obligated to comply with these provisions.   Par has satisfied all of its obligations under these valid and enforceable agreements.

146.   *First*, in March 2015, Rutkowski signed a "Trade Secret, Non-Disclosure and Restrictive Covenant Agreement."   This agreement defined "Proprietary Information" as "confidential and trade secret information, including formulas, formulations, processes, methods of manufacture, research and development including protocols and/or records, results, data, product pricing information, financial information, product pricing, marketing information, and the identify of customers including customer lists . . . ."  By signing the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement, Rutkowski agreed to a non-disclosure clause, which provided that Rutkowski will not "divulge, disclose, or communicate to anyone or any entity, directly or indirectly either during or after the

termination of your employment with Par, any of Par's Proprietary Information, and agree not to use Par's Proprietary Information in your required duties for any subsequent employer."

147.   Rutkowski also agreed to a non-solicitation clause, which provided that Rutkowski will not "solicit, induce, encourage or attempt to solicit, induce or encourage any employee of Par to leave his/her employment with Par . . . or . . . hire, attempt to hire, assist in the hire or, or attempt to assist in the hire of an employee of Par."

148.   Rutkowski further agreed that Par Sterile is "entitle[d] . . . to injunctive relief from a court having appropriate jurisdiction" as a result of his "failure to abide by this Agreement."

149.   *Second*, in September 2015, Rutkowski signed a "Proprietary Information and Nondisclosure Agreement."  Par was the intended beneficiary of this agreement between Rutkowski and Endo International plc.  This agreement defined "Confidential Information" as "trade secret and . . . information . . . disclosed to or known by me as a consequence of my employment and . . . not generally known outside of Employer."  By signing the Proprietary Information and Nondisclosure Agreement, Rutkowski agreed to a non-disclosure clause, which provided that Rutkowski will not "disclose or use at any time, either during or subsequent to my employment, any Confidential Information of employer which I develop or

otherwise become informed of during my employment, except as required in my duties to Employer."

150.   Rutkowski also agreed to a non-solicitation clause, which provided that Rutkowski will "not directly or indirectly, either for myself or through an agent, consultant, firm or corporation, solicit or cause loss of . . . employees from Endo."

151.   *Third*, in April 2017, Rutkowski signed an "Employee Certificate of Compliance."   Par was the intended beneficiary of this agreement between Rutkowski and Endo International plc.   By signing the Employee Certificate of Compliance, Rutkowski agreed to a non-disclosure clause, which provided that Rutkowski was:

> obligated to preserve in confidence and not use for my own benefit or the benefit of any third party of any of the following: confidential and proprietary information, knowledge, data, documents or other information relating to the Company's products, systems, databases, research programs, know-how, designs, data, customer lists or any other proprietary and/or confidential information pertaining to any business of the Company or any of its subsidiaries, parents or affiliated companies, or information pertaining to any of the Company's suppliers, clients, customers, employees, consultants, or independent contractors that I had in my possession or had access to during my time of employment with the Company.

152.   The relevant provisions of all three agreements—the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement, the Proprietary Information and Nondisclosure Agreement, and the Employee Certification of Compliance—are still in effect.   Neither Rutkowski nor Par has terminated the agreements.   To the

extent the non-disclosure and non-solicitation clauses in the agreements address the same subject matters, the clauses are consistent and without contradiction among the three agreements.  To the extent that other clauses within the agreements contradict these clauses, those contradictions do not affect the enforceability of the non-disclosure and non-solicitation clauses.  All three agreements are valid contracts and independently enforceable.

153.   Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products.  These Trade Secrets are described above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process.  Some or all of the documents and information comprising Par's Trade Secrets constitute "Proprietary Information" or "Confidential Information" as defined in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement, the Proprietary Information and Nondisclosure Agreement, and the Employee Certification of Compliance.

154.   Rutkowski was in possession of Par's Trade Secrets while subject to the three agreements.  In those agreements, he:  (1) expressly acknowledged and confirmed the confidential nature of Par's Trade Secrets; (2) agreed to maintain the confidentiality of Par's Trade Secrets; (3) agreed not to use Par's Trade Secrets for their own purposes or the purposes of a third party; and (4) agreed not to solicit Par's

employees.

155.   Rutkowski knowingly and improperly disclosed Par's Trade Secrets to QuVa and used the Trade Secrets outside the scope of his employment with Par Sterile.   Rutkowski's knowing and improper disclosure and use of Par's Trade Secrets constitutes a breach of the non-disclosure clauses in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement, the Proprietary Information and Nondisclosure Agreement, and the Employee Certification of Compliance.

156.   Rutkowski knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile.  Rutkowski first solicited Par Sterile employees while he was still employed by Par Sterile.  Par is informed and believes that Rutkowski continued to breach his non-solicitation obligations to Par after he left Par.  If Rutkowski was willing to solicit Par employees on QuVa's behalf while still employed by Par, he would likely continue such conduct after he joined QuVa.   Rutkowski's knowing and improper solicitation constitutes a breach of the non-solicitation clauses in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement and the Proprietary Information and Nondisclosure Agreement.

157.   By reason of Rutkowski's breach of contracts alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain,

and Par will be without an adequate remedy at law.

158.   Par is also entitled to recover compensatory damages, general damages, and special damages from Rutkowski.   The amount of such relief cannot be determined precisely at this time.

## COUNT VIII
### Breach of Contract, New Jersey Common Law
### (*Against Defendant Kohut*)

159.   Par re-alleges each and every allegation set forth in Paragraphs 1 through 158, inclusive, and incorporates them herein by reference.

160.   As a consultant for Par, Kohut signed an employment agreement with clauses relating to the Trade Secrets, confidential information, and non-solicitation. The relevant provisions of this agreement remain in full force and, for good consideration, Kohut remains obligated to comply with these provisions.  Par has satisfied all of its obligations under this valid and enforceable agreement.

161.   In March 2015, Kohut signed a "Trade Secret, Non-Disclosure and Restrictive Covenant Agreement."    This agreement defined "Proprietary Information" as "confidential and trade secret information, including formulas, formulations, processes, methods of manufacture, research and development including protocols and/or records, results, data, product pricing information, financial information, product pricing, marketing information, and the identify of customers including customer lists . . . ."  By signing the Trade Secret, Non-

Disclosure and Restrictive Covenant Agreement, Kohut agreed to a non-disclosure clause, which provided that Kohut will not "divulge, disclose, or communicate to anyone or any entity, directly or indirectly either during or after the termination of your employment with Par, any of Par's Proprietary Information, and agree not to use Par's Proprietary Information in your required duties for any subsequent employer."

162.   Kohut also agreed to a non-solicitation clause, which provided that Kohut will not "solicit, induce, encourage or attempt to solicit, induce or encourage any employee of Par to leave his/her employment with Par . . . or . . . hire, attempt to hire, assist in the hire or, or attempt to assist in the hire of an employee of Par."

163.   Kohut further agreed that Par Sterile is "entitle[d] . . . to injunctive relief from a court having appropriate jurisdiction" as a result of her "failure to abide by this Agreement."

164.   Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products.  These Trade Secrets are described above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process.  Some or all of the documents and information comprising Par's Trade Secrets constitute "Proprietary Information" as defined in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

165.   Kohut was in possession of Par's Trade Secrets while subject to the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.   In the agreement, she:  (1) expressly acknowledged and confirmed the confidential nature of Par's Trade Secrets; (2) agreed to maintain the confidentiality of Par's Trade Secrets; (3) agreed not to use Par's Trade Secrets for her own purposes or the purposes of a third party; and (4) agreed not to solicit Par's employees.

166.   Kohut knowingly and improperly disclosed Par's Trade Secrets to QuVa and used the Trade Secrets outside the scope of her employment with Par Sterile.  Kohut's knowing and improper disclosure and use of Par's Trade Secrets constitutes a breach of the non-disclosure clause in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

167.   Kohut knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile.  Kohut's knowing and improper solicitation constitutes a breach of the non-solicitation clause in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

168.   By reason of Kohut's breach of contract alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

169.   Par is also entitled to recover compensatory damages, general damages, and special damages from Kohut.  The amount of such relief cannot be determined precisely at this time.

## COUNT IX
## Breach of Contract, New Jersey Common Law
### (*Against Defendant Short*)

170.   Par re-alleges each and every allegation set forth in Paragraphs 1 through 169, inclusive, and incorporates them herein by reference.

171.   As an employee for Par, Short signed an employment agreement with clauses relating to the Trade Secrets, confidential information, and non-solicitation. The relevant provisions of this agreement remain in full force and, for good consideration, Short remains obligated to comply with these provisions.  Par has satisfied all of its obligations under this valid and enforceable agreement.

172.   In March 2015, Short signed a "Trade Secret, Non-Disclosure and Restrictive Covenant Agreement."   This agreement defined "Proprietary Information" as "confidential and trade secret information, including formulas, formulations, processes, methods of manufacture, research and development including protocols and/or records, results, data, product pricing information, financial information, product pricing, marketing information, and the identify of customers including customer lists . . . ."  By signing the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement, Short agreed to a non-disclosure

clause, which provided that Short will not "divulge, disclose, or communicate to anyone or any entity, directly or indirectly either during or after the termination of your employment with Par, any of Par's Proprietary Information, and agree not to use Par's Proprietary Information in your required duties for any subsequent employer."

173.    Short also agreed to a non-solicitation clause, which provided that Short will not "solicit, induce, encourage or attempt to solicit, induce or encourage any employee of Par to leave his/her employment with Par . . . or . . . hire, attempt to hire, assist in the hire or, or attempt to assist in the hire of an employee of Par."

174.    Short further agreed that Par Sterile is "entitle[d] . . . to injunctive relief from a court having appropriate jurisdiction" as a result of his "failure to abide by this Agreement."

175.    Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products.  These Trade Secrets are described above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process.  Some or all of the documents and information comprising Par's Trade Secrets constitute "Proprietary Information" as defined in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

176.    Short was in possession of Par's Trade Secrets while subject to the

Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.   In the agreement, he:  (1) expressly acknowledged and confirmed the confidential nature of Par's Trade Secrets; (2) agreed to maintain the confidentiality of Par's Trade Secrets; (3) agreed not to use Par's Trade Secrets for her own purposes or the purposes of a third party; and (4) agreed not to solicit Par's employees.

177.   Short knowingly and improperly disclosed Par's Trade Secrets to QuVa and used the Trade Secrets outside the scope of his employment with Par Sterile. Short's knowing and improper disclosure and use of Par's Trade Secrets constitutes a breach of the non-disclosure clause in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

178.   Short knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile.  Short's knowing and improper solicitation constitutes a breach of the non-solicitation clause in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

179.   By reason of Short's breach of contract alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

180.   Par is also entitled to recover compensatory damages, general damages,

and special damages from Short.  The amount of such relief cannot be determined precisely at this time.

**COUNT X**
**Breach of Contract, New Jersey Common Law**
(***Against Defendant Rhoades***)

181.   Par re-alleges each and every allegation set forth in Paragraphs 1 through 180, inclusive, and incorporates them herein by reference.

182.   As an employee for Par, Rhoades signed an employment agreement with clauses relating to the Trade Secrets, confidential information, and non-solicitation.  The relevant provisions of this agreement remain in full force and, for good consideration, Rhoades remains obligated to comply with these provisions.  Par has satisfied all of its obligations under this valid and enforceable agreement.

183.   In March 2015, Rhoades signed a "Trade Secret, Non-Disclosure and Restrictive Covenant Agreement."    This agreement defined "Proprietary Information" as "confidential and trade secret information, including formulas, formulations, processes, methods of manufacture, research and development including protocols and/or records, results, data, product pricing information, financial information, product pricing, marketing information, and the identify of customers including customer lists . . . ."  By signing the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement, Rhoades agreed to a non-disclosure clause, which provided that Rhoades will not "divulge, disclose, or

communicate to anyone or any entity, directly or indirectly either during or after the termination of your employment with Par, any of Par's Proprietary Information, and agree not to use Par's Proprietary Information in your required duties for any subsequent employer."

184.   Rhoades also agreed to a non-solicitation clause, which provided that Rhoades will not "solicit, induce, encourage or attempt to solicit, induce or encourage any employee of Par to leave his/her employment with Par . . . or . . . hire, attempt to hire, assist in the hire or, or attempt to assist in the hire of an employee of Par."

185.   Rhoades further agreed that Par Sterile is "entitle[d] . . . to injunctive relief from a court having appropriate jurisdiction" as a result of his "failure to abide by this Agreement."

186.   Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products.  These Trade Secrets are described above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process.  Some or all of the documents and information comprising Par's Trade Secrets constitute "Proprietary Information" as defined in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

187.   Rhoades was in possession of Par's Trade Secrets while subject to the

Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.   In the agreement, he:  (1) expressly acknowledged and confirmed the confidential nature of Par's Trade Secrets; (2) agreed to maintain the confidentiality of Par's Trade Secrets; (3) agreed not to use Par's Trade Secrets for her own purposes or the purposes of a third party; and (4) agreed not to solicit Par's employees.

188.   Rhoades knowingly and improperly disclosed Par's Trade Secrets to QuVa and used the Trade Secrets outside the scope of his employment with Par Sterile.  Rhoades's knowing and improper disclosure and use of Par's Trade Secrets constitutes a breach of the non-disclosure clause in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

189.   Rhoades knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile.  Rhoades's knowing and improper solicitation constitutes a breach of the non-solicitation clause in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

190.   By reason of Rhoades's breach of contract alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

191.   Par is also entitled to recover compensatory damages, general damages,

and special damages from Rhoades.  The amount of such relief cannot be determined precisely at this time.

## COUNT XI
## Breach of Contract, New Jersey Common Law
### (*Against Defendant McGrady*)

192.   Par re-alleges each and every allegation set forth in Paragraphs 1 through 191, inclusive, and incorporates them herein by reference.

193.   As an employee for Par, McGrady signed an employment agreement with clauses relating to the Trade Secrets, confidential information, and non-solicitation.  The relevant provisions of this agreement remain in full force and, for good consideration, McGrady remains obligated to comply with these provisions. Par has satisfied all of its obligations under this valid and enforceable agreement.

194.   In March 2015, McGrady signed a "Trade Secret, Non-Disclosure and Restrictive Covenant Agreement."  McGrady agreed to a non-solicitation clause, which provided that McGrady will not "solicit, induce, encourage or attempt to solicit, induce or encourage any employee of Par to leave his/her employment with Par . . . or . . . hire, attempt to hire, assist in the hire or, or attempt to assist in the hire of an employee of Par."

195.   McGrady further agreed that Par Sterile is "entitle[d] . . . to injunctive relief from a court having appropriate jurisdiction" as a result of his "failure to abide by this Agreement."

196.   McGrady knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile.  McGrady's knowing and improper solicitation constitutes a breach of the non-solicitation clause in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

197.   By reason of McGrady's breach of contract alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

198.   Par is also entitled to recover compensatory damages, general damages, and special damages from McGrady.  The amount of such relief cannot be determined precisely at this time.

### COUNT XII
### Breach of Contract, New Jersey Common Law
### (*Against Defendant Hartley*)

199.   Par re-alleges each and every allegation set forth in Paragraphs 1 through 198, inclusive, and incorporates them herein by reference.

200.   As an employee for Par, Hartley signed an employment agreement with clauses relating to the Trade Secrets, confidential information, and non-solicitation. The relevant provisions of this agreement remain in full force and, for good consideration, Hartley remains obligated to comply with these provisions.  Par has

satisfied all of its obligations under this valid and enforceable agreement.

201.   In March 2015, Hartley signed a "Trade Secret, Non-Disclosure and Restrictive Covenant Agreement."   Hartley agreed to a non-solicitation clause, which provided that Hartley will not "solicit, induce, encourage or attempt to solicit, induce or encourage any employee of Par to leave his/her employment with Par . . . or . . . hire, attempt to hire, assist in the hire or, or attempt to assist in the hire of an employee of Par."

202.   Hartley further agreed that Par Sterile is "entitle[d] . . . to injunctive relief from a court having appropriate jurisdiction" as a result of his "failure to abide by this Agreement."

203.   Hartley knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile.  Hartley's knowing and improper solicitation constitutes a breach of the non-solicitation clause in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

204.   By reason of Hartley's breach of contract alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

205.   Par is also entitled to recover compensatory damages, general damages,

and special damages from Hartley.  The amount of such relief cannot be determined precisely at this time.

## COUNT XIII
### Breach Of Fiduciary Duty, New Jersey Common Law
#### (*Against Defendants Hinchen, Jenkins, And Rutkowski*)[3]

206.   Par re-alleges each and every allegation set forth in Paragraphs 1 through 205, inclusive, and incorporates them herein by reference.

207.   Hinchen, Jenkins, and Rutkowski each owed, and continue to owe, a fiduciary duty to Par because, among other reasons, Par entrusted each of them with access to the Trade Secrets and other confidential corporate information and because each was a corporate officer of Par Sterile.  Hinchen was President of Par Sterile, Jenkins was Chief Development Officer of Par Sterile, and Rutkowski was a Senior Vice President and General Manager at Par Sterile.

208.   Hinchen's, Jenkins's, and Rutkowski's fiduciary duties included, among others, the duty to protect the confidentiality of Par's Trade Secrets and other confidential information and to refrain from unfairly competing with Par by using Par's Trade Secrets and other confidential information

209.   Hinchen, Jenkins, and Rutkowski have knowingly breached their

---

[3] To the extent that economic loss doctrine applies to these claims, which Par contends it does not, Count XIII is alleged as an alternative to the contract claims pled herein.  *See IDT Corp.*, 2012 WL 4050298, at *6.

fiduciary obligation to Par by disclosing and/or using Par's Trade Secrets and other confidential information for the benefit of QuVa in the preparation for the production of a competing vasopressin compound and the other acts described above.

210.   By reason of the above-alleged acts and conduct of Hinchen, Jenkins, and Rutkowski, Par has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

211.   Par  is also entitled to recover compensatory damages and punitive damages from Hinchen, Jenkins, and Rutkowski.  The amount of such relief cannot be determined precisely at this time.

### COUNT XIV
### Breach Of Duty Of Loyalty, New Jersey Common Law
(*Against Defendants Hinchen, Jenkins, Rutkowski, Short, Rhoades, McGrady, and Hartley*)[4]

212.   Par  re-alleges each and every allegation set forth in Paragraphs 1 through 211, inclusive, and incorporates them herein by reference.

213.   Hinchen, Jenkins, Rutkowski, Short, Rhoades, McGrady, and Hartley owed, and continue to owe, a duty of loyalty to Par because, under New Jersey law, every employee owes a duty of loyalty to his or her employee to not act contrary to

---

[4] To the extent that economic loss doctrine applies to these claims, which Par contends it does not, Count XIV is alleged as an alternative to the contract claims pled herein.  *See IDT Corp.*, 2012 WL 4050298, at *6.

the employer's interests while employed.  This duty prohibits the disclosure of trade secrets or other confidential information of the employer, and it extends past an employee's termination.  Hinchen, as President of Par Sterile, Jenkins, as Chief Development Officer of Par Sterile, Rutkowski, as a Senior Vice President and General Manager at Par Sterile, Short, as Senior Director of Quality Control at Par Sterile, Rhoades, as Manager of Sterility Assurance at Par Sterile, McGrady, as Manager of Deviations and Lot Dispositions at Par Sterile, and Hartley, as Director of Technical Services at Par Sterile,  were all employees of Par Sterile and therefore owed Par a duty of loyalty that extends past their employment with Par Sterile.

214.   Hinchen, Jenkins, Rutkowski, Short, Rhoades, McGrady, and Hartley knowingly breached their duty of loyalty by disclosing and/or using Par's Trade Secrets and other confidential information for the benefit of QuVa in the preparation for the production of a competing vasopressin compound and the other acts described above.   At the time of such disclosure and use, Hinchen, Jenkins, Rutkowski, Short, Rhoades, McGrady, and Hartley knew or had reason to know that their knowledge of the Trade Secrets was acquired under circumstances giving rise to a duty to maintain the secrecy, and limit the use, of the Trade Secrets and other confidential information.

215.   By reason of the above-alleged acts and conduct of Hinchen, Jenkins, Rutkowski, Short, Rhoades, McGrady, and Hartley, Par has been damaged, and it

will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

216.   Par is also entitled to recover compensatory damages and punitive damages from Hinchen, Jenkins, Rutkowski, Short, Rhoades, McGrady, and Hartley.  The amount of such relief cannot be determined precisely at this time.

**COUNT XV**
**Breach Of Duty Of Confidence, New Jersey Common Law**
(***Against Defendants Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades,***
***McGrady, and Hartley***)[5]

217.   Par re-alleges each and every allegation set forth in Paragraphs 1 through 216, inclusive, and incorporates them herein by reference

218.   Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, and Hartley owed, and continue to owe, a duty of confidence to Par because, among other reasons, Par disclosed to them Trade Secrets and other confidential information based on their express and implied promise of confidentiality.

219.   Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, and Hartley breached their duty of confidence by misappropriating Par's Trade Secrets, including by disclosing and using the Trade Secrets without Par's express or implied

---

[5] To the extent that economic loss doctrine applies to these claims, which Par contends it does not, Count XV is alleged as an alternative to the contract claims pled herein.  *See IDT Corp.*, 2012 WL 4050298, at *6.

consent.  At the time of such disclosure and use, Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, and Hartley knew or had reason to know that their knowledge of the Trade Secrets of other confidential information was acquired under circumstances giving rise to a duty to maintain the secrecy, and limit the use, of the Trade Secrets and other confidential information.

220.  By reason of the acts and conduct of Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, and Hartley alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage.  The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

221.  Par  is also entitled to recover compensatory damages and punitive damages from Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, and Hartley.  The amount of such relief cannot be determined precisely at this time.

## COUNT XVI
## Tortious Interference With Contractual Relations, New Jersey Common Law
### (*Against Defendant QuVa*)

222.  Par  re-alleges each and every allegation set forth in Paragraphs 1 through 221, inclusive, and incorporates them herein by reference.

223.  Par Sterile has contractual relationships with employees that have confidential knowledge of the Trade Secrets and other confidential described above, including such key employees as David Short, Stephen Rhoades, Travis McGrady,

David "Mike" Hartley, Guy Thompson, Mike Rutkowski, Ashley Short, Chinnasamy Subramaniam, and Donna Kohut.   These contractual relationships include a non-disclosure clause.   Par has fulfilled its obligation under those agreements.

224.   As described above, QuVa, by and through its agents, engaged in an aggressive poaching campaign of Par Sterile's key employees with actual knowledge of Par Sterile's contractual relationships with those employees and the contractual relationships' protection of Par Sterile's Trade Secrets.   Legitimate hiring on the open market, without using confidential information as to which Par Sterile employees had knowledge of the Trade Secrets and other confidential information, would not have resulted in such targeting of the above-named individuals.

225.   QuVa intended to use improper means in interfering with Par Sterile's contractual relationships with the former key employees listed above without lawful justification or legitimate reason for this interference.   As a result, QuVa's tortious interference was intentional and with malice.

226.   As a direct and proximate result of QuVa's actions, the former key employees listed above were induced to breach the non-disclosure clauses in their various employment agreements.

227.   As a result of QuVa's wrongdoing, Par has been damaged, and it will continue to suffer great and irreparable harm and damage.   The amount of this

irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

228.   Par is also entitled to recover compensatory damages and punitive damages from QuVa.  The amount of such relief cannot be determined precisely at this time.

## RELIEF SOUGHT

WHEREFORE, Par prays for judgment against Defendants, and each of them, as follows:

1.     An injunction restraining the Defendants, as well as their employers, agents, employees, and all persons acting in concert with them, from using, copying, publishing, disclosing, transferring, or selling Par's Trade Secrets or other confidential proprietary information that may be determined to be Trade Secret information, and from obtaining any commercial advantage or unjust enrichment from their misappropriation of Par's Trade Secrets or other confidential and proprietary information;

2.     An injunction restraining Defendants, as well as their employers, agents, employees, and all persons acting in concert with them, from selling or offering for sale any product that competes with a Par product and was developed and/or is manufactured using Par's Trade Secrets, including the products Ephedrine, Epinephrine HCL, Ketamine, Methohexital, Neostigmine, Oxytocin, and

Vasopressin;

3.      An injunction restraining Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, Travis McGrady, and David Hartley from engaging in or participating in any employment involving activity regarding sterile drug products, including the products Ephedrine, Epinephrine HCL, Ketamine, Methohexital, Neostigmine, Oxytocin, and Vasopressin;

4.      An injunction restraining Defendants, as well as their employers, agents, employees, and all persons acting in concert with them, from improperly soliciting Par's employees;

5.      An order requiring Defendants, their employers, agents, employees, and all persons acting in concert with them, to return to Par any and all of its Trade Secrets and other confidential, proprietary materials that may be determined not to be Trade Secret information, including but not limited to any and all materials created incorporating or referencing Par's Trade Secrets and other confidential information;

6.      During the pendency of this action, an injunction enjoining and restraining Defendants from destroying, manipulating, or otherwise altering any evidence, including evidence that may reside on (or be embodied by changes to) any computer system, network, or other electronic means of data storage or transfer, relating in any way to the matters alleged in this Complaint;

7.   Par be awarded damages caused by Defendants' conduct, including punitive and exemplary damages as applicable and interest;

8.   Reasonable attorneys' fees;

9.   All costs of suit herein incurred; and

10.   Such other and further relief as the Court may deem proper.

DATED:   January 12, 2018         Respectfully Submitted,

Daniel M. Petrocelli (admitted *pro hac vice*)
Brett J. Williamson (admitted *pro hac vice*)
Jeffrey A. Barker (admitted *pro hac vice*)
David S. Almeling (admitted *pro hac vice*)
**O'MELVENY & MYERS LLP**
Times Square Tower
7 Times Square
New York, New York 10036
Telephone:      (212) 326-2000
Facsimile:      (212) 326-2061

Lawrence S. Lustberg
Daniel J. McGrady
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
Telephone:  (973) 596-4500
Facsimile:   (973) 596-0545

By: s/ Lawrence S. Lustberg
          Lawrence S. Lustberg

*Attorneys for Plaintiffs Par Pharmaceutical,*
*Inc. and Par Sterile Products, LLC*