NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAR PHARMACEUTICAL, INC, and <br> PAR STERILE PRODUCTS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> QUVA PHARMA, INC., STUART HINCHEN, <br> PETER JENKINS, and MIKE RUTKOWSKI <br><br> Defendants. | Civ. Action No. 17-6115-BRM-DEA <br><br> **OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Defendants QuVa Pharma, Inc. ("QuVa"), Stuart Hinchen, Peter Jenkins, and Mike Rutkowski's (collectively, "Defendants") Motion to Strike Undisclosed Trade Secrets. (ECF No. 115.) Plaintiffs Par Pharmaceutical, Inc. ("Par Pharmaceutical") and Par Sterile Products, LLC ("Par Sterile") (collectively, "Par") oppose the Motion. (ECF No. 119) The Court, having reviewed the papers submitted by the parties pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below, and for good cause having been shown, Defendants' motion is **DENIED**.

**I. BACKGROUND**

This matter arises from Defendants' alleged misappropriation of Par's trade secrets, including Trade Secret No. 11, which is at issue in this Motion and described below. (Am. Compl. (ECF No. 114) ¶ 1.) Par Pharmaceutical is a New York Corporation headquartered in Chestnut

Ridge, New York. (*Id.* ¶ 7.) Par Sterile, a Delaware limited liability company headquartered in Chestnut Ridge, New York, is a wholly-owned, indirect subsidiary of Par Pharmaceutical. (*Id.* ¶ 6.) Par Sterile was originally known as JHP Pharmaceuticals, LLC ("JHP"), until Par Pharmaceutical acquired and renamed JHP in 2014. (*Id.* ¶ 6.) QuVa is a Delaware corporation with a place of business in Bloomsbury, New Jersey. (*Id.* ¶ 8; Answer (ECF No. 48) ¶ 8.)

Hinchen was President and Chief Executive Officer of JHP from its founding in 2007 until Par Pharmaceutical acquired JHP in 2014. (ECF No. 114 ¶ 9; ECF No. 48 ¶ 9.) Par alleges Hinchen served as President of Par Sterile from February 2014 to June 11, 2014, after Par Pharmaceutical acquired JHP. (ECF No. 114 ¶ 9.) Jenkins was Chief Development Officer of JHP from its founding in 2007 until Par Pharmaceutical acquired JHP in 2014. (ECF No. 114 ¶ 9; ECF No. 48 ¶ 9.) Par alleges Jenkins served as Chief Development Officer of Par Sterile from February 2014 to June 6, 2014 after Par Pharmaceutical acquired JHP. (ECF No. 114 ¶ 10.) Rutkowski was Vice President and General Manager of JHP from May 2013 until Par Pharmaceutical acquired JHP in 2014, and he then served as Senior Vice President and General Manager of Par Sterile from February 2014 to April 14, 2017. (ECF No. 114 ¶ 11; ECF No. 48 ¶ 11.) Dana Kohut, who is a resident of Texas and an employee of QuVa in Sugar Land, Texas, served as a consultant for JHP from 2007 until Par Pharmaceutical acquired JHP. (ECF No. 114 ¶ 12.) Kohut served as a consultant for Par Sterile at its Rochester, Michigan facility from February 2014 to August 2014. (*Id.*) Kohut also served as a consultant for QuVa from November 2014 until QuVa hired her as its vice president of operations in August 2015. (*Id.*) David Short, who is a resident of Texas and an employee of QuVa in Sugar Land, Texas, was JHP's Senior Director of Quality Control from May 2011 until the acquisition of JHP. (ECF No. 114 ¶ 13.) Short served in the same capacity for Par Sterile from February 2014 to October 2015, and he also served as a consultant for Quva at that

2

time (*Id.*) QuVa hired Short to be its Vice President of Quality in October 2015. (*Id.*) Stephen Rhoades, who is a resident of Texas and a former employee[1] of QuVa in Sugar Land, Texas, was JHP's Manager, Sterility Assurance from August 2013 until the acquisition of JHP. (ECF No. 114 ¶ 14.) Rhoades was Par Sterile's Manager, Sterility Assurance from February 2014 until October 2015, when QuVa hired him as its Director of Sterility Assurance. (*Id.*) Travis McGrady, who is a resident of Texas and a QuVa employee in Temple, Texas, was JHP's Manager, Deviations & Lot Disposition from October 2007 until the acquisition of JHP. (ECF No. 114 ¶ 15.) McGrady was Par Sterile's Manager, Deviations & Lot Disposition from February 2014 until February 2016, when QuVa hired him as its director of quality systems. (*Id.*) David Hartley, who is a resident of Texas and a QuVa employee in Sugar Land, Texas, was JHP's Director, Technical Services from September 2013 until the acquisition of JHP. (ECF No. 114 ¶ 16.) Harley was Par Sterile's Director, Technical Services from February 2014 until March 2016, when QuVa hired him as its Director of Facility Engineering. (*Id.*)

    **A.**    **Vasostrict®**

Par alleges Hinchen and Jenkins, who founded QuVa, poached several Par Sterile employees, including Rutkowski, and used the former Par Sterile employees' knowledge of a Par product, Vasostrict®[2], to create a competing product. (ECF No. 114 ¶¶ 1-3.) Vasostrict® is an intravenous injection used in increase blood pressure in adults with vasodilatory shock. (ECF No. 114 ¶ 21; ECF No. 48 ¶ 16.) Vasostrict® contains vasopressin, which is "the synthetic form of a

---

[1] The Amended Complaint refers to Rhoades as a QuVa employee, but on December 15, 2017, QuVa informed Par it had terminated Rhoades for deleting Par documents from a person thumb drive in violation of a litigation hold. (ECF No. 96-4.)

[2] JHP originally filed the application for FDA approval of Vasostrict®, which was originally known as Pitressin®. (ECF No. 48 ¶¶ 10-12.)

3

polypeptide hormone secreted by the posterior pituitary gland." (ECF No. 114 ¶ 22; ECF No. 48 ¶ 17, at 55 ¶ 11.) According to Par, prior to 2014, the FDA allowed manufacturers to sell vasopressin and other drugs that had been marketed before the Food, Drug, and Cosmetic Act of 1938 ("FDCA") without government approval, because those drugs were deemed "grandfathered." (ECF No. 114 ¶ 22) JHP, under the direction of Jenkins and Hinchen, manufactured and sold such a vasopressin injection. (*Id.*) In 2011, the Food and Drug Administration ("FDA") began encouraging manufacturers to seek approval for unapproved drugs, including vasopressin injections. (ECF No. 114 ¶ 23; ECF No. 48 ¶ 18.) In response to the FDA's directive, JHP submitted a New Drug Application ("NDA") for approval for the vasopressin injection. (ECF No. 114 ¶ 24; ECF No. 48 ¶ 19.) On February 25, 2014, Par Pharmaceutical acquired JHP Group Holdings, Inc., which was the ultimate parent company of JHP, for approximately $490 million. (ECF No. 114 ¶ 25; ECF No. 48 ¶ 20.)

Par alleges it invested substantial time and money in developing Vasostrict® before and after the acquisition of JHP. (ECF No. 114 ¶ 26.) On April 17, 2014, Par Sterile received FDA approval to sell Vasostrict®. (ECF No. 114 ¶ 27; ECF No. 48 ¶ 22.) Vasostrict® was the first and remains the only FDA-approved intravenous vasopressin injection. (*Id.*) Par alleges it "has implemented numerous security measures" to protect its trade secrets, including surveillance cameras and manned patrols at its manufacturing plants, and restricting access to documents that contain trade secret information. (ECF No. 114 ¶ 30.) Par asserts its employees and third parties, such as partners and vendors, must execute a confidentiality agreement as a condition of their employment. (*Id.* ¶¶ 31, 33.)

**B.     The Creation of QuVa and Solicitation of Par Sterile Employees**

Jenkins and Hinchen resigned from Par Sterile in June 2014, and both executed a Separation Agreement and Release ("Separation Agreement") in which they agreed they would not disclose proprietary information related to their employment with Par Sterile.[3] (*Id.* ¶¶ 35-36; ECF No. 48 ¶¶ 30-31.) Par alleges before or at the time they resigned, Hinchen and Jenkins secretly planned and prepared to launch a new pharmaceutical company that would compete with Par. (ECF No. 114 ¶ 37.) Par claims Hinchen and Jenkins's new company "would compete with Par for business from hospitals and other healthcare providers using a hybrid 'compound manufacturing' model." (*Id.*) Compounding is a process by which a person "combines, mixes, or alters ingredients of a drug to create a medication under a licensed pharmacist." (*Id.*) According to Par, compounded drugs do not require FDA approval and can go to market without a FDA finding of manufacturing quality, though they must comply with the FDA's Current Good Manufacturing Practices ("CGMP") guidelines and inspections. (*Id.*) On July 29, 2015, Hinchen and Jenkins incorporated QuVa in Delaware and then announced they had acquired a sterile drug compounding facility in Sugar Land, Texas. (ECF No. 114 ¶ 39; ECF No. 48 ¶ 33.)

Par alleges between October 2014 and February 2015, Hinchen and Jenkins began to solicit Short, who was still Par Sterile's Senior Director of Quality. (ECF No. 114 ¶ 38.) In October 2014, Hinchen and Jenkins began to solicit Kohut, who was still a consultant for Par Sterile. (*Id.*) On December 15, 2015, QuVa announced a six-person executive leadership team, which included four former Par Sterile employees or consultants—Hinchen, Jenkins, Kohut, and Short. (ECF No. 114 ¶ 40; ECF No. 48 ¶ 34.) Par alleges QuVa is seeking to become a competitor in the sterile drug

---

[3] Defendants admit Jenkins and Hinchen executed the Separation Agreements, but they dispute Par's characterization of the Separation Agreement. (ECF No. 48 ¶¶ 30-31.)

5

manufacturing market by, in part, poaching experienced Par Sterile employees. (ECF No. 114 ¶ 41.) Between October 26, 2015, and June 28, 2017, QuVa hired eight former Par Sterile employees: (1) Stephen Rhoades, Par Sterile's Manager of Sterility Assurance; (2) Travis McGrady, Par Sterile's Manager of Deviations and Lot Disposition; (3) David "Mike" Hartley, Par Sterile's Director of Technical Services; (4) Ahmed Soliman, Qualitest Pharmaceutical's Manager, Analytical Research & Development;[4] (5) Guy Thompson, Par Sterile's supervisor of the microbiology lab; (6) Mike Rutkowski, Par Sterile's Senior Vice President and General Manager of the Rochester, Michigan facility; (7) Ashley Short, a Par Sterile Quality Control Chemist; and (8) Chinnasamy Subramaniam, Par Sterile's Manager of Analytical Research and Development. (ECF No. 114 ¶ 42.)

Par claims these former Par Sterile employees breached their employment agreements with Par by aiding and abetting QuVa. (ECF No. 114 ¶ 43.) Specifically, Par alleges Kohut, Short, and Rhoades "had detailed knowledge of and access to certain Trade Secrets and other Par confidential information." (*Id.* ¶ 44.) Additionally, Par contends Rutkowski aided Kohut, Short, and Rhoades's misappropriation of Par's trade secrets by sending them confidential information while still working for Par. (*Id.* ¶ 45.) Par alleges Kohut, Short, Rhoades, McGrady, Hartley, and Soliman also breached the non-solicitation provisions in their employment agreements with Par by making unauthorized contact with various Par employees. (*Id.* ¶ 46.)

### C. QuVa's Alleged Misappropriation of Par's Trade Secrets

In June 2017, Par learned that on or about April 19, 2017, QuVa had submitted a letter to the FDA regarding the classification of vasopressin. (ECF No. 114 ¶ 47.) In response to QuVa's

---

[4] The Amended Complaint does not define Qualitest Pharmaceuticals. The Court infers it is an affiliate of Par.

letter, the FDA indicated vasopressin would be under "Category 1" of bulk drug substances under evaluation pursuant to Section 503B of the FDCA. (*Id.*) Vasopressin's "[i]nclusion in Category 1 means 'the FDA does not intend to take action against an outsourcing facility' that compounds the substance at issue while it is under evaluation." (*Id.* ¶ 48.) Par alleges QuVa's letter regarding the classification of vasopressin coupled with its hiring of former Par employees led Par to investigate whether QuVa improperly disclosed or used Par's trade secrets or confidential information. (*Id.* ¶ 49.) As part of its investigation, Par reviewed internal emails it alleges reveal Rutkowski disclosed Par trade secrets to QuVa as early as ten months before his resignation from Par Sterile. (*Id.* ¶¶ 50-56.) Par claims Rutkowski also improperly downloaded Par documents to a personal hard drive. (*Id.* ¶ 57.) Par further alleges Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades had access to certain of Par's trade secrets and other confidential information. (*Id.* ¶ 59.) Par likewise contends Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades have roles at QuVa similar to those they had at Par Sterile, which would make it impossible to work on QuVa's competing vasopressin product without using Par's trade secrets. (*Id.* ¶ 60.) Finally, Par alleges all of the former Par Sterile employees QuVa hired, including Soliman, Thompson, Short, and Subramaniam, had knowledge of Par trade secrets and confidential information, and could exploit that information because they have roles at QuVa similar to their former roles at Par Sterile. (*Id.* ¶¶ 61-64.)

## II. PROCEDURAL HISTORY

On August 14, 2017, Par filed the Complaint. (ECF No. 1.) On August 28, 2017, Par filed an Application for an Order to Show Cause Why Expedited Discovery Should Not Be Granted. (ECF No. 12.) On August 29, 2017, the Honorable Douglas E. Arpert, U.S.M.J granted the application. (ECF No. 15.) On October 4, 2017, the parties entered into a consent agreement to

engage in expedited discovery, and Judge Arpert set a schedule for briefing on Par's Motion for a Preliminary Injunction. (ECF No. 43.)

On January 12, 2018, Par filed the First Amended Complaint, asserting sixteen claims: (1) violation of the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836 against a QuVa, Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades (Count I); (2) violation of the New Jersey Trade Secrets Act, N.J.S.A. 56:15-2 against QuVa, Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades (Count II); (3) misappropriation of trade secrets under New Jersey common law against QuVa, Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades (Count III); (4) unfair competition under New Jersey common law against QuVa (Count IV); (5) through (12) breach of contract under New Jersey common law against Hinchen (Count V), Jenkins (Count VI), Rutkowski (Count VII), Kohut (Count VIII), Short (Count IX), Rhoades (Count X), McGrady (Count XI), and Hartley (Count XII); (13) breach of fiduciary duty under New Jersey common law against Hinchen, Jenkins, and Rutkowski (Count XIII); (14) breach of the duty of loyalty under New Jersey common law against Hinchen, Jenkins, Rutkowski, Short, Rhoades, McGrady, and Hartley (Count XIV); (15) breach of the duty of confidence under New Jersey common law against Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, and Hartley (Count XV); and (16) tortious interference with contractual relations under New Jersey common law against QuVa (Count XVI).

On October 13, 2017, Defendants filed the Answer to the Original Complaint and asserted six counterclaims. (ECF No. 48.) Counts 1 through 5 are claims for declaratory judgments that QuVa does not infringe any of five patents Par purports to own in connection with Vasostrict®.[5]

---

[5] The patents at issue are: (1) U.S. Patent No. 9,375,478; (2) U.S. Patent No. 9,687,526; (3) U.S. Patent No. 9,744,239; (4) U.S. Patent No. 9,744,209; and (5) U.S. Patent No. 9,750,785.

(ECF No. 48 ¶¶ 46-60.) Count 6 is a claim for unfair competition under New Jersey common law. (*Id.* ¶¶ 60-71.) On the same day, Defendants filed a Motion to Dismiss various counts of Par's Complaint. (ECF No. 47.) Par opposes Defendants' Motion to Dismiss. (ECF No. 58.) On November 17, 2017, Par filed a Motion to Dismiss Defendant's counterclaim for unfair competition (ECF No. 66) and a Motion for a Preliminary Injunction.[6] (ECF No. 68.) Defendants oppose both motions.[7] (ECF Nos. 102 and 91.) On January 16, 2018, Defendants filed the Motion to Strike Undisclosed Trade Secrets. (ECF No. 115.)

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 26(e) states, in pertinent part:

> A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production or request for admission—must supplement or correct its disclosure response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]

"A court may exclude evidence where a party has failed to provide information as required by Rule 26 'unless the failure was substantially justified or his harmless.'" *Steele v. Aramark Corp.*, 535 Fed. App'x 137, 143 (3d Cir. 2013) (quoting Rule 37(c)(1)). "The exclusion of critical evidence is an extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791-92 (3d Cir. 1994).

---

[6] On January 8, 2018, the Court held a telephone conference with the parties and scheduled Oral Argument on the Motion for Preliminary Injunction for February 14, 2018. (ECF No. 123.)

[7] Also pending before the Court but not addressed in this this Opinion is a Motion to Seal filed by Par, which will be decided by Judge Arpert. (ECF No. 117.)

## IV. DECISION

The sole question before this Court in this Motion is whether Defendants' alleged misappropriation of Par's Trade Secret No. 11 should be considered in Par's Motion for a Preliminary Injunction.

### A. Trade Secret No. 11

Par first identified Trade Secret No. 11[8] on October 20, 2017, in its Responses to Defendants' First Set of Interrogatories (Expedited) as one of fifty-two categories of trade secrets it alleges Defendants misappropriated. (Decl. of Stephen R. Howe, Esq. in Supp. of Ds.' Mot. to Strike Undisclosed Trade Secrets ("Howe Decl.") (ECF No. 116-1) Ex. B.) Par identified Trade Secret 11 as follows:

> Par's strategies to meet FDA's standards during onsite inspections of product, including the fact that natural light may affect manual inspection capability results and that tinting the windows may be effective. A related trade secret is the fact that the use of blinds may not be effective because of the difficulty in cleaning them. Documents that exemplify these trade secrets include those identified in this paragraph, The March 9, 2017 "1005 in operation" email (Par0018088-18090), PAR-ROC-SOP-00146 (Manual Inspection of Product") (Par-0033762-0033800), and PAR-ROC-PAR-ROC-SOP-00136 (PAR-0002877-0002889) ("Product Reject Rate Database Use and Maintenance") (Par-0002877-0002889).

(*Id.* at 11.) On October 25, 2017, Par served supplemental responses to several interrogatories, but Trade Secret 11 was not changed. (Pls.' Suppl. Resp. to Interrog. Nos. 1, 5, 8, and 9 (Howe Decl. Ex. D).)

Defendants also sought "[a]ll Documents relating to any trade secret alleged to be related to your Vastrostict® vasopressin product and/or other vasopressin products, including but not

---

[8] Par initially referred to Trade Secret No. 11 as Trade Secret No. 10. For consistency, the Court shall refer only to Trade Secret No. 11.

limited to the specific trade secrets within the categories of technical know-how and confidential information [alleged in] the Complaint." (Defs.' First Set of Req. for the Produc. of Docs. (Howe Decl. Ex. D).) Par produced documents on October 20, 21, and 31, 2017, and on November 1, 2, 3, 6, and 24, 2017. (Br. in Supp. of Ds.' Mot. to Strike Undisclosed Trade Secrets (ECF No. 116) at 5.) On November 3, 2017, Defendants deposed Jason Crist, one of two experts Par designated to testify regarding the scope of the trade secrets Par alleged Defendants misappropriated. (Howe Decl. Ex. G; Dep. of Jason Crist (Howe Decl. Ex. H).) Crist testified Trade Secret No. 11 is "natural light may affect inspection capability and that window tinting may be effective" and "the use of blinds may not be effective because of the difficulty in cleaning them." (Howe Decl. Ex. H at 120:14-121:12.) Crist further testified Par's Supplemental Responses to Interrogatory Numbers 1, 5, 8, and 9 was true and correct as to the trade secrets about which he could testify, including Trade Secret No. 11. (*Id.* at 26:6-29-2.) He also testified it is possible there may be other trade secrets Par could have included in its interrogatory response but he did not investigate what those additional trade secrets would be. (*Id.* at 34:20-35:11.)

Defendants argue Par expanded the scope of Trade Secret No. 11 upon filing the Motion for Preliminary Injunction. (ECF No. 116 at 6 (citing Pls. Br. in Supp. of Mot. for Prelim. Inj. (ECF No. 69) at 11-14, 28-30.) Par's expert, Dr. Michael Miller, stated Trade Secret No. 11 included Par's "guidelines, procedures, and techniques to ensure that its facilities and processes meet the FDA inspection standards." (Decl. of Dr. Michael Miller in Supp. of Pls.' Mot. for Prelim. Inj. ("Miller Decl." (ECF No. 70) ¶ 79.) Dr. Miller stated Trade Secret No. 11 included Par's Aseptic Process Simulation Master Plan ("APS Plan"), "a detailed document for validating Par's aseptic manufacturing processes," and Par's Environmental / Personnel Monitoring Master Plan ("MP-EMPM"), which "provides a detailed definition of the policies and strategies for

11

implementing and managing the Environmental and Personnel Monitoring programs at Par." (*Id.* ¶¶ 79-81.) Miller certified that Defendants misappropriated Trade Secret No. 11, in part by using information in Par's APS Plan and MP-EMPM. (*Id.* ¶¶ 83-91.) Defendants argue Par never supplemented its interrogatory responses or production of documents to include its APS Plan or MP-EMPM in Trade Secret No. 11. (ECF No. 116 at 6-7.) Therefore, they contend, Par should not be permitted to rely on Trade Secret No. 11 in its Motion for Preliminary Injunction, other than to the extent it refers to the original scope of Trade Secret No. 11 from Par's responses to Defendants' interrogatories. (*Id.*)

### B. Par's Obligation to Supplement its Disclosure of Trade Secret No. 11

Courts use a four-part test to determine whether a party breached its duty to supplement a discovery response pursuant to Rule 26(e)(2). *Pfizer Inc. v. Teva Pharm. USA, Inc.*, No. 04-cv-0754, 2006 WL 2938723, at *3 (D.N.J. Oct 13, 2006) (citing *Tritek Tech., Inc. v. United States*, 63 Fed. Cl. 740, 746-47 (Ct. Cl. 2005)). The factors are: "(1) whether there was a prior response; (2) whether the response became materially incorrect or incomplete; (3) whether the party knew that the response was incomplete; and (4) whether the corrective information was otherwise made known to the other party through the discovery process or in writing." *Id.*

As to the first factor, it is clear Par's response to Interrogatory No. 1 was a prior response. *See Tritek*, 63 Fed. Cl. at 746. As to the second and third factors, whether the response became materially incomplete and whether Par knew this, Par argues its response was sufficient. (Pls.' Opp. to Defs.' Mot. to Strike (ECF No. 119) at 8-9.) Par claims its reply that Trade Secret No. 11 included "Par's strategies to meet FDA's standards during onsite inspections" necessarily includes its APS Plan and MP-EMPM. (*Id.* at 9.) However, Par also argues it did not include its APS Plan or MP-EMPM in Trade Secret No. 11, because it was unaware Defendants wrongfully possessed

12

those documents until they produced them with their opposition to Par's Motion for Preliminary Injunction. (*Id.* at 10-11.) Par's second argument—that it was not initially aware Defendants' possessed the APS Plan and MP-EMPM—suggests Par knew its response to Interrogatory No. 1 had become incomplete. Par tacitly acknowledges its realization that Defendants' possessed the APS Plan and MP-EMPM led Par to expand the trade secrets it believed were misappropriated. (*Id.*)

The Court is not persuaded by Par's argument that it could not have disclosed the APS Plan and MP-EMPM were aspects Trade Secret No. 11 because it was not aware Defendants possessed those documents. Defendants' Interrogatory No. 1 asked Par to "[i]dentify with particularity each Par trade secret with respect to [its] Vasostrict® vasopressin product and/or other vasopressin products, including but not limited to the specific trade secrets within the categories of technical know-how and confidential information set forth in . . . the Complaint." (Howe Decl. Ex. A at 10.) Defendants did not ask Par to identify those trade secrets it alleged Defendants misappropriated, but to identify "each Par trade secret" related to its vasopressin products. The Court finds Par meets the second and third factors.

Finally, as to the fourth factor—whether corrective information was otherwise made known to the other party through the discovery process or in writing—Par argues it cured any failure to supplement in its briefing in support of its Motion for Preliminary injunction. (ECF No. 119 at 11.) Par points out Rule 26(e)(1)(A) requires supplementation only "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." (*Id.*)

Par's reliance on Rule 26(e)(1)(A) is equally unavailing. Par's briefing in its Motion for Preliminary Injunction could not cure its failure to supplement, because such disclosure was not

"made known to [Defendants] during the discovery process." Expedited discovery concluded on November 10, 2017, while Par filed its Motion for Preliminary Injunction on November 17, 2017. (ECF Nos. 43 and 68.) A party can supplement its disclosures through deposition testimony. *Eli Lily and Co. v. Actavis Elizabeth, LLC*, No. 07-cv-3770, 2010 WL 1849913, at *3 (D.N.J. May 7, 2010) (citations omitted). But Crist, Par's expert, did not include any additional elements to Trade Secret No. 11 than those in Par's interrogatory responses. (Howe Decl. Ex. H 26:6-29-2; 34:20-35:11.) Therefore, the Court finds Par meets the fourth factor and that it failed to supplement its response to Interrogatory No. 1 pursuant to Rule 26(e)(2).

### C. Exclusion Pursuant to Rule 37

"A violation of Rule 26(e) does not automatically result in . . . the exclusion of the omitted information." *Pfizer Inc.*, 2006 WL 2938723, at *4. The omitted information should be excluded "if there was no 'substantial justification' for the violation and the violation causes harm to the other party." *Id.* The party facing sanction has the burden of proving the violation was justified or harmless. *Id.* (citing *Tritek*, 63 Fed. Cl. at 750).

The Third Circuit has identified four factors district courts should consider to determine whether exclusion of nondisclosed evidence is warranted:

> (1) the prejudice or surprise to the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure the prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation.

*Nicholas v. Pa. State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000).

Here, the Court finds the factors weigh against excluding Trade Secret No. 11 from the Court's consideration of Par's Motion for Preliminary Injunction. As to whether Defendants suffered prejudice or surprise, a party has suffered prejudice when its "ability to prepare for and

14

conduct [the] case at trial" has been impaired. *Tritek*, 63 Fed. Cl. at 751 (quoting *Rowland v. Am. Gen. Fin.*, 340 F.3d 187, 196 (4th Cir. 2003)). Defendants argue they were prejudiced because they could not "take full and fair discovery to develop and support *all* defenses available to them." (Ds.' Reply in Supp. of Their Mot. to Strike Undisclosed Trade Secrets (ECF No. 127) at 11.) In particular, Defendants cite the fact they could not depose Dr. Miller. (*Id.*) However, Defendants were able to refute Dr. Miller's assertions through their own expert declarations. (Decl. of Stephen R. Howe, Esq. in Supp. of Ds.' Opp. to Ps.' Mot. for Prelim Inj. ("Howe P.I. Decl.") (ECF No. 88-1) Exs. 418, 420, 422, 424.)

The Court is not persuaded by Defendants' argument they have been prejudiced, particularly in light of the evidence they seek to exclude. In its Motion for Preliminary Injunction, Par argues Rhoades wrongfully provided Defendants with a copy of Par's APS Plan. (ECF No. 69 at 12.) In opposition to the Motion for Preliminary Injunction, Defendants submitted a declaration in which Rhoades stated he did not believe Par's APS Plan contained any confidential information. (Howe P.I. Decl. Ex. 420 ¶ 27.) Then, on December 9, 2017, after Defendants submitted their Opposition to Par's Motion for a Preliminary Injunction, Rhoades informed QuVa he possessed a thumb drive that contains Par documents, and that he had deleted information from the thumb drive after the litigation hold in this case was in place. (Suppl. Decl. of David S. Almeling, Esq. in Supp. of Pls.' Mot. for Prelim. Inj. ("Almeling Decl.") (ECF Nos. 96-1 to 96-7) Ex. 429.) Par's APS plan was among the documents Rhoades appropriated and later deleted from the thumb drive. (*Id.*) QuVa later fired Rhoades. (Almeling Decl. Ex. 449.) Now, Defendants ask the Court to exclude a document Defendants obtained from an ex-employee whom they terminated for deleting evidence. In view of these facts, Defendants' claim of prejudice is dubious.

As to the other factors, the Court finds they weigh against exclusion of Trade Secret No. 11. Because Defendants have submitted briefing and expert declarations refuting Par's expert declaration regarding Trade Secret No. 11, there is no need of further cure for Par's initial failure to disclose. There will be no disruption of the proceedings due to the Court's consideration of Trade Secret No. 11. To the contrary, the parties have briefed the issue thoroughly and provided the Court with substantial arguments regarding the issue. Finally, the Court finds no evidence Par acted in bad faith by failing to include the APS Plan and MP-EMPM as aspects of Trade Secret No. 11. To the contrary, Par's definition of Trade Secret No. 11 indicated there were multiple "strategies to meet FDA's standards during onsite inspections of product." (Howe Decl. Ex. B.) Par noted those strategies "include[ed] the fact that natural light may affect manual inspection," but in no way disguised the fact Trade Secret No. 11 is broader than the effects of natural light. (*Id.*)

The Court finds exclusion of Trade Secret No. 11 is not appropriate. The exclusion of evidence is an "extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 791-92. Trade Secret No. 11 will not be stricken from the Court's consideration of the Motion for Preliminary Injunction.

## V. CONCLUSION

For the reasons set forth above, Defendants' motion is **DENIED.**

Date: February 8, 2018  */s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**