NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| PAR PHARMACEUTICAL, INC, and PAR STERILE PRODUCTS, LLC, | : : : : | |
| Plaintiffs, | : : | Civ. Action No. 17-6115-BRM-DEA |
| v. | : : | **REDACTED OPINION ORIGINALLY FILED** |
| QUVA PHARMA, INC., STUART HINCHEN, PETER JENKINS, and MIKE RUTKOWSKI | : : : : | **UNDER SEAL AT ECF NO. 156** |
| Defendants. | : : : | |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Plaintiffs Par Pharmaceutical, Inc. ("Par Pharmaceutical") and Par Sterile Product, LLC's ("Par Sterile") (collectively, "Par") Motion for a Preliminary Injunction. (ECF No. 68.) Defendants QuVa Pharma, Inc. ("QuVa"), Stuart Hinchen, Peter Jenkins, and Mike Rutkowski's (collectively, "Defendants") oppose the Motion. (ECF No. 88.) Pursuant to Federal Rule of Civil Procedure 78(a), the Court heard oral argument on February 14, 2018.[1] For the reasons set forth herein, Par's Motion for a Preliminary Injunction is **GRANTED IN PART** and **DENIED IN PART**.

---

[1] After oral argument, the Court requested the parties meet and confer in an effort to reach an agreement on the Motion for Preliminary Injunction. On February 21, 2018, the parties advised the Court they were unable to reach an agreement.

# I. FACTUAL BACKGROUND

## A.    The Parties

This matter arises from Defendants' alleged misappropriation of Par's trade secrets. (Am. Compl. (ECF No. 114) ¶ 1.) Par Pharmaceutical is a New York corporation headquartered in Chestnut Ridge, New York. (*Id.* ¶ 7.) Par Sterile, a Delaware limited liability company headquartered in Chestnut Ridge, New York, is a wholly-owned, indirect subsidiary of Par Pharmaceutical. (*Id.* ¶ 6.) Par Sterile was originally known as JHP Pharmaceuticals, LLC ("JHP"), until Par Pharmaceutical acquired and renamed JHP in 2014. (*Id.* ¶ 6.) QuVa is a Delaware corporation with a place of business in Bloomsbury, New Jersey. (*Id.* ¶ 8; Answer (ECF No. 48) ¶ 8.)

Hinchen was President and Chief Executive Officer of JHP from its founding in 2007 until Par Pharmaceutical acquired JHP in 2014. (ECF No. 114 ¶ 9; ECF No. 48 ¶ 9.) Par alleges Hinchen served as President of Par Sterile from February 2014 to June 11, 2014, after Par Pharmaceutical acquired JHP. (ECF No. 114 ¶ 9.) Jenkins was Chief Development Officer of JHP from its founding in 2007 until Par Pharmaceutical acquired JHP in 2014. (ECF No. 114 ¶ 9; ECF No. 48 ¶ 9.) Par alleges Jenkins served as Chief Development Officer of Par Sterile from February 2014 to June 6, 2014, after Par Pharmaceutical acquired JHP. (ECF No. 114 ¶ 10.) Rutkowski was Vice President and General Manager of JHP from May 2013 until Par Pharmaceutical acquired JHP in 2014. Thereafter, from February 2014 to April 14, 2017, he served as Senior Vice President and General Manager of Par Sterile. (ECF No. 114 ¶ 11; ECF No. 48 ¶ 11.) Dana Kohut, a resident of Texas and an employee of QuVa in Sugar Land, Texas, served as a consultant for JHP from 2007 until Par Pharmaceutical acquired JHP. (ECF No. 114 ¶ 12.) Kohut served as a consultant for Par Sterile at its Rochester, Michigan facility from February 2014 to August 2014. (*Id.*) Kohut also

served as a consultant for QuVa from November 2014 until QuVa hired her as its vice president of operations in August 2015. (*Id.*) David Short, a resident of Texas and an employee of QuVa in Sugar Land, Texas, was JHP's Senior Director of Quality Control from May 2011 until the acquisition of JHP. (ECF No. 114 ¶ 13.) Short served in the same capacity for Par Sterile from February 2014 to October 2015, and he also served as a consultant for Quva at that time (*Id.*) QuVa hired Short to be its Vice President of Quality in October 2015. (*Id.*) Stephen Rhoades, a resident of Texas and a former employee[2] of QuVa in Sugar Land, Texas, was JHP's Manager, Sterility Assurance from August 2013 until the acquisition of JHP. (ECF No. 114 ¶ 14.) Rhoades was Par Sterile's Manager, Sterility Assurance from February 2014 until October 2015, when QuVa hired him as its Director of Sterility Assurance. (*Id.*) Travis McGrady, a resident of Texas and a QuVa employee in Temple, Texas, was JHP's Manager, Deviations & Lot Disposition from October 2007 until the acquisition of JHP. (ECF No. 114 ¶ 15.) McGrady was Par Sterile's Manager, Deviations & Lot Disposition from February 2014 until February 2016, when QuVa hired him as its director of quality systems. (*Id.*) David Hartley, is a resident of Texas and a QuVa employee in Sugar Land, Texas, was JHP's Director, Technical Services from September 2013 until the acquisition of JHP. (ECF No. 114 ¶ 16.) Hartley was Par Sterile's Director, Technical Services from February 2014 until March 2016, when QuVa hired him as its Director of Facility Engineering. (*Id.*)

---

[2] The Amended Complaint refers to Rhoades as a QuVa employee, but on December 15, 2017, QuVa informed Par it had terminated Rhoades for deleting Par documents from a personal thumb drive in violation of a litigation hold. (ECF No. 96-4.)

### B.     Vasostrict®

Par alleges Hinchen and Jenkins, who founded QuVa, poached several Par Sterile employees, including Rutkowski, and used the former Par Sterile employees' knowledge of a Par product, Vasostrict®[3], to create a competing product. (ECF No. 114 ¶¶ 1-3.) Vasostrict® is an intravenous injection used in increase blood pressure in adults with vasodilatory shock. (ECF No. 114 ¶ 21; ECF No. 48 ¶ 16.) Vasostrict® contains vasopressin, which is "the synthetic form of a polypeptide hormone secreted by the posterior pituitary gland." (ECF No. 114 ¶ 22; ECF No. 48 at 8, 55.) According to Par, prior to 2014, the FDA allowed manufacturers to sell vasopressin and other drugs that had been marketed before the Food, Drug, and Cosmetic Act of 1938 ("FDCA") without government approval, because those drugs were deemed "grandfathered." (ECF No. 114 ¶ 22.) JHP, under the direction of Jenkins and Hinchen, manufactured and sold such a vasopressin injection. (*Id.*) In 2011, the Food and Drug Administration ("FDA") began encouraging manufacturers to seek approval for unapproved drugs, including vasopressin injections. (ECF No. 114 ¶ 23; ECF No. 48 ¶ 18.) In response to the FDA's directive, JHP submitted a New Drug Application ("NDA") for approval for the vasopressin injection. (ECF No. 114 ¶ 24; ECF No. 48 ¶ 19.) On February 25, 2014, Par Pharmaceutical acquired JHP Group Holdings, Inc., which was the ultimate parent company of JHP, for approximately $490 million. (ECF No. 114 ¶ 25; ECF No. 48 ¶ 20.)

Par alleges it invested substantial time and money in developing Vasostrict® before and after the acquisition of JHP. (ECF No. 114 ¶ 26.) On April 17, 2014, Par Sterile received FDA approval to sell Vasostrict®. (ECF No. 114 ¶ 27; ECF No. 48 ¶ 22.) Vasostrict® was the first and

---

[3] JHP originally filed the application for FDA approval of Vasostrict®, which was originally known as Pitressin®. (ECF No. 48 ¶¶ 10-12.)

remains the only FDA-approved intravenous vasopressin injection. (*Id.*) Par alleges it "has implemented numerous security measures" to protect its trade secrets, including surveillance cameras and manned patrols at its manufacturing plants, and restricting access to documents that contain trade secret information. (ECF No. 114 ¶ 30.) Par asserts its employees and third parties, such as partners and vendors, must execute a confidentiality agreement as a condition of their employment. (*Id.* ¶¶ 31, 33.)

### C.    The Creation of QuVa and Solicitation of Par Sterile Employees

Par alleges QuVa was and is seeking to become a competitor in the sterile drug manufacturing market by, in part, poaching experienced Par Sterile employees. (ECF No. 114 ¶ 41.) Jenkins and Hinchen resigned from Par Sterile in June 2014, and both executed a Separation Agreement and Release ("Separation Agreement") in which they agreed they would not disclose proprietary information related to their employment with Par Sterile. (*Id.* ¶¶ 35-36; ECF No. 48 ¶¶ 30-31.) Par alleges before or at the time of their resignation, Hinchen and Jenkins secretly planned and prepared to launch a new pharmaceutical company that would compete with Par. (ECF No. 114 ¶ 37.) Par claims Hinchen and Jenkins's new company "would compete with Par for business from hospitals and other healthcare providers using a hybrid 'compound manufacturing' model." (*Id.*) Compounding is a process by which a person "combines, mixes, or alters ingredients of a drug to create a medication under a licensed pharmacist." (*Id.*) According to Par, compounded drugs do not require FDA approval and can go to market without a FDA finding of manufacturing quality, though they must comply with the FDA's Current Good Manufacturing Practices ("CGMP") guidelines and inspections. (*Id.*) On July 29, 2015, Hinchen and Jenkins incorporated QuVa in Delaware and then announced they had acquired a sterile drug compounding facility in Sugar Land, Texas. (ECF No. 114 ¶ 39; ECF No. 48 ¶ 33.)

Par alleges, between October 2014 and February 2015, Hinchen and Jenkins began to solicit Short, who was still Par Sterile's Senior Director of Quality. (ECF No. 114 ¶ 38.) In October 2014, Hinchen and Jenkins began to solicit Kohut, who was still a consultant for Par Sterile. (*Id.*) On December 15, 2015, QuVa announced a six-person executive leadership team, which included four former Par Sterile employees or consultants—Hinchen, Jenkins, Kohut, and Short. (ECF No. 114 ¶ 40; ECF No. 48 ¶ 34.) Between October 26, 2015, and June 28, 2017, QuVa hired eight former Par Sterile employees: (1) Stephen Rhoades, Par Sterile's Manager of Sterility Assurance; (2) Travis McGrady, Par Sterile's Manager of Deviations and Lot Disposition; (3) David "Mike" Hartley, Par Sterile's Director of Technical Services; (4) Ahmed Soliman, Qualitest Pharmaceutical's Manager, Analytical Research & Development; (5) Guy Thompson, Par Sterile's supervisor of the microbiology lab; (6) Mike Rutkowski, Par Sterile's Senior Vice President and General Manager of the Rochester, Michigan facility; (7) Ashley Short, a Par Sterile Quality Control Chemist; and (8) Chinnasamy Subramaniam, Par Sterile's Manager of Analytical Research and Development. (ECF No. 114 ¶ 42.)

Par claims these former Par Sterile employees breached their employment agreements with Par by aiding and abetting QuVa. (ECF No. 114 ¶ 43.) Specifically, Par alleges Kohut, Short, and Rhoades "had detailed knowledge of and access to certain [t]rade [s]ecrets and other Par confidential information." (*Id.* ¶ 44.) Additionally, Par contends Rutkowski aided Kohut, Short, and Rhoades's misappropriation of Par's trade secrets by sending them confidential information while still working for Par. (*Id.* ¶ 45.) Par alleges Kohut, Short, Rhoades, McGrady, Hartley, and Soliman also breached the non-solicitation provisions in their employment agreements with Par by making unauthorized contact with various Par employees. (*Id.* ¶ 46.)

### D.     QuVa's Alleged Misappropriation of Par's Trade Secrets

In June 2017, Par learned that on or about April 19, 2017, QuVa had submitted a letter to the FDA regarding the classification of vasopressin. (ECF No. 114 ¶ 47.) In response to QuVa's letter, the FDA indicated vasopressin would be under "Category 1" of bulk drug substances under evaluation pursuant to Section 503B of the FDCA. (*Id.*) Vasopressin's "[i]nclusion in Category 1 means 'the FDA does not intend to take action against an outsourcing facility' that compounds the substance at issue while it is under evaluation." (*Id.* ¶ 48.) Par alleges QuVa's letter regarding the classification of vasopressin coupled with its hiring of former Par employees led Par to investigate whether QuVa improperly disclosed or used Par's trade secrets or confidential information. (*Id.* ¶ 49.) As part of its investigation, Par reviewed internal emails it alleges reveal Rutkowski disclosed Par trade secrets to QuVa as early as ten months before his resignation from Par Sterile. (*Id.* ¶¶ 50-56.) Par claims Rutkowski also improperly downloaded Par documents to a personal hard drive. (*Id.* ¶ 57.) Par further alleges Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades had access to certain of Par's trade secrets and other confidential information. (*Id.* ¶ 59.) Par likewise contends Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades have roles at QuVa similar to those they had at Par Sterile, which would make it impossible to work on QuVa's competing vasopressin product without using Par's trade secrets. (*Id.* ¶ 60.) Finally, Par claims all of the former Par Sterile employees QuVa hired, including Soliman, Thompson, Short, and Subramaniam, had knowledge of Par trade secrets and confidential information, and could exploit that information because they have roles at QuVa similar to their former roles at Par Sterile. (*Id.* ¶¶ 61-64.)

## II.  Procedural History

On August 14, 2017, Par filed the Complaint. (ECF No. 1.) On August 28, 2017, Par filed an Application for an Order to Show Cause Why Expedited Discovery Should Not Be Granted.

(ECF No. 12.) On August 29, 2017, the Honorable Douglas E. Arpert, U.S.M.J. granted the application. (ECF No. 15.) On October 4, 2017, the parties entered into a consent agreement to engage in expedited discovery, and Judge Arpert set a schedule for briefing on Par's Motion for a Preliminary Injunction. (ECF No. 43.)

On January 12, 2018, Par filed the First Amended Complaint, asserting sixteen claims: (1) violation of the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 against a QuVa, Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades (Count I); (2) violation of the New Jersey Trade Secrets Act ("NJTSA"), N.J.S.A. 56:15-2 against QuVa, Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades (Count II); (3) misappropriation of trade secrets under New Jersey common law against QuVa, Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades (Count III); (4) unfair competition under New Jersey common law against QuVa (Count IV); (5) through (12) breach of contract under New Jersey common law against Hinchen (Count V), Jenkins (Count VI), Rutkowski (Count VII), Kohut (Count VIII), Short (Count IX), Rhoades (Count X), McGrady (Count XI), and Hartley (Count XII); (13) breach of fiduciary duty under New Jersey common law against Hinchen, Jenkins, and Rutkowski (Count XIII); (14) breach of the duty of loyalty under New Jersey common law against Hinchen, Jenkins, Rutkowski, Short, Rhoades, McGrady, and Hartley (Count XIV); (15) breach of the duty of confidence under New Jersey common law against Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, and Hartley (Count XV); and (16) tortious interference with contractual relations under New Jersey common law against QuVa (Count XVI). (ECF No. 114.)

On January 16, 2018, Defendants filed a Motion to Strike Undisclosed Trade Secrets (ECF No. 115), which the Court denied on February 8, 2018 (ECF Nos. 136 & 137). On February 14, 2018, the Court heard oral argument on the Motion for Preliminary Injunction. On February 16,

2018, at the Court's invitation, Par (ECF No. 153), Defendants (ECF No. 152), and Rhoades (ECF No. 151) submitted post-argument supplemental briefing.

### III. LEGAL STANDARD

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.'" *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). "A plaintiff seeking a preliminary injunction must establish that he is [1] likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Ferring*, 765 F.3d at 210 (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). The movant bears the burden of showing these four factors weigh in favor of granting the injunction, and a failure to establish any one factor will render a preliminary injunction inappropriate. *Id.* A likelihood of success on the merits "requires a showing significantly better than negligible but not necessarily more likely than not." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179) (3d Cir. 2017). "How strong a claim on the merits is enough depends on the balance of the harms: the more net harm the injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* (quoting *Hoosier Energy Rural Elec. Co-op, Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)). The moving party must show irreparable harm is more likely than not in the absence of an injunction. *Id.*

### IV. DECISION

Par seeks an indefinite injunction in three categories: (1) an injunction against QuVa's sale of aseptic products that directly compete with Par; (2) an injunction against QuVa's further

solicitation of Par employees in breach of non-solicitation agreements; and (3) an injunction against former Par employees from working on QuVa products that compete with Par products. (ECF No. 69 at 30-36.)

### A. The Likelihood Par Will Succeed on the Merits of Its Claims[4]

Par argues it has shown it will likely succeed on the merits of its breach of contract claims and its trade secret misappropriation claims. (Br. in Supp. of Pls.' Mot. for Prelim. Inj. (ECF No. 69).) Par alleges Defendants breached their contracts by soliciting Par employees and disclosing Par confidential information. Under New Jersey law, a plaintiff must show: "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007) (citation omitted). Defendants do not dispute the existence of a contract or whether Par performed its contractual obligations. The basis for Par's claims for breach of the non-disclosure agreement is Defendants' alleged misappropriation of trade secrets. Therefore, the Court's analysis of Par's likelihood of success of the breach of the non-disclosure agreement claim serves as analysis of the trade secret misappropriation claim, as well. The Court considers Par's arguments concerning each of the claims in turn.

### 1. Breach of the Non-Solicitation Agreement

Hinchen and Jenkins left Par in June 2014 and executed the Separation Agreement. Each agreed not to "directly or indirectly, use, communicate, disclose or disseminate any Confidential Information in any manner whatsoever," and, for a year after leaving Par, not to "solicit, hire,

---

[4] The facts in Par's Motion for a Preliminary Injunction are based on evidence obtained through the limited expedited discovery permitted under the Court's Order of October 4, 2017. (ECF No. 43.)

induce or attempt to induce, or assist others to solicit, hire, induce or attempt to induce, any director, officer, employee, contractor, consultant or agent" of Par. (Declaration of David S. Almeling, Esq. in Support of Pls.' Mot. for a Prelim. Inj. ("Almeling Decl."), Ex. 5 ¶¶ 7-8; Ex. 6 ¶¶ 7-8.)[5] The restriction on disclosing confidential information had no expiration, and the non-solicitation term expired on June 6, 2015, for Jenkins and June 11, 2015, for Hinchen. (*Id.*) Rutkowski, Kohut, Short, Rhoades, and McGrady were also subject to similar twelve-month non-solicitation provisions. (Almeling Decl. Exs. 14-15, 19-20, 78.)

Par cites several facts in support of its claim Hinchen and Jenkins breached the non-solicitation agreement. (Almeling Decl. Ex. 448.)



---

[5] Exhibits 1-204 and 428-50 to the Almeling Decl. were filed under ECF Nos. 72-75 and 96, respectively. Plaintiffs also submitted the Declaration of Lawrence S. Lustberg. Esq. in Support of Pls.'Mot. for a Prelim. Inj. ("Lustberg Decl."), which included Exhibits 451-65 filed under ECF Nos. 139-2 to 139-16, and 140, respectively. Defendants' Exhibits 205-427 were filed with the Declaration of Stephen R. Howe, Esq. in Support of Ds.' Opp. to Pls.' Mot. for a Prelim. Inj. ("Howe Decl.") under ECF Nos. 88-89. For clarity, the Court will cite the exhibits by number without reference to their ECF document number.

[black redacted area]

Defendants argue Hinchen's and Jenkins's interactions with Par employees and consultants before June 11, 2015, did not breach the non-solicitation agreement. (ECF No. 88 at 30-32.) They claim Hinchen and Jenkins never attempted to "solicit, hire, [or] induce" Short or Kohut "to either leave or terminate his or her employment, consulting or other position" with Par. (*Id.* at 31 (quoting Almeling Decl. Exs. 5, 6).) [black redacted]

[black redacted]

[black redacted]

[black redacted]

[black redacted] (*Id.* (citing Howe Decl. Ex. 323 at 171:11-3, 179:18-180:7).) The Court finds this argument unpersuasive.

A party proves a likelihood of success on the merits by demonstrating a "reasonable *probability* of eventual success in the litigation." *South Camden Citizens in Action v. N.J. Dep't of Envt'l. Prot.*, 274 F.3d 771, 777 (3d Cir. 2001). Here, the Court finds Par has met this burden. There is a reasonable probability Hinchen's and Jenkins's contacts with Short and Kohut before June 2015 breached the non-solicitation agreement. The clause was broad, prohibiting any "direct[] or indirect[]" effort to "solicit, hire, induce, or attempt to induce . . . any director, officer, employee, contractor, consultant or agent of" Par. (Almeling Decl. Ex. 5 ¶ 8; Ex. 6 ¶ 8.) [black redacted]

[black redacted]

[REDACTED] Based on these facts, the Court concludes Par has a reasonable probability of succeeding in its claim Hinchen and Jenkins breached their non-solicitation agreements by indirectly soliciting Kohut and Short.

As the Court finds Par has shown a likelihood it will succeed on the merits of its claims Hinchen and Jenkins breached their contracts, the Court need not analyze whether the remaining former Par employees also breached their respective non-solicitation agreements.

### 2. Breach of Non-Disclosure Agreement / Trade Secret Misappropriation

Defendants argue Michigan or Texas law should apply to Par's state law trade secret claims, not New Jersey law as Par argues. (ECF No. 88 at 10.) While New Jersey applies a presumption of irreparable harm in trade secret cases, Michigan and Texas do not. (*Id.* at 11 (citing *PrimePay, LLC v. Barnes*, 2015 U.S. Dist. LEXIS 65710, *81 (E.D. Mich. May 20, 2015); *DGM Servs. v. Figueroa*, 2016 Tex. App. LEXIS 13808, *12-16 (Tex. App. Dec. 29, 2016); *Nat'l Start & Chem. Corp. v. Parker Chem. Corp.*, 219 N.J. Super. 158, 162 (N.J. Super. Ct. App. Div. 1987)).) Par argues any potential conflict is immaterial, because Par does not seek a presumption of irreparable harm but rather argues it will suffer actual irreparable harm in the absence of an injunction. The Court agrees and finds there is no conflict, and to the extent there is a conflict, it is immaterial to this Motion. *See infra* notes 6, 10, and 11.

A party asserting a claim under the DTSA and the NJTSA must show: (1) the existence of a trade secret and (2) the misappropriation of that secret. 18 U.S.C. § 1839(3), (5); N.J.S.A. 56:15-2. Under New Jersey common law, a plaintiff must show: (1) the existence of a trade secret, (2) communicated in confidence by the plaintiff to the employee, (3) disclosed by the employee in breach of that confidence, (4) acquired by the competitor with knowledge of the breach of confidence, and (5) used by the competitor to the detriment of the plaintiff. [6] *Rohm & Haas Co. v. Adco Chem Co.*, 689 F.2d 424, 429-30 (3d Cir. 1982).

---

[6] The elements are similar under the Michigan Uniform Trade Secrets Act ("MUTSA") and the Texas Uniform Trade Secrets Act ("TUTSA"), both of which provide a trade secret "must be shown (1) to derive independent economic value from not being generally known, or discoverable through proper means, to others and (2) have been subject to reasonable efforts to maintain its secrecy." *PrimePay*, 2015 U.S. Dist. LEXIS 65710 at *56; *Seismic Wells, LLC v. Matthews*, 2016 U.S. Dist. LEXIS 85602, *8 (N.D. Tex. Feb. 22, 2016). A plaintiff must show (1) the party who acquired the trade secret knew or should have known it was done through improper means, or (2)

Par alleges two categories of Defendants' trade secret misappropriation: (1) secrets related to Par's Aseptic Process Simulation Master Plan ("APS Plan"); and (2) operational and technical trade secrets related to the manufacture and distribution of Par's products. (ECF No. 69 at 11, 14; *see* Declaration of Michael Miller, Ph.D. ("Miller Decl.") (ECF No. 70).)

### a. Misappropriation of APS Plan Trade Secrets

In order to receive FDA approval, a drug compounding facility must comply with current Good Manufacturing Processes ("CGMP") to perform aseptic manufacturing. (Miller Decl. ¶¶ 38-39.) The APS Plan establishes the standard operating procedure used to validate all of a company's sterile products. (ECF No. 69 at 11.) ████████████████████████████████████ ████████████████████████ █ Par alleges QuVa relied on misappropriated trade secrets from Par's APS Plan to prepare its own APS Plan. (*Id.*) Par cites evidence that ████████████ ████████████████████████████████████████████████████ ██████████

█ ████████████████████████████████████
█ ████████████████████████████████████
████████████████████████████████████
█ ████████████████████████████████████
████████████████████████████████████
████████████████████████████

---

the disclosure or use of a trade secret that was acquired through improper means. M.C.L. § 445.1902(b); Tex. Cil. Prac. & Rem. Code Ann. § 134A.002(3).

█ ████████████████████████████████████
████████████████████████████████████
████████████████████████████



Par argues ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████. (Miller Suppl. Decl. ¶¶ 10-16.) ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████ (*Id.* ¶ 12.)

---

[8] The Court finds significant the fact ████████████████████████

██████████████████████████████████████ (*Compare* Almeling Decl. Ex.
53 *with* Ex. 140.)

Defendants argue QuVa's APS Plan "is uniquely tailored to QuVa's specific manufacturing processes, and was independently developed based on publicly available information and the general industry knowledge and experience of its employees." (ECF No. 88 at 21.) They maintain Par's efforts to comply with FDA best practices cannot constitute trade secrets. *Id.* (citing *Dana Ltd. v. Am. Axle & Mfg. Holdings*, No. 1:10-CV-450, 2013 WL 4498993, at *12 (W.D. Mich. Aug. 19, 2013) (holding an employee's knowledge of best practices was not a trade secret)). Defendants further claim ███████████████████████████████ ███████████████████████████████ (ECF No. 88 at 5.) Defendants assert Par's APS Plan would have limited application to QuVa's development of its own plan, because QuVa uses manual manufacturing at its facility while Par uses a high-volume automated process. (*Id.* at 22.) Finally, Defendants state ███████████████████████ was general advice, not specific information that would qualify as a trade secret. (*Id.* at 22-23.)

The Court finds Par has demonstrated ████████████████████████████ ███████████████████████████████████████████ ███ ███████████████████████████████████████████ ██████████████████████ ████████████████████████ ██████████████████████████████ The Court is satisfied that, while some individual elements of the APS Plan may be known in the industry, Par's combination of the elements into departmental divisions constitute a trade secret. (*See* Miller Suppl. Decl. ¶ 13.)

The evidence produced in expedited discovery suggests the ex-Par Sterile employees were not merely relying on their memory of industry best practices when they transitioned to QuVa. *See Dana Ltd.*, 2013 WL 4498993, at *12 (finding information did not constitute a trade secret when employee could recall testing protocols from memory). ███████████████████████████

████████████████████████████████████████████

(Rhoades Decl. ¶ 27.) However, on December 9, 2017, after Defendants submitted their Opposition to Par's Motion for a Preliminary Injunction, Rhoades informed QuVa he possessed a thumb drive that contained Par documents, and that he had deleted information from the thumb drive after the litigation hold in this case was in place. (ECF No. 429.) Par's APS Plan was among the documents Rhoades appropriated and later deleted from the thumb drive. (*Id.*) QuVa later fired Rhoades. (ECF No. 449.) Rhoades was not merely relying on his professional experience obtained at Par Sterile. To the contrary, he admits he took and then deleted Par documents.[9]

At oral argument, Defendants suggested Rhoades's acts could not be imputed to QuVa, because (1) Rhoades did not inform QuVa he was in possession of the thumb drive, (2) he did not consult QuVa before he deleted the documents, (3) he deleted the documents to protect himself from blame, not to serve QuVa, and (4) QuVa terminated Rhoades upon learning of his actions. Par rebutted this argument by pointing out ████████████████████████████████

███████████████████████████████████████████ (*See* Almeling Decl. Ex. 51 at 1.) The Court finds Rhoades's use of Par documents while at QuVa can be attributed to QuVa under New Jersey agency law, because his conduct was (1) the type of work Rhoades was authorized to perform; (2) took place within the hours and premises of his work for QuVa; and (3) and was "actuated, at least in part, by a purpose to serve [QuVa]." *Allard v. Eisenhauer*, 971 F. Supp. 458, 463 (D.N.J. 2013) (quoting *Carter v. Reynolds*, 815 A.2d 460, 464 (N.J. 2003) (citing

---

[9] On February 13, 2018, one day before the Court heard oral argument on this Motion, Par sought and was granted permission to file a supplemental brief regarding Rhoades's February 9, 2018 deposition and forensic analysis of Rhoades's thumb drive. (ECF No. 142.) The Court considered Par's submission provided greater detail of Rhoades's knowing deletion of electronic evidence after the litigation hold was in place.

*Di Cosala v. Kay*, 450 A.2d 508, 513 (1982) (citing Restatement (Second) of Agency § 228 (1957)))).[10]

On its own, the factual record regarding QuVa's development of its APS Plan suggests Par is likely to succeed on the merits of its claims arising from Defendants' alleged breach of the non-disclosure agreements. Par's likelihood of success is greater in light of Rhoades's admissions. The Court finds Par has adequately pled claims under the DTSA and the NJTSA, as it has made a prima facie showing the APS Plan constituted a trade secret and that Defendants misappropriated that secret. *See* 18 U.S.C. § 1839(3), (5); N.J.S.A. 56:15-2. Further, Par has adequately alleged under New Jersey common law: (1) the APS Plan constitutes a trade secret, (2) that Par communicated in confidence to Rhoades; (3) Rhoades then disclosed the trade secret in breach of that confidence; (4) QuVa acquired the APS Plan with knowledge of the breach of confidence; and (5) QuVa used Par's APS Plan to Par's detriment. [11] *See Rohm & Haas Co.*, 689 F.2d at 429-30.

---

[10] Rhoades's actions would be attributable to QuVa under Michigan law and Texas law, as well. *Stephens v. Worden Ins. Agency, LLC*, 859 N.W.2d 723, 734-35 (Mich. Ct. App. 2014) (citation omitted) (finding employer is answerable for agent's actions when agent is engaged in employer's business and not merely acting to serve his or her own ends); *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998) (finding an employer is liable for its employee's actions when the conduct "falls within the scope of the employee's general authority in furtherance of the employer's business and for the accomplishment of the object for which the employee was hired").

[11] The Court's finding would be the same under either Michigan or Texas law, because Par has shown its APS Plan "(1) derive[s] independent economic value from not being generally known, or discoverable through proper means, to others and (2) ha[s] been subject to reasonable efforts to maintain its secrecy." (Miller Suppl. Decl. ¶¶ 12-16.) *See PrimePay*, 2015 U.S. Dist. LEXIS 65710 at *56; *Seismic Wells, LLC*, 2016 U.S. Dist. LEXIS 85602, *8 (N.D. Tex. Feb. 22, 2016). Rhoades's admitted conduct reveals (1) he knew he acquired Par's APS Plan through improper means, and (2) QuVa later used the information, which had been acquired through improper means. M.C.L. § 445.1902(b); Tex. Cil. Prac. & Rem. Code Ann. § 134A.002(3).

### b.     Misappropriation of Operational and Technical Trade Secrets

Par alleges Defendants misappropriated trade secrets related to Par's manufacture and distribution of its products.[12] For purposes of analyzing Par's likelihood of success on its trade secret misappropriation claim, the Court considers the parties arguments as to Trade Secret No. 33. Trade Secret No. 33 concerns various formulations of Par's vasopressin products. (Miller Decl. ¶ 98.) Par claims it developed these formulations through extensive trial and error. (*Id.*) Par alleges

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████    ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████

        ██████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████    ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[12] In its Brief in support of this Motion, Par argues it is likely to succeed on the merits of its claim Defendants have misappropriated Trade Secret Nos. 1, 3, 5, 8, 11, 27, 33-36, 43, 45, 47, 49, and 51. (ECF No. 69 at 27.) The Court need not analyze the merits of Par's claim as to each of those trade secrets, because Par would demonstrate a likelihood of success on the merits of its claim if Defendants misappropriated even one of the trade secrets at issue.



(Miller Suppl. Decl. ¶¶ 40-42.) At oral argument, Defendants argued they have produced evidence of independent development of QuVa's vasopressin product, which is sufficient to defeat Par's motion as to the likelihood of success on the merits. However, the Court notes Par does not need prove by a preponderance of the evidence that it will prevail on its claim Defendants misappropriated Trade Secret No. 33. *See Reilly*, 858 F.3d at 179 (finding a likelihood of success on the merits "requires a showing significantly better than negligible but not necessarily more likely than not"). The Court finds Par has met this burden.

For these reasons, the Court finds Par has demonstrated a likelihood of success on the merits of its claim Defendants misappropriated its trade secrets related to the manufacture of its products.

**B.     The Likelihood Par Will Suffer Irreparable Harm**

A party seeking an injunction must make "a clear showing of immediate irreparable injury." *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (1980). The Third Circuit has held the disclosure of trade secrets may establish immediate irreparable harm. *Neo Gen Screening, Inc. v. TeleChem Intern., Inc.*, 69 F. App'x 550, 554-55 (3d Cir. 2003) (citing *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92 (3d Cir. 1992)); *see also FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (holding that a loss of trade secrets was an irreparable harm that could not be measured in money because "a trade secret once lost is, of course, lost forever"). However, a preliminary junction "is not automatic merely because a trade secret claim is alleged and ought not be granted absent satisfaction of all the prerequisites for equitable relief." *Bay State Lighting Co., Inc. v. Voight Lighting Indus., Inc.*, No. 84-1189, 1984 WL 1450, at *4 (D.N.J. July 17, 1984) (citing *Cont'l Grp., Inc.*, 614 F.2d at 358-59).

Par argues it will suffer irreparable harm in the absence of an injunction in several ways. Par contends Vasostrict® ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████ (Declaration of Dr. Christine S. Meyer ("Meyer Decl.") (ECF No. 69-3) ¶ 10.) Par claims it would suffer substantial harm if QuVa's vasopressin product goes to market, ████████████████████████████████████████████████████████████ ███████████████████████████████████ (*Id.* ¶¶ 11-13.) Par also claims it is developing new vasopressin products, and the lost revenue to these ventures would be difficult to quantify "because such a calculation would involve estimating the but-for sales with limited historical experience on which to base future expected sales." (*Id.* ¶ 14.) The lost revenue would lead to additional harm, ████████████████████████████████████████████████████████

██████████████████████████████████████████████ (*Id.* ¶ 21.) Finally, Par argues it would suffer reputational harm if QuVa's product experiences a safety incident or must be recalled. (*Id.* ¶ 27.) Par contends there is a legitimate risk of such an incident, because QuVa's product may not be subject to the same oversight as Vasostrict®, which has FDA approval. (*Id.* ¶¶ 27-28.)

Defendants argue Par has not established it will suffer irreparable harm because any harm is quantifiable and can be redressed through money damages. (Declaration of Mohan Rao, Ph.D., Howe Decl. Ex. 427 ("Rao Decl.") ¶¶ 17, 15, 18-25, 30.) Defendants argue Par's lost profits could be calculated by subtracting Par's sales from the sales Par expected to make before QuVa entered the market. (*Id.* ¶ 19.) Defendants contend Par itself will know its sales, and the expected sales are calculable from Par's information and from third-party analysis. (*Id.* ¶¶ 19-20.) Finally, Defendants argue Par provides several claims of speculative harm, such as residual damage to Par's reputation due to any problems with QuVa's product. (*Id.* ¶¶ 31-41 (citing *INDECS Corp. v. Claim Doc, LLC*, No. 16-4421, 2017 WL 1086178, at *4 (D.N.J. Mar. 21, 2017) (holding plaintiffs did not establish irreparable harm based on speculative and conclusory statements concerning loss of goodwill)).)

The Court finds Par has proffered substantial evidence it would suffer irreparable harm beyond that which money damages could remedy. *See Sanofi-Synthelabo v Apotex, Inc.*, 470 F.3d 1368, 1381 (Fed. Cir. 2006) (finding "irreversible price erosion, loss of good will, . . . and the discontinuance of clinical trials" were forms of irreparable harm); *see also Altana Pharma AG v. Teva Pharm. USA, Inc.*, 566 F.3d 999 (Fed. Cir. 2009) (finding same). The Court found particularly persuasive the impact QuVa's product could have on Par's ███████████████████████████

(Meyer Decl. ¶ 14.) In view of the barriers to calculating money damages, the Court finds Par has met its burden.[13]

For these reasons, the Court finds Par would suffer irreparable harm in the absence of an injunction.

### C.    The Balance of the Equities

Courts have routinely found the equities favor the party seeking to prevent the misappropriation of trade secrets. *See NVR, Inc. v. Davern*, No. 15-cv-5059, 2015 WL 9450831, at *3 (D.N.J. Dec. 23, 2015) (finding "the balance of hardships favor[ed] plaintiff, who sought protection of trade secrets); *Daily Instruments Corp. v. Heidt*, 998 F. Supp.2d 553, 571 (S.D. Tex. 2014) (finding the balance of equities favored party seeking to enjoin ex-employee from breaching non-competition agreement and disclosing trade secrets); *Pyro Spectaculars North, Inc. v. Souza*, 861 F. Supp.2d 1079, 1092 (E.D. Cal. 2012) (finding the equities favored plaintiff when an injunction "would essentially only require him to abide by existed law regarding the unauthorized use of another's trade secrets"); *Learn2.com, Inc. v. Bell*, No. 3-cv-812-R, 2000 WL 36731362, at *17 (N.D. Tex. July 20, 2000) (granting an injunction prohibiting defendant from using and disclosing plaintiff's trade secrets). Defendants argue the equities weigh against an injunction. (ECF No. 88 at 38) They claim ███████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

---

[13] Significantly, the Separation Agreement, which both Hinchen and Jenkins executed, provides any breach of the non-disclosure, non-solicitation, or non-compete provisions "will result in *immediate and irreparable damage* to [Par] and will entitle [Par] to injunctive relief." (Almeling Decl. Ex. 5 ¶ 15, Ex. 6 ¶ 15 (emphasis added).)

The Court finds the balance of equities favors an injunction, but not the broad injunction Par seeks. Although Par has shown a likelihood of success on the merits of its claim Defendants misappropriated trade secrets related to Par's APS Plan, an injunction on all competing QuVa aseptic products is not warranted. Par's evidence in support of its argument it will suffer irreparable harm dealt almost exclusively with its vasopressin products. (*See* Meyer Decl. ¶¶ 11-14, 27-28) Therefore, the Court finds the balance of equities favors an injunction on QuVa's vasopressin products. As for Par's request that Defendants be enjoined from soliciting any additional Par employees, the parties acknowledge Hinchen's and Jenkin's non-solicitation agreements have expired. Par's contracts with its current employees should govern its rights and remedies if those employees improperly seek employment with QuVa or elsewhere.

Therefore, the Court finds the balance of equities favors only an injunction on the marketing and sale of QuVa's vasopressin products. The Court rejects Defendants' argument that any injunction should last only forty to sixty hours, which is the length of time Defendants' expert estimates independent development the APS Plan would require. (ECF No. 152 at 5 (citing Patterson Decl. ¶ 13.) The Court has found the APS Plan is not the only basis on which Par has demonstrated a likelihood of success on the merits of its misappropriation claims. Therefore, the advantage Defendants obtained through the alleged misappropriation of the APS Plan is not the only basis for the duration of the injunction. The injunction shall remain in place through the conclusion of trial.

### D.     The Public Interest Favors an Injunction

"[T]he effect on public interest considered by this Court [is] not that justice be done, but that specific acts presumptively benefiting the public not be halted until the merits [can] be reached and a determination made as to what justice require[s]." *Cont'l Group, Inc. v. Amoco Chem. Corp.*, 614 F.2d 351, 358 (1980). Here, the Court finds the public interest favors an injunction. "The public has a clear interest in safeguarding fair commercial practices and in protecting employers from the theft or piracy of trade secrets, confidential information, or, more generally, knowledge and technique in which the employer may be said to have a proprietary interest." *Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 229 (D.N.J. 2009) (quoting *Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879, 894 (N.J. 1988)). The Court recognizes the merits of Defendants' argument that there is benefit to the public from open competition in the marketplace. (ECF No. 88 at 40 (citing *Fazio v. Temp. Excellence, Inc.*, No. BER-C-275-06, 2006 WL 2587625, at *3 (N.J. Super. Ct. Ch. Div. Sept. 8, 2006).) However, in light of the Court's finding Par has shown a likelihood of success on the merits of its trade secret misappropriation claims, the Court finds a more compelling public interest would be served through an injunction. *See Nat'l Reprographics, Inc.*, 621 F. Supp. 2d at 229.

### V.  Conclusion

For the reasons set forth above, Par's Motion for a Preliminary Injunction (ECF No. 68) is **GRANTED IN PART** and **DENIED IN PART**. Defendants are enjoined from marketing and releasing their planned vasopressin product. The injunction is effective through the conclusion of trial. An appropriate Order will follow.

Date: March 1, 2018                              */s/ Brian R. Martinotti*
                                                 **HON. BRIAN R. MARTINOTTI**
                                                 **United States District Judge**