**BLANK ROME LLP**
*A Pennsylvania LLP*
Stephen M. Orlofsky, Esquire
David C. Kistler, Esquire
Leigh Ann Buziak, Esquire
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
Telephone: (609) 750-7700
Orlofsky@blankrome.com
Kistler@blankrome.com
LBuziak@blankrome.com

**MERCHANT & GOULD, P.C.**
Jeffrey S. Ward, Esquire (*Pro Hac Vice*)
Wendy M. Ward, Esquire (*Pro Hac Vice*)
Stephen R. Howe, Esquire (*Pro Hac Vice*)
10 East Doty Street, Suite 600
Madison, WI 53703
Telephone: (608) 280-6750
jward@merchantgould.com
wward@merchantgould.com
showe@merchantgould.com

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., and PAR STERILE PRODUCTS, LLC,<br><br>                              Plaintiffs,<br><br>   v.<br><br>QUVA PHARMA, INC., STUART HINCHEN, PETER JENKINS, and MIKE RUTKOWKSI,<br>                              Defendants. | Civil Action No. 17-6115 (MAS)(DEA)<br><br>*Filed Electronically* |

## DEFENDANTS' OPPOSITION TO PAR'S MOTION FOR EXPEDITED DISCOVERY

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

FACTUAL BACKGROUND ...................................................................................3

  A.  Defendants Gained Significant Experience with Manufacturing
      and Marketing Sterile Solutions Prior to Founding JHP.................................3

  B.  Par's Vasostrict® Product is based on a 100 Year-Old
      Vasopressin Product Called Pitressin® .........................................................5

  C.  After Par Received FDA Approval for Vasostrict®, Par Began
      Rapidly Raising Prices due to its Monopoly on Vasopressin
      Products. .........................................................................................................7

  D.  Hinchen and Jenkins are Fired Shortly After JHP is Purchased,
      and Form QuVa Pharma After the Expiration of Non-Compete
      Covenants in their Agreements........................................................................9

  E.  QuVa Pharma Sells Compounded Products that are Subject to
      Different Federal Statutes and Regulations than Pharmaceutical
      Companies .....................................................................................................10

  F.  QuVa's Compounded Vasopressin Injection Product is
      Different From Vasostrict®.............................................................................11

  G.  Par's Alleged Trade Secrets Consist of Widely Known Industry
      Information, as well as Information Made Available by Par
      Itself .............................................................................................................13

ARGUMENT ........................................................................................................16

  I.     PAR HAS NOT OVERCOME THE PRESUMPTION
         AGAINST EXPEDITED DISCOVERY. ..................................................16

  II.    THE *NOTARO* STANDARD IS THE PROPER STANDARD TO
         BE APPLIED, AND DOES NOT SUPPORT EXPEDITED
         DISCOVERY IN THIS CASE ..................................................................18

i

A.     The *Notaro* Standard Applies Here ...........................................18

B.     Par Fails to Meet the *Notaro* Standard.....................................20

1.  Par Has Not Established Irreparable Injury .........................20

2.  Par Has Not Established a Reasonable Probability of Success on the Merits ..........................................................21

3.  There is No Connection Between the Requested Discovery and the Avoidance of Irreparable Injury ............29

4.  Defendants' Prejudice Far Outweighs Any Harm to Par ......................................................................................30

III.   ALTERNATIVELY, PAR'S REQUEST FOR EXPEDITED DISCOVERY SHOULD BE DENIED, AS IT ALSO FAILS TO MEET THE REASONABLENESS STANDARD....................................33

CONCLUSION .....................................................................................................39

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*111 Debt Acquisition LLC v. Six Ventures, Ltd.*,
　No. 08-768, 2008 U.S. Dist. LEXIS 85431 (S.D. Ohio Aug. 15,
　2008) ...................................................................................................31

*Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*,
　134 S. Ct. 568 (2013)..........................................................................32

*Bachtel v. Barker*,
　No. 15-434, 2015 U.S. Dist. LEXIS 106641 (S.D. Ohio Aug. 13,
　2015) ...................................................................................................32

*Better Packages, Inc. v. Zheng*,
　No. 05-4477, 2006 U.S. Dist. LEXIS 30119 (D.N.J. May 17, 2006) ....16, 19, 38

*Chubb INA Holdings, Inc. v. Chang*,
　No. 16-2354, 2016 U.S. Dist. LEXIS 82225 (D.N.J. June 24, 2016) .........*passim*

*Dimension Data N. Am., Inc. v. NetStar-1, Inc.*,
　226 F.R.D. 528 (E.D.N.C. 2005)..................................................29, 34

*EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp.*,
　No. 05-5259, 2006 U.S. Dist. LEXIS 16672 (D.N.J. Apr. 4, 2006)...................21

*Fluke Elecs. Corp. v. CorDEX Instruments, Inc.*,
　No. 12-2082, 2013 U.S. Dist. LEXIS 19540 (W.D. Wash. Feb. 13,
　2013) .......................................................................................17, 29, 34

*Givaudan Fragrances Corp. v. Krivda*,
　No. 08-4409, 2013 U.S. Dist. LEXIS 153437 (D.N.J. Oct. 25,
　2013) ...................................................................................................22

*Graham Tech. Sols., Inc. v. Thinking Pictures, Inc.*,
　949 F. Supp. 1427 (N.D. Cal. 1997).....................................................31

*Gucci Am., Inc. v. Daffy's, Inc.*,
　No. 00-4463, 2000 U.S. Dist. LEXIS 16714 (D.N.J. Nov. 14,
　2000) .............................................................................................*passim*

iii

*IDT Corp.* v. *Unlimited Recharge, Inc.*,
    No. 11-4992, 2011 U.S. Dist. LEXIS 138666 (D.N.J. Dec. 2, 2011) ...............22

*Janus Et Cie v. Kahnke*,
    No. 12-7201, 2013 U.S. Dist. LEXIS 139686 (S.D.N.Y. Aug. 28,
    2013) .................................................................................................28

*Marietta Corp. v. Fairhurst*,
    301 A.D.2d 734 (N.Y. App. Div. 2003) ............................................28

*Merrill Lynch v. O'Connor*,
    194 F.R.D. 618 (N.D. Ill. 2000)..........................................................37

*Metito (Overseas) Ltd. v. GE*,
    No. 05-9478, 2009 U.S. Dist. LEXIS 12590 (S.D.N.Y. Feb. 17,
    2009) .................................................................................................28

*Notaro v. Koch*,
    95 F.R.D. 403 (S.D.N.Y. 1982) ..................................................*passim*

*On-Line Techs., Inc. v. Bodenseewerk Perkin Elmer GmbH*,
    386 F.3d 1133 (Fed. Cir. 2004) ..........................................................23

*Pharmacia Corp. v. Alcon Labs., Inc.*,
    201 F. Supp. 2d 335 (D.N.J. 2002)......................................................21

*Sawhorse Enters. v. Church & Dwight Co.*,
    No. 12-6811, 2013 U.S. Dist. LEXIS 48155 (D.N.J. Apr. 3, 2013).30, 33, 34, 38

*Techtronic Indus. N. Am., Inc. v. Inventek Colloidal Cleaners LLC*,
    No. 13-4255, 2013 U.S. Dist. LEXIS 113956 (D.N.J. Aug. 13,
    2013) ...........................................................................................*passim*

## Statutes

18 U.S.C. § 1836(b)(1)..............................................................................21

18 U.S.C. § 1893(3) .................................................................................22

21 U.S.C. § 353b(a)(5)..............................................................................11

21 U.S.C. § 355........................................................................................10

21 U.S.C. § 355(b)(1)................................................................................14

iv

21 U.S.C. § 355(b)(2)........................................................................................6

21 U.S.C. § 355b ..............................................................................................11

Federal Food, Drug, and Cosmetic Act Section 503B.......................................11, 37

New Jersey Trade Secrets Act .........................................................................21

**Other Authorities**

21 CFR § 314.53 ..............................................................................................14

Federal Rules of Civil Procedure 26(d)(1) ........................................................16

New Jersey Local Rule 6.1(b).............................................................................3

145867.00100/106127451v.1

## INTRODUCTION

Par's Motion is utterly devoid of any facts sufficient to justify imposing of the exceptional remedy of expedited discovery. In particular, glaringly absent from Par's Motion is any mention of a specific trade secret related to its approved vasopressin concentrate vial product. Indeed, Par's claim that it has vasopressin-related trade secrets is highly suspect, because volumes of information related to making and using Par's product, as well as other vasopressin injection products, has been placed in the public domain. These disclosures were not made by the Defendants, but by third parties and *Par itself*. By definition, Par's own patents[1] and patent applications covering its product are the antithesis of any potential trade secret related to that product. Without any trade secrets relating to vasopressin, there is simply no basis for Par to seek any relief, much less expedited discovery, in this matter.

Par has also failed to identify any specific measures taken to protect its unspecified trade secrets and has failed to identify any material that QuVa has improperly used to develop, test or market a vasopressin product. Par's purported support for any such misappropriation consists of innuendo upon insinuation. This is insufficient to carry its burden – which here is heightened given the

---

[1] Tellingly, Par does not mention its patents in its Motion papers.

145867.00100/106127451v.1

extraordinary nature of the relief it requests.

Par's request for expedited discovery should also be denied as it has failed to establish that the relief requested is necessary to avoid irreparable injury. Indeed, Par has turned the usual process for obtaining preliminary relief on its head by requesting discovery prior to moving for an injunction. If Par had genuine concerns for its purported trade secrets, it should have requested a preliminary injunction at the outset of the case. Moreover, there is absolutely no basis for Par's assertion that expedited discovery is necessary to preserve information. To the contrary, Defendants have and will comply with their preservation obligations under the Federal Rules.

Even a cursory review of the expedited discovery that Par proposes demonstrates that Par's Motion – and indeed, this entire action – is not motivated by any genuine concern for maintaining the confidentiality of its (non-specified) trade secrets, but by a darker purpose – its desire to maintain its present monopoly-enabled inflated pricing for Vasostrict®. The proposed discovery seeks irrelevant, but highly sensitive, business information from QuVa concerning its plans for development of a compounded vasopressin product. Because QuVa's lawful development and planned marketing of a *different* vasopressin product threatens Par's monopoly, it is using the present case to both fish for competitive intelligence and to stave off lawful competition. The Court should neither

2

countenance Par's fishing expedition nor permit its harassment of Defendants

QuVa, Hinchen, Jenkins and Rutkowski by way of expedited discovery.

Finally, Par's request is premature as it seeks expedited discovery before

Defendants have even had an opportunity to respond to Plaintiffs' Complaint.[2]

This Court should be aware that there are a number of threshold jurisdictional and

other challenges that may be the subject of forthcoming motions to dismiss Par's

claims.

In short, Par has not adduced a single fact sufficient to support either its

present Motion for Expedited Discovery or its "forthcoming" motion for a

preliminary injunction. Defendants request that the Court deny Par's Motion for

Expedited Discovery.

## FACTUAL BACKGROUND

### A.    Defendants Gained Significant Experience with Manufacturing and Marketing Sterile Solutions Prior to Founding JHP.

Defendants' significant industry knowledge and experience with making

sterile solutions, coupled with the wealth of available public information regarding

Vasostrict®, and vasopressin products in general, obviates any need for them to

use Par's "trade secrets," to the extent any relevant trade secrets even exist.

---

[2] Defendants' Answer was originally due to be filed with the Court on September 7, automatically extendable under New Jersey Local Rule 6.1(b) to September 21, 2017.

Defendants Stuart Hinchen and Peter Jenkins, the founders of JHP and most recently, QuVa Pharma, gained significant experience with the manufacture, sale and regulatory issues relating to sterile pharmaceutical solutions, such as injection products, when they were senior executives of another pharmaceutical company specializing in sterile solutions prior to founding JHP in 2007. In 2001, Mr. Hinchen and Mr. Jenkins, as employees of Mayne Group Limited, purchased Faulding Pharmaceuticals, a pharmaceutical company specializing in sterile pharmaceutical products, and renamed the company Mayne Pharmaceuticals ("Mayne"). (Declaration of Stuart Hinchen, dated September 6, 2017 (hereafter, "Hinchen Decl."), ¶ 3.) Mayne had two sterile manufacturing facilities, one in Australia, which provided oncology drugs globally, and one in Puerto Rico, which provided non-oncology drugs for the U.S. market. (*Id*. at ¶ 4.) Mayne's approved drug products were sold to pharmaceutical wholesalers for resale to healthcare providers. (*Id*. at ¶ 10.)

These sterile solution products were made using aseptic processing techniques. (*Id*. at ¶ 5.) Both of these plants had to comply with FDA regulations regarding current Good Manufacturing Procedures ("cGMP") and were subject to FDA inspection. (*Id*. at ¶ 6.) Mayne also had a cGMP-compliant manufacturing facility in Boulder, Colorado that made active pharmaceutical ingredients ("API") for use in these sterile formulations. (*Id*. at ¶¶ 7-8.)

4

Shortly after Mayne Group purchased Faulding, its Australian plant had some significant FDA issues, including compliance with cGMP. (*Id*. at ¶ 11.) To remedy those issues and bring the plant into compliance, Mayne hired Defendant Mike Rutkowski and Donna Kohut, among others. (*Id*.) At the time Mayne hired Mr. Rutkowski and Ms. Kohut, both had extensive experience in the manufacture of sterile pharmaceutical solutions, including working as industry consultants to address FDA compliance issues at facilities making such products. (*Id*. at ¶ 12.) Not surprisingly, given the wealth of information and experience they brought to their jobs at Mayne, Mr. Rutkowski's and Ms. Kohut's efforts were successful, resulting in a compliant plant and a passed FDA inspection. (*Id*. at ¶ 13.) Eventually, in 2006, Mayne was sold to Hospira. (*Id*. at ¶ 14.)

### B. Par's Vasostrict® Product is based on a 100 Year-Old Vasopressin Product Called Pitressin®.

Vasostrict® is essentially a copy of a vasopressin injection product called Pitressin®, which has been marketed since the early 1900's, and for which a significant amount of information has been publicly available for many years. Thus, it is unlikely that Par has generated any significant trade secrets relating to the Vasostrict® product formulation and its manufacture, as it alleges. (Dkt. 13 (hereafter, "Par Br.") at 4.)

In 2007, Mr. Hinchen and Mr. Jenkins founded JHP Pharmaceuticals and purchased a sterile solution manufacturing facility in Rochester, Michigan from

5

King Pharmaceuticals ("King"), as well as the rights to make certain products previously made by King, including Pitressin®. (Hinchen Decl. ¶¶ 15-16.) Like Mayne, JHP sold its drug products to wholesalers. (*Id*. at ¶ 10.) At the time JHP purchased the Rochester facility, King had been making Pitressin® for many years. (*Id*. at ¶ 16.) JHP continued to make it at the Rochester facility in the same way it had been previously made by King and earlier owners of the facility. (*Id*.) The Rochester facility purchased by JHP is now owned by Par and is known as Par Sterile. (*Id*. at ¶ 17.)

Pitressin® was an unapproved product that was nevertheless lawfully sold because it was first marketed long before FDA first implemented specific safety and efficacy guidelines for the approval of drug products in 1938 (i.e., it was a "grandfathered" product). In late 2012, pursuant to an FDA initiative to remove unapproved drugs from the market (Declaration of Stephen R. Howe, dated September 7, 2017 (hereafter, "Howe Decl."), Exh. A at 3), JHP filed a New Drug Application ("NDA") pursuant to 21 U.S.C. § 355(b)(2) (also known as a "505(b)(2) application") to manufacture and market an FDA-approved version of Pitressin®.[3] JHP relied on the substantial published literature relating to

---

[3] The FDA initiative also provided that upon FDA approval of a previously-unapproved product, all previously-marketed, but unapproved, equivalents of that product could no longer be marketed after a grace period determined by the FDA on a case-by-case basis. (Howe Decl., Exh. B at 7-8.)

145867.00100/106127451v.1

vasopressin to show the safety and efficacy of Pitressin®. (*Id*; Hinchen Decl. ¶ 18.) JHP also developed an analytical method to measure the potency of Pitressin®, which was included in a publicly-available monograph prepared by the United States Pharmacopeia ("USP"). (Declaration of Harold Patterson, dated September 6, 2017 (hereafter, "Patterson Decl."), Exh. A; Hinchen Decl. ¶ 19.)

Par acquired JHP on February 25, 2014, and JHP became Par Sterile. (Hinchen Decl. ¶ 20.) Approximately two months later, on April 17, 2014, the FDA approved JHP's originally-filed Pitressin® application. (Dkt. 12-3, Exh. D at ¶¶ 20, 22.) Par renamed the product Vasostrict®. (Howe Decl., Exh. C.) At or about the same time, the FDA made portions of JHP's NDA application available to the public. This information, among other things, set forth the Vasostrict® formulation, the most effective solution pH for stability, and the vial and closure information. (Howe Decl., Exh. C at 023-024, 028-029.) It also indicated that the potency specifications for the product matched those in the USP monograph for vasopressin injection. (*Id*. at 023.) Despite these public disclosures, Par now contends that this information constitutes its trade secrets.

### C.  After Par Received FDA Approval for Vasostrict®, Par Began Rapidly Raising Prices due to its Monopoly on Vasopressin Products.

After receiving approval for Vasostrict®, and concurrently with the FDA's removal of other unapproved vasopressin products from the market, Par began raising the price per vial of Vasostrict®. For example, when JHP was selling

Pitressin® in the 2010-2012 time frame, there were three players in the market—
JHP, APP Pharmaceuticals and American Regent. (Declaration of Peter Jenkins,
dated September 6, 2017 (hereafter, "Jenkins Decl."), ¶ 5.) At that time, these
concentrated vasopressin vial products were selling for between about $1 per vial
to about $1.70 per vial. (*Id*.) In 2013, American Regent, the market leader,
experienced a shortage, which resulted in APP raising its price to about $5 per vial,
and JHP raising its price from $1-$1.15/vial to about $2/vial. (*Id*. at ¶ 6.) Once the
FDA began removing unapproved vasopressin concentrate products from the
market shortly after the approval of Vasostrict® and acquisition of JHP by Par, Par
began regularly increasing its price. (*Id*. at ¶ 7.) Publicly-available industry data
indicates that as of May 2017, Par has raised the price of Vasostrict to about $125
per vial. (*Id*. at ¶ 8.) This is a 2500% increase from the $5 per vial price sought by
APP in 2013-14 and a 6250% increase from JHP's price per vial.

As evidenced by its unconscionable pricing practices, Par currently has a
monopoly with respect to vasopressin products, even though those products are
over 100 years old. Par is desperate to prevent others from competing with it, and
has attempted to unlawfully thwart competition in a number of ways in addition to
bringing this action against QuVa. For example, Fresenius Kabi sued Par in 2016,
alleging that Par is violating various antitrust laws by improperly restricting access
to vasopressin API. (Howe Decl., Exh. D.) Specifically, Fresenius Kabi alleges that
Par has improperly entered into exclusive supply agreements with companies

8

currently able to manufacture vasopressin API, and that as a result, Fresenius Kabi

is being prevented from making product necessary to support submission of an

Abbreviated New Drug Application for a generic version of Vasostrict®. (*Id.*) That

case is currently pending in this District before Judge Wigenton, and a motion to

dismiss by Par was unsuccessful. (Howe Decl., Exhs. E, F.)

> **D.      Hinchen and Jenkins are Fired Shortly After JHP is Purchased, and Form QuVa Pharma After the Expiration of Non-Compete Covenants in their Agreements.**

After JHP was sold to Par in February 2014, Par told Mr. Hinchen and Mr.

Jenkins not to come to work any longer, but to be available as necessary should

questions arise. (Hinchen Decl. ¶ 21.) No such questions ever arose, however. (*Id.*)

On June 6, 2014, Par terminated Mr. Jenkins without cause pursuant to section 4(c)

of Mr. Jenkins' JHP Employment Agreement. (Dkt. 12-6, Exh. P at § 4(c), Exh. S

at § 1; Hinchen Decl. ¶ 21.) That same day, Mr. Jenkins signed a Separation

Agreement and Release ("Separation Agreement"). The same scenario was

repeated with Mr. Hinchen on June 11, 2014.

Like the JHP Employment Agreements, the Separation Agreements

contained Covenants Not to Solicit and Covenants Not to Compete, among other

things. (Dkt. 12-5, Exh. O; Dkt. 12-6, Exhs. P, S, T.) These Covenants in both sets

of Agreements lasted for a period of twelve months from the dates Mr. Jenkins and

Mr. Hinchen were terminated by Par, and thus expired on June 6, 2015 for Mr.

Jenkins and on June 11, 2015 for Mr. Hinchen. (*Id.*)

9

On or about July 29, 2015 – after the expiration of the restricted periods in their agreements – Mr. Hinchen and Mr. Jenkins formally incorporated QuVa Pharma in Delaware. (Hinchen Decl. ¶ 22; Dkt. 12-3, Exh. D at ¶ 33.) Par has not alleged (nor could they) that either Mr. Hinchen or Mr. Jenkins has breached their respective Covenants Not to Compete. (Dkt. 12-3, Exh. D at ¶¶ 98-134.) Instead, Par alleges that after QuVa was formed, Mr. Hinchen and Mr. Jenkins began hiring Par employees in violation of their Covenants Not to Solicit. (*Id.* at ¶¶ 35-36.) Notably, the hire of David Short on October 26, 2015 is the earliest hire alleged by Par to be improper. (*Id.*) However, Mr. Short's hire occurred over *sixteen* months *after* Mr. Hinchen and Mr. Jenkins were fired from Par and signed their Separation Agreements—and well past the expiration of the twelve month Covenants Not to Solicit. (*Id.* at ¶ 36.)

E.   **QuVa Pharma Sells Compounded Products that are Subject to Different Federal Statutes and Regulations than Pharmaceutical Companies.**

Unlike Par Sterile, and Mayne and JHP before it, QuVa by law can manufacture and sell its compounded drug products directly to healthcare providers, and cannot sell to wholesalers. (Hinchen Decl. ¶ 23; Patterson Decl. ¶¶ 12, 15.) This is a different market from that for approved drug products like Vasostrict®. Compounded products are not approved drug products and differ from approved drug products manufactured pursuant to an NDA in many ways, including their composition, stability, shelf-life and methods of manufacture.

10

(Patterson Decl. ¶¶ 9-15.) Compounded products are in fact so different from approved drug products that 21 U.S.C. § 355, the statute governing approval of drug products (such as, e.g., Vasostrict®) by the FDA, does not apply to compounded products made in a registered outsourcing facility. *See* 21 U.S.C. § 355b (also known as "Section 503B"). (Patterson Decl. ¶ 12.) In fact, unless there is a shortage for a given approved drug product as defined by the FDA, a compounding facility cannot manufacture a product that is essentially a copy of an approved drug. 21 U.S.C. § 353b(a)(5). (Patterson Decl. ¶ 12.)

QuVa has two manufacturing facilities in Texas, both of which are registered with the FDA as outsourcing facilities pursuant to Section 503B. (Hinchen Decl. ¶ 24.) These facilities, their products, and the know-how to make those products have nothing to do with Par. They were purchased by QuVa from other compounding companies. (*Id*.) Both facilities were cGMP-compliant before QuVa purchased them, and remain so today. (Hinchen Decl. ¶ 25.) Thus, Par's allegations that QuVa needed to use alleged Par trade secrets to have cGMP compliant facilities (Par Br. at 10) are baseless. QuVa has a third facility in New Jersey (purchased in mid-2016) which is in the process of completing its outsourcing facility registration. (Hinchen Decl. ¶ 26.)

145867.00100/106127451v.1

**F.     QuVa's Compounded Vasopressin Injection Product is Different From Vasostrict®.**

Vasostrict®, like Pitressin® before it, is manufactured and sold as a concentrate. The label for Vasostrict® states that it contains 20 units of vasopressin per one milliliter (ml) of solution, and is packaged as one milliliter of solution per vial. (Howe Decl., Exh. G.) For use, it must be diluted using either saline or a 5% dextrose solution in water called D5W so that the dilute solution contains either 0.1 units/ml or 1 unit/ml. (*Id.*) These dilute solutions are directly administered to patients and are 200 and 20 times more dilute, respectively, than the Vasotrict® concentrate sold by Par. In contrast, QuVa's products are not concentrates like Vasostrict®; they are already-diluted solutions. (Dkt. 12-5, Exh. B.) Thus, Par's allegation that QuVa's vasopressin product is a "copycat" version of Vasostrict® (Par. Br. at 1) cannot withstand scrutiny.

On April 19, 2017, QuVa requested that the FDA add vasopressin to the list of drug substances that can be compounded by registered outsourcing facilities. (Dkt. 12-5, Exh. B.) In this publicly-available request, QuVa described its proposed products as vasopressin solutions for direct use in patients without any further dilution. (*Id.*) Specifically, QuVa proposed to make products having volumes from 50 ml to 250 ml, with vasopressin concentrations ranging from 0.1 unit/ml to 1 unit/ml. (*Id.*) These products, by definition, are not essentially copies

12

of Vasostrict®. (Patterson Decl. ¶¶ 12, 16-21.) If they were, the FDA would not

allow them to be sold. (*Id*. at ¶ 12.)

QuVa's proposed compounded products are completely different from

Vasostrict® in many respects, as shown in the table below:

|  | Concentration | Total Volume | Shelf Life |
|---|---|---|---|
| **Vasostrict®** | 20 units/ml | 1 ml | Stored at 2-8°C.; 12 months after being placed at room temperature |
| **QuVa's Proposed Compounded Products** | 0.1-1.0 units/ml | 50-250 ml | 75 days at room temperature |

(Patterson Decl. ¶ 21.) The differences between these products are clear to even the

most casual industry observer and are readily ascertained from QuVa's FDA

request letter. (Dkt. 12-5, Exh. B.)

### G. Par's Alleged Trade Secrets Consist of Widely Known Industry Information, as well as Information Made Available by Par Itself.

As noted above, there is a wealth of publicly available information regarding

every significant aspect of vasopressin products, including Vasostrict®. For

example, the USP monographs for vasopressin API and vasopressin injection, the

Vasostrict® label, FDA documents relating to the approval of Vasostrict® and

extensive literature relating to Pitressin®, describe vasopressin compositions, their

stability, their use, the analytical techniques necessary to make USP monograph-

13

compliant products and their packaging. (*See, e.g*, Patterson Decl. ¶¶ 27-29; Howe Decl., Exhs. 1, 2, 3, 7.) Further, the FDA and other regulatory bodies have made a significant amount of information available about cGMP compliance, aseptic manufacturing techniques, stability and shelf-life testing, and analytical techniques that pertain to manufacture of vasopressin products such as Vasostrict®. (Patterson Decl. ¶¶ 22-25.) As stated, the individual Defendants had significant experience in these areas before their respective associations with JHP and Par.

In addition, Par itself has placed a wealth of information relating to vasopressin formulations, including Vasostrict®, in the public domain. To date, Par has obtained at least five patents relating to its vasopressin injection product. These patents, with their corresponding application publication dates and issue dates, are listed below:

- U.S. Patent No. 9,375,478 ("the '478 patent"), which issued on June 28, 2016 from an application that was not previously published;

- U.S. Patent No. 9,687,526 ("the '526 patent"), which issued on June 27, 2017 from an application that was published on February 9, 2017;

- U.S. Patent No. 9,744,239 ("the '239 patent"), which issued on August 29, 2017, from an application that was published on August 14, 2016; and

- U.S. Patent No. 9,744,209 ("the '209 patent"), which issued on August 29, 2017, from an application that was published on June 8, 2017.

- U.S. Patent No. 9,750,785 ("the '785 patent"), which issued on September 5, 2017, from an application that was published on June 8, 2017.

14

(Howe Decl., Exhs. H-K, O.) Par listed these patents in the FDA's "Orange Book of Approved Products" (Howe Decl., Exh. L), and in so doing, certified that they cover the product described in its corresponding NDA, i.e., Vasostrict®. 21 U.S.C. § 355(b)(1); 21 CFR § 314.53.

Par's patents contain pages and pages of information regarding how to make, test and use various vasopressin formulations, and provide a significant number of detailed examples relating to impurity analysis, temperature and pH stability studies, the use of various excipients and buffers, use of the vasopressin formulations, and alternative formulations. Par does not mention these patents in its brief, as it knows full well how damaging they are to its claims in this case.

The '478 patent contains eight examples. These examples cover how to analyze vasopressin products for impurities and how to determine the identity of those impurities (Example 1), the results of testing to determine the best pH of the vasopressin solution for maximum stability (Example 2), the effects of adding various excipients, solvents and buffers on vasopressin solution stability (Examples 3-5), illustrative vasopressin formulations for stability testing and clinical use (Examples 6-7), and therapeutic use of a vasopressin formulation (Example 8). (Howe Decl., Exh. H at 15:43 – 24:24.)

The '209 patent contains seven of the eight examples from the '478 patent, and adds eight more, for a total of fifteen examples. It adds examples relating to the effect of temperature on the stability of vasopressin formulations (Example 8),

15

the effect of minute variations in pH from pH 2.5 to pH 4.5 on the stability of

vasopressin formulations (Examples 9-10), methods to determine the precision of

analytical methods (Example 11), the effect of a citrate buffer versus an acetate

buffer on stability of vasopressin formulations (Example 12), multidose

vasopressin and alternative vasopressin formulations (Examples 13 and 14), and

long-term stability data for vasopressin formulations (Example 15). (Howe Decl.,

Exh. K at 54:4 – 107:38.) Par's claim that it has trade secrets related to the same

topics covered in these examples is far-fetched, to say the least.

## **ARGUMENT**

### I.    **PAR HAS NOT OVERCOME THE PRESUMPTION AGAINST EXPEDITED DISCOVERY.**

A party may not seek discovery from any source before the parties have

conferred as required by Rule 26(f), unless there is an agreement between the

parties or order of the court. FED. R. CIV. P. 26(d)(1). Whether to grant or deny

leave to conduct expedited discovery is within the Court's broad discretionary

powers. *Better Packages, Inc. v. Zheng*, No. 05-4477, 2006 U.S. Dist. LEXIS

30119 at *5-6 (D.N.J. May 17, 2006).

This court has generally employed one of two standards for determining the

appropriateness of expedited discovery. *Id.*, at *6-7. The first standard, which Par

neglects to mention, is outlined in *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982).

The *Notaro* standard analyzes the underlying merits of the request in a manner

16

similar to a preliminary injunction analysis. *Id.*, at 405 n.4. The second standard

requires the moving party to prove that the requests are reasonable under the

circumstances. *Better Packages,* 2006 U.S. Dist. LEXIS 30119 at *6-7.

Under either standard, the burden is on the moving party to show that

expedited discovery is appropriate. *See Techtronic Indus. N. Am., Inc. v. Inventek*

*Colloidal Cleaners LLC*, No. 13-4255, 2013 U.S. Dist. LEXIS 113956 at *5

(D.N.J. Aug. 13, 2013). Importantly, there is a presumption against expedited

discovery that must be rebutted by the moving party. *Id.* As a result, expedited

discovery is the exception, not the norm. *Id.* at *5-6.

Also under either standard, a lack of a pending motion for a preliminary

injunction at the time of the request for expedited discovery weighs heavily against

that discovery. *Chubb INA Holdings, Inc. v. Chang*, No. 16-2354, 2016 U.S. Dist.

LEXIS 82225 at *13-14 (D.N.J. June 24, 2016); *Fluke Elecs. Corp. v. CorDEX*

*Instruments, Inc.*, No. 12-2082, 2013 U.S. Dist. LEXIS 19540 at *37 (W.D. Wash.

Feb. 13, 2013); *Gucci Am., Inc. v. Daffy's, Inc.*, No. 00-4463, 2000 U.S. Dist.

LEXIS 16714 at *16-17 (D.N.J. Nov. 14, 2000) (applying more stringent *Notaro*

standard, in part because the motion for expedited discovery "[stood] alone").

Here, although Par repeatedly claims that it intends to move for a preliminary

injunction (Par Br. at 3, 15, 25, 26), Par has not so moved. Par's mere intention to

do so is insufficient. *Chubb*, 2016 U.S. Dist. LEXIS 82225 at *13-14 (finding that

movant did not establish good cause for expedited discovery where it "merely

17

stated that it 'believe[s] there is evidence that would support a motion for [a] preliminary injunction.'"); *Fluke*, 2013 U.S. Dist. LEXIS 19540 at *36 (denying expedited discovery where movant asserted that it needed expedited discovery for the purposes of filing a motion for preliminary injunction).

As shown below, Par has failed to prove that it is entitled to the extraordinary remedy of expedited discovery under either standard. While Defendants submit that the *Notaro* standard is appropriate based on the facts of this case, if the Court decides to use the reasonableness standard, it should deny Par's request for expedited discovery for the same reasons this Court applied in *Chubb*, under analogous facts.

## II.   THE *NOTARO* STANDARD IS THE PROPER STANDARD TO BE APPLIED, AND DOES NOT SUPPORT EXPEDITED DISCOVERY IN THIS CASE.

### A.   The *Notaro* Standard Applies Here.

In *Gucci*, this court utilized the *Notaro* standard for several reasons that apply with equal force to this case. First, in *Gucci*, no preliminary injunction motion was pending. *Gucci*, 2000 U.S. Dist. LEXIS 16714 at *17. Par is undoubtedly aware that it is unlikely to meet the stringent requirements for showing entitlement to a preliminary injunction (explaining why they have not yet filed such a motion) and that it therefore cannot meet the *Notaro* standard, which parallels that test.

More importantly, in *Gucci*, the movant's motives in requesting the

18

expedited discovery were suspicious. *Gucci*, 2000 U.S. Dist. LEXIS 16714 at *17. The court noted that in view of the argument that Gucci's "real motive" was to "choke off the supply of authentic Gucci handbags to discount distributors," Gucci's expedited discovery seeking the identity of the discount distributor's supplier "might well grant to plaintiff all the relief it truly seeks in this lawsuit, even though the allegations of the complaint were without basis." *Id.* at *17-19. In view of this "substantive element" to the expedited discovery, the court found that the preliminary injunction-like analysis was appropriate. *Id.*; *see also Better Packages*, 2006 U.S. Dist. LEXIS at *8 ("The heightened [*Notaro*] standard was appropriate because of Gucci's questionable motives.").

For similar reasons, this case calls for application of the *Notaro* standard. Par's discovery requests, many of which have nothing to do with its "trade secrets," demonstrate its questionable motives. For example, Par inappropriately seeks to discover: 1) the identity of QuVa's API supplier so that it can continue its attempts to tie up the market for vasopressin API (Dkt. 12-3, Exh. I at 134); 2) QuVa's business plans and regulatory status with respect to its compounded vasopressin products, including when it intends to market those products (Dkt. 123-3, Exh. H at 98-99, Exh. I at 133-134); and 3) information about QuVa's proposed compounded product, including samples, so Par can determine whether it can assert its patents against QuVa (Dkt. 12-3, Exh. G at 88, Exh. H at 98, 99, 108, 116, 126, Exh. I at 134). These are improper uses of expedited discovery, and as in

19

*Gucci*, the discovery itself has substantive value to Par. *Gucci*, 2000 U.S. Dist. LEXIS 16714 at *19 ("It would be wrong to overlook the possibility that granting expedited discovery to [the movant] might well grant to plaintiff all the relief it truly seeks in this lawsuit, even though the allegations of the complaint were without basis."). Accordingly, the *Notaro* standard should be applied. And Par falls woefully short of that standard, as explained below.

### B.   Par Fails to Meet the *Notaro* Standard.

Under *Notaro*, the party seeking expedited discovery must demonstrate "(1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." *Notaro,* 95 F.R.D. at 405. Par has not shown that any of these factors is present here.

### 1.   Par Has Not Established Irreparable Injury.

Par fails to establish a credible threat of irreparable injury that can only be averted through expedited discovery. Par's only basis for alleging that Par will suffer irreparable harm is that trade secret misappropriation, "threatened misappropriation," and breach of the Defendants' employment agreements all constitute irreparable harm. (Par Br. at 19-21.) This argument is circular and thus fails because Par's belief in the merits of its claims, without more, provides no

20

reason to expedite discovery. *See Techtronic*, 2013 U.S. Dist. LEXIS 113956 at
*6-7. Here, there is no "more." Par has not provided any evidence of the existence
of any specific trade secrets relating to vasopressin or the misappropriation thereof,
or of the breach of any contract, as explained below.

Even with respect to the irreparable harm that could arise from its
underlying claims (as opposed to harm that could be avoided by expedited
discovery), Par's failure to immediately seek injunctive relief undercuts its
arguments. *See Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 383-84
(D.N.J. 2002); *EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp.*, No.
05-5259, 2006 U.S. Dist. LEXIS 16672 at *38-39 (D.N.J. Apr. 4, 2006) ("Where a
Plaintiff delays in seeking preliminary injunctive relief, such delay is evidence that
speedy relief is not needed.").

### 2.    Par Has Not Established a Reasonable Probability of Success on the Merits.

As noted by the court in *Gucci*, to establish a probability of success on a
motion for expedited discovery, the movant must show that "it will probably
prevail at the ultimate trial on the merits." *Gucci*, 2000 U.S. Dist. LEXIS 16714, at
*20. "Probability of success implies that the moving party…must have a very clear
and strong case." *Id.* (internal quotes and citation omitted). Par knows that it
cannot meet this requirement, as shown by its failure to move for preliminary
injunctive relief.

21

With respect to its Federal claim of trade secret misappropriation,[4] Par of course must establish that it actually has trade secrets. 18 U.S.C. § 1836(b)(1). The Defend Trade Secrets Act defines a "trade secret" as information (1) that the owner thereof has taken reasonable efforts to keep secret, and (2) has independent economic value as a result of not being generally known or readily ascertainable by proper means to others who can derive economic value from its use. 18 U.S.C. § 1893(3).

First, Par fails to identify even a single trade secret with any level of specificity. Par vaguely alleges that its vasopressin trade secrets include "technical know-how relating to chemical compositions and properties, batch quantities, assays, test methods and specifications, stability protocols, validation methods, quality control and research and development efforts to obtain increased shelf life." (Par Br. at 5.) Par also alleges trade secrets in "manufacturing, packaging, distribution, marketing, and sale of Vasostrict and other vasopressin products." (*Id*.) This vague laundry list is not remotely specific enough to establish a reasonable probability of success on Par's trade secret claims. *See IDT Corp*. v. *Unlimited Recharge, Inc.*, No. 11-4992, 2011 U.S. Dist. LEXIS 138666 at *25 (D.N.J. Dec. 2, 2011) (holding that the Court could not assess whether there was a

---

[4] Par also asserts claims under New Jersey common law and the New Jersey Trade Secrets Act. (Dkt. 12-3, Exh. D at ¶¶ 56-88.) Par has not, however, explained why New Jersey trade secret law applies to this action, and Defendants do not concede that it does.

trade secret "because Plaintiffs have failed to identify the idea or information they allege to be a 'trade secret' *with a sufficient degree of particularity*.") (emphasis added); *Givaudan Fragrances Corp. v. Krivda*, No. 08-4409, 2013 U.S. Dist. LEXIS 153437 at *10 (D.N.J. Oct. 25, 2013) ("It is hornbook law that the parties and the court cannot accurately decide the question of whether a trade secret exists without first understanding what precisely is asserted as a secret.") (citation and internal quotation omitted).

Second, as mentioned above, there is not a single category among Par's list of "trade secrets" that does not have voluminous publicly available information addressing it. Most notably, Par's own patents are directed to development work regarding various vasopressin formulations, the results of standard stability studies for different formulations at various storage temperatures, and analytical techniques to detect impurities. For instance, the examples in the '478 and '209 patents cover these topics in detail. (Howe Decl., Exhs. H, K.) It is elemental that "[a]fter a patent has issued, the information contained within it is ordinarily regarded as public and not subject to protection as a trade secret." *On-Line Techs., Inc. v. Bodenseewerk Perkin Elmer GmbH*, 386 F.3d 1133, 1141 (Fed. Cir. 2004).

In addition, the monographs for vasopressin injection and vasopressin API provide information regarding product specifications for Vasostrict®, including how to conduct testing to ensure those specifications are met. (Patterson Decl. ¶¶ 26-28.) There are also extensive regulatory guidelines, statutes, and guidance

23

documents that teach those in the industry how to properly conduct all aspects of sterile manufacturing operations, including aseptic manufacturing, and how to have a cGMP-compliant facility. (*Id*. at ¶¶ 21-25.) Indeed, the individual Defendants were already privy to this type of information based on their experience with pharmaceutical companies prior to their employment by JHP or Par. (Hinchen Decl. ¶¶ 6-13.)

As with its list of "trade secrets," Par provides a similar vague listing of "numerous security measures" Par allegedly used to protect the trade secrets: "secured facilities and computer networks, confidentiality agreements with employees and third parties, and corporate policies and trainings." (Par Br. at 5.) Again, this generalized list does not satisfy Par's burden.

Even if Par established the existence of a relevant trade secret (and it has not), there is absolutely no evidence in this case that the information is of any value to QuVa. As noted above, QuVa's compounded vasopressin products are different from Vasostrict® in numerous important respects, such as vasopressin concentration, solution volume, shelf-life, and how the products are prepared for use with patients. (Patterson Decl. ¶¶ 12, 15, 16-20.) These differences are readily apparent from a review of QuVa's FDA letter cited by Par. (Dkt. 12-5, Exh. B.) Further, QuVa's compounded products are also sold through different marketing channels than those used by Par for Vasostrict®. (Hinchen Decl. ¶ 23.) Thus, Par's

attempt to show that its alleged trade secrets have value to QuVa completely misses the mark.

Additionally, Par's hyperbole aside, the information it cites in support of its Motion fails to show any credible, direct evidence of any actual wrongdoing on the part of the Defendants. For instance, Par cites █████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

25

The same is true with respect to Mr. Rutkowski's alleged misconduct regarding personal external storage devices. Even if it is true, as Par alleges, that Mr. Rutkowski "engaged in conduct consistent with copying of files to those hard drives" (Par Br. at 11), there is simply no evidence that any copied material either consisted of Par trade secrets or that Par had taken any measures whatsoever to protect this information.[5] In fact, Par's own evidence is to the contrary—as its forensic examiner points out, software used to track copying is available in the industry, but was not installed on any of the former Par employee's computers. (Dkt. 13-10 ¶ 14.)

With respect to Par's breach of contract claims, Par utterly fails to establish there has been any breach of those contracts by either Mr. Hinchen or Mr. Jenkins. In fact, Par's claims are belied by the contracts themselves. Both Mr. Hinchen's and Mr. Jenkins's JHP Employment Agreements and their Separation Agreements provide for a twelve month non-solicitation period from their Par termination date. (Dkt. 12-5, Exh. O; Dkt. 12-6, Exh. P, S, T.) As admitted by Par, the earliest allegedly "poached" hire (David Short) occurred over *sixteen* months after Mr. Jenkins and Mr. Hinchen were fired by Par. (Dkt. 12-3, Exh. D at ¶ 36.)

---

[5] This reasoning applies with equal force to all of the alleged "suspicious behavior" by former Par employees. (*See* Par Br. at 11-14, 18.)

26

Additionally, Par has no evidence whatsoever that either Mr. Hinchen or Mr. Jenkins have breached the provisions of these Agreements regarding non-disclosure of confidential information. (Dkt. 12-5, Exh. O; Dkt. 12-6, Exhs. P, S, T.) In fact, QuVa has previously assured Par that Mr. Hinchen and Mr. Jenkins, as well as any employees hired by them, will abide by any confidentiality and non-solicitation provisions in their respective employment agreements. On February 5, 2016 attorneys for Par wrote to Mr. Hinchen and QuVa expressing concern over QuVa's hiring of David Short. (Howe Decl., Exh. M.) On February 10, 2016, attorneys for QuVa and Mr. Hinchen responded, stating that QuVa had no interest in any Par confidential information, and that all of its employees would abide by any confidentiality or non-solicitation provisions in their Par employee agreements. (Howe Decl., Exh. N.) Par was apparently satisfied, and did not contact QuVa again regarding these issues for over a year prior to filing the Complaint here. There is simply no evidence that QuVa and its employees (including Mr. Hinchen and Mr. Jenkins) are not abiding by these agreements.

Par also asserts that because QuVa placed former Par employees in similar positions within QuVa, it intended for those employees to breach their confidentiality obligations to Par. (Par Br. at 19, 21.) There is no evidence that QuVa hired any former Par employee for the purpose of obtaining trade secret information. Indeed, in light of the indisputable fact that QuVa's compounded

27

product is entirely different from Par's approved concentrate product, any such trade secrets, to the extent they exist at all, would be of no use to QuVa.

Moreover, Mr. Rutkowski's Employment Agreement with Par is governed by New York Law (see Dkt. 12-6, Exh. U at ¶ 7).[6] New York law refutes Par's position. "[T]he mere fact that a person assumed a similar position at a competitor does not, without more, make it inevitable that he will use or disclose . . . trade secret information." *Metito (Overseas) Ltd. v. GE*, No. 05-9478, 2009 U.S. Dist. LEXIS 12590, at *37 (S.D.N.Y. Feb. 17, 2009).

Additionally, Par's claim of "inevitable disclosure" is inconsistent with its own conduct. Par's Employment Contract with Mr. Rutkowski states:

> You agree not to divulge, disclose, or communicate to anyone or any entity, directly or indirectly either during or after the termination of your employment with Par, any of Par's Proprietary Information, ***and agree not to use Par's Proprietary Information in your required duties for any subsequent employer***.

(Dkt. 12-6, Exh. U at ¶ 3, emphasis added.) In view of this provision, Par clearly contemplated subsequent employment by Mr. Rutkowski. Par also did not require Mr. Rutkowski to agree to a Non-Compete provision. (*Id.*) If Par believed that subsequent employment would result in inevitable disclosure of its trade secrets, it could have required Mr. Rutkowski to sign a Non-Competition Agreement to avoid

---

[6] It is highly likely that the other former Par employees now at QuVa signed substantially similar Agreements with identical New York choice of law provisions.

28

any such issue. It did not do so. Therefore, Par's after-the-fact objection to Mr. Rutkowski's employment with QuVa rings hollow. *See Metito*, 2009 U.S. Dist. LEXIS 12590 at *37; *Janus Et Cie v. Kahnke*, No. 12-7201, 2013 U.S. Dist. LEXIS 139686 at *7-8 (S.D.N.Y. Aug. 28, 2013), *Marietta Corp. v. Fairhurst*, 301 A.D.2d 734, 738 (N.Y. App. Div. 2003).

### 3. There is No Connection Between the Requested Discovery and the Avoidance of Irreparable Injury.

As noted above, Par fails to explain how *expedited discovery* would avoid any irreparable injury. *See Dimension Data N. Am., Inc. v. NetStar-1, Inc.*, 226 F.R.D. 528, 532 (E.D.N.C. 2005) (holding that "plaintiff has not made an adequate showing that it will be irreparably harmed by delaying the broad-based discovery requested until after the initial conference…"). Not a single one of Par's discovery requests need to be addressed now. All go to the merits of its underlying claims and can be dealt with in the normal course. *See id.*

Par makes a half-hearted attempt to allege that it is concerned that evidence may be destroyed (Par Br. at 21), but Par's claim, based on a (non-party) former employee's alleged clearing of his internet browser history just prior to departing, is beyond tenuous. Any internet content that was accessed by this employee certainly does not constitute Par's trade secrets. Par has presented absolutely no basis to conclude that any evidence relevant to its claims has been destroyed. Moreover, "litigants owe an uncompromising duty to preserve what they know or

29

reasonably should know will be relevant evidence in a pending lawsuit even though no formal requests have been made and no order to preserve evidence has been entered." *Fluke*, 2013 U.S. Dist. LEXIS 19540 at *44 (internal quotations omitted). Defendants have and will comply with this duty.

### 4. Defendants' Prejudice Far Outweighs Any Harm to Par.

Although there is no prejudice to Par without expedited discovery, Defendants *will* be severely prejudiced should they be compelled to respond to Par's voluminous and overbroad discovery requests on such a short timeline. *See Sawhorse Enters. v. Church & Dwight Co.*, No. 12-6811, 2013 U.S. Dist. LEXIS 48155 at *15-16 (D.N.J. Apr. 3, 2013) (denying plaintiffs' motion for expedited discovery because request came before Rule 26 conference, before discovery schedule had even been contemplated and where nonmoving party would be burdened by having to prepare for several depositions at such an early stage in litigation); *Chubb*, 2016 U.S. Dist. LEXIS 82225 at *15-17 (denying motion for expedited discovery where discovery was not narrowly tailored, involved discovery from non-parties and would have taken place "under severe time pressure.").

Moreover, Defendants would be prejudiced by the lack of any reciprocal discovery. *Chubb*, 2016 U.S. Dist. LEXIS 82225 at *17. Given that Defendants must rebut any showing of likelihood of success to avoid the issuance of a

30

preliminary injunction, Defendants should be entitled to discovery to support its defenses and counterclaims.

Additionally, and perhaps more importantly, discovery at this juncture is premature because there are jurisdictional questions that Defendants have a right to have heard before commencing discovery. Specifically, Par purports to assert claims for breach of contract in Counts V through VII of its Complaint. (Dkt. 12-3, Exh. D at ¶¶ 98-149.) However, New Jersey is not the proper jurisdiction and venue for at least four of these contract-based claims, raising a threshold issue that must be addressed by the Court before this case proceeds. *111 Debt Acquisition LLC v. Six Ventures, Ltd.*, No. 08-768, 2008 U.S. Dist. LEXIS 85431, at *5-7 (S.D. Ohio Aug. 15, 2008) (denying motion for expedited discovery before venue and jurisdictional issues were addressed, where contract at issue contained New York forum selection clause); *Graham Tech. Sols., Inc. v. Thinking Pictures, Inc.*, 949 F. Supp. 1427, 1428 (N.D. Cal. 1997) (deferring ruling on motion for expedited discovery until issue of venue resolved where choice of law provision barred venue in the district).

Four of the relevant contracts that Par alleges have been violated contain exclusive forum selection clauses mandating that all claims related to the contracts be brought in courts *other than* New Jersey, specifically, New York and Delaware. (Dkt. 12-5, Exh. O at §6(h); Dkt. 12-6, Exh. P at §6(h), Exh. Q at §6(d), Exh. R at §6(d).) Because Par has flouted its contractual obligations and filed suit in New

31

Jersey, Par has created a threshold jurisdictional and venue problem of its own making. Defendants have the right to the benefit of their bargain, and may properly seek to transfer these actions to their agreed-upon exclusive forum. The Supreme Court has announced that where contracting parties have specified the forum in which they will litigate disputes arising from their contract, federal courts must honor the forum-selection clause "in all but the most unusual cases." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 583 (2013).

Here, Par is clearly seeking discovery related to its contract-based claims. *See* Dkt. 12-3, Exh. H at 100 (Doc. Request No. 10 "Personnel files for Stuart Hinchen, Peter Jenkins…including any agreements between QuVa and any of these individuals"; Doc. Request No. 11 "All communications between [QuVa] and any Par Employee regarding QuVa's potential employment or consulting relationship with such person, including All Communications between [QuVa] and Stuart Hinchen, Peter Jenkins…regarding QuVa's potential employment of such person."). The threshold jurisdiction and venue issues relating to Par's contract-based claims must be determined before discovery begins on claims that may not even remain in this Court. The prejudice to Defendants of having to proceed under these circumstances is manifest.[7]

---

[7] Additionally, before any expedited discovery can occur, this Court must resolve whether QuVa is subject to personal jurisdiction in New Jersey. *See Bachtel v. Barker,* No. 15-434, 2015 U.S. Dist. LEXIS 106641 at *17 (S.D. Ohio Aug. 13, 2015) (deferring ruling on motion for expedited discovery until after personal

## III. ALTERNATIVELY, PAR'S REQUEST FOR EXPEDITED DISCOVERY SHOULD BE DENIED, AS IT ALSO FAILS TO MEET THE REASONABLENESS STANDARD.

Alternatively, even assuming *arguendo* that this Court were to apply the less stringent reasonableness standard advocated by Par, its request for expedited discovery should still be denied. In particular, this Court should not authorize Par to conduct broad-based discovery on an expedited basis at the very outset of the litigation based upon nothing more than speculation and conjecture, and in the absence of any risk of irreparable harm. The mere fact that Par believes that its complaint is meritorious is not a reason to order expedited discovery. *See Techtronic Indus.*, 2013 U.S. Dist. LEXIS 113956 at *6-7. If it were, expedited discovery would be appropriate in every case—thereby running afoul of well-established precedent that establishes that expedited discovery is the exception, not the norm. *Id.* at *5-6.

The "reasonableness" or "good cause" standard requires Par to show that the request for expedited discovery is reasonable and appropriate under the circumstances. *Chubb*, 2016 U.S. Dist. LEXIS 82225 at *11. Under this standard, "the court examines the appropriateness of a request for expedited discovery by weighing the need for the discovery at that point in the litigation with the breadth

---

jurisdictional issue resolved so as to assure that " the requirements of both the state long-arm statute and the due process clause [were] met" before exercising jurisdiction).

33

of the discovery requests." *Sawhorse Enters.*, 2013 U.S. Dist. LEXIS 48155 at *12.

In evaluating whether good cause exists to permit expedited discovery, a court

considers factors such as "how far in advance of the formal start of discovery the

request is made, whether the discovery requests are narrowly tailored, the purpose

of the requested early discovery, whether the discovery burdens the defendants,

and whether the defendants are able to respond to the requests in an expedited

manner." *Id.* at *13. Whether a preliminary injunction hearing is pending is another

factor to be evaluated by the Court. *Id.* at *11.

    As to the alleged purpose for the expedited discovery, Par argues that it

seeks to support its "forthcoming" motion for preliminary injunctive relief and that

expedited discovery "is necessary to provide the Court with the full basis justifying

that relief." (Par Br. at 17.) However, as noted above, Par has not requested

preliminary injunctive relief. This Court has noted that this is a "significant factor"

weighing against expedited discovery. *Chubb*, 2016 U.S. Dist. LEXIS 82225 at

*13-14; *see also Fluke*, 2013 U.S. Dist. LEXIS 19540 at *37 (stating that the

absence of a motion for preliminary injunctive relief undermines a finding of good

cause for expedited discovery). Moreover, Par's stated purpose for seeking

expedited discovery has been squarely rejected by at least one district court as "not

a legitimate basis for expedited discovery." *Fluke*, 2013 U.S. Dist. LEXIS 19540 at

*40. The reason expedited discovery is strongly disfavored absent a pending

preliminary injunction motion is because without a frame of reference provided by

34

such a motion, there is no context for the Court to gauge the reasonableness of a plaintiff's requests. *Chubb*, 2016 U.S. Dist. LEXIS 82225 at *14; *Dimension Data*, 226 F.R.D. 528, 531-32 ("plaintiff's motion for expedited discovery is not reasonably timed, where … plaintiff has not yet filed a … motion for a preliminary injunction, setting out in detail the areas in which discovery is necessary…").

In addition, Par's requests are burdensome, overly broad and improperly extend to subjects not reasonably related to its claims. Par's requests are directed not only to Defendants, but also to three non-party QuVa employees. In addition, Par has propounded 15 interrogatories (to QuVa and Rutkowski) and 40 document requests (to QuVa, Hinchen, Jenkins and Rutkowski), and has noticed a 30(b)(6) deposition of QuVa and six individual depositions. This Court in *Chubb* found discovery of this scope and timing to be unduly prejudicial. *Chubb*, 2016 U.S. Dist. LEXIS 82225 at *17 (denying expedited discovery that required "production of large quantities of documents and the depositions of five central witnesses under severe time pressure.").

Moreover, despite its urging to the contrary, Par has *not* limited the scope of the requests to its underlying claims – instead, it is plain that Par is improperly seeking to discover the plans of a potential competitor. For example, Par's very first interrogatory to QuVa states: "Describe all facts regarding any plans You have to manufacture, market, promote and/or sell any Vasopressin Product." (Dkt. 12-3, Exh. G at 81.) Given Par's current monopoly in this market, it is easy to see why it

35

would want to know when QuVa will market its proposed compounded vasopressin product. However, Par is simply not entitled to that information because there is absolutely no nexus between the alleged conduct in this case and QuVa's business plans. Similarly, as stated above, Par seeks to learn the identity of "QuVa's supplier(s) of vasopressin for QuVa's Vasopressin Products, the dates that supplier (or those suppliers) relationship(s) began, and the amounts of vasopressin provided by that supplier (or those suppliers)." (Dkt. 12-3, Exh. I at 134.) This information has clear competitive value to Par, and Par does not even attempt to allege that the identity of any vasopressin API supplier is relevant to Par's trade secret or contract claims. *See Gucci*, 2000 U.S. Dist. LEXIS 16714 at *27 (denying expedited discovery directed to the identity of the Defendant's supplier due to the possibility of harm to the Defendant.).

Additional discovery requests are also overreaching, and in some cases, appear to be a fishing expedition for competitive business information or even potential patent claims against QuVa. Some of the more egregious examples include:

- **Interrogatory 4 to Rutkowski**: "Identify all products and processes on which You have worked at QuVa that relate to vasopressin and describe what work you have performed."

- **Request for Production 1 to QuVa**: "All documents regarding any filing by QuVa with the United States Food and Drug Administration ("FDA") in connection with vasopressin, including any communications between You and the FDA and all internal documents regarding those filing and communications."

36

- **Request for Production 3 to QuVa**, **Request for Production 7 to Hinchen**, **Request for Production 7 to Jenkins**, **and Request for Production 10 to Rutkowski**: "All documents related to the conception, development, testing, validation, quality control measures, and manufacture of any QuVa Vasopressin Product, including that product's formulation, composition and characteristics."

- **Request for Production 4 to QuVa**: "Ten samples of each strength of QuVa's Vasopressin Products."

- **Request for Production 6 to QuVa**: "Any documents relating to any distribution of any Vasopressin Product by QuVa."

- **Request for Production 7 to QuVa, Request for Production 5 to Hinchen, Request for Production 5 to Jenkins and Request for Production 4 to Rutkowski**: "Any documents relating to QuVa's business strategy regarding any Vasopressin Products."

- **QuVa 30(b)(6) Notice Topic 1**: "QuVa's filings with the Food and Drug Administration ("FDA") or any other administrative agency in connection with vasopressin, including QuVa's registration as an outsourcing facility under Section 503B of the Federal Food, Drug, and Cosmetic Act ("FDCA") for vasopressin and internal QuVa's discussions regarding these filings."

- **QuVa 30(b)(6) Notice Topic 2**: "The basis for QuVa's statements in its letter to the FDA in which QuVa nominated vasopressin for the inclusion in the list of Bulk Drug Substances Under Section 503B of the FDCA."

- **QuVa 30(b)(6) Notice Topic 5**: "The identity of each QuVa's Vasopressin Product, the work that QuVa has performed to date on that product, the decision to develop that product, and QuVa's business plan regarding that product."

- **QuVa 30(b)(6) Notice Topic 6**: "The conception, development, testing, validation, quality control measures, and manufacture of any QuVa Vasopressin Product, including that product's formulation, composition and characteristics."

(Dkt. 12-3, Exh. G at 88, Exh. H at 98, 99, 108, 116, 126, Exh. I at 133, 134.)

These discovery requests have no connection to Par's trade secret or contract

37

claims. As such, Par does not need this discovery at all, much less on an expedited basis. *See Merrill Lynch v. O'Connor*, 194 F.R.D. 618, 623 (N.D. Ill. 2000) (holding irrelevant discovery requests and misfocus of the issues to be "strongly suggestive of harassment."). Because Par's proposed discovery is overbroad and not narrowly tailored, its request for expedited discovery fails to satisfy the reasonableness standard. *See Chubb*, 2016 U.S. Dist. LEXIS 82225 at *12; *Techtronic*, 2013 U.S. Dist. LEXIS 113956 at *7-8; *Sawhorse Enters.*, 2013 U.S. Dist. LEXIS 48155 at *15-16; *Better Packages*, 2006 U.S. Dist. LEXIS 30119 at *14-15.

Par further alleges that its expedited discovery will not burden Defendants and that Defendants have ample time to respond under Par's proposed timeline. (Par Br. at 25.) Not so. First, as discussed above, much of the overbroad discovery sought by Par covers QuVa's sensitive business information, such as its marketing plans and vasopressin suppliers, and has nothing to do with Par's claims. Moreover, given the extensiveness of the requested discovery, Defendants would be forced to expend significant resources to respond far earlier than it otherwise would. *See Sawhorse Enters.*, 2013 U.S. Dist. LEXIS 48155 at *16. Importantly, Defendants will be required to divert their attention from their defense of this case, including asserting their own motions to dismiss and filing Counterclaims, in order to participate in extensive, burdensome discovery outside the normal course.

The discovery timeline established by Federal and Local Rules sufficiently

38

protects all parties' interests here. Par has provided no reason to depart from that timeline. Thus, Par's motion should fail under the reasonableness standard as well.

## CONCLUSION

In sum, Par has failed to establish its entitlement to expedited discovery under either the *Notaro* standard or the reasonableness standard. Defendants respectfully request that Par's Motion for Expedited Discovery be denied.

Dated:  September 7, 2017           Respectfully submitted,

*s/ Stephen M. Orlofsky*
**BLANK ROME LLP**
Stephen M. Orlofsky, Esquire
David C. Kistler, Esquire
Leigh Ann Buziak, Esquire
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
Telephone: (609) 750-7700
Facsimile: (609) 750-7701
Orlofsky@blankrome.com
Kistler@blankrome.com
LBuziak@blankrome.com

**MERCHANT & GOULD, P.C.**
Jeffrey S. Ward, Esquire (*Pro Hac Vice*)
Wendy M. Ward, Esquire (*Pro Hac Vice*)
Stephen R. Howe, Esquire (*Pro Hac Vice*)
10 East Doty Street, Suite 600
Madison, WI 53703
Telephone: (608) 280-6750
jward@merchantgould.com
wward@merchantgould.com
showe@merchantgould.com

*Attorneys for Defendants*

39