**BLANK ROME LLP**
*A Pennsylvania LLP*
Stephen M. Orlofsky, Esquire
David C. Kistler, Esquire
Leigh Ann Buziak, Esquire
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
Telephone: (609) 750-7700
Facsimile: (609) 750-7701
Orlofsky@blankrome.com
Kistler@blankrome.com
LBuziak@blankrome.com
*Attorneys for Defendants*

**MERCHANT & GOULD P.C.**
Jeffrey S. Ward (*admitted pro hac vice*)
Wendy M. Ward (*admitted pro hac vice*)
Stephen R. Howe (*admitted pro hac vice*)
Emily M. Wessels (*pro hac vice pending*)
10 E. Doty Street, Suite 600
Madison, WI 53703
Telephone:  (608) 280-6751
Facsimile:  (612) 332-9081
JWard@MerchantGould.com
WWard@MerchantGould.com
SHowe@MerchantGould.com
EWessels@MerchantGould.com
*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., and PAR STERILE PRODUCTS, LLC, | Civil Action No. 3:17-cv-06115-BRM-DEA |
| Plaintiffs, | *Filed Electronically* |
| v. | |
| QUVA PHARMA, INC., STUART HINCHEN, PETER JENKINS, and MIKE RUTKOWSKI, | <u>**HIGHLY CONFIDENTIAL**</u> |
| Defendants. | |

# DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................1

II.  STATEMENT OF FACTS ....................................................................2

    A.   Mr. Hinchen and Mr. Jenkins Have at All Times Complied with their Contractual Obligations to Par. ..........................................2

    B.   QuVa has No Need for Par's Alleged Trade Secrets..........................4

    C.   QuVa's Premixed Vasopressin Products were Independently Developed. ........................................................................................6

    D.   Neither QuVa nor the Individual Defendants Solicited Par Employees. ........................................................................................9

III. ARGUMENT .....................................................................................10

    A.   Legal Standards ..............................................................................10

        1.   Preliminary injunction standard .............................................10

        2.   Legal standards applicable to Par's claims of misappropriation of trade secrets ............................................10

            a.   Michigan or Texas law governs Par's trade secret claims. ...............................................................................12

            b.   Michigan and Texas trade secret standards ...................13

    B.   Par is Not Likely to Succeed on the Merits of Its Misappropriation of Trade Secrets Claims. ......................................14

        1.   Par cannot prove its claims regarding misappropriation of the alleged vasopressin trade secrets (27, 33-36, 43, 45, 47, 49 and 51).........................................................................14

            a.   QuVa's independent development shows no trade secrets were used. ..............................................................14

            b.   A majority of Par's vasopressin trade secrets consist of publicly available information. ......................15

            c.   There is no evidence that QuVa even had access to, much less used, Par's pricing information for vasopressin API. ..............................................................17

            d.   The general knowledge of employees are not trade secrets. ...........................................................................18

2.    Par is unlikely to prove its claims regarding
      misappropriation of its alleged non-vasopressin trade
      secrets (1, 3, 5, 8 and 11). .......................................................19

      a.    Par's new Trade Secret 11 information is not a
            trade secret and was not used by QuVa.........................20

      b.    Par's operational trade secrets do not derive value
            from maintained secrecy.................................................23

      c.    Par has failed to take adequate measures to protect
            the operational trade secrets. .........................................25

      d.    Mr. Rutkowski has not misappropriated any Par
            trade secrets, and Par and its expert border on
            committing fraud in their efforts to show
            otherwise.......................................................................26

C.    Par Is Not Likely to Succeed on the Merits of Its Contract
      Claims. ......................................................................................30

D.    Par Will Not Suffer Any Irreparable Harm in the Absence of
      an Injunction...............................................................................33

      1.    There would be no real, immediate or non-quantifiable
            harm to Par from the marketing of QuVa's products. ..............33

      2.    Par cannot establish irreparable harm on the basis of
            continued misappropriation or hiring of Par employees...........35

      3.    Par cannot rely on "inevitable disclosure."...............................36

E.    The Equities Favor Not Enjoining QuVa..........................................37

F.    An Injunction is Not in the Public Interest. .......................................39

IV.   CONCLUSION................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apex Tool Grp., LLC v. Wessels,*
119 F. Supp. 3d 599 (E.D. Mich. 2015) ............................................................13

*Aquasource Holdings, LLC v. Oxxytec, Inc.,*
2011 U.S. Dist. LEXIS 82890 (S.D. Tex. July 28, 2011) ..................................16

*Bancservices Grp., Inc. v. Strunk & Assocs., L.P.,*
2005 Texas App. LEXIS 8749 (Tex. App. Oct. 20, 2005)................................13

*Baxter & Assocs., L.L.C. v. D&D Elevators, Inc.,*
2017 Tex. App. LEXIS 1352 (Tex. App. Feb. 15, 2017)..................................26

*Bay State Lighting Co. v. Voight Lighting Indus.,*
1984 U.S. Dist. LEXIS 14894 (D.N.J. July 17, 1984) ......................................33

*BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.,*
229 F.3d 254 (3d Cir. 2000) ...............................................................................12

*Chemetall US Inc. v. LaFlamme,*
2016 U.S. Dist. LEXIS 29644 (D.N.J. Mar. 8, 2016) .......................................12

*The Cmty. Hosp. Grp., Inc. v. More,*
869 A.2d 884 (N.J. 2005) ............................................................................38, 39

*Cont'l Grp., Inc. v. Amoco Chems. Corp.,*
614 F.2d 351 (3d Cir. 1980) ...............................................................................33

*Dana Ltd. v. Am. Axle & Mfg. Holdings,*
2013 U.S. Dist. LEXIS 116899 (W.D. Mich. Aug. 19, 2013) ..................*passim*

*DGM Servs. v. Figueroa,*
2016 Tex. App. LEXIS 13808 (Tex. App. Dec. 29, 2016) ..........................11, 36

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
559 F.3d 110 (2d Cir. 2009) ...............................................................................34

*Fazio v. Temp. Excellence, Inc.*,
    2006 WL 2587625 (N.J. Super. Ct. Ch. Div. Sept. 8, 2006) .............................40

*Frank's GMC Truck Ctr. Inc. v. Gen. Motors Corp.*,
    847 F.2d 100 (3d Cir. 1988) .............................................................39

*Glaxo Inc. v. Novopharm Ltd.*,
    931 F. Supp. 1280 (E.D.N.C. 1996) ................................................15

*Hibu, Inc. v. Peck*,
    2017 U.S. Dist. LEXIS 189205 (D. Kan. Nov. 15, 2017) .................32

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    609 F. Supp. 2d 951 (N.D. Cal. 2009) .............................................38

*INDECS Corp. v. Claim Doc, LLC*,
    2017 U.S. Dist. LEXIS 40952 (D.N.J. Mar. 21, 2017) .....................35

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
    882 F.2d 797 (3d Cir. 1989) .............................................................33

*Janus Et Cie v. Kahnke*,
    2013 U.S. Dist. LEXIS 139686 (S.D.N.Y. 2013).............................19

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997).........................................................................10

*Nat'l Starch & Chem. Corp. v. Parker Chem. Corp.*,
    219 N.J. Super. 158 (N.J. Super. Ct. App. Div. 1987) ......................11

*NVR, Inc. v. Davern*,
    2015 U.S. Dist. LEXIS 171428 (D.N.J. Dec. 23, 2015)....................19

*Polar Molecular Corp. v. Amway Corp.*,
    2007 U.S. Dist. LEXIS 84252 (W.D. Mich. Nov. 14, 2007) ......11, 16

*PrimePay, LLC v. Barnes*,
    2015 U.S. Dist. LEXIS 65710 (E.D. Mich. May 20, 2015) .......*passim*

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017) .............................................................10

*Riad v. 520 S. Mich. Ave. Assocs. Ltd.*,
  2000 U.S. Dist. LEXIS 7646 (N.D. Ill. May 22, 2000) ......................................32

*SCS Healthcare Mktg., LLC v. Allergan USA, Inc.*,
  2012 N.J. Super. Unpub LEXIS 2704 (N.J. Super. Ct. Ch. Div.
  2012).. ..........................................................................................................11

*Seismic Wells, LLC v. Matthews*,
  2016 U.S. Dist. LEXIS 85602 (N.D. Tex. Feb. 22, 2016) ...............................13

*SI Handling Sys. v. Heisley*,
  753 F.2d 1244 (3d Cir. 1985) .........................................................................39

*Smart Vent Prods. v. Crawl Space Door Sys.*,
  2016 U.S. Dist. LEXIS 108052 (D.N.J. Aug. 15, 2016) ...................................38

*P.V. ex rel. T.V. v. Camp Jaycee*,
  197 N.J. 132 (2008) .........................................................................................11

*Vital State Can., Ltd. v. Dreampak, LLC*,
  303 F. Supp. 2d 516 (D.N.J. 2003).................................................................20

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).................................................................................10, 35, 39

**Statutes**

M.C.L. § 445.1901 ...............................................................................................13

M.C.L. § 445.1902(b) ..........................................................................................13

Texas Civ. Prac & Rem. Code Ann. § 134A.001 ...............................................13

Texas Civ. Prac & Rem. Code Ann. § 134A.002(3) ...........................................13

Texas Civ. Prac & Rem. Code Ann. § 134A.007(a)............................................11

## I.      INTRODUCTION

In its brief in support of its Motion for a Preliminary Injunction (Dkt. 69, hereafter, "Par Br."), Par weaves a tale of villainy and deceit. Although Par's brief reads like a spy novel, complete with both a "sleeper agent" and a "double agent," it is woefully short on factual and legal support for Par's trade secret and breach of contract claims. Indeed, in many respects, Par's brief is a work of pure fiction.

First, it is fiction that Messrs. Hinchen and Jenkins improperly solicited Par employees to join QuVa during their non-solicit periods. QuVa neither recruited nor offered employment to anyone at Par until after Mr. Hinchen's and Jenkins' non-solicit period had expired. After that, each of the former Par employees who have joined QuVa did so for their own personal reasons, and were certainly not recruited for any purported knowledge of Par information. Second, it is fiction that Defendants misappropriated Par's alleged "trade secrets." As a 503B compounding company that operates in a completely different way from Par, QuVa cannot use and has no need for them. Third, it is fiction that most of Par's alleged trade secrets are trade secrets at all. Instead, they consist of information in Par's own patent and published patent application, as well general knowledge in the pharmaceutical industry. Finally, it is fiction that Mr. Rutkowski engaged in complex manipulations of his computer and devices to hide malfeasance. In fact, Par's only evidence in this regard is the speculation of Par's forensic computer expert, who did not perform even the

most basic due diligence required by experts in this field.

As shown herein and in the accompanying Declarations, the real villains in this story are Par and its experts, all of whom make outrageous, unsupported and irresponsible claims in their zeal to harm Defendants and protect Par's monopoly on Vasostrict®. Accordingly, the end of this tale should be predictable. The Court should deny Par's Motion.

## II.   STATEMENT OF FACTS

### A.   Mr. Hinchen and Mr. Jenkins Have at All Times Complied with their Contractual Obligations to Par.

After they were terminated by Par without cause in June of 2014, Mr. Hinchen and Mr. Jenkins took extreme care to abide by their contractual obligations to Par. (Ex. 421 (hereafter "Hinchen Dec.") ¶¶ 5-6.)[1]

In search of a new venture that would not compete with Par, Mr. Hinchen and Mr. Jenkins investigated the 503B outsourcing business. Typically, these businesses purchase products from drug manufacturing companies like Par to use as starting materials for their products. In other words, Par would be a potential supplier, not a competitor.[2] (Id.; Ex. 416 (hereafter, "Kohut Dec.") at ¶ 18.)

---

[1] As used herein, references to "Ex." refer to: 1) with respect to Exhibits 1-204, the exhibits referenced in the Declaration of David Almeling dated November 17, 2017 (Dkt. 71), filed as Dkts. 72-75; and 2) with respect to Exhibits 205-427, the exhibits appended to the Howe Declaration dated December 8, 2017, filed herewith.

[2] In February of 2017, Par's CEO Tony Pera wanted QuVa to buy Vasostrict® and other products from Par. (Hinchen Dec. ¶ 25.) Thus, at that time, Mr. Pera viewed

Mr. Hinchen and Mr. Jenkins were also very careful to comply with their employee non-solicitation obligations to Par at all relevant times. They didn't approach or hire any former Par employees until the expiration of the one year non-solicitation period in their contracts.[3] (Ex. 238.)

Knowing full well that the facts disprove their claim that Mr. Short was improperly solicited, Par attempts to muddy the waters by misrepresenting several interactions ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

QuVa as a customer, not a competitor, and his about-face to support Par's Motion speaks volumes about the credibility of Mr. Pera's latest assertions. (Dkt. 69-4.)

[3] Messrs. Hinchen's and Jenkins' respect for their contractual obligations is also shown in an email conversation they had in February of 2015, where they discussed not approaching or offering employment to ████████████████████████████████████ ████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ ████████

████████████████

**B.    QuVa has No Need for Par's Alleged Trade Secrets.**

Par alleges that Defendants "engage[d] in a massive campaign" to steal Par's "operational" and "aseptic manufacturing" trade secrets. (Par Br. 11-16.) Par contends these trade secrets include information contained in several emails sent from Mr. Rutkowski to Ms. Kohut, alleged documents on Mr. Rutkowski's storage devices, and Par's APS Master Plan (Id.) Par is wrong on all counts.

Mr. Jenkins and Mr. Hinchen did not remotely need Par information for their new venture. Rather, they gained substantial know-how by building QuVa piece by piece from existing 503B companies. From February to July 2015, they acquired assets from Ameridose, and conducted extensive due diligence to acquire the entire compounding business of Healix Infusion Therapies. (Hinchen Dec. ¶¶ 11, 12, 14-16.) In November 2015, QuVa purchased Unique Pharmaceuticals, a long-

---

[4] Par is demonstrably wrong that ████████████████████████████████

████████████████████████████████████████████████

████████████    In any event, whether the statements in these emails should be interpreted as Par suggests, the non-solicitation period had expired by the time of this email exchange, making this whole issue irrelevant.

established compounding business in Temple, Texas. The extensive knowledge that QuVa gained through these acquisitions disproves Par's allegations that QuVa needed to use Par's alleged trade secrets to have cGMP compliant facilities. (Id.)

Further, QuVa had no need for Par information. QuVa's compounding business differs significantly from that of traditional sterile drug manufacturers such as Par, as shown in Exhibit 315. Given these differences, Par's alleged operational and aseptic processing trade secrets are simply not useful to QuVa.

Of particular relevance to Par's claims, QuVa's APS plan is based on considerations such ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ these plans without using any confidential information from Par whatsoever. (Id.)

Likewise, the "operational" trade secrets, such as information for backorders at Par Sterile on a single day in 2016, and other innocuous metrics that were

continuously posted at Par's Rochester in plain sight of everyone (including visitors), are specific to Par's business and have no relevance to QuVa's very different business. (Ex. 41 (hereafter "Rutkowski Dec.") ¶¶ 13-17, 20b-20f; Kohut Dec. ¶ 18.)

In the end, the uncontroverted record shows that QuVa's ex-Par/Endo employees have not used Par's information in any way in their roles at QuVa. (See, e.g., Rutkowski Dec. ¶ 29; Kohut Dec. ¶¶ 12, 18-19; Ex. 417 (hereafter "Thompson Dec.") ¶¶ 11-12; Ex. 210 (hereafter, "Soliman Dec.") ¶ 11; Rhoades Dec. ¶ 31; Ex. 423 (hereafter, "McGrady Dec.") ¶ 11; Ex. 413 (hereafter, "Subramaniam Dec.") ¶ 13; Ex. 414 (hereafter, "Hartley Dec.") ¶ 12; Ex. 412 (hereafter, "A. Short Dec.") ¶ 10; D. Short Dec. ¶ 29.)

## C.    QuVa's Premixed Vasopressin Products were Independently Developed.

Even though Mr. Hinchen and Mr. Jenkins consider Par's trade secret claims to be meritless, they wanted to leave no room for doubt. After Par's suit was filed and they decided to move forward with QuVa's vasopressin premixed products, they "walled off" the former Par employees from doing vasopressin-related work or communicating with the development team about vasopressin. (Hinchen Dec. ¶ 27.) Par's accusation that this somehow shows Defendants "knew their actions were improper and needed to be fixed" is exactly backwards. (Par Br. 19-20.) The wall was built to show that QuVa neither wanted, nor needed, Par's alleged trade secrets

regarding vasopressin.[5]



. These scientists have extensive

pharmaceutical development and analytical experience. (Id., ¶¶ 7-12.) None of them

have ever been associated with Par in any way. (Exs. 229, 334-335.)

Development began with a review of publicly available information regarding

vasopressin products. (Leeah Dec. ¶ 14.)

_____

[5]

[6] These products are called "bulk to sterile" products because they are made directly
from the vasopressin bulk drug substance, or "API."              They are
also called premixed, or "ready to use" products, as they can be directly administered
to patients, unlike Par's Vasostrict®, which is a concentrated product that must be
diluted before it can be used. (Ex. 425 (hereafter, "Pinal Dec.") ¶¶ 18-19.)

███████████████████████████████████████

██████████████████████████

The development of the analytical methods was similarly unaided by others at QuVa. ████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

███████████████████████████████████

███████████████████████████████████████

████████████████████████

None of this development work was influenced in any way by anyone at QuVa outside of the development team. (Id., ¶¶ 17, 21.)  The unrebutted evidence shows that the former Par employees have not been substantively involved with QuVa's development of vasopressin formulations and analytical methods in any way. (Id. ¶ 20.) Given this independent development, it is not surprising that QuVa's final formulation and analytical methods are significantly different from Par's. (Pinal Dec. ¶¶ 29-54.)

**D.    Neither QuVa nor the Individual Defendants Solicited Par Employees.**

Each of the former Par employees approached QuVa for employment, and were not solicited by anyone at QuVa.[7] (D. Short Dec. ¶¶ 19-24; Rhoades Dec. ¶ 13; McGrady Dec. ¶¶ 5, 7; Hartley Dec. ¶ 9; Soliman Dec. ¶¶ 7-9; Thompson Dec. ¶¶ 5, 7; Subramaniam Dec. ¶¶ 8, 9; A. Short Dec. ¶¶ 5, 6.) That there was absolutely no improper solicitation in any of these hires is shown by the timeline of the hires. (Ex. 238.) Each former Par employee left for his/her own reasons and has categorically denied that he/she was solicited by anyone at QuVa to join the company. (Id.)

Similarly, without any factual support other than a comparison of their salaries between Par and QuVa, Par attempts to manufacture a theory that QuVa is paying a "premium" for employees coming from Par. (Par Br. 10.) Contrary to Par's argument, QuVa pays market rate salaries consistent with the life sciences industry to attract and retain talent. (Ex. 411 (hereafter, "Palomarez Dec.") ¶ 4.) An analysis of each of the former Par employees' salaries based on market data shows that QuVa

████████████████████████████████████████████████████

██████████████████████████████████

---

[7] In the case of Ms. Kohut, who was an independent consultant for JHP and then Par, Mr. Hinchen approached her in July of 2015 to ask if she could provide more hours of consulting services than the handful of hours per week that she had previously been providing. (Kohut Dec. ¶¶ 14-15, see also Ex. 238.)

### III.   ARGUMENT

#### A.   Legal Standards

##### 1.      Preliminary injunction standard

A preliminary injunction is an "extraordinary and drastic remedy . . . that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). Specifically, a District Court should not grant such relief unless the Plaintiff establishes:

1)   it is likely to succeed on the merits;
2)   it is likely to suffer irreparable harm in the absence of an injunction;
3)   the balance of equities tips in its favor; and
4)   an injunction is in the public interest.

*See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking the preliminary injunction must satisfy the threshold of establishing likelihood of success on the merits and irreparable harm. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). If the movant meets this threshold showing, the court considers the final two factors and determines if all four factors, taken together, balance in favor of a preliminary injunction. *Id.*

##### 2.      Legal standards applicable to Par's claims of misappropriation of trade secrets

Par simply assumes that New Jersey Law applies to its state law trade secret claims. Par's assumption is wrong. Instead, Michigan and Texas law should be applied, as set forth below. To decide this choice of law issue, the Court must first

determine whether there is an actual conflict between the trade secret laws of these states. *See P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 143 (2008). Here, New Jersey law conflicts with that of Michigan and Texas in at least two important respects.

First, both Michigan and Texas reject a blanket rule that irreparable harm may be presumed based on "inevitable disclosure" of a trade secret where there is "a generalized claim that a departing employee possessed trade secrets and would of necessity employ them in his new employment." *PrimePay, LLC v. Barnes*, 2015 U.S. Dist. LEXIS 65710, *81 (E.D. Mich. May 20, 2015); *DGM Servs. v. Figueroa*, 2016 Tex. App. LEXIS 13808, *12-16 (Tex. App. Dec. 29, 2016). In contrast, New Jersey may apply a presumption of irreparable harm. *See, e.g.*, *Nat'l Starch & Chem. Corp. v. Parker Chem. Corp.*, 219 N.J. Super. 158, 162 (N.J. Super. Ct. App. Div. 1987).

Second, both the Michigan Uniform Trade Secrets Act ("MUTSA") and the Texas Uniform Trade Secrets Act ("TUTSA") preempt state common law trade secret claims. *See Polar Molecular Corp. v. Amway Corp.*, 2007 U.S. Dist. LEXIS 84252, *16-17 (W.D. Mich. Nov. 14, 2007); TEX. CIV. PRAC. & REM. CODE ANN. § 134A.007(a). In contrast, the New Jersey Trade Secrets Act does not preempt common law claims. *SCS Healthcare Mktg., LLC v. Allergan USA, Inc.*, 2012 N.J. Super. Unpub. LEXIS 2704, *18-19 (N.J. Super. Ct. Ch. Div. 2012).

11

### a. Michigan or Texas law governs Par's trade secret claims.

Since there is a conflict, this Court must apply New Jersey's choice of law rules to determine which state has the most significant relationship to this case, and apply the trade secret law of that state. *Chemetall US Inc. v. LaFlamme*, 2016 U.S. Dist. LEXIS 29644, *17-18 (D.N.J. Mar. 8, 2016). New Jersey considers four factors in the choice of law analysis: (1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the location of the parties, and (4) the place where any relationship between the parties is centered. *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 267 (3d Cir. 2000). The place where the conduct causing the alleged injury occurred is given "the greatest weight" in trade secret misappropriation cases. *Id.*

Par alleges that the conduct causing the injury occurred in both Michigan (the location of Par Sterile, from where trade secrets were allegedly taken) and Texas (the location of QuVa, where the trade secrets were allegedly used to Par's detriment). (Ex. 170, ¶¶ 29-55.) Further, the relationship between Par and the individual defendants centers on their former employment at the Rochester facility in Michigan. (Id., ¶¶ 35-55.) There is no relationship between the trade secret issues and New Jersey, as none of the accused acts occurred there. (Id., ¶¶ 6-7, 29-55.)

Thus, since Michigan and Texas are the states with the most significant interest in this dispute, the substantive laws of Michigan and Texas, not those of

New Jersey, apply to Par's state trade secret claims.

### b.    Michigan and Texas trade secret standards

The MUTSA and TUTSA are functionally the same for purposes of this motion. *See* M.C.L. § 445.1901 *et seq.;* TEX. CIV. PRAC. & REM. CODE ANN. § 134A.001 *et seq.* Under these statutes, to warrant protection, a trade secret "must be shown (1) to derive independent economic value from not being generally known, or discoverable through proper means, to others and (2) have been subject to reasonable efforts to maintain its secrecy." *PrimePay*, 2015 U.S. Dist. LEXIS 65710 at *56; *Seismic Wells, LLC v. Matthews*, 2016 U.S. Dist. LEXIS 85602, *8 (N.D. Tex. Feb. 22, 2016).

To establish misappropriation under the MUTSA and the TUTSA, a plaintiff must show acquisition of a trade secret by a party who knows or has reason to know the trade secret was acquired by improper means, or the disclosure or use of a trade secret that was acquired by improper means. *See* M.C.L. § 445.1902(b); TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(3).  In both states, "[i]t is the plaintiff's burden of 'pleading and proving the specific nature of the trade secrets.'" *Apex Tool Grp., LLC v. Wessels*, 119 F. Supp. 3d 599, 609-610 (E.D. Mich. 2015); *Bancservices Grp., Inc. v. Strunk & Assocs., L.P.*, 2005 Texas App. LEXIS 8749, *8 (Tex. App. Oct. 20, 2005).

13

**B.      Par is Not Likely to Succeed on the Merits of Its
Misappropriation of Trade Secrets Claims.**

   **1.      Par cannot prove its claims regarding misappropriation of
the alleged vasopressin trade secrets (27, 33-36, 43, 45, 47,
49 and 51).**

      **a.      QuVa's independent development shows no trade
secrets were used.**

Par does not attempt to argue that the former Par employees ever had access

to any of Par's vasopressin-related trade secrets, much less took them. (Par Br. 28-

29.) This alone should be the death of Par's claims. Further, Par simply has no good

answer to the fact that, as described above in § II.C., QuVa's vasopressin products

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████. (Pinal Dec. ¶¶ 29-54.)

Par nevertheless argues that, even if QuVa's products are different, QuVa

must have had a "head start" due to knowledge of Par information. (Par Br. 29-30.)

This speculation is based on two incorrect premises: ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

        ███████████████████████████████████████████████



"Independent development is an absolute defense to a claim of trade secret misappropriation." *Glaxo Inc. v. Novopharm Ltd.*, 931 F. Supp. 1280, 1304-05 (E.D.N.C. 1996); *see also Dana Ltd. v. Am. Axle & Mfg. Holdings*, 2013 U.S. Dist. LEXIS 116899, *68 (W.D. Mich. Aug. 19, 2013). Because QuVa independently developed its vasopressin products, it should not be enjoined from marketing those products.

> **b.    A majority of Par's vasopressin trade secrets consist of publicly available information.**

Most of Par's vasopressin "trade secrets" consist of publicly available information, primarily put into the public domain by Par itself. Specifically, Par's published U.S. Patent Application No. 2017/0290881 (the "'881 publication"), Par's U.S. Patent No. 9,375,478 (the "'478 patent"), and other public information disclose a majority of Par's vasopressin trade secrets. (Pinal Dec. ¶¶ 55-79.)

---

[8] Par's argument is also belied by the fact that ███████████████████████
███████████████████████████████████████████████████ contrary to Par's description of this work as "extensive trial and error." (Pinal Dec. ¶¶ 50-51.)



"Subject matter publicly disclosed, including that which is disclosed in an issued patent or in a published patent application, is not secret and thus cannot be protected as a trade secret." *Aquasource Holdings, LLC v. Oxxytec, Inc.*, 2011 U.S. Dist. LEXIS 82890, *11 (S.D. Tex. July 28, 2011); *Polar Molecular*, 2007 U.S. Dist. LEXIS 84252 at *14. Par cannot claim trade secret protection for its purported trade secrets regarding ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

16

**c.    There is no evidence that QuVa even had access to, much less used, Par's pricing information for vasopressin API.**

Par's alleged Trade Secret 51 relates to ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████ ██████████████████████

████████████████. (Miller Dec. ¶ 116; Exs. 171-173.) This is not remotely relevant to the price that QuVa negotiated with *its own supplier* of API for its bulk-to-sterile vasopressin products.[9]

Dr. Miller has not demonstrated that anyone at QuVa even had access to Par's pricing information, let alone used improper means to acquire it. ██████████████

████████████████████████████████████████████████

---

[9] If these statements are evidence of anything, it is that Par's monopoly-enabled pricing is well beyond the norm.

███████████████████████████████ ████████████████ Thus, it is

unlikely that Par will succeed in showing misappropriation of Trade Secret 51. *See*

*Dana*, 2013 U.S. Dist. LEXIS 116899 at *44-45.

> **d.    The general knowledge of employees are not trade secrets.**

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ ███

████████████████████████████████ (Par

Br. at 13, 30; Miller Dec. ¶¶ 109-112.) Par is not likely to succeed in claiming that

the knowledge of these individuals was misappropriated by QuVa.

████████████████████████████████████████

██████████████████████████████ (see Miller Dec. ¶ 109),

Par has not pointed to a shred of evidence that these employees had access to Par's

vasopressin information while at Par.   Second, with respect to the general industry

knowledge of these employees, it is axiomatic that such "knowledge of an employee

does not constitute a trade secret." *Dana*, 2013 U.S. Dist. LEXIS 116899 at *30. The

---

[10] Dr. Miller complains that Par was not allowed discovery regarding QuVa's pricing information and supplier. First, Par agreed that such highly sensitive information was off limits during expedited discovery. (Ex. 409, 14:20-25:7.) Second, QuVa is more than willing to provide its supplier and pricing information to the Court in camera, which will conclusively show that QuVa has in no way misappropriated this alleged trade secret.

policy behind this principle is clear – "[t]he concept of misappropriation of trade secrets must not compromise the right of employees to change jobs." *Id.* at *31. Thus, Par has not, and *cannot*, establish any trade secret based on the knowledge of the former Par employees.[11]

### 2.   Par is unlikely to prove its claims regarding misappropriation of its alleged non-vasopressin trade secrets (1, 3, 5, 8 and 11).

Par's Trade Secrets 1, 3, 5 and 8 were crafted by Par based on information that Mr. Rutkowski either emailed to Ms. Kohut, or placed onto an external storage device while he was at Par. (Miller Dec. ¶¶ 72-76.) These trade secrets include: ▇

▇

▇

▇

▇

▇

Par's Trade Secret 11 was also based on an email sent by Mr. Rutkowski to Ms. Kohut when he was at Par. ▇

---

[11] If Par had been concerned about employees leaving and going to other pharmaceutical or compounding companies, it could easily have asked its employees to sign non-compete agreements that would have restricted their ability to work. Having failed to do so, Par cannot now concoct a trade secret misappropriation claim to restrict the right of its employees to change jobs. *See NVR, Inc. v. Davern,* 2015 U.S. Dist. LEXIS 171428, *7 (D.N.J. Dec. 23, 2015); *Janus Et Cie v. Kahnke*, 2013 U.S. Dist. LEXIS 139686, *7-8 (S.D.N.Y. 2013).



Perhaps realizing the weakness of their original version of Trade Secret 11, Par has now significantly, and improperly, broadened it to include unrelated concepts such as: 1) Par's "strategies" for conducting Aseptic Process Simulations ("APS"); 2) Par's Environmental/Personnel Monitoring Master Plan ("MP-EMPM"); and 3) "procedures" for responding to FDA 483 Inspection Observations. (Par Br. 11-14, 28-29; Patterson Dec. ¶¶ 15-17.) Par's revision of Trade Secret 11 to include different concepts and documents *after completing* expedited discovery is highly improper and unfair to Defendants, who were not able to question Par's witnesses regarding these new "trade secrets." *Vital State Can., Ltd. v. Dreampak, LLC*, 303 F. Supp. 2d 516, 523 (D.N.J. 2003) (Denying preliminary injunction due to plaintiff's improper "shift[ing] and chang[ing]" definition of its trade secrets).

### a. Par's new Trade Secret 11 information is not a trade secret and was not used by QuVa.

As noted above, Trade Secret 11 now pertains to industry best practices and FDA recommendations for establishing compliant facilities. (Miller Dec. ¶ 77.) Best practices, particularly those originating with the FDA, are not the property of Par,

but are publicly available and are considered to be general industry knowledge. (Patterson Dec. ¶ 14; Rutkowski Dec. ¶ 13; Rhoades Dec. ¶ 27.) Thus, information of this type does not belong to Par and is freely available to be shared among practitioners in the industry, e.g., Mr. Rutkowski and Ms. Kohut. *See Dana*, 2013 U.S. Dist. LEXIS 116899 at *47 (holding that best practices shared by ex-employee in emails with individual at new employer did not constitute trade secrets of former employer).

The APS Plan. Par spends a significant amount of its brief villainizing QuVa's employees with respect to their conduct surrounding the creation of QuVa's APS Master Plan. (Par Br. 11-14, 28-29.) Par's story is far from the truth. QuVa's APS Plan is uniquely tailored to QuVa's specific manufacturing processes, and was independently developed based on publicly available information and the general industry knowledge and experience of its employees. █████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████



This is because an APS Plan for a 503B facility like QuVa, whose products are made manually, is significantly different from that of a company like Par, whose products are made in high volume by highly automated processes.

Mr. Rutkowski's high level, non-specific suggestions were not based on knowledge derived from Par, but a recounting of best practices based on thirty years of industry experience. (Rutkowski Dec. ¶ 20a; Kohut Dec. ¶ 19; Patterson Dec. ¶¶ 45-46.) Even if Mr. Rutkowski learned or used some of these principles during his time at Par, they do not become trade secrets for that reason alone. *See Dana,* 2013 U.S. Dist. LEXIS 116899 at *47 ("[B]est …practices do not become confidential merely because the practices were

used at [Plaintiff's business]").



     **b.**    **Par's operational trade secrets do not derive value from maintained secrecy.**

Contrary to Par's conclusory representations, Trade Secrets 1, 3 and 5 do ***not***

23

derive value from maintained secrecy. Par's only evidence to the contrary is the say-so of its expert Dr. Miller. And Dr. Miller, who is a microbiologist, not an expert in trade secrets, bases his opinion solely on conversations with Par employees. (Miller Dec. ¶¶ 65-69.) Par's self-serving statements are contrary to logic and law.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██[12] have no use whatsoever to anyone outside Par, much less a compounding company such as QuVa. (Kohut Dec. ¶ 18.) The fact that a competitor has no use for this information makes its value as a trade secret exactly nil. *PrimePay*, 2015 U.S. Dist. LEXIS 65710 at *65-66; *Dana*, 2013 U.S. Dist. LEXIS 116899 at *66 (inference of misappropriation not warranted from fact that "one small piece of information from an email…references the subject matter of one of the trade secret documents"). Moreover, the true purpose of these emails was not to pass along worthless "trade secrets." Instead, these emails were intended by Mr. Rutkowski to share with Ms. Kohut his accomplishments at Par, and contained no information that either he or Par considered to be confidential. (Rutkowski Dec. ¶¶ 19-20; Kohut Dec.

---

[12] This presentation includes photos of the exterior of the Rochester facility. Remarkably, Par claims that these photos, like literally *everything* else having to do with Par, is a trade secret. (Ex. 222, 75:13-77:23; 47:9-48:12.)

¶¶ 17-18.) This is not the activity of a "sleeper agent," as Par alleges (Par Br. 8), but is simply normal behavior between friends that have known each other for 20 years, and that have shared many personal and professional experiences. (Kohut Dec. ¶ 17; Rutkowski Dec. ¶¶ 19-20.)

Additionally, despite Par's strenuous and repeated attempts to cast Ms. Kohut's statement "I'll steal with pride, just like you taught me" in a nefarious light, it simply doesn't mean what Par wants the Court to think it means. Instead, "steal with pride" is a reference to Mr. Rutkowski's and Ms. Kohut's shared experiences with presenting data, and Mr. Rutkowski's repeated invitations for others to use his formatting style by "stealing with pride." (Kohut Dec. ¶ 18f; Rutkowski Dec. ¶ 20f.)

### c. Par has failed to take adequate measures to protect the operational trade secrets.

Par claims (again in self-serving fashion) that it has taken care to protect the information that comprises its trade secrets. (Par Br. 26-27.) Par is wrong.

First, the ████████████ that Mr. Rutkowski forwarded to Ms. Kohut[13] was posted throughout the Rochester facility where it was in plain view of all the employees, as well as the public. (Ex. 222, 57:18-22, 64:16-65:16; Rutkowski Dec.

---

[13] Par also claims that Exhibit 62 is the email and associated attachments that Mr. Rutkowski sent to Ms. Kohut. This is misleading. The over 500 pages of underlying data were not accessible to a user opening the native PowerPoint slide in an email, and neither Mr. Rutkowski nor Ms. Kohut even knew the underlying data were there. (Wolfinger Dec. ¶¶ 122-124; Rutkowski Dec. ¶ 21b; Kohut Dec. ¶ 18e.)

¶¶ 13-17; Kohut Dec. ¶18e.) The fact that the information was displayed without regard to confidentiality negates any such trade secret status Par may have intended. *See Dana*, 2013 U.S. Dist. LEXIS 116899 at *33-34 ("Regardless of what [a company] intend[s]," material that is "widely shared without any regard to confidentiality" is not a trade secret).

Second, to the extent Par claims trade secret protection for certain concepts and documents that are not marked Confidential, and which appear to contain only general industry knowledge (see §III.B.2.a. above), Par has failed to adequately notify employees which information within Par is trade secret information. *Baxter & Assocs., L.L.C. v. D&D Elevators, Inc.*, 2017 Tex. App. LEXIS 1352, *28-29 (Tex. App. Feb. 15, 2017) (affirming the denial of a temporary injunction in part because the material was "not labeled as confidential or proprietary.")

### d.    Mr. Rutkowski has not misappropriated any Par trade secrets, and Par and its expert border on committing fraud in their efforts to show otherwise.

Par's corporate witness Jason Crist admitted that Par did not know of any evidence showing that, putting aside Mr. Rutkowski, any of the former Par employees violated his or her confidentiality obligations to Par.[14] (Ex. 222, 188:10-

---

[14] Mr. Crist also testified that he knew Mr. Rutkowski to be an honest person. (Ex. 222, 13:18-21.) Moreover, the current CEO of Endo, who was previously the CEO of Par, heaped praise on Mr. Rutkowski at the time of his departure, stating "Very seldom, if ever, does a single person make such an impact to a facility. Mike, in your case, you made the facility so successful." (Ex. 328.)

21.) This fact alone destroys much of Par's case. That Par persists in pursuing the extraordinary relief of a preliminary injunction despite this glaring inadequacy in its claims highlights the reckless nature of its actions in this case.

With respect to Mr. Rutkowski, Par relies on its computer forensic expert Mr. Cooper to establish that Mr. Rutkowski misappropriated Par's trade secrets. (Par Br. 15-19.) As a preliminary matter, even if everything presented by Mr. Cooper is true (and it is most assuredly not, as explained below), Par has zero evidence that any Par documents put by Mr. Rutkowski on any external media or found to be in his possession was anything other than innocent. Acquisition of trade secret information alone is not enough to establish misappropriation; the acquisition must be by "improper means." *Dana,* 2013 U.S. Dist. LEXIS 116899 at *58. Mr. Rutkowski's unrebutted testimony establishes that to the extent he retained any of Par's confidential information, it was inadvertent and he does not need or want it. (Ex. 298, 149:22-150:25; Rutkowski Dec. ¶¶ 20-21.) *PrimePay*, 2015 U.S. Dist. LEXIS 65710 at *74 (finding no likelihood of success for misappropriation claim where inadvertently retained documents were of no value to former employee's new business and were never accessed).

In order to manufacture wrongdoing by Mr. Rutkowski, Par's forensic computer expert Scott Cooper submits a Declaration that borders on fraud.  Mr. Cooper first suggests that Mr. Rutkowski used "anti-forensic" measures such as

deleting large amounts of data, "disk defragmentation" and swapping out of hard drives before leaving Par.[15] (Dkt. 69-1 (hereafter, "Cooper Dec.") ¶¶ 48-57, 62-67.) However, even the most basic forensic investigation on the part of Mr. Cooper, including asking Par's IT department simple questions, would have shown that:

- Rutkowski's hard drive remained in use after he left,  thereby possibly contaminating all of Mr. Cooper's conclusions. (Ex. 426 (hereafter, "Wolfinger Dec.") ¶¶ 47-52.)

- 

Next Mr. Cooper suggests that Mr. Rutkowski improperly downloaded Par Confidential documents and data on both a "My Passport" drive and three thumb drives, and then accessed that information after he left Par. (Cooper Dec. ¶¶ 41-47.) First, with respect to the My Passport drive, Mr. Cooper identifies 38 allegedly confidential documents, but his own analysis proves that none of these documents were accessed after Mr. Rutkowski left Par. (Wolfinger Dec. ¶¶ 86-94.) With respect to the thumb drives, Mr. Cooper ignores two of them altogether, suggesting that he

---

[15] Mr. Cooper also implicates Mr. Subramaniam and Ms. Short in these activities. For the same reasons that Mr. Cooper's analysis is wrong with respect to Mr. Rutkowski, he is also wrong with respect to them. (Wolfinger Dec. ¶¶ 53-70, 98-103.)

found nothing helpful to Par in his analysis. (Wolfinger Dec. ¶¶ 95-97.) On the remaining drive, Mr. Cooper identified but a single document accessed after Mr. Rutkowski left Par. Mr. Cooper claims (without any evidence) that this document is a confidential Par document. That document is in fact not confidential at all – it was a presentation Mr. Rutkowski gave to college students. (Id.; Rutkowski Dec. ¶21d.)

Cooper also suggests that the evidence shows that Mr. Rutkowski destroyed or is hiding additional portable media. First, with respect to the Lenovo drive,[16] Mr. Wolfinger has conclusively shown that:

- The outer casing was never opened, so Mr. Rutkowski could not have opened the inner casing to damage the drive. (Wolfinger Dec. ¶¶ 104-107.)
- Damage to the inner casing was likely caused by Mr. Wolfinger's attempts to open the media for his own forensic analysis. (Id. ¶¶ 108-114.)
- There is absolutely no evidence of intentional damage to the drive. (Id. ¶¶ 115-120.)
- Cooper has no basis for suggesting that Confidential material was transferred onto the Lenovo drive. (Id. ¶ 120.)

Second, there is no forensic evidence to support that Mr. Rutkowski copied Confidential material onto any other "missing" devices. The only evidence is consistent with Mr. Rutkowski's testimony that he plugged some drives in to see

---

[16] After DriveSavers, a "neutral" third party, was asked to confirm that there was no recoverable data on the Lenovo hard drive, Par improperly had *ex parte* communications with the technician that did the work. Texts between this technician and Par's attorneys show that Mr. Cooper's conclusions are unfounded. (Wolfinger Dec. ¶ 108.)

what was on them and whether they worked, and upon finding that they did not, threw them out. (Id. ¶¶ 79-85.)

Finally, Par asserts that the ███████████ produced by QuVa during discovery is evidence that Mr. Rutkowski attempted to conceal his theft of confidential Par documents by damaging the media that he used to steal them. (Ex. 68; Par Br. 18-19.) Par says this document "raises more questions." (Par Br. at 19.) Nevertheless, Par did not ask Mr. Rutkowski *any* questions about this document during his deposition. If it had, it would have learned that the ███████████ was given to Mr. Rutkowski by Par employees as a parting gift during his final days at Par. (Rutkowski Dec. ¶ 18.)

### C.    Par Is Not Likely to Succeed on the Merits of Its Contract Claims.

As detailed in §III.B. above, Par has presented no evidence that Defendants misappropriated any trade secrets. For the same reasons, Defendants have not breached their confidentiality obligations, making success on this claim impossible. There is also no evidence that the Defendants breached their employee non-solicitation obligations. Importantly, Mr. Hinchen's and Mr. Jenkins' employee non-solicitation obligations expired, at the latest, on ***June 11, 2015*** (Exs. 5, 6 at ¶ 8.) Moreover, as detailed above, Mr. Hinchen and Mr. Jenkins were cognizant of their obligations and careful about complying with them through the restricted period. (Hinchen Dec. ¶¶ 7-8, 11-13, 17.)

With respect to Mr. Rutkowski, Par does not argue that he has breached his employee non-solicitation obligations, nor could it − there is no evidence in the record showing such a breach.[17] (Rutkowski Dec. ¶ 31.) The only evidence as it relates to Par employees during this ████████████████████████████████

████████████████████████████████████████████████████████████[18]

A review of these contacts and the evidence definitively shows that Mr. Hinchen and Mr. Jenkins never attempted to "solicit, hire, [or] induce" ███████████████████ "to either leave or terminate his or her employment, consulting or other position" with Par in contravention of these obligations. (Exs. 5, 6; ████████████████████ ████████████████

With respect to Ms. Kohut, the record shows that at no time did Mr. Hinchen or Mr. Jenkins ask or otherwise encourage her to stop consulting for Par. (Kohut Dec. ¶ 14.)  In fact, she continued consulting for Par through July 2015, and she did not join QuVa as an employee until the end of August 2015.  (Id. ¶ 15.)

---

[17] To the extent Par argues that Mr. Rutkowski's conduct *during* employment may constitute a breach of his employee non-solicitation obligations, Par is incorrect.  Mr. Rutkowski's obligations in this regard do not run during his employment, only for a period of time *after* the termination of his employment. (Ex. 15 ¶ 7; Ex. 308 ¶ 6.)

[18] Par argues that Mr. Hinchen and Mr. Jenkins improperly solicited Mr. Rutkowski during this timeframe too. However, there is no evidence that they had any contact with Mr. Rutkowski then and did not discuss employment with him until February-March 2017, almost two years after the expiration of the covenants. (Ex. 298, 48:11-49:4; Ex. 323, 180:9-17.)

Likewise, as discussed in § II.A. above, Mr. Hinchen's and Mr. Jenkins'



*Hibu, Inc. v. Peck*, 2017 U.S. Dist. LEXIS 189205, *17 (D. Kan. Nov. 15, 2017); *Riad v. 520 S. Mich. Ave. Assocs. Ltd.*, 2000 U.S. Dist. LEXIS 7646, *26-27 (N.D. Ill. May 22, 2000).

**D.    Par Will Not Suffer Any Irreparable Harm in the Absence of an Injunction.**

**1.    There would be no real, immediate or non-quantifiable harm to Par from the marketing of QuVa's products.**

With respect to irreparable harm, Par must demonstrate "a clear showing of immediate irreparable injury." *Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980). The harm must be one that "cannot be redressed by a legal or an equitable remedy following a trial" and a preliminary injunction is "the ***only*** way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (emphasis added). Mere "[r]isk of harm if information is inadvertently disclosed, however, is not sufficient to satisfy the standard…" and an injunction will not be issued merely to "restrain one from doing what he is not attempting and does not intend to do." *Cont'l Grp.*, 614 F.2d at 358-59.

Par will suffer no irreparable harm, let alone the harm that is required to satisfy this standard. Par's irreparable harm analysis begins with a flawed argument that irreparable harm is presumed as a matter of law. (Par Br. 30-32.) Such a presumption has been roundly rejected in this Circuit and others. *Bay State Lighting Co. v. Voight Lighting Indus.*, 1984 U.S. Dist. LEXIS 14894, *13 (D.N.J. July 17, 1984) (an "injunction is not automatic merely because a trade secret claim is alleged and ought

33

not be granted absent satisfaction of all the prerequisites for equitable relief").[19] As noted above, QuVa developed each of its sterile injectable products, including vasopressin, independently. Any injury to Par (and there is none) will be due solely to QuVa's competing product, ***not the use of trade secret information***. (Ex. 427, (hereafter, "Rao Dec.") ¶16.)

Further, monetary damages for lost sales of Par's product can be quantified using accepted economic techniques, as explained by QuVa's expert Dr. Mohan Rao. (Id. ¶¶ 7, 15, 18-25, 30.) Indeed, both experts agree that, in this two-player market, lost sales are calculated by subtracting 1) Par's actual sales from 2) the sales Par expected to make but for QuVa's entry into the market. (Id. ¶ 19; Dkt. 69-3 (hereafter, "Meyer Dec.") ¶ 15.) Par's expert Dr. Meyer admits the first factor will be known: "Actual sales of Vasostrict® and the profits from those sales will be able to be measured during the period for which QuVa's product is sold." (Meyer Dec. ¶ 16.) The second factor can be quantified from Par's own information (and projections from third-party analysts). (Rao Dec. ¶¶ 19-20.) Similarly, any price erosion for Vasostrict® can be quantified because price changes due to the QuVa

---

[19] *Norbrook Labs.*, the case Par cites for this proposition, has specifically been abrogated by the Second Circuit on this point. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118-119 (2d Cir. 2009) (holding that courts applying a presumption of harm are "not correct"). Thus, the Second Circuit and the Third Circuit are in accord that no such presumption exists.

product will be known and, if the QuVa product is later taken off the market, Par has demonstrated that it can raise the price of Vasostrict®. (Id. ¶¶ 26-28.)

Par also raises a number of highly speculative arguments that damages cannot be quantified because ███████████████████████████████████████████████ ███████████████████. (Par Br. at 32-33.) These alleged harms, based purely on speculation, pose no immediate threat. (Id. ¶¶ 31-41.) Moreover, other than Dr. Meyer's speculation, Par cites no proof that any QuVa product will affect Par's reputation. *See INDECS Corp. v. Claim Doc, LLC*, 2017 U.S. Dist. LEXIS 40952, *7-8 (D.N.J. Mar. 21, 2017) (holding plaintiffs did not meet burden to establish irreparable harm based on speculative, conclusory statements that plaintff's goodwill and reputation may be harmed in absence of injunction).

### 2.    Par cannot establish irreparable harm on the basis of continued misappropriation or hiring of Par employees.

Par alleges that irreparable harm would arise if Defendants 1) solicit Par employees to work at QuVa or 2) further misappropriate Par's trade secrets. (Par Br. 33-34.) With respect to solicitation of Par employees, the non-solicitation agreements signed by Mr. Hinchen and Mr. Jenkins have expired; thus, they are free to solicit Par employees. Regardless, QuVa is not currently soliciting any Par employees, so there is no immediate threat of harm to enjoin. *See Winter*, 555 U.S. at 22 (irreparable harm must be immediate). Moreover, there appears to have been zero harm done through QuVa's hiring of the employees at issue here – ███

███████████████████████████████   ███████████████

████████████████████. (See Exs. 363, 377.)

### 3.     Par cannot rely on "inevitable disclosure."

Par's final argument for irreparable harm is that former Par employees working on QuVa's sterile injectable products would inevitably disclose Par's trade secrets. (Par Br. at 35-36.) First, as noted above (see § II.B.), Defendants have testified that they have not and will not use Par's trade secrets and have confirmed that their job responsibilities at QuVa are entirely different from those at Par in view of the very different operations of the two companies. Moreover, prior to QuVa's nomination of vasopressin to the "Category 1" list, Par was not concerned that these employees were taking their generalized skill and knowledge to QuVa. As admitted by Par's corporate witness, Par knew at or about the time (and in some cases before) each of these employees' last day of employment that they were going to QuVa.  Par never expressed any concern at the time that this was occurring. (Ex. 222 at 272:13-23; 275:12-276:23; 280:23-282:23; 287:6-17; 291:18-292:5; 307:6-17; 309:3-11; 316:11-317:19.)

Second, Michigan and/or Texas law applies to this substantive issue, and those jurisdictions have not adopted a blanket rule applying the inevitable disclosure doctrine. *See PrimePay,* 2015 U.S. Dist. LEXIS 65710 at *81; *DGM Servs.*, 2016 Tex. App. LEXIS 13808 at *12-16. In contrast, for example, the MUTSA recognizes

"threatened misappropriation," which requires "more than a generalized claim that a departing employee possessed trade secrets and would of necessity disclose them in his new employment." *PrimePay*, 2015 U.S. Dist. LEXIS 65710 at *82. For threatened misappropriation, a party must provide evidence of duplicity in acquiring and misusing a trade secret. *Id*. Par has shown no such duplicity. Nor has it shown that QuVa targeted Par employees to get trade secret information. (Rao Dec. ¶ 29.)

### E.    The Equities Favor Not Enjoining QuVa.

By all appearances, Par originally brought this baseless case to protect its monopoly market for Vasostrict®. At the time, QuVa pointed out that Par's goal was to use the legal process to learn QuVa's launch date and other business plans regarding vasopressin, and possibly to later bring patent litigation against QuVa. (Ex. 349 at 2-3, 19-20.) QuVa's concerns were borne out during expedited discovery, when Par continually and repeatedly tried to learn QuVa's launch date and other facts regarding QuVa's business plan for vasopressin. (Ex. 218 at 145:14-146:15; Ex. 224 at 62:5-63:3, 127:10-131:15.) Par complains bitterly regarding redactions that were made to protect not only this sensitive business plan information about vasopressin, but also non-vasopressin products that were irrelevant to this case as filed, even stating that QuVa is concealing evidence.[20] (Par Br. 20.) Thus, any

---

[20] Par's baseless addition to the scope of its injunction request of other products that compete with Par is further evidence of its improper motives.

balancing of equities by the court should take Par's irresponsible litigations tactics into account. *Hynix Semiconductor Inc. v. Rambus Inc.,* 609 F. Supp. 2d 951, 985 (N.D. Cal. 2009) (plaintiff's bad faith motives for seeking an injunction may be taken into account in balancing the hardships.)

Par seeks an open-ended injunction prohibiting QuVa from selling "aseptic products that directly compete with Par." (Par Br. at 37.) This overbroad request covers six QuVa products, which together account for ██████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

With respect to Par employees, QuVa asks for an injunction to prohibit QuVa from further soliciting Par employees. (Par Br. at 37-38.) Such an injunction harms QuVa's ability to freely hire candidates of its choosing and is not warranted because: 1) Mr. Hinchen's and Mr. Jenkins' non-solicitation restrictions have expired; and 2) there is no evidence that Mr. Rutkowski has or will violate his non-solicitation restrictions. There is nothing left to enjoin. *See The Cmty. Hosp. Grp., Inc. v. More*,

869 A.2d 884, 900 (N.J. 2005) ("Because the two-year period for the restrictive covenant has expired, JFK's request for injunctive relief is moot.").

Par's proposed injunction also is not limited in temporal scope. Par seeks an injunction for the entirety of this litigation, which could take years to resolve. However, any potential harm to Par from the use of Par information (which QuVa denies) would have a much shorter impact in time. For example, QuVa's expert Mr. Patterson notes that an APS plan could be developed from scratch in 40-60 hours. (Patterson Dec. ¶ 13.) Thus, this timeframe, not the conclusion of the case, should establish the outer boundary for any possible injunction. *See SI Handling Sys. v. Heisley*, 753 F.2d 1244, 1266 (3d Cir. 1985) (endorsing injunction lasting only as long as necessary to negate the "lead time" gained from using the trade secret).

In the unlikely event the Court finds a preliminary injunction is warranted, QuVa requests that the Court order Par to post a bond and order briefing as to the appropriate amount of such bond. *Frank's GMC Truck Ctr. Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988).

### F.    An Injunction is Not in the Public Interest.

"[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of [an] injunction." *Winter*, 555 U.S. at 24. Here, the public interest is served by allowing QuVa to continue its business of providing compounded products on the "Category 1" list. By the FDA's own

definition, there is a "clinical need" for these products. (Ex. 408 at 2.)

Par's true motive in bringing this case and seeking a preliminary injunction is to protect its Vasostrict® monopoly and retain its sky-high profits at the expense of the public. When Par became the sole supplier of vasopressin, Par raised the price from approximately $5 per vial to approximately $125-$182 per vial. (Rao Dec. ¶ 27.) QuVa's product would necessarily affect the market by lowering the price of vasopressin, which benefits the public's interest in access to affordable health care. (Meyer Dec. ¶ 16.)

Finally, the public interest does not favor entering an injunction restricting the ability of employees to seek employment wherever they choose. While innovation and investment are undoubtedly important, as Par argues, these interests will not be fostered by an injunction that restricts fair trade and competition. *Fazio v. Temp. Excellence, Inc.*, 2006 WL 2587625, at *3 (N.J. Super. Ct. Ch. Div. Sept. 8, 2006).

## IV.   CONCLUSION

For the reasons stated herein and in the accompanying Declarations, Defendants request that the Court deny Par's Motion for a Preliminary Injunction.

Dated: December 8, 2017              *s/ Stephen M. Orlofsky*

Stephen M. Orlofsky
David C. Kistler
Leigh Ann Buziak
**BLANK ROME LLP**
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540

Telephone: (609) 750-7700

Jeffrey S. Ward (*pro hac vice*)
Wendy M. Ward (*pro hac vice*)
Stephen R. Howe (*pro hac vice*)
**MERCHANT & GOULD, P.C.**
10 East Doty Street, Suite 600
Madison, WI 53703
Telephone (608) 280-6750

*Attorneys for Defendants*