**BLANK ROME LLP**
*A Pennsylvania LLP*
Stephen M. Orlofsky, Esquire
David C. Kistler, Esquire
New Jersey Resident Partners
Leigh Ann Buziak, Esquire
300 Carnegie Center, Suite 220
Princeton, NJ 08540
Telephone: (609) 750-7700
Facsimile: (609) 750-7701
Orlofsky@blankrome.com
Kistler@blankrome.com
LBuziak@blankrome.com
*Attorneys for Defendants*

**MERCHANT & GOULD P.C.**
Jeffrey S. Ward (*admitted pro hac vice*)
Wendy M. Ward (*admitted pro hac vice*)
Stephen R. Howe (*admitted pro hac vice*)
Emily Wessels (*admitted pro hac vice*)
10 E. Doty Street, Suite 600
Madison, WI 53703
Telephone: (608) 280-6751
Facsimile: (612) 332-9081
JWard@MerchantGould.com
WWard@MerchantGould.com
SHowe@MerchantGould.com
EWessels@MerchantGould.com
*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAR PHARMACEUTICAL, INC. and PAR STERILE PRODUCTS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>QUVA PHARMA, INC., STUART HINCHEN, PETER JENKINS, MIKE RUTKOWSKI, DONNA KOHUT, TRAVIS MCGRADY, DAVID HARTLEY, and DAVID SHORT,<br><br>Defendants. | Civil Action No. 3:17-06115-BRM-DEA<br><br>*Filed Electronically*<br><br>Return Date: April 16, 2018<br><br>**DEFENDANT QUVA PHARMA, INC.'S NOTICE OF MOTION TO SET REQUIRED BOUND AMOUNT** |

TO:  Lawrence S. Lustberg, Esquire
     Gibbons, P.C.
     One Gateway Center
     Newark, NJ 07102-5310
     *Attorneys for Plaintiffs*

**PLEASE TAKE NOTICE** that on April 16, 2018, or as soon thereafter as counsel may be heard, the undersigned attorneys for Defendant QuVa Pharma, Inc. shall move before the Honorable Brian R. Martinotti, U.S.D.J., United States District Court, District of New Jersey, Trenton Vicinage, for an Order requiring the posting of a bond amount in connection with the Court's preliminary injunction order, pursuant to Fed. R. Civ. P. 65(c).

**PLEASE TAKE FURTHER NOTICE** that in support of the motion, Defendant will rely upon the accompanying Memorandum of Law and proposed form of Order.

Dated: March 23, 2018

_s/Stephen M. Orlofsky_

Stephen M. Orlofsky
David C. Kistler
New Jersey Resident Partners
Leigh Ann Buziak
**BLANK ROME LLP**
300 Carnegie Center, Suite 220
Princeton, NJ 08540
Telephone: (609) 750-7700
Facsimile:  (609) 750-7701
Orlofsky@BlankRome.com
Kistler@BlankRome.com
LBuziak@BlankRome.com

Jeffrey S. Ward (*pro hac vice*)
Wendy M. Ward (*pro hac vice*)
Stephen R. Howe (*pro hac vice*)
Emily M. Wessels *(pro hac vice)*
**MERCHANT & GOULD, P.C.**
10 East Doty Street, Suite 600
Madison, WI 53703
Telephone (608) 280-6750
*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this date, I caused a copy of the foregoing Notice of Motion to Set Required Bond Amount, with accompanying Memorandum of Law in support thereof, and proposed form of Order, to be served upon all counsel of record via the Court's ECF system.

Dated: March 23, 2018
*s/Stephen M. Orlofsky*
Stephen M. Orlofsky

**BLANK ROME LLP**
*A Pennsylvania LLP*
Stephen M. Orlofsky, Esquire
David C. Kistler, Esquire
New Jersey Resident Partners
Leigh Ann Buziak, Esquire
300 Carnegie Center, Suite 220
Princeton, NJ 08540
Telephone: (609) 750-7700
Facsimile: (609) 750-7701
Orlofsky@blankrome.com
Kistler@blankrome.com
LBuziak@blankrome.com
*Attorneys for Defendants*

**MERCHANT & GOULD P.C.**
Jeffrey S. Ward (*admitted pro hac vice*)
Wendy M. Ward (*admitted pro hac vice*)
Stephen R. Howe (*admitted pro hac vice*)
Emily Wessels (*admitted pro hac vice*)
10 E. Doty Street, Suite 600
Madison, WI  53703
Telephone:  (608) 280-6751
Facsimile:  (612) 332-9081
JWard@MerchantGould.com
WWard@MerchantGould.com
SHowe@MerchantGould.com
EWessels@MerchantGould.com
*Attorneys for Defendants*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAR PHARMACEUTICAL, INC. and PAR STERILE PRODUCTS, LLC,<br><br>                                        Plaintiffs,<br><br>v.<br><br>QUVA PHARMA, INC., STUART HINCHEN, PETER JENKINS, MIKE RUTKOWSKI, DONNA KOHUT, TRAVIS MCGRADY, DAVID HARTLEY, and DAVID SHORT,<br><br>                                        Defendants. | Civil Action No.<br>3:17-06115-BRM-DEA<br><br>***Filed Electronically***<br><br><br>__**HIGHLY CONFIDENTIAL**__ |

### DEFENDANT QUVA PHARMA INC.'S MEMORANDUM
### OF LAW IN SUPPORT OF REQUIRED BOND AMOUNT

# TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................1

II.  STATEMENT OF FACTS ....................................................................................1

III. ARGUMENT .........................................................................................................2

   A. Applicable Legal Standards ..............................................................................2

   B. The Bond Should be Set at $100 Million to Protect QuVa from Irreparable
   Injury. .....................................................................................................................3

      1.   QuVa's Requested Bond Amount is Supported by Expert Projections
           of Lost Profits During the Injunction Period. ......................................3

      2.   QuVa's Requested Bond Amount is Supported Par's Arguments
           Regarding Its Entitlement to an Injunction. ........................................6

IV.  CONCLUSION .....................................................................................................8

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alexander v. Primerica Holdings, Inc.*,
  811 F. Supp. 1025 (D.N.J. 1993) .................................................................3

*Hoxworth v. Blinder, Robinson & Co.*,
  903 F.2d 186 (3d Cir. 1990) ...................................................................3

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
  882 F.2d 797 (3d Cir. 1989) .................................................................2, 3

*Mead Johnson & Co. v. Abbott Labs.*,
  201 F.3d 883 (7th Cir. 2000) ...................................................................3

*Research Found. of State Univ. of N.Y. v. Mylan Pharms., Inc.*,
  723 F. Supp. 2d 638 (D. Del. 2010)......................................................7

*Sanofi-Synthelabo v. Apotex, Inc.*,
  488 F. Supp. 2d 317 (S.D.N.Y. 2006) ..................................................3

**Rules**

Fed. R. Civ. P. 65(c)...............................................................................2, 3

## I.     INTRODUCTION

Defendant QuVa Pharma, Inc. ("QuVa") requests that the Court order Plaintiffs Par Pharmaceutical, Inc. and Par Sterile Products, LLC (collectively, "Par") to post **a security bond of $102 million** before the Court's Preliminary Injunction Order (Dkt. 158, hereafter "the Order") becomes effective.

There is no dispute that a bond should be posted. Nor can there be any dispute that the bond amount should be substantial. Indeed, when seeking the preliminary injunction, Par argued it would suffer "substantial economic harm" due to the sales of the QuVa vasopressin product. QuVa's damages if it is wrongfully enjoined are merely the other side of that same coin, and QuVa's only remedy for recovering its lost profits if the preliminary injunction turns out to be improper is the amount of the bond. For this reason, courts have noted that they "should *err on the high side*" in setting the bond amount. That reasoning is applicable here, and the required bond should be set at $102 million.

## II.    STATEMENT OF FACTS

On November 17, 2017, Par filed its motion for a preliminary injunction. (Dkt. 69.) After briefing by the parties, the Court held a preliminary injunction hearing on February 14, 2018. (Dkt. 144.) At the conclusion of the hearing, the Court solicited supplemental briefing from the parties, which was filed on February 16, 2017. (Dkt. 152-153.)

On March 1, 2018, the Court issued the Order granting in part the preliminary injunction sought by Par. (Dkt. 158.) The Order enjoined all Defendants from marketing and releasing a vasopressin product through the conclusion of trial. (Id.) The Order did not, however, require Par to post a security bond in accordance with Fed. R. Civ. P. 65(c). Therefore, in order to facilitate a complete record and to preserve all deadlines associated with filing an appeal, QuVa asked the Court to temporarily vacate the Order. (Dkt. 159.) The Court agreed and issued an Order on March 12, 2018, vacating the Order until such time as the Court can determine an appropriate security bond and Par posts that bond. (Dkt. 169.)

## III.   ARGUMENT

### A.   Applicable Legal Standards

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Federal Rules require a bond with a preliminary injunction because "[a]n incorrect interlocutory order may harm defendant and a bond provides a fund to use to compensate incorrectly enjoined defendants." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 804 (3d Cir. 1989). "[A]bsent circumstances where there is no risk of monetary loss to the defendant, the failure of a district court to require

a successful applicant to post a bond constitutes reversible error." *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 210 (3d Cir. 1990) (citation omitted).

"The amount of a bond is within the discretion of the court." *Alexander v. Primerica Holdings, Inc.*, 811 F. Supp. 1025, 1038 (D.N.J. 1993) (citations omitted). "In keeping with the policies of reimbursement and protection which underlie the bond requirement, Rule 65(c) also provides that the bond is 'for the payment of *costs* and *damages* as may be incurred or suffered' by party wrongfully restrained.'" *Id.* (citing *Hoxworth*, 903 F.2d at 210-11; *Instant Air*, 882 F.2d at 804) (emphasis in original). "When setting the amount of security, district courts should *err on the high side*." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000) (emphasis added). "Unfortunately, an error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Id.*

## B.   The Bond Should be Set at $102 Million to Protect QuVa from Irreparable Injury.

### 1.   QuVa's Requested Bond Amount is Supported by Expert Projections of Lost Profits During the Injunction Period.

As noted above, QuVa requests that Par post a bond of $102 million. This bond amount protects QuVa against potential lost profits, lost market share and other costs that may arise if it is later determined that the preliminary injunction was improper. *See Sanofi-Synthelabo v. Apotex, Inc.*, 488 F. Supp. 2d 317, 349 (S.D.N.Y.

2006) (requiring a $400 million bond to protect Apotex against "potential lost profits, lost market share and associated costs of relaunch[ing]" the 

In order to determine the projected lost profits, Dr. Rao first assessed the size of the vasopressin market by analyzing six years of data showing the demand to be stable. (Rao Dec. at ¶ 6, Tab 2.) He then confirmed with QuVa that no additional entrants (beyond Par and QuVa) are expected in the vasopressin market until 2020 – after trial should be completed. (Id. at ¶ 2; Declaration of Peter Jenkins, Ex. 2 (hereafter, "Jenkins Dec.") at ¶ 10.)

---

[1] QuVa reserves the right to later request an increased bond if it turns out the conclusion of trial will be later than October 2019.

[2] Unless otherwise noted, references to "Ex. __" refer to exhibits attached to the Declaration of Stephen M. Orlofsky in Support of Defendant QuVa Pharma Inc.'s Motion to Set Required Bond Amount. The exception is Exhibit A to the Declaration of Peter Jenkins, which is attached to the Jenkins declaration.



**2.**

---

[3] This Declaration was submitted previously as Ex. 425 in connection with QuVa's preliminary injunction briefing.



(Id. at ¶ 13.) In addition, Dr. Meyer relied upon a third party UBS analyst report that projected an even greater loss in annual sales of Par's vasopressin product – $260 million per year – if a competitor vasopressin product entered the market. (Id.)

This analysis by Par and third party analysts is consistent with the conclusions reached by Dr. Rao concerning the profits that QuVa expects to lose during the period in which sales of QuVa's vasopressin products are enjoined. (Rao Dec. at ¶ 12.) Indeed, in an analogous case, the District of Delaware relied upon evidence of a Plaintiff's profits in determining the proper amount of a bond. *See Research Found. of State Univ. of N.Y. v. Mylan Pharms., Inc.*, 723 F. Supp. 2d 638, 664 (D. Del. 2010) (requiring a $26 million bond where "[b]etween July 2010, just after entry of the preliminary injunction and February 2011, which Mylan identifies as a

---

[4] This Declaration was submitted previously as Dkt. 69-3 in connection with Par's preliminary injunction briefing.

reasonable estimation of the date judgment will be entered, Plaintiffs expect to make profits of approximately $26 million on sales of Oracea®.").

## IV.   CONCLUSION

For the foregoing reasons, QuVa requests that the Court order Par to post a bond in the amount of $102 million within ten business days of the ruling on this motion.

Dated: March 23, 2018

*s/Stephen M. Orlofsky*
Stephen M. Orlofsky
David C. Kistler
New Jersey Resident Partners
Leigh Ann Buziak
**BLANK ROME LLP**
300 Carnegie Center, Suite 220
Princeton, NJ 08540
Telephone: (609) 750-7700
Facsimile:  (609) 750-7701
Orlofsky@BlankRome.com
Kistler@BlankRome.com
LBuziak@BlankRome.com

Jeffrey S. Ward (*pro hac vice*)
Wendy M. Ward (*pro hac vice*)
Stephen R. Howe (*pro hac vice*)
Emily M. Wessels *(pro hac vice)*
**MERCHANT & GOULD, P.C.**
10 East Doty Street, Suite 600
Madison, WI 53703
Telephone (608) 280-6750
*Attorneys for Defendants*

**BLANK ROME LLP**
*A Pennsylvania LLP*
Stephen M. Orlofsky, Esquire
David C. Kistler, Esquire
New Jersey Resident Partners
Leigh Ann Buziak, Esquire
300 Carnegie Center, Suite 220
Princeton, NJ 08540
Telephone: (609) 750-7700
Facsimile: (609) 750-7701
Orlofsky@blankrome.com
Kistler@blankrome.com
LBuziak@blankrome.com
*Attorneys for Defendants*

**MERCHANT & GOULD P.C.**
Jeffrey S. Ward (*admitted pro hac vice*)
Wendy M. Ward (*admitted pro hac vice*)
Stephen R. Howe (*admitted pro hac vice*)
Emily Wessels (*admitted pro hac vice*)
10 E. Doty Street, Suite 600
Madison, WI 53703
Telephone: (608) 280-6751
Facsimile: (612) 332-9081
JWard@MerchantGould.com
WWard@MerchantGould.com
SHowe@MerchantGould.com
EWessels@MerchantGould.com
*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAR PHARMACEUTICAL, INC. and PAR STERILE PRODUCTS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> QUVA PHARMA, INC., STUART HINCHEN, PETER JENKINS, MIKE RUTKOWSKI, DONNA KOHUT, TRAVIS MCGRADY, DAVID HARTLEY, and DAVID SHORT, <br><br> Defendants. | Civil Action No. 3:17-06115-BRM-DEA <br><br> *Filed Electronically* <br><br> **HIGHLY CONFIDENTIAL** |

# DECLARATION OF STEPHEN M. ORLOFSKY IN SUPPORT OF DEFENDANT QUVA PHARMA, INC.'S MOTION TO SET REQUIRED BOND AMOUNT

I, Stephen M. Orlofsky, of full age, hereby declare as follows:

1.      I am an attorney-at-law and a partner with the law firm of Blank Rome LLP, 300 Carnegie Center, Suite 220, Princeton, New Jersey 08540, attorneys for Defendants.   I made this declaration on personal knowledge and in support of Defendant QuVa Pharma, Inc.'s Motion to Set Required Bond Amount.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the Declaration of Mohan Rao, Ph.D. in Support of QuVa's Motion to Set Required Bond Amount.

3.      Attached hereto as Exhibit 2 is a true and correct copy of the Declaration of Peter Jenkins in Support of QuVa's Motion to Set Required Bond Amount.

4.      Attached hereto as Exhibit 3 is a true and correct copy of the Declaration of Dr. Rodolfo Pinal in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, dated December 7, 2017.

5.      Attached hereto as Exhibit 4 is a true and correct copy of the Declaration of Dr. Christine S. Meyer in Support of Plaintiffs' Motion for Preliminary Injunction, dated November 17, 2017.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 23, 2018                    *s/Stephen M. Orlofsky*
                                          Stephen M. Orlofsky

Exhibit 1

**BLANK ROME LLP**
*A Pennsylvania LLP*
Stephen M. Orlofsky, Esquire
David C. Kistler, Esquire
New Jersey Resident Partners
Leigh Ann Buziak, Esquire
300 Carnegie Center, Suite 220
Princeton, NJ 08540
Telephone: (609) 750-7700
Facsimile: (609) 750-7701
Orlofsky@blankrome.com
Kistler@blankrome.com
LBuziak@blankrome.com
*Attorneys for Defendants*

**MERCHANT & GOULD P.C.**
Jeffrey S. Ward (*admitted pro hac vice*)
Wendy M. Ward (*admitted pro hac vice*)
Stephen R. Howe (*admitted pro hac vice*)
Emily M. Wessels (*admitted pro hac vice*)
10 E. Doty Street, Suite 600
Madison, WI 53703
Telephone: (608) 280-6751
Facsimile: (612) 332-9081
JWard@MerchantGould.com
WWard@MerchantGould.com
SHowe@MerchantGould.com
EWessels@MerchantGould.com
*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., and PAR STERILE PRODUCTS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>QUVA PHARMA, INC., STUART HINCHEN, PETER JENKINS, and MIKE RUTKOWKSI,<br><br>Defendants. | Civil Action No. 3:17-cv-06115-BRM-DEA<br><br>***Filed Electronically***<br><br><u>**HIGHLY CONFIDENTIAL**</u> |

## DECLARATION OF MOHAN RAO, PH.D., IN SUPPORT OF QUVA'S MOTION TO SET REQUIRED BOND AMOUNT

# I   INTRODUCTION

**1.** I am an economist and Managing Director at Epsilon Economics. I submitted a Declaration on December 7, 2017. On March 1, 2018, QuVa was enjoined from marketing and releasing its vasopressin product until the conclusion of a trial in this matter.[1] I have been asked by counsel for QuVa to provide a calculation based on certain assumptions provided to me by QuVa. I understand that QuVa intends to use the calculation as a measure of the profits it would have made had it not been enjoined in this matter.

# II   INPUTS

**2.** I was asked to make the following assumptions:

- The market for vasopressin is stable and not expected to grow or decline.

- QuVa would have launched a bagged vasopressin product on May 1, 2018.

- QuVa would price its vasopressin product at $98.00 per 20 pressor units at launch (an approximately 30 percent discount to the net price of Par's Vasostrict®) and would hold that price through late 2019.

- Par would maintain its price of Vasostrict® at $137 per 20 pressor units of vasopressin through late 2019.

---

[1]Opinion, March 1, 2018, page 26.

- QuVa would obtain a 10 percent share of vasopressin sales at launch, growing to 30 percent over time.

- QuVa's average incremental cost to manufacture 20 pressor units of vasopressin is $6.13.

- Besides QuVa and Par, no other manufacturer of vasopressin product will be on the market between now and late 2019.

**3.** I have been asked by counsel to assume that the trial in this matter will be concluded in October 2019.

**4.** The result of the calculation I was asked to perform is $102.6 million, which I understand represents QuVa's potential damages between May 2018 and December 2019.

**5.** I describe my calculation below.

## III   CALCULATION

**6.** I estimated expected vasopressin sales for May 2018 through late 2019 based on historical sales of vasopressin between January 2012 and January 2018.[2] I was provided historical sales data from IMS Health's National Sales Perspectives (NSP) database that captures vasopressin sales made

---

[2]In order to estimate vasopressin sales, I used a statistical tool called regression analysis. Specifically, I estimated a statistical model that allows me to project vasopressin sales, while controlling for historical vasopressin sales levels, variations in sales levels due to seasonality, and the fact that the vasopressin market is stable over time. Regression analysis is commonly used and well accepted by economists. Jeffrey M. Wooldridge, "The Simple Regression Model," INTRODUCTORY ECONOMETRICS: A MODERN APPROACH, 2nd Edition, (Mason, OH: Thomson South-Western, 2003), pages 22-67C. Prior to conducting

in non-federal hospitals.[3]  This results in estimated sales of vasopressin of 2.68 million in 2018 and 2.68 million in 2019 (see Tab 2).

**7.**  Next, I calculate QuVa's share of the vasopressin market (which I was asked to assume would be 10 percent at launch and would take three months to reach 30 percent in steady state).

**8.**  I calculated QuVa's expected lost 20 pressor unit sales of vasopressin by taking the difference between what it would have made had it launched in May 2018 and a delayed launch upon the conclusion of the trial in October 2019.  This results in expected lost sales of 1.12 million 20 pressor units (see Tab 3).

**9.**  Next, I calculated QuVa's expected lost revenues by applying the pricing assumptions I was asked to make to the calculation of expected lost unit sales from the previous step.  As I discussed earlier, I was asked to assume that upon launch, QuVa would price its product at $98.00 per 20 pressor units of vasopressin (an approximately 30 percent discount to Par's Vasostrict®).

---

any analyses, I standardized all unit sales to 20 pressor units, which is the amount of vasopressin in one single-use vial of Vasostrict®. "New Zealand Data Sheet: Pitressin®," Link Pharmaceuticals Ltd, May 30, 2014; Vasostrict® Label (2016).

[3]IMS NSP data are collected directly from manufacturer reporting and from warehouse invoice data. See "Appropriate Use of IMS Information: Financial Community Presentation," IMS, November 12, 2009, page 8. These IMS data are consistent with data collected by Symphony Health in its Integrated Pharmaceutical Audit Suite (Exhibit 374) cited in my December 2017 Declaration, Tab 3. As expected, the provided IMS data, which is limited to non-federal hospitals, shows less vasopressin sales than the Symphony data, which covers all hospitals, clinics and other non-retail channels. See "PHAST™: Pharmaceutical Audit Suite," Symphony Health Solutions; "IDV® (Integrated Dataverse)," Symphony Health Solutions, 2015. For the purposes of this calculation, I was asked to rely on the provided IMS data.

Confidential                                                                5

**10.**  I understand that QuVa's incremental cost per 20 pressor units is
$6.13.  I understand that these incremental costs include labor, bags, active
and inactive ingredients, product testing, and distribution.  If one subtracts
the incremental cost per 20 pressor units of $6.13 from the price per 20
pressor units of $98.00, the expected profit per 20 pressor units is $91.87
(see Tab 4).[4]

**11.**  Applying the calculated profit per 20 pressor units of $91.87 to
expected lost 20 pressor units sales of 1.12 million results in expected lost
profits of $102.6 million between May 2018 and December 2019.

**12.**  I note that some of the positions taken by Par's economist Dr. Chris-
tine Meyer in support of Par's motion for the preliminary injunction are
consistent with my calculation that QuVa expects to lose significant profits
if it is enjoined from selling vasopressin products through October 2019.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

[5]Declaration of Dr. Christine Meyer, November 17, 2017, paragraph 5.
[6]Declaration of Dr. Christine Meyer, November 17, 2017, paragraph 17.

██████████████████████████████████ In addition, Dr. Meyer relied upon a third party UBS analyst report that projected a loss in sales of Par's vasopressin product of $260 million in the first year that a generic vasopressin product entered the market.[8] Dr. Meyer also concluded that QuVa may enter the market at a lower price point than Par.[9] While the generic drug market is not entirely the same as the market for compounded products, all of these conclusions by Dr. Meyer are consistent with my calculation above regarding QuVa's potential lost profits if enjoined from the sale of vasopressin products.

_____

Mohan Rao, Ph.D.

March 23, 2018

_____

[7]Declaration of Dr. Christine Meyer, November 17, 2017, paragraph 13; "Vasostrict — Key Revenue Metrics" (Exhibit 363).

[8]Declaration of Dr. Christine Meyer, November 17, 2017, paragraph 13; "Endo International: Another Solid Quarter in a Tough Environment," UBS, November 9, 2017.

[9]Declaration of Dr. Christine Meyer, November 17, 2017, paragraph 13.

# Tab 1

# List of Materials Considered

*Pleadings and Legal Documents*

1. Opinion, March 1, 2018.

*Declarations*

1. Declaration of Dr. Christine Meyer, November 17, 2017.

2. Declaration of Peter Jenkins in Support of QuVa's Motion to Set Required Bond Amount, March 23, 2018.

*Depositions*

1. Deposition of Jason Crist, Head of Quality Control at Par, November 3, 2017 (Exhibit 222).

*Financial Information*

1. Endo International plc's 10-K for fiscal year ended December 31, 2015 (Exhibit 365).

2. Endo International plc's 10-Q for quarterly period ended September 30, 2017 (Exhibit 367).

*Websites*

1. <www.americanregent.com> (Exhibit 378).

*Data*

1. IMS NSP Data for Non-federal Hospital Vasopressin Sales (February 2012 — January 2018).

2. Symphony Health Integrated Pharmaceutical Audit Suite (Exhibit 381).

3. Truven Health Analytics Red Book (Exhibit 382).

*Interviews*

1. Interviews with Peter Jenkins, Chief Development Officer at QuVa.

*Books, Articles, and Other Information*

1. "Appropriate Use of IMS Information: Financial Community Presentation," IMS, November 12, 2009.

2. "IDV® (Integrated Dataverse)," Symphony Health Solutions, 2015.

3. Jeffrey M. Wooldridge, "The Simple Regression Model," INTRODUCTORY ECONOMETRICS: A MODERN APPROACH, 2nd Edition, (Mason, OH: Thomson South-Western, 2003).

4. "New Zealand Data Sheet: Pitressin®," Link Pharmaceuticals Ltd, May 30, 2014.

5. "PHAST™: Pharmaceutical Audit Suite," Symphony Health Solutions.

6. Vasostrict® Label (2016).

***Bates Stamped Documents***

1. "Endo International: Another Solid Quarter in a Tough Environment," UBS, November 9, 2017.

2. "U.S. Generic Segment: Product P&L (Alphabetized)," October 2017, Par-0040157.

3. "Vasostrict — Key Revenue Metrics" (Exhibit 363).

4. "Vasostrict Sales/COGS/Margin by qtr Q4 2014-Q3 2017" (Exhibit 377).

# Tab 2



**Vasopressin Doses**

**Notes and Sources:** One dose of vasopressin is standardized as 20 pressor units. Historical vasopressin doses from IMS NSP Data for non-federal hospitals. Calculated as the sum of all vasopressin eaches, across all manufacturers. Eaches associated with 10mL products are multiplied by 10. Eaches associated with 0.5mL products are multiplied by 0.5.
Forecast created using proc forecast in SAS, method = winters and trend =1.



# Vasopressin Doses

**Expected Unit Sales**

| Year | Doses |
|------|-------|
| 2012 | 2,973,827 |
| 2013 | 2,955,740 |
| 2014 | 2,845,904 |
| 2015 | 2,242,844 |
| 2016 | 2,402,003 |
| 2017 | 2,500,787 |
| 2018 | 2,681,212 |
| 2019 | 2,675,453 |

**Notes and Sources:** One dose of vasopressin is standardized as 20 pressor units. Historical vasopressin doses from IMS NSP Data for non-federal hospitals. Calculated as the sum of all vasopressin eaches, across all manufacturers. Eaches associated with 10mL products are multiplied by 10. Eaches associated with 0.5mL products are multiplied by 0.5.
2018 contains 1 month (January 2018) of actual unit sales, and 11 months of forecasted sales.

Tab 3



**Notes and Sources:** Vasopressin doses (see Tab 2) times QuVa's forecasted market share (see Declaration of Peter Jenkins, March 23, 2018).

Tab 3

Tab 4

# QuVa's Expected Lost Profits

| Event | Date | Vasopressin Doses | QuVa Market Share | | QuVa Doses | | | QuVa Price | | QuVa Revenue | | | QuVa Costs | QuVa Profits | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Expected | Delay | Expected | Delay | Loss | Expected | Delay | Expected | Delay | Loss | | Expected | Delay | Loss |
| [A] | [B] | [C] | [D] | [E] | [F]=[C]*[D] | [G]=[C]*[E] | [H]=[F]-[G] | [I] | [J] | [K]=[F]*[I] | [L]=[G]*[J] | [M]=[K]-[L] | [N] | [O]=[F]*([I]-[N]) | [P]=[G]*([J]-[N]) | [Q]=[O]-[P] |
| Expected Launch | May-18 | 201,453 | 10% | | 20,145 | | 20,145 | $98.00 | | $1,974,319 | | $1,974,319 | $6.13 | $1,850,752 | | $1,850,752 |
| | Jun-18 | 270,293 | 17% | | 45,049 | | 45,049 | $98.00 | | $4,414,963 | | $4,414,963 | $6.13 | $4,138,642 | | $4,138,642 |
| | Jul-18 | 194,131 | 23% | | 45,297 | | 45,297 | $98.00 | | $4,439,306 | | $4,439,306 | $6.13 | $4,161,462 | | $4,161,462 |
| | Aug-18 | 188,162 | 30% | | 56,449 | | 56,449 | $98.00 | | $5,532,191 | | $5,532,191 | $6.13 | $5,185,946 | | $5,185,946 |
| | Sep-18 | 223,075 | 30% | | 66,922 | | 66,922 | $98.00 | | $6,558,663 | | $6,558,663 | $6.13 | $6,148,175 | | $6,148,175 |
| | Oct-18 | 192,078 | 30% | | 57,624 | | 57,624 | $98.00 | | $5,647,338 | | $5,647,338 | $6.13 | $5,293,886 | | $5,293,886 |
| | Nov-18 | 189,453 | 30% | | 56,836 | | 56,836 | $98.00 | | $5,570,160 | | $5,570,160 | $6.13 | $5,221,539 | | $5,221,539 |
| | Dec-18 | 244,049 | 30% | | 73,215 | | 73,215 | $98.00 | | $7,175,324 | | $7,175,324 | $6.13 | $6,726,240 | | $6,726,240 |
| | Jan-19 | 214,060 | 30% | | 64,218 | | 64,218 | $98.00 | | $6,293,619 | | $6,293,619 | $6.13 | $5,899,719 | | $5,899,719 |
| | Feb-19 | 245,087 | 30% | | 73,526 | | 73,526 | $98.00 | | $7,205,841 | | $7,205,841 | $6.13 | $6,754,847 | | $6,754,847 |
| | Mar-19 | 295,882 | 30% | | 88,765 | | 88,765 | $98.00 | | $8,699,288 | | $8,699,288 | $6.13 | $8,154,824 | | $8,154,824 |
| | Apr-19 | 217,731 | 30% | | 65,319 | | 65,319 | $98.00 | | $6,401,539 | | $6,401,539 | $6.13 | $6,000,884 | | $6,000,884 |
| | May-19 | 201,453 | 30% | | 60,436 | | 60,436 | $98.00 | | $5,922,958 | | $5,922,958 | $6.13 | $5,552,256 | | $5,552,256 |
| | Jun-19 | 270,293 | 30% | | 81,088 | | 81,088 | $98.00 | | $7,946,933 | | $7,946,933 | $6.13 | $7,449,556 | | $7,449,556 |
| | Jul-19 | 194,131 | 30% | | 58,239 | | 58,239 | $98.00 | | $5,707,679 | | $5,707,679 | $6.13 | $5,350,451 | | $5,350,451 |
| | Aug-19 | 188,162 | 30% | | 56,449 | | 56,449 | $98.00 | | $5,532,191 | | $5,532,191 | $6.13 | $5,185,946 | | $5,185,946 |
| | Sep-19 | 223,075 | 30% | | 66,922 | | 66,922 | $98.00 | | $6,558,663 | | $6,558,663 | $6.13 | $6,148,175 | | $6,148,175 |
| Delayed Launch | Oct-19 | 192,078 | 30% | 10% | 57,624 | 19,208 | 38,416 | $98.00 | $98.00 | $5,647,338 | $1,882,446 | $3,764,892 | $6.13 | $5,293,886 | $1,764,629 | $3,529,258 |
| | Nov-19 | 189,453 | 30% | 17% | 56,836 | 31,576 | 25,260 | $98.00 | $98.00 | $5,570,160 | $3,094,533 | $2,475,627 | $6.13 | $5,221,539 | $2,900,855 | $2,320,684 |
| | Dec-19 | 244,049 | 30% | 23% | 73,215 | 56,945 | 16,270 | $98.00 | $98.00 | $7,175,324 | $5,580,808 | $1,594,516 | $6.13 | $6,726,240 | $5,231,520 | $1,494,720 |
| | Jan-20 | 214,060 | 30% | 30% | 64,218 | 64,218 | 0 | $98.00 | $98.00 | $6,293,619 | $6,293,619 | $0 | $6.13 | $5,899,719 | $5,899,719 | $0 |
| **Total** | | | | | | | **1,116,444** | | | | | **$109,416,008** | | | | **$102,567,962** |

**Notes and Sources:**
[A] [D] [E] [I] [J] [N] Declaration of Peter Jenkins, March 23, 2018.
[C] Tab 2.

Confidential

Tab 4

Tab 5

# QuVa's Expected Lost Profits

| | |
|---|---|
| **QuVa's Expected Lost Doses** | 1,116,444 |
| **QuVa's Expected Lost Revenues** | $109,416,008 |
| **QuVa's Expected Lost Profits** | **$102,567,962** |

**Source**: Tab 4.

Tab 5

Exhibit 2

**BLANK ROME LLP**
*A Pennsylvania LLP*
Stephen M. Orlofsky, Esquire
David C. Kistler, Esquire
New Jersey Resident Partners
Leigh Ann Buziak, Esquire
300 Carnegie Center, Suite 220
Princeton, NJ 08540
Telephone: (609) 750-7700
Facsimile: (609) 750-7701
Orlofsky@blankrome.com
Kistler@blankrome.com
LBuziak@blankrome.com
*Attorneys for Defendants*

**MERCHANT & GOULD P.C.**
Jeffrey S. Ward (*admitted pro hac vice*)
Wendy M. Ward (*admitted pro hac vice*)
Stephen R. Howe (*admitted pro hac vice*)
Emily Wessels (*admitted pro hac vice*)
10 E. Doty Street, Suite 600
Madison, WI 53703
Telephone: (608) 280-6751
Facsimile: (612) 332-9081
JWard@MerchantGould.com
WWard@MerchantGould.com
SHowe@MerchantGould.com
EWessels@MerchantGould.com
*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAR PHARMACEUTICAL, INC. and PAR STERILE PRODUCTS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> QUVA PHARMA, INC., STUART HINCHEN, PETER JENKINS, MIKE RUTKOWSKI, DONNA KOHUT, TRAVIS MCGRADY, DAVID HARTLEY, and DAVID SHORT, <br><br> Defendants. | Civil Action No. 3:17-06115-BRM-DEA <br><br> *Filed Electronically* <br><br> <u>**HIGHLY CONFIDENTIAL**</u> |

## DECLARATION OF PETER JENKINS IN SUPPORT OF
## QUVA'S MOTION TO SET REQUIRED BOND AMOUNT

I, Peter Jenkins, declare as follows:

1.      I make this declaration in support of Defendant QuVa Pharma Inc.'s Motion to Set Required Bond Amount.

2.      I am the Chief Development Officer and co-founder of QuVa Pharma, Inc. ("QuVa"). I am involved in the marketing of QuVa products and am familiar with the projections of sales for new products that are created by QuVa.

3.      In connection with the preparation of QuVa's Motion to Set Required Bond Amount, I worked with QuVa's marketing department to prepare projections for the sales of QuVa's premixed vasopressin product, which would be available for shipment to customers as of May 1, 2018. A copy of those projections is attached as Exhibit A to this declaration.

4.      According to data provided by IMS, the total market size for vasopressin vial products sold by Par Sterile Products, LLC ("Par") is approximately 2.5 million vials per year. The current price for a vial containing 20 vasopressin units is $137, per IMS. According to IMS, Par generated $327 million of sales of vasopressin products in 2017. I note that there appears to be some direct supply by Par to customers, but this has not been included in the market size for the purpose of this exercise.

5.      Additionally, PharMEDium compounds premixed, ready-to-use infusion bags from vials purchased from Par and sells approximately 117,000 of

those bags to hospitals each year. The ready-to-use products purchased by hospitals are dominated by three SKUs – 100 units in 100ml bags, 20 units in 100ml bags, and 50 units in 50 ml bags. PharMEDium charges $869, $183 and $437 respectively for these bags to hospital customers.

6.      QuVa has evaluated a spectrum of price discount/market share scenarios in preparing to launch its own premixed, ready-to-use vasopressin product. The optimal price/share position is at an effective discount of 30% to Par's vial price (which equates to a price 45% below PharMEDium's bag prices). This is expected to deliver a stable market share of 30% of the total market. It is expected to take 3 months post launch to reach this stable market share. Market share at 30% is expected to be 235,000 premixed, ready-to-use bags each year. This is considered a conservative market share outcome given a 30% price discount and a superior end product provided by QuVa, as described in Paragraph 11 below.

7.      QuVa's expected sale prices are hence:

- 100 units in 100ml bag - $480
- 20 units in 100ml bag - $101
- 50 units in 50ml bag - $242

8.      QuVa's direct costs of manufacturing are derived from (1) known specific costs, such as the cost of the active pharmaceutical ingredient, the inactive ingredients and the bag container and (2) standard costs for more general items,

3

such as direct labor, testing and distribution. Those direct costs for the three product SKUs are:

- 100 units in 100ml bag - $5.80
- 20 units in 100ml bag - $6.61
- 50 units in 50ml bag - $6

9.      Based on QuVa's expected 30% market share of the annual vasopressin market, and the expected sales price of the three SKUs of products QuVa intends to market, QuVa expects annual revenue from the sales of a premixed, vasopressin product to be approximately $72 million. QuVa has modeled this revenue based on various different percentages of sales among the three SKUs, and the projected revenue does not vary widely based on the different percentages, as can be seen on slides 8-11 of the attached projection.

10.     QuVa does not expect there to be any additional companies marketing vasopressin products (beyond QuVa and Par) in 2018 or 2019. To date, no pharmaceutical companies have apparently filed an ANDA challenging the Par patents listed in the Orange Book for Vasostrict®, so any generic launch is at least 30 months away. We also expect that the threat of patent litigation by Par will deter any other 503B businesses from entering the market. Patent challenges have not been a feature of the 503B industry and participants do not have the experience nor financial bandwidth for such activity.

4

11.    QuVa's premixed, ready-to-use vasopressin product offers a number of advantages for hospitals relative to Par's vasopressin vials. A hospital compounding from a Par vial has the added cost and effort of converting the vial product into the ready-to-use bag that is administered to patients. This takes additional time and effort before the product can be administered. Further, once compounded, the Par product needs to be used within 18-24 hours, if kept refrigerated during that time to keep it stable. This adds inconvenience and increases the risk of loss of a high cost pharmacy item. Likewise, a Par vial compounded by PharMEDium is believed to require refrigeration to keep it stable and has a limited shelf life. By contrast, QuVa's product is ready-to-use when it arrives at hospitals, and it has been demonstrated to be stable at room temperature for at least 90 days. This delivers a significant improvement of convenience and flexibility of use for a hospital.

12.    QuVa has the available capacity to manufacture the estimated 235,000 premixed, ready-to-use vasopressin products that QuVa believes it can sell each year. This represents less than 5% of QuVa's current manufacturing capacity. QuVa also has all of the materials on hand necessary to manufacture the product, including the active pharmaceutical ingredient (vasopressin), the other inactive ingredients in QuVa's formulation, and the empty 50ml and 100ml bags. QuVa will use its existing marketing and distribution infrastructure to service the market.

5

Currently, QuVa is servicing customers throughout the United States without difficulty.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: 3/23/2018

# EXHIBIT A

# Market Assessment for New Product



March, 2018

**THE PERFECT BLEND OF**
**QUALITY AND INNOVATION**

QuVa
P H A R M A

# Table of Content

- Executive summary
- Assumptions
- Tier segments
- SKU unit mix
- Revenue projection for 3 scenarios
- Summary of analysis



# Executive Summary

- ## Assumptions
  - 30% expected market share capture (15% from conversion from vials and 100% (15% of total) conversion from PharMEDdium)
  - 3 months ramp up, with level sales after
  - $480 (SKU1), $101 (SKU2), $242 (SKU3) ASP of RTU bags (30% below vial ASP/45% below PM bag ASP)
  - Data used: IMS database, primary research, internal and external resources

- ## 3 Segments (Tiers) based on existing customers & potential
  - Tier1, existing customers who indicate interests and gave volume forecast: 22 hospitals from 4 systems
  - Tier2, existing customers no unsolicited forecast provided: 167 QuVa Pharma existing customers
  - Tier3, non customers with 200+ beds: 1,984 (27% of DH database) hospitals

- ## SKU mix based on Tier1 customers requests
  - SKU1: 100 units (1 unit/mL) (Preservative Free) in 100 mL Bag
  - SKU2: 20 units (0.2 unit/mL) (Preservative Free) in 100 mL Bag
  - SKU3: 50 units (1 unit/mL) (Preservative Free) in 50 mL Bag

## Findings:
  - $/U varies only slightly among the 3 SKUs. Therefore, independent of the SKU mix, the total revenue will have very little fluctuation
  - $71.6M revenue and 234.8K units (30% maximum market share)
    Scenario 1: 49%:38%:13% is the most likely SKU mix
    Max. revenue: 72.3M @28% total market share



# Current Market and Market Share Forecast Assumptions

## Current Market:
- 2.5M Vials per year ($326.6M in rev.)
- Single supplier (Par Pharma)
- 117.4K RTU units (bags) PharMEDium (PM) from Par Pharma vials

## Forecast Assumptions:
### Market Share Capture
- 15% conversion from total Vial market
    - Offer at 30% below vial price
    - Ready-to-use presentation (bags)
- 100% conversion of PharMEDium (PM) bag products
    - Estimated PM share is about 15% of total vial market
    - Do not expect that PM has the ability to supply based on current production issues
- 30% expected total market share capture

### Ramp up
- Rapid ramp up (3 months)
- Leveling out growth rate after initial ramp up

### Competitor Entry
No competitor entry expected for short and medium range



# Tier 1 Customers

**Tier1: existing customers who indicate interests and gave volume forecast**
Tier2: existing customers no unsolicited forecast provided
Tier3: non customers with 200+ beds

Forecast based on existing Tier1 customers (22 hospitals from 4 systems)
- 3 SKU presentations: 100U in 100mL, 20U in 100mL, 50U in 50mL bags
- 10%:54%:36% SKU mix breakdown

| SKUs | Product Description | Tier 1 Customer | Monthly Units est. | Annual Units est. | SKU breakdown |
|------|---------------------|-----------------|--------------------|--------------------|----------------|
| 71019-362-01 | 100 units (1 unit/mL) (Preservative Free) in 100 mL Bag | BS&W | 10 | 120 | 1.1% |
| | | MedStar | 76 | 912 | 8.4% |
| | | Total | 86 | 1,032 | 9.5% |
| 71019-364-01 | 20 units (0.2 unit/mL) (Preservative Free) in 100 mL Bag | BS&W | 336 | 4,032 | 36.9% |
| | | MedStar | 4 | 48 | 0.4% |
| | | Total | 496 | 5,952 | 54.5% |
| 61553-945-41 | 50 units (1 unit/mL) (Preservative Free) in 50 mL Bag | UNC | 52 | 624 | 5.7% |
| | | UPMC | 276 | 3,312 | 30.3% |
| | | Total | 328 | 3,936 | 36.0% |
| 3 NDCs | | Grant total | 910 | 10,920 | 100.0% |



# Tier 2 and Tier 3 customers

Tier1: existing customers who indicate interests and gave volume forecast

**Tier2: existing customers no unsolicited forecast provided:** 167 customers with 200+ beds; 252 customers with 100+ beds

**Tier3: non customers with 200+ beds:** 1,984 (27% of DH database) hospitals with 200+ beds; 3,380 hospitals with 100+ beds

Hospital bed size from Definitive Healthcare (DH)
database and QuVa existing customer information



| No. of Beds | DH | QuVa |
|---|---|---|
| 6-24 | 13% | 8% |
| 25-29s | 24% | 14% |
| 50-99 | 16% | 13% |
| 100-199s | 19% | 23% |
| 200-299s | 9% | 21% |
| 300-399s | 6% | 9% |
| 400-499s | 3% | 4% |
| 500s or more | 9% | 9% |
| Total no. of hospitals | 7,348 | 388 |



# SKU Unit Mix

- Scenario 1: 49%:38%:13%, based on Ameridose's historical data
- Scenario 2: 10%:54%:36%, forecast based on Tier1 customers
- Scenario 3: 25%:25%:50%, assume the 50U SKU is dominant

| SKUs Mix | Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|---|
| 100U in 100mL Bag | 49% | 10% | 25% |
| 20U in 100mL Bag | 38% | 54% | 25% |
| 50U in 50mL Bag | 13% | 36% | 50% |
| Total | 100% | 100% | 100% |



# Revenue Projection Scenario 1

49%:38%:13% SKU mix (based on Ameridose's historical sales data)

| SKUs | Unit Mix |
|---|---|
| 100U in 100mL | 49% |
| 20U in 100mL | 38% |
| 50U in 50mL | 13% |

**Maximum revenue about $72.3M is at 41% discount on PM price and 28% market share**

| Discount on vials | -27% | 0% | 10% | 25% | 30% | 35% | 40% |
|---|---|---|---|---|---|---|---|
| Discount on PM | 0% | 22% | 29% | 41% | 45% | 49% | 53% |
| Market Share | 10% | 20% | 23% | 28% | 30% | 32% | 33% |
| Units | 78,263 | 153,864 | 180,849 | 221,327 | 234,819 | 248,312 | 261,804 |
| Revenue | $43,276,890 | $66,993,988 | $70,869,144 | $72,275,813 | $71,560,753 | $70,276,217 | $68,395,205 |

Max. Revenue                Chosen Scenario 1
                            for projections





# Revenue Projection Scenario 2

10%:54%:36% SKU mix (forecast based on Tier1 customers)

| SKUs | Unit Mix |
|---|---|
| 100U in 100mL | 10% |
| 20U in 100mL | 54% |
| 50U in 50mL | 36% |

Maximum revenue is about $73M (units: 360K) at 41% discount on PM price and 28% market share
20U in 100mL is the dominant SKU

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Discount on vials | -27% | 0% | 10% | 25% | 30% | 35% | 40% |
| Discount on PM | 0% | 21% | 29% | 41% | 45% | 49% | 53% |
| Market Share | 10% | 20% | 23% | 28% | 30% | 32% | 33% |
| Units | 127,278 | 250,228 | 294,113 | 359,941 | 381,884 | 403,826 | 425,769 |
| Revenue | $43,767,851 | $67,754,012 | $71,673,130 | $73,095,757 | $72,381,687 | $71,073,476 | $69,171,125 |



Max. Revenue





# Revenue Projection Scenario 3

25%:25%:50% SKU mix (assume the 50U SKU is dominant)

| SKUs | Unit Mix |
|------|----------|
| 100U in 100mL | 25% |
| 20U in 100mL | 25% |
| 50U in 50mL | 50% |

**Maximum revenue about $72M is at 41% discount on PM price and 28% market share**

| Discount on vials | -27% | 0% | 10% | 25% | 30% | 35% | 40% |
|-------------------|------|------|------|------|------|------|------|
| Discount on PM | 0% | 22% | 29% | 41% | 45% | 49% | 53% |
| Market Share | 10% | 20% | 23% | 28% | 30% | 32% | 33% |
| Units | 89,789 | 176,524 | 207,483 | 253,922 | 269,402 | 284,881 | 300,361 |
| Revenue | $43,328,433 | $67,073,779 | $70,953,550 | $72,361,895 | $71,654,993 | $70,359,917 | $68,476,665 |



Max. Revenue



$72.4M: Maximum Revenue



# Summary of Analysis

Assumptions
- 30% expected market share capture (15% from conversion from vials and 100% (15% of total) conversion from PharMEDdium)
- 3 months ramp up, with level sales after
- $480 (SKU1), $101 (SKU2), $242 (SKU3) ASP (30% below vial ASP/45% below PM bag ASP)
- Data used: IMS database, primary research, internal and external resources

3 Segments (Tiers) based on existing customers & potential
- Tier1, existing customers who indicate interests and gave volume forecast: 22 hospitals from 4 systems
- Tier2, existing customers no unsolicited forecast provided: 167 QuVa Pharma existing customers
- Tier3, non customers with 200+ beds: 1,984 (27% of DH database) hospitals

SKU mix based on Tier1 customers requests
- SKU1: 100 units in 100 mL Bag
- SKU2: 20 units in 100 mL Bag
- SKU3: 50 units in 50 mL Bag

**Findings:**
$/U varies only slightly among the 3 SKUs. Therefore, independent of the SKU mix, the total revenue will have very little fluctuation.
$71.6M revenue and 234.8K units (30% maximum market share)
 Scenario 1: 49%:38%:13% is the most likely SKU mix
 Max. revenue: 72.3M @28% total market share



**49%:38%:13% scenario 1 SKU mix**

| SKUs | Unit Mix |
|------|----------|
| 100U in 100mL | 49% |
| 20U in 100mL | 38% |
| 50U in 50mL | 13% |





# Vial Market Conversion

- 2.5M annual vial volume converted to 49.3M unit of the drug
- 30% (14.8M) total unit (49.3M) converted to QuVa bags
- 49%:38%:13% SKU mix for 100U, 20U and 50U preps
- 63.1U weighted average number of unit per SKU
- 115K (SKU1), 89K (SKU2), 31K (SKU3) annual volume

| Vial NDC | Annual volume | Total U |
|---|---|---|
| 42023016401 VIAL WET MD **20U**/ML 1ML | 1,735 | 34,700 |
| 42023016425 VIAL WET MD **20U**/ML 1MLX25 | 2,446,200 | 48,924,000 |
| 42023019001 VIAL WET MD **20U**/ML 10ML | 2,125 | 425,000 |
| Total | 2,450,060 | 49,383,700 |
| **QuVa's Maxium Market Share 30%** | | 14,815,110 |

| Prep | U/SKU | SKU mix | Weighted U/SKU | Volume |
|---|---|---|---|---|
| SKU1: 100U/100mL | 100 | 49% | 49 | 115,061 |
| SKU2: 20U/mL | 20 | 38% | 7.6 | 89,231 |
| SKU3: 50UmL | 50 | 13% | 6.5 | 30,526 |
| Total | | | 63.1 | 234,819 |



# Pricing Strategy

- $480 (SKU1), $101 (SKU2), $242 (SKU3) ASP: 30% off vial ASP and 45% off PM ASP
- 49%:38%:13% SKU mix for 100U, 20U and 50U preps
- $305 ASP

| Prep | PM Price | SKU mix | 45% off PM price |
|---|---|---|---|
| SKU1: 100U/100mL | $868 | 10% | $480 |
| SKU2: 20U/mL | $183 | 54% | $101 |
| SKU3: 50UmL | $437 | 36% | $242 |
| Weighted ASP | | | $305 |



# Total Volume and Revenue

- 49%:38%:13% SKU mix for 100U, 20U and 50U preps
- 115K (SKU1), 89K (SKU2), 31K (SKU3) are volume from SKU mix and total U
- $480 (SKU1), $101 (SKU2), $242 (SKU3) ASP is 30% off vial ASP and 45% off PM ASP
- $305 ASP for all the 3 SKUs
- 71.6M revenue

| Prep | U/SKU | SKU mix | Volume | PM Price | 45% off PM price |
|------|-------|---------|--------|----------|------------------|
| SKU1: 100U/100mL | 100 | 49% | 115,061 | $868 | $480 |
| SKU2: 20U/mL | 20 | 38% | 89,231 | $183 | $101 |
| SKU3: 50UmL | 50 | 13% | 30,526 | $437 | $242 |
| Total | | | 234,819 | | $305 |
| **Total Revenue** | | | $71.6M | | |



# Total Revenue is Independent of SKU Mix

- Scenario 1: 49%:38%:13%, revenue: 71.6M
- Scenario 1: 10%:54%:36%, revenue: 72.4M
- Scenario 1: 25%:25%:50%, revenue: 71.7M
- 30% market share

| Prep | ASP | Mix1 | Mix2 | Mix3 | Volume1 | Volume2 | Volume3 | Revenue1 | Revenue2 | Revenue3 |
|------|-----|------|------|------|---------|---------|---------|----------|----------|----------|
| SKU1: 100U/100mL | $480 | 49% | 10% | 25% | 115,061 | 38,188 | 67,350 | $55,171,922 | $18,311,321 | $32,294,511 |
| SKU2: 20U/mL | $101 | 38% | 54% | 25% | 89,231 | 206,217 | 67,350 | $9,020,820 | $20,847,491 | $6,808,776 |
| SKU3: 50UmL | $242 | 13% | 36% | 50% | 30,526 | 137,478 | 134,701 | $7,377,011 | $33,222,875 | $32,551,706 |
| Total | | 100% | 100% | 100% | 234,819 | 381,884 | 269,402 | $71,569,753 | $72,381,687 | $71,654,993 |



# Revenue Projection Scenario 1

49%:38%:13% SKU mix (based on Ameridose's historical sales data)

Maximum revenue about $72M is at 41% discount on PM price and 28% market share



| SKUs | Unit Mix |
|------|----------|
| 100U in 100mL | 49% |
| 20U in 100mL | 38% |
| 50U in 50mL | 13% |

| Discount on vials | -27% | 0% | 10% | 25% | 30% | 40% |
|-------------------|------|-----|-----|-----|-----|-----|
| Discount on PM | 0% | 21% | 29% | 41% | 45% | 53% |

Revenue

$72.3M

$71.6M ◄···· Chosen Scenario 1 for projections

$70.8M

$70.2M

$67.0M

$43.2M

| | 10% | 20% | 23% | 28% | 30% | 33% |

Market Share



# Revenue Projection Scenario 2

10%:54%:36% SKU mix (forecast based on Tier1 customers)



| SKUs | Unit Mix |
|------|----------|
| 100U in 100mL | 10% |
| 20U in 100mL | 54% |
| 50U in 50mL | 36% |

Maximum revenue is about $73M (units: 360K) at 41% discount on PM price and 28% market share
20U in 100mL is the dominant SKU

| Discount on vials | -27% | 0% | 10% | 25% | 30% | 40% |
|-------------------|------|-----|------|------|------|------|
| Discount on PM | 0% | 21% | 29% | 41% | 45% | 53% |





# Revenue Projection Scenario 3

25%:25%:50% SKU mix (assume the 50U SKU is dominant)

| SKUs | Unit Mix |
|------|----------|
| 100U in 100mL | 25% |
| 20U in 100mL | 25% |
| 50U in 50mL | 50% |

Maximum revenue about $72M is at 41% discount on PM price and 28% market share

| Discount on vials | -27% | 0% | 10% | 25% | 30% | 40% |
|-------------------|------|-----|-----|-----|-----|-----|
| Discount on PM | 0% | 21% | 29% | 41% | 45% | 53% |

Revenue

$72.7M

$71.7M

$70.9M

$70.4M

$67.0M

$43.3M

| 10% | 20% | 23% | 28% | 30% | 33% |

Market Share



# Tier1 Units and Revenue Projection

Tier 1 volume is not sensitive to price change

| | Discount on vial price | -27% | 0% | 10% | 25% | 30% | 40% | 50% | 60% | 80% |
|---|---|---|---|---|---|---|---|---|---|---|
| | Discount on PM price | 0% | 21% | 29% | 41% | 45% | 53% | 61% | 68% | 84% |
| | Market Share | 10% | 20% | 23% | 28% | 30% | 33% | 37% | 40% | 47% |
| Price | 100U (0.2U/mL) PF in 5% Dextrose solution USP 100mL in 100mL Bag | 870 | $685 | $617 | $514 | $480 | $411 | $343 | $274 | $137 |
| | 20U (0.2U/mL) PF in 5% Dextrose solution USP 100mL in 100mL Bag | 183 | $144 | $130 | $108 | $101 | $87 | $72 | $58 | $29 |
| | 50U (0.2U/mL) PF in 5% Dextrose solution USP 50mL in 50mL Bag | 438 | $345 | $311 | $259 | $242 | $207 | $173 | $138 | $69 |
| | Tier 1 Average Price | 340 | 268 | 241 | 201 | 188 | 161 | 134 | 107 | 54 |
| Tier1 Units | 100U (0.2U/mL) PF in 5% Dextrose solution USP 100mL in 100mL Bag | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 | 1,032 |
| | 20U (0.2U/mL) PF in 5% Dextrose solution USP 100mL in 100mL Bag | 5,952 | 5,952 | 5,952 | 5,952 | 5,952 | 5,952 | 5,952 | 5,952 | 5,952 |
| | 50U (0.2U/mL) PF in 5% Dextrose solution USP 50mL in 50mL Bag | 3,936 | 3,936 | 3,936 | 3,936 | 3,936 | 3,936 | 3,936 | 3,936 | 3,936 |
| | Tier 1 Total Units | 10,920 | 10,920 | 10,920 | 10,920 | 10,920 | 10,920 | 10,920 | 10,920 | 10,920 |
| Tier1 revenue | 100U (0.2U/mL) PF in 5% Dextrose solution USP 100mL in 100mL Bag | $897,788 | $706,920 | $636,228 | $530,190 | $494,844 | $424,152 | $353,460 | $282,768 | $141,384 |
| | 20U (0.2U/mL) PF in 5% Dextrose solution USP 100mL in 100mL Bag | $1,091,686 | $859,595 | $773,635 | $644,696 | $601,716 | $515,757 | $429,797 | $343,838 | $171,919 |
| | 50U (0.2U/mL) PF in 5% Dextrose solution USP 50mL in 50mL Bag | $1,725,697 | $1,358,816 | $1,222,935 | $1,019,112 | $951,171 | $815,290 | $679,408 | $543,526 | $271,763 |
| | Tier 1 Total Revenue | $3,715,171 | $2,925,331 | $2,632,798 | $2,193,998 | $2,047,732 | $1,755,199 | $1,462,666 | $1,170,132 | $585,066 |



# Tier2 Units and Revenue Projection

## 49%:38%:13% SKU mix

| | Discount on vial price | -27% | 0% | 10% | 25% | 30% | 40% | 50% | 60% | 80% |
|---|---|---|---|---|---|---|---|---|---|---|
| | Discount on PM price | 0% | 21% | 29% | 41% | 45% | 53% | 61% | 68% | 84% |
| | Market Share | 10% | 20% | 23% | 28% | 30% | 33% | 37% | 40% | 47% |
| Price | 100U (0.2U/mL) PF in 5% Dextrose solution USP 100mL in 100mL Bag | 870 | 685 | 617 | 514 | 480 | 411 | 343 | 274 | 137 |
| | 20U (0.2U/mL) PF in 5% Dextrose solution USP 100mL in 100mL Bag | 183 | 144 | 130 | 108 | 101 | 87 | 72 | 58 | 29 |
| | 50U (0.2U/mL) PF in 5% Dextrose solution USP 50mL in 50mL Bag | 438 | 345 | 311 | 259 | 242 | 207 | 173 | 138 | 69 |
| | Tier 2 Average Price | 611 | 479 | 431 | 357 | 333 | 284 | 237 | 189 | 94 |
| Tier2 Units | 100U (0.2U/mL) PF in 5% Dextrose solution USP 100mL in 100mL Bag | 23,895 | 24,225 | 25,168 | 26,081 | 26,199 | 26,957 | 27,652 | 29,140 | 29,806 |
| | 20U (0.2U/mL) PF in 5% Dextrose solution USP 100mL in 100mL Bag | 13,379 | 13,635 | 14,366 | 15,074 | 15,166 | 15,754 | 16,293 | 17,447 | 17,963 |
| | 50U (0.2U/mL) PF in 5% Dextrose solution USP 50mL in 50mL Bag | 2,677 | 3,065 | 3,015 | 3,257 | 3,289 | 3,799 | 3,674 | 4,069 | 4,246 |
| | Tier 2 Total Units | 39,951 | 40,925 | 42,548 | 44,412 | 44,654 | 46,510 | 47,618 | 50,656 | 52,015 |
| Tier2 revenue | 100U (0.2U/mL) PF in 5% Dextrose solution USP 100mL in 100mL Bag | $20,787,140 | $16,594,002 | $15,515,793 | $13,398,863 | $12,562,511 | $11,079,423 | $9,470,732 | $7,984,415 | $4,083,451 |
| | 20U (0.2U/mL) PF in 5% Dextrose solution USP 100mL in 100mL Bag | $2,453,883 | $1,969,172 | $1,867,281 | $1,632,757 | $1,533,211 | $1,365,121 | $1,176,495 | $1,007,878 | $518,858 |
| | 50U (0.2U/mL) PF in 5% Dextrose solution USP 50mL in 50mL Bag | $1,173,785 | $1,058,062 | $936,744 | $843,335 | $794,721 | $786,937 | $634,180 | $561,875 | $293,137 |
| | Tier 2 Total Revenue | $24,414,808 | $19,621,235 | $18,319,819 | $15,874,955 | $14,890,443 | $13,231,481 | $11,281,407 | $9,554,167 | $4,895,445 |



# Tier3 Units and Revenue Projection

49%:38%:13% SKU mix

| | Discount on vial price | -27% | 0% | 10% | 25% | 30% | 40% | 50% | 60% | 80% |
|---|---|---|---|---|---|---|---|---|---|---|
| | Discount on PM price | 0% | 21% | 29% | 41% | 45% | 53% | 61% | 68% | 84% |
| | Market Share | 10% | 20% | 23% | 28% | 30% | 33% | 37% | 40% | 47% |
| Price | 100U (0.2U/mL) PF in 5% Dextrose solution USP 100mL in 100mL Bag | 870 | 685 | 617 | 514 | 480 | 411 | 343 | 274 | 137 |
| | 20U (0.2U/mL) PF in 5% Dextrose solution USP 100mL in 100mL Bag | 183 | 144 | 130 | 108 | 101 | 87 | 72 | 58 | 29 |
| | 50U (0.2U/mL) PF in 5% Dextrose solution USP 50mL in 50mL Bag | 438 | 345 | 311 | 259 | 242 | 207 | 173 | 138 | 69 |
| | Tier 3 Average Price | 553 | 436 | 392 | 327 | 305 | 261 | 218 | 174 | 87 |
| Tier3 Units | 100U (0.2U/mL) PF in 5% Dextrose solution USP 100mL in 100mL Bag | 13,422 | 50,137 | 62,417 | 81,338 | 87,830 | 100,295 | 112,823 | 124,557 | 150,336 |
| | 20U (0.2U/mL) PF in 5% Dextrose solution USP 100mL in 100mL Bag | 10,409 | 38,882 | 48,405 | 63,078 | 68,113 | 77,780 | 87,495 | 96,595 | 116,587 |
| | 50U (0.2U/mL) PF in 5% Dextrose solution USP 50mL in 50mL Bag | 3,561 | 13,002 | 16,559 | 21,579 | 23,302 | 26,299 | 29,933 | 33,046 | 39,885 |
| | Tier 3 Total Units | 27,392 | 102,020 | 127,381 | 165,995 | 179,245 | 204,374 | 230,251 | 254,198 | 306,809 |
| Tier3 revenue | 100U (0.2U/mL) PF in 5% Dextrose solution USP 100mL in 100mL Bag | $11,676,500 | $34,343,621 | $38,479,814 | $41,787,159 | $42,114,567 | $41,221,142 | $38,641,821 | $34,128,626 | $20,596,068 |
| | 20U (0.2U/mL) PF in 5% Dextrose solution USP 100mL in 100mL Bag | $1,909,152 | $5,615,313 | $6,291,596 | $6,832,360 | $6,885,892 | $6,739,814 | $6,318,085 | $5,580,160 | $3,367,536 |
| | 50U (0.2U/mL) PF in 5% Dextrose solution USP 50mL in 50mL Bag | $1,561,259 | $4,488,488 | $5,145,117 | $5,587,341 | $5,631,118 | $5,447,570 | $5,166,779 | $4,563,322 | $2,753,890 |
| | Tier 3 Total Revenue | $15,146,911 | $44,447,422 | $49,916,528 | $54,206,860 | $54,631,578 | $53,408,526 | $50,126,685 | $44,272,108 | $26,717,494 |



Exhibit 3

**BLANK ROME LLP**
*A Pennsylvania LLP*
Stephen M. Orlofsky, Esquire
David C. Kistler, Esquire
Leigh Ann Buziak, Esquire
301 Carnegie Center, 3rd Floor
Princeton, NJ 08540
Telephone: (609) 750-7700
Facsimile: (609) 750-7701
Orlofsky@blankrome.com
Kistler@blankrome.com
LBuziak@blankrome.com
*Attorneys for Defendants*

**MERCHANT & GOULD P.C.**
Jeffrey S. Ward (*admitted pro hac vice*)
Wendy M. Ward (*admitted pro hac vice*)
Stephen R. Howe (*admitted pro hac vice*)
Emily M. Wessels (*pro hac vice pending*)
10 E. Doty Street, Suite 600
Madison, WI 53703
Telephone:  (608) 280-6751
Facsimile:  (612) 332-9081
JWard@MerchantGould.com
WWard@MerchantGould.com
SHowe@MerchantGould.com
EWessels@MerchantGould.com
*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., and PAR STERILE PRODUCTS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>QUVA PHARMA, INC., STUART HINCHEN, PETER JENKINS, and MIKE RUTKOWSKI,<br><br>Defendants. | Civil Action No. 3:17-cv-06115-BRM-DEA<br><br>***Filed Electronically***<br><br><u>**HIGHLY CONFIDENTIAL**</u> |

## DECLARATION OF DR. RODOLFO PINAL IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Rodolfo Pinal, declare as follows:

1.      I have been retained by Merchant &Gould P.C. on behalf of Defendants QuVa Pharma, Inc. ("QuVa"), Stuart Hinchen, Peter Jenkins and Mike Rutkowski (collectively "Defendants"), to provide expert testimony in response to certain portions of the Declaration of Michael J. Miller ("Miller Declaration") (Dkt. No. 85-1), which Plaintiffs Par Pharmaceutical, Inc. and Par Sterile Products, LLC (collectively "Par") have provided in support of Par's Motion for Preliminary Injunction.

2.      Specifically, I have been asked to provide my opinion regarding (1) whether QuVa has used information comprising Par's alleged Trade Secret Nos. 27 and 33-36 in connection with developing QuVa's vasopressin premix products and analytical methods for analyzing those products, and (2) whether Par's alleged Trade Secret Nos. 27, 33 and 36 are disclosed in publicly available documents, generally known in the industry and/or are readily ascertainable.

## EXPERIENCE AND QUALIFICATIONS

3.      I have nearly 30 years of experience in pharmaceutical sciences, including positions in both industry and academia.  I have specifically focused upon pharmaceutical product development subjects, such as solubility, solubilization and drug delivery.  I am currently Associate Professor of Industrial and Physical

Pharmacy at Purdue University, where I have been teaching for the last fourteen years.

4.      I received a B.S. in Pharmaceutical Chemistry from the National University of Mexico.  After spending one year at an internship with the National General Hospital in Mexico City, I went on to obtain my a graduate degree from the University of Arizona, where I received a Ph.D. in Pharmaceutical Sciences with a concentration in Physical Chemistry.  Following graduate school, I worked as a post-doctoral fellow at the University of Florida, where I researched the fate and transport of organic compounds in complex mixtures.

5.      I have served as Director of the NSF-I/UCRC Dane O. Kildsig Center for Pharmaceutical Processing Research (CPPR) from 2005 until the present and as Chair of the Graduate Admissions Committee of the Department of Industrial and Physical Pharmacy from 2006 until 2016, when I became Director of Graduate Studies.

6.      Starting in 2003, I began my teaching career at Purdue.  I have taught both undergraduate and graduate courses in solubility and solubilization, drug delivery, pharmaceutics, pharmaceutical processing and manufacturing, and applied thermodynamics.  Since 2004, I have taught injectable products to PharmD students, including Parenteral Products (IPPH 471), Biotech and Advanced Parenterals (PHRM 866) and Dosage Forms II (PHRM 829).  My teaching on parenterals

includes formulation, compounding, stability, compatibilities, parenteral nutrition, aseptic technique and USP <797>. Additionally, I consult with industry in the areas of solubility, solubilization, physical characterization of solids, thermal analysis, and particle technology, and have lectured extensively on those areas.

7.      I have authored or co-authored more than 50 research papers and book chapters in the fields of solubility, pharmaceutics, applied thermodynamics, and particle technology.  I regularly act as a referee for a variety of academic journals, including in the fields of solution chemistry, applied thermodynamics and pharmaceutical technology.   I have been a reviewer of such journals as *Pharmaceutical Research*, *Molecular Pharmaceutics*, *Journal of Pharmaceutical Sciences*, and *Journal of Solution Chemistry*.

8.      My industry experience includes several positions in Pharmaceutical Research and Development at Hoffmann-La Roche.  I worked as a Research Associate from 1990-1991 and a Senior Scientist from 1991-1993 in the Preformulation group.  In those capacities, I characterized new drug candidates using physicochemical methods and techniques such as HPLC, TLC, UV/IR, and Fluorescence spectroscopy.  From 1993-1997, I served as a Principal Scientist in the Sterile Dosage Forms group and was responsible for developing injectable formulations for new and investigational drug products, including formulations for peptides. In this capacity, I was responsible for developing formulations for use in

clinical trials, development of HPLC methods for assessing potency and stability of the active compound as well as formulations intended for injection. I was also responsible for writing the directions for manufacturing clinical batches in the GMP suite and supervising the sterile suite operators during the manufacture of the products. From 1997-1999, I was a Principal Scientist and then from 1999-2003 I worked as a Research Leader in the Solid-State Pharmaceutics group at Hoffmann-La Roche Pharmaceutical and Analytical Research and Development.  In those capacities, I supervised the physical characterization of solids and Particle Technology using techniques such as X-ray powder diffraction, DSC, hot stage microscopy, TGA/IR, SEM, Image Analysis, Dynamic Light Scattering, Microcalorimetry, and BET gas adsorption.

9.    I am a member of several learned societies, including the American Chemical Society, the American Association of Pharmaceutical Scientists and the Rho Chi Honor Society.

10.    I have received national and international recognition for my contributions to the development and characterization of pharmaceuticals, excipients and intermediate blends, including being the recipient of the Roche Research Olympiad Silver Award, Purdue Research Foundation Fellowship, Seed for Success Award, Dean's Medal for Distinguished Service, Entrepreneurial Leadership Academy Fellow, and Faculty Awards of Excellence, Innovators Hall of Fame and

Discovery Park Fellow. In 2017, I served as chair of the Patient-Centric Focus Group of the American Association of Pharmaceutical Scientists.

11.     My curriculum vitae, which is current as of December 2017, is provided as Exhibit 317. All of my opinions stated in this Declaration are given to a reasonable degree of scientific certainty.

**BACKGROUND AND MATERIALS REVIEWED**

12.     It is my understanding that Par has accused Defendants of misappropriating certain alleged Par trade secrets, some of which relate to QuVa's vasopressin premix products, including the product formulations, and analytical methods relating to those formulations. I understand the Defendants have asserted they have not and are not using Par's alleged trade secrets, and that in any event, many, if not all of Par's alleged trade secrets are not in fact trade secrets.

13.     In forming my opinions, I considered and relied upon my education, background, and years of experience with sterile injectable pharmaceutical formulations and method of analyzing those formulations, including the use of High Performance Liquid Chromatogrraphy ("HPLC") and knowledge of Ultra Performance Liquid Chromatography ("UPLC"). I also reviewed and considered the Miller Declaration, including exhibits cited by him with respect to Par's alleged Trade Secret Nos. 27 and 33-36. I further reviewed QuVa documents relating to its vasopressin premix formulations and UPLC analytical methods. Additionally, I

reviewed reference materials and Par patents and published patent applications relating to vasopressin products. I also reviewed the depositions of Par's Rule 30(b)(6) witnesses Jason Crist and Vinayagam Kannan, and the deposition of QuVa's Rule 30(b)(6) witness Travis Leeah. Further, I reviewed the Declaration of Travis Leeah, as well as the Leeah, Chen and Yaheva resumes. The information I reviewed is listed in Exhibit 318.

14.    I reserve the right to supplement this Declaration or to rebut any testimony offered in response or rebuttal to the opinions stated herein.  In addition to the opinions set forth in this Declaration, I may respond to additional testimony and information that becomes available during deposition, at hearings, or otherwise. I may also use demonstrative and summary exhibits in the form of illustrations, charts and the like as part of any potential testimony at any proceeding.  Finally, I may provide a tutorial as part of my testimony, and some of that tutorial may be in response to any tutorial provided by Par's experts.

## SUMMARY OF OPINIONS

15.    It is also my opinion that QuVa's vasopressin premix products and analytical methods with respect to those products are not based on and do not use any of the information identified by Mr. Miller in his Declaration as constituting Par's alleged Trade Secret Nos. 27 and 33-36.

16.     It is also my opinion that at least the information identified by Dr. Miller in his Declaration as constituting Par's alleged Trade Secret Nos. 27, 33 and 36 is readily available to the public in Par's patent and published patent applications, as well as other references.

## BACKGROUND

17.     Vasopressin is a peptide hormone with the chemical name vasopressin, 8-L-arginine, and has been used for many years in sterile injection (infusion) solutions to increase blood pressure in adults with vasodilatory shock (e.g. post-cardiotomy or sepsis) who remain hypotensive (have low blood pressure) despite administration of fluids and catecholamines. (Ex. 103.) Vasopressin injection solution was sold for many years as an unapproved drug. It was sold in concentrate form that had to be diluted at the point of use (hospital) before it could be infused into a patient.

18.     These vasopressin concentrate formulations typically contained 20 vasopressin units ("20U") per milliliter of solution. For example, Par's Vasostrict®, which was approved by the FDA in 2014 under an initiative to remove unapproved products from the market, is a concentrate product containing vasopressin in an amount of 20U/ml. According to its approved label, Vasotrict® must be diluted for use in either normal saline (0.9% sodium chloride in water, known as "NS"), or 5% dextrose in water, known as "D5W," to a vasopressin concentration of 0.1U/ml or

8

1U/ml. (Ex. 103 at Section 2.1.) Normal saline and D5W are known as tonicity agents, and are commonly added to or present in injection/infusion solutions to make those solutions compatible with the patient's blood.

19.     In contrast to Vasostrict®, QuVa's vasopressin products are premixed products. In other words, QuVa's vasopressin products, as made, already contain the appropriate amount of vasopressin, either 0.1U/ml or 1U/ml, in D5W. These products do not need to be further diluted, i.e., they do not need to be compounded at the hospital for use; instead they are "ready-to-use." For this reason, premixed products are often also called "RTUs."

20.     Premixed, or RTU, products have many advantages over concentrate products. For example, there is no need to perform a compounding step such as dilution, which can result in dosing errors, broken vials, and other issues. In fact, Chapter <797> of the USP describes the conditions and practices required to prevent harm to the patient, originating from microbial contamination,  excessive bacterial endotoxins, variability in the intended strength of correct ingredients,  unintended chemical and physical contaminants, and ingredients of inappropriate quality in compounded sterile preparations ("CSPs"). (Ex. 313.) Also, in emergency situations, which is where vasopressin formulations are used, no additional time is needed to prepare the formulation for use.

21.     In his Declaration, Dr. Miller provides some information regarding chromatography methods and HPLC as paragraphs 41-48. While I understand that Dr. Miller is attempting to provide this information at a high level, there are some very basic errors that need correction and/or further explanation.

22.     In paragraph 42, Dr. Miller states that the mixture (sample) to be analyzed is "dissolved in a fluid, or a solvent, such as a solution containing acetonitrile or methanol" and that this "dissolved mixture is known as the mobile phase." (Miller Declaration at ¶42.)   This is not correct. The sample mixture containing the drug substance or drug product is not dissolved in the mobile phase, but instead is dissolved in a diluent solution. The sample containing the drug substance or drug product to be analyzed is injected into the column. The mobile phase is a solvent mixture that can be of constant (isocratic) or of changing composition (gradient) during the analytical run, and flows through the column at a fixed flow rate. The mobile phase then carries the injected drug substance or drug product sample solution through the column.

23.     In paragraph 43, Dr. Miller states that "the column material is known as the stationary phase, and is comprised of a material made of solid particles, such as silica." (Id. at ¶43.) This is not fully accurate. In the analysis of vasopressin, the silica particles are coated with a chemical substance that will have differing affinities for the various components of the sample to be analyzed. The silica particles in the

10

columns used with respect to vasopressin solutions in Par's HPLC analytical methods, patents, and published patent applications, are coated with chemical moieties comprising 18-carbon chains, or "C18." For this reason, these columns are called "C18 columns." Further, the interactions in these columns also include liquid-liquid partition phenomena, in addition to those forces listed by Dr. Miller.

24.     The C18-bonded silica particles are very non-polar in nature. As the sample mixture moves (elutes) through the column, its components partition in and out of the hydrophobic coating of the particles, with more non-polar components interacting with the particles more and thus moving more slowly through the column. In such a scenario, a more polar compound like vasopressin will interact less with the column particles, and will exit the column more quickly. However, another sample cannot be run in the column until all of the sample exits (is fully eluted from) the column. In analytical work, like with most industrial activities, "time is money," and the goal is to run as many separations as possible on a given column. To do this the gradient method is used. This consists pumping through the column different ratios of two mobile phase solutions, one usually being buffered water (the polar phase), and a solvent, such as acetonitrile, or an acetonitrile:water mixture (the non-polar phase). The gradient starts and ends with the buffered water mobile phase being pumped through the column, and in between at different time intervals, different ratios of the two mobile phase solutions are pumped through the

11

column, thus giving a mobile phase whose composition is changing with time, according to a pre-established profile, during the analysis run. Since the solvent phase is less polar, it helps to move (elute) the non-polar components of the sample through the column more quickly, thus flushing the column so it can be used again sooner.

25.     UPLC is an analytical separation technique that has its origins in the limitations of HPLC. The theoretical foundations of UPLC and HPLC analysis are exactly the same. Moreover, the basic components of UPLC and HPLC are also the same; they include a column packed with a stationary phase, injection of a sample solution into the column, the elution of the sample carried by a mobile phase pumped through the column and a detection system for the column outflow and the generation of a separation chromatogram of the components of the sample. However, despite the similarities between UPLC and HPLC, the two are distinctly different techniques. UPLC is a much more efficient separation method than HPLC. Arguably, the fundamental difference between UPLC and HPLC is the type of particles used to make the stationary phase packed into the columns in each case. The typical stationary phase particles used in HPLC are in the range of about 5 micron, ULPC stationary phase utilizes particles of less than 2 micron. The effect of the different particle size of the stationary phase brings fundamental differences

between the two techniques. The chromatographic efficiency of the column is dictated by the van Deemter equation:

$$H = 2\lambda d_p + \frac{2\gamma D_m}{u} + \frac{8}{\pi^2}\frac{k}{(1+k)^2}\frac{d_p}{D_s}u$$

which establishes that the separation efficiency of the column, $H$ (theoretical plate height) depends on the particle size of the stationary phase, $d_p$, the linear velocity of the mobile phase, $u$ (controlled by the flow rate) and the diffusion coefficients of the analyte (chemical entity being separated) in the mobile and stationary phases, $D_m$ and $D_s$, respectively. The lower the value of $H$ (smaller theoretical plates, or the greater the number of theoretical plates in the column), the more efficient the column in separating the components in the sample. The van Deemter equation is often represented in the following simplified form:

$$H = A + \frac{B}{u} + Cu$$

where $A$, $B$ and $C$ are constants representing the eddy, axial and bulk diffusion, respectively.

26.     The simplified equation allows to see the interplay between the particle size of the stationary phase and the velocity of the mobile phase (flow rate) on the efficiency of the column. The figure below compares the efficiency of HPLC and UPLC columns. (Ex. 314 at QuVa008160.)



27.    The figure above shows that UPLC is more efficient (smaller $H$ values) than HPLC throughout. For HPLC, whose stationary phase particles are between 3.5 and 10 micron, the larger the particle size the lower the separation efficiency. Moreover, for HPLC there is an optimal liquid velocity (flow rate of the mobile phase), below and above which the separation efficiency is decreased. In contrast, UPLC, which utilizes particles smaller than 2 micron, does not suffer from decreased separation efficiency as the mobile phase velocity increases. The figure below shows a comparison between chromatograms obtained by HPLC and UPLC for the same sample. Both analyses utilize acetonitrile-water linear gradient for the mobile phase. However, the composition and time profile of the gradient is different for each technique, showing that the HPLC method is not directly applicable to UPLC and vice versa. (Id at QuVa008165.)



28.     The differences between UPLC and HPLC are not limited to the
different efficiency of separation between the two methods. The differences extend
to the materials and procedures used for analysis. For example, the pressure
generated in UPLC is about one order of magnitude greater than that of HPLC. This
means that the conditions of analysis used in UPLC would render an HPLC
instrument inoperable. The flow rates between UPLC and HPLC are also necessarily
different due to the very different instrumental conditions used. While the principle
of retention in both UPLC and HPLC is partitioning, the microenvironment of the
stationary phase is different in each technique. As stated above, HPLC utilizes
smooth particles coated with a non-polar compound, whereas UPLC utilizes porous
particles reinforced by crosslinking in order to withstand the high pressures of
UPLC. (Ex. 314 at QuVa008161) This means that a HPLC method cannot be
"adapted" as a ULPC method by simply applying similar procedures using a UPLC

instrument. UPLC and HPLC are distinctly different techniques, each requiring a different analytical method even for analyzing the same drug substance or drug product. I note that a supplier of chromatographic columns may promote one or more of their columns for use in either HPLC and UPLC,  specifically, for columns where the particle size of the stationary phase is in the borderline between UPLC (less than 2 micron) and HPLC (greater than 2 micron and typically 3 micron or larger). This again does not mean that simply using an  HPLC column that is arguably applicable to UPLC would turn an HPLC method into a UPLC one. The difference between these two types of chromatographic analysis go far beyond the type of column used. Such differences involve, among others, the type of instrument, particularly the very different pressures involved (UPLC pressures will damage HPLC instrumentation), the length of the column, the analysis time and consequently the composition and gradient of the mobile phase, etc.

## OPINIONS

### QuVa's Vasopressin Premix Products and Methods for Analyzing Those Product do not Use or Contain the Information Comprising Par's Alleged Trade Secrets 27 and 33-36

#### QuVa's Vasopressin Premix Formulations are Completely Different from Par's Current Premix Formulations, which are the Subject of Alleged Trade Secret No. 33

29.     It is my understanding from reading paragraphs 98-101 of Dr. Miller's Declaration that alleged Trade Secret No. 33 includes the following information:

    (a)    the formulations for Par's premixed vasopressin products having a concentration of either 40 units of vasopressin/100ml solution ("40U/100ml premix product") or 60 units of vasopressin activity/100ml of solution ("60U/100ml premix product")[1]; and

    (b)    the studies and testing done to characterize these formulations, including optimizing the excipients in the formulations, the buffer concentration and the pH of the formulations.

(Miller Declaration at ¶100.) In support of this alleged trade secret, Dr. Miller cites Exhibits 158-160.

30.    The current formulations for Par's 40U/ml and 60U/ml premix formulations are shown in Exhibits 158 and 159, which are known as "Master Batch Records," because they describe the formulation to be made in detail and the method to make a certain sized batch of it. (Ex. 158.1 at Par0002206; Ex. 159.1 at Par0002305; Ex. 221 at 85:5-10, 91:5-24.) These formulations contain the following components on a per milliliter basis:

    (1) either 0.4 or 0.6 vasopressin units,

    (2) 50 mg dextrose,

    (3) 0.0546 mg glacial acetic acid,

    (4) 0.012 mg sodium acetate trihydrate,

    (5) water for injection ("WFI"), and

    (6) sodium hydroxide ("NaOH") or hydrochloric acid ("HCl") as necessary to adjust the pH of the formulation to 3.8.

(Id.)

---

[1] 40U/100ml and 60U/100ml is the same as 0.4U/ml and 0.6U/ml, respectively.

31.     The acetic acid and sodium acetate trihydrate form an acetate buffer having a concentration of 1 millimolar ("mM"). (Ex. 158.1 at Par0002206; Ex. 159.1 at Par0002305; Ex. 221 at 85:5-86:10, 91:5-92:16.) This amount of dextrose (50 mg) in a total solution volume of 1 ml, results in a 5% dextrose solution, or D5W (Id. at 85:5-17.) As previously stated, D5W is a common tonicity agent in pharmaceutical formulations. "**Dextrose** and sodium chloride are used to adjust tonicity in the majority of formulations." (Ex. 316 at QuVa008132; emphasis added.)

32.     Starting on or about October 16, 2017, QuVa began testing six potential vasopressin premix formulations. These formulations contain on a per milliliter basis:

> (1) either 0.1 or 1 vasopressin units,
> (2) one of 10% HCl ("dilute HCl"), lactic acid, or formic acid as a pH adjuster to adjust pH to 3.4, and
> (3) 5% Dextrose in WFI as the tonicity agent (D5W).

(Ex. 165 at QuVa004273-74; Ex. 223.)

33.     Prior to this time, QuVa had made and tested seven formulations containing (1) vasopressin in a concentration of either 20U/ml, 0.1U/ml or 1U/ml, (2) acetic acid to adjust the pH to 3.6, and (3) saline or D5W as the tonicity agent. (Ex. 163; Ex. 157 at QuVa005041 (showing potency testing results).) It is my understanding that very recently, QuVa has selected two formulations from this

18

group for final validation work.   These formulations contain the following components on a per milliliter basis:

> (1) either 0.1 or 1 vasopressin units,
> (2) lactic acid to adjust the pH to 3.4 (acceptable range 3.3-3.5), and
> (3) D5W as the tonicity agent.

(Exs. 226-227.)

34.    These formulations are completely different from Par's alleged Trade Secret vasopressin premix formulations, which are mentioned in alleged Trade Secret 33, and are shown in Exhibits 158 and 159. Par's formulations include added amounts of acetic acid and sodium acetate trihydrate sufficient to make a 1 mM acetate buffer (Ex. 221 at 82:11-83:3; 85:5-86:10, 91:12-92:10), whereas QuVa's formulations do not have any added ingredients to form a buffer. Par has never even made a vasopressin premix formulation, which like QuVa's formulations, does not contain an added buffer. (Id. at 81:23-82:7.)  Further, QuVa's formulations contain lactic acid to adjust the pH to 3.4, while Par's formulations only use sodium hydroxide or concentrated HCl in very small amounts if necessary, to obtain a different target pH of 3.8. (See, e.g., Ex. 158.1 at Par 0002206; Ex. 158.2 at Par0002222-25.)

35.    Notably, Dr. Miller does not even try to claim that QuVa's formulations are the same as Par's formulations. Instead, Dr. Miller speculates that QuVa chose

to work with monoprotic acids, such as dilute HCl, lactic acid and formic acid, based on Par's work. (Miller Decl. ¶105.) However, Dr. Miller cites no evidence supporting his speculation. Further, it is well known that vasopressin is subject to less degradation in monoprotic acids than in other types of acids. For example, Par's '478 patent discusses work done with acetic acid (a monoprotic acid) and citric acid (a triprotic acid) and concludes that additional ingredients, such as divalent metal ions, are required "to counteract the degradation of vasopressin caused by the use of a citrate buffer." (Ex. 219 at col. 20, ll. 3-5.) A citrate buffer includes citric acid. I also note that the '478 patent claims related to unit dosage forms of vasopressin, include an acetate buffer, which as I stated before, is made by adding acetic acid and sodium acetate (trihydrate) to the solution.

36.    Further, the USP monograph for vasopressin states that vasopressin API (active pharmaceutical ingredient) contains up to 15% acetic acid. (Ex. 108 at 6662.) Again, this shows the compatibility of vasopressin with monoprotic acids. Finally, Hyodo 2016 states that vasopressin solutions have increased stability under acidic conditions using acetic acid. (Ex. 321 at QuVa008482.) Thus, there is nothing secret about the use of monoprotic acids with vasopressin.

37.    Moreover, neither Par nor Dr. Miller has presented any evidence that Par ever made any vasopressin formulations, much less vasopressin premix formulations, using one of dilute HCl, lactic acid, or formic acid, or that anyone now

20

at QuVa actually took any Par confidential information relating to vasopressin formulations.

38.     Dr. Miller also implies that QuVa's use of D5W as the tonicity agent for its premix formulations instead of something else is based on confidential information from Par, stating that he did not see any documents or reasoning to support that position, which to him "indicates that QuVa has a head start based on their knowledge from Par." (Miller Decl. at ¶107.) This implication is without merit; again "[d]extrose and sodium chloride are used to adjust tonicity in the majority of formulations." (Ex. 316 at QuVa008132.)

39.     Also, since vasopressin concentrate products have been on the market, which is for a very long time, first as unapproved drugs, and now as Vasostrict®, hospitals have been compounding those concentrate products by diluting them with either normal saline or D5W. As stated earlier, the label for Vasostrict®, approved in 2014, states that it must be diluted or use in either normal saline or D5W. (Ex. 103 at Section 2.1.) The goal in making a premix product is to provide the hospital with a product that can be used with patients without compounding (e.g., further dilution) prior to administration. Thus, these products routinely contain the diluent routinely used at the hospital, which for vasopressin concentrate is one of the tonicity agents normal saline or D5W, because that it what the hospitals most frequently use and want. For example Healix, a compounding company acquired by QuVa, had a

compounded vasopressin premix product containing D5W. (Ex. 224 at 25:18-27:7; Ex. 319). Finally, Par's Patent Application Publication No. US 2017/0290881 ("the '881 publication"), published on October 12, 2017, discloses the superiority of vasopressin premix formulations containing D5W (5% dextrose), compared to those containing normal saline in terms of stability. (Ex. 210 at [458].)

40.     Therefore, there was no need for QuVa, or anyone for that matter, to use Par confidential information to choose D5W as tonicity agent for a vasopressin premix product. Its use in this regard was already publicly known.

### QuVa's Vasopressin Premix Analytical Methods are Completely Different from Par's HPLC methods, which are the Subject of Alleged Trade Secret Nos. 27 and 34-36

41.     Nor is QuVa using any of Par's alleged trade secrets relating to Par's HPLC methods to measure vasopressin concentration or peptide impurities, which are the subject of Alleged Trade Secrets Nos. 27 and 34-36. Alleged Trade Secret No. 27 relates to the diluent and mobile phases A and B used by Par in its gradient HPLC method for determining peptide impurities in vasopressin API or Vasostrict®. (Miller Declaration at ¶92.) Alleged Trade Secrets Nos. 34-36 relate to Par's HPLC method for measuring peptide impurities in vasopressin premix products as shown in Exhibits 161 and 162, the trial and error involved in determining these methods, and the resulting chromatographs. (Id. at ¶98.)

42.     However, the only actual alleged trade secret that Dr. Miller states QuVa may have used is "using gradient HPLC with a pH 3.0 phosphate buffer." (Miller Declaration at ¶96.) This is not correct. In Exhibit 157, the exhibit cited by Dr. Miller in support of this statement, QuVa's lab notebook pages indicate that QuVa was using a BEH 1.7 µm UPLC column, not an HPLC column. (Ex. 157 at QuVa005042.) Dr. Miller further ignores that this method uses a different mobile phase B than Par's HPLC method, and had a completely different gradient and much shorter run time, and would be expected with a UPLC column.  Further, QuVa's present analytical method to determine vasopressin potency (concentration) in its vasopressin premix formulations (dated November 28, 2017) also does not use gradient HPLC with a pH 3.0 phosphate buffer. Instead, QuVa uses gradient UPLC with a pH 6.0 phosphate buffer. (Ex. 209 at QuVa007756-57.) This is a very significant difference, as discussed above.

43.     Dr. Miller also implies that QuVa will use Par's methods at some point, quoting testimony from QuVa's Travis Leeah that QuVa was using a method different from the USP monograph version. (Miller Declaration at ¶96.) This is simply not the case. Departures from USP monographs with respect to analytical testing are extremely common, as drug product manufacturers constantly strive to improve quality. The USP provides the minimum standards that must be met. For example, USP <797> states "this chapter provides minimum practice and quality

standards for CSPs [compounded sterile preparations]." (Ex. 313 at QuVa008235.) The same criterion applies to other USP chapters. QuVa's modifications to the USP monograph are typical, and involve using a gradient elution (see Exs. 403-405) and setting the column temperature above room temperature (Exs. 402, 405) to improve on the USP method.

44.     Dr. Miller studiously avoids actually comparing the QuVa's method to Par's alleged trade secret methods, but instead says he does not have sufficient detail to do so (Miller Declaration at ¶96.) even though he has the laboratory notebook pages showing QuVa's UPLC method as of October 20, 2017, which I understand to be the close of fact discovery. Instead, he quotes Travis Leeah, QuVa's 30(b)(6) witness on its vasopressin development that the development method was not finished as of the date of his deposition (November 10, 2017), implying that QuVa will in fact use Par's HPLC method trade secrets. (Miller Decl. at ¶103.)

45.     However, QuVa is not using any of this information. As stated above, QuVa has a method for measuring vasopressin concentration (potency) in its vasopressin premix product that is ready to be validated. (Ex. 209.) This method is completely different from Par's HPLC methods shown in Exhibits 161 and 162. This can be shown by reviewing the chart below.

| Chromatographic Conditions | Par Ex. 161 (Ex. 162)* | Patent '881 Example 17 | USP 40 method Ex. 9 | QuVa Ex. 209 |
|---|---|---|---|---|
| Instrument | HPLC | HPLC | LC (HPLC) | UPLC |
| Column | Phenomenex Kinetex XB-C18 2.6 µm, 100A pore, 3.0 x 150 mm | Phenomenex Kinetex XB-C18 2.6 µm, 100A pore, 3.0 x 150 mm | Packing L1 (C18) 4.6 mm x 25 cm | HSS T3 C18, 1.8 µm, 2.1 x 100 mm |
| Column Temp. | 40°C | 35°C | 40°C | 50.0°C |
| Flow rate | 0.43 mL/min (0.5 mL/ Min) | 1.0 mL/min | 1.0 mL/min | 0.4 mL/min |
| Detector wavelength | 215 nm | 215 nm | 220 nm | 220 nm |
| Injection volume | 500 µL | 500 µL | 20 µL | 75 µL |
| Sample temp | 5°C | 10°C | Not stated | 10°C |
| Run time | 55 min (45 min) | 55 min | ~ 60 min | 22 min |
| Retention time | ~ 31 min (~30 min) | ~ 17.6 min (Fig. 21) | Between 6-9 min | ~ 6.8-7 min |
| Diluent A | 0.25% v/v Acetic acid | 0.25% v/v Acetic acid | 0.25% v/v Acetic acid | |
| Diluent B | 0.25%v/v acetic acid with 3 g (6 g) sodium chloride per (1 L water | 0.25%v/v acetic acid with 3 g sodium chloride per 1 L water | 5 g chlorobutanol in 5 mL glacial acetic acid, 5 g alcohol, 1.1 g sodium acetate in 1000mL water | 5g chlorobutanol in 100 mL Acetonitrile and 900 mL 0.001N HCl |
| Mobile phase A | 15.6 g sodium phosphate monobasic monohydrate in 1000 mL adjusted with phosphoric acid to pH 3.0 | 15.6 g sodium phosphate monobasic monohydrate in 1000 mL adjusted with phosphoric acid to pH 3.0 | 6.6 g dibasic ammonium phosphate in 1000 mL adjusted with phosphoric acid to pH 3.0 | 1.4 g potassium phosphate monobasic in 1000 mL adjusted with potassium hydroxide to pH 6.0 |
| Mobile phase B | 50:50 Acetonitrile:water | 50:50 Acetonitrile:water | Acetonitrile | Acetonitrile |

Gradient method:

| Par Ex. 161 (Ex. 162)* | | | Patent '881 Example 17 | | | USP 40 method Ex. 9 | QuVa Ex. 209 | | |
|---|---|---|---|---|---|---|---|---|---|
| Time (min) | % Mobile Phase | | Time (min) | % Mobile Phase | | Isocratic method % Mobile Phase 87:13 A:B | Time (min) | % Mobile Phase | |
| | A | B | | A | B | | | A | B |
| 0 | 90 | 10 | 0 | 90 | 10 | | 0 | 90 | 10 |
| 30 | 77 | 23 | 40 | 50 | 50 | | 10 | 83 | 17 |
| 40 | 50 | 50 | 45 | 50 | 50 | | 11 | 50 | 50 |
| 45 | 50 | 50 | 46 | 90 | 10 | | 15 | 50 | 50 |
| 46 | 90 | 10 | 55 | 90 | 10 | | 16 | 90 | 10 |
| 55 | 90 | 10 | | | | | 22 | 90 | 10 |

* **Differences in the method given in Ex 162 relative to the method describes in Ex. 161 are given in parenthesis in Table #. The gradient method in Ex. 162 is:**

25

| Gradient method | Time (Min) | % Mobile Phase | |
|---|---|---|---|
| | | A | B |
| | 0 | 90 | 10 |
| | 1 | 90 | 10 |
| | 30 | 77 | 23 |
| | 33 | 20 | 80 |
| | 36.6 | 20 | 80 |
| | 36.5 | 90 | 10 |
| | 45 | 90 | 10 |

46.     The first difference is that QuVa's method uses a UPLC column and a UPLC instrument, while Par's methods (as well as those in the '881 publication and the USP monograph) are HPLC methods using HPLC instrumentation. As discussed above, UPLC columns are shorter and more efficient than HPLC columns, and a HPLC method cannot be "adapted" as a ULPC method by simply applying similar procedures using a UPLC instrument. UPLC and HPLC are distinctly different techniques, each requiring a different analytical method even for analyzing the same drug substance or drug product. Thus, not surprisingly, the methods differ in terms of the diluent, mobile phases, gradients, and run times, just to mention a few of the many differences.

47.     In fact, Par's HPLC methods in Exhibits 161 and 162 are much closer to the HPLC method for determining vasopressin concentration and peptide impurities in vasopressin premix products set forth in Example 17 of the '881 publication than they are to QuVa's method. In fact, as can be seen in the table, the

method of Example 17 of the '881 publication and Par's methods are the same or similar in a number of respects.

48.     Also, Par's HPLC methods are very detailed, and cannot be performed at Par without the person performing the method reviewing it as it is performed. Thus, to be able to accurately replicate Par's method, a QuVa employee would have to have taken an actual copy of the method, which in any event would have been no use with respect to QuVa's UPLC methods. It is my understanding that Par is unaware of any of the ex-Par employees at QuVa actually doing so. (Ex. 222 at 188:10-21.)

49.     I note that Dr. Miller implies that QuVa is or will be using Par's alleged trade secrets because Par's development of its formulations and HPLC methods involved "extensive studies" and "extensive validation work," while QuVa has relatively few lab notebook entries and has been working on its vasopressin project for a short period of time. (See Miller Decl. at ¶¶100-101, 104). This is not the case; the "extensive studies" and "extensive validation work" that Dr. Miller refers to, are activities that must be carried out by analysts as part of analytical method development, and are unique to each set of column, instrumentation, mobile phase, gradient, etc. used. This means that QuVa scientists, or any analyst for that matter, will need to conduct this type of work from scratch, when developing an analytical method for vasopressin or for any other drug substance or drug product.  Without

27

this type of development work, there is no analytical method to speak of, since the results are unique to the specific method being developed, and inextricably linked to the unique set of parameters (equipment and experimental variables) of the method. As stated above, an UPLC method cannot be implemented by simply "adapting" an existing HPLC method. One of the reasons is that the results, parameters and information derived from the development of one method are inapplicable (irrelevant) to the other.

50.    With respect to Par's vasopressin premix formulation work, the allegedly supporting documents are excerpts from Dr. Kannan's laboratory notebooks, Nos. 44 and RB-196, which are set forth in Exhibit 160. (Miller Declaration at ¶96.) Kannan Notebook 44 contains only six pages relating to vasopressin premix work--pages 1, 2, 3, 10, 44, and 46, covering work done on only four days: January 27, 2015, January 30, 2015, June 27, 2017 and June 30, 2017 (Ex. 160.1 at Par0036406-11; Ex. 221at 100:23-101:6.) Of those four days, the 0.2 vasopressin units/ml formulations set forth in alleged Trade Secret 33 were made in a single day (January 27, 2015).

51.    With respect to Kannan Notebook RB-196, Dr. Kannan made (1) nine formulations on September 20-21, 2017, (2) made five more formulations for stability studies on January 16, 2017, (3) made a single formulation on February 24, 2017 for compatibility testing, and (4) made a single formulation on or about June

28

21, 2017 for more compatibility testing. (Ex. 160.2 at Par0036478-36515.) Thus, Par's formulation work for its premix products, as set forth in the Kannan notebooks, apparently took five days out of a 2.5 year period. This can hardly be considered "extensive development," and is certainly no longer than QuVa's Jianping Chen spent making QuVa's formulations. Again, Jianping Chen, or any other scientist, would have to perform the same type of work in order to develop new formulations.

52. Further, with respect to the development of Par's HPLC methods for its vasopressin premix products, which also supposedly involve "extensive trial and error," none of the supporting documents actually show any of this "trial and error" development work. There are no supporting documents cited for alleged Trade Secrets Nos. 34-35, except for the methods themselves, and with respect to alleged Trade Secret No. 27, the only supporting documents are validation or verification studies of the method itself. Thus, QuVa has actually provided more documentation of its method development work than has Par.

53. Moreover, to the extent evidence of Par's HPLC work is available, much of it is not relevant. For example, with respect to its vasopressin products, the FDA requires Par to quantify individual impurities, such as peptide impurities, in those products. One of Par's two HPLC methods relating to its vasopressin premix products (Ex. 161) is directed to detecting and quantifying these impurities. Conversely, the FDA does not require this with respect to QuVa's vasopressin

products, because QuVa, as a 503B company, needs its products to comply with the USP vasopressin monograph. That monograph does not require quantification of individual impurities. (Ex. 108 at 6662.)

54.    Further, I have reviewed the Declaration of Travis Leeah (Ex. 422) in this case, as well as the resumes of the individual on the development team (Ex. 334), and understand that to date, the person responsible for developing QuVa's analytical method for QuVa's vasopressin products, Dr. Ludmila Yaheva, has spent about 30 hours on the project. This is in line with what I would expect it would take for a person of ordinary skill in the art to develop an analytical method to determine vasopressin potency. Likewise, I understand that Travis Leeah and Jianping Chen, before developing QuVa's formulations, conducted literature and product research, and then Ms. Chen made the vasopressin formulations in a total of a few days. This is also in line with what I would expect for this product, especially given that I understand it will have a "Beyond Use Date" ("BUD") of 50-90 days.

**The Information Dr. Miller States Constitutes Par's Alleged Trade Secrets 27, 33 and 36 is Publicly Available and/or Well Known in the Industry**

**Par's Alleged Trade Secret 27**

55.    As I discussed earlier, Par's alleged Trade Secret No 27 relates to the preparation of the diluent, and mobile phases A and B, for Par's HPLC method for determining peptide impurities in vasopressin API, and Vasostrict®, along with the

trial and error associate with determining these preparations. (Miller Declaration at ¶92.)

56.     I reviewed the exhibits cited by Dr. Miller in support of his statement, Exhibits 151-156, but none of these documents provide Par's gradient HPLC method itself. In fact, Exhibits 155 and 156 appear to be missing from Par's Exhibits. I do note that Exhibit 154, ARD-15-055R, is supposed to have an Attachment 1 that is a protocol, but it was not attached. I was provided with a complete copy of ARD-15-055P, including Attachment 1. (Ex. 220.) This attachment does disclose the HPLC test method, including the diluent and Mobile Phases A and B used in the method and their preparation. (Id. at Par0014847-62.)

57.     The preparation and use of Par's diluent and mobile phases A and B with respect to HPLC testing of vasopressin API or Vasostrict® for peptide impurities is readily available to the public, for example in Par's U.S. Patent No. 9,375,478 ("the '478 patent"), the USP monographs for vasopressin, and other references.

58.     The '478 patent issued on June 28, 2016, and relates to vasopressin formulations for use in the treatment of hypotension. (Ex. 219.) It discloses various vasopressin injection formulations, the effect of various ingredients (excipients) on the stability of those formulations, an illustrative method for using these formulations on patients, and HPLC methods for testing the formulations for

31

vasopressin content and peptide impurities. (Id. at Examples 1-8, col. 15, l. 44 – col. 24, l. 23.)

59.     Example 1 of the '478 patent discloses a gradient HPLC method for detecting vasopressin impurities (including peptide impurities) and vasopressin concentration in an illustrative vasopressin formulation. It uses the same HPLC system, column and conditions as Par's method. (Compare Ex. 219 at col. 16, ll. 1-18 with Ex. 220 at Par0014848.) This HPLC method is set forth in significant detail, and discloses all of Par's alleged Trade Secret 27.

60.     First, Dr. Miller states that preparing the diluent for the sample, 0.25% v/v acetic acid and then refrigerating it, is a Par trade secret and that the use of this diluent "stabilizes the test sample and does not impart impurities." (Miller Declaration at ¶94.) The '478 patent, in Example 1, states that the diluent for use in the HPLC method is 0.25% v/v acetic acid, and further describes how to prepare it. (Ex. 219 at col. 16, ll. 19-23.) While the example does not expressly disclose refrigerating the diluent, it is known from basic chemistry that refrigeration slows down the generation of impurities resulting from chemical degradation. The rates of reactions increase when the temperature is raised. Different reactions respond different to temperature, but a convenient although very rough rule of thumb is that a reaction rate doubles for every 10 °C (or 10 K) increase in temperature. (Ex. 322.) This basic chemistry notion is part of the standard practice of HPLC technique.

Further, I note that Par's test method itself does not indicate that the diluent is refrigerated, and method used to make it matches that disclosed in the '478 patent. (Compare Ex. 220 at Par0014849 with Ex. 219 at col. 16, ll. 19-23.) In addition, the HPLC method for determining peptide impurities in vasopressin premix products disclosed in Example 17 of the '881publication discloses the preparation and use of the same diluent, here called "Diluent A." (Ex. 210 at [404], and also discloses refrigerating the stock standard solution, which contains a solution of vasopressin in Diluent A. (Id. at [411].)

61.     In addition, 0.25% v/v acetic acid is used as the diluent in the HPLC method for determining vasopressin API potency that is disclosed in the USP monograph for vasopressin.  (Ex. 108 at 6662.)

62.     Next, Dr. Miller states that the use of a phosphate buffer at pH 3.0 for Mobile Phase A in this HPLC method is a Par trade secret. (Miller Decl. at ¶¶92-94.) The use of this identical mobile phase is also disclosed the vasopressin HPLC method of Example 1 of the '478 patent. Specifically, the '478 patent in Example 1 states that "[p]hosphate buffer at pH 3.0 was used for mobile phase A," and then describes its preparation. (Ex. 219 at col. 16, ll. 24-31.) Again, the method for making this mobile phase in Par's HPLC method document is disclosed exactly in the '478 patent. (Compare Ex. 220 at Par0014849 with Ex. 219 at col. 16, ll. 24-31.)

63.     Dr. Miller states that the use of a 50:50 mixture of acetonitrile and water (acetonitrile:water (50:50)) as Mobile Phase B in this HPLC method is a Par trade secret. (Miller Declaration at ¶¶92-94.) Once again, the use of this mobile phase is disclosed in the HPLC method of Example 1 of the '478 patent, which states, "[a]n acetonitrile:water (50:50) solution was used for the mobile phase B," and then provides the method for making this mobile phase. (Ex. 219 at col. 16, ll. 32-34.) The method for making this mobile phase in Par's HPLC method document is also disclosed exactly in the '478 patent. (Compare Ex. 220 at Par0014849 with Ex. 219 at col. 16, ll. 32-34.)

64.     Finally, Dr. Miller states that "Par's scientists developed a two-stage elution process (i.e. gradient HPLC) in which the phosphate buffer Mobile Phase A is followed by the second acetonitrile:water Mobile Phase B," and that this "process helps late eluting peaks to be narrower and taller for greater resolution which is important for the trace analysis of impurities in vasopressin products." (Miller Decl. at ¶92.) As I stated above, the HPLC process to determine vasopressin impurities in Example 1 of the '478 patent is a gradient process as well. (Ex. 219 at col. 16, ll. 1-18.) Dr. Miller is not correct in stating that the Mobile Phase A is followed by Mobile Phase B. Instead, the ratio of Mobile Phase A to Mobile Phase B is changed over time (a gradient), starting at a ratio of 90:10, then going to a ratio of 50:50, and then going back to a ratio of 90:10 at set points over a 55 minute period. (Ex. 220 at

Par0014848.) This exact gradient is disclosed in the '478 patent's HPLC example. (Ex. 219 at col. 16, ll. 13-17.) Further, the example chromatograms (Figures 1-8) associated with Par's gradient HPLC method to determine vasopressin impurities appear to be identical to the chromatograms disclosed in Figures 1-8 of the '478 patent, with good resolution of later-eluting peaks in a vasopressin sample solution (Figure 6 in both documents). (Compare Ex. 220 at Par0014857-60 with Ex. 219 at Figures 1-8.)

65.    Therefore, all of Par's alleged Trade Secret 27 is disclosed in the '478 patent and/or other publicly available documents.

### Par's Alleged Trade Secret 33

66.    As stated earlier, it is my understanding from reading paragraphs 98-101 of Dr. Miller's Declaration that alleged Trade Secret 33 includes the following information:

> (a)    the formulations for Par's premixed vasopressin products having a concentration of either 40 units of vasopressin/100ml solution ("40U/100ml premix product") or 60 units of vasopressin activity/100ml of solution ("60U/100ml premix product"); and

> (b)    the studies and testing done to characterize these formulations, including optimizing the excipients in the formulations, the buffer concentration and the pH of the formulations.

(Miller Declaration at ¶100.) In support of this alleged trade secret, Dr. Miller cites Exhibits 158-160.

67.     All this information is publicly available, as it is shown in Par's '881 publication. (Ex. 210.)

68.     The current formulations for Par's 40U/ml and 60U/ml vasopressin premix formulations are shown in Exhibits 158 and 159, which are known as "Master Batch Records," because they describe the formulation to be made in detail and the method to make a certain sized batch of it. (Ex. 158.1 at Par0002206; Ex. 159.1 at Par0002305; Ex. 221 at 85:5-10, 91:5-24.) These formulations contain on a per ml basis (1) either 0.4 or 0.6 vasopressin units, (2) 50 mg dextrose, (3) 0.0546 mg glacial acetic acid, (4) 0.012 mg sodium acetate trihydrate, and (5) water for injection ("WFI"). The formulations also may contain sodium hydroxide ("NaOH") or hydrochloric acid ("HCl") as necessary to adjust the pH of the formulation. The acetic acid and sodium acetate trihydrate form an acetate buffer having a concentration of 1 millimolar ("mM"). (Ex. 158.1 at Par0002206; Ex. 159.1 at Par0002305; Ex. 221 at 85:5-86:10, 91:5-92:16.) This amount of dextrose (50 mg) in a total solution volume of 1 ml, results in a 5% dextrose solution, or D5W (Id. at 85:5-17.)

69.     36.     Example 16 of the '881 publication discloses nine different vasopressin premix formulations, each of which contains vasopressin in an amount of 0.4 or 0.6 vasopressin units/ml of solution. (Ex. 210 at [404], Tables 55-63.) Formulation G (Table 61) exactly matches Par's 0.4 U/ml vasopressin premix

36

product. (Compare Ex. 158.1 at Par0002206 with Ex. 210 at [404].) This is shown below.

### Master Batch Record

| Specification Number: | Process Stage | Theoretical Yield | Expected Yield |
|---|---|---|---|
| IN500322 | BULK SOLUTION | 224.2 kg (220 L) | 222.0 kg (217.8 L) |

| Label Claim | | | |
|---|---|---|---|
| EACH 1.0 mL CONTAINS | LABEL CLAIM | EXCESS USED | UNIT FORMULA |
| PRESSOR ACTIVITY | 0.4 UNITS | ----------- | 0.4 UNITS |
| DEXTROSE, ANHYDROUS | 50 MG | ----------- | 50 MG |
| ACETIC ACID GLACIAL USP | 0.0546 MG | ----------- | 0.0546 MG |
| SODIUM HYDROXIDE NF/EP | --------- | ----------- | QS |
| SODIUM ACETATE TRIHYDRATE, USP | 0.012 MG | ----------- | 0.012 MG |
| HYDROCHLORIC ACID NF/EP | ----------- | ----------- | QS |
| WATER FOR INJECTION USP/EP | --------- | ----------- | 1.0 ML |
| SPECIFIC GRAVITY: 1.0192 | | | |

## TABLE 61

### Formulation G (40 IU/100 mL) (1 mM Buffer)

| Ingredient | Concentration |
|---|---|
| Vasopressin (IU) | 0.4 |
| Dextrose Anhydrous (mg) | 50 |
| Acetic acid (mg) | 0.0546 |
| Sodium Acetate Trihydrate (mg) | 0.012 |
| Hydrochloric acid QS for | pH adjustment |
| Sodium hydroxide QS for | pH adjustment |
| Water for injection QS to (mL) | 1 |

37

70.     Par's Rule 30(b)(6) witness Dr. Vinayagam Kannan, who is also a listed inventor on the '881 publication, confirmed that the amounts of each ingredient are the same in both formulations. (Ex. 221 at 107:8-12.) I understand Dr. Kannan tried to say that the formulations were "similar" but not the same, because Formulation G does not list the grades of HCl or NaCl shown in the Master Batch Record, and says "acetic acid" instead of "glacial acetic acid," which is the wording used in the Master Batch Record. These are not differences. Any person having experience with pharmaceutical formulation knows that the grades of HCl and NaOH in the Master Batch Record (NF/EP) are almost universally used in formulation work, and "acetic acid" is just shorthand for "glacial acetic acid."

71.     Likewise, Formulation H (Table 62) in Example 16 of the '881 publication exactly matches Par's 0.4 U/ml vasopressin premix product. (Compare Ex. 159.1 at Par0002305 with Ex. 210 at [404].) This is shown below.

**Master Batch Record**

| Specification Number: | Process Stage | Theoretical Yield | Expected Yield |
|---|---|---|---|
| **IN500324** | BULK SOLUTION | 224.2 kg (220 L) | 222.0 kg (217.8 L) |
| **Label Claim** | | | |
| EACH 1.0 mL CONTAINS | LABEL CLAIM | EXCESS USED | UNIT FORMULA |
| PRESSOR ACTIVITY | 0.6 UNITS | ----------- | 0.6 UNITS |
| DEXTROSE, ANHYDROUS | 50 MG | ----------- | 50 MG |
| ACETIC ACID GLACIAL USP | 0.0546 MG | ----------- | 0.0546 MG |
| SODIUM HYDROXIDE NF/EP | --------- | ----------- | QS |
| SODIUM ACETATE TRIHYDRATE, USP | 0.012 MG | ----------- | 0.012 MG |
| HYDROCHLORIC ACID NF/EP | ----------- | ----------- | QS |
| WATER FOR INJECTION USP/EP | --------- | ----------- | 1.0 ML |
| SPECIFIC GRAVITY: 1.0192 | | | |

## TABLE 62

### Formulation H (60 IU/100 mL) (1 mM Buffer)

| Ingredient | Concentration |
|---|---|
| Vasopressin (IU) | 0.6 |
| Dextrose Anhydrous (mg) | 50 |
| Acetic acid (mg) | 0.0546 |
| Sodium Acetate Trihydrate (mg) | 0.012 |
| Hydrochloric acid QS for | pH adjustment |
| Sodium hydroxide QS for | pH adjustment |
| Water for injection QS to (mL) | 1 |

And again, Dr. Kannan confirmed that the amounts of each ingredient are the same in both formulations. (Ex. 221 at 110:20-111:4)

39

72.     Exhibit 160 contains excerpts of two laboratory notebooks of Dr. Kannan, Notebook 44 and Notebook RB-198.  At pages 1-9 of notebook RB-198, Dr. Kannan makes various lab batches of vasopressin premix formulations to use in stability studies. (Ex. 160.2 at Par0036478-86.) These formulations were all made over a two-day period, September 20-21, 2016. (Id.) A comparison of these formulations to those in Example 16 of the '881 publication shows that (1) formulations 1-4 in the notebook are the same as formulations A-D in Example 16, respectively, (2) notebook formulations 5 and 6 are the same as Example 16 formulations E and F, respectively, except for a minor difference in NaCl content (8.7 mg vs. 9 mg), and (3) notebook formulations 7-9 are the same as Example 16 formulations G, H and 9, respectively.  (Compare Ex. 160.2 at Par 0036479-80 with Ex. 210 at [404].) Dr. Kannan admitted this is the case. (Ex. 221 at 124:16-128:24.)

73.     Dr. Miller also states that it is a trade secret that "extensive studies demonstrated that Vasostrict®, when diluted in a tonicity agent such as saline, was stable for only 48 hours." (Miller Declaration at ¶100.) This is not a premixed product, but instead is the product resulting from taking a vial of Vasostrict®, which is a concentrated vasopressin solution containing 20 vasopressin units per ml of solution, and diluting it with normal saline after exposing it to the air. Further, Dr. Miller cites no information showing any such studies, much less any "extensive studies." In addition, the Vasostrict® label states that once Vasostrict is diluted, it

must be discarded after 18 hours at room temperature. (Ex. 103 at Section 2.1). This information is not useful in making a premix product.

74.     Dr. Miller then states that "conversely, when Vasostrict® is diluted in 5% dextrose at a pH of 3.8, the stability of the premix formulation is substantially increased (e.g., 15 months under refrigerated conditions and six months at ambient or room temperature conditions." (Id.) This statement makes no sense, because diluting a vial of concentrated vasopressin solution does not result in a premixed product, as discussed previously.

75.     Nevertheless, since this alleged trade secret relates to premix products, I will assume that Dr. Miller means that the trade secret is that vasopressin premix products diluted in 5% dextrose show this stability. This point, however, is shown in the '881 publication. Example 17 discloses a method for measuring vasopressin concentration and impurities in vasopressin premix products, including the formulations of Example 16. (Id. at [405]-462].) These formulations differ from each other in terms of tonicity agent (saline or 5% dextrose) and the concentration of the buffer (1 mM or 10 mM). (Id. at [404]; Ex. 221 at 112:7-113:10.) It also provides stability data for those formulations. (Ex. 221 at 111:5-113:10.)  Finally, Example 17 of the '881 publication discloses the results of this testing, and the conclusions that were drawn from those results. (Ex. 210 at [457]-[462].)

76.     Specifically, the '881 publication reports that based on the data from Example 17, the formulations with 5% dextrose as the tonicity agent and a 1 mM acetate buffer were more stable than formulations using NaCl (normal saline) with either acetate buffer concentration and more stable than the formulations with 5% dextrose as the tonicity agent and a 10 mM acetate buffer. (Id at [458].) It then states that based on the data from the Figures derived from the study, "the estimated shelf-life at 5°C is about 16.1 months, and the estimated shelf-life at 25°C is about 8 months." (Id. at [460].) This stability is slightly better than that described by Dr. Miller as the alleged trade secret, and thus discloses it, because a person with formulation experience would understand that the best formulations in terms of stability used 5% dextrose. Further, of the vasopressin premix formulations of Example 16 that were tested in Example 17, the only formulations meeting this criteria—those containing a 1mM acetate buffer and 5% dextrose—are Formulations G and H, Par's current vasopressin premix formulations, as discussed above.

77.     Dr. Miller next states that alleged Trade Secret 33 is that "Par's development program also determined that tonicity agents, such as saline, produced more impurities in the premix product as compared with 5% dextrose," and that "these same studies showed that the level of impurities increased at higher acetate buffer concentrations (i.e., 10 mM) as compared with lower concentrations (i.e., 1 mM)." (Miller Decl. at ¶100.) As I stated above, the '881 publication discloses this

same information. (Ex. 210 at [458].) Dr. Kannan agreed that the results in Example 17 showed that in stability testing of up to six months at various temperatures, the formulations with dextrose as the tonicity agent and a 1 mM acetate buffer had lower rates of degradation and impurity formation than the other formulations. (Ex. 221 at 118:13-119:9.) The degradation rate and formation of impurities for a given formulation over time at various temperatures is precisely how stability is determined and a shelf-life established for that formulation. Dr. Kannan also admitted this is one of the ways he determines long-term stability for a given formulation. (Id. at 120:24-121:12.)

78.     Accordingly Examples 16 and 17 of the '881 publication disclose all of the information constituting alleged Trade Secret 33.

### Par's Alleged Trade Secret No. 36

79.     Par's alleged Trade Secret No. 36 is set forth in the Miller Declaration at paragraph 100. This alleged trade secret relates the same subject matter as alleged Trade Secret 33, including referring to the same supporting exhibits. Specifically, the information allegedly constituting this alleged trade secret is that using dextrose as a tonicity agent results in lower impurity levels while using sodium chloride does not, and that the use of a 1 mM acetate buffer resulted in a low level of impurities, while the use of a 10 mM acetate buffer resulted in a high level of impurities. (Miller

Declaration at ¶100.) This information is all disclosed in Examples 16 and 17 of the

'881 publication, as discussed above in connection with alleged Trade Secret 33.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated:  07 DEC 2017                           _____

Exhibit 4

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

Lawrence S. Lustberg
Daniel J. McGrady
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102-5310
Telephone:  (973) 596-4500
Facsimile:   (973) 596-0545

Daniel M. Petrocelli (admitted *pro hac vice*)
Brett J. Williamson (admitted *pro hac vice*)
Jeffrey A. Barker (admitted *pro hac vice*)
David S. Almeling (admitted *pro hac vice*)
**O'MELVENY & MYERS LLP**
Times Square Tower
7 Times Square
New York, New York 10036
Telephone:  (212) 326-2000
Facsimile:   (212) 326-2061

*Attorneys for Plaintiffs Par Pharmaceutical,
Inc. and Par Sterile Products, LLC*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAR PHARMACEUTICAL, INC. and PAR STERILE PRODUCTS, LLC,<br><br>    Plaintiffs,<br><br>        v.<br><br>QUVA PHARMA, INC., STUART HINCHEN, PETER JENKINS, and MIKE RUTKOWSKI,<br><br>    Defendants. | Civil Action No.  3:17-cv-06115-MAS-DEA<br><br>**DECLARATION OF DR. CHRISTINE S. MEYER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

I, Dr. Christine S. Meyer, declare and state as follows:

    1.   I am an economist and Managing Director at National Economic Research Associates, Inc. ("NERA"). I specialize mainly in the areas of the economics of intellectual property, antitrust analysis, and the evaluation of commercial damages and harm, including in trade secrets misappropriation and unfair competition cases. I have been qualified to testify as an expert on these subjects in courts throughout the world, including in the District of New Jersey. I received my Ph.D. in economics from the Massachusetts Institute of Technology. Over the years, I have published and spoken frequently on the subject of damages. A complete list of my prior testimony and publications can be found in my *curriculum vitae*, which is appended to this declaration as **Exhibit 131**[1].

    2.   NERA is being compensated for the time I spend on this assignment at my customary hourly rate of $675 and is separately reimbursed for reasonable out-of-pocket expenses. Professional staff members employed by NERA and working under my direction have hourly billing rates that range from $225 to $565. No part of my or NERA's compensation is dependent upon the outcome of this action or the nature of the opinions I express.

---

[1] All references to "Ex. __" are to exhibits to the Declaration of David S. Almeling filed concurrently herewith.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

3.    I have been asked to provide opinions on two issues: (1) the types of economic harm that Par will likely suffer as a result of a misuse of trade secrets and breaches of employment agreements by QuVa; and (2) the extent to which that harm will be able to be quantified.[2]

4.    In preparing this declaration, I (or economists working under my direction) have relied upon court filings, internal documents provided by Par, analyst reports, publicly available information, and discussions with Par personnel.[3] A complete list of the information that has been relied upon in preparing this declaration can be found in **Exhibit 195**.

5.    My work in this matter is ongoing. Accordingly, I expressly reserve the right to supplement these opinions, if warranted, based on, for example, the receipt of additional relevant information, or if additional research or reflection leads me to change my opinions. Based on the information available to me and my analysis to date, I have reached the following principal conclusions:

---

[2]   For purposes of this declaration, I refer to Plaintiffs as Par and Defendants as QuVa. I understand that QuVa, absent a preliminary injunction barring them from doing so, may begin selling a competing vasopressin product in the U.S. at any time. If it does so, I also understand that these sales would be made "at risk" of being found by the Court to have relied on Par's trade secrets, which QuVa allegedly misappropriated.

[3]   Specifically, I relied upon a telephone conversation with Par's President, Tony Pera, and Par Sterile's Vice President of Sterile Sales, Scott Sims, on November 8, 2017 and a telephone conversation with Tony Pera on November 16, 2017.

a) If QuVa is allowed to launch a compounded vasopressin product, Par will likely suffer substantial economic harm.

b) This harm could be caused by a loss of Vasostrict® sales and/or a reduction in Vasostrict®'s price. Because Vasostrict® is the top selling drug for Par, lost revenues from Vasostrict® will significantly affect Par, beyond its losses on Vasostrict® alone. There may also be potential damage to Par's brand and an impairment of Par's ability to invest.

c) Calculating the economic harm to Par if QuVa were to launch a vasopressin product would be difficult to do with reasonable certainty. This is due to uncertainty regarding the but-for world particularly in the medium- to long-term, specifically relating to Par's future sales and the returns on Par's future investments.

## I.    Background

6.    The case at hand involves Vasostrict®, a product developed and manufactured by Par Sterile Products, LLC ("Par Sterile"), a subsidiary of Par Pharmaceutical, Inc. ("Par"), and the ultimate parent of which is Endo International plc ("Endo").[4] The active ingredient in Vasostrict® is vasopressin.[5]

---

[4] "Products," *Par Sterile*, available at http://www.parsterileproducts.com/ products/, accessed November 13, 2017. Par Pharmaceutical was purchased by Endo International in 2015. "Overview," *Endo International,* available at http://www.endo.com/our-companies/overview, accessed November 13, 2017.

Vasostrict® is "the first (and so far only) intravenous ("IV") vasopressin injection, United States Pharmacopeia ("USP"), product with a New Drug Application ("NDA") approved by the FDA." Par obtained FDA approval for Vasostrict® in April 2014.[6]

7.    Vasostrict® is used in hospital settings to "increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines."[7] Thus, I understand that Vasostrict® is a product that is used after other drugs have failed to treat relaxed blood vessels, meaning that the patient has lower blood pressure and is at-risk of organ failure.[8] I understand that Vasostrict® is sold in a vial and, prior to being

---

[5]   "Approval Package for Application Number: 204485Orig1s004, Trade Name: Vasostrict," *Center for Drug Evaluation and Research,* available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/204485Orig1s004.pdf, accessed November 15, 2017, p. 1.

[6]   *Par Pharmaceutical, Inc., and Par Sterile Products, LLC, Plaintiffs, v. QuVa Pharma, Inc., Stuart Hinchen, Peter Jenkins, and Mike Rutkowski, Defendants,* United States District Court for the District of New Jersey, C.A. No. 2:17-cv-06115, Complaint for Damages, Injunctive, and Other Relief, August 14, 2017 ("Complaint"), ¶¶16 and 22.

[7]   "Vasostrict®," *Par Sterile,* available at http://www.parsterileproducts.com/products/products/vasostrict/about-vasostrict.php, accessed November 16, 2017.

[8]   "What Is Cardiogenic Shock?," *National Heart, Lung, and Blood Institute,* available at https://www.nhlbi.nih.gov/health/health-topics/topics/shock, accessed November 15, 2017.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

administered to patients, must be diluted.[9] Par sells Vasostrict® directly to hospitals, who prepare the required dilutions of product in-house to be administered to patients, and to compounders, who prepare such dilutions of the product on the hospital's behalf, and then sell the prepared bags to hospitals.[10] I understand that the Vasostrict® sold by Par is a sterile product that is then compounded into a dilution that is ready to be administered to patients, a process known as "sterile to sterile" compounding.[11]

8.     On April 19, 2017, QuVa submitted a letter to the FDA to add vasopressin to the Bulk Drug Substances List under Section 503B of the Federal

---

[9]  I understand that a vasopressin product prepared in this manner is sometimes referred to as a "bagged" product. (Discussion with Par's Tony Pera and Scott Sims, on November 8, 2017.)

[10]  The FDA defines compounding as "a practice in which a licensed pharmacist, a licensed physician, or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combines, mixes, or alters ingredients of a drug to create a medication tailored to the needs of an individual patient." ("Compounding and the FDA: Questions and Answers," *U.S. Food & Drug Administration*, available at https://www.fda.gov/Drugs/GuidanceCompliance RegulatoryInformation/PharmacyCompounding/ucm339764.htm#what, accessed November 14, 2017.)

[11]  Discussion with Par's Tony Pera and Scott Sims, on November 8, 2017. See also, "A Visual Guide to PharMEDium's Sterile-to-Sterile Compounding Process," *PharMEDium,* available at https://www.pharmedium.com/why-pharmedium/our-process/, accessed November 15, 2017; "Memorandum Report: High-Risk Compounded Sterile Preparations and Outsourcing by Hospitals that Use Them," *Department of Health and Human Services*, available at https://oig.hhs.gov/oei/reports/oei-01-13-00150.pdf, accessed November 15, 2017 ("DHHS Memorandum Report"), p. 2.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

Food, Drug, and Cosmetic Act ("Section 503B").[12] This request was granted on July 1, 2017,[13] making vasopressin a Category 1 bulk drug substance, which I understand means that it can be compounded in bulk by an outsourcing facility,[14] such as QuVa,[15] without obtaining FDA approval of an NDA or Abbreviated New Drug Application ("ANDA"). I understand that Par alleges that, but for QuVa's misuse of trade secrets and the breaches of the employment agreements by former Par employees, QuVa would not be able to successfully compound and sell vasopressin.[16]

9.     QuVa offers compounding services,[17] including preparation of compounded formulations in IV bags to hospitals, and has a national reach with its

---

[12]  Complaint, ¶3.

[13]  "Bulk Drug Substances Nominated for Use in Compounding Under Section 503B of the Federal Food, Drug, and Cosmetic Act," *U.S. Food and Drug Administration,* available at https://www.fda.gov/downloads/drugs/guidance complianceregulatoryinformation/pharmacycompounding/ucm467374.pdf, accessed November 16, 2017, p. 3.

[14]  Complaint, ¶3.

[15]  "Registered Outsourcing Facilities," *U.S. Food and Drug Administration,* available at https://www.fda.gov/drugs/guidancecomplianceregulatoryinformati on/pharmacycompounding/ucm378645.htm, accessed November 10, 2017.

[16]  Complaint, ¶55. I understand that Par alleges that employment contracts were breached by defendants Stuart Hinchen, Peter Jenkins, and Mike Rutkowski (Complaint, ¶¶98-149).

[17]  "503B Outsourcing Services," *QuVa Pharma,* available at http://www.quva pharma.com/503b-outsourcing-services/, accessed November 14, 2017.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

large-scale manufacturing.[18] I also understand that because vasopressin is a Section 503B Category 1 bulk drug substance, QuVa  would not require an NDA or an ANDA approval from the FDA in order for it to begin compounding and selling a vasopressin product to hospitals. Thus, QuVa would skip the expensive, time-consuming, and rigorous ANDA approval process that FDA-approved drugs face.[19]

I also understand that, because vasopressin is a 503B Category 1 bulk substance drug substance, QuVa plans to utilize a vasopressin bulk drug substance that has not been approved by the FDA and compound it into a "bagged" product for use by hospitals, and that it would not be able to do so but for the misappropriation of Par's trade secrets and improper hiring of former Par employees.[20] I understand that QuVa's vasopressin product could be derived from a non-sterile substance that

---

[18] "QuVa Pharma Acquires Biotech Pharmaceutical Facility in New Jersey," *Cision PR Newswire,* available at https://www.prnewswire.com/news-releases/quva-pharma-acquires-biotech-pharmaceutical-facility-in-new-jersey-300302583.html, accessed November 17, 2017.

[19] "FDA Fact Sheet: What's Involved in Reviewing and Approving Generic Drug Applications?," available at https://www.fda.gov/downloads/Drugs/Resources ForYou/Consumers/BuyingUsingMedicineSafely/GenericDrugs/UCM510852.p df, accessed November 17, 2017. A 2009 FTC report noted that "the product development costs for small-molecule generic drugs [typically take] three to five years to develop and cost between $1 and $5 million." (Wroblewski, Michael S. et al., "Emerging Health Care Issues: Follow-on Biologic Drug Competition," *Federal Trade Commission,* June 2009, available at https://www.ftc.gov/sites/ default/files/documents/reports/emerging-health-care-issues-follow-biologic-drug-competition-federal-trade-commission-report/p083901biologicsreport.pdf, accessed November 17, 2017.)

[20] Complaint, ¶55.

would be compounded into a sterile bagged formulation and sold to hospitals.[21] I understand that such a process (i.e., beginning with a non-sterile substance and compounding that substance into a sterile formulation) is known as "non-sterile to sterile compounding" or "high risk compounding," because there is no requirement that the compounder use an FDA-approved product.[22]

## II.  Issue 1: Par Will Likely Suffer Substantial Economic Harm as a Result of QuVa's Launch of a Competing Vasopressin Product

10.  Sales of Vasostrict® are and have been substantial. Internal data from Par show that Vasostrict® revenues have been generally increasing over time since the product launched in 2014. **Exhibit 199** shows that the net revenue has increased over time since Vasostrict®'s launch, reaching $301 million in the first three quarters of 2017. In addition, Vasostrict® is an important drug in Par's—and, indeed, in Par's parent company, Endo's—product portfolio.[23] Sales of Vasostrict® made up a majority of Par Sterile's total revenues for the first three

---

[21] Discussion with Par's Tony Pera and Scott Sims, on November 8, 2017.

[22] Discussion with Par's Tony Pera and Scott Sims, on November 8, 2017. See also, DHHS Memorandum Report, p. 2.

[23] In fact, a recent Morgan Stanley analyst report stated, "Vasostrict durability matters because it is Endo's largest profit contributor." (Chantanapongwanij, Onusa, Thomas Chiu, Zhu Shen Ng, and David Risinger, "Vasostrict CP and Compounding Considered," *Morgan Stanley,* November 15, 2017, p. 1.)

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

quarters of 2017.[24] Vasostrict® generated $343.5 million in net sales in 2016,[25] which was at least $150 million more than any of the branded product's revenues listed in Endo's 2016 10-K.[26] According to analyst reports, Vasostrict® was Endo's "top selling product" in 2016,[27] and it is projected to "account for north of 20% of 2017 EBITDA" for 2017.[28]

---

[24] Vasostrict®'s net revenues were estimated to be approximately 60 percent of total net revenues ($301 million out of $499 million) for Par Sterile's products from January through September 2017. See "Par Sterile U.S. Generic Segment Product P&L, 2017 October LBE," (Par Sterile NS & GM By Product for Vaso Litigation_111017 (Oct LBE).pdf). I understand that the  Par Sterile has products not included on the Par Sterile Product P&L above and, even when those products are considered, Vasostrict® still makes up a majority of Par Sterile's net sales. See "Licensed U.S. Generic Segment Product P&L, 2017 October LBE" (Licensed NS & GM By Product for Vaso Litigation_111417 (Oct LBE).pdf)).

[25] Endo International plc Form 10-K for the fiscal year ended December 31, 2016, p. 67.

[26] Endo International plc Form 10-K for the fiscal year ended December 31, 2016, p. 68.

[27] Darout, Etzer, and Jason Gerberry, "Endo International plc: 4Q Wrap-Up: Modest Sales Beat, But Lowering Ests on Pessimistic '17 Guide," *Leerink Partners,* February 28, 2017, p. 1; Finkelstein, Andrew, "Endo International: Managing Through a Challenging Environment," *Susquehanna Financial Group, LLLP*, August 9, 2017, p. 5.

[28] Amsellem, David, "Endo International (ENDP): Injectables Look Great, But Visibility on LT Durability Murky," *Piper Jaffray,* November 9, 2017, p. 1. A Barclays analyst report states that it estimates Endo's 2017 EBITDA will be $1.5 billion and, thus, 20% of EBITDA would imply $300 million for Vasostrict®. Indeed, Vasostrict® was projected to have more than $300 million in sales in 2017. See also, Nadipuram, Sriker, Douglas D. Tsao, and Morgan Williams, "Endo International PLC: Comings & Goings for Vasostrict," *Barclays,* August 18, 2017.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

11.   If QuVa's launch causes Par to lose sales of Vasostrict® and/or causes the price of Vasostrict® to be reduced, Par will lose profits. Those lost profits could be substantial, they could occur through a variety of mechanisms, and they could have immediate as well as medium- and long-term effects.

12.   For example, if QuVa launches a competing vasopressin product, Par is likely to lose sales of Vasostrict® to QuVa's product. In addition, if QuVa launches a competing vasopressin product, price competition between Par and QuVa will likely ensue, lowering the price of Vasostrict®.

13.   Par's internal projections reveal that entry by a generic competitor would alter Par's revenue forecasts substantially.[29] Rather than a 10 percent increase in yearly revenue—which is what had been predicted for the year prior and for the other scenarios in which there was no entry—Par would expect a 35 percent *decrease* in yearly revenue.[30] A UBS analyst report also forecasts that a hypothetical generic Vasostrict® competitor entering in 2020 would drastically decrease Vasostrict® sales. It projects $400.3 million in sales for Vasostrict® in

---

[29] The document shows the expected decline in Vasostrict® sales due to a competitor in April 2020. I understand from Par that the competitor modeled in this document is a *generic* competitor. See "Vasostrict® – Key Revenue Metrics" (U.S. Gx Dec'16 Strat Plan – Vasostrict®_102517.pptx).

[30] "Vasostrict® – Key Revenue Metrics" (U.S. Gx Dec'16 Strat Plan – Vasostrict® _102517.pptx).

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

2019 (before generic entry) and $140.1 million in sales in 2020, a 65% drop.[31] In addition, because QuVa can launch without incurring the costs associated with seeking FDA approval of an ANDA for its product, which a generic competitor would incur, it may be able to price its product below the expected price of a generic, leading to even more price erosion and/or lost sales for Vasostrict®.

14. I also understand that Par is in the process of developing additional vasopressin products. In fact, Par recently released a 10 mL version of Vasostrict®, and I understand that Par is developing a "bagged" product that may be similar to the product that QuVa plans to launch.[32] Par may also lose sales of these new products if QuVa were to launch a vasopressin product. If QuVa were to launch their product, it would be difficult to ascertain the damages to Par because such a calculation would involve estimating the but-for sales for a new product with limited historical experience on which to base future expected sales. As noted below, it can be difficult to predict future sales even with a record of past sales.

## III. Issue 2: Accurately Quantifying All Economic Harm to Par if QuVa Launches a Competing Vasopressin Product Will Likely Not Be Possible

---

[31] Ear, Uy, Marc Goodman, and Zidong Zhang, "Endo International: Another Solid Quarter in a Tough Environment," *UBS,* November 9, 2017, pp. 1 and 8.

[32] "Vasostrict® Vial Forecasts" (Vasostrict® Forecasts PreMix 11-9-17.xlsx).

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

15.  In the event that QuVa does launch a product and a damages expert is asked to assess Par's damages, Par's lost profits would be, among other things, at least from a theoretical perspective the difference between the profits Par would have made from sales of Vasostrict had QuVa not launched its competing product and the profits from sales of Vasostrict that Par actually made. However, to measure such lost profits, a damages expert would have to calculate both of these amounts reliably, which would be difficult to do given all of the uncertainties outlined below.

16.  As I have described above, QuVa's launch of a vasopressin product will likely cause some hospitals to switch from Vasostrict® to QuVa's product, resulting in lost sales to Par. Additionally, the competition from QuVa is likely to cause a decrease in the price of Vasostrict®. Actual sales of Vasostrict® and the profits from those sales will be able to be measured during the period for which QuVa's product is sold. However, estimates of the sales of Vasostrict® (and related profits) *but for* QuVa's entry will be uncertain or, at a minimum, difficult to calculate in their entirety. Below, I identify and describe several factors that individually and collectively contribute to this uncertainty. These relate to the specific and unusual economic circumstances in this particular case, specifically the fact that the launch of QuVa's product may cause long-lasting harm to Par through harm to its reputation, as the QuVa product would not have FDA approval

13

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

and may not be up to the same quality standards as Vasostrict®. Such harm would be in addition to immediate harm from lost sales due to direct competition with QuVa's product. In addition, because revenues from Vasostrict® make up a substantial amount of Par's (and Endo's) overall revenues, the effect of the lost revenues from Vasostrict® could affect future investments, thereby compounding the harm to Par and making it even more speculative to quantify the extent of the harm.

17. Vasostrict® was the first and is currently the only FDA-approved intravenous vasopressin injection available in the United States, and its historical sales revenues (based on internal data) have been substantial, generating hundreds of millions of dollars in revenues and profits (see **Exhibit 199)**. Past experience does not necessarily predict future performance, and how Vasostrict®'s sales would continue to evolve if QuVa were not to launch its vasopressin product is uncertain. But for QuVa's launch, Vasostrict®'s sales could continue to increase over time. However, estimating the magnitude of what the change would have been will be difficult, which could cause the estimate of incremental losses to understate the actual losses incurred.[33] Indeed, Par's projections themselves also demonstrate the uncertainty involved in making such a prediction. Par has

---

[33] In fact, the bias of the estimate could be in either direction, which further contributes to its uncertainty.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

projected various scenarios—varying by as much as $149 million from 2015 through 2019, even without entry by a competitor—revealing its own uncertainty regarding Vasostrict®'s growth with and without competition (see **Exhibit 204**).

18.   In addition, although Par has modeled scenarios related to the effects of potential generic entrants, as noted above, I understand that QuVa's product would not be an FDA-approved generic equivalent. Thus, whether QuVa's entry would have an effect similar to that of a generic is uncertain, which further underscores the uncertainty of the precise magnitude of an effect (other than the fact that it would likely be negative) of QuVa's misuse of Par's trade secrets on Par's profits.

19.   Moreover, I understand that the FDA's Interim Policy on Compounding under Section 503B—which I understand is the policy that would allow QuVa to enter the market with a vasopressin product without an approved NDA or ANDA from the FDA—was published in January 2017 and, thus, has been in place for a relatively short period of time.[34] The lack of history related to product launches under this policy—and the effects of those launches on existing FDA-approved products—makes it difficult to model the precise quantitative negative effect of QuVa's launch on Par.

---

[34] "Interim Policy on Compounding Using Bulk Drug Substances Under Section 503B of the Federal Food, Drug, and Cosmetic Act," *U.S. Department of Health and Human Services,* January 2017, available at https://www.fda.gov/downloads /Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM469122.pd f, accessed October 23, 2017.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

20.  QuVa's launch may also cause harm to Par through means beyond lost sales directly to QuVa. These types of harms could be long-lasting and, as such, difficult to quantify.

21.  For example, QuVa's launch is likely to affect Par's and its parent company Endo's ability to invest in R&D and product improvements that could lead to future profits for Par and Endo. I understand that Par and Endo have been making substantial capital investments with the profits earned from Vasostrict® and that they plan to continue making such investments.[35]

22.  Par Sterile, a subsidiary of Par and Endo, operates a sterile drug manufacturing facility that specializes in injectables, located in Rochester, Michigan. I understand that most of Par Sterile's products, including Vasostrict®, are manufactured in this facility. Par's parent company, Endo, invests in and plans to continue to expand and upgrade the Rochester facilities. For example, from January through October 2017, Endo estimated that it invested over $36 million in the Rochester facility, and it has budgeted an additional $40 million for 2018.[36] As noted above, Vasostrict® was the highest-earning product in Endo's portfolio in

---

[35] Discussion with Par's Tony Pera and Scott Sims, on November 8, 2017. See also, "Endo 2018 Capital Plan, November 8, 2017" (2018 Capital Summary 11.8.2017.pptx), slide 2.

[36] "Endo 2018 Capital Plan, November 8, 2017" (2018 Capital Summary 11.8.2017.pptx), slide 2.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

2016.[37] Thus, QuVa's launch could impair Endo's ability to make the capital expenditures required to manufacture new and existing vasopressin and non-vasopressin products, leading to a long-term reduction in profits.

23.   I understand that having the financial ability to maintain and operate the Rochester facility is critically important for Endo.[38] I further understand from discussions with Par's President, Tony Pera, that such investments and upkeep of the Rochester facility would not be possible without the revenues and profits from Vasostrict®. Based on my review of the information available to me, this claim is economically reasonable, given the importance of Vasostrict® in Par's portfolio.

24.   I understand from Par personnel that if profits on Vasostrict® decline substantially, Par would decrease its investments because it would no longer expect to make as large of a return on investment from the capital improvements in the Rochester facility. This is because, as I understand, the capital improvements and investments in the Rochester facility are designed to enable the continued production of Vasostrict® as well as allow for the development of new products, including new formulations of Vasostrict® and a pre-mix vasopressin product.

---

[37] Darout, Etzer, and Jason Gerberry, "Endo International plc: 4Q Wrap-Up: Modest Sales Beat, But Lowering Ests on Pessimistic '17 Guide," Leerink Partners, February 28, 2017, p. 1; Finkelstein, Andrew, "Endo International: Managing Through a Challenging Environment," Susquehanna Financial Group, LLLP, August 9, 2017, p. 5.

[38] Discussion with Par's Tony Pera and Scott Sims, on November 8, 2017.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

25.  In addition to losing a revenue stream that Par can use for future investments, losing revenues from Vasostrict® can affect Par's (or Endo's) ability to raise capital. A Leerink Partners analyst report notes that Endo should not be "at risk of violating debt covenants unless a string of unexpected events unfold, including... multiple competitors to Vasostrict® get approved."[39] This report implies that entry by competitors could affect Endo's ability to repay its debts. If QuVa's entry leads analysts to believe that Endo would have a hard time repaying its debts, it could be harder and/or more expensive for Endo to issue debt for future investments.

26.  Because Vasostrict® generates a large part of Par's and, indeed, Endo's, revenues and profits, a substantial loss of sales of Vasostrict® could also harm the company's attractiveness to investors and, thus, its stock price. Market analysts following this market have already indicated concerns following the FDA's approval of vasopressin as a Section 503B Category 1 substance, stating:

> Vasostrict® sales of $96M in 2Q17 annualizes to approximately 11% of projected 2017 revenue and approximately 20% of adjusted EBITDA. Following the FDA's decision to put vasopressin on the bulk drug substances under evaluation list, it is possible that compounding pharmacies are now able to sell compounded vasopressin to hospitals using vasopressin API instead of Vasostrict® vials. What contingencies does ENDP have in place to retain

---

[39] Darout, Etzer, and Jason Gerberry, "Endo International plc: Lowering Ests, Persistent US Gx Headwinds, Lowering PT to $12," *Leerink Partners,* January 24, 2017, p. 1.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

market share in this instance and can you quantify what effect you expect this to have on sales?[40]

27.  There are other sources of harm to Par's reputation caused by QuVa's launch that would continue even after QuVa's product is taken off the market by a permanent injunction. If this preliminary injunction is not granted, QuVa will be able to sell a product that may not be subject to the same standards and/or FDA oversight as Vasostrict®. This is because currently there are higher safety and quality standards for manufacturing FDA-approved drugs, such as Vasostrict® than there are for manufacturing bulk compounded products using bulk drug substances that have not been FDA-approved.[41]

28.  A safety incident and/or recall for QuVa's vasopressin product could have immediate as well as long-lasting effects on Par's profits from sales of

---

[40] Nadipuram, Sriker, Douglas D. Tsao, and Morgan Williams, "Barclays Fall Outlook & Conference Guide: Spec Pharma Conference Guide," *Barclays,* August 31, 2017, p. 11.

[41] See, e.g., Jennifer Gudeman, Michael Jozwiakowski, John Chollet, and Michael Randell, "Potential Risks of Pharmacy Compounding," *Drugs RD*, Vol 13, Number 1, March 23, 2013, p. 1, "Unlike FDA-approved drugs, pharmacy-compounded products are not clinically evaluated for safety or efficacy. In addition, compounded preparations do not have standard product labeling or prescribing information with instructions for safe use. Compounding pharmacies are not required to report adverse events to the FDA, which is mandatory for manufacturers of FDA-regulated medications." See also, Sasich, Larry D.and Sana R. Sukkari, "Unknown Risks of Pharmacy-Compounded Drugs," *The Journal of the American Osteopathic Association,* 108.2, February 2008.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

Vasostrict® and quantifying such effects would be a complex and uncertain exercise. Indeed, there may be harm to the brand that cannot be undone.

29.   If a safety incident and/or recall occur as a result of QuVa's product launch using Par's trade secrets, Vasostrict®'s reputation would likely suffer, even if Vasostrict® was not itself recalled or found to be unsafe, because Vasostrict® is the leading vasopressin product on the market. I understand that safety concerns regarding QuVa's vasopressin product generally could translate to safety concerns regarding Vasostrict® and that a recall of vasopressin could have a negative spillover effect on Vasostrict®, and, thus, Par's revenues from Vasostrict®. Moreover, if QuVa enters, and is later enjoined, but, in the meantime, a safety issue ensues, it may be difficult to tie the losses due to the safety issue to QuVa's entry.

30.   Breaches in sterility, such as recalls by compounding outsourcing facilities like QuVa, have occurred recently and can have devastating effects on a company's and/or product's reputation. For example, in July 2017, Cantrell Drug Company, a compounding outsourcing facility,[42] "voluntarily recall[ed] all lots of unexpired sterile drug products to the hospital and user level due to lack of sterility

---

[42] "Cantrell Drug Company Updates FDA-Registration to 503B Outsourcing Facility," *Cantrell Drug Company,* available at https://cantrelldrug.com/company-announcements/, accessed November 8, 2017.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

assurance."[43] The company eventually filed for re-organization under Chapter 11 of the U.S. Bankruptcy Code due to multiple FDA inspections into their product development.[44]

31. Another recall recently occurred in September 2017 when United Pharmacy, a compounding pharmacy,[45] recalled its glutamine, arginine, and carnitine (GAC) injectable product amid safety concerns.[46] These recalls provide examples of how bulk compounded products (such as QuVa's potential vasopressin product) may pose safety risks compared to FDA-approved products

---

[43] "Cantrell Drug Company Issues Voluntary Nationwide Recall of All Sterile Drug Products Due to Lack of Sterility Assurance," *U.S. Food and Drug Administration,* available at https://www.fda.gov/Safety/Recalls/ucm568494 .htm, accessed November 8, 2017.

[44] "Cantrell Drug Company Announces Reorganization," *Benzinga,* available at https://www.benzinga.com/pressreleases/17/11/b10740131/cantrell-drug-company-announces-reorganization, accessed November 8, 2017.

[45] "United Pharmacy Home Page," *United Pharmacy*, available at http://united-rx.com/, accessed November 15, 2015.

[46] The FDA found that some samples of United Pharmacy's compounded GAC product had a high pH and were missing active ingredients. "FDA investigates two adverse events associated with United Pharmacy's compounded glutamine, arginine, and carnitine product for injection," *U.S. Food and Drug Administration,* available at https://www.fda.gov/Drugs/GuidanceCompliance RegulatoryInformation/PharmacyCompounding/ucm584125.htm?utm_campaig n=Compounding%20Risk%20Alert%3A%20United%20Pharmacy%E2%80%99 s%20glutamine%2C%20arginine%2C%20and%20carnitine&utm_medium=ema il&utm_source=Eloqua, accessed November 15, 2015.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

(such as Vasostrict®) because they "have not been evaluated by FDA for safety, effectiveness, and quality."[47]

32. I also understand that QuVa is soliciting Par's key employees, including employees with intimate knowledge of Vasostrict®. From an economic perspective, high levels of employee turnover, including the loss of numerous employees with unique knowledge, skill, and experience, can cause economic harm to a company because the company loses their productivity, a value that is particularly difficult to quantify.[48] High employee turnover can also lead to disruption of day-to-day operations, and impose additional hiring and training costs to a firm such as Par. These harms are also difficult to quantify because they affect the company in various dimensions. High levels of turnover and/or loss of key employees may also affect a company's growth, leading to long-term harm.

33. The stock price of Par's parent company, Endo, could also be affected by these potential harms resulting from QuVa's misappropriation of trade secrets and breaches of employment agreements.[49] If an actual safety incident were to occur, or even if the market perceives an increased risk of a safety event, as a result of QuVa's entry, this could reduce Endo's stock price. Likewise, if high employee

---

[47] *Ibid.*

[48] See, e.g., Kung, Mei-Chuan and Matthew O'Connell, "The Cost of Employee Turnover," *Industrial Management,* January/February 2007.

[49] Discussion with Par's Tony Pera, on November 16, 2017.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

turnover or the risk of key employees leaving causes the market to perceive Endo's (and Par's) expected future growth as more risky, this, too, could cause a decline in Endo's stock price.[50] In summary, all of the concerns and risks associated with QuVa's entry have the potential to harm Endo's and Par's reputation and market valuation.

34.  In conclusion, I find that Par is likely to suffer economic harm as a result of QuVa's misappropriation of trade secrets and breaches of employment agreements to launch a vasopressin product. I also find that quantifying that harm with a reasonable degree of certainty will likely not be possible due to the varying dimensions of harm to Par, including lost sales to QuVa, price erosion, potential damage to Par's brand, an impairment of Par's ability to invest, and costs associated with the loss of workforce.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

---

[50]  Indeed, an August 2017 analyst report from Barclay's stated that "[a] more immediate threat to ENDP's Vasostrict franchise would appear to be QuVa Pharma." This report also noted Endo's lawsuit regarding QuVa's hiring of nine employees from Par. (Nadipuram, Sriker, Douglas D. Tsao, and Morgan Williams, "Endo International PLC: Comings & Goings for Vasostrict," *Barclays,* August 18, 2017).

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

Executed on the 17th day of November, 2017.

_Christine S. Meyer_

_____

Christine S. Meyer

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

**BLANK ROME LLP**
*A Pennsylvania LLP*
Stephen M. Orlofsky, Esquire
David C. Kistler, Esquire
New Jersey Resident Partners
Leigh Ann Buziak, Esquire
300 Carnegie Center, Suite 220
Princeton, NJ 08540
Telephone: (609) 750-7700
Facsimile: (609) 750-7701
Orlofsky@blankrome.com
Kistler@blankrome.com
LBuziak@blankrome.com
*Attorneys for Defendants*

**MERCHANT & GOULD P.C.**
Jeffrey S. Ward (*admitted pro hac vice*)
Wendy M. Ward (*admitted pro hac vice*)
Stephen R. Howe (*admitted pro hac vice*)
Emily Wessels (*admitted pro hac vice*)
10 E. Doty Street, Suite 600
Madison, WI 53703
Telephone: (608) 280-6751
Facsimile: (612) 332-9081
JWard@MerchantGould.com
WWard@MerchantGould.com
SHowe@MerchantGould.com
EWessels@MerchantGould.com
*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAR PHARMACEUTICAL, INC. and PAR STERILE PRODUCTS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>QUVA PHARMA, INC., STUART HINCHEN, PETER JENKINS, MIKE RUTKOWSKI, DONNA KOHUT, TRAVIS MCGRADY, DAVID HARTLEY, and DAVID SHORT,<br><br>Defendants. | Civil Action No. 3:17-06115-BRM-DEA<br><br>*Filed Electronically*<br><br><br>**ORDER SETTING REQUIRED BOND AMOUNT** |

**THIS MATTER** having been opened to the Court by Stephen M. Orlofsky, Esq. of Blank Rome LLP, a Pennsylvania limited liability partnership, attorneys for Defendant QuVa Pharma, Inc., for an order requiring the posting of a bond amount in connection with the Court's preliminary injunction order, and Lawrence S. Lustberg, Esq. of Gibbons, P.C. appearing on behalf of the Plaintiffs in opposition to the motion to set the bond amount, and the Court having considered the moving papers, the papers in opposition, if any, and for other good cause shown, it is

**ON THIS _____ DAY OF APRIL, 2018,**

**ORDERED** that Plaintiffs Par Pharmaceutical, Inc. and Par Sterile Products LLC will post a bond in the amount of $102 million before the Court's preliminary injunction order (Dkt. 158) becomes effective.

_____

Honorable Brian R. Martinotti, U.S.D.J.