**BLANK ROME LLP**
*A Pennsylvania LLP*
Stephen M. Orlofsky, Esquire
David C. Kistler, Esquire
*New Jersey Resident Partner:*
Leigh Ann Buziak, Esquire
300 Carnegie Center, Suite 220
Princeton, NJ 08540
Telephone: (609) 750-7700
Facsimile: (609) 750-7701
Orlofsky@blankrome.com
Kistler@blankrome.com
LBuziak@blankrome.com
*Attorneys for Defendants*

**GREEN GRIFFITH & BORG-BREEN LLP**
Jeffrey S. Ward (*admitted pro hac vice*)
Wendy M. Ward (*admitted pro hac vice*)
8383 Greenway Blvd., Suite 600
Middleton, WI 53562
Telephone: (312) 883-8060
JWard@GreenGriffith.com
WWard@GreenGriffith.com

Emer Simic (*admitted pro hac vice*)
City Place
676 North Michigan Avenue, Suite 3900
Chicago, IL 60611
Telephone: (312) 883-8000
ESimic@GreenGriffith.com
*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAR PHARMACEUTICAL, INC., and PAR STERILE PRODUCTS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>QUVA PHARMA, INC., STUART HINCHEN, PETER JENKINS, MIKE RUTKOWKSI, DONNA KOHUT, DAVID SHORT, STEPHEN RHOADES, TRAVIS McGRADY, and DAVID HARTLEY,<br><br>Defendants. | Civil Action No. 3:17-cv-06115-BRM-DEA |

**DEFENDANTS QUVA'S, HINCHEN'S AND JENKINS' ANSWER,
AFFIRMATIVE DEFENSES AND COUNTERCLAIMS
TO PAR'S FIRST AMENDED COMPLAINT**

Defendants QuVa Pharma, Inc. ("QuVa"), Stuart Hinchen ("Hinchen") and Peter Jenkins ("Jenkins") (collectively, and together with QuVa, "Defendants"), by and through their counsel, hereby respond to the enumerated paragraphs of Plaintiffs' First Amended Complaint (D.I. 114) as follows. For purposes of this Answer, Defendants assume that the headings used in the Complaint are for organizational purposes and do not require a response. To the extent a response is required, the allegations of the headings are denied.

## NATURE OF THE CASE

1.     This is a blatant case of trade secrets theft. Defendant QuVa and its principals, Defendants Stuart Hinchen and Peter Jenkins, were desperate to begin competing with Par's life-saving, FDA-approved, vasopressin-based cardiopulmonary drug Vasostrict®, but were unwilling to spend the time and money to do the research and development work necessary to launch their own alternative product. So they took a short cut. Just four months after leaving their positions as Par Sterile executives, Hinchen and Jenkins began a poaching campaign to hire away key employees with intimate knowledge of Par's trade secrets regarding the development, validation, regulatory approval, and market introduction of sterile pharmaceutical products, including Vasostrict®. Par's former employees then assisted in the disclosure and use of Par's trade secrets, as well as the unlawful solicitation of additional Par employees, to establish QuVa as a competitor to Par. Defendants Donna Kohut, David Short, and Stephen Rhoades disclosed Par's trade secrets in an effort to assist QuVa in creating its competing sterile products. Defendants Kohut, Short, Rhoades, Travis McGrady, and David Hartley solicited additional Par Sterile employees in violation of their non-solicitation agreements with Par. To date, QuVa has hired at least twelve former Par Sterile executives, managers, and consultants, almost all of whom were solicited in violation of contractual promises to Par. QuVa's hiring practices are highlighted by the recent addition of former Par Sterile Senior Vice President and General Manager, Defendant Mike Rutkowski.

**RESPONSE:** *Defendants admit that Hinchen and Jenkins were formerly executives*

*employed by Par Sterile and that former Par Sterile employees or consultants, many of*

2

*whom worked with Hinchen and Jenkins prior to their employment by Par Sterile,*

*including Rutkowski, Kohut, Short, McGrady, Rhoades and Hartley, were hired by QuVa.*

*Defendants deny the remaining allegations in Paragraph 1.*

2.     Internal Par email records show that in the weeks and months leading up to his April 14, 2017 departure from Par Sterile, Rutkowski was communicating with QuVa personnel and, in violation of Par's rights, disclosing highly confidential and proprietary information relating to manufacturing and storage methods, operating details and results, business strategies for Vasostrict®, and other confidential Par information. Rutkowski hid these communications from Par, which has only recently discovered them after conducting an investigation. This investigation has also uncovered that Rutkowski additionally violated Par company policy by, on information and belief, improperly downloading numerous Par documents to a personal hard drive within days of giving notice that he was leaving the company. These documents include, on information and belief, confidential Par documents regarding personnel, finances, corporate strategy, and many other topics.

**RESPONSE:** *Defendants deny the allegations in Paragraph 2.*

3.     Additionally, on April 19, 2017—just five days after Rutkowski's departure from Par Sterile—QuVa submitted a letter to the U.S. Food and Drug Administration ("FDA") seeking to add vasopressin to a list of active ingredients for drug compounding in an effort to avoid the formal FDA approval process, which effort, if successful, would allow QuVa to directly compete with Par Sterile's formally FDA approved Vasostrict®. Although the letter was rife with factual misrepresentations, the FDA nevertheless relied on it in deciding to add vasopressin to its Bulk Drug Substances List dated as of July 1, 2017, indicating that it is now under "Category 1" of bulk drug substances under evaluation pursuant to Section 503B of the Food, Drug and Cosmetic Act of 1938 ("FDCA"). Inclusion in Category 1 means that "the FDA does not intend to take action against an outsourcing facility" that compounds the drug substance at issue while it is under evaluation, effectively giving a green light to an outsourcing facility such as QuVa to begin compounding.

**RESPONSE:** *Defendants admit that QuVa submitted a letter to the FDA on April 19,*

*2017 nominating vasopressin as a Bulk Drug Substance that can be used to compound*

*drug products in accordance with section 503B of the Federal Food, Drug and Cosmetic*

*Act. Defendants further admit that the FDA added vasopressin to its "Category 1- Bulk*

*Substances Under Evaluation" List as of the July 1, 2017 update. Defendants deny the*

*remaining allegations in Paragraph 3.*

4.    QuVa has already begun manufacturing and selling competing sterile pharmaceutical products, including Ephedrine, Epinephrine HCl, Ketamine, Methohexital, Neostigmine, and Oxytocin, using Par's confidential and proprietary trade secrets, and QuVa has admitted that it intends to begin manufacturing and selling a vasopressin product that will compete with Par's Vasostrict® "as soon as possible," which will also be done using Par's confidential and proprietary trade secrets, actions that will irreparably harm Par if not enjoined.

**RESPONSE:** *Defendants admit that QuVa manufactures and sells compounded sterile*

*pharmaceutical products, including Ephedrine, Epinephrine HCl, Ketamine,*

*Methohexital, Neostigmine, and Oxytocin. Defendants admit that QuVa is prepared to*

*manufacture and sell a vasopressin product. Defendants deny the remaining allegations*

*in Paragraph 4.*

5.    In light of these actions, Par has no choice but to bring this action to prevent QuVa from unfairly competing and improperly usurping Par's significant investment in Vasostrict® and other sterile pharmaceutical products.

**RESPONSE:** *Defendants deny the allegations in Paragraph 5.*

## THE PARTIES

6.    Plaintiff Par Sterile is a Delaware limited liability company with its headquarters in Chestnut Ridge, New York. Par Sterile is a wholly-owned, indirect subsidiary of Par Pharmaceutical. In 2014, Par Pharmaceutical acquired JHP Group Holdings, Inc., which was the ultimate parent company of JHP Pharmaceuticals, LLC ("JHP"), a Delaware limited liability company that was headquartered in Parsippany, New Jersey, and changed JHP's name to Par Sterile.

4

**RESPONSE:** *Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6, and therefore deny the same.*

7.     Plaintiff Par Pharmaceutical is a New York corporation with its headquarters in Chestnut Ridge, New York. Par Pharmaceutical is a wholly-owned, indirect subsidiary of Endo International plc.

**RESPONSE:** *Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7, and therefore deny the same.*

8.     Par is informed and believes that Defendant QuVa is a Delaware corporation with a regular and established place of business in Bloomsbury, New Jersey.

**RESPONSE:** *Defendants admit that QuVa is a Delaware corporation and that it has a facility in Bloomsbury, New Jersey. Defendants deny the remaining allegations in Paragraph 8.*

9.     Par is informed and believes that Defendant Stuart Hinchen is a resident of Saddle River, New Jersey. Hinchen served as President and Chief Executive Officer of JHP in Parsippany, New Jersey from its founding in 2007 until the acquisition of JHP Group Holdings, Inc., which was the ultimate parent company of JHP, by Par Pharmaceutical in February 2014 through a reverse subsidiary merger, and as President of Par Sterile in Woodcliff Lake, New Jersey from February 2014 to June 11, 2014, and by doing so availed himself of the privileges of New Jersey law.

**RESPONSE:** *Defendants admit served as President and Chief Executive Officer of JHP in Parsippany, New Jersey from its founding in 2007 until the acquisition of JHP Group Holdings, Inc., which was the ultimate parent company of JHP, by Par Pharmaceutical in February 2014 through a reverse subsidiary merger. Defendants deny the remaining allegations in Paragraph 9.*

5

10.     Par is informed and believes that Defendant Peter Jenkins is a resident of New York City, New York. Jenkins served as Chief Development Officer of JHP in Parsippany, New Jersey from its founding in 2007 until the acquisition of JHP Group Holdings, Inc. (as described above), and as Chief Development Officer of Par Sterile in Woodcliff Lake, New Jersey from February 2014 to June 6, 2014, and by doing so availed himself of the privileges of New Jersey law.

**RESPONSE:** *Defendants admit that Jenkins served as Chief Development Officer of JHP in Parsippany, New Jersey from its founding in 2007 until the acquisition of JHP Group Holdings, Inc., which was the ultimate parent company of JHP, by Par Pharmaceutical in February 2014 through a reverse subsidiary merger. Defendants deny the remaining allegations in Paragraph 10.*

11.     Par is informed and believes that Defendant Mike Rutkowski is a resident of the State of New Jersey and is an employee of QuVa in Bloomsbury, New Jersey. Rutkowski served as Vice President and General Manager of JHP from May 2013 until the acquisition of JHP Group Holdings, Inc. (as described above). As Senior Vice President and General Manager of Par Sterile from February 2014 to April 14, 2017, Rutkowski regularly traveled to and communicated with other executives at JHP's headquarters at Parsippany, New Jersey, and subsequently at Par Sterile's headquarters in Woodcliff Lake, New Jersey, and by doing so availed himself of the privileges of New Jersey law.

**RESPONSE:** *Defendants admit that Rutkowski is a resident of the State of New Jersey and is an employee of QuVa in Bloomsbury, New Jersey. Defendants admit that Rutkowski served as Vice President and General Manager of JHP from May 2013 until the acquisition of JHP Group Holdings, Inc. Defendants lack knowledge or information sufficient to form a belief as to the truth of whether Rutkowski regularly traveled to and communicated with other executives at JHP's headquarters at Parsippany, New Jersey,*

6

*and subsequently at Par Sterile's headquarters in Woodcliff Lake, New Jersey, and*

*therefore deny the same. Defendants deny the remaining allegations in Paragraph 11.*

12.     Par is informed and believes that Defendant Donna Kohut is a resident of the State of Texas and is an employee of QuVa in Sugar Land, Texas. Kohut, as an employee of LexaMed Ltd., served as a consultant for JHP from 2007 until the acquisition of JHP Group Holdings, Inc. (as described above). Kohut continued as a consultant for Par Sterile at the Rochester, Michigan facility from February 2014 to August 2015. Kohut also served as a consultant for QuVa from November 2014 until her eventual hiring as QuVa's Vice President of Operations on or about August 2015. Kohut, as Vice President of Operations, regularly travels to and communicates with QuVa employees at QuVa's Bloomsbury, New Jersey facility, and by doing so availed herself of the privileges of New Jersey law.

**RESPONSE:** *Defendants admit that Kohut is a resident of the State of Texas and is an*

*employee of QuVa in Sugar Land, Texas. Defendants admit that Kohut was hired as*

*QuVa's Vice President of Operations on or about August 2015. Defendants admit that*

*Kohut served as a consultant for JHP from 2007 until the acquisition of JHP Group*

*Holdings, Inc. Defendants admit that as QuVa's Vice President of Operations, Kohut*

*occasionally travels to and communicates with QuVa employees at QuVa's Bloomsbury,*

*New Jersey facility, but deny that she "regularly" does so and deny that she has "availed*

*herself of the privileges of New Jersey Law." Defendants lack knowledge or information*

*sufficient to form a belief as to the truth of the remaining allegations of Paragraph 12,*

*and therefore deny the same.*

13.     Par is informed and believes that Defendant David Short is a resident of the State of Texas and is an employee of QuVa in Sugar Land, Texas. Short served as Senior Director of Quality Control at JHP from May 2011 until the acquisition of JHP Group Holdings, Inc. (as described above). Short continued to serve as Senior Director of Quality Control at Par Sterile from February 2014 until October 2015. Short also

provided consulting services to QuVa during this time, until he was hired as QuVa's Vice President of Quality on or about October 2015. Short, as QuVa's Vice President of Quality, regularly travels to and communicates with QuVa employees at QuVa's Bloomsbury, New Jersey facility, and by doing so availed himself of the privileges of New Jersey law.

**RESPONSE:** *Defendants admit that Short is a resident of the State of Texas and is an*

*employee of QuVa in Sugar Land, Texas. Defendants admit that Short was hired as*

*QuVa's Vice President of Quality on or about October 2015. Defendants admit that Short*

*served as Senior Director of Quality Control at JHP from May 2011 until the acquisition*

*of JHP Group Holdings, Inc. and continued to serve as Senior Director of Quality*

*Control at Par Sterile from February 2014 until October 2015. Defendants admit that as*

*QuVa's Vice President of Quality, Short occasionally travels to and communicates with*

*QuVa employees at QuVa's Bloomsbury, New Jersey facility but deny that he*

*"regularly" does so and deny that he has "availed himself of the privileges of New*

*Jersey Law." Defendants deny the remaining allegations in Paragraph 13.*

14.     Par is informed and believes that Defendant Stephen Rhoades is a resident of the State of Texas and is an employee of QuVa in Sugar Land, Texas. Rhoades served as Manager, Sterility Assurance at JHP from August 2013 until the acquisition of JHP Group Holdings, Inc. (as described above). Rhoades continued to serve as Manager, Sterility Assurance at Par Sterile from February 2014 until October 2015. QuVa hired Rhoades as its Director of Sterility Assurance on or about October 26, 2015. Rhoades, as QuVa's Director of Sterility Assurance, regularly travels to and communicates with QuVa employees at QuVa's Bloomsbury, New Jersey facility, and by doing so availed himself of the privileges of New Jersey law.

**RESPONSE:** *Defendants admit that QuVa hired Rhoades as its Director of Sterility*

*Assurance on or about October 26, 2015. Defendants admit that Rhoades served as*

*Manager, Sterile Assurance at JHP from August 2013 until the acquisition of JHP Group*

*Holdings, Inc. and continued to serve as Manager, Sterility Assurance at Par Sterile from*

*February 2014 until October 2015. Defendants admit that as QuVa's Director of Sterility*

*Assurance, Rhoades occasionally traveled to and communicated with QuVa employees at*

*QuVa's Bloomsbury, New Jersey facility but deny that he "regularly" did so and deny*

*that he has "availed himself of the privileges of New Jersey Law." Defendants deny the*

*remaining allegations in Paragraph 14.*

15.     Par is informed and believes that Defendant Travis McGrady is a resident of
the State of Texas and is an employee of QuVa in Temple, Texas. McGrady served as
Manager, Deviations & Lot Disposition at JHP from October 2007 until the acquisition of
JHP Group Holdings, Inc. (as described above). McGrady continued to serve as Manager,
Deviations & Lot Distribution at Par Sterile from February 2014 until February 2016.
QuVa hired McGrady as its Director of Quality Systems on or about February 15, 2016.
McGrady, as QuVa's Director of Quality Systems, regularly travels to and communicates
with QuVa employees at QuVa's Bloomsbury, New Jersey facility, and by doing so
availed himself of the privileges of New Jersey law.

**RESPONSE:** *Defendants admit that McGrady is a resident of the State of Texas and is*

*an employee of QuVa in Sugar Land, Texas. Defendants admit that QuVa hired McGrady*

*as its Director of Quality Systems on or about February 15, 2016. Defendants admit that*

*McGrady served as Manager, Deviations & Lot Disposition at JHP from October 2007*

*until the acquisition of JHP Group Holdings, Inc. and continued to serve as Manager,*

*Deviations & Lot Distribution at Par Sterile from February 2014 until February 2016.*

*Defendants admit that as QuVa's Director of Quality Systems, McGrady occasionally*

*travels to and communicates with QuVa employees at QuVa's Bloomsbury, New Jersey*

*facility but deny that he "regularly" does so and deny that he has "availed himself of the*

*privileges of New Jersey Law." Defendants deny the remaining allegations in Paragraph*

*15.*

16.    Par is informed and believes that Defendant David Hartley is a resident of the State of Texas and is an employee of QuVa in Sugar Land, Texas. Hartley served as Director, Technical Services at JHP from September 2013 until the acquisition of JHP Group Holdings, Inc. (as described above). Hartley continued to serve as Director, Technical Services at Par Sterile from February 2014 until March 2016. QuVa hired Hartley as its Director of Facility Engineering on or about March 14, 2016. Hartley, as QuVa's Director of Facility Engineering, regularly travels to and communicates with QuVa employees at QuVa's Bloomsbury, New Jersey facility, and by doing so availed himself of the privileges of New Jersey law.

**RESPONSE:** *Defendants admit that QuVa hired Hartley as its Director of Facility*

*Engineering on or about March 14, 2016. Defendants admit that Hartley served as*

*Director, Technical Services at JHP from September 2013 until the acquisition of JHP*

*Group Holdings, Inc. and continued to serve as Director, Technical Services at Par*

*Sterile from February 2014 until March 2016. Defendants admit that as QuVa's Director*

*of Facility Engineering, Hartley occasionally traveled to and communicated with QuVa*

*employees at QuVa's Bloomsbury, New Jersey facility but deny that he "regularly" did*

*so and deny that he has "availed himself of the privileges of New Jersey Law."*

*Defendants deny the remaining allegations in Paragraph 16.*

17.    Par is informed and believes that the Defendants, and each of them, were the agents, servants, and employees of each of their co-defendants, and in doing the things alleged herein were acting within the course and scope of their authority as such agents, servants, and employees and with the permission and consent of their co-defendants, and each of them. In particular, Par is informed and believes that Defendants Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, and Hartley have acted

and are presently acting as the agents and/or employees of QuVa and working on its behalf.

**RESPONSE:** *Defendants admit that Hinchen, Jenkins, Rutkowski, Kohut, Short and McGrady are employees of QuVa, and that Rhoades and Hartley are former employees of QuVa. The remaining allegations in Paragraph 17 are denied.*

## JURISDICTION AND VENUE

18.     This action arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, *et seq.*, as amended, and New Jersey law. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

**RESPONSE:** *Defendants admit the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction pursuant to 28 U.S.C. § 1367. The remaining allegations in Paragraph 18 are denied.*

19.     This Court has personal jurisdiction over Defendants. Along with each of the Defendants' substantial and continuing contacts with New Jersey as alleged above and herein, Par is informed and believes that Defendants' actions causing Par's injury, even if initiated at times outside of New Jersey, were expressly aimed at New Jersey, with knowledge that they would cause harm in New Jersey. These purposeful actions constitute at least minimum contact with New Jersey such that the maintenance of this suit in this Court does not offend traditional notions of fair play and substantial justice. This Court's personal jurisdiction over Hinchen and Jenkins is further established by virtue of their express consent to personal jurisdiction in the federal courts of New Jersey as set forth in their respective written agreements, described *infra*.

**RESPONSE:** *Defendants do not contest this Court has personal jurisdiction over them solely for the purposes of this action but deny that they have committed acts causing injury to Par. The remaining allegations in Paragraph 19 are denied.*

11

20.     As is further set forth herein, a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred and have a direct effect in this District. Venue therefore lies in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2).

**RESPONSE:** *Defendants do not contest that Venue lies in this District solely for the*

*purposes of this action. The remaining allegations in Paragraph 20 are denied.*

## GENERAL ALLEGATIONS

### A.     Par Sterile Obtains The First And Only FDA-Approved Intravenous Vasopressin Injection.

21.     Par Sterile is a specialty pharmaceutical company that develops, manufactures, and sells sterile drug products, including Vasostrict®, the first (and so far only) intravenous vasopressin injection, United States Pharmacopeia ("USP"), product with a New Drug Application ("NDA") approved by the FDA. Developed using proprietary technologies and advanced medical methods, Vasostrict® increases blood pressure in adults with vasodilatory shock (*e.g.*, postcardiotomy or sepsis) who remain hypotensive despite the administration of fluids and catecholamines (such as norepinephrine), restoring blood pressure to safe levels through the narrowing of blood vessels and the increase in blood volume due to water retention in the body.

**RESPONSE:**  *Defendants admit Par Sterile is a specialty pharmaceutical company that*

*develops, manufactures, and sells sterile drug products, including Vasostrict®, the first*

*(and so far only) intravenous vasopressin injection, United States Pharmacopeia*

*("USP"), product with a New Drug Application ("NDA") approved by the FDA.*

*Defendants admit that Vasostrict® increases blood pressure in adults with vasodilatory*

*shock (e.g., postcardiotomy or sepsis) who remain hypotensive despite the administration*

*of fluids and catecholamines (such as norepinephrine), restoring blood pressure to safe*

12

*levels through the narrowing of blood vessels and the increase in blood volume due to*

*water retention in the body. Defendants deny the remaining allegations in Paragraph 21.*

22.    Vasopressin is the synthetic form of a polypeptide hormone secreted by the posterior pituitary gland. For many decades prior to 2014, vasopressin was allowed to be sold as an unapproved drug in the United States, due to its having been marketed as a therapeutic agent prior to the 1938 enactment of the FDCA. Among the companies manufacturing and selling unapproved vasopressin injection was JHP, a privately-held company founded in 2007 and led by Defendants Jenkins and Hinchen (the "JH" in "JHP"). JHP's name was changed to Par Sterile when JHP Group Holdings, Inc., which was the ultimate parent company of JHP, was acquired by Par Pharmaceutical in 2014.

**RESPONSE:** *Defendants admit the allegations in Paragraph 22.*

23.    In recent years, the FDA has sought to have manufacturers of marketed unapproved drugs seek FDA approval for such products. Specifically, in September 2011, the FDA issued guidance to drug manufacturers stating that it would begin taking steps to "encourage the manufacturers of these products to obtain the required evidence and comply with the approval provisions of the Federal Food, Drug, and Cosmetic Act [] or remove the products from the market."

**RESPONSE:** *Defendants admit the allegations of Paragraph 23.*

24.    In response to the FDA's guidance, JHP, then under the control of Defendants Hinchen and Jenkins, pursued the FDA's extensive NDA process to seek approval from the FDA to manufacture and sell a vasopressin injection, USP, product pursuant to Section 505(b)(2) of the FDCA, 21 U.S.C. § 355(b)(2). On September 26, 2012, JHP submitted to the FDA NDA No. 204485 for its intravenous vasopressin injection under the name Vasostrict®.

**RESPONSE:** *Defendants admit that JHP, then under their control, on September 26,*

*2012 submitted NDA No. 204485 pursuant to Section 505(b)(2) of the FDCA, 21 U.S.C. §*

*355(b)(2) seeking approval to manufacture and sell a vasopressin injection, USP,*

*product. Defendants deny the remaining allegations of Paragraph 24.*

25.    On February 25, 2014, Par Pharmaceutical acquired JHP Group Holdings, Inc., which was the ultimate parent company of JHP, through a reverse subsidiary merger for total consideration approximating $490 million, and JHP's name was changed to Par Sterile.

**RESPONSE:** *Defendants admit the allegations of Paragraph 25.*

26.    Both before and after the acquisition, Par invested substantial amounts of time and money in its development program for Vasostrict® to satisfy the FDA's requirements for an NDA.  Those requirements, which are detailed in 21 C.F.R. § 314, *et seq.*, include demonstrating: (a) the safety and efficacy of the drug; (b) the ways in which the benefits of the drug outweigh any risks associated with its use; and (c) that the methods used in manufacturing the drug, and the controls used to maintain the drug's quality, are adequate to preserve the drug's identity, strength, quality, and purity. Par Sterile also was required to demonstrate and document the results of clinical tests, how the drug behaves in the human body, and how it is manufactured, processed and packaged.

**RESPONSE:** *Defendants deny that JHP was required to conduct clinical tests to satisfy the requirements of 21 C.F.R § 314 when it filed its vasopressin NDA before the acquisition of JHP by Par. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 26, and therefore deny the same.*

27.    Par's substantial investment in the development program for Vasostrict® and in the NDA process was rewarded on April 17, 2014, when Par Sterile received FDA approval to sell Vasostrict®, the first (and so far only) FDA-approved intravenous vasopressin injection, USP. Par Sterile thereafter applied for and received numerous supplemental FDA approvals regarding the product's shelf life, storage, formulation and dosage, and began commercial sales of Vasostrict® in November 2014.

**RESPONSE:** *Defendants admit that Par Sterile received FDA approval to sell Vasostrict® on April 17, 2014 and that Vasostrict® is the first (and so far only) FDA-approved intravenous vasopressin injection, USP. Defendants lack knowledge or*

14

*information sufficient to form a belief as to the truth of the remaining allegations in*

*Paragraph 27, and therefore deny the same.*

28.    Par has devoted significant time and resources researching, developing, and validating different formulations of Vasostrict® and other sterile pharmaceutical products. This process involved years of effort and collaboration across different departments, including laboratory research, formulation development, analytical chemistry, quality control and assurance, validation, process development, and manufacturing.  Through largely time-consuming trial- and-error experimentation with different pH adjustments, buffers, excipients, temperatures and other experimental conditions, Par achieved important and commercially valuable increased efficiencies in manufacturing and improved products.

**RESPONSE:** *Defendants deny the allegations in Paragraph 28.*

**B.    Par's Trade Secrets And Its Extensive Measures To Protect Them.**

29.    Par's development of Vasostrict® and other sterile pharmaceutical products, including the work performed as part of NDA No. 204485 and the supplements thereto, as well as Par Sterile's ongoing efforts to manufacture and sell an increasing variety of formulations of Vasostrict® and other sterile pharmaceutical products, has produced a substantial amount of highly sensitive and proprietary trade secret information, the confidentiality of which is critical to the significant value that these products represent to Par. Included among these trade secrets is technical  know-how relating to chemical compositions and properties, batch quantities, assays, test methods and specifications, stability protocols, validation methods, quality control, research & development efforts to obtain increased shelf life under both refrigeration and room temperature storage conditions, as well as confidential information relating to the manufacture, packaging, distribution, marketing, and sale of Vasostrict® and other sterile pharmaceutical products, including customer identities, industry competitive intelligence, strategic plans, results of operations, and short- and long-term business strategies and initiatives (collectively, the "Trade Secrets").

**RESPONSE:** *Defendants deny the allegations of Paragraph 29.*

30.    To protect the confidentiality of the Trade Secrets, Par has implemented numerous security measures. For example, Par's physical facilities (including, in particular, Par's laboratory and manufacturing facilities located in Rochester, Michigan,

where Vasostrict® is presently manufactured and packaged for distribution and sale, and where research and development work on new vasopressin products is conducted) are enclosed by secure fencing (including barbed wire) and monitored 24 hours a day by surveillance cameras and manned patrols. Entry to and exit from Par facilities is controlled, and access is allowed only to authorized individuals. Within Par's facilities, tangible copies of Trade Secret information, including but not limited to lab notebooks, batch records, and quality control procedures and protocols, are maintained in secured and locked locations, access to which is limited to those with a need to know and who use the Trade Secrets in the development and manufacturing process.

**RESPONSE:** *Defendants deny that Par has implemented security measures sufficient to protect any alleged Trade Secret information. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 30, and therefore deny the same.*

31.    Par maintains certain Trade Secrets in the form of electronic records that are accessible via the Par secure computer network. Access to that network is limited to Par employees, and access to electronically stored Trade Secret information on that network is password protected and monitored by Par security personnel. All relevant Par employees are required to read, acknowledge, and execute a confidentiality agreement as a condition of, and in consideration for, their employment, by which they agree not to disclose any confidential or proprietary information to anyone outside of the company, and not to use any of that information in connection with work performed for any future employer.

**RESPONSE:** *Defendants deny that Par has implemented security measures sufficient to protect any alleged Trade Secret information. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31, and therefore deny the same.*

32.    Par has also implemented corporate policies and trainings to protect its Trade Secrets and other confidential information, including information technology security guidelines that, *inter alia*, strictly limit the downloading, copying, or distribution of the company's confidential information by its employees, except as

specifically authorized and required for the performance of the employee's duties.

**RESPONSE:** *Defendants deny that Par has implemented security measures sufficient to protect any alleged Trade Secret information. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32, and therefore deny the same.*

33.     Par also requires third parties, such as partners and vendors, to sign non-disclosure agreements. And Par limits access to confidential information to such third parties on an as-needed basis.

**RESPONSE:** *Defendants deny that Par has implemented security measures sufficient to protect any alleged Trade Secret information. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33, and therefore deny the same.*

## C.     Defendants Hinchen And Jenkins Solicit Kohut And Short To Form QuVa And To Unfairly Compete With Par.

34.     As the founders of JHP, and subsequently as executives with Par Sterile, Defendants Hinchen and Jenkins had detailed knowledge of and access to certain Trade Secrets and other Par confidential information, and both were parties to employment agreements under which they promised not to "directly or indirectly, disclose, reveal, divulge, publish or otherwise make known to  any Person or use any Confidential Information for any reason or purpose whatsoever, except for the proper discharge of the Employee's duties to the Company under this   Agreement."    "Confidential Information"  is  broadly  defined  in  the employment agreements to include "all information, data, agreements, documents, reports, 'know-how', interpretations, plans, studies, forecasts, projections and records (whether in written form, electronically stored or otherwise) containing or otherwise reflecting information [including] . . . operating procedures, techniques, systems, processes and methods, all intellectual property, product and service information, including research and development and

proposed products and services . . . and . . . other commercial 'knowhow', trade secrets and information not available to the public generally."

**RESPONSE:** *Defendants admit that Hinchen and Jenkins were the founders of JHP. Defendants admit that Hinchen and Jenkins were subsequently executives with Par Sterile and that they were parties to certain agreements with Par. Defendants admit that the quoted language appears in one or more of their agreements, except to the extent those quotes are incomplete. Defendants deny the remaining allegations of Paragraph 34, including but not limited to any characterizations of the quoted language.*

35.     On June 6, 2014, shortly after Par Sterile received FDA approval for Vasostrict®, Jenkins resigned his employment with Par Sterile. As part of his resignation, Jenkins received a substantial severance payment. He also executed a "Separation Agreement and Release" in which he acknowledged having access to Par Confidential Information, as defined in the employment agreement described above, and agreed that he "shall not . . . directly or indirectly, use, communicate, disclose or disseminate any Confidential Information in any manner whatsoever," and that he "shall not . . . solicit, hire, induce or attempt to induce . . . any director, officer, employee, contractor, consultant or agent" of Par for one year.

**RESPONSE:** *Defendants admit that Jenkins executed a "Separation Agreement and Release" on June 6, 2014, and that the quoted language appears in that agreement, except to the extent those quotes are incomplete. Defendants deny that Jenkins resigned his employment with Par Sterile. Defendants deny the remaining allegations in Paragraph 35, including but not limited to any characterizations of the quoted language.*

36.     A few days later, on June 11, 2014, Hinchen likewise resigned his employment with Par Sterile.   As part of his resignation, Hinchen received a substantial severance payment. He also executed a "Separation Agreement and Release" in which he acknowledged having access to Par Confidential Information as defined in the employment agreement described above, and agreed that he "shall not . . . directly or

indirectly, use, communicate, disclose or disseminate any Confidential Information in any manner whatsoever," and that he "shall not . . . solicit, hire, induce or attempt to induce . . . any director, officer, employee, contractor, consultant or agent" of Par for one year.

**RESPONSE:** *Defendants admit that Hinchen executed a "Separation Agreement and Release" on June 11, 2014, and that the quoted language appears in that agreement, except to the extent those quotes are incomplete. Defendants deny that Hinchen resigned his employment with Par Sterile. Defendants deny the remaining allegations in Paragraph 36, including but not limited to any characterizations of the quoted language.*

37.     Par is informed and believes that at, about, or before the time of their resignations, Hinchen and Jenkins began secretly planning and preparing, with the aid of Par confidential information, to launch a new pharmaceutical company that would compete with Par for business from hospitals and other healthcare providers using a hybrid "compound manufacturing" model to avoid the time and expense of going through the rigorous FDA new drug approval that applies to drug manufacturers such as Par Sterile. Compounding by an outsourcing facility is a practice in which a person combines, mixes, or alters ingredients of a drug to create a medication under the supervision of a licensed pharmacist. Compounded drugs are not required to be FDA-approved and may lack an FDA finding of manufacturing quality before being marketed, though they are required to comply with Current Good Manufacturing Practices ("CGMP") guidelines and inspections by the FDA.

**RESPONSE:** *Defendants admit that compounding by an outsourcing facility is a practice in which a person combines, mixes, or alters ingredients of a drug to create a medication under the supervision of a licensed pharmacist. Defendants admit that compounded drugs are not required to be FDA-approved pursuant to an NDA or ANDA under 21 C.F.R. § 314, though compounded drugs made by registered 503B outsourcing facilities are required to comply with Current Good Manufacturing Practices ("CGMP")*

19

*guidelines and inspections by the FDA. Defendants deny the remaining allegations in*

*Paragraph 37.*

38.     Hinchen and Jenkins laid the foundation for their competing business between October 2014 and February 2015. Relying on Par's confidential information regarding the specific roles and duties of Par's employees, in October 2014 Hinchen and Jenkins began soliciting Short, who was still Par Sterile's Senior Director of Quality. Using that same confidential information, in November 2014 Hinchen and Jenkins began soliciting Kohut, who was still a consultant for Par Sterile. Short and Kohut also assisted Hinchen and Jenkins in creating numerous aspects of their competing business with the aid of Par confidential information (including various work regarding vasopressin and other sterile pharmaceutical products).

**RESPONSE:** *Defendants deny the allegations of Paragraph 38.*

39.     On July 29, 2015, Hinchen and Jenkins formally incorporated QuVa in Delaware, and shortly thereafter simultaneously announced the acquisition of a sterile drug compounding facility in Sugar Land, Texas, and a majority equity investment from Bain Capital Private Equity, a global investment firm. QuVa subsequently announced the acquisition of a manufacturing facility in Bloomsbury, New Jersey.

**RESPONSE:** *Defendants admit the allegations in Paragraph 39.*

40.     QuVa officially hired Kohut as its Vice President of Operations on or about August 31, 2015, and Short as its Vice President of Quality on or about October 8, 2015. On or about December 15, 2015, less than six months after QuVa's formation, QuVa announced a six-person executive leadership team, four members of which were former Par Sterile employees or consultants—Hinchen, Jenkins, Kohut, and Short.

**RESPONSE:** *Defendants admit that QuVa hired Kohut as its Vice President of*

*Operations on or about August 31, 2015, and that QuVa hired Short as its Vice President*

*of Quality on or about October 8, 2015. Defendants admit that QuVa announced its six-*

*person leadership team on December 15, 2015, which included Hinchen, Jenkins, Kohut,*

*and Short. Defendants deny the remaining allegations of paragraph 40.*

20

**D.      QuVa Solicits Additional Par Sterile Employees To Unfairly Compete With Par.**

41.      Par is informed and believes that QuVa is pursuing a strategy of rapid growth to become a major competitor in the sterile drug manufacturing market by, in part, poaching experienced employees of Par Sterile, including executives and managers with valuable expertise in research and development, quality control, testing and validation, process development, and manufacturing methods, including sterile manufacturing. In particular, Par is informed and believes that QuVa has targeted Par Sterile employees with intimate knowledge of the Trade Secrets and other confidential information regarding sterile manufacturing, Vasostrict®, and Par's other sterile products.

**RESPONSE:** *Defendants deny the allegations in Paragraph 41.*

42.      Consistent with this strategy, Par is informed and believes that QuVa solicited, induced, and ultimately hired the following additional Par employees, on or about the dates indicated:

(a)      Stephen Rhoades, Par Sterile's Manager of Sterility Assurance, on or about October 26, 2015;

(b)      Travis McGrady, Par Sterile's Manager of Deviations and Lot Disposition, on or about February 15, 2016;

(c)      David "Mike" Hartley, Par Sterile's Director of Technical Services, on or about March 14, 2016;

(d)      Ahmed Soliman, Qualitest Pharmaceutical's Manager, Analytical Research & Development, on or about April 1, 2016;

(e)      Guy Thompson, Par Sterile's Supervisor of the Microbiology Lab, on or about November 14, 2016;

(f)      Mike Rutkowski, Par Sterile's Senior Vice President and General Manager of the Rochester, Michigan facility, on or about April 17, 2017;

(g)      Ashley Short, Par Sterile's Quality Control Chemist II, on or about May 8, 2017; and

(h)     Chinnasamy Subramaniam, Par Sterile's Manager of Analytical Research & Development, on or about June 28, 2017.

**RESPONSE:** *Defendants admit that QuVa hired the employees mentioned in Paragraph 42 (a)-(h) on or about the dates indicated. Defendants deny the remaining allegations in Paragraph 42.*

43.     Par is informed and believes that after joining QuVa, most of these former Par Sterile employees aided and abetted QuVa's strategy by breaching their own employment agreements with Par.

**RESPONSE:** *Defendants deny the allegations in Paragraph 43.*

44.     As employees or consultants of Par Sterile, Kohut, Short, and Rhoades had detailed knowledge of and access to certain Trade Secrets and other Par confidential information. Kohut, Short, and Rhoades were parties to employment agreements under which they promised not to "divulge, disclose, or communicate to anyone or any entity, directly or indirectly, either during or after the termination of your employment with Par, any of Par's Proprietary Information, and agree not to use Par's Proprietary Information in your required duties for a subsequent employer." They also promised to not "directly or indirectly (1) interfere with Par's employees; (2) solicit, induce, encourage or attempt to solicit, induce or encourage any employee or Par to leave his/her employment with Par; or (3) hire, attempt to hire, attempt to hire or attempt to assist in the hire of any employee of Par" for one year after termination from Par Sterile.

**RESPONSE:** *Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44, and therefore deny the same.*

45.     Beginning no later than early 2016, Kohut, Short, and Rhoades each breached their non-disclosure agreements by disclosing and utilizing Par's Trade Secrets to benefit QuVa. This misappropriation was aided by Rutkowski who sent QuVa's employees additional Par Trade Secrets while he was still employed by Par. The misappropriation included the unauthorized disclosure, distribution, and use of confidential Par technical documents that were taken from Par without Par's

permission. These documents, prominently branded with the Par name, logo, and other clear identifying information, contained numerous, detailed Par Trade Secrets. While Par has still not determined how or when these confidential documents were taken, it has determined that QuVa incorporated the Trade Secrets from those confidential documents into its own business and operations.

**RESPONSE:** *Defendants deny the allegations in Paragraph 45.*

46. Kohut, Short, Rhoades, McGrady, Hartley, and Soliman each also breached the non-solicitation provisions in their respective employee agreements with Par. The solicitations consisted of phone calls, emails, in-person conversations, and/or interviews with Par employees. In particular:

   (a) Kohut, whose non-solicitation period expired on or about August 24, 2016, improperly solicited employees in breach of that agreement, including McGrady on or about January 21, 2016, Subramaniam on January 25, 2016, Hartley on or about February 1, 2016, Soliman on or about April 7, 2016, and Thompson on or about February 8, 2016;

   (b) Short, whose non-solicitation period expired on or about October 23, 2016, improperly solicited employees in breach of that agreement, including McGrady on or about January 21, 2016, Subramaniam on January 25, 2016, Hartley on or about February 1, 2016, Soliman on or about April 7, 2016, and Thompson on or about February 8, 2016;

   (c) Rhoades, whose non-solicitation period expired on or about October 17, 2017, improperly solicited employees in breach of that agreement, including McGrady on or about January 21, 2016, Hartley on or about February 1, 2016, and Thompson on or about February 8, 2016;

   (d) McGrady, whose non-solicitation period expired on or about February 13, 2017, improperly solicited Soliman on or about April 1, 2016 in breach of that agreement;

   (e) Hartley, whose non-solicitation period expired on or about March 12, 2017, improperly solicited Rutkowski on or about September 17, 2016 in breach of that agreement; and

   (f) Soliman, whose non-solicitation period expired on or about June 28, 2018, improperly solicited Ashely Short on or about April 17, 2017 in breach of that agreement.

**RESPONSE:** *Defendants deny the allegations in Paragraph 46.*

E.     **Par's Discovery Of QuVa's Actual And Threatened Misappropriation Of The Trade Secrets.**

47.     In June 2017, Par learned for the first time that, on or about April 19, 2017, QuVa had submitted a letter to the FDA requesting that vasopressin be added to the list of bulk drug substances under "Category 1" pursuant to the FDA's "Interim Policy on Compounding Using Bulk Drug Substances Under Section 503B of the Federal Food, Drug, and Cosmetic Act" (the "Interim Policy"). The Interim Policy is intended to provide guidance to the pharmaceutical industry regarding the submission and review of nominations of substances to be included on the FDA's list of bulk drug substances that may be used in compounding conducted by outsourcing facilities under section 503B of the FDCA.

**RESPONSE:** *Defendants admit that the Interim Policy is intended to provide guidance to the pharmaceutical industry regarding the submission and review of nominations of substances to be included on the FDA's list of bulk drug substances that may be used in compounding conducted by outsourcing facilities under section 503B of the FDCA. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 47, and therefore deny the same.*

48.     In July 2017, Par learned that, notwithstanding numerous material factual misrepresentations in QuVa's April 19 letter, the FDA had responded to QuVa's request by adding vasopressin to its Bulk Drug Substances List dated as of July 1, 2017, indicating that vasopressin is now under "Category 1" of bulk drug substances under evaluation pursuant to Section 503B of the FDCA. Inclusion in Category 1 means that "the FDA does not intend to take action against an outsourcing facility" that compounds the substance at issue while it is under evaluation.

**RESPONSE:** *Defendants admit that QuVa submitted a letter to the FDA on April 19, 2017 nominating vasopressin as a Bulk Drug Substance that can be used to compound drug products in accordance with section 503B of the Federal Food, Drug and Cosmetic*

*Act. Defendants further admit that FDA added vasopressin to its "Category 1- Bulk*

*Substances Under Evaluation" List as of the July 1, 2017 update. Defendants deny the*

*remaining allegations in Paragraph 48.*

49.    This information, coupled with QuVa's solicitation and hiring of multiple Par employees involved in the development, testing and manufacture of Par Sterile's Vasostrict® and other vasopressin products, caused Par to launch an investigation into whether QuVa and/or any of its agents or employees had improperly disclosed or used Par's Trade Secrets and other confidential information. While that investigation is ongoing and has necessarily been limited to information within Par's ability to access, the results to date have been shocking and have led Par to conclude that Defendants are engaged in actual and threatened misappropriation of the Trade Secrets and other confidential information.

**RESPONSE:** *Defendants deny that they are engaged in actual or threatened*

*misappropriation of the alleged Trade Secrets or confidential information. Defendants*

*lack knowledge or information sufficient to form a belief as to the truth of the remaining*

*allegations in Paragraph 49, and therefore deny the same.*

50.    A review of certain internal Par emails shows that defendant Rutkowski, Par Sterile's former Senior Vice President and General Manager of its Rochester, Michigan facility (and QuVa's most senior hire from Par) began disclosing Par's Trade Secrets and other confidential information to QuVa by email at least as early as June 2016 (ten months ***before*** he resigned from Par Sterile). Those improper email communications continued until just prior to Rutkowski's departure from Par Sterile.

**RESPONSE:** *Defendants deny the allegations in Paragraph 50.*

51.    For example, in a June 28, 2016 email, Rutkowski delivered to Donna Kohut (the former Par Sterile consultant who by that date had joined QuVa) a Par "backorder report," disclosing in detail (including average days aging and total backorder amount, broken down by facility location) certain Trade Secrets in the form of confidential Par business information.

**RESPONSE:** *Defendants admit that Rutkowski sent an email to Donna Kohut on June*

*28, 2016. Defendants deny the remaining allegations in Paragraph 51.*

52.     In an October 25, 2016 email exchange, Rutkowski informed Kohut that he was willing to provide "any slides" that she would need for an upcoming QuVa employee meeting, and further improperly disclosed confidential Par business information regarding "unit counts" at the Rochester, Michigan facility, and the fact that Par was performing product testing using certain metrics that he believed have an effect on absorption rates.

**RESPONSE:** *Defendants admit that Rutkowski and Donna Kohut exchanged emails on*

*October 25, 2016. Defendants deny the remaining allegations of Paragraph 52.*

53.     In a March 9, 2017 email exchange, Rutkowski provided Kohut with Par Trade Secrets and other confidential information relating to how to pass an FDA facility inspection, to which Kohut responded, "[a]ppreciate the tip." This information was particularly important to QuVa, as the FDA had previously determined that the QuVa facility in question failed to meet certain quality control standards related to maintaining sterility and avoiding contamination. Notably, Rutkowski's email was in response to an earlier email from Kohut, forwarding an internal QuVa announcement (distributed to former Par Sterile employees Rhoades and Hartley, who were by that time QuVa employees) that a QuVa facility was "in operation," to which Rutkowski responded "Way to go team!!!!!!!!!!!!!!!!," evidencing that by at least March 2017 Rutkowski considered his "team" to be QuVa, not his employer Par Sterile.

**RESPONSE:** *Defendants admit that Rutkowski and Donna Kohut exchanged emails on*

*March 9, 2017. Defendants deny the remaining allegations of Paragraph 53.*

54.     In a March 13, 2017 email, Rutkowski and Kohut discussed some of their joint efforts to recruit Par Sterile employees from QuVa while Rutkowski was still employed by Par Sterile. After informing Kohut that a Par Sterile employee had announced he was departing for another company, Kohut lamented that she was "sorry to have missed out on him joining QuVa, yet he is closer in distance *so that would actually facilitate hire without any of the politics between the organizations*." (emphasis added). Rutkowski responded with a damning admission of his own efforts to solicit Par Sterile employees for QuVa: "*I spoke to him but he elected to go elsewhere*.

26

Not much else I can do." (emphasis added).

**RESPONSE:** *Defendants admit that Rutkowski and Donna Kohut exchanged emails on*

*March 13, 2017. Defendants deny the remaining allegations of Paragraph 54.*

55.    In a second March 13, 2017 email, Rutkowski sent Kohut an internal Par PowerPoint presentation containing Trade Secrets and other confidential information regarding Par's historical operations and sales.

**RESPONSE:** *Defendants admit that Rutkowski and Donna Kohut exchanged emails on*

*March 13, 2017. Defendants deny the remaining allegations of Paragraph 55.*

56.    And on March 15, 2017—just prior to giving notice to Par Sterile that he was leaving the company—Rutkowski forwarded to Kohut at QuVa three detailed, internal Par PowerPoint presentations containing many of Par's sensitive, highly confidential and proprietary Trade Secrets, including supply chain metrics (such as batching performance, yields, deviation rates, complaints, recalls, perfect batches, and values of backorders), monthly finances and budgets, training and personnel developments, and future business plans relating to planned new product launches, including vasopressin products. In reply, QuVa's Kohut candidly announced, *"I'll steal with pride just like you taught me."* (emphasis added). Rutkowski responded favorably:  "LOL Love it!!!!!"

**RESPONSE:** *Defendants admit that Rutkowski and Donna Kohut exchanged emails on*

*March 15, 2017. Defendants deny the remaining allegations of Paragraph 56.*

57.    On information and belief, Rutkowski's misconduct did not end with his emails to QuVa but, instead, extended to improperly downloading numerous Par documents to a personal hard drive within days of giving notice that he was leaving Par Sterile. For example, on April 3, 2017, Rutkowski, in violation of Par's computer-usage policies, connected to his Par computer his personal Western Digital My Passport Portable External Hard Drive, a large hard drive with the storage capacity for an entire terabyte of data. For several hours on that same day, Rutkowski accessed a large number of documents in short succession and, on information and belief, downloaded to his personal hard drive, among other things, confidential Par documents regarding FDA regulations and inspections, product tables, accounting documents, personnel

documents, historical presentations about Par's Rochester facility, and a presentation to the Board of Directors.

**RESPONSE:** *Defendants deny the allegations in Paragraph 57.*

58.    Upon information and belief, these emails and forensics demonstrating Defendants' misconduct are only the tip of the iceberg, and full discovery of QuVa's, the individual Defendants' and their financial backers' internal emails, documents, electronic records, and testimony under oath of QuVa principals, along with various other forms of discovery, will uncover much more, similar evidence. Par's limited expedited discovery has already uncovered extensive evidence that demonstrates Defendants improper and unlawful conduct.

**RESPONSE:** *Defendants deny the allegations in Paragraph 58.*

59.    Additionally, Hinchen, Jenkins, Rutkowski, Kohut, Short and Rhoades, through their respective roles at Par Sterile, had daily access to, and even assisted in creating, certain of Par's Trade Secrets and other confidential information. They were involved in and exposed to, for example, technical know-how relating to sterile manufacturing, chemical compositions, batch quantities, assays, test methods and specifications, stability protocols, validation methods, quality control, and/or other research and development efforts, as well as confidential information relating to the manufacture, packaging, distribution, marketing, and sale of Vasostrict® and/or other sterile products.

**RESPONSE:** *Defendants deny the allegations in Paragraph 59.*

60.    Par is informed and believes that Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, Hartley, and Soliman have assumed roles at QuVa similar to their prior roles at Par Sterile. Par is informed and believes that given these roles at QuVa, as well as the voluminous confidential and proprietary information they were exposed to, it would be impossible for Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, Hartley, and Soliman to have performed or to continue to perform any work for QuVa regarding a vasopressin or other sterile drug product that would directly compete with Par Sterile's Vasostrict®—as QuVa recently described in its letter to the FDA nominating vasopressin for inclusion on the Bulk Drug Substances List—or other sterile products without using Par's Trade Secrets.

**RESPONSE:** *Defendants deny the allegations in Paragraph 60.*

61.     Similarly, and on information and belief, the other former Par Sterile employees with extensive knowledge of the Trade Secrets that QuVa recently poached––Ahmed Soliman, Guy Thompson, Ashley Short, and Chinnasamy Subramaniam—have all assumed roles at QuVa similar to those that they performed at Par, and in these new roles, they too will inevitably use and disclose Par's Trade Secrets for their own benefit and for the benefit of QuVa. Par is informed and believes that QuVa has not taken the steps necessary to prevent these former Par Sterile employees from disclosing or using Par's Trade Secrets, such as assigning the employees to positions that have no relationship with sterile manufacturing. On the contrary, QuVa is having them work directly with sterile manufacturing.

**RESPONSE:** *Defendants deny the allegations in Paragraph 61.*

62.     In particular, and based on information and belief, all former Par Sterile employees who now work at QuVa are doing so in similar roles:

a.     Hinchen, co-founder of JHP and former President of Par Sterile, is now co-founder and Chief Executive Officer of QuVa.

b.     Jenkins, co-founder of JHP and Chief Development Officer at Par Sterile, is now co-founder and Chief Development Officer at QuVa.

c.     Hartley, former Director of Technical Services at Par Sterile, is now the Director of Facilities and Engineering at QuVa.

d.     David Short, former Senior Director of Quality Systems at Par Sterile, is now Vice President of Quality at QuVa.

e.     Kohut, former consultant to Par Sterile, is now Vice President of Operations & Logistics at QuVa.

f.     McGrady, former Manager of Deviations & Lot Disposition at Par Sterile, is now Director of Corporate Quality Systems at QuVa.

g.     Rhoades, former Manager of Sterility Assurance at Par Sterile, is now Director of Sterility Assurance at QuVa.

h.     Thompson, former Supervisor of the Microbiology Lab at Par Sterile, is now Quality Assurance Manufacturing Manager of at QuVa.

i.      Soliman, former Manager, Analytical Research & Development at Qualitest Pharmaceuticals, is now Director of Analytical Lab Research & Development at QuVa.

j.      Subramaniam, former Manager of Analytical R&D at Par Sterile, is now in Director of Quality Control Lab at QuVa.

k.      Ashley Short, former Quality Control Chemist II at Par Sterile, is now Senior Analytical Chemist at QuVa.

l.      Rutkowski, former Senior Vice President and General Manager of the Rochester facility at Par Sterile, is now Vice President and General Manager of Bloomsbury, New Jersey facility at QuVa.

**RESPONSE:** *Defendants deny the allegations in Paragraph 62.*


63.    Based on the information provided above, Par is informed and believes that QuVa has used or will use Par's Trade Secrets and other confidential information to compound vasopressin products with the properties described in the nomination submitted by QuVa to the FDA on April 19, 2017, and pursuant to the FDA's July 1, 2017 addition of vasopressin to the Bulk Drug Substance List.

**RESPONSE:**  *Defendants deny the allegations in Paragraph 63.*


64.    Par is informed and believes that Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades—and the former Par Sterile employees they hired—performed or continue to perform their respective duties at QuVa in compounding a vasopressin and other sterile products by using or relying on Par's Trade Secrets. For example, there are several challenges involved in making pre-mixed formulations of vasopressin. To overcome these challenges and create the pre-mixed products with the characteristics that QuVa is claiming (*e.g.*, potency, sterility, and shelf life) within the time period in which QuVa made its representations, Par is informed and believes that QuVa necessarily has to rely on or use the information QuVa has misappropriated (as described above) and QuVa's employees' knowledge gained from Par's years of work on Vasostrict®, including confidential work regarding ways to stabilize vasopressin and increase its shelf-life in undiluted and diluted formulations.


**RESPONSE:** *Defendants deny the allegations in Paragraph 64.*

## COUNT I
## Violation Of Federal Defend Trade Secrets Act, 18 U.S.C. § 1836
### (*Against QuVa, Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades*)

65.     Par re-alleges each and every allegation set forth in Paragraphs 1 through 64, inclusive, and incorporates them herein by reference.

**RESPONSE:** *Defendants incorporate the responses to Paragraphs 1-64 as if fully set forth herein.*

66.     Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products. These Trade Secrets are described generally above and comprise financial, business, scientific, technical, economic, and/or engineering information that are used in or intended for use in interstate commerce and that accordingly constitute "trade secrets" under 18 U.S.C. § 1839(3).

**RESPONSE:** *Defendants deny the allegations in Paragraph 66.*

67.     Par has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Par's Trade Secrets and by taking the other reasonable measures described above.

**RESPONSE:** *Defendants deny the allegations in Paragraph 67.*

68.     These confidential and proprietary Trade Secrets derive independent economic value from not being generally known to or readily ascertainable through proper means by another person who can obtain economic value from the disclosure and use of such information, and have conferred a competitive advantage on Par over others in the relevant market.

**RESPONSE:** *Defendants deny the allegations in Paragraph 68.*

69.     Other than through Defendants' improper disclosure, the Trade Secrets are not known to others and are not readily ascertainable by proper means to persons who

could derive value from their disclosure or use.

**RESPONSE:** *Defendants deny the allegations in Paragraph 69.*

70.     Defendants misappropriated Par's Trade Secrets by improper means and without authorization, including by disclosing and using and/or threatening to disclose and use the Trade Secrets without Par's express or implied consent in the preparation for production of a competing vasopressin drug product and in the other ways described above. Par's investigation of this conduct, which is ongoing, has identified several instances of this misappropriation by Defendants, including some described above.

**RESPONSE:**  *Defendants deny the allegations in Paragraph 70.*

71.     The Defendants' actual and threatened use and disclosure of the Trade Secrets constitutes misappropriation because, among other reasons, at the time of such use and disclosure, the Defendants knew or had reason to know that their knowledge of the Trade Secrets was derived through persons who owed a duty to Par to maintain the secrecy of the Trade Secrets.

**RESPONSE:** *Defendants deny the allegations in Paragraph 71.*

72.     Defendants' misappropriation comprises acts, including without limitation use of Par's Trade Secrets, on or after the date of the enactment of the Defend Trade Secrets Act, May 11, 2016.

**RESPONSE:** *Defendants deny the allegations in Paragraph 72.*

73.     Defendants' current and continued misappropriation of Par's Trade Secrets is reckless and malicious. Defendants know of the confidentiality, ownership, and use restrictions on the Trade Secrets.

**RESPONSE:** *Defendants deny the allegations in Paragraph 73.*

74.     By reason of the above-alleged acts and conduct of Defendants, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *Defendants deny the allegations in Paragraph 74.*

75.     Par is also entitled to recover compensatory and exemplary damages from Defendants, including but not limited to the losses resulting from their wrongful conduct and any unjust enrichment caused by their misappropriation. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:**  *Defendants deny the allegations in Paragraph 75.*

## COUNT II
## Violation Of The New Jersey Trade Secrets Act, N.J.S.A. 56:15-2
### (*Against QuVa, Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades*)

76.     Par re-alleges each and every allegation set forth in Paragraphs 1 through 75, inclusive, and incorporates them herein by reference.

**RESPONSE:** *Defendants incorporate the responses to Paragraphs 1-75 as if fully set*

*forth herein.*

77.     Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products. These Trade Secrets are described generally above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process that constitute "trade secrets" under N.J.S.A. 56:15-2.

**RESPONSE:** *Defendants deny the allegations in Paragraph 77.*

78.     Par has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Par's Trade Secrets and by taking the other reasonable measures described above.

**RESPONSE:** *Defendants deny the allegations in Paragraph 78.*

79.     These confidential and proprietary Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, others who can obtain economic value from its disclosure or use, and have conferred a competitive advantage on Par in the relevant market.

**RESPONSE:** *Defendants deny the allegations in Paragraph 79.*

80.     Other than through Defendants' improper disclosure, the Trade Secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

**RESPONSE:** *Defendants deny the allegations in Paragraph 80.*

81.     Defendants misappropriated Par's Trade Secrets by improper means and without authorization, including by disclosing and using and/or threatening to disclose and use the Trade Secrets without Par's express or implied consent in the preparation for production of a competing vasopressin compound and in the other ways described above, including in the inevitable disclosure or use of the Trade Secrets in their work for QuVa. Par's investigation, which is ongoing, has identified several instances of this misappropriation by Defendants, including some described above.

**RESPONSE:** *Defendants deny the allegations in Paragraph 81.*

82.     The Defendants' actual and threatened use and disclosure of the Trade Secrets constitutes misappropriation because at the time of such use and disclosure, the Defendants knew or had reason to know that their knowledge of the Trade Secrets was derived through persons who owed a duty to Par to maintain the secrecy of the Trade Secrets.

**RESPONSE:** *Defendants deny the allegations in Paragraph 82.*

83.     Defendants' current and continued misappropriation of Par's Trade Secrets is willful and malicious. Defendants know of the confidentiality, ownership, and use restrictions on the Trade Secrets.

**RESPONSE:** *Defendants deny the allegations in Paragraph 83.*

84.     By reason of the above-alleged acts and conduct of Defendants, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *Defendants deny the allegations in Paragraph 84.*

85.     Par is also entitled to recover compensatory and punitive damages from Defendants, including but not limited to the losses resulting from their wrongful conduct and any unjust enrichment caused by their misappropriation. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *Defendants deny the allegations in Paragraph 85.*


## COUNT III
### Misappropriation Of Trade Secret, New Jersey Common Law
#### (*Against QuVa, Hinchen, Jenkins, Rutkowski, Kohut, Short, and Rhoades*)

86.     Par re-alleges each and every allegation set forth in paragraphs 1 through 85, inclusive, and incorporates them herein by reference.

**RESPONSE:** *Defendants incorporate the responses to Paragraphs 1-85 as if fully set forth herein.*

87.     Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products. These Trade Secrets are described above and comprise a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process that constitute "confidential information" under New Jersey Common Law.

**RESPONSE:** *Defendants deny the allegations in Paragraph 87.*

88.     Defendants had regular access to the Trade Secrets throughout the course of their employment with Par Sterile. Defendants know of the confidentiality, ownership, and use restrictions on the Trade Secrets.

**RESPONSE:** *Defendants deny the allegations in Paragraph 88.*

89.     Par has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Par's Trade Secrets and by taking the other reasonable measures described above.

**RESPONSE:** *Defendants deny the allegations in Paragraph 89.*

90.     These confidential and proprietary Trade Secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use, and have conferred a competitive advantage on Par.

**RESPONSE:** *Defendants deny the allegations in Paragraph 90.*

91.     Other than through Defendants' improper disclosure, the Trade Secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

**RESPONSE:** *Defendants deny the allegations in Paragraph 91.*

92.     Defendants misappropriated Par's Trade Secrets by improper means and without authorization, including by disclosing and using and/or threatening to disclose and use the Trade Secrets without Par's express or implied consent in the preparation for production of a competing vasopressin compound and in the other ways described above. Par's forensic investigation, which is ongoing, has identified several instances of this misappropriation by Defendants, including some described above.

**RESPONSE:** *Defendants deny the allegations in Paragraph 92.*

93.     Defendants have and will continue to misappropriate Par's Trade Secrets by using these Trade Secrets without authority, including in their preparation for the production of a competing vasopressin compound.

**RESPONSE:** *Defendants deny the allegations in Paragraph 93.*

94.     The Defendants' actual and threatened use and disclosure of the Trade Secrets constitutes misappropriation because at the time of such use and disclosure, the Defendants knew or had reason to know that their knowledge of the Trade Secrets was derived through persons who owed a duty to Par to maintain the secrecy of the Trade Secrets.

**RESPONSE:** *Defendants deny the allegations in Paragraph 94.*

95.     Defendants' current and continued misappropriation of Par's Trade Secrets is willful and malicious.

**RESPONSE:** *Defendants deny the allegations in Paragraph 95.*

96.     By reason of the above-alleged acts and conduct of Defendants, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *Defendants deny the allegations in Paragraph 96.*

97.     Par is also entitled to recover compensatory and punitive damages from Defendants. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *Defendants deny the allegations in Paragraph 97.*

## COUNT IV
## Unfair Competition, New Jersey Common Law
### (*Against Defendant QuVa*)

98.     Par re-alleges each and every allegation set forth in Paragraphs 1 through 97, inclusive, and incorporates them herein by reference.

**RESPONSE:** *QuVa incorporates its responses to Paragraphs 1-97 as if fully set forth herein.*

99.    Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products. These Trade Secrets and other confidential information are described above and constitute "confidential information" under New Jersey Common Law.

**RESPONSE:** *QuVa denies the allegations in Paragraph 99.*

100.    Par has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Par's Trade Secrets.

**RESPONSE:** *QuVa denies the allegations in Paragraph 100.*

101.    These confidential and proprietary Trade Secrets derive independent economic and commercial value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use, and have conferred a competitive advantage on Par.

**RESPONSE:** *QuVa denies the allegations in Paragraph 101.*

102.    QuVa misappropriated Par's Trade Secrets by knowingly acquiring the Trade Secrets through improper means, namely by knowingly inducing former employees to breach their duty to maintain the secrecy of the Trade Secrets.  QuVa also misappropriated the Trade Secrets by disclosing and using the Trade Secrets without Par's express or implied consent after knowingly using improper means to acquire knowledge of the Trade Secrets.

**RESPONSE:** *QuVa denies the allegations in Paragraph 102.*

103.    QuVa has and will continue to misappropriate Par's Trade Secrets by using these Trade Secrets without authority, including in the production of a competing vasopressin compound.

**RESPONSE:** *QuVa denies the allegations in Paragraph 103.*

104.    QuVa's current and continued misappropriation of Par's Trade Secrets is willful, in bad faith, and malicious. QuVa knows of the confidentiality, ownership, and use restrictions on the Trade Secrets.

**RESPONSE:** *QuVa denies the allegations in Paragraph 104.*

105.    By reason of the above-alleged acts and conduct of QuVa, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *QuVa denies the allegations in Paragraph 105.*

106.    Par is also entitled to recover compensatory and punitive damages from QuVa. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *QuVa denies the allegations in Paragraph 106.*


## COUNT V
## Breach Of Contract, New Jersey Common Law
### (*Against Defendant Hinchen*)

107.    Par re-alleges each and every allegation set forth in Paragraphs 1 through 106, inclusive, and incorporates them herein by reference.

**RESPONSE:** *Hinchen incorporates his responses to Paragraphs 1-106, as if fully set forth herein.*

108.    During his course of employment with JHP and Par Sterile, Hinchen signed at least three separate agreements with clauses relating to the Trade Secrets, confidential information, and non-solicitation. The relevant provisions of these agreements remain in full force and, for good consideration, Hinchen remains obligated to comply with these provisions. Par has satisfied all of its obligations under these valid and enforceable agreements.

**RESPONSE:** *Hinchen admits that he signed certain agreements with Par, but denies*

*that all obligations contained in these agreements continue in full force and effect.*

*Hinchen denies the remaining allegations of Paragraph 108.*

109.   *First*, in December 2012, Hinchen signed an "Employee Agreement"
with JHP. This agreement defined "Confidential Information" as

> all information, data, agreements, documents, reports, 'know-how',
> interpretations, plans, studies, forecasts, projections and records (whether
> in written form, electronically stored or otherwise) containing or
> otherwise reflecting information [including]
> . . . operating procedures, techniques, systems, processes and methods, all
> intellectual property, product and service information, including research
> and development and proposed products and services . . . and
> . . . other commercial 'knowhow', trade secrets and information not
> available to the public generally . . . .

By signing the Employee Agreement, Hinchen agreed to a non-disclosure clause, which
provided that Hinchen "will not, directly or indirectly, disclose, reveal, divulge, publish
or otherwise make known to any Person or use any Confidential Information for any
reason or purpose whatsoever, except for the proper discharge of the Employee's duties
to the Company under this Agreement."

**RESPONSE:** *Hinchen admits that he entered into an Employee Agreement with JHP,*

*and that the quoted language appears in the agreement, except to the extent it is*

*incomplete. Hinchen denies the remaining allegations of Paragraph 109, including but*

*not limited to any characterizations of the quoted language.*

110.   Hinchen also agreed to a one-year non-solicitation clause, which provided
that Hinchen

> will not in any manner, directly or indirectly . . . solicit, hire, induce or
> attempt to induce, or assist others to solicit, hire, induce or attempt to
> induce, any director, officer, employee, contractor, consultant or agent of

40

any member of [JHP] to either (I) leave or terminate his or her employment, consulting or other position or business relationship with any member of the Company Group, or (II) breach his or her employment, consulting or other agreement with any member of the Company Group . . . .

**RESPONSE:** *Hinchen admits that the quoted language appears in the agreement, except to the extent it is incomplete. Hinchen denies the remaining allegations of Paragraph 110, including but not limited to any characterizations of the quoted language.*

111.   Hinchen further agreed that JHP "will be entitled to seek equitable relief, including, without limitation, an injunction or injunctions (without the requirement of posting a bond, other security or any similar requirement or proving any actual damages), to prevent breaches or threatened breaches of this Agreement."

**RESPONSE:** *Hinchen admits that the quoted language appears in the agreement, except to the extent it is incomplete. Hinchen denies the remaining allegations of Paragraph 111, including but not limited to any characterizations of the quoted language.*

112.   *Second*, in December 2012, Hinchen signed a "Restrictive Covenant Agreement" with JHP. This agreement defined "Confidential Information" as

all information of or regarding [JHP], including, without limitation . . . information regarding . . . all source code, object code, modules, algorithms, software programs, system architectures, research, inventions, processes, techniques, costs, prices, customer contracts, requirements, systems, specific needs, customer lists or any other information related to customers or prospective customers that could create a competitive advantage, plans, budgets, forecasts, financial results, operations and personnel information, all information relating to the development, formulation, production, marketing or sale of existing or contemplated products, services, systems or processes; . . . know-how, trade secrets and proprietary information . . . .

41

By signing the Restrictive Covenant Agreement, Hinchen agreed to a non-disclosure clause, which provided that Hinchen will not "disclose or furnish to any Person . . . any Confirmation Information."

**RESPONSE:** *Hinchen admits he signed an agreement entitled "Restrictive Covenant*

*Agreement," and that the quoted language appears in that agreement, except to the*

*extent it is incomplete. Hinchen denies the remaining allegations of Paragraph 112,*

*including but not limited to any characterizations of the quoted language.*

    113.   Hinchen also agreed to a three-year non-solicitation clause, which provided that Hinchen will not "directly or indirectly employ, Solicit, or attempt to employ, or Solicit . . . any director, officer, consultant or employee" of JHP.

**RESPONSE:** *Hinchen admits that the quoted language appears in the agreement, except*

*to the extent it is incomplete. Hinchen denies the remaining allegations of Paragraph*

*113, including but not limited to any characterizations of the quoted language.*

    114.   *Third*, in June 2014, Hinchen signed a "Separation and Release" with Par Sterile. This agreement provided that the parties "reiterate certain terms contained in [Hinchen]'s Employment Agreement."

**RESPONSE:** *Hinchen admits that he entered into a Separation and Release Agreement*

*with Par, and that the quoted language appears in that agreement, except to the extent it*

*is incomplete. Hinchen denies the remaining allegations of Paragraph 114, including but*

*not limited to any characterizations of the quoted language.*

    115.   By signing the Separation and Release, Hinchen agreed to a non-disclosure clause, which provided that Hinchen will "not at any time, other than as may be required in connection with the performance by him of any remaining duties or obligations under the Employment Agreement, directly or indirectly, use,

communicate, disclose or disseminate any Confidential Information in any manner whatsoever . . . ."

**RESPONSE:** *Hinchen admits that the quoted language appears in the agreement, except to the extent it is incomplete. Hinchen denies the remaining allegations of Paragraph 115, including but not limited to any characterizations of the quoted language.*

116.   Hinchen also agreed to a one-year non-solicitation clause, which provided that Hinchen will

not in any manner, directly or indirectly . . . . solicit, hire, induce or attempt to induce . . . any director, officer, employee, contractor, consultant or agent of [Par Sterile] existing on or prior to the date of this Release to either (i) leave or terminate his or her employment, consulting or other position or business relationship with [Par Sterile] or (ii) breach his or her employment, consulting or other agreement with [Par] . . . .

**RESPONSE:** *Hinchen admits that the quoted language appears in the agreement, except to the extent it is incomplete. Hinchen denies the remaining allegations of Paragraph 116, including but not limited to any characterizations of the quoted language.*

117.   Hinchen further agreed that a breach of the Separation and Release "will result in immediate and irreparable damage to [Par Sterile] and will entitle [Par Sterile] to injunctive relief from a court having appropriate jurisdiction."

**RESPONSE:**  *Hinchen admits that the quoted language appears in the agreement, except to the extent it is incomplete. Hinchen denies the remaining allegations of Paragraph 117, including but not limited to any characterizations of the quoted language.*

118.    Hinchen consented to the jurisdiction of New Jersey state and federal courts. Hinchen's consent to jurisdiction in New Jersey supersedes any previous consent to jurisdiction in other forums.

**RESPONSE:** *Hinchen denies the allegations of Paragraph 118.*

119.    The relevant provisions of all three agreements—the Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement and Release— are still in effect. Neither Hinchen nor Par has terminated the agreements. To the extent the non-disclosure and non-solicitation clauses in the agreements address the same subject matters, the clauses are consistent and without contradiction among the three agreements. To the extent that other clauses within the agreements contradict these clauses, those contradictions do not affect the enforceability of the non-disclosure and non-solicitation clauses. As a result, all three agreements are valid contracts and independently enforceable.

**RESPONSE:** *Hinchen denies the allegations of Paragraph 119.*

120.    Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products. These Trade Secrets are described above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process. Some or all of the documents and information comprising Par's Trade Secrets constitute "Confidential Information" as defined in the Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement and Release.

**RESPONSE:** *Hinchen denies the allegations of Paragraph 120.*

121.    Hinchen was in possession of Par's Trade Secrets while subject to three agreements. In those agreements, he: (1) expressly acknowledged and confirmed the confidential nature of Par's Trade Secrets; (2) agreed to maintain the confidentiality of Par's Trade Secrets; (3) agreed not to use Par's Trade Secrets for their own purposes or the purposes of a third party; and (4) agreed not to solicit Par's employees.

**RESPONSE:** *Hinchen denies the allegations of Paragraph 121.*

122.    Hinchen knowingly and improperly disclosed Par's Trade Secrets to QuVa and used the Trade Secrets outside the scope of his employment with Par Sterile. Hinchen's knowing and improper disclosure and use of Par's Trade Secrets constitutes a

breach of the non-disclosure clauses in his Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement.

**RESPONSE:** *Hinchen denies the allegations of Paragraph 122.*

123.   Hinchen knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile. Hinchen's knowing and improper solicitation constitutes a breach of the non-solicitation clauses in his Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement.

**RESPONSE:** *Hinchen denies the allegations of Paragraph 123.*

124.   By reason of Hinchen's breach of contracts alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *Hinchen denies the allegations of Paragraph 124.*

125.   Par is also entitled to recover compensatory damages, general damages, and special damages from Hinchen. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *Hinchen denies the allegations of Paragraph 125.*

## COUNT VI
## Breach Of Contract, New Jersey Common Law
### (*Against Defendant Jenkins*)

126.   Par re-alleges each and every allegation set forth in Paragraphs 1 through 125, inclusive, and incorporates them herein by reference.

**RESPONSE:** *Jenkins incorporates his responses to Paragraphs 1-125, as if fully set forth herein.*

127.     During his course of employment with JHP and Par Sterile, Jenkins signed at least three separate agreements with clauses relating to the Trade Secrets, confidential information, and non-solicitation. The relevant provisions of these agreements remain in full force and, for good consideration, Jenkins remains obligated to comply with these provisions. Par has satisfied all of its obligations under these valid and enforceable agreements.

**RESPONSE:** *Jenkins admits that he signed certain agreements with Par, but denies that all obligations contained in these agreements continue in full force and effect. Jenkins denies the remaining allegations of Paragraph 127.*

128.     *First*, in December 2012, Jenkins signed an "Employee Agreement" with JHP. This agreement defined "Confidential Information" as

> all information, data, agreements, documents, reports, 'know-how', interpretations, plans, studies, forecasts, projections and records (whether in written form, electronically stored or otherwise) containing or otherwise reflecting information [including]
> . . . operating procedures, techniques, systems, processes and methods, all intellectual property, product and service information, including research and development and proposed products and services . . . and
> . . . other commercial 'knowhow', trade secrets and information not available to the public generally . . . .

By signing the Employee Agreement, Jenkins agreed to a non-disclosure clause, which provided that Jenkins "will not, directly or indirectly, disclose, reveal, divulge, publish or otherwise make known to any Person or use any Confidential Information for any reason or purpose whatsoever, except for the proper discharge of the Employee's duties to the Company under this Agreement."

**RESPONSE:** *Jenkins admits that he entered into an Employee Agreement with JHP, and that the quoted language appears in the agreement, except to the extent it is incomplete. Jenkins denies the remaining allegations of Paragraph 128, including but not limited to any characterizations of the quoted language.*

129.    Jenkins also agreed to a one-year non-solicitation clause, which provided that Jenkins

> will not in any manner, directly or indirectly . . . solicit, hire, induce or attempt to induce, or assist others to solicit, hire, induce or attempt to induce, any director, officer, employee, contractor, consultant or agent of any member of [JHP] to either (I) leave or terminate his or her employment, consulting or other position or business relationship with any member of the Company Group, or (II) breach his or her employment, consulting or other agreement with any member of the Company Group . . . .

**RESPONSE:** *Jenkins admits that the quoted language appears in the agreement, except to the extent it is incomplete. Jenkins denies the remaining allegations of Paragraph 129, including but not limited to any characterizations of the quoted language.*

130.    Jenkins further agreed that JHP "will be entitled to seek equitable relief, including, without limitation, an injunction or injunctions (without the requirement of posting a bond, other security or any similar requirement or proving any actual damages), to prevent breaches or threatened breaches of this Agreement."

**RESPONSE:** *Jenkins admits that the quoted language appears in the agreement, except to the extent it is incomplete. Jenkins denies the remaining allegations of Paragraph 130, including but not limited to any characterizations of the quoted language.*

131.    *Second*, in December 2012, Jenkins signed a "Restrictive Covenant Agreement" with JHP. This agreement defined "Confidential Information" as

> all information of or regarding [JHP], including, without limitation . . . information regarding . . . all source code, object code, modules, algorithms, software programs, system architectures, research, inventions, processes, techniques, costs, prices, customer contracts, requirements, systems, specific needs, customer lists or any other information related to customers or prospective customers that could create a competitive advantage, plans, budgets, forecasts, financial results, operations and personnel information, all information relating to

the development, formulation, production, marketing or sale of existing
or contemplated products, services, systems or processes; . . . know-how,
trade secrets and proprietary information . . . .

By signing the Restrictive Covenant Agreement, Jenkins agreed to a non-disclosure
clause, which provided that Jenkins will not "disclose or furnish to any Person . . . any
Confirmation Information."

**RESPONSE:** *Jenkins admits he signed an agreement entitled "Restrictive Covenant*

*Agreement," and that the quoted language appears in that agreement, except to the*

*extent it is incomplete. Jenkins denies the remaining allegations of Paragraph 131,*

*including but not limited to any characterizations of the quoted language.*

132.   Jenkins also agreed to a three-year non-solicitation clause, which provided
that Jenkins will not "directly or indirectly employ, Solicit, or attempt to employ, or
Solicit . . . any director, officer, consultant or employee" of JHP.

**RESPONSE:** *Jenkins admits that the quoted language appears in the agreement, except*

*to the extent it is incomplete. Jenkins denies the remaining allegations of Paragraph 132,*

*including but not limited to any characterizations of the quoted language.*

133.   *Third*, in June 2014, Jenkins signed a "Separation and Release" with Par
Sterile. This agreement provided that the parties "reiterate certain terms contained in
[Jenkins]'s Employment Agreement." By signing the Separation and Release, Jenkins
agreed to a non-disclosure clause, which provided that Jenkins will "not at any time,
other than as may be required in connection with the performance by him of any
remaining duties or obligations under the Employment Agreement, directly or
indirectly, use, communicate, disclose or disseminate any Confidential Information in
any manner whatsoever . . . ."

**RESPONSE:** *Jenkins admits that he entered into a Separation and Release Agreement*

*with Par, and that the quoted language appears in that agreement, except to the extent it*

*is incomplete. Jenkins denies the remaining allegations of Paragraph 133, including but not limited to any characterizations of the quoted language.*

134.   Jenkins also agreed to a one-year non-solicitation clause, which provided that Jenkins will

> not in any manner, directly or indirectly . . . . solicit, hire, induce or attempt to induce . . . any director, officer, employee, contractor, consultant or agent of [Par Sterile] existing on or prior to the date of this Release to either (i) leave or terminate his or her employment, consulting or other position or business relationship with [Par Sterile] or (ii) breach his or her employment, consulting or other agreement with [Par Sterile] . . . .

**RESPONSE:** *Jenkins admits that the quoted language appears in the agreement, except to the extent it is incomplete. Jenkins denies the remaining allegations of Paragraph 134, including but not limited to any characterizations of the quoted language.*

135.   Jenkins further agreed that a breach of the Separation and Release "will result in immediate and irreparable damage to [Par Sterile] and will entitle [Par Sterile] to injunctive relief from a court having appropriate jurisdiction."

**RESPONSE:** *Jenkins admits that the quoted language appears in the agreement, except to the extent it is incomplete. Jenkins denies the remaining allegations of Paragraph 135, including but not limited to any characterizations of the quoted language.*

136.   Jenkins consented to the jurisdiction of New Jersey state and federal courts. Jenkins's consent to jurisdiction in New Jersey supersedes any previous consent to jurisdiction in other forums.

**RESPONSE:** *Jenkins denies the allegations of Paragraph 136.*

137.    The relevant provisions of all three agreements—the Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement and Release—are still in effect. Neither Jenkins nor Par has terminated the agreements. To the extent the non-disclosure and non-solicitation clauses in the agreements address the same subject matters, the clauses are consistent and without contradiction among the three agreements. To the extent that other clauses within the agreements contradict these clauses, those contradictions do not affect the enforceability of the non-disclosure and non-solicitation clauses. As a result, all three agreements are valid contracts and independently enforceable.

**RESPONSE:** *Jenkins denies the allegations of Paragraph 137.*

138.    Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products. These Trade Secrets are described above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process. Some or all of the documents and information comprising Par's Trade Secrets constitute "Confidential Information" as defined in the Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement and Release.

**RESPONSE:** *Jenkins denies the allegations of Paragraph 138.*

139.    Jenkins was in possession of Par's Trade Secrets while subject to the three agreements. In those agreements, he: (1) expressly acknowledged and confirmed the confidential nature of Par's Trade Secrets; (2) agreed to maintain the confidentiality of Par's Trade Secrets; (3) agreed not to use Par's Trade Secrets for their own purposes or the purposes of a third party; and (4) agreed not to solicit Par's employees.

**RESPONSE:** *Jenkins denies the allegations of Paragraph 139.*

140.    Jenkins knowingly and improperly disclosed Par's Trade Secrets to QuVa and used the Trade Secrets outside the scope of his employment with Par Sterile. Jenkins's knowing and improper disclosure and use of Par's Trade Secrets constitutes a breach of the non-disclosure clauses in his Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement.

**RESPONSE:** *Jenkins denies the allegations of Paragraph 140.*

141.   Jenkins knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile. Jenkins's knowing and improper solicitation constitutes a breach of the non-solicitation clauses in his Employment Agreement, Restrictive Covenant Agreement, and Separation Agreement.

**RESPONSE:** *Jenkins denies the allegations of Paragraph 141.*

142.   By reason of Jenkins's breach of contracts alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *Jenkins denies the allegations of Paragraph 142.*

143.   Par is also entitled to recover compensatory damages, general damages, and special damages from Jenkins. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *Jenkins denies the allegations of Paragraph 143.*

## COUNT VII
## Breach Of Contract, New Jersey Common Law
### (*Against Defendant Rutkowski*)

144.   Par re-alleges each and every allegation set forth in Paragraphs 1 through 143, inclusive, and incorporates them herein by reference.

**RESPONSE:** *The allegations of Paragraph 144 are not directed at Defendants, and*

*therefore are not addressed.*

145.   During his course of employment with JHP and Par Sterile, Rutkowski at least signed three separate agreements with clauses relating to the Trade Secrets, confidential information, and non-solicitation. The relevant provisions of these agreements remain in full force and, for good consideration, Rutkowski remains obligated to comply with these provisions. Par has satisfied all of its obligations under

these valid and enforceable agreements.

**RESPONSE:** *The allegations of Paragraph 145 are not directed at Defendants, and therefore are not addressed.*

146.   *First*, in March 2015, Rutkowski signed a "Trade Secret, Non-Disclosure and Restrictive Covenant Agreement." This agreement defined "Proprietary Information" as "confidential and trade secret information, including formulas, formulations, processes, methods of manufacture, research and development including protocols and/or records, results, data, product pricing information, financial information, product pricing, marketing information, and the identify of customers including customer lists . . . ." By signing the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement, Rutkowski agreed to a non- disclosure clause, which provided that Rutkowski will not "divulge, disclose, or communicate to anyone or any entity, directly or indirectly either during or after the termination of your employment with Par, any of Par's Proprietary Information, and agree not to use Par's Proprietary Information in your required duties for any subsequent employer."

**RESPONSE:** *The allegations of Paragraph 146 are not directed at Defendants, and therefore are not addressed.*

147.   Rutkowski also agreed to a non-solicitation clause, which provided that Rutkowski will not "solicit, induce, encourage or attempt to solicit, induce or encourage any employee of Par to leave his/her employment with Par . . . or . . . hire, attempt to hire, assist in the hire or, or attempt to assist in the hire of an employee of Par."

**RESPONSE:** *The allegations of Paragraph 147 are not directed at Defendants, and therefore are not addressed.*

148.   Rutkowski further agreed that Par Sterile is "entitle[d] . . . to injunctive relief from a court having appropriate jurisdiction" as a result of his "failure to abide by this Agreement."

**RESPONSE:** *The allegations of Paragraph 148 are not directed at Defendants, and therefore are not addressed.*

149.   *Second*, in September 2015, Rutkowski signed a "Proprietary Information and Nondisclosure Agreement." Par was the intended beneficiary of this agreement between Rutkowski and Endo International plc. This agreement defined "Confidential Information" as "trade secret and . . . information . . . disclosed to or known by me as a consequence of my employment and . . . not generally known outside of Employer." By signing the Proprietary Information and Nondisclosure Agreement, Rutkowski agreed to a non-disclosure clause, which provided that Rutkowski will not "disclose or use at any time, either during or subsequent to my employment, any Confidential Information of employer which I develop or otherwise become informed of during my employment, except as required in my duties to Employer."

**RESPONSE:** *The allegations of Paragraph 149 are not directed at Defendants, and*

*therefore are not addressed.*

150.   Rutkowski also agreed to a non-solicitation clause, which provided that Rutkowski will "not directly or indirectly, either for myself or through an agent, consultant, firm or corporation, solicit or cause loss of . . . employees from Endo."

**RESPONSE:**   *The allegations of Paragraph 150 are not directed at Defendants, and*

*therefore are not addressed.*

151.   *Third*, in April 2017, Rutkowski signed an "Employee Certificate of Compliance." Par was the intended beneficiary of this agreement between Rutkowski and Endo International plc. By signing the Employee Certificate of Compliance, Rutkowski agreed to a non-disclosure clause, which provided that Rutkowski was:

> obligated to preserve in confidence and not use for my own benefit or the benefit of any third party of any of the following: confidential and proprietary information, knowledge, data, documents or other information relating to the Company's products, systems, databases, research programs, know-how, designs, data, customer lists or any other proprietary and/or confidential information pertaining to any business of the Company or any of its subsidiaries, parents or affiliated companies, or information pertaining to any of the Company's suppliers, clients, customers, employees, consultants, or independent contractors that I had in my possession or had access to during my time of employment with the Company.

**RESPONSE:** *The allegations of Paragraph 151 are not directed at Defendants, and*

*therefore are not addressed.*

152.    The relevant provisions of all three agreements—the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement, the Proprietary Information and Nondisclosure Agreement, and the Employee Certification of Compliance— are still in effect. Neither Rutkowski nor Par has terminated the agreements. To the extent the non-disclosure and non-solicitation clauses in the agreements address the same subject matters, the clauses are consistent and without contradiction among the three agreements. To the extent that other clauses within the agreements contradict these clauses, those contradictions do not affect the enforceability of the non-disclosure and non-solicitation clauses. All three agreements are valid contracts and independently enforceable.

**RESPONSE:** *The allegations of Paragraph 152 are not directed at Defendants, and*

*therefore are not addressed.*

153.    Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products. These Trade Secrets are described above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process. Some or all of the documents and information comprising Par's Trade Secrets constitute "Proprietary Information" or "Confidential Information" as defined in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement, the Proprietary Information and Nondisclosure Agreement, and the Employee Certification of Compliance.

**RESPONSE:** *The allegations of Paragraph 153 are not directed at Defendants, and*

*therefore are not addressed.*

154.    Rutkowski was in possession of Par's Trade Secrets while subject to the three agreements. In those agreements, he: (1) expressly acknowledged and confirmed the confidential nature of Par's Trade Secrets; (2) agreed to maintain the confidentiality of Par's Trade Secrets; (3) agreed not to use Par's Trade Secrets for their own purposes or the purposes of a third party; and (4) agreed not to solicit Par's employees.

**RESPONSE:** *The allegations of Paragraph 154 are not directed at Defendants, and therefore are not addressed.*

155.    Rutkowski knowingly and improperly disclosed Par's Trade Secrets to QuVa and used the Trade Secrets outside the scope of his employment with Par Sterile. Rutkowski's knowing and improper disclosure and use of Par's Trade Secrets constitutes a breach of the non-disclosure clauses in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement, the Proprietary Information and Nondisclosure Agreement, and the Employee Certification of Compliance.

**RESPONSE:** *The allegations of Paragraph 155 are not directed at Defendants, and therefore are not addressed.*

156.    Rutkowski knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile. Rutkowski first solicited Par Sterile employees while he was still employed by Par Sterile. Par is informed and believes that Rutkowski continued to breach his non-solicitation obligations to Par after he left Par. If Rutkowski was willing to solicit Par employees on QuVa's behalf while still employed by Par, he would likely continue such conduct after he joined QuVa. Rutkowski's knowing and improper solicitation constitutes a breach of the non-solicitation clauses in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement and the Proprietary Information and Nondisclosure Agreement.

**RESPONSE:** *The allegations of Paragraph 156 are not directed at Defendants, and therefore are not addressed.*

157.    By reason of Rutkowski's breach of contracts alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *The allegations of Paragraph 157 are not directed at Defendants, and therefore are not addressed.*

158.    Par is also entitled to recover compensatory damages, general damages, and special damages from Rutkowski. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *The allegations of Paragraph 158 are not directed at Defendants, and*

*therefore are not addressed.*

## COUNT VIII
## Breach Of Contract, New Jersey Common Law
## (*Against Defendant Kohut*)

159.    Par re-alleges each and every allegation set forth in Paragraphs 1 through 158, inclusive, and incorporates them herein by reference.

**RESPONSE:** *The allegations of Paragraph 159 are not directed at Defendants, and*

*therefore are not addressed.*

160.    As a consultant for Par, Kohut signed an employment agreement with clauses relating to the Trade Secrets, confidential information, and non-solicitation. The relevant provisions of this agreement remain in full force and, for good consideration, Kohut remains obligated to comply with these provisions. Par has satisfied all of its obligations under this valid and enforceable agreement.

**RESPONSE:** *The allegations of Paragraph 160 are not directed at Defendants, and*

*therefore are not addressed.*

161.    In March 2015, Kohut signed a "Trade Secret, Non-Disclosure and Restrictive Covenant Agreement." This agreement defined "Proprietary Information" as "confidential and trade secret information, including formulas, formulations, processes, methods of manufacture, research and development including protocols and/or records, results, data, product pricing information, financial information, product pricing, marketing information, and the identify of customers including customer lists . . . ." By signing the Trade Secret, Non- Disclosure and Restrictive Covenant Agreement, Kohut agreed to a non-disclosure clause, which provided that Kohut will not "divulge, disclose, or communicate to anyone or any entity, directly or indirectly either during or

after the termination of your employment with Par, any of Par's Proprietary Information, and agree not to use Par's Proprietary Information in your required duties for any subsequent employer."

**RESPONSE:**  *The allegations of Paragraph 161 are not directed at Defendants, and*

*therefore are not addressed.*

162.    Kohut also agreed to a non-solicitation clause, which provided that Kohut will not "solicit, induce, encourage or attempt to solicit, induce or encourage any employee of Par to leave his/her employment with Par . . . or . . . hire, attempt to hire, assist in the hire or, or attempt to assist in the hire of an employee of Par."

**RESPONSE:**  *The allegations of Paragraph 162 are not directed at Defendants, and*

*therefore are not addressed.*

163.    Kohut further agreed that Par Sterile is "entitle[d] . . . to injunctive relief from a court having appropriate jurisdiction" as a result of her "failure to abide by this Agreement."

**RESPONSE:**  *The allegations of Paragraph 163 are not directed at Defendants, and*

*therefore are not addressed.*

164.    Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products. These Trade Secrets are described above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process. Some or all of the documents and information comprising Par's Trade Secrets constitute "Proprietary Information" as defined in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

**RESPONSE:**  *The allegations of Paragraph 164 are not directed at Defendants, and*

*therefore are not addressed.*

165.    Kohut was in possession of Par's Trade Secrets while subject to the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement. In the agreement,

she: (1) expressly acknowledged and confirmed the confidential nature of Par's Trade Secrets; (2) agreed to maintain the confidentiality of Par's Trade Secrets; (3) agreed not to use Par's Trade Secrets for her own purposes or the purposes of a third party; and (4) agreed not to solicit Par's employees.

**RESPONSE:**   *The allegations of Paragraph 165 are not directed at Defendants, and*

*therefore are not addressed.*

166.    Kohut knowingly and improperly disclosed Par's Trade Secrets to QuVa and used the Trade Secrets outside the scope of her employment with Par Sterile. Kohut's knowing and improper disclosure and use of Par's Trade Secrets constitutes a breach of the non-disclosure clause in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

**RESPONSE:**   *The allegations of Paragraph 166 are not directed at Defendants, and*

*therefore are not addressed.*

167.    Kohut knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile. Kohut's knowing and improper solicitation constitutes a breach of the non-solicitation clause in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

**RESPONSE:**   *The allegations of Paragraph 167 are not directed at Defendants, and*

*therefore are not addressed.*

168.    By reason of Kohut's breach of contract alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:**   *The allegations of Paragraph 168 are not directed at Defendants, and*

*therefore are not addressed.*

169.    Par is also entitled to recover compensatory damages, general damages,

and special damages from Kohut. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:**  *The allegations of Paragraph 169 are not directed at Defendants, and*

*therefore are not addressed.*

## COUNT IX
## Breach Of Contract, New Jersey Common Law
## (*Against Defendant Short*)

170.    Par re-alleges each and every allegation set forth in Paragraphs 1 through 169, inclusive, and incorporates them herein by reference.

**RESPONSE:** *The allegations of Paragraph 170 are not directed at Defendants, and*

*therefore are not addressed.*

171.    As an employee for Par, Short signed an employment agreement with clauses relating to the Trade Secrets, confidential information, and non-solicitation. The relevant provisions of this agreement remain in full force and, for good consideration, Short remains obligated to comply with these provisions. Par has satisfied all of its obligations under this valid and enforceable agreement.

**RESPONSE:** *The allegations of Paragraph 171 are not directed at Defendants, and*

*therefore are not addressed.*

172.    In March 2015, Short signed a "Trade Secret, Non-Disclosure and Restrictive Covenant Agreement." This agreement defined "Proprietary Information" as "confidential and trade secret information, including formulas, formulations, processes, methods of manufacture, research and development including protocols and/or records, results, data, product pricing information, financial information, product pricing, marketing information, and the identify of customers including customer lists . . . ." By signing the Trade Secret, Non- Disclosure and Restrictive Covenant Agreement, Short agreed to a non-disclosure clause, which provided that Short will not "divulge, disclose, or communicate to anyone or any entity, directly or indirectly either during or after the termination of your employment with Par, any of Par's Proprietary Information, and agree not to use Par's Proprietary Information in your required duties for any

subsequent employer."

**RESPONSE:** *The allegations of Paragraph 172 are not directed at Defendants, and*

*therefore are not addressed.*

173.    Short also agreed to a non-solicitation clause, which provided that Short will not "solicit, induce, encourage or attempt to solicit, induce or encourage any employee of Par to leave his/her employment with Par . . . or . . . hire, attempt to hire, assist in the hire or, or attempt to assist in the hire of an employee of Par."

**RESPONSE:** *The allegations of Paragraph 173 are not directed at Defendants, and*

*therefore are not addressed.*

174.    Short further agreed that Par Sterile is "entitle[d] . . . to injunctive relief from a court having appropriate jurisdiction" as a result of his "failure to abide by this Agreement."

**RESPONSE:** *The allegations of Paragraph 174 are not directed at Defendants, and*

*therefore are not addressed.*

175.    Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products. These Trade Secrets are described above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process. Some or all of the documents and information comprising Par's Trade Secrets constitute "Proprietary Information" as defined in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

**RESPONSE:** *The allegations of Paragraph 175 are not directed at Defendants, and*

*therefore are not addressed.*

176.    Short was in possession of Par's Trade Secrets while subject to the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement. In the agreement, he: (1) expressly acknowledged and confirmed the confidential nature of Par's Trade Secrets; (2) agreed to maintain the confidentiality of Par's Trade Secrets; (3) agreed not

to use Par's Trade Secrets for her own purposes or the purposes of a third party; and (4) agreed not to solicit Par's employees.

**RESPONSE:** *The allegations of Paragraph 176 are not directed at Defendants, and therefore are not addressed.*

177.    Short knowingly and improperly disclosed Par's Trade Secrets to QuVa and used the Trade Secrets outside the scope of his employment with Par Sterile. Short's knowing and improper disclosure and use of Par's Trade Secrets constitutes a breach of the non-disclosure clause in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

**RESPONSE:** *The allegations of Paragraph 177 are not directed at Defendants, and therefore are not addressed.*

178.    Short knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile. Short's knowing and improper solicitation constitutes a breach of the non-solicitation clause in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

**RESPONSE:** *The allegations of Paragraph 178 are not directed at Defendants, and therefore are not addressed.*

179.    By reason of Short's breach of contract alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *The allegations of Paragraph 179 are not directed at Defendants, and therefore are not addressed.*

180.    Par is also entitled to recover compensatory damages, general damages, and special damages from Short. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *The allegations of Paragraph 180 are not directed at Defendants, and therefore are not addressed.*

## COUNT X
### Breach Of Contract, New Jersey Common Law
### (*Against Defendant Rhoades*)

181.    Par re-alleges each and every allegation set forth in Paragraphs 1 through 180, inclusive, and incorporates them herein by reference.

**RESPONSE:** *The allegations of Paragraph 181 are not directed at Defendants, and therefore are not addressed.*

182.    As an employee for Par, Rhoades signed an employment agreement with clauses relating to the Trade Secrets, confidential information, and non- solicitation. The relevant provisions of this agreement remain in full force and, for good consideration, Rhoades remains obligated to comply with these provisions.  Par has satisfied all of its obligations under this valid and enforceable agreement.

**RESPONSE:** *The allegations of Paragraph 182 are not directed at Defendants, and therefore are not addressed.*

183.    In March 2015, Rhoades signed a "Trade Secret, Non-Disclosure and Restrictive Covenant Agreement." This agreement defined "Proprietary Information" as "confidential and trade secret information, including formulas, formulations, processes, methods of manufacture, research and development including protocols and/or records, results, data, product pricing information, financial information, product pricing, marketing information, and the identify of customers including customer lists . . . ." By signing the Trade Secret, Non- Disclosure and Restrictive Covenant Agreement, Rhoades agreed to a non- disclosure clause, which provided that Rhoades will not "divulge, disclose, or communicate to anyone or any entity, directly or indirectly either during or after the termination of your employment with Par, any of Par's Proprietary Information, and agree not to use Par's Proprietary Information in your required duties for any subsequent employer."

**RESPONSE:** *The allegations of Paragraph 183 are not directed at Defendants, and therefore are not addressed.*

184.     Rhoades also agreed to a non-solicitation clause, which provided that Rhoades will not "solicit, induce, encourage or attempt to solicit, induce or encourage any employee of Par to leave his/her employment with Par . . . or . . . hire, attempt to hire, assist in the hire or, or attempt to assist in the hire of an employee of Par."

**RESPONSE:** *The allegations of Paragraph 184 are not directed at Defendants, and therefore are not addressed.*

185.     Rhoades further agreed that Par Sterile is "entitle[d] . . . to injunctive relief from a court having appropriate jurisdiction" as a result of his "failure to abide by this Agreement."

**RESPONSE:** *The allegations of Paragraph 185 are not directed at Defendants, and therefore are not addressed.*

186.     Par is the owner of Trade Secrets and other proprietary or confidential information relating to Vasostrict® and other vasopressin products. These Trade Secrets are described above and are comprised of a formula, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process. Some or all of the documents and information comprising Par's Trade Secrets constitute "Proprietary Information" as defined in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

**RESPONSE:** *The allegations of Paragraph 186 are not directed at Defendants, and therefore are not addressed.*

187.     Rhoades was in possession of Par's Trade Secrets while subject to  the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement. In the agreement, he: (1) expressly acknowledged and confirmed the confidential nature of Par's Trade Secrets; (2) agreed to maintain the confidentiality of Par's Trade Secrets; (3) agreed not to use Par's Trade Secrets for her own purposes or the purposes of a third party; and (4) agreed not to solicit Par's employees.

**RESPONSE:** *The allegations of Paragraph 187 are not directed at Defendants, and therefore are not addressed.*

188.    Rhoades knowingly and improperly disclosed Par's Trade Secrets to QuVa and used the Trade Secrets outside the scope of his employment with Par Sterile. Rhoades's knowing and improper disclosure and use of Par's Trade Secrets constitutes a breach of the non-disclosure clause in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

**RESPONSE:** *The allegations of Paragraph 188 are not directed at Defendants, and therefore are not addressed.*

189.    Rhoades knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile. Rhoades's knowing and improper solicitation constitutes a breach of the non-solicitation clause in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

**RESPONSE:** *The allegations of Paragraph 189 are not directed at Defendants, and therefore are not addressed.*

190.    By reason of Rhoades's breach of contract alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *The allegations of Paragraph 190 are not directed at Defendants, and therefore are not addressed.*

191.    Par is also entitled to recover compensatory damages, general damages, and special damages from Rhoades.  The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *The allegations of Paragraph 191 are not directed at Defendants, and therefore are not addressed.*

## COUNT XI
## Breach Of Contract, New Jersey Common Law
### (*Against Defendant McGrady*)

192.   Par re-alleges each and every allegation set forth in Paragraphs 1 through 191, inclusive, and incorporates them herein by reference.

**RESPONSE:**  *The allegations of Paragraph 192 are not directed at Defendants, and therefore are not addressed.*

193.   As an employee for Par, McGrady signed an employment agreement with clauses relating to the Trade Secrets, confidential information, and non- solicitation. The relevant provisions of this agreement remain in full force and, for good consideration, McGrady remains obligated to comply with these provisions. Par has satisfied all of its obligations under this valid and enforceable agreement.

**RESPONSE:**  *The allegations of Paragraph 193 are not directed at Defendants, and therefore are not addressed.*

194.   In March 2015, McGrady signed a "Trade Secret, Non-Disclosure and Restrictive Covenant Agreement." McGrady agreed to a non-solicitation clause, which provided that McGrady will not "solicit, induce, encourage or attempt to solicit, induce or encourage any employee of Par to leave his/her employment with Par . . . or . . . hire, attempt to hire, assist in the hire or, or attempt to assist in the hire of an employee of Par."

**RESPONSE:**  *The allegations of Paragraph 194 are not directed at Defendants, and therefore are not addressed.*

195.   McGrady further agreed that Par Sterile is "entitle[d] . . . to injunctive relief from a court having appropriate jurisdiction" as a result of his "failure to abide by this Agreement."

**RESPONSE:** *The allegations of Paragraph 195 are not directed at Defendants, and therefore are not addressed.*

196.   McGrady knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile. McGrady's knowing and improper solicitation constitutes a breach of the non-solicitation clause in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

**RESPONSE:** *The allegations of Paragraph 196 are not directed at Defendants, and therefore are not addressed.*

197.   By reason of McGrady's breach of contract alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *The allegations of Paragraph 197 are not directed at Defendants, and therefore are not addressed.*

198.   Par is also entitled to recover compensatory damages, general damages, and special damages from McGrady. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *The allegations of Paragraph 198 are not directed at Defendants, and therefore are not addressed.*

## COUNT XII
## Breach of Contract, New Jersey Common Law
### (*Against Defendant Hartley*)

199.   Par re-alleges each and every allegation set forth in Paragraphs 1 through 198, inclusive, and incorporates them herein by reference.

**RESPONSE:**  *The allegations of Paragraph 199 are not directed at Defendants, and therefore are not addressed.*

200.   As an employee for Par, Hartley signed an employment agreement with clauses relating to the Trade Secrets, confidential information, and non-solicitation. The relevant provisions of this agreement remain in full force and, for good consideration, Hartley remains obligated to comply with these provisions. Par has satisfied all of its obligations under this valid and enforceable agreement.

**RESPONSE:**  *The allegations of Paragraph 200 are not directed at Defendants, and therefore are not addressed.*

201.   In March 2015, Hartley signed a "Trade Secret, Non-Disclosure and Restrictive Covenant Agreement." Hartley agreed to a non-solicitation clause, which provided that Hartley will not "solicit, induce, encourage or attempt to solicit, induce or encourage any employee of Par to leave his/her employment with Par . . . or . . . hire, attempt to hire, assist in the hire or, or attempt to assist in the hire of an employee of Par."

**RESPONSE:**  *The allegations of Paragraph 201 are not directed at Defendants, and therefore are not addressed.*

202.   Hartley further agreed that Par Sterile is "entitle[d] . . . to injunctive relief from a court having appropriate jurisdiction" as a result of his "failure to abide by this Agreement."

**RESPONSE:**  *The allegations of Paragraph 202 are not directed at Defendants, and therefore are not addressed.*

203.   Hartley knowingly and improperly solicited Par Sterile's employees to leave Par Sterile and/or breach their respective employment agreements with Par Sterile. Hartley's knowing and improper solicitation constitutes a breach of the non- solicitation clause in the Trade Secret, Non-Disclosure and Restrictive Covenant Agreement.

**RESPONSE:** *The allegations of Paragraph 203 are not directed at Defendants, and therefore are not addressed.*

204.   By reason of Hartley's breach of contract alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *The allegations of Paragraph 204 are not directed at Defendants, and therefore are not addressed.*

205.   Par is also entitled to recover compensatory damages, general damages, and special damages from Hartley. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *The allegations of Paragraph 205 are not directed at Defendants, and therefore are not addressed.*

## COUNT XIII
## Breach of Fiduciary Duty, New Jersey Common Law
### *(Against Defendants Hinchen, Jenkins, And Rutkowski)*

206.   Par re-alleges each and every allegation set forth in Paragraphs 1 through 205, inclusive, and incorporates them herein by reference.

**RESPONSE:** *Defendants Hinchen and Jenkins incorporate their responses to Paragraphs 1-205, as if fully set forth herein.*

207.   Hinchen, Jenkins, and Rutkowski each owed, and continue to owe, a fiduciary duty to Par because, among other reasons, Par entrusted each of them with access to the Trade Secrets and other confidential corporate information and because each was a corporate officer of Par Sterile. Hinchen was President of Par Sterile, Jenkins was Chief Development Officer of Par Sterile, and Rutkowski was a Senior Vice President and General Manager at Par Sterile.

**RESPONSE:** *Defendants Hinchen and Jenkins admit that Hinchen was President of Par Sterile, Jenkins was Chief Development of Par Sterile, and Rutkowski was a Senior Vice President and General Manager at Par Sterile. Defendants deny the remaining allegations of Paragraph 207.*

208.   Hinchen's, Jenkins's, and Rutkowski's fiduciary duties included, among others, the duty to protect the confidentiality of Par's Trade Secrets and other confidential information and to refrain from unfairly competing with Par by using Par's Trade Secrets and other confidential information.

**RESPONSE:** *Defendants Hinchen and Jenkins deny the allegations of Paragraph 208.*

209.   Hinchen, Jenkins, and Rutkowski have knowingly breached their fiduciary obligation to Par by disclosing and/or using Par's Trade Secrets and other confidential information for the benefit of QuVa in the preparation for the production of a competing vasopressin compound and the other acts described above.

**RESPONSE:** *Defendants Hinchen and Jenkins deny the allegations of Paragraph 209.*

210.   By reason of the above-alleged acts and conduct of Hinchen, Jenkins, and Rutkowski, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *Defendants Hinchen and Jenkins deny the allegations of Paragraph 210.*

211.   Par is also entitled to recover compensatory damages and punitive damages from Hinchen, Jenkins, and Rutkowski. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *Defendants Hinchen and Jenkins deny the allegations of Paragraph 211.*

## COUNT XIV
## Breach of Duty of Loyalty, New Jersey Common Law

*(Against Defendants Hinchen, Jenkins, Rutkowski, Short, Rhoades, McGrady, and Hartley)*

212.    Par re-alleges each and every allegation set forth in Paragraphs 1 through 211, inclusive, and incorporates them herein by reference.

**RESPONSE:**  *Defendants Hinchen and Jenkins incorporate their responses to*

*Paragraphs 1-211, as if fully set forth herein.*

213.    Hinchen, Jenkins, Rutkowski, Short, Rhoades, McGrady, and Hartley owed, and continue to owe, a duty of loyalty to Par because, under New Jersey law, every employee owes a duty of loyalty to his or her employee to not act contrary to the employer's interests while employed. This duty prohibits the disclosure of trade secrets or other confidential information of the employer, and it extends past an employee's termination. Hinchen, as President of Par Sterile, Jenkins, as Chief Development Officer of Par Sterile, Rutkowski, as a Senior Vice President and General Manager at Par Sterile, Short, as Senior Director of Quality Control at Par Sterile, Rhoades, as Manager of Sterility Assurance at Par Sterile, McGrady, as Manager of Deviations and Lot Dispositions at Par Sterile, and Hartley, as Director of Technical Services at Par Sterile, were all employees of Par Sterile and therefore owed Par a duty of loyalty that extends past their employment with Par Sterile.

**RESPONSE:**  *Defendants Hinchen and Jenkins admit that Hinchen was President of Par*

*Sterile, Jenkins was Chief Development of Par Sterile, Rutkowski was Senior Vice*

*President and General Manager at Par Sterile, Short was Senior Director of Quality*

*Control at Par Sterile, Rhoades was Manager of Sterility Assurance at Par Sterile,*

*McGrady was Manager of Deviations and Lot Dispositions and Hartley was Director of*

*Technical Services at Par Sterile. Defendants Hinchen and Jenkins deny the remaining*

*allegations of Paragraph 213.*

214.    Hinchen, Jenkins, Rutkowski, Short, Rhoades, McGrady, and Hartley knowingly breached their duty of loyalty by disclosing and/or using Par's Trade Secrets and other confidential information for the benefit of QuVa in the preparation for the

production of a competing vasopressin compound and the other acts described above. At the time of such disclosure and use, Hinchen, Jenkins, Rutkowski, Short, Rhoades, McGrady, and Hartley knew or had reason to know that their knowledge of the Trade Secrets was acquired under circumstances giving rise to a duty to maintain the secrecy, and limit the use, of the Trade Secrets and other confidential information.

**RESPONSE:**  *Defendants Hinchen and Jenkins deny the allegations of Paragraph 214.*

215.   By reason of the above-alleged acts and conduct of Hinchen, Jenkins, Rutkowski, Short, Rhoades, McGrady, and Hartley, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:**  *Defendants Hinchen and Jenkins deny the allegations of Paragraph 215.*

216.   Par is also entitled to recover compensatory damages and punitive damages from Hinchen, Jenkins, Rutkowski, Short, Rhoades, McGrady, and Hartley. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:**  *Defendants Hinchen and Jenkins deny the allegations of Paragraph 216.*

## COUNT XV
## Breach of Duty of Confidence, New Jersey Common Law
### *(Against Defendants Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, and Hartley)*

217.   Par re-alleges each and every allegation set forth in Paragraphs 1 through 216, inclusive, and incorporates them herein by reference.

**RESPONSE:**  *Defendants Hinchen and Jenkins incorporate their responses to*

*Paragraphs 1-216, as if fully set forth herein.*

218.   Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, and Hartley owed, and continue to owe, a duty of confidence to Par because, among other reasons, Par disclosed to them Trade Secrets and other confidential information based on their express and implied promise of confidentiality.

**RESPONSE:** *Defendants Hinchen and Jenkins deny the allegations of Paragraph 218.*

219.   Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, and Hartley breached their duty of confidence by misappropriating Par's Trade Secrets, including by disclosing and using the Trade Secrets without Par's express or implied consent. At the time of such disclosure and use, Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, and Hartley knew or had reason to know that their knowledge of the Trade Secrets of other confidential information was acquired under circumstances giving rise to a duty to maintain the secrecy, and limit the use, of the Trade Secrets and other confidential information.

**RESPONSE:** *Defendants Hinchen and Jenkins deny the allegations of Paragraph 219.*

220.   By reason of the acts and conduct of Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, and Hartley alleged above, Par has been damaged, and it will continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *Defendants Hinchen and Jenkins deny the allegations of Paragraph 220.*

221.   Par is also entitled to recover compensatory damages and punitive damages from Hinchen, Jenkins, Rutkowski, Kohut, Short, Rhoades, McGrady, and Hartley. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *Defendants Hinchen and Jenkins deny the allegations of Paragraph 221.*

## COUNT XVI
## Tortious Interference With Contractual Relations, New Jersey Common Law
### *(Against Defendant QuVa)*

222.   Par re-alleges each and every allegation set forth in Paragraphs 1 through 221, inclusive, and incorporates them herein by reference.

**RESPONSE:** *QuVa incorporates its responses to Paragraphs 1-221, as if fully set forth herein.*

223.   Par Sterile has contractual relationships with employees that have confidential knowledge of the Trade Secrets and other confidential described above, including such key employees as David Short, Stephen Rhoades, Travis  McGrady, David "Mike" Hartley, Guy Thompson, Mike Rutkowski, Ashley Short, Chinnasamy Subramaniam, and Donna Kohut. These contractual relationships include a non-disclosure clause. Par has fulfilled its obligation under those agreements.

**RESPONSE:** *QuVa admits that David Short, Stephen Rhoades, Travis McGrady, David*

*"Mike" Hartley, Guy Thompson, Mike Rutkowski, Ashley Short, Chinnasamy*

*Subramaniam, and Donna Kohut entered into one or more agreements with Par Sterile.*

*QuVa denies the remaining allegations of Paragraph 223.*

224.   As described above, QuVa, by and through its agents, engaged in an aggressive poaching campaign of Par Sterile's key employees with actual knowledge of Par Sterile's contractual relationships with those employees and the contractual relationships' protection of Par Sterile's Trade Secrets. Legitimate hiring on the open market, without using confidential information as to which Par Sterile employees had knowledge of the Trade Secrets and other confidential information, would not have resulted in such targeting of the above-named individuals.

**RESPONSE:** *QuVa denies the allegations of Paragraph 224.*

225.   QuVa intended to use improper means in interfering with Par Sterile's contractual relationships with the former key employees listed above without lawful justification or legitimate reason for this interference. As a result, QuVa's tortious interference was intentional and with malice.

**RESPONSE:** *QuVa denies the allegations of Paragraph 225.*

226.   As a direct and proximate result of QuVa's actions, the former key employees listed above were induced to breach the non-disclosure clauses in their various employment agreements.

**RESPONSE:** *QuVa denies the allegations of Paragraph 226.*

227.   As a result of QuVa's wrongdoing, Par has been damaged, and it will

continue to suffer great and irreparable harm and damage. The amount of this irreparable harm will be difficult if not impossible to ascertain, and Par will be without an adequate remedy at law.

**RESPONSE:** *QuVa denies the allegations of Paragraph 227.*

228.   Par is also entitled to recover compensatory damages and punitive damages from QuVa. The amount of such relief cannot be determined precisely at this time.

**RESPONSE:** *QuVa denies the allegations of Paragraph 228.*

## RELIEF SOUGHT

**RESPONSE:** *Defendants deny that Plaintiffs are entitled to any of the relief identified in Paragraphs 1-10 in the Relief Sought Section.*


## DEFENDANTS' AFFIRMATIVE DEFENSES

Based on the factual allegations contained in the First Amended Complaint, without admitting any wrongful conduct on the part of Defendants, without admitting that Par suffered any loss, damage, or injury, and without assuming any burden of proof that it would not otherwise bear under applicable law, Defendants asserts the following affirmative defenses. These defenses are pleaded in the alternative and without prejudice to the denials and other statements made in Defendants' Answer and/or Counterclaims to the Complaint.

Defendants reserve the right to amend this Answer and to add additional Affirmative Defenses.

74

## FIRST DEFENSE

Par's claims are barred, in whole or in part, because the Complaint fails to state a claim for damages or for injunctive relief upon which such relief may be granted.

## SECOND DEFENSE

Plaintiffs are not entitled to the relief requested as a matter of law on any of their claims against Defendants.

## THIRD DEFENSE

Plaintiff's claims are or may be barred, or the relief it seeks limited, because the information asserted by Plaintiff to be confidential or trade secrets does not constitute protectable trade secrets or confidential information. They are and have been generally known to the public (at least by way of Plaintiffs' patents and published patent applications, as well as other acts of Plaintiffs), are and have been readily ascertainable by proper means, are and have been independently developed by others, and/or are not subject to reasonable efforts by Plaintiffs to maintain secrecy. Plaintiffs' claims fail to establish any purported trade secrets have economic value derived from not being generally known. Plaintiffs' claims fail to establish any purported trade secrets have economic value to Defendants or others.

## FOURTH DEFENSE

Plaintiffs' claims are or may be barred, or the relief it seeks limited, due to Plaintiffs' failure to describe its alleged confidential information and trade secrets with

reasonable particularity or with sufficient detail to distinguish them from unprotected information and to inform Defendants whether or to what extent Plaintiff possesses trade secrets or that such trade secrets have been misappropriated. Virtually every pharmaceutical business includes "technical know-how relating to chemical compositions and properties, batch quantities, assays, test methods and specifications, stability protocols, validation methods, quality control, and research & development efforts to obtain increased shelf life under both refrigeration and room temperature storage conditions," as well as "confidential information relating to the manufacture, packaging, distribution, marketing, and sale" of pharmaceutical products. Additionally, such businesses may include "customer identities, industry competitive intelligence, strategic plans, results of operations, and short- and long-term business strategies and initiatives," making Plaintiffs' vague allegations insufficient to inform Defendants of what alleged trade secrets have purportedly been misappropriated.

## FIFTH DEFENSE

Plaintiffs have not suffered any monetary damages or other injury as a result of any acts or omissions of Defendants regarding any alleged trade secrets or confidential information, or any alleged misappropriation or misuse thereof.

## SIXTH DEFENSE

Plaintiffs' claims are brought in bad faith without substantial justification and for

76

an improper purpose.

## SEVENTH DEFENSE

At all times relevant to the Complaint, Defendants acted in good faith. Defendants have not misappropriated trade secrets or other proprietary or confidential information in violation of any state or federal statute or common law.

## EIGHTH DEFENSE

Par's claims fail because Defendants have, at all material times, engaged in lawful dealings with Par in the marketplace and without any intent to harm Par.

## NINTH DEFENSE

Par's claims against Defendants are barred in whole or in part by the equitable doctrines of unclean hands, waiver, release, laches, estoppel, and/or res judicata.

## TENTH DEFENSE

Par's claims for breach of fiduciary duty, breach of the duty of loyalty, and breach of the duty of confidence are barred by the economic loss doctrine.

## ELEVENTH DEFENSE

Par's claims for breach of fiduciary duty, breach of the duty of loyalty, breach of the duty of confidence and tortious interference with contract are barred by the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code Ann. § 134A.007 or the

Michigan Uniform Trade Secrets Act, M.C.L. § 445.1908.

## TWELFTH DEFENSE

Par's New Jersey state law claims are barred by choice of law principles.

## THIRTEENTH DEFENSE

Par's claims and damages, if any, are barred because Defendants' conduct was not the factual or proximate cause of any injury or loss that Par allegedly sustained and any such injury or loss was caused by Par and/or another third party for which Defendants are not responsible.

## FOURTEENTH DEFENSE

Par's claims against Defendants are barred in whole or in part by its failure to mitigate its damages, if it has suffered any such damages.

## FIFTEENTH DEFENSE

Par is not entitled to recover actual or compensatory damages because it cannot demonstrate any actual injury or special damages arising from the alleged acts of Defendants and/or its other former employees.

## SIXTEENTH DEFENSE

Par's claims for equitable relief against Defendants are barred, in whole or in part, because Par has not alleged any conduct that may cause irreparable harm and/or Par has an adequate remedy at law and because the relief requested is overly broad, unreasonable,

and based on an incorrect interpretation of Defendants' obligations to Par.

## SEVENTEENTH DEFENSE

Par's request for exemplary or punitive damages is barred by the applicable facts and laws, including applicable provisions of state law as well as the United States Constitution.

## EIGHTEENTH DEFENSE

Par's request for attorneys' fees is barred because there is no legal basis for attorneys' fees for Par's claims.

## NINETEENTH DEFENSE

Par's claims fail because Par's former employees have not breached their respective agreements with Par and because QuVa did not have any knowledge of any alleged breach that may have occurred.

## TWENTIETH DEFENSE

QuVa never rendered substantial assistance or encouragement of any kind to any former Par employee to breach his or her contractual agreements with Par.

## TWENTY-FIRST DEFENSE

QuVa has not tortiously interfered with Par's contracts or business relationships because at all times relevant to the Complaint, Defendants engaged in proper and acceptable conduct that comported with, and was sanctioned by, the "rules of the game" which society and the relevant industry have adopted, and which Par has adopted and used. As a result, any alleged interference by Defendants with Par's alleged contracts or

business relationships was proper and privileged under the circumstances.

## TWENTY-SECOND DEFENSE

Par's claim for tortious interference with contractual relationships fails because Par cannot identify contract or prospective gain that was lost from QuVa's intentional interference.

## TWENTY-THIRD DEFENSE

Par's claims against Defendants are barred in whole or in part because the manner in which Par is attempting to enforce its agreements renders the agreements invalid and unenforceable under the applicable state law.

## TWENTY-FOURTH DEFENSE

Certain categories of information Par may claim as confidential or proprietary is a matter of public or general knowledge in the industry and was otherwise widely known outside of Par.

## TWENTY-FIFTH DEFENSE

Par has selectively enforced its restrictive covenants.

## TWENTY-SIXTH DEFENSE

Par's former employees each had their own independent reasons for leaving Par and joining QuVa and were not induced to leave Par by Defendants.

## TWENTY-SEVENTH DEFENSE

Par's business and management policies, procedures, and practices caused many employees, including some of the employees who joined QuVa, to seek employment

elsewhere.

## TWENTY-EIGHTH DEFENSE

Plaintiffs have not suffered any monetary damages or other injury as a result of any solicitation of Par employees by Defendants in connection with any alleged trade secrets or confidential information, or any alleged misappropriation or misuse thereof.

## TWENTY-NINTH DEFENSE

Par has abused and/or misused the civil litigation process in bringing, maintaining, and litigating this lawsuit against Defendants.

## THIRTIETH DEFENSE

Par's motive in filing and maintaining this lawsuit is for the purpose of stifling competition in and monopolizing the market for vasopressin. Par also improperly seeks to require QuVa to expend substantial resources defending Par's allegations for the purpose of causing serious financial harm to QuVa's business.

## THIRTY-FIRST DEFENSE

Plaintiffs have not suffered any monetary damages or other injury as a result of any solicitation of Par employees by Defendants in connection with any alleged trade secrets or confidential information, or any alleged misappropriation or misuse thereof.

## THIRTY-SECOND DEFENSE

Par filed this lawsuit without having conducted a proper investigation, and without a sufficient factual basis to make the allegations contained therein.

## DEFENDANTS' COUNTERCLAIMS

Defendants/Counterclaim Plaintiffs QuVa Pharma, Inc. ("QuVa"), Stuart Hinchen ("Hinchen") and Peter Jenkins ("Jenkins") (collectively, "Defendants" or "Counterclaim Plaintiffs") for their Counterclaims against Plaintiffs/Counterclaim Defendants Par Pharmaceutical Inc. and Par Sterile Products LLC (collectively, "Par" or "Counterclaim Defendants")), hereby allege as follows:

## INTRODUCTION

1.     Since the outset of this case, through a variety of different tactics, Par has made clear that its real motivation for the filing this lawsuit is *not* the protection of its trade secrets and confidential information but rather to destroy QuVa and embarrass its founders Stuart Hinchen and Peter Jenkins, as well as other high-level former Par employees, with the ultimate goal of protecting its monopoly on the sale of its blockbuster brand name drug, Vasostrict®.

2.     Par has made its intentions abundantly clear throughout this litigation with its scorched earth litigation strategy. But, Par has gone too far. Par's actions as described in these Counterclaims are not those of simply taking a hardline litigation tactic or approach. Instead, Par has engaged in tortious conduct by defaming QuVa, Hinchen and Jenkins and intimidating QuVa's expert witnesses to the point where they have withdrawn from this litigation.

3.     Par defamed Counterclaim Plaintiffs when, after filing its original complaint, which contains many false and defamatory statements about Counterclaim

Plaintiffs, Par posted the complaint throughout the café of Par's Rochester, Michigan facility to ensure that all the Par employees and third-parties that frequent this common area within the facility would see it.

4.    Par's tortious behavior continued when, just days after QuVa disclosed to Par that it had fully engaged two expert witnesses, as required by the parties' Discovery Confidentiality Order, ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ As a massive pharmaceutical company with substantial purchasing power, these threats were taken seriously. Both experts were forced to withdraw from their engagement with QuVa, even though both firms had previously determined that no conflict of interest existed.

5.    Counterclaim Plaintiffs do not make the allegations in these Counterclaims lightly, but they are left with no choice. Par's concerted actions with Endo have now crossed a line and have caused serious harm and damage to the Counterclaim Plaintiffs. Par has defamed Counterclaim Plaintiffs and has blatantly and unapologetically interfered with the contractual relationships that Counterclaim Plaintiffs had with their experts.

## **THE PARTIES**

6.    Defendant/Counter-Plaintiff QuVa is a Delaware corporation with its

headquarters in Sugarland, Texas.

7.   Defendant/Counter-Plaintiff Hinchen is a resident of Texas and is Chief Executive Officer of QuVa.

8.   Defendant/Counter-Plaintiff Jenkins is a resident of Texas and is Chief Development Officer of QuVa.

9.   On information and belief, Plaintiff/Counter-Defendant Par Sterile Products LLC ("Par Sterile") is a Delaware limited liability company with its headquarters in Chestnut Ridge, New York. Par Sterile is a wholly-owned, indirect subsidiary of Par Pharmaceutical Inc. In 2014, Par Pharmaceutical Inc. acquired JHP Group Holdings, Inc., which was the ultimate parent company of JHP Pharmaceuticals, LLC ("JHP"), a Delaware limited liability company that was headquartered in Parsippany, New Jersey, and changed JHP's name to Par Sterile Products LLC.

10.   On information and belief, Plaintiff/Counter-Defendant Par Pharmaceutical Inc. ("Par Pharmaceutical,") is a New York corporation with its headquarters in Chestnut Ridge, New York. Par Pharmaceutical is a wholly-owned, indirect subsidiary of Endo International plc. ("Endo").

11.   On information and belief, Par and Endo are separate and distinct entities which operate independently of each other. On information and belief, Endo has global headquarters in Dublin, Ireland and U.S. headquarters in Malvern, Pennsylvania.

## JURISDICTION AND VENUE

12. This is an action seeking legal and equitable relief for: (1) defamation; (2) violation of 42 U.S.C. § 1985; and (3) tortious interference with Counterclaim Plaintiffs' contractual and business relationships with two expert witnesses retained to testify in this action.

13. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1343(a)(1)(2)(3) and (4), 28 U.S.C. §§ 1331, and the pendent and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

14. This Court has personal jurisdiction over Counterclaim Defendants. On information and belief, Counterclaim Defendants regularly conduct business throughout the United States including within the State of New Jersey, and derive substantial revenue from its activities within the State of New Jersey. Counterclaim Defendants have also specifically directed activities to the State of New Jersey by filing the current action.

15. Venue is proper pursuant to 28 U.S.C. § 1391(b).

## BACKGROUND

16. Counterclaim Plaintiffs Stuart Hinchen and Peter Jenkins are the founders of Counterclaim Plaintiff QuVa. Prior to founding QuVa in 2015, Hinchen and Jenkins had a series of successful ventures in the pharmaceutical industry, where they developed and honed their ability to create successful and valuable businesses and workplaces where employees thrived.

17.   In 2001, Hinchen and Jenkins, while working for Mayne Group Limited, purchased a company called Faulding Pharmaceuticals, a global pharmaceutical company specializing in generic sterile pharmaceutical products and renamed it Mayne Pharma ("Mayne"). Mayne had three sterile manufacturing facilities that utilized aseptic processing techniques, which were required to comply with FDA regulations regarding current Good Manufacturing Procedures ("cGMP").

18.   Shortly after the acquisition, Mayne's plant in Australia had some significant FDA issues, including compliance with cGMP. Mayne hired a team of well-known consultants in the industry, which included Mike Rutkowski ("Rutkowski") and Donna Kohut ("Kohut"), to remedy these issues. Under Mr. Hinchen and Mr. Jenkins's management, Mayne thrived. In 2006, Mayne was sold to Hospira Pharmaceuticals and has since been acquired by Pfizer.

### THE FOUNDING AND SALE OF JHP INCLUDING A NEW DRUG APPLICATION FOR A VASOPRESSIN PRODUCT

19.   In 2007, Mr. Hinchen and Mr. Jenkins founded JHP Pharmaceuticals ("JHP") and purchased a sterile solution manufacturing facility in Rochester, Michigan from King Pharmaceuticals ("King"). Mr. Hinchen and Mr. Jenkins brought in a team of consultants to improve the quality and manufacturing processes at the facility. This team again included Mr. Rutkowski and Ms. Kohut.

20.   JHP acquired the rights to make certain products previously made by King, including a vasopressin product called Pitressin®. When JHP purchased the Rochester facility, King had been selling Pitressin® for many years.

21.   Although Pitressin® was an unapproved product at the time, JHP was permitted to sell it because the drug had existed for so long. It was first marketed long before FDA first implemented specific safety and efficacy guidelines for the approval of drug products in 1938, and it was "grandfathered" into the regulatory framework.

22.   In late 2012, pursuant to an FDA initiative to remove unapproved "grandfathered" drugs from the market, JHP filed a New Drug Application ("NDA") pursuant to 21 U.S.C. § 355(b)(2) (also known as a "505(b)(2) application") to manufacture and market an FDA-approved version of vasopressin. In doing so, JHP relied on the substantial published literature relating to vasopressin. No clinical trials were undertaken or required by the FDA for approval. JHP also developed an analytical method to measure the potency of vasopressin formulations, which was included in a publicly-available monograph prepared by the United States Pharmacopeia ("USP").

23.   On February 25, 2014, Par Pharmaceutical acquired JHP and renamed it Par Sterile.

24.   Just months after the acquisition, on April 17, 2014, the FDA approved the vasopressin NDA originally filed by JHP. With that approval, Par became the only manufacturer with an FDA-approved version of vasopressin. Even though

vasopressin had existed for many years, now that an FDA-approved version existed, all non-approved versions of the drug had to be removed from the market. Par renamed the drug Vasostrict®.

25.    At or about the same time as the approval, the FDA made portions of JHP's NDA application available to the public. This information set forth among other things, the Vasostrict® formulation, the most effective solution pH for stability, and the vial and closure information. It also indicated that the potency specifications for the product matched those in the USP monograph for vasopressin injection.

26.    At or about the date the FDA approved Par's Vasostrict® NDA, the label for Vasostrict® was also made publicly available. The label indicates that Vasostrict® must be diluted with normal saline (0.9% sodium chloride) or 5% dextrose in water (D5W) to either 0.1 units/ml or 1 unit/ml for intravenous administration to patients.

27.    Almost immediately after receiving FDA approval--and thus being granted a monopoly on the sale of Vasostrict®--Par began raising the price of Vasostrict®. Publicly-available industry data indicates that as of May 2017, Par has raised the price of Vasostrict® to about $125 per vial. This is a 6250% increase from JHP's price per vial prior to the acquisition by Par.

## THE FOUNDING AND FORMATION OF QUVA

28.    After JHP was sold to Par, Par told Mr. Hinchen and Mr. Jenkins not to come to work any longer, but to be available as necessary should questions arise. On June 6, 2014, Par terminated Mr. Jenkins without cause pursuant to section 4(c) of Mr.

Jenkins' JHP Employment Agreement. That same day, Mr. Jenkins signed a Separation Agreement and Release ("Separation Agreement") that contained a twelve month "Covenant Not to Solicit" and a twelve month "Covenant Not to Compete." The same scenario was repeated with Mr. Hinchen on June 11, 2014.

29.   Accordingly, Mr. Jenkins' Covenant Not to Solicit and Covenant Not to Compete expired on June 6, 2015, and Mr. Hinchen's Covenant Not to Solicit and Covenant Not to Compete expired on June 11, 2015.

30.   After being terminated by Par, Mr. Jenkins and Mr. Hinchen explored other potential business ventures. They ultimately developed an idea to create a pharmaceutical compounding company with enhanced adherence to cGMP, thus improving quality and safety of compounded products.

31.   That idea became QuVa, which was founded in late July 2015. To form QuVa, Mr. Hinchen and Mr. Jenkins acquired manufacturing facilities, personnel and significant know-how from Healix Infusion Therapies and Unique Pharmaceuticals Inc., both of which are registered with the FDA as outsourcing facilities pursuant to Section 503B and were cGMP-compliant at the time they were purchased. QuVa also purchased intellectual property from Ameridose, another compounding company, including products, methods for making those products, and know-how relating to outsourcing facilities. QuVa further purchased an additional facility in Bloomsbury, New Jersey in mid-2016.

32.     Since its founding, QuVa has operated as a pharmaceutical outsourcing company that manufactures and sells unapproved compounded drug products directly to healthcare providers. This venture is different from Mayne and JHP because by law, the compounded drug products that QuVa sells cannot be commercially-available approved products, and QuVa cannot sell its compounded drug products to anyone who will resell them, including pharmaceutical wholesalers.

33.     Because QuVa sells compounded drug products, QuVa's market is different from that for approved drug products and its products differ from approved drug products manufactured pursuant to an NDA or ANDA in many ways, including composition, stability, shelf-life, and methods of manufacture. Additionally, the drugs are manufactured in very different ways and thus the roles and responsibilities of QuVa employees that are involved in manufacturing compounded drugs are inherently different than the roles and responsibilities of employees involved in manufacturing drugs at a traditional pharmaceutical manufacturing company such as Par.

34.     QuVa was founded after the non-solicitation periods in the employment agreements of Mr. Jenkins and Mr. Hinchen expired. Not surprisingly given their track record of success and their ability to create a culture where employees thrive, several former Par employees were interested in employment with QuVa and to be a part of Mr. Jenkins' and Mr. Hinchen's next business success.

35.   On information and belief, in the fall of 2015 and into 2016, Par became aware that it had employees that were leaving for QuVa. And yet, at the time of their departures for QuVa, Par did not raise any issues with respect to the protection of Par's confidential information.

36.   However, upon information and belief, Par's view of QuVa began to change in and around April 2017 due to the confluence of two unrelated events.

37.   First, in late March 2017, Mr. Rutkowski resigned as General Manager of Par's Rochester facility and to join QuVa. On information and belief, Par recognized that Rutkowski had been a major contributor to the success of its manufacturing operations there.

38.   Second, on April 19, 2017, QuVa sent a letter to the FDA requesting that vasopressin be added to the FDA's "Category 1" List. Inclusion on this list by the FDA permits outsourcing companies like QuVa to prepare compounded products using bulk active ingredient, rather than a pre-formulated product, as the starting material. In response to QuVa's letter, FDA added vasopressin to the "Category 1" List in July 2017.

39.   Afraid that QuVa might threaten its monopoly by manufacturing a compounded vasopressin product, and in retaliation for hiring former Par employees, Par developed a litigation strategy intended to drive QuVa out of business and embarrass Mr. Hinchen and Mr. Jenkins as well as other former Par employees who joined QuVa.

## PAR BEGINS ITS CONCERTED EFFORTS TO EMBARRASS MR. HINCHEN AND MR. JENKINS AND DESTROY QUVA

40.     On August 14, 2017 Par commenced its litigation strategy when it filed its initial Complaint. (D.I. 1.)

41.     Par's Complaint alleges, at its core, that QuVa, Hinchen and Jenkins unlawfully solicited former Par employees and misappropriated various Par Trade Secrets relating to Vasostrict® and other vasopressin products.

42.     The initial Complaint wove a tale of conspiracy and deception spun primarily from emails, completely unrelated to vasopressin, between long-time friends Mr. Rutkowksi and Ms. Kohut who had both previously worked with Mr. Hinchen and Mr. Jenkins at Mayne and JHP.

43.     In addition to recasting Mr. Rutkowski's correspondence with Ms. Kohut in a nefarious light, Par's Complaint also contains multiple false and defamatory statements accusing QuVa, Hinchen and Jenkins of business misconduct, alleging that QuVa unlawfully solicited former Par employees and stole Par Trade Secrets in order to develop a competing product to Par's Vasostrict® product. For example, Par's false and defamatory statements include:

- "Just weeks after founding QuVa, Hinchen and Jenkins (themselves former Par Sterile executives) began a poaching campaign to hire away key employees with intimate knowledge of Par's trade secrets regarding the development, validation, regulatory approval, and market introduction of Vasostrict® and other vasopressin products." (Complaint at ¶ 1.)

- "QuVa submitted a letter to the U.S. Food and Drug Administration seeking to add vasopressin to a list of active ingredients for drug compounding which "was rife with factual misrepresentations." (Complaint at ¶ 3.)

- "QuVa is pursuing a strategy of rapid growth to become a major competitor in the sterile drug manufacturing market by, in part, poaching experienced employees of Par Sterile." (Complaint at ¶ 35.)

- "QuVa has targeted Par Sterile employees with intimate knowledge of the Trade Secrets and other confidential information regarding sterile manufacturing, Vasostrict®, and Par's other vasopressin products." (Complaint at ¶ 35.)

- "QuVa has not taken the steps necessary to prevent these former Par Sterile employees from disclosing or using Par's Trade Secrets, such as assigning the employees to positions that have no relationship with sterile manufacturing." (Complaint at ¶ 52.)

- "QuVa has used or will use Par's Trade Secrets and other confidential information to compound vasopressin products with the properties described in the nomination submitted by QuVa to the FDA on April 19, 2017, and pursuant to the FDA's July 1, 2017 addition of vasopressin to the Bulk Drug Substance List." (Complaint at ¶ 54.)

- "To overcome the[] challenges and create the pre-mixed products with the characteristics that QuVa is claiming (e.g., potency, sterility, and shelf life) within the time period in which QuVa made its representations, Par is informed and believes that QuVa necessarily has to rely on or use the information QuVa has misappropriated (as described above) and QuVa's employees' knowledge gained from Par's years of work on Vasostrict®, including confidential work regarding ways to stabilize vasopressin and increase its shelf-life in undiluted and diluted formulations." (Complaint at ¶ 55.)

- "Defendants misappropriated Par's Trade Secrets by improper means and without authorization, including by disclosing and using and/or threatening to disclose and use the Trade Secrets without Par's express or implied consent in the preparation for production of a competing vasopressin drug product." (Complaint at ¶ 61.)

- "QuVa's current and continued misappropriation of Par's Trade Secrets is willful, in bad faith, and malicious." (Complaint at ¶ 95.)

93

- "QuVa engaged in an aggressive poaching campaign of Par Sterile's key employees with actual knowledge of Par Sterile's contractual relationships with those employees and the contractual relationships' protection of Par Sterile's Trade Secrets. Legitimate hiring on the open market, without using confidential information as to which Par Sterile employees had knowledge of the Trade Secrets and other confidential information, would not have resulted in such targeting of the above-named individuals." (Complaint at ¶ 168.)

- "QuVa intended to use improper means in interfering with Par Sterile's contractual relationships with the former key employees listed above without lawful justification or legitimate reason for this interference. As a result, QuVa's tortious interference was intentional and with malice." (Complaint at ¶ 169.)

44.   Each of these allegations in the Complaint falsely accuse Counterclaim Plaintiffs of business misconduct, and upon dissemination to the public, would significantly harm the professional reputation of Counterclaim Plaintiffs.

45.   Each of these allegations in the Complaint are objectively, and demonstrably false.

46.   Each of these allegations in the Complaint were made by Par without underlying factual support for the allegations.

47.   On information and belief, Par had knowledge that each of the allegations in the Complaint were false. Par had knowledge that public dissemination of these false statements would harm the professional reputation of Counterclaim Plaintiffs, a result that Par intended.

48.   Each of these allegations in Par's Complaint are not subjective statements of opinion, but rather are false statements of fact.

94

49.   On information and belief, on or around August 2017, a member of Par's management team publicly posted a copy of the Complaint on the wall at the café in Par's Rochester, MI facility.

50.   On information and belief, on or around August 2017, a member of Par's management team further publicly distributed copies of the Complaint on tables at the café in Par's Rochester, MI facility.

51.   On information and belief, on or around August 2017, a member of Par's management team further distributed a memo summarizing the allegations of the Complaint via email to all Par employees at that time.

52.   These acts are attributable to Par, as the individual(s) who publicly disseminated the Complaint and the memo is(are) Par's agent(s).

53.   On information and belief, the Complaint was posted and distributed in a publicly accessible area of Par's Rochester facility, *i.e.*, the café.

54.   On information and belief, the café at Par's Rochester facility is regularly visited by third parties, including representatives from customers (*e.g.*, hospital representatives), agents of the FDA, and various vendors on site. On information and belief, the Complaint was plainly and clearly visible to these third parties.

55.   On information and belief, the café at Par's Rochester facility is regularly visited by current and/or former Par employees who are wholly unrelated to this lawsuit. On information and belief, the Complaint was plainly and clearly visible to these

Par employees who had no legitimate or common interest in the merits or ultimate result of the lawsuit.

56.   On information and belief, Par posted the Complaint in the café and distributed copies at the café and via email, not to achieve the objects of the litigation, but as part of its concerted effort to harm Counterclaim Plaintiffs by (1) publicizing the allegations in the Complaint, (2) embarrassing and harming the professional reputation of QuVa, Mr. Hinchen and Mr. Jenkins, and Par's former employees who left Par to join QuVa, and (3) intimidating current employees from leaving employment at Par.

57.   On information and belief, Par posted the Complaint in its café to further these unlawful objectives.

58.   On information and belief, a member of Par's management team removed the copy of the Complaint from the publicly visible display area only because a member of Par's workforce wrote comments on the face of the Complaint disputing the merits of the allegations.

59.   On information and belief, while the Complaint was displayed in Par's café, it was viewed by third-parties and/or employees of Par who had no connection to the lawsuit, causing reputational harm and damages to Counterclaim Plaintiffs.

## PAR'S EFFORTS TO HARM COUNTERCLAIM PLAINTIFFS CONTINUE

60.   Knowing that the allegations of its Complaint were weak, Par initiated an aggressive litigation strategy in the hopes of finding additional information to

96

support its claims. When, during expedited discovery, Par learned that the

Defendants did not misappropriate any Par trade secrets related to vasopressin, Par

shifted the focus of its case.

61.   Par's case is now focused on the alleged theft of "trade secrets" entirely unrelated

to vasopressin—the Environmental Monitoring ("EM") Plan and Aseptic

Processing ("APS") Plan.

62.   Although Par was able to get a preliminary injunction prohibiting QuVa from

developing vasopressin, the injunction is limited. Par knows that the EM and APS

plans do not contain information that will qualify as trade secrets and that they will

likely lose when this case is fully litigated. In an effort to prevent this from

happening, Par has now embarked on a strategy to thwart justice by intimidating

Counterclaim Plaintiffs' expert witnesses.

### PAR'S AND ENDO'S UNLAWFUL INTIMIDATION OF QUVA'S EXPERT WITNESS MR. PAMPINELLA

63.   James Pampinella ("Mr. Pampinella") is a Senior Managing Director at Ankura

Consulting Group ("Ankura") in San Francisco, California. Mr. Pampinella is an

expert on complex commercial litigation matters and has experience testifying as

an expert on damages in deposition and trials in federal and state court. Mr.

Pampinella has experience providing economic, financial and damage consulting

services on commercial litigation matters. He has specific experience in trade

secret cases, including placing values on alleged trade secret information and related damages issues.

64. Based on his significant experience and unique knowledge and skill set, Mr. Pampinella is particularly qualified to testify regarding Par's damages theories in this litigation.

65. During December 2018, Mr. Pampinella was asked if he could serve as an expert witness on behalf of Defendants in this litigation. Subsequently, Mr. Pampinella ran a conflict check, and expressly confirmed that he had no conflict that would prevent him from serving as an expert witness adverse to Par in this litigation.

66. In January 2019, Mr. Pampinella formally agreed to provide services to the Defendants as an expert witness in connection with this litigation. Mr. Pampinella executed a contract reflecting this agreement.

67. On January 23, 2019, counsel for Defendants disclosed the engagement of James Pampinella as an expert witness pursuant to paragraph 22(c) of the Discovery Confidential Order ("DCO") (D.I. 45) that the parties entered on October 10, 2017.

68. The DCO governs the procedure for the disclosure, or objection to disclosure, of Confidential or Outside Counsel Only material to technical advisors or expert witnesses.

69. Paragraph 22(c) of the DCO states the required procedure for disclosure of Confidential or Outside Counsel Only material to a Technical Advisor (also known as an expert witness). Paragraph 22(c) provides:

98

> A party desiring to disclose Confidential or Outside Counsel Only material to a Technical Advisor shall also give prior written notice of the intended disclosure by email to all counsel of record in the litigation and the producing party shall have ten business days after such notice is given to object in writing to the disclosure. The party desiring to disclose Confidential or Outside Counsel Only material to a Technical Advisor must provide the following information for each Technical Advisor: name, address, curriculum vitae, current employer, employment history for the past ten years, a listing of cases in which the witness has testified as an expert at trial or by deposition within the preceding five years, and identification of any patents or patent applications in which the Technical Advisor is identified as an inventor or applicant, is involved in prosecuting or maintaining, or has any pecuniary interest. No Confidential or Outside Counsel Only material shall be disclosed to such expert(s) or consultant(s) until after the expiration of the foregoing notice period and resolution of any objection.

70.    Defendants' disclosure of Mr. Pampinella fulfilled each of the requirements of

paragraph 22(c) of the DCO.

71.    Paragraphs 22(d)(e) and (f) of the DCO state the required procedure for objecting

to disclosure of Confidential or Outside Counsel Only material to a Technical

Advisor (or expert witness).

72.    Paragraph 22(d) of the DCO provides:

> A party objecting to disclosure of Confidential or Outside Counsel Only material to a Technical Advisor shall state with particularity the ground(s) of the objection. The objecting party's consent to the disclosure of Confidential or Outside Counsel Only material to a Technical Advisor shall not be unreasonably withheld, and its objection must be based on that, party's good faith belief that disclosure of its Confidential or Outside Counsel Only material to the Technical Advisor will result in specific business or economic harm to that party.

73.     Paragraph 22(e) of the DCO provides:

>    If after consideration of the objection, the party desiring to
>    disclose the Confidential or Outside Counsel Only material to a
>    Technical Advisor refuses to withdraw the Technical Advisor,
>    that party shall provide notice to the objecting party. Thereafter,
>    the objecting party shall move the Court, within ten business
>    days of receiving such notice, for a ruling on its objection. A
>    failure to file a motion within the ten business day period,
>    absent an agreement of the parties to the contrary or for an
>    extension of such ten business day period, shall operate as an
>    approval of disclosure of the Confidential or Outside Counsel
>    Only material to the Technical Advisor. The parties agree to
>    cooperate in good faith to shorten the time frames set forth in
>    this paragraph if necessary to abide by any discovery or briefing
>    schedules.

74.     Paragraph 22(f) of the DCO provides:

>    The objecting party shall have the burden of showing to the
>    Court "good cause" for preventing the disclosure of its
>    Confidential or Outside Counsel Only material to the Technical
>    Advisor. This "good cause" shall include a particularized
>    showing that: (1) the Confidential or Outside Counsel Only
>    material is confidential commercial information, (2) disclosure
>    of the Confidential or Outside Counsel Only material likely
>    would result in a clearly defined and serious injury to the
>    objecting party's business, (3) the proposed Technical Advisor
>    is in a position to allow the Confidential or Outside Counsel
>    Only material to be disclosed to or become known by the
>    objecting party's competitors, and (4) that the Technical
>    Advisor's access to Confidential or Outside Counsel Only
>    material may create other confidentiality or legal risks in
>    connection with other patent-related activities or interests tied
>    to the Technical Advisor.

75.     On January 28, 2019, counsel for Par objected to Defendants' retention of James

Pampinella on the basis that "Par and its parent company, Endo, have retained

10

Navigant (now Ankura) on at least four matters since 2013, all of which remain open." Specially, Par identified the following matters:

- Since 2013, Navigant has served as Endo's e-discovery vendor and settlement administrator in *In re: American Medical Systems, Inc., Pelvic Repair System Products Liability Litigation*, MDL No. 2325 (Southern District of West Virginia);

- Since 2014, Navigant has served as an e-discovery vendor for Endo, Par, and the joint defense group in *In re National Prescription Opiate Litigation*, MDL No. 2804 (Northern District of Ohio);

- Since 2015, Navigant has served as Endo's e-discovery vendor in *In re Testosterone Replacement Therapy Products Liability Litigation*, MDL No. 2545 (Northern District of Illinois); and

- Since 2018, a Navigant senior managing director has provided consulting services to the tax group at an Endo subsidiary.

76.   Par's objection failed to fulfill the requirements of the DCO (*e.g.*, paragraph 22(d)). Specifically, Par failed to state (1) the grounds for Par's objection and (2) the specific harm, business or economic, that Par would suffer if Confidential or Outside Counsel Only material was disclosed to Mr. Pampinella.

77.   On February 1, 2019, counsel for Defendants informed Par that its objection was improper and requested that Par either withdraw its objection or provide: (1) the specific business or economic harm that Par will suffer; (2) the supporting factual and legal authority and details of the harm faced by Par; (3) to the extent Par is claiming some sort of conflict of interest, the engagement letters related to the matters that cause such alleged conflicts; (4) a list of all individuals that worked on such matters; and (5) an explanation of why a conflict exists.

78.   Par did not respond and did not cure the deficiencies in its objection or provide the additional information Defendants' counsel requested.

79.   On information and belief, representatives from Par, in collaboration with representatives from Endo, conspired to prevent Mr. Pampinella from testifying as an expert witness for Defendants by intimidation and/or threat.

80.   On information and belief, a representative from Par and/or Endo contacted Mr. Pampinella's employer, Ankura.

81.   On information and belief, the representative from Par and/or Endo threatened Ankura and Mr. Pampinella, informing them that if Mr. Pampinella did not withdraw from this litigation that they would place economic pressure on Ankura and Navigant by withdrawing ongoing and future work, regardless of whether the services had any connection to the current litigation.

82.   On information and belief, the threats from Endo were performed at the direction of, and for the benefit of Par. On information and belief, Par was substantially involved with the decision to threaten Ankura and Mr. Pampinella, as well as the conversations held with Ankura and Mr. Pampinella.

83.   On February 11, 2019, Ankura informed Defendants' counsel that Mr. Pampinella was withdrawing from the litigation.

84.   The sole reason Ankura terminated its contract with Counterclaim Plaintiffs was the unlawful threat from Par and/or Endo.

85.   Par has no good faith belief that disclosure of its Confidential or Outside Counsel Only material to Mr. Pampinella will result in a business or economic harm to Par or Endo.

86.   Rather, Par and Endo conspired to deter Mr. Pampinella from testifying by threat and/or intimidation, in order to: (1) obtain a litigation advantage with respect to Par's claims by excluding a highly qualified expert witness, and (2) increase the costs of this litigation for Counterclaim Plaintiffs.

87.   Objectively, there is no potential business or economic harm that could be caused by disclosure of Par's Confidential or Outside Counsel Only material to Mr. Pampinella.

88.   Contrary to Par's allegation in its counsel's January 28, 2019 letter, Navigant Consulting, Inc. ("Navigant") and Ankura are not the same company. Rather, in or around August 2018, Navigant Consulting, Inc. ("Navigant") agreed to sell its disputes, forensics and legal technology segment and its transaction advisory services practice to Ankura. Mr. Pampinella and his team do not currently work at Navigant.

89.   On information and belief, Mr. Pampinella and his team (1) did not work on any of the four matters identified by Par, (2) did not have access to any information related to the four matters identified by Par, and (3) did not have any communications with any Navigant or Ankura personnel involved with such matters regarding those matters.

10

90.   On information and belief, none of the four matters identified by Par involve the parties to this Action, *i.e.*, Par Sterile and Par Pharmaceutical.

91.   On information and belief, the first three matters identified by Par are simply e-discovery and hosting assignments where the e-discovery practice at Navigant simply collected data, without rendering opinions or providing independent analyses.

92.   E-discovery related projects do not present conflicts with other services provided by Navigant and/or Ankura.

93.   On information and belief, Navigant's engagement letters, including its engagement letters with Endo and/or any Endo subsidiary, explicitly state that e-discovery related projects do not conflict the firm from providing other services.

94.   Counterclaim Plaintiffs expended significant time and costs obtaining Mr. Pampinella as an expert witness in this litigation. Counterclaim Plaintiffs will expend further significant time and costs obtaining another expert witness to replace Mr. Pampinella in this litigation.

95.   Because Mr. Pampinella is uniquely qualified to testify regarding Par's allegations in this lawsuit, Counterclaim Plaintiffs will be specifically harmed by Par's and Endo's conspiracy to prevent Mr. Pampinella from testifying.

96.   Counterclaim Plaintiffs' defense to Par's damages theories has been diminished by the loss of a highly qualified expert witness with favorable case opinions as a direct result of the intentional interference of Par and its agents.

## PAR'S AND ENDO'S UNLAWFUL INTIMIDATION OF QUVA'S EXPERT WITNESS MR. BRADSHAW

97. Sheldon Bradshaw ("Mr. Bradshaw") is a partner at King & Spalding LLP and a member of the firm's FDA and Life Sciences practice. Mr. Bradshaw served as Chief Counsel at the U.S. Food and Drug Administration (FDA) from 2005 to 2007. Mr. Bradshaw has significant experience as an expert witness in complex litigations, including litigations concerning drug products and FDA regulations.

98. Based on his significant experience and unique knowledge and skill set, Mr. Bradshaw is particularly qualified to testify regarding the lack of merit of Par's claims in this litigation.

99. During December 2018, Mr. Bradshaw was asked if he could serve as an expert witness for Defendants in this litigation. Subsequently, Mr. Bradshaw ran a conflict check, and expressly confirmed that he had no conflict with testifying as an expert witness adverse to Par.

100. During January 2019, Mr. Bradshaw formally agreed to provide services for Defendants as an expert witness in connection with this litigation. Mr. Bradshaw sent Defendants' counsel an engagement letter reflecting this agreement, which Defendants' counsel signed and returned to Mr. Bradshaw.

101. On January 31, 2019, counsel for Defendants disclosed the engagement of Sheldon Bradshaw as an expert witness pursuant to paragraph 22(c) of the DCO. Pursuant

to this email, QuVa fulfilled each of the requirements under paragraph 22(c) of the DCO.

102.  On February 1, 2019, counsel for Par Sterile and Par Pharmaceutical objected to Defendants' retention of Sheldon Bradshaw on the basis that "King & Spalding has served as counsel for Par's parent company, Endo, for several years, including engagements that are current and ongoing."

103.  Par failed to fulfill the requirements of the DCO (*e.g.*, paragraph 22(d)) for objecting to disclosure of Confidential or Outside Counsel Only material to a technical advisor or expert witness. For example, Par failed to state (1) the grounds for Par's objection and (2) the specific harm, business or economic, that Par would suffer if Confidential or Outside Counsel Only material was disclosed to Mr. Bradshaw.

104.  On February 1, 2019, counsel for Counterclaim Plaintiffs informed Par that its objection was improper and requested that Par provide a list of the engagements to which they were referring, and a list of engagements where King & Spalding has been, or is currently, adverse to Par or Endo. Counterclaim Plaintiffs further requested that Par specify the alleged "specific business or economic harm to" Par from their retention of Mr. Bradshaw.

105.  In response, Par did not cure the deficiencies in its objection or provide the additional information requested by Counterclaim Plaintiffs.

106.   On information and belief, representatives from Par and representatives from Endo

conspired to prevent Mr. Bradshaw from testifying as an expert witness for

Defendants by intimidation and/or threat.

107.   ██████████████████████████████████████████████████

██████████████████████████

108.   ██████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

109.   ████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

█████████████████

110.   On February 11, 2019, the same exact day that Ankura terminated its relationship

with Counterclaim Plaintiffs, Mr. Bradshaw informed Counterclaim Plaintiffs that

he was withdrawing from the litigation.

111. █████████████████████████████████████

████████████████████████████████████████

████████████████████████████

112. On information and belief, Par and Endo have no good faith belief that disclosure of its Confidential or Outside Counsel Only material to Mr. Bradshaw will result in a business or economic harm to Par or Endo.

113. Rather, on information and belief, Par and Endo conspired to deter Mr. Bradshaw from testifying by threat and/or intimidation, in order to (1) obtain a litigation advantage with respect to Par's claims by excluding a highly qualified expert witness, and (2) increase the costs of this litigation for Counterclaim Plaintiffs.

114. Objectively, there is no potential business or economic harm that could be caused by disclosure of Par's Confidential or Outside Counsel Only material to Mr. Bradshaw.

115. Counterclaim Plaintiffs expended significant time and costs obtaining Mr. Bradshaw as an expert witness in this litigation. Counterclaim Plaintiffs will expend significant time and costs obtaining another expert witness to replace Mr. Bradshaw in this litigation.

116. Because Mr. Bradshaw is uniquely qualified to testify regarding Par's baseless allegations in this lawsuit, Counterclaim Plaintiffs will be specifically harmed by Par's and Endo's conspiracy to prevent Mr. Bradshaw from testifying.

117.   Counterclaim Plaintiffs have had their case diminished by the loss of a highly qualified expert witness with favorable case opinions as a direct result of the intentional interference of Par and its agents.

## COUNT 1: PAR'S PUBLIC DISSEMINATION OF FALSE DEFAMATORY STATEMENTS REGARDING DEFENDANTS

118.   Counterclaim Plaintiffs incorporate all previous allegations by reference.

119.   Par made many false and defamatory statements about Counterclaim Plaintiffs in the Complaint, accusing them of business misconduct, including (a) trade secret misappropriation and (b) breach of non-solicitation and confidentiality provisions in contracts, which statements Par knows to be false.

120.   There was no factual basis for these statements.

121.   Par communicated these false and defamatory statements to third parties. Par publicly displayed a copy of the Complaint at the café in Par's Rochester, MI facility and further distributed copies of the Complaint on tables at the café. The copies were posted and/or distributed by a member or members of Par's management team on behalf of Par and this action is thus attributable to Par. A member of Par's management team further distributed a memo on behalf of Par summarizing these false and defamatory statements to all employees at Par via email.

122. This purposeful dissemination of the defamatory allegations in the Complaint via posting and distribution at the café and further distribution via email is not subject to any applicable privilege, including the litigation privilege.

123. The false and defamatory statements made by and on behalf of Par concern the professional and business reputation and character of Counterclaim Plaintiffs and were made maliciously and with intent to destroy the professional reputation and business of Counterclaim Plaintiffs. Par's defamatory statements were malicious, reckless, and/or negligently made.

124. As a direct and proximate result of Par's conduct, Counterclaim Plaintiffs have incurred damages including but not limited to, loss of reputation. These false statements harm QuVa's reputation as a pharmaceutical compounding company and place QuVa in false light. They also harm Mr. Hinchen's and Mr. Jenkin's reputation in the business community and place them in false light. These false statements seek to preclude Counterclaim Plaintiffs from obtaining business from customers (such as hospitals) as well as funding from third party investors.

125. These statements made by Par were defamatory *per se*. In the alternative, to the extent the Court finds these statements were not defamatory *per se*, these statements were defamatory because they falsely accuse Counterclaim Plaintiffs of business misconduct and related allegations and were intended to severely harm the reputation of Counterclaim Plaintiffs.

11

## COUNT 2: PAR'S VIOLATION OF 42 U.S.C. §1985(2)

126.   Counterclaim Plaintiffs incorporate all previous allegations by reference.

127.   42 U.S.C. §1985(2) is captioned "Obstructing justice; intimidating party, witness, or juror" and states:

> If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.

128.   Par violated 42 U.S.C. §1985(2) by conspiring with Endo for the purpose of deterring Mr. Pampinella from testifying in this litigation as an expert witness for Counterclaim Plaintiffs by intimidation and/or threat.

129.   As a direct and proximate result of Par's actions, Counterclaim Plaintiffs have suffered damages, including: (1) the time and costs associated with retention of Mr. Pampinella, (2) the time and costs associated with retention of an expert witness to replace Mr. Pampinella, and (3) the deprivation of Counterclaim Plaintiffs' right to hire a highly qualified expert witness such as Mr. Pampinella,

11

impacting Counterclaim Plaintiffs' ability to defend themselves in response to Par's allegations.

130. Par also violated 42 U.S.C. §1985(2) by conspiring with Endo for the purpose of deterring Mr. Bradshaw from testifying in this litigation as an expert witness for Counterclaim Plaintiffs by intimidation and/or threat.

131. As a direct and proximate result of Par's actions, Counterclaim Plaintiffs have suffered damages, including: (1) the time and costs associated with retention of Mr. Bradshaw, (2) the time and costs associated with retention of an expert witness to replace Mr. Bradshaw, and (3) the deprivation of Defendants' right to hire a highly qualified expert witness such as Mr. Bradshaw, impacting Defendants' ability to defend themselves in response to Par's allegations.

## COUNT 3: PAR'S TORTIOUS INTERFERENCE WITH DEFENDANTS' CONTRACTS WITH EXPERT WITNESSES

132. Counterclaim Plaintiffs incorporate all previous allegations by reference.

133. Par has tortiously interfered with Defendants' contractual relationship with Mr. Pampinella.

134. Defendants had an existing and valid contract with Mr. Pampinella, wherein Mr. Pampinella agreed to provide testimony as an expert witness on behalf of Defendants. Par knew or should have known about the contractual relationship between Defendants and Mr. Pampinella.

11

135.   Par has tortiously interfered with Defendants' contractual relationship with Mr. Pampinella by encouraging and causing Mr. Pampinella to withdraw from his contractual obligations to Defendants.

136.   Par acted without privilege or justification in interfering with Defendants' contractual relationship with Mr. Pampinella.

137.   Par's interference with Defendants' contractual relationship with Mr. Pampinella was willful and wanton and has been carried out with a specific intent to injure Defendants in the conduct of their business and defense of this lawsuit.

138.   Defendants have suffered, and will continue to suffer, substantial and irreparable damage as a result of Par's tortious conduct with regard to Defendants' agreement with Mr. Pampinella.

139.   Par has also tortiously interfered with Defendants' contractual relationship with Mr. Bradshaw.

140.   Defendants had an existing and valid contract with Mr. Bradshaw, wherein Mr. Bradshaw agreed to provide testimony as an expert witness on behalf of Defendants. Par knew or should have known about the contractual relationship between Defendants and Mr. Bradshaw.

141.   Par has tortiously interfered with Defendants' contractual relationship with Mr. Bradshaw by encouraging and causing Mr. Bradshaw to withdraw from his contractual obligations to Defendants.

11

142.   Par acted without privilege or justification in interfering with Defendants'
       contractual relationship with Mr. Bradshaw.

143.   Par's interference with Defendants' contractual relationship with Mr. Bradshaw
       was willful and wanton and has been carried out with a specific intent to injure
       Defendants in the conduct of their business and defense of this lawsuit.

144.   Defendants have suffered, and will continue to suffer, substantial and irreparable
       damage as a result of Par's tortious conduct with regard to Defendants' agreement
       with Mr. Bradshaw.

## COUNT 4: PAR'S TORTIOUS INTERFERENCE WITH DEFENDANTS' PROSPECTIVE BUSINESS RELATIONSHIPS WITH EXPERT WITNESSES

145.   Counterclaim Plaintiffs incorporate all previous allegations by reference.

146.   Par has tortiously interfered with Defendants' business relationship with Mr.
       Pampinella.

147.   Defendants had an existing business relationship with Mr. Pampinella, wherein Mr.
       Pampinella agreed to provide testimony as an expert witness on behalf of
       Defendants. Par knew or should have known about the business relationship
       between Defendants and Mr. Pampinella.

148.   Par has tortiously interfered with Defendants' business relationship with Mr.
       Pampinella by encouraging and causing Mr. Pampinella to withdraw from his
       agreed upon obligations to Defendants.

149. Par acted without privilege or justification in interfering with Defendants' business relationship with Mr. Pampinella.

150. Par's interference with Defendants' business relationship with Mr. Pampinella was willful and wanton and has been carried out with a specific intent to injure Defendants in the conduct of their business and defense of this lawsuit.

151. Defendants have suffered, and will continue to suffer, substantial and irreparable damage as a result of Par's tortious conduct with regard to Defendants' business relationship with Mr. Pampinella.

152. Par has also tortiously interfered with Defendants' business relationship with Mr. Bradshaw.

153. Defendants had an existing business relationship with Mr. Bradshaw, wherein Mr. Bradshaw agreed to provide testimony as an expert witness on behalf of Defendants. Par knew or should have known about the business relationship between Defendants and Mr. Bradshaw.

154. Par has tortiously interfered with Defendants' business relationship with Mr. Bradshaw by encouraging and causing Mr. Bradshaw to withdraw from his agreed upon obligations to Defendants.

155. Par acted without privilege or justification in interfering with Defendants' business relationship with Mr. Bradshaw.

156. Par's interference with Defendants' business relationship with Mr. Bradshaw was willful and wanton and has been carried out with a specific intent to injure Defendants in the conduct of their business and defense of this lawsuit.

157. Defendants have suffered, and will continue to suffer, substantial and irreparable damage as a result of Par's tortious conduct with regard to Defendants' business relationship with Mr. Bradshaw.

## **PRAYER FOR RELIEF**

Wherefore, Counterclaim Plaintiffs request that judgment be entered in their favor and against Par as follows:

A.   An award of compensatory damages for Par's defamation of Counterclaim Plaintiffs.

B.    An award of compensatory damages for Par's tortious interference and conspiracy to intimidate and preclude Counterclaim Plaintiffs' expert witnesses;

C.   Incidental and consequential damages as permitted by law;

D.   An award of exemplary and punitive damages against Par for the malicious, reckless and unjustified defamatory statements it publicly disseminated regarding Counterclaim Plaintiffs.

E.   An award of exemplary and punitive damages against Par for Par's tortious interference and conspiracy to intimidate and preclude Counterclaim Plaintiffs' expert witnesses.

11

F.    A declaration that this is an exceptional case;

G.    A declaration that Counterclaim Plaintiffs are entitled to their fees, costs, and expenses in this action pursuant to Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b)(3)(D) and any other applicable statute, and awarding such fees, costs, and expenses;

H.    Attorneys' fees and costs; and

I.    Such other legal and equitable relief as may be just and proper under the circumstances.

Dated: February 27, 2019

<u>s/Stephen M. Orlofsky</u>
Stephen M. Orlofsky
David C. Kistler
New Jersey Resident Partners
Leigh Ann Buziak
**BLANK ROME LLP**
300 Carnegie Center, Suite 220
Princeton, NJ 08540
Telephone: (609) 750-7700
Facsimile: (609) 750-7701
Orlofsky@BlankRome.com
Kistler@BlankRome.com
LBuziak@BlankRome.com

Jeffrey S. Ward
Wendy M. Ward
**GREEN, GRIFFITH &
BORG-BREEN LLP**
8383 Greenway Blvd., Suite 600
Middleton, WI  53562
Telephone: (312) 883-8060
JWard@GreenGriffith.com
WWard@GreenGriffith.com

Emer Simic

11

**GREEN, GRIFFITH &
BORG-BREEN LLP**
676 North Michigan Avenue,
Suite 3900
Chicago, IL 60611
Telephone: (312) 883-8017
ESimic@GreenGriffith.com

*Attorneys for the QuVa Defendants*

11